UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-cv-21724-BLOOM/MCALILEY

HAVANA DOCKS CORPORATION,

    Plaintiff,

v.

CARNIVAL CORPORATION,

    Defendant.
_____/

# ORDER GRANTING IN PART PLAINTIFF'S MOTION TO COMPEL EVIDENCE WITHHELD UNDER THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE

Plaintiff, Havana Docks Corporation, filed a motion to compel Defendant, Carnival Corporation, to produce eleven documents that are a series of emails, that include some attachments.[1] (ECF Nos. 234; 239).[2] The parties put those emails into two groups: "Talking Points" (eight emails) and "Other Lobbying Communications" (three emails). (*Id.*). Carnival withholds the emails, which are responsive to discovery requests Plaintiff issued, as protected attorney-client communications and/or work product. (Privilege Logs, ECF Nos. 239-8; 239-9).[3] Carnival filed a response to Havana Docks' motion, and Havana

---

[1] The parties resolved by agreement all other issues in Havana Docks' motion.

[2] The motion Havana Docks filed at ECF No. 239 is a sealed, unredacted version of ECF No. 234.

[3] The eleven emails appear redundantly on Carnival's privilege logs, presumably because some of the same emails were collected at Carnival from different custodians.

1

Docks filed a reply. (ECF Nos. 241; 245; 256; 259).[4] The Honorable Beth Bloom referred the motion to me. (ECF No. 80).

I reviewed the eleven documents *in camera* and on June 14, 2021, I heard oral argument.[5] For the reasons that follow, I grant Havana Docks' motion in part.

**I.     Background**

Havana Docks sues Carnival pursuant to 22 U.S.C. § 6082 – the Helms-Burton Act, also known as the LIBERTAD Act (here, "the Act") – in connection with Carnival's use in recent years of docks in the Port of Havana to embark and disembark passengers on Carnival's cruise ships. The Cuban government confiscated that property in 1960 without payment of compensation, and Havana Docks thereafter acquired a certified claim to the property. The Act creates a private right of action in favor of any United States national who owns a claim to property confiscated by the Cuban Government, against any person who "traffics" in that property. 22 U.S.C. § 6082(a)(1)(A). Havana Docks claims that Carnival's use of the docks amounts to trafficking in commercial real property in violation of the Act and that it is entitled to recover damages. *See generally* (Second Am. Compl., ECF No. 149).

The Act defines trafficking as "knowingly and intentionally…engag[ing] in a commercial activity using or otherwise benefiting from confiscated property...." 22 U.S.C. § 6023(13). The Act excludes from that definition use of the property that is "incident to

---

[4] The response Carnival filed at ECF No. 245 is a sealed, unredacted version of ECF No. 241. The reply Havana Docks filed at ECF No. 259 is a sealed, unredacted version of ECF No. 256.

[5] A transcript of that hearing is filed at ECF No. 275.

lawful travel to Cuba...." 22 U.S.C. § 6023(13)(B)(iii). The Act, however, does not define lawful travel. *See* 22 U.S.C. § 6023. Carnival asserts a lawful travel affirmative defense, and the parties have engaged in discovery pertinent to this defense.

The Act also includes a provision that authorizes the President to suspend its effective date. 22 U.S.C. § 6085(b). Shortly after its enactment in 1996, the President invoked that provision, and the right to bring suit under the Act remained suspended until May 2, 2019, when the suspension was lifted. *See* (ECF No. 124 at 3). That same day, Havana Docks filed this suit, and companion suits against other cruise lines that made similar use of the Havana port facilities.

In the months leading up to this lawsuit, both parties understood that the suspension of Plaintiff's right to file suit might be lifted. Both parties worked with counsel, in the anticipation of possible litigation, and both lobbied representatives of the United States government, seeking protection of their respective interests. The emails at issue here are a series of back-and-forth written discussions among Carnival officers and employees about Carnival's efforts to persuade officials within the executive and legislative branches of the federal government to do two things: first, urge the President to not lift the lawsuit suspension, and second, clarify that Carnival's use of the port in Havana was lawful travel under the Act. Carnival's General Counsel, Arnaldo Perez, is included in all emails and these company employees and officers are included in some or all emails:

- Tandy Bondi, Vice President of Public Affairs;
- Micky Arison, Chair of Board of Directors;
- Arnold Donald, President and CEO;

3

- Roger Frizzell, Chief Communications Officer; and

- Emanuel Colina, paralegal in Carnival's legal department.

In its motion, Havana Docks argues that the documents are not protected work product because they were not made in anticipation of litigation; rather, the emails were exchanged in preparation for, and as part of, Carnival's lobbying efforts. (ECF No. 239 at 9-12). Havana Docks also argues that the documents are not protected attorney-client communications because Carnival made the communications for the purpose of securing business advice (*i.e.*, for lobbying), not legal advice. (*Id.*).

## II. Analysis

### A. Work product

Carnival asserts that four of the "Talking Points" documents are protected work product.[6] It has failed to support that claim.

I turn first to the principles that underlie the work product doctrine. The purpose behind the doctrine is to allow attorneys to make careful and thoughtful preparation for litigation, without fear that their adversaries will unfairly benefit from their efforts. *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947). The doctrine, which is codified in the Federal Rules of Civil Procedure, offers qualified protection for (1) documents or tangible things, (2) prepared in anticipation of litigation, and (3) by or for a party, or for his or her representatives. Fed. R. Civ. P. 26(b)(3)(A).

---

[6] They are Bates numbered PRIV_0000542, PRIV_0000543, PRIV_0002326 and PRIV_0002328.

As with other evidentiary privileges, a party that invokes the work product doctrine has the burden to prove its applicability. *Johnson v. Gross*, 611 F. App'x 544, 547 (11th Cir. 2015) (citation omitted). Specifically, that party must establish each of its elements. To accomplish this, the party may need to provide the Court evidence, via sworn statements, of facts that demonstrate the existence of the privilege. *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 639 (S.D. Fla. 2011). The proponent has this obligation because evidentiary privileges are "not lightly created nor expansively construed, for they are in derogation of the search for the truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974). Because privilege "serves to obscure the truth ... it should be construed as narrowly as is consistent with its purpose." *United States v. Noriega*, 917 F.2d 1543, 1551 (11th Cir. 1990) (quoting *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987)). The burden, therefore, is clearly on Carnival here, to establish each element of the work product doctrine.

Courts look to the "reason or purpose" behind the creation of the claimed work product, to determine whether it was prepared in anticipation of litigation. *Diamond Resorts U.S. Collection Dev., LLC v. US Consumer Attorneys, P.A.*, No. 18-cv-80311, 2021 WL 505122, at *7 (S.D. Fla. Feb. 11, 2021) (citation omitted). In particular, Carnival must establish that the "primary motivating purpose" behind the creation of the documents was to aid in possible future litigation. *Bridgewater*, 286 F.R.D. at 641-44 (quoting *United*

*States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981))[7]; *see also Diamond Resorts*, 2021 WL 505122, at *7. If documents are prepared for a business purpose, or for some other non-litigation purpose, they plainly fall outside the protection of the work product doctrine. *Bridgewater*, 286 F.R.D. at 641.

As noted, I reviewed the emails *in camera*. In them, Carnival's principals develop arguments Carnival would make to urge government officials to not lift the suspension of the Act and to define lawful travel favorably to Carnival. One argument was that Carnival might be sued if the President lifted the suspension of the Act, at great cost to Carnival and to many Cuban entrepreneurs who found gainful employment related to Carnival's use of the ports. From this it is evident that Carnival was lobbying, at least in significant part, because of its concern that it would be sued. Carnival argues that its anticipation of this litigation was the primary purpose for these communications, and Havana Docks argues that the primary purpose of the communications was to support Carnival's lobbying efforts.

In sorting this out, I am guided by the purpose of the work product doctrine *i.e.*, to allow attorneys to prepare for litigation without fear that their adversaries will unfairly benefit from their efforts. *Hickman*, 329 U.S. at 510–11. Here, disclosure of the emails reveals how Carnival went about making their case to government officials; not how they prepared to defend a potential lawsuit. Moreover, a straightforward application of the

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

phrase "primary motivating purpose", easily leads to the conclusion that the primary purpose of these emails was for Carnival to be effective in its lobbying efforts.

Carnival provides no affidavit or other evidence to prove otherwise.[8] At oral argument Carnival's counsel all but acknowledged that it had not met its burden of proof, when she credibly recognized that Carnival's "stronger" argument was that the emails are protected by the attorney-client privilege. (ECF No. 275 at 12-13).

In sum, I find that Carnival did not establish that the emails are protected by the work product doctrine.

### B. Attorney-client privilege

Carnival asserts the attorney-client privilege for all emails. It is Carnival's stronger argument, but one that Carnival mostly fails to support.

The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients ...." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). It thus protects: (1) communications, (2) made between an attorney and client, (3) in confidence, and (4) for the purpose of obtaining or providing legal advice for the client. *See Diamond Resorts*, 2021 WL 505122, at *4 (citations omitted). As explained earlier, Carnival has the burden to prove the applicability of the privilege it claims. *See United States v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir. 1991) (citation omitted).

---

[8] Carnival did provide an affidavit of its general counsel, Arnaldo Perez, with its response memorandum, but it solely addressed a different privilege challenge that Havana Docks made in its motion, that the parties amicably resolved after this matter was fully briefed. *See* (ECF No. 245-2).

As a general proposition, when a corporation communicates with outside counsel, it is often easier for it to show that it did so for legal advice. *United States v. Davita, Inc.*, 301 F.R.D. 676, 682 (N.D. Ga. 2017) (citation omitted). The reason for communications between corporate employees and their in-house counsel, however, can be more difficult to discern. This is because corporate counsel typically have responsibilities beyond providing legal counsel. "[M]odern corporate counsel have become involved in all facets of the enterprises for which they work … [they might] participate[] in and render[] decisions about business, technical, scientific, public relations, and advertising issues, as well as purely legal issues." *In re Vioxx Products Liab. Litig.*, 501 F. Supp. 2d 789, 797 (E.D. La. 2007). "In addition, because they are part of a word crafting profession, more often than not, they are excellent writers and editors", whose advice is sought in this regard. *Id.* at 798.

When a corporation claims attorney-client privilege for its communications with its in-house counsel, courts expect the company to demonstrate that the primary purpose for the communication was legal advice. *Id.*; *Davita, Inc.*, 301 F.R.D. at 682; *United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 09-cv-1002, 2012 WL 5415108, at *4 (M.D. Fla. Nov. 6, 2012); *Pearlstein v. BlackBerry Ltd.*, No. 13-CV-07060, 2019 WL 1259382, at *4 (S.D.N.Y Mar. 19, 2019) ("[I]n light of the two hats often worn by in-house lawyers, communications between a corporation's employees and its in-house counsel though subject to the attorney-client privilege must be scrutinized carefully to determine whether the predominant purpose of the communication was to convey business advice and information or, alternatively, to obtain or provide legal advice."). The nature of email

has complicated this task; email "has made it so convenient to copy legal counsel on every communication that might be seen as having some legal significance at some time, regardless of whether it is ripe for legal analysis." *Vioxx*, 501 F. Supp. 2d at 798.

Here, the email chains were initiated by Tandy Bondi, Carnival's Vice-President of Public Affairs and, while the General Counsel, Perez, is included in each email, so are multiple others. The simple inclusion of an attorney on an email, without more, does not make that communication attorney-client privileged. In none of the emails does Bondi, or others, expressly ask Perez for his legal advice. Nor does Perez state that he is providing legal advice, although he does label one of his emails "ATTORNEY CLIENT PRIVILEGED COMMUNICATION." Perez does address legal and non-legal subjects. In response to some emails, Perez writes nothing.

As noted above, the clear purpose of these communications was to reach agreement on how Carnival would try to persuade federal government officials to not lift the suspension of the effective date of the Act, and/or to take steps to favorably, for Carnival, define lawful travel. If, in fact, Bondi's primary purpose in sending her emails was to secure legal advice from Perez, then a declaration from her specific to her emails, that provided background information and context, may have illuminated the record. A similar particularized declaration from Perez, or perhaps others, might have done the same. Carnival, however, provided no such evidence, and thus the Court is left to simply read the emails and do its best to determine where legal advice was the primary purpose for a communication.

"The Court should not have to guess or speculate about the applicability of the privilege, for the party asserting it has the affirmative duty to demonstrate that it applies to each document or communication sought to be disclosed." *Wyndham Vacation Ownership, Inc. v. Reed Hein & Assocs., LLC*, No. 18-cv-2171, 2019 WL 9091666, at *7 (M.D. Fla. Dec. 9, 2019) (citation omitted). But, in large part, that is what I was left to do.

### i. The Talking Points

Carnival's Bates number PRIV_0002326 is a string of six emails exchanged over three days in March 2019. The emails begin, chronologically, at the bottom of the document, and for my purposes I start there, and number the messages in chronological order.

Bondi sent the first email – dated March 15, 2019, 10:28 a.m. – to Perez and Frizzell and copied paralegal Colina. She attached draft talking points prepared for Arison, Chairman of the Board, for his use when speaking to the executive branch, and Bondi writes that she "[w]elcome[s] any changes you might have." The talking points provide brief information about Carnival's business in Cuba and why it supports democracy and private entrepreneurship there, Carnival's concern that if the Act becomes effective, Carnival may be exposed to an enormous claim for damages, and Carnival's request for clarification about the scope of lawful travel under the Act.

The Court cannot conclude that the primary purpose of this email is to solicit legal advice from Perez. The email is written to both the General Counsel and the Chief Communications Officer and solicited both of their comments. And its express purpose was to invite their input for a lobbying presentation.

Less than 30 minutes later, at 10:55 a.m., Perez responded with the second email, addressed to Bondi and Frizzell, and copied to Colina. He asked a question and made two suggestions that are at the intersection of legal and business concerns, that includes a suggestion that examples be provided to illustrate an argument.[9] Perez suggests that paralegal Colina pull some data to support that illustration. The Court concludes that Perez offers a mix of legal, business, advocacy, and lobbying advice. It cannot declare, with any certainty, that his primary goal was to give legal advice.

Bondi responds about twenty minutes later, at 11:14 a.m., to Perez and Frizzell, again copying Colina. She advises that she will follow-up on Perez's advice and will respond to his inquiry and explains how she came up with a number for Carnival's possible damages exposure if it were sued under the Act. This, and Perez's prior email, include the most discussion of legal issues in this string of communications. It is fair to describe some of Perez's comments as legal advice. Yet, as before, it is not clear from these emails, standing alone, that the primary purpose of these multi-party communications was the solicitation and offering of legal advice.

The following two emails (emails four and five), both sent the same day by Colina, at 11:17 a.m. and 5:59 p.m., respectively, plainly are not attorney-client privileged. Colina provides data regarding monies Carnival has spent on shore operators in Cuba. Carnival argues that since this information comes from a paralegal, at the suggestion of the company's General Counsel, that this is covered by that privilege. Carnival is correct that

---

[9] Lawyers are often skilled advocates, about both legal and nonlegal matters. This is plainly so for Perez.

paralegals can provide information to a client that is covered by the attorney-client privilege. *See, e.g.*, *In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 834 (S.D. Fla. 2016). But, to be so, the information must be provided in the context of a privileged communication. Here, Colina is following-up on Perez's suggestion that certain business information would nicely illustrate one of Carnival's arguments, which the Court does not view as legal advice.

Carnival has also failed to show that the last email is an attorney-client privileged communication. Bondi sent it two days later, on March 18, 2019 at 8:42 a.m., to Colina, Perez and Frizzell. She attached revised talking points and wrote "let me know if you have any further edits." Carnival argues that Bondi was seeking Perez's "feedback and advice on changes she has made to certain content based on Mr. Perez's legal advice." (ECF No. 245 at 12). Yet, Bondi does not single out Perez or ask for legal advice, rather she writes three individuals all of whom have different roles in shaping the lobbying message. Moreover, the changes in this draft, compared to the first draft, are not, on their face, the result of legal advice.

Bondi wrote two other emails that fall into this "Talking Points" group. Carnival argues that both are attorney-client privileged "because they contain draft communications prepared in part by Mr. Perez, and upon which Mr. Perez gave legal advice." (ECF No. 245 at 14) (emphasis deleted).

Bondi sent the first two days later, on March 20, 2019, at 11:29 a.m., to Arison, Chairman of the Board, copied to Perez, Frizzell, and Iris Vega, Arison's Executive

Assistant.[10] Bondi advises Arison of a phone call and adds: "Below are the talking points [for the call] Arnie and I prepared. Please let me know if you need any additional information…."

The attached talking points are identical to those Bondi sent in the prior email, except for a change to one digit of a number. Although Perez, in the second email mentioned above, asked a question about that number, from the information the Court has, it is not clear that this numerical change was deliberate, much less that it was the result of legal advice. Although Bondi writes that she and Perez "prepared" the talking points, the Court's knowledge of Perez's role in the preparation of that document is confined to what is in the prior six emails, which as the Court has explained, is a mix of Perez's thoughts on legal and non-legal matters. Here again, and for the reasons already given, the record does not support a finding that Bondi's primary purpose in conveying this information was to send Arison, and the others copied, Perez's legal advice.

Bondi sent the final email in this group to Arison nearly a month later, on April 16, 2019, at 5:30 p.m.[11] Here she copies Frizzell, Perez, Colina and Vega. She advises Arison of another telephone call and attaches similar proposed talking points for that call. For the reasons already stated, I find that Carnival has not shown that the primary purpose of this communication was the transmission of legal advice.

---

[10] This is Bates numbered PRIV_0000617.

[11] This is Bates numbered PRIV_0000618.

13

In sum, the Court overrules Carnival's objection to producing these documents to Havana Docks as it finds that Carnival has not carried its burden to establish that the documents are protected by the attorney-client privilege, and it therefore orders Carnival to produce the "Talking Points" emails.

### ii. Other Lobbying Communications

The "Other Lobbying Communications" are all found in one document, at Bates number PRIV_0002380.[12] It is a string of eight emails sent over two days, in January 2019. Again, Bondi initiates the communications. As before, she writes to Arison, Perez and Frizzell, but now includes Arnold Donald, President and CEO.[13]

In her first email, sent January 18, 2019, at 9:31 a.m., Bondi sets out a proposed strategy to persuade the President to not lift the suspension of the Act and adds that she is "available to discuss these recommendations".[14] Without doubt, the primary purpose of this communication is the development of a lobbying strategy, and I overrule Carnival's privilege objection to producing it in discovery.

Perez sends the second email that same day, at 3:14 p.m., to all those on Bondi's first email. He first writes "ATTORNEY CLIENT PRIVILEGED COMMUNICATION" and then proceeds to write what is plainly legal advice about the Act and about an argument

---

[12] These emails also redundantly appear in Bates numbered documents PRIV_0002381 and PRIV_0002382.

[13] Paralegal Colina is not included in these communications.

[14] She writes that this is "a follow up to our discussions." The Court is uninformed about those prior discussions.

Carnival might make to a court, if sued. He then suggests how that argument might be useful in the lobbying effort. On its face, the primary purpose of Perez's message is to offer legal advice and it is thus protected by the attorney-client privilege. The fact that Perez labeled his communication as an attorney-client communication does not, in and of itself, make it so. What makes the message privileged, is its content.

The third email is also a frank request for legal advice from Bondi to Perez. Bondi wrote it that same day, at 4:44 p.m. The legal advice she seeks does support the lobbying effort, but the record is clear that the primary purpose of her inquiry is to get Perez's legal guidance.

Perez responds to Bondi, at 5:29 p.m., copying Arnold, Arison and Frizzell, in the fourth email. He gives a legal opinion about the Act, and its application to Carnival. Again, while this information guides the lobbying effort, the primary purpose of his communication is to offer legal advice. On this basis, I find that the second, third and fourth emails are protected by the attorney-client privilege.

Not so for the final four emails. Bondi writes email number five the same day, at 10:16 p.m. She relays the substance of a conversation she had with a United States legislator that evening. It is purely factual. She does not solicit any legal advice, but she does make a recommendation about further lobbying efforts.

Perez responds that evening at 11:21 p.m., in the sixth email. He comments on Bondi's report and offers no legal advice.

Bondi replies the next morning, January 19, 2019, at 5:15 a.m., in the seventh email. She answers a non-legal question Perez asked, and then recommends that Carnival provide

the legislator "language to clarify the lawful travel exemption and ask him to include it in the regs." That is, she suggests how to advance their lobbying efforts, and this is plainly the primary purpose of this communication.

Donald writes the eighth and final email at 11:35 a.m. on July 19, 2019, to all included on this string, but addresses it to Perez, who he asks to "please craft the recommended language with [Bondi]", referring to Bondi's last (seventh) email.

In its response memorandum, Carnival rests its argument that all eight emails are protected attorney-client communications, on this final email. It writes that Donald's request to Perez

> referenc[es] the recommended language found in the preceding *__seven other emails__* on this email thread. In short, the first sentence is a request from the CEO to the General Counsel to draft something in accordance with the General Counsel's legal advice rendered in the chain below.

(ECF No. 245 at 15) (emphasis in original). I cannot agree with Carnival's factual characterization of Donald's final request to Perez, nor the legal significance it accords that message. Donald asks Perez to work with Bondi to draft the language for the legislator that Bondi suggested in her seventh email. Contrary to Carnival's argument, the suggested language plainly is not laid out in all prior emails.

Moreover, this record does not demonstrate that the primary purpose of Donald's request of Perez and Bondi – that they draft language for the legislator's consideration – is the rendition of legal advice. While Perez's legal expertise surely would be of benefit, these emails lead the Court to conclude that the primary purpose of Donald's request was for assistance with a business matter, the lobbying of Congress.

In sum, I grant Havana Docks' Motion to Compel vis-à-vis emails one, five, six, seven and eight, and I deny the Motion, and uphold Carnival's assertion of the attorney-client privilege for emails two, three and four.

### III. Conclusion

For these reasons, the Court **ORDERS** that Havana's Docks' Motion to Compel, (ECF Nos. 234; 239), is **GRANTED IN PART**. The Court **ORDERS** Carnival to, **no later than July 19, 2021**, produce to Havana Docks the emails and related attachments identified in this Order.

**DONE and ORDERED** in Miami, Florida, this 13th day of July 2021.

_____
CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

cc: The Honorable Beth Bloom
    Counsel of record