**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. 19-cv-21724-BLOOM/MCALILEY**


HAVANA DOCKS CORPORATION,

      Plaintiff,

v.

CARNIVAL CORPORATION, d/b/a
Carnival Cruise Lines, a foreign corporation,

      Defendant.

_____/


**CARNIVAL CORPORATION'S INDVIDUAL**
**MOTION FOR SUMMARY JUDGMENT**

Stuart H. Singer
Pascual Oliu
Meredith Schultz
Corey P. Gray
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
poliu@bsfllp.com
mschultz@bsfllp.com
cgray@bsfllp.com

*Attorneys for Carnival Corporation*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

I.     SUMMARY JUDGMENT IS APPROPRIATE FOR THE CLAIMS BASED ON
      CONDUCT BY AIRTOURS AND COSTA. ...................................................... 1

     A.    Plaintiff Seeks to Penalize Carnival for Conduct of Foreign Entities That Is
          Legal Under Foreign Law. ...................................................................... 1

          1.    Helms–Burton Does Not Permit Assigning Liability to a Minority
              Shareholder. .................................................................................. 1

          2.    Airtours' Conduct Was Legal Under Applicable Law. ............................ 3

          3.    Plaintiff Seeks to Make an "End-Run" Around the EU Blocking
              Statute. ......................................................................................... 4

          4.    Carnival's Ownership of Costa During Its Unwinding Period Was
              Legal Under United States Law. ...................................................... 6

          5.    Carnival Did Not Take on Costa's Liabilities. .................................... 6

     B.    Costa and Airtours' Use of the Havana Cruise Port Terminal Was Necessary
          to Lawful Travel. ..................................................................................... 8

     C.    Claims Premised on Pre-2004 Conduct Are Time-Barred; There Is No
          "Continuing Violation." .......................................................................... 8

          1.    Section 6084 Is a Statute of Repose Because It Runs From the Date
              of the Defendant's Last Culpable Act or Omission. ............................ 8

          2.    A "Continuing Violation" Theory Is Inapplicable to Statutes of
              Repose, and It Fails on the Merits. ................................................. 11

II.    ALL OF CARNIVAL'S USE OF THE TERMINAL WAS INCIDENT AND
      NECESSARY TO LAWFUL TRAVEL. ........................................................ 12

CONCLUSION .......................................................................................................... 15

CERTIFICATE OF SERVICE ..................................................................................... 16

i

## <u>TABLE OF AUTHORITIES</u>

<b>Page(s)</b>

<u>**Cases**</u>

*Aldana v. Fresh Del Monte Produce, Inc.*,
 2007 WL 7143959 (S.D. Fla. Aug. 30, 2007)............................................................. 2

*Baker v. Raymond Int'l, Inc.*,
 656 F.2d 173 (5th Cir.1981) ................................................................................. 3, 7

*Berkey v. Third Ave. R. Co.*,
 155 N.E. 58 (1926)................................................................................................... 7

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
 154 A.2d 684 (1959) ................................................................................................ 7

*Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*,
 419 F.3d 355 (5th Cir. 2005) ................................................................................. 10

*California Pub. Emp.'s Ret. Sys. v. ANZ Sec., Inc.*,
 137 S. Ct. 2042 (2017)................................................................................... 9, 10, 11

*Carlucci v. Han*,
 886 F.Supp.2d 497 (E.D. Va. 2012) ...................................................................... 11

*CTS Corp. v. Waldburger*,
 573 U.S. 1 (2014)........................................................................................... 8, 9, 10

*Daughtry v. Jenny G. LLC*,
 703 F. App'x 883 (11th Cir. 2017) .......................................................................... 7

*Dole Food Co. v. Patrickson*,
 538 U.S. 468 (2003)................................................................................................. 7

*Dusek v. JPMorgan Chase & Co.*,
 832 F.3d 1243 (11th Cir. 2016) ............................................................................... 9

*Freihofer v. Vermont Country Foods, Inc.*,
 No. 2:17-CV-149, 2019 WL 2995949 (D. Vt. July 9, 2019).................................. 11

*Jones v. Vericrest Fin., Inc.*,
 No. 1:11-CV-2330-TWT-CCH, 2011 WL 7025915 (N.D. Ga. Dec. 7 ................... 11

*JPMorgan Chase Bank, N.A. v. Ballard*,
 213 A.3d 1211 (Del. Ch. 2019).......................................................................... 9, 10

*Korman v. Party Girl Enters., Inc.*,
   2013 WL 12094631 (S.D. Fla. June 19, 2013) .......................................................................... 2

*Lewis v. Parker*,
   67 F. Supp. 3d 189 (D.D.C. 2014) ............................................................................................. 9

*Lobegeiger v. Celebrity Cruises, Inc.*,
   No. 11-21620-CIV, 2011 WL 3703329 (S.D. Fla. Aug. 23, 2011) ........................................... 3

*López Regueiro v. American Airlines Inc. and Latam Airlines Group, S.A.*,
   No. 19-cv-23965-JEM (S.D. Fla. Aug. 24, 2021) .................................................................... 10

*Maria Dolores Canto Marti v. Iberostar Hoteles y Apartamentos S.L.*,
   No. 1:20-cv-20078 (S.D. Fla. Apr. 24, 2020) ........................................................................... 5

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
   513 U.S. 251 (1995) .................................................................................................................. 15

*Nat'l R.R. Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002) .................................................................................................................. 12

*Perforaciones Maritimas Mexicanas S.A. de C.V. v. Seacor Holdings, Inc.*,
   443 F. Supp. 2d 825 (S.D. Tex. 2006) ....................................................................................... 3

*Plymouth Cty. Retirement Ass'n, v. Schroeder*,
   576 F. Supp. 2d 360 (E.D.N.Y. 2008) ..................................................................................... 11

*Prasad v. Holder*,
   776 F.3d 222 (4th Cir. 2015) ..................................................................................................... 9

*R/V Beacon, LLC v. Underwater Archeology & Exploration Corp.*,
   2014 WL 4930645 (S.D. Fla. Oct. 1, 2014) .............................................................................. 3

*Regan v. Wald*,
   468 U.S. 222 (1984) ............................................................................................................... 4, 6

*Roberts v. Gadsden Mem'l Hosp.*,
   835 F.2d 793 (11th Cir. 1988) ................................................................................................. 12

*Sundance Golf Corp. v. Hometown Highlands Fla., LLC*,
   No. 8:08-CV-1937-T-24TGW, 2009 WL 2868644 (M.D. Fla. Sept. 1, 2009) ........................... 5

*Thermoset Corp. v. Bldg. Materials Corp of Am.*,
   849 F.3d 1313 (11th Cir. 2017) ................................................................................................. 5

*U.S. Dep't of Labor v. Preston*,
   873 F.3d 877 (11th Cir. 2017) ............................................................................................ 9, 10

*Ungaro-Benages v. Dresdner Bank AG,*
  No. 01-2547-CIV, 2003 WL 25729923 (S.D. Fla. Feb. 20, 2003) ............................................ 5

*United States v. Bestfoods,*
  524 U.S. 51 (1998) ...................................................................................................... 3, 7, 8

*Whirlpool Corp. v. Freight Revenue Recovery of Miami, Inc.,*
  756 Fed. App'x. 986 (11th Cir. 2018) ................................................................................. 7

*Wood v. United States,*
  1:14-CV-00399-JDL, 2016 WL 11580579 (D. Me. Feb. 2, 2016) ........................................... 9

**Statutes**

15 U.S.C. § 78u–6(h)(1)(B)(iii)(I)(aa) .................................................................................. 10

22 U.S.C. § 6023(13)(A)(iii) ................................................................................................. 4

22 U.S.C. § 6023(13)(B)(iii) .......................................................................................... *passim*

22 U.S.C. § 6081(6) ............................................................................................................. 6

22 U.S.C. § 6084 ........................................................................................................... *passim*

22 U.S.C. § 6091 ................................................................................................................. 2

22 U.S.C. § 6091(a) ............................................................................................................ 14

22 U.S.C. § 6091(b)(2)(B)(iii) ............................................................................................. 15

29 U.S.C. § 113(1) .............................................................................................................. 10

42 U.S.C. § 2278 ............................................................................................................... 10

**Rules**

Fed. R. Civ. P. 19 ................................................................................................................. 5

**Regulations**

15 C.F.R. § 740.15 ............................................................................................................. 13

15 C.F.R. § 746.2 ............................................................................................................... 13

31 C.F.R. § 515.565 ........................................................................................................... 13

31 C.F.R. § 515.565(b) ...................................................................................................... 14

31 C.F.R. § 515.572 ........................................................................................................... 13

81 Fed. Reg. 55, 15326-15327 (March 22, 2016) ........................................................ 15

84 Fed. Reg. 25986 (June 5, 2019) ........................................................................... 13

84 Fed. Reg. 25992 (June 5, 2019) ........................................................................... 13

**<u>Other Authorities</u>**

142 CONG. REC. H1645-02, 1996 WL 90487, at H1656 ....................................... 4, 6

Barrack Obama, United States President, Speech in Cuba (March 21, 2016) available at
   https://www.miamiherald.com/news/nation-world/world/americas/cuba/
   article67364722.html ...................................................................................... 13

BLACK'S LAW DICTIONARY 1636–37 (10th ed. 2014)................................................. 9

*Insulation from Liability Through Subsidiary Corporations*,
   39 Yale L.J. 193 (1929) ...................................................................................... 7

Section 1B(2) of the European Union ("Withdrawal") Act 2018, 2018 c.16, s.1(B)(2) ............... 4

Defendant CARNIVAL CORPORATION ("Carnival") fully joins and incorporates herein the joint brief filed by four cruise lines in support of summary judgment (the "Joint Brief"), and additionally moves for summary judgment for the reasons stated herein.

## INTRODUCTION

The Joint Brief, filed on behalf of all four cruise lines that Havana Docks Corporation ("HDC") has sued, demonstrates fundamental problems at the heart of HDC's claims. This brief explains further reasons, specific to Carnival, why summary judgment is appropriate in this case. First, HDC has claims against Carnival based on cruises by an entity known as Airtours—but Airtours was never part of Carnival nor did Carnival control it; Carnival was merely a minority shareholder in the company. Second, HDC's allegations include cruises to Cuba by Costa Crociere ("Costa") after Carnival acquired Costa. As with all of Carnival's cruises, however, these were lawful and conducted pursuant to a specific license that allowed Carnival to wind down Costa's Cuba business for a fixed period of time after the acquisition. Because Carnival did terminate Costa's Cuba operations timely in 1997, the travel was both lawful and, importantly, occurred well beyond the applicable two-year statute of repose that applies for Title III claims. Finally, this brief further describes Carnival's lawful travel to Havana from 2015–2019 pursuant to both specific and general licenses authorizing such travel, and describes Carnival's robust programs for complying with those licenses. Because there can be no dispute that all of Carnival's use of the Terminal was entirely lawful, summary judgment is appropriate.

## I.      SUMMARY JUDGMENT IS APPROPRIATE FOR THE CLAIMS BASED ON CONDUCT BY AIRTOURS AND COSTA.

Summary judgment is appropriate for Plaintiff's allegations concerning Costa Crociere S.p.A. ("Costa") and Airtours plc ("Airtours") as the material facts are not in dispute.[1]

### A.      Plaintiff Seeks to Penalize Carnival for Conduct of Foreign Entities That Is Legal Under Foreign Law.

#### 1.      Helms–Burton Does Not Permit Assigning Liability to a Minority Shareholder.

It is undisputed that Carnival was a minority shareholder in Airtours.[2] Indeed, from

---

[1] Carnival incorporates the standard for summary judgment set forth in the Defendants' joint motion for summary judgment.

[2] Carnival's minority (<30%) ownership of Airtours, a United Kingdom publicly traded company, was at all times lawful. *See* U.S. Dep't of Treasury, Office of Foreign Assets Control, Opinion Letter on Application of the Cuban Assets Control Regulation to Certain Investments by

1996–2001, Carnival held less than a 30% interest in Airtours, a publicly traded company. *See* SUMF at ¶¶ 1–2. In bringing suit against Carnival for Airtours' conduct, Plaintiff asks the Court to ignore the Helms–Burton carve out for holding securities in publicly traded companies. "The term 'traffics' does not include . . . the trading or holding of securities publicly traded or held, unless trading is with or by a person determined by the Secretary of the Treasury to be a specially designated national." 22 U.S.C. § 6091. Accordingly, a plain reading of the Helms–Burton statute shows Carnival did not traffic by virtue of its minority interest in Airtours. As Plaintiff can make no showing that Airtours was not a publicly traded company, and can make no showing that Carnival or Airtours were entities designated by the Secretary of the Treasury to be a "specially designated national," Carnival is entitled to summary judgment with regard to Airtours as a matter of law.

To the extent Plaintiff purports to ask this Court, in contravention of the plain text of Helms–Burton, to hold a minority shareholder liable for the acts of the corporation, Plaintiff has also failed to make the requisite evidentiary showing to pierce the corporate veil. As this Court has previously articulated, "[t]he prerequisites for piercing the veil in federal maritime law are the same as elsewhere including under Florida law.[3] . . . Florida law requires that the plaintiff prove three elements in order to pierce the veil and reach the assets of an owner: (1) that the shareholder dominated and controlled the corporation to such an extent that the corporation did

---

Persons Subject to the Jurisdiction of the United States (Mar. 4, 1994) ("A U.S. company or individual may make a secondary market investment in a third country company doing business in Cuba provided that the investment does not result in control in fact of the company by the U.S. investor. A secondary market investment that falls short of a controlling interest is not prohibited."). Carnival's investment in Airtours did not result in control in fact of the company by Carnival, and there is no record evidence to support any contrary position.

[3] Carnival submits that in an analysis under Section 145 of the Restatement of Conflict of Laws, Florida law would apply to determine whether it is appropriate for the Court to pierce the corporate veil to allow liability against a minority shareholder. However, "the Florida and federal common law standards for piercing the corporate veil and holding a shareholder of a corporation liable for the acts of the corporation are very similar." *See Korman v. Party Girl Enters., Inc.*, 2013 WL 12094631, at *2 (S.D. Fla. June 19, 2013); *see also Aldana v. Fresh Del Monte Produce, Inc.*, 2007 WL 7143959, at **5–6 (S.D. Fla. Aug. 30, 2007) (finding it "not necessary to resolve the choice of law issue" because courts "have interpreted Florida law as requiring the same elements that federal common law requires to pierce the corporate veil," making "the determination [] the same under state law and federal common law"). Accordingly, to the extent that this Court determines that "federal common law" governs the issue of piercing the corporate veil, Plaintiff similarly fails to meet its significant burden of proof.

not exist independently of ownership and the owners were in fact the 'alter egos' of the corporation; (2) that the corporate form was utilized for a fraudulent or improper purpose; and (3) that the fraudulent or improper use of the corporate form caused injury to the plaintiff." *R/V Beacon, LLC v. Underwater Archeology & Exploration Corp*., 2014 WL 4930645, at *3 (S.D. Fla. Oct. 1, 2014) (Bloom, J.) (internal quotation marks and citation omitted). *See also Lobegeiger v. Celebrity Cruises, Inc.*, No. 11-21620-CIV, 2011 WL 3703329, at *15 (S.D. Fla. Aug. 23, 2011) (internal citation omitted) ("The prerequisites for piercing a corporate veil are as clear in federal maritime law as in shoreside law: The individual must have used the corporate entity to perpetrate a fraud or have so dominated and disregarded the corporate entity's corporate form that the corporate entity primarily transacted the individual's personal business rather than its own corporate business."). *Cf. Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 179–80 (5th Cir.1981) (explaining that in a maritime tort action, a plaintiff generally has recourse against the corporate entity that incurred the liability and not its stockholders); *Perforaciones Maritimas Mexicanas S.A. de C.V. v. Seacor Holdings, Inc.*, 443 F. Supp. 2d 825, 832 (S.D. Tex. 2006) (declining to pierce the corporate veil and hold liable the minority shareholder in a corporation that owned a Mexican flag vessel in action stemming from an collision with a drilling rig).

The record in this case is devoid of an iota of evidence to support any of the requisite elements that Plaintiff would have to establish in order to hold Carnival liable for the conduct of Airtours. There is no evidence of Carnival's "domination" of Airtours, nor is there any suggestion that Airtours operated as a vehicle for the commission of fraudulent conduct. Significantly, as the Supreme Court noted in *United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998), discussed *infra*, Carnival's election of certain Airtours directors, and even the duplication of certain directors, is insufficient to pierce the corporate veil. Even if Plaintiff could make the requisite showing—and to be clear, it cannot—Airtours' conduct was still lawful under United Kingdom law; therefore, there can be no liability under Helms–Burton. Summary judgment is appropriate on this basis.

### 2.   Airtours' Conduct Was Legal Under Applicable Law.

Airtours was a publicly traded, United Kingdom tour company that conducted occasional cruises to Havana, Cuba. *See* SUMF at ¶¶ 6. Plaintiff does not dispute that it was legal for a U.K. company, carrying European passengers, to cruise to Cuba. Indeed, Plaintiff makes no allegation that a U.K. company engaging in such travel to Cuba was unlawful under U.K. law. *See* Second

Amended Complaint ("SAC"). Nor is there any legal merit to the argument that Carnival somehow participated or profited from Airtours' "trafficking," *see* 22 U.S.C. § 6023(13)(A)(iii), as the Helms–Burton statute expressly carves out lawful travel, and Plaintiff cannot dispute that Airtours travel was lawful under the applicable U.K. law. *See* 22 U.S.C. § 6023(13)(B)(iii); *see Regan v. Wald*, 468 U.S. 222, 224 (1984); 142 CONG. REC. H1645-02, 1996 WL 90487, at H1656. As there is no disputed issue of law or fact as to the legality of Airtours' travel to Cuba, Plaintiff cannot seek to hold Carnival liable for those lawful acts, and summary judgment in Carnival's favor is appropriate.

### 3. Plaintiff Seeks to Make an "End-Run" Around the EU Blocking Statute.

Plaintiff brings suit against Carnival, even though it is the wrong party, because the Plaintiff knows that the governing law makes it procedurally more difficult to bring suit against Airtours and Costa. In 1996, in response to the passage of the Helms–Burton Act, the European Community ("EC") enacted Council Regulation (EC) No. 2271/96, which prohibits EU member state corporations from complying with ". . . any requirement . . . including requests of foreign courts, based on . . . [Helms–Burton] or from actions based thereon or resulting therefrom." *See* Protecting Against the Effects of the Extra-Territorial Application of Legislation Adopted by a Third Country, and Actions Based Thereon or Resulting Therefrom, Council Regulation 2271/96, art. 5, 1996 O.J. (L 390) 1 (EC).

Italy adopted this EU Helms–Burton blocking statute in 1998. *See* Disposizioni di Carattere Sanzionatorioamministrativo in Attuazione del Regolamento, Decreto Legislativo 26 Agosto 1998, n. 346. The United Kingdom ("U.K.") adopted the EU Helms–Burton blocking statute in 1996. *See* Extraterritorial US Legislation (Sanctions against Cuba, Iran and Libya) (Protection of Trading Interests) Order 1996, 1972 c.68 (No. 3171). The U.K. recently enacted legislation maintaining and preserving the EU Helms–Burton blocking statute, despite Brexit, and thus the U.K. blocking statute remains in effect to this day. *See* Protecting Against the Effects of the Extraterritorial Application of Third Country Legislation (Amendment) (EU Exit) Regulations 2020, 2018 c.16 (No. 1660).[4]

---

[4] This new, post-Brexit law supersedes the 2018 Withdrawal Act, which *__also__* maintained and preserved the blocking statute. *See* section 1B(2) of the European Union ("Withdrawal") Act 2018, 2018 c.16, s.1(B)(2).

If Plaintiff filed suit against Airtours and Costa—the parties against whom it alleges wrongdoing under Helms–Burton—it would most likely have to engage in an administrative process overseas to proceed with the claim. For example, in *Maria Dolores Canto Marti v. Iberostar Hoteles y Apartamentos S.L.*, No. 1:20-cv-20078 (S.D. Fla.), the plaintiff brought a Helms–Burton claim against a Spanish company. Acknowledging that the European Commission requires "companies from the European Union to obtain authorization before filing a response to any lawsuit under the Helms Burton Act," Judge Scola stayed the case "until the European Union grants Iberostar's request for authorization." *See Maria Dolores Canto Marti v. Iberostar Hoteles y Apartamentos S.L.*, No. 1:20-cv-20078 (S.D. Fla. Apr. 24, 2020) (D.E. 17).

"[U]nder the doctrine of international comity, a United States court normally will give effect to executive, legislative, and judicial acts of a foreign nation." *Ungaro-Benages v. Dresdner Bank AG*, No. 01-2547-CIV, 2003 WL 25729923, at *7 (S.D. Fla. Feb. 20, 2003), aff'd, 379 F.3d 1227 (11th Cir. 2004) (Internal quotation marks and citation omitted). This Court should give the blocking statute deference under principles of international comity, and not allow Plaintiff to continue suit against an incorrect party simply because Carnival is an administratively easier, though incorrect, target. Accordingly, summary judgment in Carnival's favor is appropriate.

Indeed, this Court need not even reach the merits of Plaintiff's claim as it relates to Costa and Airtours. Instead, the Court should dismiss the claim because Costa and Airtours are indispensable parties under Federal Rule of Civil Procedure 19 that Plaintiff failed to name as defendants. *See Sundance Golf Corp. v. Hometown Highlands Fla., LLC*, No. 8:08-CV-1937-T-24TGW, 2009 WL 2868644, at *1 (M.D. Fla. Sept. 1, 2009) (refusing to reach the merits of the case when evaluating the parties' cross-motions for summary judgment because "Defendant ha[d] correctly pointed out that this case [was required to be] dismissed for failure to join an indispensable party under Federal Rule of Civil Procedure 19."). *Cf.*, *Thermoset Corp. v. Bldg. Materials Corp of Am.*, 849 F.3d 1313, 1321 (11th Cir. 2017) ("the fact that this case has already been litigated to summary judgment does not convince us to continue this action in federal court without [an indispensable party]"). Because Costa and Airtours are distinct entities, and the ones Plaintiff alleges engaged in wrongdoing, "the court cannot accord complete relief" in their absence. *See* Fed. R. Civ. P. 19. Accordingly, this Court should dismiss Plaintiff's claim as it

related to Costa and Airtours, regardless of the merits, because in Costa and Airtours' "absence, the court cannot accord complete relief among the existing parties." Fed. R. Civ. P. 19.

### 4. Carnival's Ownership of Costa During Its Unwinding Period Was Legal Under United States Law.

Upon Carnival's application, the Office of Foreign Asset Control ("OFAC") issued License No. C-18621 to Carnival on February 12, 1997 (the "1997 OFAC License"). SUMF at ¶¶ 18–21. The 1997 OFAC License permitted Carnival to: (1) acquire a nearly 50% interest in Costa; (2) wind down and abandon Costa's business in Cuba; and (3) complete the scheduled Costa sailings to Cuba, terminating on November 24, 1997. *Id*. at ¶¶ 22–28. Pursuant to, and in compliance with, the license, Costa abandoned its joint venture in Cuba and discontinued its sailing to Cuba by November 24, 1997. *Id*. at ¶ 29. Accordingly, not only was Costa's travel to Cuba in 1997 lawful pursuant to its OFAC license, but its abandonment of business with Cuba and its cessation of cruises to Cuba furthered the foreign policy of the United States at the time. 22 U.S.C. § 6081(6).

Moreover, given that Carnival kept OFAC fully apprised of the nature of Costa's business in Cuba, *id*. at ¶ 17, by necessity, the 1997 OFAC License contemplated Costa's use of the Havana Cruise Port Terminal over which it had leasing rights and operational control through its joint venture during the wind-down period. *Id*. at ¶¶ 13–15. Accordingly, the United States clearly and unequivocally authorized Carnival's interest in Costa during the pendency of Costa's winding down of travel to the Havana Cruise Port Terminal in 1997, rendering both Carnival's interest in Costa, and Costa's travel, lawful under Helms–Burton. *See* 22 U.S.C. § 6023(13)(B)(iii); *Regan*, 468 U.S. at 224; 142 CONG. REC. H1645-02, 1996 WL 90487, at H1656.

### 5. Carnival Did Not Take on Costa's Liabilities.

Carnival did not assume Costa's legal liabilities in either its 1997 acquisition of 50% of Costa or in its 2000 acquisition of the remaining 50% interest.[5] *See* SUMF at ¶ 31. Costa is still

---

[5] Carnival's Annual Report for 2000 states that the Costa acquisition impacted Carnival's financial "assets and liabilities" as follows: Fair value of acquire assets at $915,437; Debt assumed at (310,259); Other liabilities assumed (94,354); Cash paid for acquisition 510,824, Cash acquired and consolidated (130,539); and Net cash paid as reflected in the 2000 Statement of Cash Flows at $380,285." This Annual Report does not reflect that Carnival took on Costa's legal labilities, but rather gives an accounting of financial liabilities relating to Carnival's

an Italian company that maintained its corporate form through Carnival's acquisition of Costa's holding company. As such, only Costa is liable for Costa's conduct. Indeed, "[a] basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *Bestfoods*, 524 U.S. at 61 (internal quotation marks) (citing Douglas & Shanks*, Insulation from Liability Through Subsidiary Corporations*, 39 YALE L.J. 193 (1929); *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 687 (1959); *Berkey v. Third Ave. R. Co*., 155 N.E. 58 (1926) (Cardozo, J.); 1 W. Fletcher, Cyclopedia of Law of Private Corporations § 33, p. 568 (rev. ed. 1990) ("Neither does the mere fact that there exists a parent-subsidiary relationship between two corporations make the one liable for the torts of its affiliate"); *Cf, Whirlpool Corp. v. Freight Revenue Recovery of Miami, Inc.*, 756 Fed. App'x. 986, 989 (11th Cir. 2018) ("[T]here is a rebuttable presumption that a corporation and its owner are distinct entities and generally are not liable for one another's debts.").

As discussed *supra* with respect to Airtours, Plaintiff likewise fails to meet the burden of piercing the corporate veil to reach Carnival with regard to Costa under either Florida law or Federal common law. "The veil separating corporations and their shareholders may be pierced in some circumstances . . . . The doctrine of piercing the corporate veil, however, is the rare exception, applied in the case of fraud or other exceptional circumstances, and usually determined on a case-by-case basis." *See Dole Food*, 538 U.S. at 475 (internal citation omitted); *see also Daughtry v. Jenny G. LLC*, 703 F. App'x 883, 886 (11th Cir. 2017) (quoting *Baker*, 656 F.2d at 179) ("'Under exceptional circumstances' we may disregard the corporate form where the principal uses the corporation to perpetrate a fraud on investors or 'used a closed corporation as his personal business conduit.'" (internal brackets omitted)).

Further, as the Supreme Court noted in *Bestfoods*, Carnival's election of certain Costa directors, and even the duplication of certain directors, is insufficient to pierce the corporate veil.

---

changed reporting of Costa's operating results after the acquisition. *See* SUMF at ¶ 2 (2001 Annual Report).

*Bestfoods*, 524 U.S. at 61–62. Accordingly, Carnival is entitled to summary judgment relating to claims related to Costa, as it is not liable for Costa's conduct.

**B.      Costa and Airtours' Use of the Havana Cruise Port Terminal Was Necessary to Lawful Travel.[6]**

There is no genuine dispute of material fact that Costa and Airtours' use of the Havana Cruise Port Terminal was necessary to lawful travel, and as a result, no liability can attach to this conduct. Costa's joint venture with Silares Terminales del Caribe ("Silares") necessitated Costa's use of the Havana Cruise Port Terminal that it jointly operated with Silares through its subsidiary, Milestone. SUMF ¶¶ 13–15. Additionally, as its name suggests, the Havana Cruise Port Terminal was the only place where cruise ships could embark and disembark passengers; indeed, there is no record evidence of any other cruise terminal in Havana, Cuba that existed in 1997. Accordingly, pursuant to the joint venture with Silares, and due to the lack of any alternative, it was necessary for Costa to use the Havana Cruise Port Terminal as it wound down its cruises to Havana in 1997. Further, as stated above, given that Carnival kept OFAC fully apprised of the nature of Costa's business in Cuba, including its joint venture in the operation and use of the Havana Cruise Port Terminal, SUMF ¶ 17, the 1997 OFAC License therefore contemplated Costa's use of the Havana Cruise Port Terminal. SUMF ¶ 22. Accordingly, Costa's use of the Havana Cruise Port Terminal was necessary.

Regarding Airtours, again, the Havana Cruise Port Terminal was the only option for cruise ships docking in Havana, and there is no record evidence of any other cruise terminal in Havana, Cuba that existed from 1996–2001; therefore, it was necessary for Airtours to use the Havana Cruise Port Terminal. Accordingly, as a matter of law, both Costa and Airtours' use of the Havana Cruise Port Terminal was necessary to their lawful travel.

**C.      Claims Premised on Pre-2004 Conduct Are Time-Barred; There Is No "Continuing Violation."**

**1.      Section 6084 Is a Statute of Repose Because It Runs From the Date of the Defendant's Last Culpable Act or Omission.**

In *CTS Corp. v. Waldburger*, the Supreme Court explained that, while a statute of limitations "creates a time limit for suing in a civil case, based on the date when the claim

---

[6] Carnival adopts and incorporates the argument on necessary travel at Defendant's Omnibus Motion for Summary Judgement, 11.

accrued," a statute of repose is measured "*from the date of the last culpable act or omission of the defendant*." 573 U.S. 1, 7–8 (2014) (internal quotation marks and citation omitted) (emphasis added). *See also U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 883 (11th Cir. 2017). A statute of repose "is not related to the accrual of any cause of action; the injury need not have occurred, much less have been discovered." *CTS Corp.*, 573 U.S. at 8; *Preston*, 873 F.3d at 883 (statute of repose bars "'any suit that is brought after a specified time *since the defendant acted*,' without regard to any later accrual") (quoting Black's Law Dictionary 1636–37 (10th ed. 2014)).

Thus "[w]hile a statute of limitations is intended to require plaintiffs to pursue diligent prosecution of known claims by limiting the time to bring suit based on the date when the cause of action accrued, a statute of repose puts an outer limit on the right to bring a civil action based on the date of the last culpable act or omission of the defendant, whether or not an injury even occurred or was discovered." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1247 (11th Cir. 2016) (quoting *CTS*, 573 U.S. at 8–9) (internal quotation marks omitted).

Section 6084 is a statute of repose under this binding analytical framework. It operates "from the date of the last culpable act or omission," *CTS Corp.*, 573 U.S. at 8, here, "after the trafficking giving rise to the action has ceased to occur." 22 U.S.C. § 6084. The statutory language of Helms–Burton is critical: as the Supreme Court explained, a statute that "runs from the defendant's last culpable act . . . not from the accrual of the claim . . . is close to a *dispositive indication* that the statute is one of repose." *California Pub. Emp.'s Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (emphasis added).

*CTS* and *ANZ* are the two definitive Supreme Court cases in this area, and courts following these precedents have construed statutes like Section 6084, that focus on a specified time since the defendant acted, to be statutes of repose, rather than statutes of limitations.[7]

---

[7] *See, e.g.*, *Prasad v. Holder*, 776 F.3d 222, 227 (4th Cir. 2015) ("The defining feature of a statute of repose . . . is that it establishes the same deadline for everyone, setting out a 'fixed, statutory cutoff date' independent of any variable related to claim accrual or discovery of an injury."); *Wood v. United States*, 1:14-CV-00399-JDL, 2016 WL 11580579, at *7 (D. Me. Feb. 2, 2016) (finding a statute of repose rather than of limitations where "[t]he accrual of a medical malpractice cause of action from the date of an act or omission giving rise to an injury, and not from the date of the discovery of the injury, is the controlling element"); *Lewis v. Parker*, 67 F. Supp. 3d 189, 209 (D.D.C. 2014) (statute used "classic language of a statute of repose" when it

Indeed, in *CTS Corp.*, the Supreme Court's two examples of clear statutes of repose were both statutes that ran from the date of the defendant's last culpable conduct. 573 U.S. at 13.[8]

The Eleventh Circuit has reached similar conclusions. In *Preston*, the Eleventh Circuit found that ERISA's time-barring statute, 29 U.S.C. § 113(1), is a statute of repose. 873 F.3d at 883. That statute, like Section 6084, ran from the date of the last action that constituted wrongful conduct, rather than from when the claim accrued. The Eleventh Circuit found that because the statute ran from the defendants "last action," it was "clear" that the "time bar is properly classified as a statute of repose." *Id*.[9]

The plain language of Helms–Burton further indicates that it provides a repose period.[10] *See ANZ*, 137 S. Ct. at 2049 (looking to "structure" and "language" of relevant statute in determining "legislative objective" was statute of repose). Section 6084 provides that "an action . . . may not be brought more than 2 years after the trafficking giving rise to the action has ceased

---

[8] ran from the time of the commission of the fraud); *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1235 (Del. Ch. 2019) (citing *ANZ* and reasoning that the "six-year period in Section 174 during which directors can be liable for an unlawful dividend is tied, not to the accrual of a cause of action, but rather to the payment of a dividend," and therefore, is a statute of repose); *see also Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355, 364 (5th Cir. 2005) ("Section 16.012 is clearly a statute of repose because it cuts off a claimant's right to sue a manufacturer for a product defect by requiring him to 'commence a products liability action . . . before the end of 15 years after the date of the sale of the product by the defendant,' and because it runs from an act of the defendant—'the date of the sale of the product by the defendant.'") (footnotes omitted).

[8] The Court cited two examples of statutes of repose, 15 U.S.C. § 78u–6(h)(1)(B)(iii)(I)(aa) ("An action under this subsection may not be brought… more than 6 years after the date on which the violation of subparagraph (A) occurred") and 42 U.S.C. § 2278 ("no individual or person shall be prosecuted … unless the indictment is found or the information is instituted within ten years next after such offense shall have been committed").

[9] Section 6084 is titled "Limitation of Actions." The *CTS* Court noted that it is "not dispositive" that the statute refers to the period as a statute of limitations rather than a statute of repose, noting examples of statutes of repose that fall under the heading "statute of limitations" or similar. *CTS Corp.*, 573 U.S. at 13. The Court further noted that "Congress has used the term 'statute of limitations' when enacting statutes of repose" and that "petitioner does not point out an example in which Congress has used the term 'statute of repose.'" *Id*.

[10] Another Helms–Burton plaintiff has conceded the same. In *López Regueiro v. American Airlines Inc. and Latam Airlines Group, S.A.*, No. 19-cv-23965-JEM (S.D. Fla. Aug. 24, 2021), the plaintiff admitted that the Helms–Burton statute is a statue of repose. *See* Plaintiff's Motion to Compel American Airlines Inc.'s Responses to Discovery Requests at 2, *López Regueiro*, No. 19-cv-23965-JEM (Mar. 13, 2020) (ECF No. 70).

to occur." 22 U.S.C. § 6084. "This instruction admits of no exception and on its face creates a fixed bar against future liability." *ANZ*, 137 S. Ct. at 2049.

In sum, Section 6084 runs from the date of a specific event, the date "after the trafficking giving rise to the action has ceased to occur," and not from an accrual date. It is therefore a statute of repose, for which equitable tolling is unavailable. *ANZ*, 137 S. Ct. at 2049. Carnival is entitled to summary judgment related to Costa and Airtours' conduct as claims based thereon are time-barred.

> **2.      A "Continuing Violation" Theory Is Inapplicable to Statutes of Repose, and It Fails on the Merits.**

In ruling on the Motion to Dismiss, this Court explained that it declined to reach the issue of whether Section 6084 is a statute of repose because Plaintiff had pled "a series of trafficking taking place 'at various times' spanning over a two-decade period." Omnibus Order at 20–21, Sept. 14, 2020, ECF No. 124. At this procedural posture, Plaintiff's allegations of a "continuing violation" are no longer credible as the record evidence shows the opposite, and a majority of courts recognize that "continuing violation" theories do not apply to statutes of repose.

"[T]he continuing violations theory itself has been recognized by courts as an equitable tolling doctrine." *Freihofer v. Vermont Country Foods, Inc.*, No. 2:17-CV-149, 2019 WL 2995949, at *4 (D. Vt. July 9, 2019) (citing *Plymouth Cty. Retirement Ass'n, v. Schroeder*, 576 F. Supp. 2d 360, 376 (E.D.N.Y. 2008) (internal quotations omitted). "The Supreme Court has expressly forbidden equitable tolling when applying a statute of repose." *Id*. (citing *California Pub. Emp.'s Retirement Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2050 (2017)). Therefore, Plaintiff cannot avoid the statute of repose by claiming a "continuing violation"[11] and Carnival is entitled to summary judgment. *Cf. Jones v. Vericrest Fin., Inc.*, No. 1:11-CV-2330-TWT-CCH,

---

[11] While some courts have been divided on the issue of whether a "continuing violation" theory can save a claim from a statute of repose, the majority across circuits have rejected the continuing violation theory when applying statutes of repose. *Freihofer*, 2019 WL 2995949, at *4. For example, in the securities context, "[d]istrict courts in the First Circuit have applied the continuing fraud exception to Section 10(b)'s statute of repose, while district courts in the Fifth and Ninth Circuits have rejected it. District courts in the Second Circuit are split." *Carlucci v. Han*, 886 F.Supp.2d 497, 514 (E.D. Va. 2012) (declining to apply the continuing violation theory to a statute of repose).

2011 WL 7025915, at *13 (N.D. Ga. Dec. 7, 2011) ("equitable tolling cannot revive a stale rescission claim because of the three-year statute of repose under TILA").

Even if the Court decides to reach the merits of Plaintiff's "continuing violation" theory, it must fail. The fully developed evidentiary record shows Carnival divested its minority interest in Airtours in 2001, and it wound-down, under a license issued by OFAC, all of Costa's Cuba-related operations in 1997. *See* SUMF ¶¶ 2, 23–29. Thereafter, it is undisputed that Carnival and its affiliates had **no travel** to Cuba for **fifteen** years until the Obama Administration encouraged, and OFCA licensed, such travel in 2016.[12] There is no record evidence of "repeated conduct" as required by the Supreme Court in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002). Indeed, "mere commonality" of the conduct (in that it involves the same property and defendant) is not enough. *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 800 (11th Cir. 1988). Instead, there must be a "substantial nexus" between the two alleged wrongs. *Id*. at 800.

When "two incongruent [unlawful] events are separated by a substantial time hiatus," here, **15 years**, "the hiatus further supports the conclusion that the two incidents were discrete and unrelated." *Id*. at 801. Carnival's 2016–2019 sailings to Cuba were neither a "continuation" of its minority interest in Airtours, nor a "continuation" of its divestiture and unwinding of Costa's business in Cuba. Therefore, there is no "substantial nexus" connecting the pre-2004 conduct to Carnival's recent sailings as required by the Eleventh Circuit. Indeed, there is no nexus at all.

Accordingly, the issue of whether Plaintiff's claims concerning Airtours and Costa are time-barred is ripe and summary judgment is appropriate.

## II.   ALL OF CARNIVAL'S USE OF THE TERMINAL WAS INCIDENT AND NECESSARY TO LAWFUL TRAVEL.

Summary Judgment is appropriate because all of Carnival's conduct was incident and necessary to lawful travel, and thus excluded from the definition of "trafficking" under Title III of the Helms–Burton Act. That definition states: "[t]he term 'traffics' does not include …

---

[12] There is no dispute that Carnival did not sail to Cuba from 1998–2015. Indeed, Judge McAliley twice denied Plaintiff discovery from the years 2001–2013 on relevance grounds after Plaintiff failed to make a showing of any alleged conduct for that time period. *See* Order Following November 25, 2020 Discovery Hearing at ¶ 4, Nov. 25, 2020, ECF No. 165.; *see* Order Denying Plaintiff's Motion to Compel 2009 Documents, Aug. 13, 2021, ECF No. 296 (affirming the same).

transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel." 22 U.S.C. § 6023(13)(B)(iii). Thus, Carnival is not liable for any transaction or use of property that was: (1) incident to "lawful travel to Cuba," and (2) "necessary to the conduct of such travel." Here, there can be no disputing that Carnival was engaged in providing lawful travel to Cuba, that the alleged conduct (embarking and disembarking passengers on the docks) was incident to that travel, and that Carnival's use of HDC's property was necessary to such travel.

As explained in the Joint Brief, Carnival's cruises from 2016 to 2019 were lawful pursuant to general licenses allowing passengers to travel to Cuba for a variety of purposes. The general licenses made it lawful to travel to any city in Cuba, including Havana. 31 C.F.R. § 515.565; 31 C.F.R. § 515.572; 15 C.F.R. § 740.15; 15 C.F.R. § 746.2; 84 FR 25992 (June 5, 2019) (addressing OFAC regulation amendments); 84 FR 25986 (June 5, 2019) (addressing BIS regulation amendments). Additionally, the Joint Brief explains that there is only one place in Havana where cruise passengers may embark and disembark: the aptly named Havana Cruise Terminal. Because there was no alternative place for cruise passengers lawfully traveling to Havana to embark and disembark in Havana, it is beyond dispute that using the Havana Cruise Terminal was both incident and necessary to lawful travel.

In addition, before President Obama issued the general licenses, Carnival obtained specific licenses approving travel by Carnival and its passengers to any place in Cuba, including Havana. Those specific licenses, issued by OFAC and the Bureau of Industry and Security ("BIS") covered cruises prior to the issuance of general licenses (which obviated the need for specific licenses). SUMF ¶¶ 35–38. After Carnival received these specific licenses, President Obama formally invited Carnival to attend a speech during his historic visit to Cuba. There, in Havana, President Obama stated: "With last week's port security announcement, we've removed the last major hurdle to resuming cruises and ferry service—all of which will mean even more Americans visiting Cuba in the years ahead and appreciating the incredible history and culture of the Cuban people."[13] SUMF ¶ 38. Thus, from the very beginning, Carnival's cruises were not just permitted but actively *encouraged* by the U.S. Government, as a key component of the President's foreign policy toward Cuba. Additionally, as described in Part I above, Carnival

---

[13] Barrack Obama, United States President, Speech in Cuba (March 21, 2016) available at https://www.miamiherald.com/news/nation-world/world/americas/cuba/article67364722.html.

obtained a specific license when it acquired Costa, allowing Carnival to wind down Costa's operations—including cruises to Havana—over a period of several months. Thus, all of Carnival's cruises in this case were lawful pursuant to either a general or specific license.

Carnival structured its cruises to comply with the terms of these licenses and all other laws concerning travel to Cuba. SUMF ¶ 42. The specific license covering Costa's involvement in Cuba merely required the winding down of that business by November 1997; Costa stopped sailing to Cuba prior to that date. SUMF ¶¶ 18, 22. The remaining licenses covering Carnival's other cruises to Cuba allowed Carnival to provide cruises to passengers who engaged in a variety of permitted activities, including people-to-people experiences consisting of a "full-time schedule of activities that enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities, and result in meaningful interaction with individuals in Cuba." 31 C.F.R. § 515.565(b) (Nov. 9, 2017). To ensure compliance, Carnival designed a schedule of shore excursions for passengers that was "carefully crafted and curated to fall under the category of people-to-people" set forth in the OFAC regulations. SUMF ¶ 43. Indeed, Carnival submitted proposed shore excursions and itineraries to the U.S. Government along with its initial request for specific licenses to cover Fathom's cruises to Cuba. SUMF ¶ 35. Carnival also required all passengers to participate in these shore excursions or, when and where permissible, self-certify that they had otherwise complied with the regulations. SUMF ¶ 42. Carnival also provided written instructions regarding OFAC compliance affidavits, including "People to People" and certifications and maintained records of traveler affidavits—attesting compliance with the regulations—for all passengers on board the cruises subject to these requirements. SUMF ¶¶ 41–43.

Because Carnival consistently complied with all applicable regulations, the U.S. Government consistently concluded that Carnival's travel was lawful and never brought any enforcement action regarding Carnival's travel to Cuba. Indeed, the State department, with its expressly delegated authority for enforcing the Helms–Burton Act as provided in Title IV of that Act,[14] *told* HDC that Carnival's travel plainly fit within the "clear exclusion in Title IV's definition of 'traffics' of transactions and uses of property incident to lawful travel to Cuba." SUMF ¶¶ 46–47. For this reason, the agency charged with enforcing Helms–Burton chose not to

---

[14] 22 U.S.C. § 6091(a).

take any action against Carnival for its cruises to Cuba. The definition in "Title IV" is, of course, the same definition that applies in this Title III action. *Compare* 22 U.S.C. § 6091(b)(2)(B)(iii) *with* § 6023(13)(B)(iii) (identical exclusions for lawful travel). Thus, the Government's interpretation of this definition is entitled to respect and deference in this litigation. *E.g.*, *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 255 (1995). Further, the U.S. Coast Guard specifically approved the return of vessels from all Cuban ports, was aware that Carnival used the Havana Cruise Port Terminal to provide carrier services to Havana, and never disallowed Carnival reentry to U.S. after using the Havana Port Terminal. *See* Notification of the Removal of Conditions of Entry on Vessels Arriving From the Republic of Cuba, 81 Fed. Reg. 55, 15326-15327 (March 22, 2016) (removing conditions of entry to U.S. "for vessels arriving from the country of the Republic of Cuba"); SUMF ¶¶ 44, 45, 53.

Carnival's use of the Terminal was plainly also necessary for such travel. *Id.* ("The State Dept lawyer specifically told me they viewed docking on our property as 'necessary' and so they wouldn't consider it trafficking."). As explained in the Joint Brief, *every* cruise line sailing to Havana was told the same thing: The Havana Cruise Port Terminal is the *only* place in Havana where cruise passengers may embark and disembark. SUMF ¶ 52; MINTRANS, Res. 251, Art. 34.2. This was no mere suggestion: before sailing in, it was "compulsory" for Cuban pilots to physically board each cruise ship and guide the ship to the Terminal. SUMF ¶ 54. Carnival (like the other Defendants) tried to find alternative places to dock, because availability at the Terminal was extremely limited; no alternatives were permitted by the Cuban Government. SUMF ¶ 50. Indeed, Carnival's contracts with Aries ***required*** that Carnival use the Terminal in Havana, thereby making its use necessary. SUMF ¶ 55.

Accordingly, all use of the Terminal was incident and necessary to lawful travel to Cuba, and thus, as the Government told HDC, Carnival's travel clearly fits within the lawful-travel exclusion from Helms–Burton.

## CONCLUSION

For the reasons described above and in the Joint Brief, there is no genuine dispute of fact in this litigation and Carnival is entitled to summary judgment dismissing all of HDC's claims as a matter of law.

Dated: September 20, 2021

Pedro A. Freyre
AKERMAN LLP
(Florida Bar No. 192140)
98 SE 7th St., Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600
Pedro.freyre@akerman.com

George J. Fowler, III
(*Pro Hac Vice*)
Luis Llamas
(Florida Bar No. 89822)
JONES WALKER LLP
201 St. Charles Ave.
New Orleans, LA 70170
Telephone: (504) 582-8752
gfolwer@joneswalker.com

Respectfully submitted,

By: */s/ Stuart H. Singer*
Stuart H. Singer
(Florida Bar No. 377325)
Pascual Oliu
(Florida Bar No. 107737)
Meredith Schultz
(Florida Bar No. 29536)

Corey P. Gray
(Florida Bar No. 0115473)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
poliu@bsfllp.com
mschultz@bsfllp.com
cgray@bsfllp.com

*Attorneys for Carnival Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all counsel of record via the court's CM/ECF System on September 20, 2021.

By: */s/ Corey P. Gray*
COREY P. GRAY