# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

HAVANA DOCKS CORPORATION,　　　　　　　　**Case No. 19-cv-21724**
　　　　　　　　　　　　　　　　　　　　　　　　**BLOOM/McAliley**
　　　　Plaintiff,

v.

CARNIVAL CORPORATION,

　　　　Defendant.
_____/

HAVANA DOCKS CORPORATION,　　　　　　　　**Case No. 19-cv-23588**
　　　　　　　　　　　　　　　　　　　　　　　　**BLOOM/Louis**
　　　　Plaintiff,

v.

MSC CRUISES SA,
MSC CRUISES SA CO, and
MSC CRUISES (USA) INC.,

　　　　Defendants.
_____/

HAVANA DOCKS CORPORATION,　　　　　　　　**Case No. 19-cv-23590**
　　　　　　　　　　　　　　　　　　　　　　　　**BLOOM/Louis**
　　　　Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,

　　　　Defendant.
_____/

HAVANA DOCKS CORPORATION,　　　　　　　　**Case No. 19-cv-23591**
　　　　　　　　　　　　　　　　　　　　　　　　**BLOOM/Louis**
　　　　Plaintiff,

v.

NORWEGIAN CRUISE LINE HOLDINGS LTD.,

　　　　Defendant.
_____/

## <u>DEFENDANTS' OMNIBUS MOTION FOR SUMMARY JUDGMENT</u>

Defendants Carnival Corporation d/b/a Carnival Cruise Line ("Carnival"); MSC Cruises S.A., MSC Cruises SA Co., and MSC Cruises (USA) Inc. (collectively, "MSC Cruises"); Royal Caribbean Cruises Ltd. ("Royal Caribbean"); and Norwegian Cruise Line Holdings Ltd. ("Norwegian" and, collectively with Carnival, MSC Cruises, and Royal Caribbean, "Defendants") move the Court for the entry of an Order granting summary judgment in Defendants' favor on the sole claim asserted by Havana Docks Corporation ("Plaintiff" or "HDC").

## INTRODUCTION

In these four lawsuits, Plaintiff seeks to recover damages under Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (the "Act" or "Helms-Burton") in excess of $700 million *per defendant*.  Plaintiff's claim is based on Defendants' alleged use of one pier – the San Francisco Pier (sometimes called "Pier 1") – at the Havana Cruise Port Terminal in Havana, Cuba (the "Terminal") to dock their vessels and disembark and embark their passengers, as the Cuban Government required Defendants to do when traveling to Havana.   Incredibly, Plaintiff makes this claim despite Defendants' travel to Cuba having been expressly *authorized* and, indeed, *encouraged* by President Obama as part of his administration's foreign policy goals.[1] In other words, Plaintiff challenges the core of these foreign-policy decisions of the Executive Branch, and essentially asks this Court to hold "unlawful" and subject to crushing liability the very activities that the President of the United States had blessed.

Plaintiff's bid should proceed no further, because Defendants are entitled to summary judgment for at least four reasons:  *First*, Plaintiff did not own the Terminal; rather, at most, Plaintiff had a limited right to operate a cargo business in which Defendants did not and could not have trafficked.  *Second*, the travel in which Defendants engaged from 2016 to June 2019 was entirely lawful, and thus expressly exempt from the Act's definition of "trafficking," because that

---

[1]      "Bearing in mind the limits imposed by the Cuban Liberty and Democratic (LIBERTAD) Solidarity Act of 1996 ('Libertad Act') and other relevant statutes, the Departments of the Treasury and Commerce implemented six packages of regulatory amendments to the Cuba sanctions program, easing restrictions on travel, trade, and financial transactions. . . .  Future U.S. citizen travel will be supported by scheduled air service, which began in August 2016, and the first U.S. cruise liner visited Cuban ports in May 2016. . . . The United States will continue to encourage people-to-people linkages through government and privately sponsored exchanges, . . . .  As permitted by law, we will continue to support the development of scheduled and chartered air service and maritime links, including ferries."  Presidential Policy Directive -- United States-Cuba Normalization, The White House (Oct. 14, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/10/14/presidential-policy-directive-united-states-cuba-normalization.

travel was pursuant to and in compliance with a series of licenses and authorizations issued by the United States Government, and Defendants' alleged use of Pier 1 was "necessary" to the conduct of "such" lawful travel. **Third**, Plaintiff does not have statutory standing to bring a Title III claim as its principal place of business is not in the United States as required under the Act. **Fourth**, Title III as Plaintiff would have this Court apply it violates the United States Constitution in numerous ways.[2] Because the material facts concerning these issues are not in dispute, and on those facts Defendants are entitled to judgment as a matter of law, this Motion should be granted.

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party meets this initial burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Id.*, 906 F.3d, at 1302, 1311–12. Where the non-moving party fails to carry this burden such that no genuine dispute of material fact exists before the court, the movant is entitled judgment as a matter of law. *Pagazani v. Equifax Info. Services, LLC*, No. 15-cv-61467, 2016 WL 7508251, at *6 (S.D. Fla. Feb. 17, 2016) (Bloom, J.).

## ARGUMENT

### I.   Plaintiff Did Not Own the Terminal that Defendants Used

Defendants did not "traffic" in Plaintiff's property because Plaintiff never owned the three Piers located that the Terminal: the San Francisco, Machina, and Santa Clara Piers (the "Piers"). Further, Plaintiff never owned the Terminal, which Defendants used for embarking and disembarking passengers. Instead, the Terminal (which includes the Piers) has always been owned entirely by the Cuban Government – and thus the Cuban Government did not "confiscate" *that*

---

[2]   In addition, although this Court has previously held that Plaintiff "alleged sufficient facts" to overcome its Article III challenges "at [the Motion to Dismiss] stage," Defendants' position remains that Plaintiff lacks Article III standing because, among other things, it cannot demonstrate a concrete injury in fact that is traceable to Defendants' conduct. Because Defendants believe the bases articulated in Defendants' Omnibus and Individual Motions are more than sufficient to resolve this action, Defendants merely preserve this argument here notwithstanding that the issue of subject matter jurisdiction cannot be waived.

property at all.

As confirmed by Defendants' unrebutted expert Ambar Diaz, Plaintiff previously possessed a Concession (the "Concession"), defined in a series of Cuban administrative Decrees (the "Decrees"), granting it only a non-exclusive right to operate a business at the Terminal, and even that business was limited to providing cargo services.  This Court's prior decisions on Defendants' Motions to Dismiss were necessarily based on the pleadings, and thus the Court rightfully accepted as true Plaintiff's allegations that it "'is the rightful owner of an interest in and claim to certain commercial waterfront real property in the Port of Havana, Cuba,' identified as the Havana Cruise Port Terminal (the 'Subject Property')" and that "Plaintiff continuously owned, possessed, and used the Subject Property from 1917 until the Cuban Government confiscated it in 1960."  *E.g.*, *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, 454 F. Supp. 3d 1259, 1264, 1271–72 (S.D. Fla. 2020).  Now that this action has progressed, the undisputed evidence establishes that these allegations are wrong, and that Cuba has always owned the Terminal.

Ms. Diaz is an expert in the laws and decrees that governed marine ports in Cuba prior to 1960, and she has opined on how those laws affect and define – and limit – the scope of Plaintiff's concession.[3]  The deadline for expert disclosures has passed, Ms. Diaz's testimony is unrebutted, and her conclusions are clear:  Plaintiff has never owned the Terminal, and under Cuban law, Plaintiff ***could not*** have ever owned the Terminal, which always belonged to the Republic of Cuba.  As Ms. Diaz opines, the terms of the Concession Decrees, which are governed by Cuban law, confirm that Plaintiff possessed nothing more than a non-exclusive, time-limited right to operate a ***cargo***-services business ***at*** the Terminal.  Statement of Undisputed Material Facts ("SUMF") No. 1.  Far from ***owning*** the Piers, Plaintiff could not even exclude others from them, and had no right to operate ***passenger*** services or even prevent passenger ships (such as cruise lines) from docking at the Terminal.  SUMF Nos. 2–3.  Thus, the Cuban Government could not have "confiscated" the Terminal from Plaintiff in 1960 because Plaintiff never owned it and it already belonged to Cuba.  SUMF No. 4.  At most, the Cuban Government confiscated or terminated Plaintiff's limited right to operate a cargo business – something in which Defendants did not and could not have "trafficked" in any sense.  SUMF No. 1.

The Act provides that "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national

---

[3]      Report of Ambar Diaz, pp. 2-3

who owns the claim *to such property*[.]" 22 U.S.C. § 6082(a)(1)(A) (emphasis added). Thus, the Act requires not only that the plaintiff "own a claim to such property," but also that the defendant "traffic" in that *specific confiscated "property."* As this Court has previously explained, *"'such property' in the phrase 'the claim to such property' refers to 'property which was confiscated by the Cuban Government.'"* *Havana Docks Corp.*, 454 F. Supp. 3d at 1277 (emphasis added). Here, Plaintiff has alleged that Defendants used Pier 1 at the Terminal – but because that property *always* belonged to Cuba, it was not "property which was confiscated by the Cuban Government." *Id.* And Plaintiff cannot show that Defendants "trafficked" in Plaintiff's limited and non-exclusive right to provide cargo services – the only "property" or "interest" that Plaintiff owned.[4]

A.    The Cuban Government Owned and Controlled the Piers

Under Cuban law and the terms of Plaintiff's Concession, the Cuban Government always retained ownership and control over the use of the shoreline and any piers built on the shoreline at the Terminal, including Pier 1. SUMF No. 4. As Ms. Diaz explained in her uncontroverted report: "Before the Concession, during the Concession and thereafter the Cuban government has owned the Piers."[5]

Plaintiff's limited rights to use the Terminal were governed by the provisions of the General Law of Public Works and the Law of Ports for the Island of Cuba. SUMF No. 5. Under these provisions, "[p]ublic works projects (concessions) were characterized by State ownership."[6] The Piers are part of a port of "general interest of first class," and thus are "*property of the nation and for public use*."[7] Indeed, Article 13 of the Cuban Law of Ports states that "ports," which are defined to include "man-made constructions" within a port, as "of national sovereignty and public use," and provides that "the State provides and arranges for security and usage" there.[8]

_____

[4]    Plaintiff's right to use the Terminal also was limited because, even if not confiscated, it would have expired in 2004. Defendants assert and preserve the issue that Defendants did not traffic in Plaintiff's rights because they expired in 2004, for the reasons stated in Defendants' Motions to Dismiss, but we do not reargue the issue here in light of this Court's prior rulings on this issue.

[5]    SUMF Ex. 1, Diaz Report at p. 21, Conclusions 1 and 2.

[6]    Diaz Report at p. 6.

[7]    SUMF Ex. 2, Law of Ports, Arts. 1.1, 2, 4, 12, 13 and 16; SUMF Ex. 1, Diaz Report at p. 6.

[8]    SUMF Ex. 2, Law of Ports, Art. 1, 13, 15, 16, 17; SUMF Ex. 1, Diaz Report at p. 13 ("the basic definition of a port under Article 13 [] includes natural coast configurations and man-made constructions.").

\\MI - 750176/000004 - 763163 v9

Accordingly, the "management" and "service" of the ports was the exclusive regulatory jurisdiction of the ministries of the Cuban government.[9]

The purpose of the Concession, like all administrative concessions under Cuban law, was to delegate work on public property to the private sector for the public's use and benefit.[10] SUMF No. 6. Plaintiff's Concession began in 1905 as a proposal by Sylvester Scovel (who owned Plaintiff's predecessor) to the Cuban Government "to build a dock for *public use*" in Havana Harbor in exchange for the right to operate a cargo loading and unloading business. SUMF No. 7. The rights granted to Plaintiff, and the construction and the operation of the piers, were highly regulated and controlled by the Cuban Government. SUMF No. 8. After finding that the proposal complied with the applicable Cuban laws for such projects, the State entered six presidential Decrees spanning from 1905 to 1934 that defined Plaintiff's rights, all of which confirmed that these were for public use. SUMF No. 9.

Indeed, Plaintiff *itself* recognized that the company never owned any real estate in Cuba but only a limited "right-to-operate" on the Piers. In a November 3, 2018 email from a shareholder of Plaintiff, Robert MacArthur, whose father's company had built the Terminal's piers, to Plaintiff's President Mickael Behn, Mr. MacArthur cautions Mr. Behn not to mislead the public about what assets Plaintiff owned in Cuba:

> I do not believe Havana Docks owns any property in Cuba or ever did. The cruise lines may be taking comfort in that. We need to establish exactly what has been stolen before we can establish a claim. Clearly the right-to-operate was 'stolen' when Castro came into power. But, that right would have expired by now under the original terms. So, is it correct to claim that the cruise lines are operating with stolen property? We need to prove Havana Docks property ownership.

SUMF No. 15.

Because Cuba always owned the Terminal, the Terminal itself could not have been

---

[9]     SUMF Ex. 2, Law of Ports, Art. 18, 21, 23 ("The Governor General of the Island, as the Head of all branches of civil Administration and Delegate of the Ministry of Overseas Territories, is also the head of all services in ports that are the responsibility of said Ministry."); Law of Public Works, Art. 64; *see also Sleeper v. Puig*, 22 F. Cas. 321, 322 (2nd Cir. 1879) (observing that the Cuban Government and the Captain of the Port of Havana controlled the wharves and assigned berths).

[10]    Diaz Report pp. 5 – 7; *see also* Decrees 85, 467, 1022, 2424, 1944.

"confiscated" by the Cuban Government at any time.[11]  Thus, the Terminal cannot be considered "confiscated property" under the Act.

B.    Plaintiff Did Not Have the Right to Exclude Others from the Terminal

Because HDC **did not own** the Terminal, Plaintiff did not have the right to control its use or to exclude others from occupying or using the Piers there.  Thus, Plaintiff's Concession is materially unlike the Mariel concession at issue in *Odette Blanco de Fernandez, née Blanco Rossell et al. v. Seaboard Marine, Ltd.*, No. 20-cv-25176, 2021 WL 2173213 (S.D. Fla. July 27, 2021) ("*Blanco Rossell*").  In that case, the Court emphasized that the Mariel concession allegedly included "the right to evict any occupants from the property." *Id.* at *7.  Thus, the Court found that "had the 70-Year Concession not been illegally confiscated, the Blanco Rossell Siblings' authorization would have been required for the ZEDM to exploit those rights." *Id.*  In other words, in that case, the Cuban Government allegedly confiscated the Blanco Rossell's fundamental property interest: the right to exclude others from the subject property. *Alabama Ass'n of Realtors v. Dep't of Health & Human Services*, __ S.Ct. __, 2021 WL 3783142, at *4 (Aug. 26, 2021) (calling the right to evict "one of the most fundamental elements of property ownership").  By contrast, Plaintiff's Concession – which included only the limited right to operate a business on the property – did not include a right to evict, and thus Plaintiff's "authorization" would not have been required for Defendants to have used the Piers.

Several important provisions of Cuban law establish that Plaintiff did not enjoy exclusive rights to the Terminal that would prevent third parties such as Defendants from docking at the Piers.  Pursuant to Article 12 of the Law of Ports, the public has "[t]he unrestricted right to use the coastal sea, inlets, anchorages, bays, and openings [*i.e.* ports]."[12]  As Ms. Diaz states, pursuant to Article 12, "the public[,] including cruise lines, could use the Piers to embark and disembark passengers."[13]  Further, Plaintiff's Concession was subject to Article 44 of the Law of Ports, which provides that "[s]uch authorization **shall not constitute a monopoly**, and therefore others may be

---

[11]    In relevant part, the Act defines "confiscated" as: (A) the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959—(i) without the property having been returned or adequate and effective compensation provided; or (ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure. 22 U.S.C. § 6023(4).

[12]    SUMF Ex. 2, Law of Ports, Art. 12.

[13]    Diaz Report at 13, 21.

granted for the same class of works *in the same port, beach or portions of the coast*, provided that public service is not impaired by them."[14] Thus, Plaintiff did not have a monopoly over its use of the Terminal. SUMF No. 10; *see also* Diaz Report, at 15 ("The purpose of this provision was to guarantee that the project was for the public benefit, rather than the benefit of HDC.").

Article 48 of the Law of Ports further imposed important limitations, precluding anyone from preventing third parties from using the very same premises[15]:

> … it will be granted to that which meets the necessary conditions to *protect existing rights to enter the port, anchor, embark and disembark afloat or on the coast, such that no service that is freely practiced is compulsory to the public*.

Accordingly, the Concession could not impair the preexisting right of the public, including Defendants, to use the Terminal without Plaintiff's authorization.

C.  Plaintiff Only Had a Limited Right to Conduct Cargo Operations

The rights granted to Plaintiff, and the construction of the project and oversight thereafter, were heavily regulated and controlled by the Cuban Government. In this regard, the only right afforded to Plaintiff was the right to operate a cargo business, which was the purpose of the Concession. SUMF No. 11. Neither the Presidential Decrees nor the Scovel Proposal mention or request that Plaintiff be afforded the right to provide passenger terminal services. SUMF Nos. 12–14. Nothing in Cuban law authorized Plaintiff to provide such services either. SUMF No. 14. Once the project was completed, the Concession contemplated that Plaintiff "would be allowed to operate a *cargo service* on the premises subject to the fees determined by the Cuban State."[16] SUMF No. 7. (emphasis added). Perhaps not surprisingly, then, in a submission to the FCSC, Plaintiff said that it "offers docking and warehousing facilities for import and export, bonded warehouses and provisional *cargo* deposits for merchandise pending customs appraisement, etc." SUMF No. 16. There was no mention of passengers. *Id.*

Significantly, Mr. Scovel's proposal offered to rebuild a booth for providing passenger services that had previously existed at this part of the Port of Havana – and offered to deliver that passenger booth *to the Cuban Government*. SUMF No. 12. This offer was memorialized in the Concession and subsequent Presidential Decrees, which required Plaintiff and its predecessors to

---

[14]      SUMF Ex. 2, Law of Ports, Art. 44; SUMF Ex. 1, Diaz Report at 15.
[15]      SUMF Ex. 2, Law of Ports, Art. 48; SUMF Ex. 1, Diaz Report at 15.
[16]      SUMF Ex. 2, Diaz Report at 7; SUMF Ex. 3, Decree 467, ¶¶ 17, 19 ("The works comprising the project are concessioned for public service, subject to the rates accepted in the auction for them.")

deliver the reconstructed passenger booth to the Government upon its completion.  SUMF No. 13. Since passenger services had previously existed at this location, and under the Law of Ports the Concession could not alter "prior rights to the use of the port and its works," the delivery of the passenger booth to the Republic of Cuba only confirms that Plaintiff and its predecessors never had a right to control or even offer passenger services at the Terminal.  SUMF No. 14.

In short: Plaintiff neither owned nor controlled the Terminal or the Pier at which Defendants docked.  Plaintiff had only a limited right to operate a non-exclusive cargo-services business at the Terminal – rights that had nothing to do with the Defendants' use of the Terminal. When the Cuban Government terminated Plaintiff's right to operate that business, it did not "confiscate" the Terminal, or the Piers—which, after all, the Cuban Government always owned – and thus Defendants did not use "confiscated property" when they docked in Havana.

> D. **The Foreign Claims Settlement Commission Decision**
> **Does Not Give the Plaintiffs Rights They Never Really Owned.**

Contrary to Cuban law and the clear factual record in this case, Plaintiff has alleged that the Cuban Government confiscated the **Terminal** from it, relying primarily on a 1971 decision by the Foreign Claims Settlement Commission ("FCSC") certifying Plaintiff's claim to confiscation of a "Concession and tangible assets."  The FCSC decision was based upon misstatements Plaintiff made to the FCSC in 1967 regarding its ownership of real estate in Havana.  In its April 27, 1967 claims application, Plaintiff's then-Vice President Thomas Whittaker stated that Plaintiff owned real estate in Havana made up of "land and concessions."  SUMF 17.[17]  In addition, in answering the FCSC's specific questions regarding the extent of HDC's property in Cuba, Plaintiff stated[18]:



> Answers to:
>
> INFORMATION QUESTIONNAIRE FOR
> UNITED STATES PROPERTY OWNERS IN CUBA
>
> The HAVANA DOCKS CORPORATION owns and operates in Havana Harbor, three Ocean Steamship piers, named respectively, the San Francisco, Machina and Santa Clara piers linked by a marginal building,  This terminal company offers docking and warehousing facilities for import and export, bonded warehouses and provisional cargo deposits for merchandise pending customs appraisement, etc.

SUMF No. 18.  As is now known, these representations were untrue:  Plaintiff had only a limited right to operate a cargo business at the Terminal; it did not own the Terminal, including any of its

---

[17]   Exhibit D, HDC FCSC Claim Form, p. __.
[18]   Exhibit E, HDC Response to FCSC Interrogatories, p. __.

Piers or marginal building.  SUMF No. 1.  The instructions for submitting claims to the FCSC stated any claimant making such false statements would forfeit any rights to the FCSC's awards. *See* Final Report of Cuba Claims Settlement Commission at 118 ("Any claimant … who knowingly and willfully conceals a material fact or makes a false statement or representation with respect to any matter before the Commission shall, under law, forfeit all rights to any award or payment on account of this claim."); 22 U.S.C. § 1623(e).  Accordingly, the FCSC's decision is not entitled to deference here.  *De Gaster v. Dillon*, 247 F. Supp. 511 (D.D.C. 1963) (refusing to enforce FCSC award after determining that fraudulent evidence was presented to the FCSC).[19]

Moreover, the FCSC's decision was made after an *ex parte* proceeding, based on evidence submitted by Plaintiff claiming – wrongly – that Plaintiff owned the Property.  *E.g.*, *Shanghai Power Co. v. U.S.*, 4 Cl. Ct. 237, 241 (Cl. Ct. 1983) (rejecting argument that FCSC's findings were conclusive, noting that "the FCSC made its valuation entirely on an ex parte basis, with plaintiff alone producing evidence").  Defendants had no notice of or opportunity to challenge the FCSC's decision, nor any chance to object when Plaintiff told the FCSC that it owned such property when, in reality, the property had always belonged to the Cuban Government.

Indeed, treating the FCSC's findings here as "conclusive," 22 USC 6083(a)(1), would violate due process and contravene the fundamental "principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40–41 (1940).  Under well-established principles of Due Process, a party cannot be bound by an earlier tribunal's adjudicative judgment where the party was neither represented nor had the opportunity to participate in the earlier proceeding. *Richards v. Jefferson Cnty.*, 517 U.S. 793, 802–03 (1996).  Agency findings are treated as res judicata where an agency "resolved disputed issues of fact properly before it which the parties have had an adequate

---

[19]       In any event, despite Plaintiff's claims, the FCSC decision did ***not*** hold that Plaintiff owned the Terminal.  The FCSC's task was to determine the purported amount of Plaintiff's loss, which is precisely what the decision accomplished (although Defendants do not believe it did so correctly).  Thus, the FCSC did not discuss any relevant issues of Cuban property law, such as the issues described at length in Ms. Diaz's report.  Instead, it relied largely on *financial* statements and *appraisals*, documents far more suited for determining a financial valuation than property ownership.  For example, when the Commission certified Plaintiff's losses attributable to "Land and Concession" and various Piers, it relied chiefly on HDC's *Balance Sheet*. (FCSC Proposed Decision at 5.)

opportunity to litigate," *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422 (1966), but no such opportunity was given or could have been given to Defendants here.  Thus, in other contexts, administrative determinations secured *ex parte* are not binding in subsequent suits involving third parties who had no opportunity to appear before the agency.  *E.g.*, *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1169 (11th Cir. 2019) (finding third-party was not bound by Patent and Trade Office finding "because it was not a party to any prior proceeding").

In sum, there is overwhelming evidence that Plaintiff did not own the Piers or Terminal, and there is a serious Due Process issue that would result from treating the FCSC's *ex parte*, 1971 decision as conclusive in this private litigation.

> E.     Defendants' Use of the Piers Did Not Constitute Trafficking
> in Plaintiff's Limited Right to Conduct Cargo Operations

As described above, the only "confiscated property" at issue in this litigation was Plaintiff's limited, non-exclusive right to provide cargo services at the Terminal.  SUMF No. 1.  This Court has already held that Defendants are liable only for trafficking in "confiscated property" – and Defendants did not use or have anything to do with Plaintiff's Concession rights, since Plaintiff's Concession did not include handling passengers.  *Havana Docks Corp.*, 454 F. Supp. 3d at 1277 ("Further, 'such property' in the phrase 'the claim to such property' refers to 'property which was confiscated by the Cuban Government.'").  Under the plain text of the Act as described above, Defendants did not traffic in Plaintiff's confiscated property.

This Court's decision in *Blanco Rossell* is instructive.  As discussed above, in that case, which was decided under Rule 12(b)(6), the Blanco Rossell siblings alleged that they had broad property rights, including ownership of land and an unusually broad concession, which included the right to "plan, study, execute, maintain, and exploit" public docks.  2021 WL 3173213, at *7. In addition, there were "exceptional" rights to the Bay of Mariel, including the right to evict others at the property.  *Id.*  In contrast, Plaintiff here had only a limited, non-exclusive right to use the Piers to conduct cargo operations.

The Court noted that the statute broadly defines property that can be confiscated.  22 U.S.C. § 6023(13)(A).  The Court then held that trafficking includes the use of any aspect of the property confiscated.  *Blanco Rossell*, 2021 WL 3173213, at *6.  Seaboard argued that the container terminal it used was not constructed until 2009, well after the Blanco Rossell siblings' property had been confiscated. *Id.* at *6.  The Court found that in constructing the terminal the Cuban Government planned, studied, executed, and maintained public docks.  Therefore, the Cuban

Government exploited one of the rights that allegedly was granted to the Blanco Rossell siblings in the Concession. *Id.* at *7. The Court explained that, if the Blanco Rossell Concession had not been confiscated, the Cuban authorities would have needed the authorization of the Blanco Rossell siblings to construct the terminal. *Id.*

Here, Plaintiff's confiscated property was only a particular, narrow interest in the Terminal. Because the property confiscated from Plaintiff was only a limited right to conduct cargo operations, Defendants did not use or benefit from that right when it conducted passenger operations. If the Plaintiff's Concession had not been confiscated, the Cuban Government still would not have needed Plaintiff's permission to assign Defendants' vessels to the piers of the Terminal to conduct passenger operations.[20]

Accordingly, Plaintiff cannot establish as a matter of law that Defendants trafficked in any property confiscated from it by the Cuban Government.

## II. Defendants Did Not "Traffic" Because Their Alleged Use of the Terminal Was Incident to Lawful Travel to Cuba and Necessary to the Conduct of Such Travel

### A. The Lawful Travel Exclusion

The definition of "traffics" "does ***not include*** . . . transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel." 22 U.S.C. §6023(13)(B)(iii) (emphasis added). Because the undisputed facts confirm that Defendants' use of the Terminal was necessary and incident to travel that was unquestionably lawful (based on the Obama Administration's well-known policy toward Cuba), Defendants did not "traffic."

Indeed, Congress took care to provide safe harbor in these circumstances. The 1995 version of the bill that Congress eventually passed and the President enacted into law did not exclude lawful travel from the definition of "trafficking." H.R. REP. No. 104-202(I), at 5, (1995), *reprinted in* 1996 U.S.C.C.A.N. 527. In response, a number of Senators expressed concern that the Act would needlessly restrict Americans' ability to lawfully travel to Cuba. These concerns made sense because before Helms-Burton, a number of Presidents had ***allowed*** Americans to travel

---

[20]    Similarly, in *Havana Docks Corp.*, the Court stated that there was a direct "[c]ausal link between a claimant's injury from the Cuban Government's expropriation of their property and a subsequent trafficker's unjust enrichment from the use of ***that*** confiscated property." 484 F. Supp. 3d at 1230 (emphasis added). Here, Defendant's discharge of passengers at the Piers did not involve the specific non-exclusive limited right to conduct cargo operations that the Cuban Government has confiscated from Plaintiff.

to Cuba.  *See Regan v. Wald,* 468 U.S. 222, 224 (1984) (explaining that for five years the United States Department of the Treasury's Office of Foreign Asset Control ("OFAC") allowed transactions incident to travel in Cuba).  Thus, Senator Simon offered an amendment to the Bill that aimed to protect lawful travel.  141 CONG. REC. S15320-01, S15320, 1995 WL 614999.  As he explained, "this amendment says simply that Americans can use what I think is a constitutional right to travel. [Congress] should not restrict travel to any country unless security is threatened."  *Id.*[21]  Indeed, the final Conference Report makes clear that the scope of the lawful travel exclusion is broad: "The definition of 'traffics,' as used in Title III, has been modified to ***remove any liability for . . . any activities related to lawful travel to Cuba*.**"  142 CONG. REC. H1645-02, 1996 WL 90487, at H1656 (emphasis added).

> **B.  Defendants' Travel to Havana, Cuba Was Lawful
>     Because It Was Licensed by the United States Government**

The lawful travel exclusion allows "lawful travel to Cuba."  Defendants' passenger carrier services to Havana were unquestionably lawful because they were licensed, authorized, and encouraged by the United States Government.

In 2015, the Obama Administration announced it would relax travel restrictions to Cuba and authorized certain types of travel between the United States and Cuba.  In September 2015, OFAC promulgated a general license authorizing cruise lines to transport passengers to Cuba.[22] In order to do so, OFAC promulgated a regulation containing a "general license" that "authorized" companies "subject to U.S. jurisdiction," like Defendants, "to provide carrier services to, from, or within Cuba in connection with travel or transportation between the United States and Cuba."  *See* 31 C.F.R. § 515.572(a)(2)(i).[23] Nothing in the general license limited ***where*** in Cuba cruise carriers could travel – and indeed, when President Obama made one of his most express statements about

---

[21]    Senator Simon's initial travel-related amendment failed.  *See* 141 CONG. REC. D1225-02, D1255, 1995 WL 615160.  However, in 1996, Senator Helms – a co-sponsor of the law – proposed the carve-out amendment again, which was passed and incorporated into the final law.

[22]    OFAC is charged with regulating travel to Cuba.  *See, e.g., Martinez v. Rep. of Cuba,* No. 10-22095, 2011 WL 13115432, at *3 (S.D. Fla. June 27, 2011), *report and recomm. adopted in part, rejected in part on other grounds*, 2011 WL 13115471 (S.D. Fla. Aug. 26, 2011) ("Cuba-related travel transactions by persons subject to U.S. jurisdiction are prohibited unless authorized by OFAC."); *see also Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F. Supp. 2d 59, 64 (D.D.C. 2009), *aff'd*, 638 F.3d 794 (D.C. Cir. 2011) (explaining that OFAC general licenses "broadly authorize[] entire classes of transactions").

[23]    Unless stated otherwise, all references in this Motion to sections of the Code of Federal Regulations are to the versions in effect from September 2015 through June 2019.

re-authorizing cruise voyages to Cuba, he was *in Havana*.[24]  And, when those services were provided by a vessel, those companies were "authorized to provide lodging services onboard such vessels to persons authorized to travel to or from Cuba pursuant to this part during the period of time the vessel is traveling to, from, or within Cuba, *including when docked at a port in Cuba*." 31 C.F.R. § 515.572(a)(4) (Sept. 21, 2015) (emphasis added).  Another regulation provided that "*[a]ll transportation-related transactions ordinarily incident to travel* to, from, and within Cuba . . . are authorized."  31 C.F.R. § 515.560(c)(1) (emphasis added); *see generally* 80 Fed. Reg. 56915 (Sept. 21, 2015); *id.* at 56916 ("[T]hese amendments . . . facilitate travel to Cuba for authorized purposes (including authorizing by general license the provision of carrier services by vessel) . . . .  OFAC is amending section 515.572 to authorize persons subject to U.S. jurisdiction to provide carrier services by vessel, without the need for specific licenses from OFAC, and to add an authorization to provide certain lodging services aboard such vessels in connection with such transportation.") (parenthetical in original).[25]

In tandem with those OFAC regulations, the U.S. Department of Commerce, Bureau of Industry and Security ("BIS") promulgated a regulation, also effective September 21, 2015, authorizing cruise ships to transport passengers to *any* location in Cuba.  Likewise, the United States Coast Guard, in conjunction with the Department of Homeland Security, removed the conditions of entry on vessels arriving from the country of the Republic of Cuba, effective March 22, 2016.  Specifically, "[b]ased on port assessments conducted in February 2016, the Coast Guard has determined that the Republic of Cuba is now maintaining effective anti-terrorism measures, and is accordingly removing the conditions of entry announced in the previously published Notice of Policy." *See* Notification of the Removal of Conditions of Entry on Vessels Arriving From the

---

[24]     *Remarks by President Barrack Obama*, Havana, Cuba (March 21, 2016), *available at*  https://obamawhitehouse.archives.gov/the-press-office/2016/03/21/remarks-president-obama-and-president-raul-castro-cuba-joint-press ("With last week's port security announcement, we've removed the last major *hurdle to resuming cruises and ferry service* — all of which will mean even more Americans visiting Cuba in the years ahead and appreciating the incredible history and culture of the Cuban people.") (emphasis added).

[25]     *See* 15 C.F.R. § 740.15(d)(1) and (6)(ii) (Sept. 21, 2015); *see generally* 80 Fed. Reg. 56898 (Sept. 21, 2015); *id.* at 56899-01 ("The Commerce and Treasury Departments are taking additional coordinated actions in support of the President's Cuba policy.  This rule amends the terms of existing license exceptions that are available for Cuba, . . . and creates a new licensing policy to . . . facilitate travel to Cuba for authorized purposes."); *see also* 15 C.F.R. § 746.2 ("You may export or reexport without a license if you transaction meets all the applicable terms and conditions of any of the following License Exceptions.").

Republic of Cuba, 81 Fed. Reg. 15326-15327 (March 22, 2016).  These approvals for travel were a key aspect of the Obama Administration's new policy toward Cuba.[26]

Additionally, when Norwegian and Royal Caribbean applied to OFAC for a specific license to sail to Cuba, OFAC responded that given the existence of the general license to travel to Cuba, nothing more or more specific was required.  SUMF No. 19.[27]  Notably, the United States Government never restricted *where* in Cuba a cruise carrier could travel or disapprove of Norwegian's and Royal Caribbean's plans to sail to Cuba.  Thus, there can be no doubt that these OFAC general licenses render Defendants' voyages to Havana "lawful travel."[28]

Finally, just as Defendants did not *begin* sailing to Cuba until after licenses were issued allowing passenger carrier services to Cuba, Defendants *stopped* sailing to Cuba as soon as the regulations were again amended, effective as of June 5, 2019, to end commercial cruise travel to Cuba.  SUMF Nos. 20–21; *see* 84 Fed. Reg. 25992 (June 5, 2019) (containing the relevant CACR amendments); 84 Fed. Reg. 25986 (June 5, 2019) (containing the relevant EAR amendments).  In short, Defendants' sailings to Havana constituted "lawful travel to Cuba" because Defendants' vessels docked and disembarked passengers in Cuba pursuant to general licenses and authorizations issued by OFAC and BIS.

### C. Defendants' Alleged Use of the Terminal Was Incident to Defendants' Lawful Travel

The lawful travel exclusion is satisfied where the transactions and uses of confiscated property are "incident" to lawful travel to Cuba.  "Incident" means "[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." INCIDENT, Black's Law Dictionary (10th ed. 2014).  Thus, a use of property is "incident to lawful travel" when the use of the property "arises out of" or is "otherwise connected with" the travel.

---

[26]    *See* n.1, *supra.*

[27]    Carnival had previously applied for and obtained a specific license before the general license was issued, as described in Carnival's Individual Motion for Summary Judgment.

[28]    Further, the general licenses were regulations promulgated pursuant to authority given to the President by the Trading With the Enemy Act of 1917 ("TWEA"), 50 U.S.C. § 4305(b), which provides that a person who acts pursuant to such a regulation cannot "be held liable in any court" under the TWEA.  In turn, the TWEA is expressly incorporated in the definition of "economic embargo of Cuba" in the Helms-Burton Act, 22 U.S.C. § 6023(7)(A).  Therefore, acting pursuant to the general licenses demonstrates "lawful travel" for purposes of trafficking; however, Title III also requires that the alleged use or transaction must be incident to and necessary to that lawful travel, which is discussed below and in Defendants'' individual summary judgment briefs.

*Comnet Wireless, LLC v. Benning Power Elecs., Inc.*, No. 15-cv-3424, 2016 WL 8578007, at *2 (D. Colo. Feb. 8, 2016) (describing costs of airfare to Denver as "expenses incident to travel"); *see also* 50 U.S.C. § 1702(b)(4) (defining "transactions ordinarily incident to travel to or from any country" to include "arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages"). This plain meaning is reinforced by legislative history: "[the exclusion was intended to] **remove** *any* **liability for** . . . *any* **activities** *related to lawful travel to Cuba*." 142 CONG. REC. H1645-02, 1996 WL 90487, at H1656 (emphasis added).

That is precisely what Defendants' use of the Terminal was: the vessels needed a place to dock, and docking at Pier 1 was incident to getting the guests to their lawful travel in Cuba. Thus, docking at Pier 1 and using the terminal building to disembark and process passengers was "incident to" both Defendants' and their passengers' "lawful travel."

### D. Defendants' Alleged Use of the Terminal Was Necessary to the Conduct of Such Travel

Last, Defendants' alleged use of the Terminal during their lawful travel to Havana was "necessary to the conduct of such travel." As a threshold matter, "necessary" does *not* mean having no other alternative. But, even if it did, Defendants' alleged use of the Terminal would meet that definition because the Cuban Government *required* Defendants to dock at Pier 1 of the Terminal when Defendants' ships were calling in Havana—indeed, this was the only place in Havana where cruise passengers were allowed to embark or disembark. In fact, the United States Department of State told Plaintiff on multiple occasions that the cruise lines' use of the Terminal was "necessary" to the conduct of their lawful travel and thus covered by the lawful travel exclusion.

#### i. *Necessary Does Not Mean Defendants Must Have Had No Other Alternative Than to Use the Terminal*

The word "necessary," as used in the lawful travel exclusion, does not mean having "no other alternative." "[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). "As a basic rule of statutory interpretation," courts "read the statute using the normal meanings of its words." *Consol. Bank, N.A., Hialeah v. U.S. Dept. of Treasury, Office of Comptroller of Currency*, 118 F.3d 1461, 1463 (11th Cir. 1997).

The Eleventh Circuit has held, in accordance with Supreme Court precedent and the ordinary usage of the term, that necessity is governed by a "test of *reasonableness*, not of absolute

necessity." *Inbesa Am., Inc. v. M/V Anglia*, 134 F.3d 1035, 1036 (11th Cir. 1998) (citations omitted) (emphasis added) ("To qualify as maritime, moreover, the elements of a contract must 'pertain directly to and be necessary for commerce or navigation upon navigable waters . . . The test we apply in deciding whether the subject matter of a contract is necessary to the operation, navigation, or management of a ship is a test of reasonableness, not of absolute necessity.'"). Black's Law Dictionary notes that "necessary" "may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought." *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018) (quoting Black's Law Dictionary 928 (5th ed. 1979)).

This makes sense, for as far back as Chief Justice Marshall in *McCulloch v. Maryland*, courts have concluded that the term necessary means "convenient, or useful, or essential" to the relevant end, not "absolutely necessary." 17 U.S. 316, 388 (1819) (interpreting the term "necessary" as used in the Constitution's Necessary and Proper Clause). Especially considering that Congress exercises its own Article I powers within these generous bounds of what is "necessary and proper," its statutory prescription should be read in harmony. Indeed, this venerable usage of "necessary" echoes throughout the law. *See*, *e.g.*, *Fish v. Kobach*, 840 F.3d 710, 734 (10th Cir. 2016) ("[C]ourts also have frequently interpreted 'necessary' to mean something less than absolute necessity."); *C. I. R. v. Tellier*, 383 U.S. 687, 689 (1966) (a business expense is "necessary" within the meaning of the Tax Code if it is "appropriate and helpful"), *accord CSX Corp. v. United States*, 909 F.3d 366, 370 (11th Cir. 2018) (Jordan, J., concurring).[29] Thus, as a matter of ordinary usage, when the Act refers to a transaction or use being "necessary to the conduct of such travel," it means that the use must be important, helpful, or appropriate to the conduct of the lawful travel at issue – ***not*** that there is "no other alternative."[30]

---

[29]   *See also Nat. Res. Def. Council, Inc. v. Thomas*, 838 F.2d 1224, 1236 (D.C. Cir. 1988) ("[C]ourts have frequently interpreted the word 'necessary' to mean less than absolutely essential, and have explicitly found that a measure may be 'necessary' even though acceptable alternatives have not been exhausted." (internal citations omitted)); *Nat'l R.R. Passenger Corp. (Amtrak) v. 3.44 Acres More or Less of Land & Bldg. located at 900 2nd St. NE, Washington, DC 20002-3557*, 266 F. Supp. 3d 63, 68 (D.D.C. 2017) ("[F]or centuries the law has also recognized a broader understanding of necessity that does not imply indispensability."); *F.T.C. v. Rockefeller*, 591 F.2d 182, 188 (2d Cir. 1979) (holding that the FTC can gather information "necessary" to its investigations in an ancillary investigation, if the need for the information "arise[s] reasonably and logically out of the main investigation.")

[30]   Other courts also have frequently interpreted "necessary" to mean something less than absolute necessity. *See, e.g., United States v. Comstock*, 560 U.S. 126, 134 (2010) (acknowledging that "Chief Justice Marshall emphasized that the word 'necessary' does not mean

The legislative history of the Act memorialized in the Conference Report, which "next to the statute itself it is the most persuasive evidence of congressional intent," *RJR Nabisco, Inc. v. United States*, 955 F.2d 1457, 1462 (11th Cir. 1992), further confirms that Congress intended the lawful travel provision to be read broadly. *See* 142 Cong. Rec. H1645-02, H1656, 1996 WL 90487 (explaining that the reason for adding the lawful travel exclusion was to "remove any liability for . . . ***any activities*** related to lawful travel") (emphasis added). The Act was never intended to punish or deter lawful travel to Cuba (or any conduct related to such travel). *Id.* at H1656 ("The definition of 'traffics' … has been modified to ***remove any liability for*** . . . ***any activities related to lawful travel to Cuba***." (emphasis added)).

Context and a plain reading of the provision bolsters this interpretation even further. *See Util. Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 321 (2014) (noting that statutory interpretation must take context into account). The Act does not require that the use of the property at issue be "necessary" to "such lawful travel"; rather, the term "necessary" is coupled with another phrase – "the conduct of" the travel. In that context, courts have found "necessary" does not mean strictly essential. *See United States v. Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969) (finding that the right to solicit customers in a given area is "necessary to the conduct" of a business even though the court did not consider whether those specific customers were essential to the business); *Mudge v. Stop & Shop, Inc.*, 162 N.E.2d 670, 672 (Mass. 1959) (stating that grocery carts are "necessary to the conduct" of grocery stores even though the court did not consider that customers could theoretically move goods through the store by other means).

Elsewhere in the Act, Congress similarly used "necessary" in ways that if the term were actually intended to mean absolutely essential, would render those subject provisions nonsensical. For instance, the Act states that "the President shall take all ***necessary*** steps to ensure the safety and security of the United States against espionage by Cuban journalists it believes to be working for the intelligence agencies of the Cuban Government." 22 U.S.C. § 6044(b) (emphasis added).

---

'absolutely necessary.'"); *Cellular Telecomms., & Internet Ass'n v. F.C.C.*, 330 F.3d 502, 509–10 (D.C. Cir. 2003) ("Hence the word 'necessary' does not always mean absolutely required or indispensable. Indeed, there are many situations in which the use of the word 'necessary,' in context, means something that is done, regardless of whether it is indispensable, to achieve a particular end."); *Sierra Club v. Lyng*, 663 F. Supp. 556, 559–60 (D.D.C. 1987) ("In this context 'necessary' simply embraces measures 'needed to achieve a certain result or effect,' . . . that is, measures that are needed as part of a program designed to control, in the sense of restrain or curb, beetle infestations.").

None would argue that under this section the President could not deploy guards to protect the United States from espionage because some other method might also be effective, and thus that such deployment were not "absolutely necessary" to "ensure the country's safety and security."[31]

ii.     *Defendants' Alleged Use of the Terminal*
        *Was "Necessary" to the Conduct of Their Lawful Travel to Cuba*

To be exempted from 'trafficking,' transactions and uses of confiscated property do not need to be necessary **to conduct** lawful travel to Cuba, rather they merely need to be "necessary **to the conduct of *such* travel**." 22 U.S.C. § 6023(13)(B)(iii) (emphasis added). And "such travel" refers to the "lawful travel to Cuba" referred to in this first part of the provision. *See id.* The distinction between having to show necessity "to the conduct of such travel" – as the statute requires – as opposed to necessity "to conduct such travel" more broadly – as Plaintiff advocates for – is material. The very fact that cruise lines customarily needed to **port** in Havana in order to **travel** to Havana should suffice to establish as a matter of law that the "uses" at issue were "necessary to the conduct of such travel" (sailing to Havana) so as to fall within the safe harbor.

While Defendants had a license from the United States Government to travel to anywhere in Cuba, this action only concerns Defendants' voyages to Havana – the only location where the Subject Property lies. Thus, the operative inquiry here is whether Defendants' transactions and uses of the Terminal were necessary to the conduct of **such travel** – that is: Defendants' travel to **Havana** – not whether Defendants' transactions and uses were necessary to conduct travel to the island at all. *See Gatlin Oil Co. v. United States*, 169 F.3d 207, 211 (4th Cir. 1999) (quoting *Black's Law Dictionary* 1432 (6th ed. 1990)) (holding that the term "such" is limited to "the object as already particularized in terms which are not mentioned, and is a descriptive and relative word, referring to the last antecedent").

iii.    *Defendants' Use of the Terminal*
        *Was "Necessary" Under Any Interpretation of that Word*

As just discussed, "necessary to the conduct of such travel" means that the use must be

---

[31]     Additional examples of the use of "necessary" by itself are found throughout the Act. *See, e.g.*, 22 U.S.C. § 6062(b)(2)(A)(i)(I) ("[A]ssistance to Cuba under a transition government shall, subject to an authorization of appropriations and subject to the availability of appropriations, be limited to--such food, medicine, medical supplies and equipment, and assistance to meet emergency energy needs, as is necessary to meet the basic human needs of the Cuban people . . . ."); *id.* at § 6039(b)(1) ("The President shall take the necessary steps to encourage the Organization of American States to create a special emergency fund for the explicit purpose of deploying human rights observers, election support, and election observation in Cuba.").

useful, appropriate, helpful, or related to the conduct of the lawful travel at issue.  Defendants' use of the Terminal undeniably meets that standard.  But, even if "necessary" meant "no other alternative," Defendants' use of the Terminal would still meet that heightened standard.

During the time they were sailing to Havana, Defendants' ships only docked at Pier 1.  SUMF No. 22.  And this was not by Defendants' choice.  To the contrary, the Cuban Government *required* Defendants to dock at that pier, at that terminal, when calling in Havana.  SUMF Nos. 23, 26.  Indeed, when Defendants' ships arrived in Havana, the Cuban harbor pilots physically boarded the ships and they *themselves* docked the ships at Pier 1.  SUMF No. 24.  And Defendants did not accept this mandate unquestioningly.  Rather, on multiple occasions Defendants asked the Cuban Government for permission to anchor their ships offshore and "tender" passengers ashore, as well as to dock at other facilities in Havana (such as the Port of Mariel) or at other cities located nearby Havana (such as Matanzas), *but the Cuban Government did not authorize any such request*.  SUMF No. 23.  Further, even if tendering had been allowed, the passengers would *still* need to be transported to the Terminal for required tasks such as customs and immigration.  SUMF No. 25.  Thus, under any construction of the word "necessary," Defendants' use of the Terminal was "necessary to the conduct of such travel."

### iv.    *The United States Government Agreed that the Lawful Travel Exclusion Applied to Defendants' Conduct*

It is undisputed that the United States Government is the sole arbiter of whether an entity has violated an applicable general license or authorization (*i.e.*, whether that entity's conduct was "lawful" under such license or authorization).  And against that backdrop, the United States Government repeatedly and unequivocally agreed that cruise lines' passenger carrier services to Cuba – and specifically cruises lines' that used the Terminal to stop in Havana – met the "lawful travel" exclusion requirements.  Indeed, at no point did the United States Government even suggest, let alone conclude, that Defendants' use of the Terminal constituted  "trafficking.".

Crucially, *Plaintiff itself* asked the United States Government to weigh in on the legality under Title IV of the Act of the cruise lines' actions at the Terminal.  SUMF No. 27.[32]  The United

---

[32]    Plaintiff requested that the United States Department of State invoke Title IV of the Helms-Burton Act, which requires the denial of visas to persons who traffic in confiscated property to which a U.S. national owns a claim.  *See* 22 U.S.C. § 6091(a).  Importantly, the language of Title IV's lawful travel exclusion is *identical* to that contained in Title III.  *See* 22 U.S.C. § 6091(b)(2)(B)(iii) ("The term 'traffics' does not include . . . transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are

States Government's response was clear and simple:  ***the cruise lines' use of the Terminal was*** ***<u>not</u> trafficking because that conduct fell within the lawful travel exclusion***.   SUMF No. 28.  Plaintiff nonetheless repeatedly communicated with federal government officials and lawyers, attempting to obtain confirmation that the cruise lines' use of the Terminal constituted "trafficking," and even lobbied the Administration to activate Title III.  SUMF No. 27.  But the United States Government never once obliged and, in fact, told Plaintiff the opposite:  "[A]s previously discussed, given the ***clear exclusion in Title IV's definition of 'traffics' of*** ***transactions and uses of property incident to lawful travel to Cuba, we are not currently*** ***pursuing Title IV actions in relation to commercial cruise lines***."  SUMF No. 28.  And this was not the only time that the United States Government rebuffed Plaintiff's attempts to persuade the government to take action against the cruise lines under the Act.  SUMF No. 28, Ex. 86, HDC 001013 at 001013 (acknowledging a State Department representative's "assertion [during an in-person meeting] that the cruise lines were not trafficking by virtue of [the lawful travel exclusion]"); SUMF No. 28, Ex. 87,  HDC 013553 at HDC 013554 ("Heretofore The State Department has asserted that the use of the confiscated port properties in Cuba has been 'necessary' to the conduct as such travel as allowed for in the law . . . ."); SUMF No. 28, Ex. 88, HDC 001328 at HDC 001328 ("The State Dept. lawyer specifically told me they viewed docking on our property as 'necessary' and so they wouldn't consider it trafficking."); SUMF No. 28, Ex. 89, HDC 001498 at HDC 001501 ("On 3 separate occasions when I presented these facts to State Department officials and requested a Title IV action against the foreign executives and directors of the cruise lines, State officials determined without any investigation that it was necessary for the cruise lines to use our properties to cruise to Cuba.").

The opinions of the State Department ordinarily are "entitled to deference as the considered judgment of the Executive on a particular question of foreign policy."  *Republic of Austria v.* *Altmann*, 541 U.S. 677, 701–02 (2004).[33]  As part of his foreign policy, President Obama made

_____

necessary to the conduct of such travel.")

[33]    After all, the President (via the State Department) exercises considerable authority in the realm of foreign affairs, *see, e.g.*, *Bank Markazi v. Peterson*, 578 U.S. 212, 1328–29 (2016), especially when, as here, the President is acting pursuant to an express authorization of Congress, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38 (1952) (Jackson, J., concurring).  To avoid entanglement in foreign policy matters that are properly the province of the political branches, courts have consistently upheld and deferred to determinations by the President and the State Department with regard to the viability of claims touching on matters of foreign

the considered judgment to authorize and encourage Defendants to sail their cruise ships to Cuba, and the State Department implemented that policy in part by repeatedly confirming that the lawful travel exclusion in 22 U.S.C. § 6023(13)(B)(iii) covers the sailings to Cuba at issue in this case. This Court should defer to—not interfere with—those foreign-policy judgments.  Moreover, despite Plaintiff's repeated efforts, the Government *never* imposed any penalty under the Act against Defendants for any alleged "trafficking" in the Terminal.  And this did not change during the Trump administration, which took a much stricter approach to travel to Cuba by reducing the number of travel opportunities to Cuba.   Thus, this Court should defer to these determinations by State Department officials that the lawful travel exclusion applies to the conduct at issue.

v.     *The Act Does Not Prohibit the United States Government from Promulgating Regulations Permitting Cruise Travel to Cuba*

Finally, there is no question that the OFAC regulations allowing travel to Cuba – *anywhere* in Cuba – were lawful.  This is because until a court rules that any such regulations are invalid, they constitute, for purposes of private lawsuits such as this, binding law, and their validity is not a matter for this litigation.  "Without deciding that the regulation is invalid, it, of course, has the force of law. This court is powerless to declare it invalid unless we find it to be unreasonable and inconsistent with the law."  *Davis v. Bowen*, 840 F.2d 822, 824 (11th Cir. 1988) (citing *International Railway Co. v. Davidson*, 257 U.S. 506 (1922); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948)).

Binding precedent in this Circuit establishes that "[p]lainly, Congress has reposed considerable power in the President to adjust our Nation's sanctions against the Cuban Government," including in "*periodic tightening and loosening of sanctions related to travel*, enforcement levels, agricultural and medical supplies, remittances, and humanitarian aid." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 1284 (11th Cir. 2013) (emphasis added); *id.* at 1277 ("[T]he economic embargo against Cuba is pervasive.  But the federal regime also contains numerous exceptions, permitting certain kinds of transactions with

---

relations.  *See, e.g.*, *Zivotofsky v. Kerry*, 576 U.S. 1 (2015) (affirming State Department's policy regarding listing of "Jerusalem" as birth place on passport, despite contrary statute, because of President's powers over foreign relations); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983) ("[T]his Court consistently has deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities."); *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (affirming presidential determination to settle private claims against Iranian assets).

Cuba through licensing as well as through complete exemptions.").  When Congress enacted the Act in 1996, it incorporated the then-existing regulatory framework governing travel to Cuba, including the Cuban Assets Control Regulations ("CACR") through which OFAC would later promulgate the general licenses authorizing cruise travel to Cuba.  *See* 110 Stat. 792 (codified as 22 U.S.C. § 6032(c)); *see also* 110 Stat. 790 (codified at 22 U.S.C. § 6023(7)).  The CACR, as it existed in 1996, broadly provided for the issuance of licenses such as those under which the cruise lines sailed.  31 C.F.R. § 515.801(b)(6) (1996).[34]

Indeed, section 109 of the Act specifically authorizes the President to "furnish assistance and provide other support for individuals and independent nongovernmental organizations to support democracy-building efforts for Cuba." *See* 110 Stat. 799 (codified as 22 U.S.C. § 6039(a)). Under the Obama administration, OFAC cited these foreign policy objectives when promulgating the subsequent 2016 amendments to the CACR, which authorized individual people-to-people travel,   *See* CACR, 81 Fed. Reg. 13,989, 13, 989–90 (Mar. 16, 2016). President Trump, then, subsequently continued these policies from his inauguration in January 2017 through June 2020, at several times making specific findings that adjustments to the regulations that he enacted would not impact vessel carrier services.  *See* 82 Fed. Reg. 48875, 48875 (Oct. 20, 2017) (Pres. Trump's regulatory changes "shall not prohibit transactions that . . . concern air and sea operations that support permissible travel").  There is simply no room for any argument that the regulations by those Presidents were unlawful.[35]

## III.    Plaintiff Cannot State a Claim Under Title III Because Its Principal Place of Business at the Time Plaintiff Filed its Complaint Was Not in the United States

Under the Act, a defendant that "traffics in property which was confiscated by the Cuban

---

[34]        Then, as now, the CACR provided criteria for both general and specific licenses. *See* 31 C.F.R. § 515.560 (1996).  Further, the CACR expressly preserved the authority of the Secretary of the Treasury or the Secretary's designee, which would appropriately include OFAC, to permit transactions otherwise prohibited by the regulations.  *See* 31 C.F.R. § 515.201 (1996).

[35]        Moreover, two separate reports prepared by the U.S. General Accounting Office ("GAO"), at the behest of Congress in 1998 and in 2009, concluded that (i) the President still maintains "broad discretion" to make additional modifications to the Cuba sanctions; and (ii) prior measures, implemented by the executive branch that have had the effect of easing specific restrictions of the Cuba sanctions, have been consistent with statutory mandates and within the discretionary authority of the President.  *See* United States GAO, *U.S. Embargo on Cuba: Recent Regulatory Changes and Potential Presidential or Congressional Actions*, GAO-09-951R (September 2009); *Cuban Embargo: Selected Issues Relating to Travel, Exports, and Telecommunications*, GAO/NSIAD-99-10 (December 1998).

Government on or after January 1, 1959, shall be liable to any ***United States national*** who owns the claim to such property for money damages." 22 U.S.C. § 6082(A)(1)(A) (emphasis added). Thus, to succeed on a claim under Title III, a plaintiff bears the burden of establishing that it is a "United States national," which the Act specifically defines as "(A) any United States citizen; or (B) any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, ***and which has its principal place of business in the United States***." 22 U.S.C. § 6023(15) (emphasis added). Plaintiff's principal place of business is (and at all relevant times has been) outside of the United States; therefore, it cannot bring a claim under the Act, and summary judgment is appropriate. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014) (clarifying that "statutory standing" is not actually a matter of standing but a simple question of whether a particular plaintiff has a cause of action under the statute).

In *Hertz Corp. v. Friend*, the Supreme Court articulated the controlling standard for determining the location of a corporation's principal place of business ("PPB") under the federal diversity-jurisdiction statute. 559 U.S. 77 (2010). The Court "conclude[d] that 'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Id.* at 92–93. Further, a corporation's PPB is determined as of time of the filing of the subject lawsuit. *See Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571 (2004) (measuring "all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of the facts that existed at the time of filing").

Mere labels in pleadings and public filings are insufficient to determine PPB. Instead, since *Hertz*, the Eleventh Circuit has adopted and applied the "nerve center" test to make such a determination. Under that test, courts look to a variety of factors that include "an analysis of the type of business," "the location of executive decisions," and "where documents are maintained." *Motyl v. Franklin Templeton Cos., LLC*, No. 13-60967, 2013 WL 12043364, at *1–2 (S.D. Fla. Oct. 7, 2013) (citation omitted) ("Residency is relevant under the *Hertz* analysis."). Applying that test in *Wylie v. Red Bull North America, Inc.*, 627 F. App'x 755 (11th Cir. 2015), the Eleventh Circuit held that "[t]he fact that the CEO, CFO, and Secretary of defendant Red Bull are listed on [a state corporate filing] as sharing [a] 'Principal Office Address'" in California was "insufficient under *Hertz*" to establish that Red Bull's PPB was in California where no other facts were alleged that showed that said office in California was defendant Red Bull's "actual center of direction,

control, and coordination."  *Id.* at 757–58; *see also Powers v. Mandarin Oriental Miami, Inc.*, No. 09-23681, 2010 WL 11506140, at *1 (S.D. Fla. Mar. 2, 2010) (applying the *Hertz* test).[36]

Here, it is undisputed that in 2019, Plaintiff had two directors and officers, one of whom was a shareholder and Plaintiff's President Mickael Behn, who since 1999 has resided in London, United Kingdom.  *See* SUMF Nos. 30–31, 33–34, 36–37, 39.  It is likewise undisputed that Mr. Behn conducts and controls Plaintiff's business almost exclusively from overseas.  Expert forensic analysis of Mr. Behn's email shows that he sent[37] ***98% of Plaintiff's business emails from overseas***, primarily from the United Kingdom:[38]



SUMF Nos. 48–49.

The United Kingdom is not only Plaintiff's "nerve center," but also its control center.  Mr. Behn made Jerry M. Johnson, his family banker, the Secretary and Treasurer.  *See* SUMF Nos. 41, 46.  This was not a paid position, or even a part-time position, but simply a ministerial one. Mr. Johnson has at all times reported to Mr. Behn, pursuant to Plaintiff's By-Laws.  *See* SUMF Nos. 38, 40, 42–43.  Plaintiff's operations made Mr. Johnson a subordinate, tasked with mere clerical

---

[36]      The *Powers* case is instructive.  There, the defendant corporation asserted that its principal place of business was in California because the corporation's financial records and one of its three directors, who served as treasurer, were located there.  2010 WL 11506140, at *1.  The corporation contended it had "no offices, employees, bank accounts or corporate records in Florida," though one of the other two directors, who was also the president of the corporation, resided and worked in Florida.  *Id.*  In other words, the corporation in *Powers* "divide[d] its command and coordinating functions among officers who work[ed] at several different locations." *Id.*  Ultimately, the Court found that the PPB was in Florida, where the president managed the corporation, and that the presence of the treasurer and financial records in California was not sufficient to show that its nerve center was in California.  *Id.*

[37]      *See* SUMF No. 49, Ex. 99 at 3, 18.

[38]      *Id.*

functions of keeping proper records, maintaining Plaintiff's financial affairs, and performing other minor and occasional duties imposed and directed by Mr. Behn, who actually controlled and carried out the management of HDC's *overall* business and affairs.  *See* SUMF Nos. 50, 52–59. In exchange for his overall management, Mr. Behn gets paid a monthly stipend, while Mr. Johnson received no compensation apart from a handful of discrete instances at Mr. Behn's discretion when he specifically directed such payment.  *See* SUMF No. 60–62.  In fact, it is undisputed that Mr. Johnson reports to Mr. Behn to this day.  *See* SUMF No. 43; *see also Hertz*, 559 U.S. at 96 (holding that where command over a business is divided among officers the "nerve center" test "nonetheless points courts in a single direction, toward the center of overall direction, control, and coordination").[39]  Moreover, forensic analysis of Mr. Johnson's emails with Mr. Behn confirms that the nerve and control centers are outside the U.S.: 69% of emails between Mr. Johnson and Mr. Behn routed through European Union or United Kingdom computers, and up to 99% routed to or from an individual located in the European Union or United Kingdom.[40]  *See* SUMF No. 51.

Merely having a less-than part-time, subordinate officer located in Kentucky, along with a smattering of corporate records, is insufficient under Eleventh Circuit precedent to establish a principal place of business in Kentucky.  Indeed, up to and through 2019, it was solely Mr. Behn who: approved drafts of corporate governance records; decided on  lobbying and legal strategy; approved the retention of contractors, managed Plaintiff's social media accounts; maintained Plaintiff's historical corporate records; and directed the payments to be made from Plaintiff's bank account.  *See* SUMF Nos. 47, 53–57.

Under *Hertz*, the mere fact that Plaintiff started listing the address of the Bank of the Bluegrass (Mr. Johnson's employer for his full-time job), as its corporate address, *see* SUMF No. 46, also does not establish Plaintiff's PPB was in Kentucky.  *See Wylie*, 627 F. App'x at 758 (finding state corporate filing identifying corporation's principal office address insufficient for

---

[39]      And this makes sense.  It is Mr. Behn, a resident of the UK, for whom the Havana Docks Corporation is a matter of personal as well as business interest.   *See* SUMF Nos. 32 (explaining that Mickael Behn's great-grandfather created Plaintiff and Mickael Behn's great-grandfather transferred the responsibility for managing Plaintiff to his grandfather, William C. Behn, in the late 1940s), 35.  It is Mr. Behn who is, thus, the family heir to his great grandfather and grandfather's international business fortune, legacy, and history.  *See id.*  Knowing little to nothing about Plaintiff, let alone its history in the context of Cuban politics, Plaintiff's Secretary and Treasurer – Mr. Johnson – slowly started getting involved with ministerial aspects of Plaintiff's business for the first time in 2011. *See* SUMF No. 41.

[40]      SUMF No. 51, Ex. 99 at 16, 19.

25

purposes of establishing PPB).  This is particularly so here, where Messrs. Behn and Johnson primarily conducted business by email and telephone, and Mr. Behn had not stepped foot in Kentucky as of the time of his deposition since he was a child.  SUMF Nos. 45, 48. Indeed, Plaintiff has never even been registered to do **business** in Kentucky.  SUMF Nos. 29, 44.

Thus, the undisputed evidence confirms that Plaintiff is not a "United States national" under the Act, and Defendants are entitled to summary judgment in their favor.

**IV.**    **Plaintiff's Interpretation of the Act Raises Significant Constitutional Concerns**

If the Act were to be construed to reach Defendants' conduct at issue here (which it should not), then Plaintiff's theory of liability and damages gives rise to serious constitutional questions.

A.    Plaintiff's Interpretation of the Act Seeks to Punish
Conduct that the Federal Government has Licensed and Encouraged

Due Process bars Plaintiff's theory of liability under the well-settled principle that parties cannot be held liable for conduct that the Government has licensed, permitted, and encouraged. *Cox v. Louisiana*, 379 U.S. 559, 571 (1965); *Raley v. Ohio*, 360 U.S. 423, 438 (1959).

As discussed above, the OFAC general licenses broadly authorized Defendants to dock at Cuban ports.  But the Government did more than just issue general licenses and authorizations: it consistently and actively **encouraged** cruise ships to travel to Cuba, as discussed above. Indeed, even when the Trump Administration announced a new Cuba policy, it stated that "[t]he regulatory changes shall not prohibit transactions that the Secretary of the Treasury or the Secretary of Commerce, in coordination with the Secretary of State, determines are consistent with the policy set forth in section 2 of this memorandum and . . . concern air and sea operations that support permissible travel, cargo, or trade."  82 Fed. Reg. 48875, 48876.

Under Plaintiff's theory, Defendants may be subject to liability for engaging in conduct that the government expressly licensed, transparently permitted, and actively encouraged.  This is flatly impermissible for, as the Supreme Court held in *Raley v. Ohio*, a party may not be punished for "exercising a privilege which the [government] clearly had told him was available to him." *Raley*, 360 U.S. at 438.  Further, "[t]he Due Process Clause" forbids punishment where "public officials" have "affirmatively told" parties their conduct is permissible.  *Cox*, 379 U.S. at 571. Both *Raley* and *Cox* involved potential statutory liability for parties who had received government assurances for their conduct and the Court concluded that Due Process precluded liability.  The same is true here, where any reasonable party in Defendants' position would have relied on similar government assurances – licenses and encouragement – which were more specific than Title III

and more recent in time.  Imposing significant (after-the-fact) liability would thus be a clear Due Process violation.  *PHH Corp. v. Consumer Fin. Protection Bureau*, 839 F.3d 1, 48 (D.C. Cir. 2016) (Kavanaugh, J.), *reinstated in pertinent part on reh'g en banc*, 881 F.3d 75, 83 (D.C. Cir. 2018) (*en banc*) ("When a government agency officially and expressly tells you that you are legally allowed to do something, but later tells you 'just kidding' and enforces the law *retroactively* against you and sanctions you for actions you took in reliance on the government's assurances, that amounts to a serious due process violation.") (emphasis in original).[41]

B.   Plaintiff's Interpretation Is Impermissibly Retroactive

It is undisputed (and this Court has recognized) that prior to the May 2019 activation of Title III Defendants' conduct was not subject to a private cause of action under Title III.  However, Plaintiff nonetheless seeks damages for conduct occurring between 1996 and 2019 – which was *not* subject to a Title III cause action – based on the theory that pre-2019 conduct suddenly became actionable when the Title III's suspension ended in 2019.  That is quintessential retroactivity.

It is irrelevant that Title III was already *enacted* at the time of Defendants' cruises; what matters is that at the time Defendants cruised, the Executive Branch had taken two actions to remove Title III liability for that conduct: first, the Executive suspended Title III, and second, the Executive issued licenses to permit and encourage cruise travel to Cuba.  Only after the Executive Branch's about-face in 2019 – revoking the licenses and lifting the suspension – did a cause of action arise for the conduct that had previously been permitted.  The Supreme Court's seminal decision in *Landgraf v. USI Film Prods*. defined a "retroactive" statute as one that "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed."  511 U.S. 244, 280 (1994).  Plaintiff's invocation of a cause of action that abruptly arose on May 2, 2019, asks this Court to do all three:

---

[41]   This Court previously acknowledged "the government's encouragement and licensure" but opined that neither those "nor the history of suspending Title III [are] sufficient to establish a lack of fair notice under the Due Process Clause," because "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply."  *Havana Docks Corp. v. MSC Cruises (USA) Inc., et al.*, 484 F. Supp. 3d 1177, 1201 (S.D. Fla. 2020) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).  *Texaco v. Short* involved the concept that the public is generally presumed to know the statutory laws.  However, this case is not governed by that principle because there is a significant constitutional difference between whether someone is presumed to know a law and Plaintiff's theory that Defendants may be subjected to substantial (retroactive) liability for engaging in conduct that the United States Government had *licensed* and *encouraged*.

(1) "impair rights" Defendants possessed when they acted, (2) increase Defendants' "liability for past conduct," and (3) "impose new duties with respect to transactions already completed."

"[T]he court must ask whether the new provision attaches ***new legal consequences***" to past events. *Id.* at 269–70 (emphasis added). That is precisely what Plaintiff seeks here. It is undisputed that Defendants were not subject to a damages action at the time they cruised, and to attach the "new legal consequence" of the immense treble damages Plaintiff seeks here would undoubtedly violate the *Landgraf* principle. Indeed, it is well recognized that increasing monetary liability for past conduct – even conduct that had already been proscribed – is impermissible retroactivity. *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the *conduct* that will subject him to punishment, but also of the *severity of the penalty* that a State may impose.") (emphasis added); *Landgraf*, 511 U.S. at 281–82. A statute may only operate retroactively if there is a "clear congressional intent." *Id.* at 208. None exists here.

**Fifth Amendment Taking and Due Process Clauses**. The Supreme Court has established a three-factor test under the Fifth Amendment for assessing whether retroactive liability is reasonably foreseeable and proportionate to the party's conduct: "[1] the economic impact of the regulation, [2] its interference with reasonable investment backed expectations, and [3] the character of the governmental action." *Eastern Enter. v. Apfel*, 524 U.S. 498, 500 (1998) (internal quotation marks and citation omitted). All three factors here preclude retroactive application of Title III. ***First***, there can be no doubt as to the severity of the "economic impact" on Defendants of the massive treble damages that Plaintiff seeks. ***Second***, as already discussed, Plaintiff's theory rests on an extreme reading of Title III and thus substantially "interfere[s] with reasonable investment backed expectations." And ***third***, Plaintiff's liability theory is wholly disproportionate to Defendants' conduct, thus calling into question the "character of the governmental action."

**Ex Post Facto Clause**. Under the Ex Post Facto Clause, Congress is forbidden from enacting "any law which imposes a punishment for an action which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *United States v. W.B.H.*, 664 F.3d 848, 852 (11th Cir. 2011). Although generally applied in the criminal context, a civil regulatory scheme's effects can be "so punitive that they negate its civil aims," and courts have established guideposts for that determination: "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as punishment; imposes an

affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Id.* at 853–54 (citation omitted). Applying these guideposts, Plaintiff's construction renders Title III an impermissible Ex Post Facto law.

C.   Plaintiff's Interpretation of the Act Would Impose
Damages Liability Disproportionate to the Alleged Conduct

Plaintiff's startling theory of damages under the Act is that each cruise line – even if a cruise line landed only a single passenger on a dock in Cuba – should have to pay the greater of either (a) the amount identified in the FCSC's certified claim, plus interest and then trebled, or (b) the current fair market value of the "property," trebled. According to Plaintiff and its experts, this means that each cruise line is liable for almost $700 million in damages and Plaintiff is seeking collectively *$2.8 billion* in damages. Simply put, Plaintiff's assertion is entirely devoid of any Constitutionally-required proportionality between damages and liability, and violates both the Due Process Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment.

**Due Process Clause of the Fifth Amendment**. The Supreme Court has repeatedly reaffirmed that the due process proportionality principle must apply even where damages are statutorily prescribed. *E.g., St. Louis, I.M., & S. Ry. Co. v. Williams*, 251 U.S. 63, 66–67 (1919) (a statutory penalty violates due process "where the penalty prescribed is so severe and oppressive to be wholly disproportioned to the offense and obviously unreasonable."); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 429 (2003) (damages must be "proportionate to the wrong committed."). Proportionality applies "whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages." *BMW*, 517 U.S. at 572, 574.

**Excessive Fines Clause of the Eighth Amendment**. Damages are unconstitutional under the Excessive Fines Clause "if [they are] grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). It is well-settled that even where civil remedies serve a "remedial" purpose, the Excessive Fines Clause applies so long as they are punitive "in part." *Austin v. United States*, 509 U.S. 602, 608–10 (1993). Here, Plaintiff's request for treble damages under the Act triggers the Excessive Fines Clause because treble damages are "essentially punitive in nature." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000); *see also Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("[T]he very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers.").

\\MI - 750176/000004 - 763163 v9

The Eleventh Circuit has recognized that statutory damages can be invalidated where they could result in "horrendous, possibly annihilating punishment." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004), *cert. denied sub nom. UnitedHealth Grp., Inc. v. Klay*, 543 U.S. 1081 (2005); *see also Golan v. FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019) (concluding that although the Telephone Consumer Protection Act on its face does not "allow[] for the reduction of statutory damages," the district court had the authority to reject Congress's statutory damages award as unconstitutionally excessive and disproportionate to the "severity of the offense."). Numerous other Courts from across the country have held similarly.[42] Plaintiff's theory raises the very Constitutional violations recognized by the Supreme Court and Eleventh Circuit.[43]

This issue can and should be resolved at summary judgment. This Court has opined that the proportionality principle could be satisfied because "a claimant under Title III might seek to recover statutory damages in an amount close to the amount of profits generated from a defendant's trafficking." *MSC Cruises*, 484 F. Supp. 3d at 1203. Plaintiff cannot satisfy this standard, as it is seeking nearly $700 million from each Defendant when (a) Defendants did not confiscate anything from Plaintiff, meaning there was no direct harm caused by the Defendants and Plaintiff would have been in the same position regardless of whether the cruise lines used the Terminal at all; (b) Plaintiff's claimed damages vastly exceed any reasonable compensatory measure of damages, such as amounts paid in fees to the Terminal operator, Aries, and (c) even if profits earned by the cruise lines could be considered a reasonable comparator for purposes of proportionality, the ***$2.8 billion*** collectively sought against the cruise lines dwarfs the cruise lines' alleged profits. Simply put, this issue is ripe for resolution at summary judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, summary judgment should be granted in Defendants' favor.

---

[42]     *See, e.g. Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 460, 465 (D. Md. 2012); *DirecTV, Inc. v. Gonzalez*, No. Civ.A.SA-03-1170 SR, 2004 WL 1875046, at *4 (W.D. Tex. Aug. 23, 2004); *In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. 328, 350-51 (N.D. Ill. 2002).

[43]     In addition, Plaintiff's massive damages claim creates what the Eleventh Circuit in *Klay*, 382 F.3d at 1275 has described as "hydraulic pressure on defendants to settle."

Dated:  September 20, 2021                    Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**          **HOGAN LOVELLS US LLP**
401 East Las Olas Boulevard, Suite 1200     600 Brickell Avenue, Suite 2700
Fort Lauderdale, Florida                    Miami, Florida 33131
Telephone:  (954) 356-0011                  Telephone (305) 459-6500
                                            Facsimile: (305) 459-6550

By:/s/ *Stuart H. Singer*
Florida Bar No. 377325                      By: /s/ *Allen P. Pegg*
ssinger@bsfllp.com                          Richard C. Lorenzo
Meredith Schultz                            Florida Bar No. 071412
Florida Bar No. 29536                       richard.lorenzo@hoganlovells.com
mschultz@bsllp.com                          Allen P. Pegg
Corey P. Gray                               Florida Bar No. 597821
Florida Bar No. 0115473                     allen.pegg@hoganlovells.com
cgray@bsfllp.com

                                            *Counsel for Norwegian Cruise Line*
Pedro A. Freyre                             *Holdings Ltd.*
Florida Bar No. 192140
Pedro.freyre@akerman.com
**AKERMAN LLP**                             **HOLLAND & KNIGHT LLP**
98 S.E. 7th Street, Suite 1100              701 Brickell Avenue, Suite 3300
Miami, Florida 33131                        Miami, Florida 33131
Telephone:  (305) 374-5600                  Telephone:  (305) 374-8500
                                            Facsimile:  (305) 789-7799

George J. Fowler, III (admitted *pro hac vice*)
gfowler@joneswalker.com                     By: /s/ *Scott D. Ponce*
Luis Llamas                                 Sanford L. Bohrer
Florida Bar No. 89822                       Florida Bar No. 160643
llamas@joneswalker.com                      sbohrer@hklaw.com
**JONES WALKER LLP**                        Scott D. Ponce
201 St. Charles Avenue                      Florida Bar No. 0169528
New Orleans, LA 70170                       sponce@hklaw.com
Telephone:  (504) 582-8752

                                            *Counsel for Royal Caribbean Cruises Ltd.*
*Counsel for Carnival Corporation*

\\MI - 750176/000004 - 763163 v9

**VENABLE LLP**
600 Massachusetts Avenue
Washington, D.C. 20001
Telephone: (202) 344-4703
Facsimile:  (202) 344-8300

By:/s/ J. Douglas Baldridge
Florida Bar No. 708070
JBaldridge@venable.com
Andrew T. Hernacki (admitted *pro hac vice*)
ATHernacki@venable.com
Justin B. Nemeroff (admitted *pro hac vice*)
JBNemeroff@venable.com

*Counsel for MSC Cruises*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 20, 2021, the foregoing was filed with the Clerk of Court using CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

By:    */s/ Stuart H.Singer*
        Stuart H. Singer

\\MI - 750176/000004 - 763163 v9