# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| HAVANA DOCKS CORPORATION | |
| v. | Case No. 19-cv-21724-Bloom/McAliley |
| CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE, a foreign corporation | |
| HAVANA DOCKS CORPORATION | |
| v. | Case No. 1:19-cv-23588-BLOOM/Louis |
| MSC CRUISES (USA) INC., MSC CRUISES SA CO., and MSC CRUISES S.A. | |
| HAVANA DOCKS CORPORATION | |
| v. | Case No. 19-cv-23590-BLOOM/Louis |
| ROYAL CARIBBEAN CRUISES LTD. | |
| HAVANA DOCKS CORPORATION | |
| v. | Case No. 19-cv-23591-BLOOM/Louis |
| NORWEGIAN CRUISE LINE HOLDINGS LTD. | |

## EXPERT REPORT OF AMBAR DIAZ, ESQ.

## ASSIGNMENT

I have prepared this report at the request of Counsel for the Defendants: Carnival Corporation; Royal Caribbean Cruises Ltd.; MSC Cruises (USA) Inc.; MSC Cruises Sa Co.; MSC Cruises S.A.; and Norwegian Cruise Line Holdings Ltd.  I have been asked:

I.    To review the concession ("Concession") held by the Havana Docks Corporation ("Havana Docks") related to the construction of three piers in the port of Havana, (hereinafter "Piers[1]") and to opine on what rights the Concession provides under the laws of Cuba.

II.   I have also been asked to opine on Cuban laws and regulations applicable to ports in Cuba that were in effect during 2015 to the present.  Specifically, I have been asked to opine on the effect of these administrative laws and regulations with respect to requirements for the mooring of cruise ships in the Port of Havana.

## QUALIFICATIONS

I hold a law degree from University of Havana, where I graduated with honors in 1993. I practiced law in Cuba with emphasis on maritime and insurance law until I immigrated to the United States in March 2000.

From 1995 through 2000, I worked as an in-house attorney for the marine division of the Cuban national insurance company, ESICUBA, S.A. In the course of my responsibilities there, I became familiar with the port of Havana and dealt with the regulations pertaining to the port and maritime operations. During my time there, I handled protection and indemnity claims for various cargo fleets. I also handled third party liability claims on behalf of port terminals and freight forwarders and provided advice on loss prevention matters in the

---

[1] These three piers were originally named from North to South: San Francisco, Machina and Santa Clara. *See* Exhibit 1, *see also* Map of Piers circa 1970 (source CU-2492, p. 387). The San Francisco pier is currently in operation and known in Cuba as the Sierra Maestra Terminal and will be referred to in this report interchangeably as the San Francisco pier or "Cruise Terminal" in Section II.

maritime industry as well as on the implementation of the International Safety Management Code.

In Cuba, both during law school and in practice, I was required to review and analyze the laws applicable to navigation and mooring in Cuban waters, and, in particular, the port of Havana. I have developed a deep familiarity with these laws and regulations that are pertinent to the subject matter of this opinion.

Following my arrival in the United States, I obtained a Juris Doctor degree at the University of Miami, School of Law, where I also graduated with honors, in 2003. During law school I clerked for the admiralty/maritime law firm Hayden & Milliken, P.A.   I have practiced law in the United States since 2003, first with the admiralty/maritime law firm Houck, Hamilton & Anderson, P.A., and thereafter at my own law firm.

Since 2003, my law practice has centered on around assisting U.S. companies enter the Cuban market and advising them about the lawful activities permitted under the laws of the United States with respect to dealings with Cuba. I also advise clients on Cuban law and regularly provide legal opinions on different topics of Cuban law, including but not limited to corporate, real estate, maritime, probate, and immigration law. I also assist with registering trademarks, organizing humanitarian projects, and entering into agreements with Cuban counterparts, among others, within the boundaries of what U.S. laws permit.

For the past three years, Chambers & Partners has recognized me as one of the few U.S. attorneys who specializes in Cuban law. I am also often invited to speak on Cuban topics in specialized forums like the Juncadella Corporate Counsel Group and the Conference of the Americas for the Florida Customs Brokers & Forwarders Association, Inc. Accordingly, keeping up to date with Cuban law is an integral part of my practice.

In the course of my work, I have been to the Cruise Terminal at the port of Havana. Therefore, I am familiar with the premises and the current layout of the terminal, and I am familiar with the requirements and procedures required for a cruise line to call that port.

My current hourly rate is $350.  My compensation is not contingent on the analysis and opinions offered, nor on the outcome of this litigation.

## PREAMBLE

This report is separated into two sections. Section I describes and analyzes the decrees spanning from 1905-1934 that form and modify the Concession as well as certain Cuban laws,

including the Law of Ports (*Ley de Puertos*) of 1890 and the General Law of Public Works (*Ley de Obras Publicas*) of 1883 that were incorporated into and govern the Concession.

Section II describes the current legal system in place in Cuba applicable to ships calling on ports in the island.

**SECTION I**

**THE CONCESSION GRANTED BY THE GOVERNMENT OF CUBA TO HAVANA DOCKS CORPORATION**

**SUMMARY OF OPINIONS**

I have been asked to opine on the Concession held by Havana Docks related to the construction of the Piers and to opine on what rights the Concession provided under the laws of Cuba. Havana Docks' rights with regard to the port related exclusively to cargo operations. This right had nothing to do with the Cuban government's rights to allow passenger ships to moor at the Piers for the transportation of passengers. The Cuban government reserved all rights related to passengers without limitation.

These rights held and reserved by the Cuban government regarding passengers existed prior to 1905 to the present regardless of the political party in control of the government. Based on my knowledge of the applicable laws and regulations, and my review of the documents and laws relevant to the administrative Concession, it is my expert opinion that:

1) Before the Concession, during the Concession and thereafter the Cuban government (also referred to herein as the "State") has owned the Piers.[2]

2) Before the Concession, during the Concession and thereafter the Cuban government has controlled port operations, supervised the work performed and as a sovereign authority controlled who could use the Piers.[3]

3) The Concession provided to Havana Docks a non-exclusive right to operate a cargo loading and unloading business on the Piers. The State granted Havana Docks this non-exclusive right for the benefit of the public subject to the laws of Cuba for administrative Concessions which include: Presidential Decrees, the Law of Ports and the Law of Public Works.[4]

---

[2] Exhibit 2, Law of Ports, Arts. 1, 2 and 4.
[3] Exhibit 3 (*in globo*), Decree 467 of 1905, Arts. 28 and 29. *See* also Exhibit 2, Law on Ports, Arts. 1.2, 18 and 21.
[4] Decree 467, Art. 2.

4

4) Havana Docks was not granted any rights in connection with operating a passenger terminal and had no right to control or restrict the right of the public, including a cruise line, to use the Piers to embark and disembark passengers.[5]

5) Havana Docks did not have a monopoly to provide services at the Piers. Thus, the government could allow other entities to provide similar services and there was no legal obligation for third parties who used the Piers to use Havana Docks' services.[6]

6) If the Concession were still in effect today, cruise lines and other vessel owners could use the Piers without any legal obligation to contract with or use the services of Havana Docks.[7]

7) Pursuant to Cuban law, the Cuban government had the unilateral right to terminate the Concession at any time.[8]

8) The Cuban government originally granted the Concession in 1905 for a fixed term of fifty years.[9] The Cuban government later extended the term to ninety-nine years.[10] Pursuant to Cuban law and the terms of the Concession itself, the expiration date of the Concession was 2004.[11]

9) By the very terms of the Presidential Decree that granted the Concession and the Law of Ports, Havana Docks was on notice that in the event of an expropriation of the Concession by the government of Cuba, the only party from whom it could recover compensation was the Cuban government and the maximum compensation to which it could be entitled was capped by the value of the construction work performed.[12]

## I.    THE HAVANA DOCKS CONCESSION

### A.  Background on Administrative Concessions

The Havana Docks Concession, including its subsequent amendments, was a public works' project.[13]  Pursuant to the law in force in Cuba between 1904 and 1960, the State had the duties of organizing, providing for, and supervising public services, and therefore the necessary

---

[5] Law of Ports, Arts. 12, 48.
[6] Law of Ports, Art. 44.
[7] Law of Ports, Arts. 12, 44, 48.
[8] Exhibit 4, General Law of Public Works, Art. 67.
[9] Decree 467 of 1905, Art. 2.
[10] Decree 467 of 1905, Art. 2 and Ex. 3 (*in globo*), Decree 1944 of 1920, Art. 2.
[11] Law of Public Works, Art. 54 limits as a matter of law the term of these concessions to a maximum of ninety-nine years.
[12] Decree 467 of 1905, Articles 6-8, citing Article 50 of the Law of Ports.
[13] Decree 467 of 1905, Visto and Resultando 1.

powers to discharge those duties.[14] Public works projects (concessions) were characterized by State ownership, public interest, State rights and with the purpose to benefit the public. Public services included the construction, management, and operation of ports and of the port's infrastructure under the supervision and regulatory powers of the State.[15] By law, all ports were the property of the State.[16] By law, the port of Havana was a port of general interest of first class given the quality and convenience of its facilities and warehouses, the high volume of international trade taking place at it, and the connection of the port to the domestic business and transportation networks.[17]

Havana Docks and its predecessors were administrative concessionaires of public works and public port services.[18] The administrative concession was a hybrid legal institution that combined public and private law, statutory and contractual provisions, and public interests.[19] The concession created obligations between the State and the private entity or concessionaire where the former authorized the construction of public works on port infrastructure for the discharge of public services and the latter, as a contractor, assumed the costs of carrying out those works and providing the services.[20] In compensation for the construction expenses, the State authorized the concessionaire to make profits according to a State-approved fee schedule.[21] Notwithstanding the rules and elements of private law, private interests, and stipulations present in this legal institution, the rules, principles and procedures of Administrative law controlled the life of the administrative concession.[22] The legal and contractual framework of the administrative concessions reserved for

---

[14] Law of Ports, Arts. 18-35.
[15] Law of Ports, Arts. 21-24.
[16] Law of Ports, Arts. 1. 2, 13.
[17] Law of Ports, Arts. 15-16.
[18] Law of Ports, Arts. 28; Decree 467; Ex. 3 (*in globo*), [Tribunal Supremo de Justicia, Sala Civil y Contencioso-Administrativa], El Banco Español de la Isla de Cuba contra Resolución de la Secretaria de Hacienda. Sentencia núm. 2 (Febrero 28 a 1902), 188, 204; [Pleno del Tribunal Supremo de Justicia], Materia de inconstitucionalidad. Sentencia No. 36 de 1913.- 30 de Septiembre de 1913. [Sanitary Dungcart Company vs. República de Cuba], 73-74; [Tribunal Supremo de Justicia. Sala Contencioso-Administrativa], Sentencia No. 91 de 1915.- 8 de noviembre de 1915 [Compañía de Puertos de Cuba vs. República de Cuba], 215-216.
[20] Law of Public Works, Arts. 93, 95; Law of Public Works, Arts. 123.1, 124, 126-127; Law of Ports, Arts. 44, 49; Decree 467, Conditions 3-5, 17; Exhibit 5, [Tribunal Supremo de Justicia. Sala Contencioso-Administrativa], Sentencia No. 91 de 1915.- 8 de noviembre de 1915 [Compañía de Puertos de Cuba vs. República de Cuba], 216.
[21] Decree 467 of November 29, 1905, Conditions 19-20.
[22] Exhibit 5, [Tribunal Supremo de Justicia, Sala Civil y Contencioso-Administrativa], El Banco Español de la Isla de Cuba contra Resolución de la Secretaria de Hacienda. Sentencia núm. 2 (Febrero 28 a 1902), 188, 204; Exhibit 5, [Tribunal Supremo de Justicia, Sala Civil y Contencioso-Administrativa], Henry P. Booth contra el Ayuntamiento de la Habana. Sentencia núm. 68 (Septiembre 14 de 1905), 649, 661; [Pleno del Tribunal Supremo de Justicia],

the State the powers necessary to guarantee that public interests and public services took precedence over any interest of the concessionaire.[23]

### B. History Behind the Havana Docks Concession

On August 24, 1904, Mr. Sylvester Scovel, submitted to the Governor of Havana a proposal for the construction of a pier and a system to unload and load cargo, the expansion of the Customs offices, the Department of "Vistas" and the passengers booth for the benefit and use of the State.[24] Once the construction works were completed, the Concessionaire would be authorized to operate a cargo service on the premises subject to the regulations and fees determined by the Cuban State.[25] This proposal was later known as the "Scovel Proposal". The Scovel Proposal was just that, an offer to carry out a construction project on State owned land under certain conditions. The Presidential Decrees awarding the Concession, detailed below, form the Concession and identify which parts of the Scovel Proposal were accepted.[26]

On February 27, 1905, the President of the Republic of Cuba issued Decree 85 declaring that the public works involved and to be constructed through the Proposal filed by Mr. Sylvester Scovel, were for the benefit of the public ("utilidad pública").[27] Decree 85 of 1905 defined as a matter of Cuban law the nature of the proposal for the construction of the docks in the Havana port as a matter of public interest. This declaration meant that the entire project was for the interest of the Cuban state, was to be constructed for the benefit of general interests, and was governed by public law and was defined by a formal presidential declaration of public purpose.[28] Notably, the title of Mr. Scovel's Proposal states is a project "…to build a dock for public use."[29]

---

Materia de inconstitucionalidad. Sentencia No. 36 de 1913.- 30 de Septiembre de 1913. [Sanitary Dungcart Company vs. República de Cuba], 73-74.

[23] Law of Ports, Arts. 18, 21, 23-24, 50.

[24] Exhibit 6, Sylvester Scovel, Proyecto de un Espigón Oficinas Nuevas de Aduana, Edificio de Vistas y Muelle de Uso Publico; August 24, 1904; p. 5-6.

[25] Decree 467, Art. 19.

[26] Decrees 85, 467, 1022, 184, and 1944.

[27] Decree 85 of 1905, p. 284. Like Decree 467, Decree 85 also references the Scovel Proposal. *See* Exhibit 3, (*in globo*) Decree 85, last paragraph: "The proposal presented by Mr. Sylvester Scovel are hereby declared for public use".

[28] Decree 85 of 1905.

[29] Sylvester Scovel, Proyecto de un Espigón Oficinas Nuevas de Aduana, Edificio de Vistas y Muelle de Uso Público; August 24, 1904; p. 1.

Decree 85 specifically refers to state interests and the general public interests of commerce and navigation.[30] Under these strong public law principles, the rights of the concessionaire were limited and distinguishable from private ownership rights and leasehold rights.

On November 29, 1905, President Estrada Palma issued Presidential Decree 467 granting the administrative Concession to Compañía del Puerto for a 50-year term.[31] The public works administrative Concession was granted by the government of Cuba to Compañía del Puerto as successor in interest of Sylvester Scovel.[32] It should be noted that, at this point, the Concession only contemplated the construction of one pier in front of the San Francisco church, and thus the pier was named the San Francisco pier.[33]

Compañía del Puerto, the Concessionaire, promised to build a pier with mechanical installations on an area of the State-owned San Francisco Wharf.[34] The Concessionaire further promised to build a new Custom's House and to expand the passenger booth for the exclusive use of the State and the public.[35] The Concessionaire would collect the state-approved fees for the loading, unloading and temporarily storage of cargo.[36] Mr. Scovel's proposal did not request to offer passenger related services.[37] Likewise, pursuant to Decree 467 the concessionaire was not authorized to offer passenger services. All the construction activities and the commercial operations of Compañía del Puerto would proceed under the supervision and control of the State.[38] In issuing Decree 467 the government of Cuba confirmed the nature of this project as a matter of public purpose ("utilidad pública"). [39] Importantly, Decree 467 states that the Concession cannot hinder the rights of third parties.[40]

The construction works started on March 29, 1906.[41] Soon thereafter, the works were halted because the Concessionaire wanted to occupy other areas of the San Francisco pier.[42] The

---

[30] Decree 85 of 1905.
[31] Decree 467 of 1905, Condition No. 2.
[32] Decree 467 of 1905, Resultando No. 5.
[33] Decree 467 of 1905, Conditions Nos. 1, 4, and 5 (b) and (c).
[34] Decree 467 of 1905, Condition No. 1.
[35] Decree 467 of 1905, Condition No. 5 (e).
[36] Decree 467 of 1905, Conditions Nos. 19-22.
[37] Sylvester Scovel, Proyecto de un Espigón Oficinas Nuevas de Aduana, Edificio de Vistas y Muelle de Uso Público; August 24, 1904.
[38] Law of Ports, Arts. 18, 21, 24, 27, 32 and 35; Decree 467 of 1905, Conditions No. 16, 25, 28, 29 and 32.
[39] Decree 467 of 1905, Resultando [1].
[40] Decree 467, Art. 31.
[41] Decree 1022/1910, Resultando [2].
[42] Decree 1022/1910, Resultando [3].

State refused, and invited the Concessionaire, Compañía del Puerto, to submit technical modifications to the project according to the suggestions made by the Secretary of Public Works.[43] The construction of the pier was suspended on October 2, 1906.[44]

In 1910, the State issued Decree 1022, approving modifications to the Concession whereby Compañía del Puerto would then build four piers: the San Francisco Pier (Pier A); the Custom's House Pier (Pier B); La Machina Pier (Pier C); and the Obrapía Pier (Pier D).[45] The Concession's 50-year term set in 1905, the approved fee's schedule, and all other legal terms were ratified.[46] Decree 1022 also reiterated that the Concession's main purpose was to benefit the public.[47]

Compañía del Puerto assigned all its rights and interests under the Concession to Port of Havana Docks Co. Presidential Decree 184 dated March 13, 1911 approved this assignment.[48] Unlike private property rights in which the owner may transfer at any time, under a state granted concession, as a matter of law, the interests, rights and obligations under concession may only be assigned if authorized by the State. Through Presidential Decree 184 of 1911 the president of Cuba, approved the assignment of the concession to Port of Havana Docks Company. The Presidential Decree specifically provided that all terms and conditions, including all the obligations of the beneficiary imposed by the presidential decrees issued in 1905 and 1910 applied to the concession.[49]

On December 13, 1920, President Mario García Menocal issued the Decree 1944, amending the terms of the Concession once again. Piers C and D projected in 1910 would become a single pier of larger capacity for cargo handling.[50] The Concession term was extended from the initial 50 years to 99 years, counted from November 29, 1905, the day when the Concession was granted.[51] All other terms from the Concession decrees of November 29, 1905, and November 11, 1910, not in contradiction with Decree 1944, remained in force.[52]

---

[43] Decree 1022/1910, Resultandos [4-6].
[44] Decree No. 1022 of 1910, Resultando [7].
[45] Decree 1022/1910, Condition No. 1.
[46] Decree No. 1022 of 1910, Condition No. 14.
[47] Decree 1022.
[48] Exhibit 3, (*in globo*) Decree 184 of 1911.
[49] Decree 184 of 1911, Paragraph 3.
[50] Decree 1944 of 1920, Por Cuanto No. 2 and Resuelvo No.1.
[51] Decree 1944 of 1920, Resuelvo No. 2.
[52] Decree 1944 of 1920, Resuelvo No. 10.

In 1928, Port of Havana Docks Company sold all its corporate stock to Havana Docks Corporation, a Delaware corporation, and the deed was notarized in Cuba on April 11, 1928.[53] Havana Docks Corporation thus acquired the administrative Concession. In both June of 1928 and January of 1931, Havana Docks applied for the State's recognition as successor concessionaire.[54] The construction of the Piers was completed in 1930.[55]

On September 7, 1934, through Presidential Decree 2424, the Cuban government approved the assignment of the Concession by Port of Havana Docks Co. to Havana Docks Corporation.[56] In approving the assignment of the Concession, the Cuban State reiterated that these works were declared a matter of public purpose ("utilidad pública").[57] The State also noted that, in 1910, through Presidential Decree 1022, amendments were introduced to the public works involved to preserve and ensure that at all times, the Concession's purpose which was to serve the public interest ("los intereses públicos").[58]

### C. The Laws Governing the Havana Docks Concession

#### i. The General Law of Public Works (Ley General de Obras Públicas)

This administrative Concession was granted in 1905 pursuant to the provisions of the Law of Public Works.[59]  The law defines "public works" as all construction works devoted to the general use, such as roads and *ports*, or to provide State services, such as State owned buildings.[60] Any project for the construction, maintenance, use and supervision of public works could only be approved by the State.[61] The law reserved as projects that could only be conducted and controlled by the State the roads contemplated under the general plan (carreteras incluidas en el plan general) and the ports of commerce of general interest (puertos de comercio de interés general).[62]

---

[53] Decree 2424 of 1934, Visto and Resultando No. 1.
[54] Decree 2424 of 1934, Resultandos Nos. 1 and 7.
[55] Decree 2424 of 1934, Resultando No. 7.  Pursuant to a record dated September 1, 1930 the state acknowledged receipt of the works.
[56] Decree 2424 of 1934, Resuelvo Único. Presidential Decree 2424 of 1934 notes that on April 11, 1928 pursuant to Public Deed 49 before Habana Public Notary Oscar Montero a contract was executed by and between Port of Havana Docks Company and Havana Docks Corporation for the assignment of the concession originally granted by the Cuban State in 1905.
[57] Decree 2424 of 1934, Resultando 2.
[58] Decree 2424 of 1934, Resultando 6; Decree 1022/1920, Resultando No. 5.
[59] Decree 467 of 1905, Art. 2.
[60] General Law of Public Works, Art. 1.
[61] General Law of Public Works, Art. 2.
[62] General Law of Public Works, Art. 4.

Pursuant to Article 52 of the General Law of Public Works, in place when the Concession was initially granted and in place through all its modifications, individuals and private companies could build and exploit public works for general use such as roads, railroads and ports through concessions granted by the State. [63] Chapter VI of the law provides the terms and conditions under which administrative concessions for the construction of public works are granted by the State. The Law of Public Works provided how a concession could be granted by the State, including the importance of *protecting at all times the public interest*,[64] as follows:

1. Concessions could only be granted for a maximum term of ninety-nine (99) years.  Unlike private property rights, any rights granted to the beneficiary of a concession have a fixed term which expires.

2. Article 59 of the Law provided some of the mandatory clauses to be included under all concessions. Those mandatory clauses included the amount of the bond to be posted by the concessionaire;[65] the terms for starting and finishing the construction works;[66] the conditions for the construction and use of the works;[67] and, the right granted to the State to unilaterally terminate the concession ("caducidad").[68]

3. The private party interested in obtaining a concession for public use from the State was required to present a project explaining the details of the construction works and how the construction works would benefit the general interest[69] of the public, through a request filed with the Ministerio de Ultramar.[70]

4. The private party must have previously made public the project and request for a concession in the official gazette.[71]

5. The State would supervise the construction of the works and the exploitation of the works.[72]

---

[63] General Law of Public Works, Art. 7.
[64] General Law of Public Works, Art. 61.
[65] General Law of Public Works, Art .59.1 and article 28 of its Regulations.
[66] General Law of Public Works, Art. 59.2.
[67] General Law of Public Works, Art. 59.3.
[68] General Law of Public Works, 67.
[69] General Law of Public Works, Art.55: "las ventajas que de su construcción han de reportar los intereses generales."
[70] General Law of Public Works, Art. 57.
[71] General Law of Public Works, Art. 63.
[72] General Law of Public Works, Art. 64.

6. When concessions involve works to be performed on State property, public tenders were mandatory.[73]

Article 113 of the Law of Public Works provides that whenever a public construction work is <u>intended for public use</u> a formal <u>public purpose declaration</u> ("<u>declaración de utilidad pública</u>") is required. Lastly, Chapter X of the law provided that the disputes related to concessions granted by the State were subject to the exclusive jurisdiction of Cuban administrative courts (*jurisdicción contencioso administrativa*). [74]

Significantly, Decrees 85 and 467 of 1905, referenced above, specifically determined that the concession granted to Compañía del Puerto was a concession as described and Article 97 of the General Law of Public Works and Articles 44 and 45 of the Law of Ports.[75] The Scovel Proposal followed the procedure for the submission or concession proposals under the Law of Public Works.

## ii. The Law of Ports for the Island of Cuba - Royal Decree 202 dated October 31, 1890.[76]

Decree 467 of 1905 specifically provides that the concession was granted pursuant to the provisions of the Law of Ports.[77] The Law of Ports includes a complete regulation of all ports in Cuba, including their legal nature, classification, ownership and purpose. Specifically, the Law of Ports provides:

1. That ports are <u>public property</u>; are owned by the State (del dominio nacional) and for <u>public use</u> (uso público).[78]

2. That ports are part of the maritime zone owned and controlled by the state along with the territorial sea.[79]

3. That areas within the territory of Cuba, <u>owned by the State</u> and defined as maritime zones include: the land maritime zone (*zona marítima terrestre*), which corresponds to costal or

---

[73] General Law of Public Works, Art. 72.
[74] General Law of Public Works, Art. 119.
[75] Pursuant to a Royal Decree issued on May 30, 1883, the Spanish government ruled that the General Law of Public Works issued on April 13, 1877, would apply to the Island of Cuba.
[76] On October 31, 1890, a Royal Decree was issued in Madrid, to provide a "Law of Ports" for the Island of Cuba. Pursuant to Royal Decree 202, the Law of Ports (*Ley de Puertos*) in force in Spain at that time and issued on March 7, 1880, would apply to the Island of Cuba. Thus, the Law of Ports for Cuba ("*Ley de Puertos para la Isla de Cuba*") was promulgated.
[77] Decree 467 of 1905 including recitals and Art. 2.
[78] Law on Ports, Art. 1.
[79] Law on Ports, Art. 1.

maritime frontier areas bathed by the sea; and the littoral sea (*mar litoral*), which includes the <u>maritime zone surrounding the coast</u>, or State borders determined by international law and which include coves, bays and <u>ports</u>.[80]

4. Pursuant to Article 12, the public has a fundamental right to the use of the littoral sea, which includes coves, bays and ports. One of the specific uses of the littoral sea is the public's right to embark and disembark passengers.[81]

5. These areas of the State's territory, which are public property, are dedicated primarily for maritime services which are deemed a <u>matter of public purpose</u> ("utilidad pública").[82]

Accordingly, absent any rules or regulations to the contrary, pursuant to Article 12 of the Law on Ports, as incorporated by the Concession, the public, including cruise lines, could use the Piers to embark and disembark passengers.

The law provides the basic definition of a port under Article 13, which includes natural coast configurations and man-made constructions ("obras construidas al efecto"). The dedicated permanent use for maritime traffic is essential under the definition  ("en los cuáles exista de una manera permanente y en debida forma tráfico marítimo").

Pursuant to the Law of Ports any construction on Cuban ports could only be performed through administrative concessions granted by the State through the "Ministerio de Ultramar". Articles 19 and 28 of the law of Ports provide that whenever a port construction would impact public property land (terrenos de dominio público), the General Law of Public Works would apply.

Article 31 of the Law of Ports refers to a mandatory legal requirement pursuant to which every Cuban port must include a littoral service zone ("zona litoral de servicio") to perform loading and unloading operations. The law specifically provides that including such mandatory zone in all port projects is a matter of public purpose ("lleva consigo la declaratoria de utilidad pública").[83]

Further discussion of the Law of Ports, particularly Articles 44, 48 and 49 is provided below.

---

[80] Law on Ports, Art. 1. ("el mar litoral, o bien la zona marítima, que ciñe las costas of fronteras de los dominios de España, en toda la anchura determinada por el derecho internacional, con sus ensenadas, radas, bahías, <u>puertos</u> ..")
[81] Law on Ports, Art. 12.
[82] Law of Ports, Art. 2.
[83] Law of Ports, Art. 31.

### D.  Scope and Nature of the Concession

A close review of the laws that granted the Concession to Havana Docks and its predecessors to operate a cargo service in the port of Havana reveal the scope of the rights granted, and more importantly: what was not granted. Per the Presidential Decree No. 467 of 1905, the Concession consisted of the construction in the port of Havana of a pier[84] with mechanical installations to be used for the docking, loading, and unloading of vessels as required for the operations of import and export of goods. ("an administrative concession for the construction of a jetty/dock with mechanical installations, a building for Customs Offices, a special Department for Customs Inspectors, apparatus for loading and unloading, and other accessory works at the port of this Capital.")[85] The concessionaire would reserve for itself the operation of the cargo service for a term of 50 years.[86]

This project was contingent on the Cuban State granting the use of State property.[87] As consideration for said grant, Mr. Scovel offered the State the construction of the pier,  a system to unload and load cargo, and the expansion of the Customs offices, the Department of "Vistas" and the passengers booth for the benefit and use of the State.[88]  Once the construction works were completed, the concessionaire would be authorized to operate a cargo service on the premises subject to the regulations and tariffs determined by the Cuban State.[89]

The concessionaire had limited autonomy inasmuch they could not decide which vessels would use their service, not even the order of the services, nor the fees they would charge.[90]

#### i.  Concession granted to operate a non-exclusive cargo service

Decree 467 of 1905 granted the concession pursuant to the provisions of the Law of Ports of 1890.[91] The Law of Ports regulated all ports in Cuba, addressing their legal nature, classification, ownership and purpose, and provided that ports were public property; owned by the state (del

---

[84] The project was amended in 1920 to extend the construction to three piers instead of one. *See* Exhibit 3 (*in globo*) Decree 1944 of 1920.
[85] Decree 467, preamble.
[86] Decree 467, Art. 2. The term was extended to 99 years by Decree 1944 of 1920.
[87] Decree 467, Conditions Nos. 4 and 5.
[88] Decree 467, Condition No. 5.
[89] Decree 467, Visto and Conditions Nos. 19-22.
[90] Decree 467 of 1905, Conditions Nos. 5(d), 19 and 23.
[91] Decree 467 of 1905.

dominio nacional) and for <u>public use</u> (uso público).[92]  Of significance, the Law of Ports made clear that:

> **Article 44**: It is the duty of the colonial secretary to grant authorization, after hearing the naval authorities, for the construction on the sea or beaches and adjoining lands, or in ports, whether for private or public use, of such wharves, quays, dockyards, floating docks, shipyards, and other similar works as are complementary and auxiliary to those existing for the service of the port. *Such authorization shall not constitute a monopoly, and therefore others may be granted for the same class of works in the same harbor, beach or stretch of coast provided the public service or use does not suffer thereby.* (Emphasis added)

Pursuant to Article 44, the Conession did not grant Havana Docks exclusive rights on the Piers. To the contrary, the State could offer similar concessions if it deemed it necessary: "others may be granted for the same class of works in the same harbor, beach or stretch of coast provided the public service or use does not suffer thereby." The purpose of this provision was to guarantee that the project was for the public benefit, rather than the benefit of Havana Docks. Presidential Decree 467 of 1905 creating the Concession at issue specifically references this Article to define the type of concession being granted.[93]

Articles 48 and 49 further imposed important limitations on the Concession, precluding the creation of exclusivity grants that would prevent third parties from using the very same premises covered by the concession:

> **Article 48.** When the works of a port the concession of which is applied for, whether in conformity with the plan of the of the applicant, or subject to the one surveyed and approved by the colonial department, refers to one in which, although no work has yet been executed, there exists a legally authorized maritime commerce, and services are performed with more or less perfection, ***the concession must be granted under such conditions as may be necessary to reserve in full force the existing rights of entering the***

---

[92] Law on Ports, Art. 1.
[93] *See* Condition No. 2 of Decree 467 of 1905 "This concession is understood among the ones described in article 44 and 45 of the Law of Ports of October 31 of 1890"

> *port, loading, and unloading, afloat or on the coast, so that none of the*
> *services that are freely exercised or enjoyed by the public may be made*
> *compulsory.*

Accordingly, pursuant to Article 48, the Concession could not impair the preexisting right of the public, including cruise lines, to use the Piers for cargo and passenger services. Further, the public, including cruise lines, was not obligated to use the services of Havana Docks. These points are again mentioned in Article 49, as noted below.

> **Article 49.** Proper authorization may also be granted to a private company
> for executing the works of a port in charge of the State or for completing
> those which are constructed or suspended, or carrying out one part of the
> plan while the State executes the other, in which case special conditions
> may be established in compensation of the expenses thereof and for the
> benefit of the company in the shape of the cession of the land where the
> works are carried on, for a limited time, or other privileges, according to the
> available portion of the work, the cost of those that may be executed and
> the nature or importance of the public services existing in the post, ***provided***
> ***prior rights to the use of the port and its works are reserved in full force***,
> as stated in the preceding article.

Per the Law of Ports, Havana Docks enjoyed an administrative concession limited by the legal mandate forbidding preclusion of third parties from using the premises. The State granted the concession for the benefit of the public within the strict limits set by the Law of Ports, which expressly outlawed the granting of exclusive rights to the detriment of third parties. Moreover, the Law of Ports and the Presidential Decrees that authorized the Concession expressly maintain the superior power of the State as the grantor of the Concession, and specify the Concession to be a limited grant of rights to operate a service on property owned by the State for a finite period of time.

### ii.   Havana Docks never had the right to provide passenger services on the premises

The previous section discussed the nature and scope of the Concession held by Havana Docks: a non-exclusive right to operate a cargo service on the premises once construction of the

pier was completed. The Concession did not include or mention the provision of passenger services.

Going back to Mr. Scovel's Proposal, when describing the economics behind the operation of this proposed Concession asked to be allowed to charge a loading and unloading fee of sixty-five cents to one dollar and five cents per ton of cargo, plus other charges to the consigners and merchants sending or receiving the cargo. None of the fees that Mr. Scovel projected to charge for the services under the Concession included an amount for work related to, or services provided, to passengers or to ships carrying passengers.[94] This is significant because Mr. Scovel proposed to rebuild the passengers' booth that existed at the premises as consideration for receiving the cargo Concession, but expressed no interest or intent related to being involved in the passenger business. To the contrary, per Presidential Decree No. 467, authorizing the Concession,[95] the Compañía del Puerto agreed to *deliver the passengers booth to the State* upon completion of the construction works.

The Scovel Proposal confirms that by 1904 passenger services were rendered at the pier, because of the existence of the passenger booth. Also, the fact that Mr. Scovel proposed to reconstruct said booth for the State to use indicates that the State intended to continue offering passenger services on the premises independently of the cargo services to be offered by Compañía del Puerto.  Consistent with the Law of Ports, the State preserved the right to continue using the area for passenger services.

According to Article 48 and 49 of the Law of Ports, since passenger services already existed at the subject location, the granting of the Concession did not in any fashion affect the future provision of said services as "*prior rights to the use of the port and its works are reserved in full force".* [96] The Scovel Proposal, which was quite detailed, exclusively focused on cargo services.

The relevant articles of the Law of Ports, which protected the rights of the general public *vis-a vis* with the rights of the concessionaire, safeguarded the availability of passenger services on the docks used by Havana Docks prior and during the life of the Concession as well as thereafter. In other words, through the Concession, the State maintained its rights to provide passenger services as it had before the issuance of the Concession.

---

[94] Sylvester Scovel, Proyecto de un Espigón, Oficinas Nuevas de Aduana, Edificio de Vistas y Muelle de Uso Público; August 24, 1904, pages 33, 35 and 129-147.
[95] Decree 467 of 1905, Condition No. 17.
[96] Law of Ports, Art. 49.

Furthermore, by reconstructing and delivering the passenger booth to the State, the concessionaire acknowledged it had notice of the intent of the State to provide passenger services on the premises. The Havana Docks Concession was based on Mr. Scovel's plan to provide cargo service on State property without detriment to the rights of the State to provide passenger services on the same premises, either by itself or through the services of another concessionaire.

### iii.   Concession only granted for ninety-nine years

Though not initially granted, Mr. Scovel asked in his Proposal that the Concession be for ninety-nine years counted from the date of the completion of the construction works,[97] acknowledging this was the maximum term permitted under the Law of Public Works of 1883.[98] The Law of Public Works, Article 100, states:

> The concessions referred to in the previous articles of this Chapter shall be granted from *ninety-nine years at most*, except in the cases wherein the special laws of public works establish a longer period, or when the concession is granted by means of a special law which may thus determine.

However, Decree 467 of 1905, condition No. 2, states: "This concession is understood among the ones described in article 44 and 45 of the Law of Ports of October 31 of 1890 and the 97 of General Law of Public Works of April 19 of 1883, and it is granted *for a term of fifty (50) years counted from the date of the concession*."

The term of the Concession was later extended to ninety-nine years on December 13, 1920 by virtue of presidential decree No. 1944. However, once again the term was counted from the date of the Concession on November 29, 1905. Decree 1944 states:

> Second: to extend the term of reversion to the State as stated on the second condition of the decree No. 467 of November 29, 1905 up to ninety-nine years counted from the date of the concession.

Importantly, the governing administrative law regarding the term and existence of Havana Docks' rights related to the property is found in the Law of Public Works and the Law of Ports. These two laws take precedence over any general article of the Civil Code of 1889. Under Cuban law, the

---

[97] Sylvester Scovel, Proyecto de un Espigón, Oficinas Nuevas de Aduana, Edificio de Vistas y Muelle de Uso Público; August 24, 1904, 49.
[98] *See* Law of Public Works, Art. 100.

Civil Code only applies in the absence of a more specific or "special" law. [99] Here, the more specific/special laws are the Law of Public Works and the Law of Ports, both of which expressly reference administrative concessions for the development of ports and both are incorporated by the aforementioned decrees that make up the Concession.

The Law of Public Works established ninety-nine years as the maximum term a concession could be granted. Neither the Concession documents nor any Cuban law in effect at the time the Concession Decrees were issued provide for any type of tolling of the Concession term, or reversionary interest to the concessionaire, should the concessionaire's interest be interrupted or terminated during the original term of the concession. To the contrary, the Cuban government has already enforced the running of the period *of this very Concession* when the concessionaire's use of the Concession was previously suspended. Here, the concessionaire experienced an interruption in use in 1906. From October 2, 1906, until November 11, 1910, construction works were suspended on the Pier because the initial project was deemed inadequate for the operations of the port, and the Concessionaire was asked to present modifications to the initial proposal. [100] The Cuban government did not "stop the clock" on the Concession for the four years during which the concessionaire's operations were suspended, nor did the Cuban government otherwise suspend the running of the period of the Concession. The Cuban Government did not award an extra four years to the Concessionaire as a reversionary interest, or as compensation, or as a future or contingent possessory right. Instead, Decree 1022 of 1910 approved the concessionaire's proposed modifications to the project, but *did not extend the term to make an allowance for the four-year interruption*. The Concession was still set to expire in the year 2004 – *not 2008* – whereupon the concessionaire's rights would still terminate.

Accordingly, Havana Dock's claim in the Second Amended Complaint, that "under the terms of the concession and the Cuban law in force at the time, Havana Docks still retains, to this day, a reversionary interest of 44 years remaining in the Subject Property," is misplaced. Under the language of the Concession, under the governing law - Law of Public Works and the Law of

---

[99] *See* Civil Code of 1889, Articles 16 and 1456. The Civil Code of 1889 was abrogated on July 16, 1987 by Law 59, the current Civil Code.
[100] Decree 1022 of 1910, Resultandos 6-9.

Ports, and under the State's own interpretation and actions taken upon a previous suspension of use, Havana Docks has no such reversionary interest or future or contingent possessory right.

Havana Docks conceded as much in footnote 1 of the Balance Sheet of December 31, 1959, submitted to the Foreign Claims Settlement Commission. Luis Parajon, who submitted an expert appraisal of the Concession to the Foreign Claims Settlement Commission, also confirmed "the Concession ran for 99 years, to the year 2004".[101] Thus, the Concession was not simply for 99 years in the abstract, but for a period that would terminate in 2004.

### iv. Termination of the Concession

The State had the unilateral right to terminate the Concession[102], and the State had the right to determine if the concessionaire was timely complying with all terms and conditions for the Concession to stay operative.[103] The State could also terminate the Concession if the concessionaire failed to properly maintain the works completed, or failed to provide the services as obligated. In those situations, the Concession was forfeited.[104] Further, the Concession contemplated termination via expropriation. Such was the case of expropriations under Law of Ports and the General Law of Public Works, when the State decided to take or destroy an existing public work project to start another one that better fit the needs of public services and of public interests.[105] Article 50 of the Law of Ports states:

> In case works declared of public utility are to be executed in a port by the State, the deputations, or municipal councils, and in order to carry them out it should become necessary to utilize or destroy those constructed by private persons by virtue of concessions granted them, the concessionaires shall have a right to be indemnified only for the value of the material employed in said works, after an appraisement by experts made in conformity with the general regulations for the execution of this law.

Article 50 of the Law of Ports confirms the superior right of the State to terminate the Concession leaving the concessionaire with the limited and exclusive recourse of seeking compensation from the State for the value of the works performed. This limitation of rights was

---

[101] See page 16, paragraph b of Luis Parajon's appraisal report.
[102] Law of Public Works, Art. 67.
[103] Exhibit 5, [Tribunal Supremo de Justicia, Sala Civil y Contencioso-Administrativa], Materia Contencioso-Administrativa. Sentencia No.91.- 8 de noviembre de 1915 [Compañia de Puertos de Cuba vs. República de Cuba], 220. *See also* Law of Public Works, Art. 67 and Law of Ports, Art. 58.6.
[104] Decree 467, Conditions 10 and 32.
[105] Law of Ports, Arts.50; Decree 467 of November 29, 1905, Condition 7.

acknowledged by Mr. Scovel in the proposal incorporated into the Havana Docks concession. Specifically, in the general condition No. 6, Mr. Scovel stated that in case of expropriation pursuant to article 50 of the Law of Ports, then the concessionaire would remove from the dock all its chattel and equipment.[106]

## CONCLUSIONS

1) Before the Concession, during the Concession and thereafter the Cuban government (also referred to herein as the "State") has owned the Piers.[107]

2) Before the Concession, during the Concession and thereafter the Cuban government has controlled port operations, supervised the work performed and as a sovereign authority controlled who could use the Piers.[108]

3) The Concession provided to Havana Docks a non-exclusive right to operate a cargo loading and unloading business on the Piers.  The State granted Havana Docks this non-exclusive right subject to the laws of Cuba for administrative Concessions which include:  Presidential Decrees, the Law of Ports and the Law of Public Works.[109]

4) Havana Docks was not granted any rights in connection with operating a passenger terminal and had no right to control or restrict the right of the public, including a cruise line, to use the Piers to embark and disembark passengers.[110]

5) Havana Docks did not have a monopoly to provide services at the Piers. Thus, the government could allow other entities to provide similar services and there was no legal obligation for third parties who used the Piers to use Havana Docks' services.[111]

6) If the Concession were still in effect today, cruise lines and other vessel owners could use the Piers without any legal obligation to contract with or use the services of Havana Docks.

7) Pursuant to Cuban law, the Cuban government had the unilateral right to terminate the Concession at any time.[112]

---

[106] Sylvester Scovel, Proyecto de un Espigón, Oficinas Nuevas de Aduana, Edificio de Vistas y Muelle de Uso Público; August 24, 1904; p. 50.
[107] Exhibit 2, Law of Ports, Arts. 1, 2 and 4.
[108] Exhibit 3 (*in globo*), Decree 467 of 1905, Arts. 28 and 29. *See* also Exhibit 2, Law on Ports, Arts. 1.2, 18 and 21.
[109] Decree 467, Art. 2.
[110] Law of Ports, Art. 48.
[111] Law of Ports, Art. 44.
[112] Exhibit 4, General Law of Public Works, Art. 67.

8) The Cuban government originally granted the Concession in 1905 for a fixed term of fifty years. The Cuban government later extended the term to ninety-nine years.[113] Pursuant to Cuban law and the terms of the Concession itself, the expiration date of the Concession was 2004.[114]

9) By the very terms of the Presidential Decree that granted the Concession and the Law of Ports, Havana Docks was on notice that in the event of an expropriation of the Concession by the government of Cuba, the only party from whom it could recover compensation was the Cuban government and the maximum compensation to which it could be entitled was capped by the value of the construction work performed.[115]

## SECTION II

## THE HAVANA CRUISE TERMINAL AND THE CRUISE INDUSTRY

### SUMMARY OF OPINIONS

I have been asked to opine on the scope of Cuban laws, decrees, and administrative resolutions applicable from 2015 to 2019 with respect to mooring cruise ships to disembark and embark passengers in the Port of Havana.  Based on my knowledge and experience, it is my expert opinion that the applicable laws, decrees, and administrative resolutions provide that a cruise line calling on the port of Havana can only dock at the Cruise Terminal, and not anywhere else in the port.  The summary basis for my expert opinion is as follows:

1) The administration of Cuban ports is part of the centralized Cuban government system, which is structured in tiers delegating powers and administrative functions from one level to the next one.

2) Within that structure, the ports fall under the control of the Ministry of Transportation, which assigns the administration of the port to several entities and agencies by delegating specific areas of competence and responsibilities through a set of laws, decrees, and administrative resolutions.

---

[113] Decree 467 of 1905, Art. 2 and Ex. 3 (*in globo*), Art. 2, Decree 1944 of 1920.
Law of Public Works, Art. 54 limits as a matter of law the term of these concessions to a maximum of ninety-nine years.
[115] Decree 467 of 1905, Articles 6-8, citing Article 50 of the Law of Ports.

3) Under the law, a cruise ship is obligated to use the services of a port agent, which serves as its local representative and coordinator to ensure an orderly and efficient operation. In the port of Havana, the port agent is Consignataria Mambisa (a/k/a/ SERVIMAR). SERVIMAR's internal regulations mandate the use of the Cruise Terminal

4) The Cruise Terminal is administered by ARIES, S.A., a government owned company and the only entity licensed by the Cuban Ministry of Transportation to provide passenger services.

5) The contract that cruise lines were required to enter into with ARIES, S.A. specifically requires that incoming ships moor at the Cruise Terminal.

6) The relevant laws, decrees and administrative resolutions in Cuba also establish that a cruise line must strictly observe the immigration, sanitary, and Customs laws of the country or face fines and other penalties. Those services are only available at the Cruise Terminal.

7) Pursuant to Resolution 251 issued by the Ministry of Transportation and SERVIMAR's regulations, the use of ship tenders is not permitted in the Port of Havana. Even if ship tenders were allowed, the passengers carried in the tenders would still be disembarked at the Cruise Terminal, as it is the only location where the requisite immigration, sanitary, and Customs facilities are available for processing cruise line passengers.

8) In sum, a cruise line calling the port of Havana must abide by the Cuban laws and regulations in place, which require a cruise line travelling to Havana to dock at the Cruise Terminal.

## I.  GENERAL OVERVIEW AND BACKGROUND OF CUBAN LEGAL SYSTEM

In the following section, I provide a brief overview of the Cuban legal system including descriptions of the Cuban constitution, government organization, history, and administrative law. I omit any discussion of corporate, commercial and contract law, as I did not find those areas relevant for the purposes of this report.

### A. Legal System

Cuba is governed by a legal system based on principles derived from European Continental law, also known as civil law, which Cuba has adapted.  On February 24, 2019, a new Constitution was adopted. However, a multitude of statutes and regulations, legal principles, categories, institutions, practices, methodologies and principles of legal interpretation predating the Revolution of 1959 have survived. The laws in force in December 1958, included the statutory law enacted up until that date, along with Spanish law and Spanish legal traditions. Ultimately, Cuban

law is linked to the continental or Roman-Germanic-French system of law shared by most of western Europe and by Latin America. Since the mid-1980s, with the dissolution of Communist regimes in Europe, the Cuba legal system has gradually returned to the Spanish and Continental legal traditions. Reflecting its past as a Spanish colony, Cuba is a civil law state that emphasizes written codes.

The legal authority discussed herein includes statutes (laws) enacted by the National Assembly, decrees issued by the President of Cuba and President of the Council of the State and administrative resolutions issued by State administrative authorities such as the Ministry of Transportation.

### B. Administrative Law

Currently, few civil and business relations in Cuba, whether involving nationals or foreigners, are exempt from administrative statutes, regulations, actions, and proceedings. Administrative Law establishes a legal framework for the activities of the central and local government through the public officials and employees vis-à-vis other public entities as well as private individuals and private legal entities. Administrative law includes legal provisions, principles, institutions, contracts, actions and adjudicatory resolutions for the organization and performance of public services. Essential to Cuban Administrative Law, like elsewhere, are port operations, maritime traffic (and services related thereto), the enforcement of custom, immigration and sanitary regulations, and overall the exercise of what Anglo-American law calls Police Power. Administrative Law also covers the negotiation, execution and performance of administrative contracts with private individuals and business entities, as well as the regime of administrative concessions ("Administrative" meaning with the State or state entities).

### II.   STATUTORY FRAMEWORK FOR PORT ACTIVITIES IN CUBA

The following section discusses the legislation, statutory provisions, regulations, rules, organization and practices related to the use of ports in Cuba.

Until 2002, the basic law governing port activities was contained in the Spanish Law of Ports, in force in Cuba since October 31, 1890,[116] as amended and partially abrogated by subsequent legislation. In 2002, the Council of State promulgated the Decree-Law No. 230 on

---

[116] Discussed in great detail in Section I of this report.

Ports overhauling the entire port legislation of the country.[117] The Decree-Law 230 on Ports establishes the basic principles for the classification of ports, organizes the Cuban Port Network (*Sistema Portuario Nacional*), sets the foundations for the management of port areas, and provides for the maintenance of public order and operative safety and for the protection of the environment, among other provisions. Following Decree-Law 230, the Council of Ministers issued Decree No. 274 that provides the regulations to implement Decree-Law 230 and define the activities that can take place at the ports.[118]

The set of Cuban laws on ports and maritime activities as it stands today was completed with the promulgation of the Law No. 115 of 2013 on Navigation and the Decree No. 317 of 2013 establishing the rules and regulations for its enforcement.[119] These two instruments define (i) the functions of State's entities concerning port and maritime activities; (ii) the rules on ship records, maritime safety and accidents; (iii) the duties and responsibilities of the carrier, the ship's captain and crew members; (iv) the legal framework and essential provisions of the maritime transport agreement; (v) the regulations governing safe navigation; and (vi) the roles played by each individual or entity providing maritime services, commercial services, fishing services, and recreational services for tourists and for the sport industries.

The Ministry of Transportation ("MITRANS") is the highest state authority regarding transport activities in Cuba. Pursuant to the Law Decree No. 147 of 1994, the Council of Ministries delegated to the MITRANS the running, execution, and control of government policy as to transportation by roads, maritime, and pluvial, and related services as well as the civil navigation.[120]

## A. The Public Administration of the Port of Havana

### 1. The Havana Port Administration

Following the enactment of the new legislation on ports in 2002, the State organized the Havana Port Administration (*Administración Portuaria de la Habana*). The Havana Port Administration, is the highest state authority regarding activities, operations, exploitation, construction, maintenance, and preservation of the environment in the harbor. Its jurisdiction extends beyond the port itself to any facilities directly linked to the port operations. Under the

---

[117] Exhibit 7 (*in globo*), Decree No. 230 on Ports.
[118] Exhibit 7 (*in globo*), Decree No. 274.
[119] Exhibit 7 (*in globo*), Law No. 115 of 2013 on Navigation and Decree No.317.
[120] Exhibit 7 (*in globo*), Law Decree No. 147 of 1994.

*Sistema Portuario Nacional* created by Decree-Law 230, the Port of Havana is classified as a "Port of general interest – 1ˢᵗ Class" (*Puerto de interés general de primera categoría*) because of its importance in the national economy.

### 2. Regulations for the Management and Operations of the Port of Havana

In compliance with the legislation on ports and navigation, the MITRANS issued the Resolution No. 251 ("Res. No. 251") in 2005 regulating the internal management and operations of the Port of Havana. Res. No. 251, as discussed below, defines the geographical limits of the port, running along an imaginary line connecting Leeward Point (Punta Sotavento) with the Cruise Terminal.[121] The Cruise Terminal is on the first pier after passing the entrance channel of the Port of Havana.[122]

#### a) Port's Public Authorities

Res. No. 251 also governs essential aspects of the operation of maritime traffic in and the role performed by the different operators involved at the Port of Havana.[123] Under Res. 251, the "Port's Public Authorities" (*Autoridades Públicas Portuarias*) are those state entities that regulate maritime safety and offer inspection services. The Port's Public Authorities include public officials and employees from the Ministry of Interior (MININT), the General Customs' Office of the Republic of Cuba (*Aduana General de la República*), the Harbor Master's Office (*Capitanía del Puerto*), the Office of Immigration and Aliens (*Dirección de Inmigración y Extranjería*), the Office for International Sanitary Controls (*Control Sanitario Internacional*), and the Office for Border Veterinary and Phytosanitary Services (*Servicios Veterinarios de Frontera y Fitosanitarios*).[124] The Operators (*Operadores*) are defined as those legal entities which, as per applicable laws, are responsible for the port terminals or facilities.[125] The Service providers (*Prestadores de servicios*) are defined as individuals or legal entities which, as per applicable laws, provide any services related to port operations.[126]

---

[121] Exhibit 7 (*in globo*),  MITRANS, Res. 251, Article 4.
[122] *See* Exhibit 1, Map of Piers.
[123] MITRANS, Res. 251.
[124] MITRANS, Res. 251, Article 3 (e).
[125] MITRANS, Res. 251, Article 3 (j).
[126] MITRANS, Res. 251, Article 3 (l).

### b)  Ship Dispatch Services and Arrival Scheduling

The Regulations of the Port of Havana require that Port's Public Authorities and Port Agencies (*Agencias Consignatarias*) provide ship dispatch services all year round, 24 hours a day, including holidays. Port's Public Authorities and Port Agencies are required to effectively coordinate their work for the reduction of the stay of ships in port.[127] To that end, Port's Public Authority and the Agencias Consignatarias are members of the Arrival Scheduling Board (*Junta de Programación de Arribo*) together with the Harbor Master's Office, the Havana Pilot Station (*Estación de Prácticos de La Habana*), the Caribbean Navigation Company (*Empresa de Navegación del Caribe*), GEMAR, and the health authorities.[128]  The Arrival Scheduling Board agrees on and approves an arrival plan of incoming ships with the fundamental goal of securing the availability of existing docking positions upon actual arrival.[129]

## III.    The Cruise Terminal Of The Port Of Havana

The following section addresses the regulations pertaining to the use of the Cruise Terminal, namely Res. 251. Res. 251 requires that cruise lines to contract with Aries, S.A. and SERVIMAR, and requires that cruise lines comply with immigration, customs and health control laws. A review of all these authorities establishes that under Cuban law, the Cruise Terminal is the only dock where a cruise ship can moor.

There are three types of port facilities in the Port of Havana: (1) the terminal for cruise passengers (Cruise Terminal); (2) the loading/unloading facility for bulk cargo and containers; and (3) the terminal for petroleum products.

### A.  The Cruise Terminal

The Cruise Terminal is the northernmost pier of the three piers, near the entrance to the Port of Havana. All three piers were in ruins and virtually abandoned by the mid-1990s. However, in the late 1990s, the Cruise Terminal was rehabilitated and is the only fully operational pier of the three.[130] Port Authorities do not allow ships to dock at the other two piers other than tugboats and other small service vessels.

---

[127] MITRANS, Res. 251, Articles 6 and 9.
[128] MITRANS, Res. 251, Article 12.
[129] MITRANS, Res. 251, Article 13.
[130] Exhibit 1 (*in globo*), Map of Piers and Pictures of Piers.

1.  **Docking in the Port of Havana and Resolution 251- Internal Resolution for the Operation and Internal Order of the Havana Port Administration**

The regulations for the Port of Havana concerning docking, anchoring, berthing, loading and unloading passengers and cargo, and otherwise designating a pier or location inside the port for those purposes follow a long-standing legal tradition dating back to Spanish sovereignty and Spanish law. At least since the late 1780s, except in maritime emergencies, docking, anchoring, berthing, loading and unloading passengers and cargo at the port of Havana without the authorization of the port's authorities have been strictly prohibited. A ship's owners or captains did not have a choice or preference as to which pier or location in the port they were assigned for docking, anchoring, berthing and other port operations. The Port's Captain determined the pier, dock or location for such activities according to the maritime practices of said port ratified by Royal Orders of January 26, 1786, and again on February 18, 1820 and subsequent regulations from the 1830s.[131] The United States government ratified and codified those legal regulations and traditions between 1898 and 1902, during the period following the Spanish-American War.[132]

As mentioned above, Res. 251 was published in the Official Gazette on December 2005 and contains the internal procedures for the Port of Havana. As detailed in Res. 251 below, current legal regulations place multiple conditions and limitations on ships calling in to ports and command the captains and crew to act or refrain from acting in many manners for their own benefit, for the safety, speed and order of port operations, and for the preservation of public interests.

Notably, Res. 251 expressly states that the Cruise Terminal is the terminal where the following services will be provided, among others: embarkation and disembarkation of passengers, immigration, customs, and gangways to allow passengers on and off the ship.[133] Specifically, Article 34.1-2 of Decree 251 provides:

Art.34. Service to cruise ships include:

---

[131] "Reales 'ordenes comunicadas a la Intendencia de la Habana en 26 de Enero y 1º. de Setiembre de 1786 y 18 de Febrero de 1820 acerca de policía de muelles." In José María Zamora y Coronado, *Registro de legislación ultramarina y Ordenanza General de 1803 para Intendentes y empleados de Hacienda en Indias*. Tomo 1 (Habana: Imprenta del Gobierno y Capitanía general por S.M., 1839), 499-502.

[132] Brigadier General Adna R. Chaffee, Jefe del Estado Mayor, Orden General No. 174, 20 de Septiembre de 1899, Arts.1-2; Reglamento de Puertos, Arts. 1, 6. In República de Cuba. Secretaria de Hacienda, *Reglamento y disposiciones para las Capitanías de Puerto* (Habana: Imprenta de Rambla y Bouza, 1903), 4, 6, 7.

[133] MITRANS, Res. 251, Article 34.2.

1. The dispatch of the ship's entry, which is characteristically performed by Port's Public Authorities, before docking inside the harbor, by communicating its decision permitting the immediate disembarkation of passengers.

2. The service of embarking and disembarking passengers includes the organization of immigration and custom controls, and necessary services by the port operator to provide the passengers access to and from the *Cruise Terminal* from the ship.

Accordingly, Res. 251 recognizes the Cruise Terminal as the only dock where cruise passengers can disembark in Havana.

Besides establishing that the Cruise Terminal is the only permitted point of disembarkation, Res. 251 states that in the Port of Havana ship tenders cannot be used for the transportation of passengers, crew and/or authorities to the anchored ships or the dock, unless there is a specific authorization from the Harbor Master.[134] Specifically, the provision in article 28 provides: "The vessels cannot use their own tenders to carry the persons mentioned before, except in those cases expressly authorized by the Harbor Master". If there are reasons justifying the use of tenders, such service must be provided by the Port´s Public Authority.[135]

## 2. Cruise Terminal Building

The Cruise Terminal is the only facility that has necessary features for a cruise ship to dock. One necessary feature is the two-story building ("Cruise Terminal Building") erected on the pier. On the first floor or platform level, Customs, the officials of immigration and quarantine control (CIQ) inspect and admit the cruise crew and the passengers with their luggage. Buses have access to that level. Relevant equipment such as x-ray inspection devices are available only on the north side of the building. The second floor of the Cruise Terminal Building is reserved for cruise passengers' use. The Cruise Terminal is also the headquarters of ARIES, S.A. the Cuban entity licensed to operate the public service of port terminals for passengers.[136]

## 3. Cruise Terminal Operator - ARIES, S.A.

---

[134] MITRANS, Res. 251, Article 28.
[135] MITRANS, Res. 251, Articles 27 and 28.
[136] Exhibit 8, license 1511-23, issued to ARIES, S.A by the MITRANS.

A cruise line sailing to Cuba must contract with a licensed cruise line terminal operator.[137] The only company in Cuba licensed to operate a cruise terminal is ARIES, S.A.[138] Pursuant to the Regulations of the Law Decree No. 168 of 1996, a company providing services pertaining to transportation must hold a license.[139] The license granted to ARIES, S.A by the MITRANS authorizes this company to provide public services for the operation of a passenger port terminal. As a consequence, a cruise line seeking to call the port of Havana will need to contract with the company authorized and licensed to operate a passenger terminal, i.e., the Cruise Terminal operated by ARIES, S.A.

The contracts between ARIES, S.A. and the four cruise lines expressly require that the cruise lines' ships moor at the Cruise Terminal to disembark passengers. Specifically, the contracts include as an annex a "Schedule of calls and berth reservations" (*Programación de escalas y reservas de atraques*) for each arrival season. As the name itself specifies, cruise ships "dock" at the terminals that are enabled for this purpose. The schedule identifies the Cruise Terminal as the only pier in Havana where the four cruise lines can moor their ships.[140] The schedules identify the Cruise Terminal as the pier the four cruise lines must use and, more specifically, the "North" side of the Cruise Terminal. In addition, the contracts with Aries identify a fee that is owed per passenger for passengers disembarking in the "Cruise Terminal".[141]

### 4. Port Agent at the Port of Havana

Cruise operators must designate a Port Agent (*Agente Consignatario*) to act in the name of, and on behalf of, the Cruise operator (or ship owner or shipping company) while conducting any activity or maneuver related to maritime transport at the relevant port. The retained Port Agent is the legal representative of the ship owner onshore before the maritime or port authorities.[142] Given its extensive knowledge of port operations and the conditions of the workplace, as well as knowledge of the language and the regulations of the country, the Port Agent is key to ensuring compliance with the various regulations and laws discussed herein.

---

[137] MITRANS Res. 251, Article 10 (b).
[138] Exhibit 8, license issued to ARIES, S.A, by the MITRANS.
[139] Exhibit 7, (*in globo*), Law Decree No. 168 of 1996.
[140] Exhibit 9, (*in globo*) Cruise Lines contracts with Aries S.A., Schedule of calls and berth reservations, Anexo 1.
[141] Cruise Lines contracts with Aries S.A., Anexo 2.
[142] Exhibit 7, (*in globo*) Law No.115 on Navigation, Article 69.

According to Cuban regulations on maritime navigation, the Port Agent shall: (a) receive and assist the ship at the port; (b) carry out any administrative procedures required for the admission of the ship in port and the granting of any authorizations needed for the ship to operate; (c) take whatever measures are required to comply with regulations and orders issued by competent authorities; (d) ensure that the ship is duly staffed and supplied; (e) issue, validate and sign any bills of lading and other necessary documentation as representative of the shipowner, the shipping company or the captain of the vessel; (f) assist the captain of the vessel, engage in and supervise any services required for port operations; and (g) carry out as many acts and procedures as necessary for navigation, transport and maritime trade.[143]

SERVIMAR, also known as Consignataria Mambisa, is the entity in the port of Havana that acts as a port agent. SERVIMAR, as the local agent for the cruise ships, facilitates the operations and the information necessary to call the port ranging for details of the facilities, mandatory requirements like the use of pilots, information on tides, availability of fresh water and bunkering, etcetera.

SERVIMAR has issued a bulletin to the cruise lines, detailing all regulations and services applicable and available at the Port of Havana.[144] Section 12 of the bulletin titled "Terminal Details" specifically identifies Pier 1 as the "Cruise Terminal," and provides specific characteristics of the pier for the benefit of the cruise operators.[145]   Sections 17 and 18 of the bulletin states as follows:

> No. 17: ANCHORAGE: Cruise vessels are currently allowed to anchor when a pier is not available, but the use of ship tenders is not allowed.

> No. 18: TENDERS: Vessel tenders cannot be used while a vessel is in port.

Accordingly, pursuant to the requirements of the only port agent in Havana, the Cruise Terminal is the only dock where a cruise line can moor to disembark passengers and the use of ship tenders is not allowed. Regulations in place since the late nineties also impose fines and

---

[143] Exhibit 7, (*in globo*) Decree 317, Article 128.
[144] Exhibit 10 is the Bulletin issued by SERVIMAR.
[145] *See* Exhibit 10.

provide the harbor master with broad authority to deal with violations of a myriad of regulations concerning the use of tenders and other boats.[146]

Even in a hypothetical situation, wherein Cuban law allowed for the use of tenders in the Port of Havana, passengers carried on tenders would still need to disembark at the Cruise Terminal in order to go through Immigration, Customs, and sanitary control, as discussed below.

### 5.   Regulations regarding Immigration, Customs, and Sanitary laws

The Cuban laws and regulations on Immigration, Customs, and Sanitary control indicates that a ship owner has no choice but to use the docks where authorities can perform the tasks associated with those administrative functions, i.e., passport control, health, and customs inspections as further explained below.

Per Res. 251 by the MITRANS, the operation of passenger vessels must comply with the national laws on Immigration, Customs, Harbor Master, Border Control, sanitary and veterinarian controls as well as any other relevant rules resulting from the International Conventions of which Cuba is signatory.[147] In the port of Havana, the facilities for these services are only available in the Cruise Terminal.

### a)   Immigration

The Cruise Terminal is the only dock in the port of Havana that maintains the necessary facilities to comply with Cuba immigration laws for cruise vessels and the thousands of passengers they carry. Pursuant to Decree No. 26, Regulations on Immigration Laws of 2015, Chapter IV, paragraph 142, cruise lines must comply, among others, with the following immigration regulations, such as restrictions on cruise lines from terminating a crew member while in port, and procedures to follow in case of illness of a crew member.[148] Likewise, all passengers must carry with them an embarkment and disembarkment card in accordance to the vessel's manifest.[149] Failure to follow said and similar formalities will entail administrative fines of up to $5,000.00 pesos. In the same spirit, Article 146 of Decree No. 26 authorizes a $1,000.00 fine for those cases

---

[146] Exhibit 7, (*in globo*), Decree-Law No. 194 of 1999 "Infractions resulting from the possession and operation of boats in the national territory" and Resolution No. 2 of 1999 by the Ministry of Interior.
[147] MITRANS Res. 251 of 2005, Art. 35.
[148] Exhibit 7, (in globo), Art 66, Decree No. 26 of 2015, Immigration Procedure.
[149] Exhibit 7, (in globo), Art. 143, Decree No. 26 of 2015, Immigration Procedure.

where a passenger or crewmember is left ashore. Similarly, per Article 146, a shipowner would also face administrative fines in case a stowaway escapes from aboard the vessel. The port agent is made jointly liable for any violations.

As a result, a cruise line needs to disembark its passengers in the place designated by the Cuban authorities with an immigration checkpoint not only for the efficiency of its operations, but to avoid penalties.

### b) Customs

The Cruise Terminal is the only dock in the port of Havana that maintains the necessary facilities to process the thousands of passengers carried in a cruise ship to comply with Cuban Customs laws.  Resolution No. 187 of 2008 by the General Custom of the Republic, contains the rules for the dispatch and Custom control of vessels and aircrafts, including cruise ships.[150] Article 11 explains that the Customs dispatch and control is performed at the Customs and Customs points of control located in the ports and airports designated for the international traffic. The same article points out that arriving to a place other than the designated for Custom control will result in all goods aboard to be seized by Customs. Articles 25 and 31 makes the port agent and custom broker jointly liable for any violations. Article 11 of the Resolution No. 187 requires the cruise lines to disembark their passengers in a place where Customs authorities can process them. The Cruise Terminal is the only area that maintains the necessary equipment to comply with Article 11.

### c) Health control

The Cruise Terminal is the only dock in the port of Havana that maintains the necessary facilities to comply with Cuba's sanitary laws.  Decree No. 104 of 1982 deals with the health and sanitary control in Cuban ports and airports.[151] Article 2 states that international ports and airports will have a health team with personnel, equipment, and premises appropriate to inspect and provide sanitary services to all vessels and aircrafts that arrive to the country. The goal of the health and sanitary inspection is to prevent the transmission of infectious diseases. The decree also lists the obligations for the captain of the vessels that arrives to Cuban ports as well as the penalties for violations.

---

[150] Exhibit 7, (*in globo*), Resolution No. 187 of 2008.
[151] Exhibit 7, (*in globo*), Decree No. 104 of 1982.

To comply with the Immigration, Customs, and Sanitary controls, a cruise line must moor where those services can be provided.  In the port of Havana, the Cruise Terminal is the only facility designated to provide Immigration, Customs, and Sanitary controls.

## CONCLUSIONS

Based on my knowledge and experience, it is my expert opinion that the applicable laws, decrees and administrative resolutions provide that a cruise line calling on the port of Havana can only dock at the Cruise Terminal, and not anywhere else in the port.  In addition:

1) The administration of Cuban ports is part of the centralized Cuban government system, which is structured in tiers delegating powers and administrative functions from one level to the next one.

2) Within that structure, the ports fall under the control of the Ministry of Transportation, which assigns the administration of the port to several entities and agencies by delegating specific areas of competence and responsibilities through a set of laws, decrees, and administrative resolutions.

3) Under the law, a cruise ship is obligated to use the services of a port agent, which serves as its local representative and coordinator to ensure an orderly and efficient operation. In the port of Havana, the port agent is Consignataria Mambisa (a/k/a/ SERVIMAR). SERVIMAR's internal regulations mandate the use of the Cruise Terminal

4) The Cruise Terminal is administered by ARIES, S.A., a government owned company and the only entity licensed by the Cuban Ministry of Transportation to provide passenger services.

5) The contract that cruise lines were required to enter into with ARIES, S.A. specifically requires that incoming ships moor at the Cruise Terminal.

6) The relevant laws, decrees and administrative resolutions in Cuba also establish that a cruise line must strictly observe the immigration, sanitary, and Customs laws of the country or face fines and other penalties. Those services are only available at the Cruise Terminal.

7) Pursuant to Resolution 251 issued by the Ministry of Transportation and SERVIMAR's regulations, the use of ship tenders is not permitted in the Port of Havana. Even if ship tenders were allowed, the passengers carried in the tenders would still be disembarked at the Cruise Terminal, as it is the only location where the requisite immigration, sanitary, and Customs facilities are available for processing cruise line passengers.

8)  In sum, a cruise line calling the port of Havana must abide by the Cuban laws and regulations in place, which require a cruise line travelling to Havana to dock at the Cruise Terminal.


      I confirm that the opinions I have expressed represent my true and complete professional opinion.


Name:  Ambar Diaz, Esq.

Date:  3/19/21