# EXHIBIT 82

Page 1

```
1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
2
3              CASE NO.:  19-23590-CIV-BLOOM/LOIS
4      HAVANA DOCKS CORPORATION,
5
6                    Plaintiff,
7      vs.
8      ROYAL CARIBBEAN CRUISES LTD.,
9                    Defendant.
       _____/
10
11          ZOOM VIDEOTAPED DEPOSITION OF HAVANA DOCKS
12             CORPORATION/JERRY JOHNSON 30 (b)(6)
13             TAKEN ON BEHALF OF THE DEFENDANT
14             Taken Remote Via Zoom
               January 19, 2021
15             10:00 a.m. 5:06 p.m.
16
17
18
19     REPORTED BY
       MARLA SCHREIBER, COURT REPORTER
20     NOTARY PUBLIC, STATE OF FLORIDA
21
22
23
24
25                 APPEARANCES OF COUNSEL
```

Page 2

1    ON BEHALF OF THE PLAINTIFF:
2    COLSON HICKS EIDSON, P.A.
     By STEPHANIE A. CASEY, ESQ.
3    255 Alhambra Circle, Penthouse
     Coral Gables, Florida 33134
4    scasey@colson.com
5    ON BEHALF OF THE DEFENDANT:
6    HOLLAND & KNIGHT, LLP
     By SCOTT D. PONCE, ESQ.
7    By BENJAMIN TAORMINA, ESQ.
     701 Brickell Avenue, Suite 3300
8    Miami, Florida 33131
     sponce@hklaw.com
9
10   MARGOL & MARGOL, P.A.
     By RODNEY S. MARGOL, ESQ.
11   2029 3rd Street North
     Jacksonville, Florida 32250
12   rodney@margolandmargol.com
13   ALSO PRESENT:
14   SUSAN GARRISON, Videographer
15   MICKAEL BEHN
16                  INDEX OF EXAMINATION
17   WITNESS:  JERRY JOHNSON
18   DIRECT EXAMINATION                     PAGE
19   By Mr. Scott Ponce, Esquire              4
20   CROSS-EXAMINATION
21   By Ms. Stephanie A. Casey, Esquire   196
22   REDIRECT EXAMINATION
23   By Mr. Scott Ponce, Esquire            198
24
25

Page 3

```
 1                    E X H I B I T S

 2     Defendant's Exhibit 1              Page:   17
       (Notice of Deposition)
 3     Defendant's Exhibit 2              Page:   41
       (Final Decision)
 4     Defendant's Exhibit  3             Page:   41
       (Proposed Decision)
 5     Defendant's Exhibit 4              Page:   47
       (Part of Electronic Filing fro Exhibit 2)
 6     Defendant's Exhibit 5              Page:   51
       (2-page document Bates HDC012573)
 7     Defendant's Exhibit 6              Page:   56
       (Bates HDC298)
 8     Defendant's Exhibit 7              Page:   62
       (Email Chain)
 9     Defendant's Exhibit  8             Page:   66
       (Amended Complaint)
10     Defendant's Exhibit  9             Page:   75
       (Photograph of Piers)
11     Defendant's Exhibit 10             Page:   81
       (Photograph)
12     Defendant's Exhibit 11             Page:   89
       (Inventory List)
13     Defendant's Exhibit 12             Page:   95
       (Final Summary of Inventory List)
14     Defendant's Exhibit 13             Page:  105
       (Bates HDC19064)
15     Defendant's Exhibit 14             Page:  134
       (Bates HDC1320)
16     Defendant's Exhibit 15             Page:  136
       (Bates HDC14348 Email String)
17     Defendant's Exhibit 16             Page:  141
       (Bates HDC1180 Email)
18     Defendant's Exhibit 17             Page:  147
       (Bates HDC1013 Email)
19     Defendant's Exhibit 18             Page:  151
       (Bates HDC83)
20     Defendant's Exhibit 19             Page:  154
       (Bates HDC1328)
21     Defendant's Exhibit 20             Page:  156
       (Bates HDC14361)
22     Defendant's Exhibit 21             Page:  167
       (Bates HDC1498)
23     Defendant's Exhibit 22             Page:  173
       (Federal Statute 22)
24     Defendant's Exhibit 23             Page:  182
       (Interrogatories)
25     Defendant's Exhibit 24             Page:  187
       (Havana Docks Responses to 30 (b)(6) notice)
```

```
                                                     Page 4

 1              THE VIDEOGRAPHER:  Today is January 19,

 2         2021.  We are going on the record at 9:57 a.m.

 3         This is the videotaped deposition via Zoom of

 4         Jerry Johnson with the Havana Docks Corporation

 5         in the matter of Havana Docks Corporation versus

 6         Royal Caribbean Cruises LTD filed in the United

 7         States District Court Southern District of

 8         Florida.

 9              I am Susan Garrison, the videographer.  The

10         court reporter is Marla Schreiber.  We are on

11         the record and the court reporter may proceed.

12    THEREUPON:

13                        JERRY JOHNSON

14    was called as a witness, and after having been first

15    duly sworn, testified as follows:

16              THE WITNESS:  I do.

17                    DIRECT EXAMINATION

18    BY MR. PONCE:

19         Q    Mr. Johnson, good morning.  My name is

20    Scott Ponce.  I'm an attorney for the Royal Caribbean

21    Cruises Limited.  With me on the screen is my colleague

22    Ben Taormina.

23              Would you give us your full name for the

24    record?

25         A    Yes, my name is Jerry Mitchell Johnson.
```

Page 5

1          Q    Mr. Johnson, where do you live?

2          A    I live in Versailles, Kentucky.  Would you

3     like the specific address?

4          Q    Yes, would be great.

5          A    It's at 706 Delaney Way in Versailles,

6     Kentucky.  The ZIP Code is 40383.

7          Q    Is Versailles like in French

8     V-e-r-s-a-i-l-l-e-s?

9          A    Yes, sir, that's correct.  We are in

10    Kentucky so the pronunciation is different.

11         Q    I got you.

12              MS. CASEY:  We will designate just his

13              address as confidential on the record and I

14              guess we will designate whatever portions of the

15              transcript that are confidential at a later

16              time. But I just wanted to make a note that was

17              not.

18              MR. PONCE:  I agree that it should be.

19    BY MR. PONCE:

20         Q    Mr. Johnson, I know by this point you have

21    had your deposition taken a lot in the course of these

22    cases and you are a pro by this point.  But if you will

23    indulge me and let me just go over a couple of

24    important rules that I know you know by now.

25              The first is if at any time you don't

Page 6

1    understand one of my questions, please let me know and

2    I will rephrase it.  That's not confrontational for you

3    to do.  It is not inappropriate for you to do.  Your

4    job is to answer questions that you can understand and

5    my job is to ask questions that I hope you understand.

6    So if you don't understand something that I have asked,

7    please let me know and I will rephrase it.  When the

8    deposition is done and the weeks and months from now,

9    all we will have is the transcript and if you've

10   answered a questioned, we have to assume that you

11   understood it.  is that okay, will you agree to that?

12        A    Yes, sir.  I understand that.

13        Q    The next is this is hard if we were sitting

14   across a conference table from each other and it is

15   even harder in the Zoom environment that we are all

16   operating in now.  But it is important that you and I

17   don't speak at the same time so if you can wait until I

18   finish my question before you give your answer, and

19   likewise I will wait for you to answer before beginning

20   my next question because the court reporter can only

21   take down one of us at a time.  If we are speaking

22   together, her fingers explode.  And that's hard to do,

23   but let's do the best we can and with that, let's get

24   into it.

25             Are you currently employed, Mr. Johnson?

```
                                              Page  7
 1           A    Yes, I am.

 2           Q    By whom are you employed?

 3           A    I am employed by Bank of the Bluegrass in

 4    Lexington, Kentucky.

 5           Q    How long have you been employed by Bank of

 6    the Bluegrass?

 7           A    Just slightly over ten years.

 8           Q    Do you currently have a -- what is your

 9    current title at the Bank of the Bluegrass?

10           A    I'm a senior vice president and director of

11    our wealth management and trust department.

12           Q    How long have you had that position?

13           A    From the time of my hiring with Bank of the

14    Bluegrass, 10 years ago.

15           Q    Again, in a couple of sentences, how would

16    you describe what you do in that role on a day-to-day

17    basis?

18           A    Our principal role in our wealth management

19    area is the hand laying of investments for high net

20    worth individuals and families.  We also do quite a bit

21    of administration of trust work through our trust

22    department charter here at the bank, financial planning

23    for our clients, retirement planning and so forth.

24           Q    So is it fair to say, I know we just rolled

25    over to a new year and I am still writing checks that
```

1    say 2020 on them.  Did you start at Bank of the

2    Bluegrass in 2010 or 2011?

3           A     2010.

4           Q     And immediately prior to joining the

5    bank -- and let's just call it the bank so I don't have

6    to say Bank at the Bluegrass every time.

7                 Immediately prior to joining the bank,

8    where did you work?

9           A     I was with another banking institution also

10   in Lexington, Kentucky.  I was an affiliate of Fifth

11   Third Corporation which is based in Cincinnati, Ohio.

12          Q     How long were you with that institution?

13          A     I was with them for five years.

14          Q     And what did you do at Fifth Third?

15          A     Similar capacity in the wealth management

16   area.  I was a senior vice president and client

17   relationship manager.

18          Q     Were you at Fifth Third for five years?

19          A     Yes, sir.

20          Q     This will be the last one we do.

21                What did you do immediately before you went

22   to Fifth Third Bank?

23          A     I was with another super regional banking

24   firm, that being National City Corporation which was

25   based in Cleveland, Ohio.  My tenure with them was also

Page 9

1    in Kentucky though at our national city affiliates in

2    Kentucky.  That entity is now under PNC out of

3    Pennsylvania.

4           Q    Okay.  Do you have a college degree?

5           A    Yes, sir, I do.

6           Q    From which school?

7           A    From Morehead State University in Morehead,

8    Kentucky.

9           Q    That's where Phil Simms went, correct?

10          A    Yes, sir, it is.  You have a good memory.

11          Q    What did you get your degree in Morehead

12   State?

13          A    I have a degree in business with emphasis

14   in finance.  I also I have a master's degree in

15   business from Morehead State.

16          Q    What year did you get your undergraduate

17   degree?

18          A    1981.

19          Q    What about the master's?

20          A    I received my master's as I was working so

21   that took a bit longer.  I don't remember the specific

22   date.  But it was within the latter 1980s.

23          Q    Any other advanced or graduate degrees in

24   addition to that master's?

25          A    No, sir.

Page 10

```
 1          Q    Is that master's in business
 2    administration?
 3          A    Yes, sir, it is.
 4          Q    So first question of the day, have you ever
 5    heard of a company named Havana Docks Corporation?
 6          A    Yes, I have.
 7          Q    Do you have any official title or status
 8    with Havana Docks Corporation?
 9          A    I do.
10          Q    What is that?  Do you have a title with
11    Havana Docks Corporation?
12          A    In terms of officer title?
13          Q    Yes, sir.
14          A    Yes, I have multiple designations.  I am
15    designated as vice president, comptroller, secretary
16    and treasurer.
17          Q    Does Bank of the Bluegrass have any
18    relationship with Havana Docks Corporation?
19          A    No, sir, other than in our role for an
20    investment account that Bank of the Bluegrass
21    administers on behalf of the Havana Docks Corporation.
22          Q    Does the role you play with Havana Docks,
23    would you say that's separate from your employment with
24    Bank of the Bluegrass?
25          A    Yes, sir, it is.
```

Page 11

```
1          Q    When did you first, and I know you listed a

2    bunch of executive level titles there.  When did you

3    first develop a relationship or come to have a

4    relationship with Havana Docks Corporation?

5          A    Prior to the officer designations?

6          Q    If there was a prior, yes, let's start

7    there.

8          A    A relationship with Havana Docks

9    Corporation began in 2011 and through the connection

10   with the Behn family.

11         Q    Was the connection with the Behn family

12   yours or was it Bank of the Bluegrass initially?

13         A    Initial connection with the Behn family was

14   through our work for them through Bank of the

15   Bluegrass.

16         Q    For lack a better word, was that an account

17   or relationship that was assigned to you by the bank?

18         A    Yes, that's correct.  However, assigned

19   clarification, I initiated the relationship to bring

20   that relationship into the bank.  But yes, it was

21   assigned to me.

22         Q    Going back to 2011, how did you -- what did

23   you do to originate that relationship?

24         A    Received a call from an attorney here in

25   Lexington, Kentucky who asked me if I would be
```

Page 12

```
 1    interested in looking at an opportunity for trust

 2    relationship management for a family and that family

 3    was the Behn family.

 4         Q    What was that attorney's name?

 5         A    His name was Bruce Reynolds and he is with

 6    the law firm of Stites & Harbison here in Lexington.

 7         Q    Did Mr. Reynolds give you any indication of

 8    what the family's business was or if it was engaged in

 9    any type of business?

10         A    At that time I don't recall that we delved

11    into that area.

12         Q    Without going step by step, minute by

13    minute every communication you might have had with the

14    Behn family early on.  Once you got the initial

15    contract from Mr. Reynolds, who at the Behn family did

16    you primarily coordinate or communicate with before the

17    bank signed him up as a client?

18         A    The initial contact would have been with a

19    lady in the family, her name is Aphra Behn.

20         Q    Is that -- I've seen it written, A-p-h-r-a?

21         A    Yes, sir, that's correct.

22         Q    Okay.  So she was your initial point of

23    contact, I guess, once you got the referral from Mr.

24    Reynolds?

25         A    Yes, sir, as I recall.
```

Page 13

1        Q    Over time, did you, and I guess let me
2    narrow that scope a little bit.
3             Before the bank signed up the Behn family
4    as a client, did you communicate with anyone else at
5    the Behn family in addition to Ms. Behn, Aphra Behn?
6        A    I am sorry.  Mr. Ponce, would you mind
7    repeating the first part of that question?
8        Q    Yes.  During the time before the bank
9    signed up the Behn family as a client, did you
10   communicate with anyone in addition to Aphra Behn?
11       A    I don't recall that specifically.  But in
12   close proximity to that time frame, I met Aphra Behn's
13   son, Mickael Behn, who I believe is on the Zoom
14   conference with us today.
15       Q    So you were successful signing on behalf of
16   the bank signing up the Behn family as a client,
17   correct?
18       A    Yes, sir.
19       Q    During those introductory calls or certain
20   communications before the bank signed them up as a
21   client, what was your understanding of what the Behn's
22   family business was?
23            MS. CASEY:  Objection to form.
24            THE WITNESS:  Early on I didn't know much
25        about the history of the Behn's family business.

Page 14

```
 1              The initial engagement with the Behn family
 2              focused on the administration of the family
 3              trust.
 4     BY MR. PONCE:
 5          Q    What assets at that time were held in the
 6     trust?
 7              MS. CASEY:  Mr. Johnson, I will caution you
 8              not to reveal any information that you would not
 9              be able to reveal under bank secrecy statutes.
10              THE WITNESS:  Thank you, Ms. Casey.  I
11              understand.  I can give a generic answer typical
12              investment structure for a trust, marketable
13              securities and so forth.
14     BY MR. PONCE:
15          Q    What services were you offering the Behn
16     family at that initial time when you were working to
17     sign them up as a client or customer?
18              MS. CASEY:  Objection to form.
19              THE WITNESS:  Typical trust administration
20              for the type of trusts that were involved,
21              including the investment management for the
22              assets and the trust.
23     BY MR. PONCE:
24          Q    That was in 2011 I understand you to say.
25     That was shortly after you joined the Bank of the
```

Page 15

1    Bluegrass?

2            A    Yes, sir, that's correct.

3            Q    When did you acquire the executive level

4    titles you mentioned with Havana Docks Corporation?

5            A    The first iteration of titles occurred in

6    2018 whereby it was designated as secretary treasurer.

7            Q    How did it come to be or why was it that

8    you acquired that title?

9            A    As my work progressed with the family and

10   on behalf of Havana Docks, it was felt that that formal

11   designation was needed so that I could act in an

12   official capacity on behalf of Havana Docks.

13           Q    Was that something the Bank of the

14   Bluegrass needed to approve?

15           A    Is that something Bank of the Bluegrass

16   needed to approve?

17           Q    Yes.

18           A    Yes, that's correct.

19           Q    The Bank of the Bluegrass approved your

20   taking on that capacity or role with Havana Docks

21   Corporation?

22           A    Yes, sir, that's correct.

23           Q    What was it that you would be doing in that

24   role for Havana Docks Corporation?

25           A    That would be the functions that I

Page 16

1    continued to perform, basically the corporate

2    administrative work for the company filing tax returns,

3    completion of the company financial statements,

4    maintaining the stockholder registry and so forth.

5         Q    Are you involved at all in -- let me make

6    sure I am going to say this right.  In your -- with

7    those titles that you hold for Havana Docks

8    Corporation, do you refer to yourself as an officer of

9    the company?

10        A    Yes, sir.

11        Q    As an officer of the company in doing the

12   things you just described for the company, are you

13   involved in strategic business making decisions?

14             MS. CASEY:  Objection to form.

15             THE WITNESS:  I would think that would be

16        accurate.

17   BY MR. PONCE:

18        Q    So it's more than just an administrative

19   function and you make sure that the taxes get mailed in

20   and the corporate documents get filed, you have more

21   substantive role than just being pre administrative

22   functions; is that correct?

23        A    Yes.  Again, that would be accurate.

24        Q    Let's, if we can look at what we marked as

25   Exhibit 1 to your deposition which with any luck at all

Page 17

```
 1    is appearing on a computer screen near you.
 2              Do you see what we have marked as Exhibit
 3    1, Mr. Johnson?
 4         A    Yes, sir, I do.
 5         (Whereupon, the above referred-to document
 6           was marked as Defendant's Exhibit 1)
 7    BY MR. PONCE:
 8         Q    Is this a title Defendant's Renotice of
 9    taking Videotaped Deposition of Plaintiff?
10         A    Yes, sir, that's correct.
11         Q    Have you seen this document before?
12         A    I don't recall if I have seen the document.
13    I've certainly seen the questions that are being asked
14    of us.
15         Q    Are you here today to answer questions on
16    behalf of Havana Docks Corporation?
17         A    Yes, sir, I am, to the best of my ability.
18         Q    As far as you know, are you the person who
19    is being designated to testify on behalf of Havana
20    Docks Corporation in connection with all of the topics
21    that are listed in this document?  And please, if you
22    want to take your time and scroll through and look at
23    them.
24         A    Yes, sir.  That's my understanding.
25         Q    So we are finished with Exhibit 1 if you
```

Page 18

1    want to stop looking at it, you are welcome to.

2          A     Mr. Ponce, as Ms. Casey referred to earlier

3    this morning, I do have in front of me the matrix

4    advancers that we submitted to you this morning as well

5    so I will be referring to that document.

6          Q     Mr. Johnson, is Havana Docks Corporation

7    incorporated in the United States?

8          A     Yes, sir.

9          Q     In which state is it incorporated?

10         A     In the State of Delaware.

11         Q     Throughout its corporate existence, has it

12   been incorporated in the State of Delaware?

13         A     Yes, sir, that's my understanding.

14         Q     We will talk plenty more about this later

15   as we go on.

16                But the Cuban government confiscated

17   properties on Havana Docks' property in 1960, correct?

18         A     Yes, sir, that's my understanding.

19         Q     And in that period of time immediately

20   before that confiscation in 1960, what was Havana Docks

21   Corporation's business, what did it do?

22         A     The operation of the port facilities in

23   Havana, specifically the piers at Havana Docks,

24   handling of cargo and the piers also served for

25   passenger ships as I understand.

Page 19

```
1          Q    So at that time immediately before the
2     confiscation, how many employees did Havana Docks
3     Corporation have?
4          A    I am not sure, Mr. Ponce.  I have not seen
5     that document.
6          Q    Is it your sense knowing what you do about
7     the business that it was more than 10, more than 15,
8     more than 100?
9               MS. CASEY:  Objection, outside the scope.
10              THE WITNESS:  It could be a bit of
11              speculation, Mr. Ponce.  But I would think
12              certainly more than 10.  I would say in the
13              range of 50 would be reasonable.  It could be
14              more.
15    BY MR. PONCE:
16         Q    However many employees it had, where
17    geographically were those employees located?
18              MS. CASEY:  Objection to scope.  And I am
19              sorry, Mr. Ponce, I don't mean to interrupt you
20              as you are going along.  I suppose we should
21              have discussed this before we started.  This
22              deposition was noticed as the 30(b)(6) but also
23              the individual capacity of that position, am I
24              correct in that?
25              MR. PONCE:  Well, we noticed two
```

Page 20

```
 1        depositions separately.  The morning deposition
 2        being the 30(b)(6) deposition of Havana Docks
 3        Corporation and the afternoon deposition being
 4        of Mr. Johnson individually.
 5             MS. CASEY:  Okay.  Do you plan to just, I
 6        guess, terminate the (b)(6) when you are done
 7        with that part and then we will reswear in the
 8        witness for the individual capacity?
 9             MR. PONCE:  I think so.  I mean, my sense I
10        mean the rules of a 30(b)(6) deposition are that
11        if it's outside the scope of a topic, you know,
12        the deponent at that point is not speaking on
13        behalf of the corporation but is speaking on his
14        or her personal knowledge if they have any.  So,
15        you know, I don't see a second deposition being
16        long.  Frankly, my hope was maybe knock it out
17        in one sitting.  But, you know, we might have to
18        play that by ear a little bit.
19             MS. CASEY:  Okay.  That's fine.  I will
20        just object to the scope as we go along to
21        preserve it for the first, I guess for this part
22        of the deposition that's the 30(b)(6).
23             MR. PONCE:  Okay.
24             MS. CASEY:  So I apologize for interrupting
25        you mid question on that.
```

Page 21

```
 1              MR. PONCE:  No apologies necessary.  Let's
 2         go back to where we were.
 3    BY MR. PONCE:
 4         Q    However many employees Havana Docks
 5    Corporation had at that time immediately before the
 6    confiscation, do you know where geographically those
 7    employees were located?
 8              MS. CASEY:  Objection, scope.
 9              THE WITNESS:  No, sir, I do not know
10         specifically where they were located.
11    BY MR. PONCE:
12         Q    At the time immediately before the
13    confiscation, did Havana Docks Corporation have
14    employees in Cuba?
15              MS. CASEY:  Same objection.
16              THE WITNESS:  To the best of my knowledge,
17         that's correct.
18    BY MR. PONCE:
19         Q    At the time immediately before the
20    confiscation, did Havana Docks Corporation have any
21    employees based in the United States?
22              MS. CASEY:  Same objection.
23              THE WITNESS:  I do not know that
24         specifically.
25    BY MR. PONCE:
```

Page 22

```
 1          Q    At the time immediately before the
 2     confiscation, who made the day-to-day business
 3     decisions for Havana Docks Corporation?
 4                    MS. CASEY:  Same objection.
 5                    THE WITNESS:  It would be my answer for
 6               you, Mr. Ponce, that would be William C. Behn
 7               who was the president of Havana Docks
 8               Corporation at the time of confiscation.
 9     BY MR. PONCE:
10          Q    Earlier, Mr. Johnson, you mentioned Aphra
11     Behn, mother of Mickael Behn, Aphra Behn related to
12     William C. Behn who was present at the Havana Docks
13     Corporation at the time of confiscation?
14          A    Yes, sir, she is.  Aphra is Mr. Behn --
15     William C. Behn's daughter.
16          Q    So William C. Behn is Mickael Behn's
17     grandfather?
18          A    Yes, sir, that's correct.
19          Q    Maternal grandfather, correct?
20          A    Correct.
21          Q    At the time immediately before the
22     confiscation and that confiscation, William C. Behn,
23     did he live in Cuba?
24          A    Mr. Behn, can we back up to that last
25     question.  I apologize.  I have to think about my
```

Page 23

```
 1    paternal and maternal.  I hope I answered that
 2    correctly.
 3         Q    So I am not trying to trick you.  I think
 4    that's right.  If his last name is Behn and Mickael's
 5    last name is Behn, I think that means he is the
 6    paternal grandfather.  If one of us is wrong, then we
 7    are both wrong.  We will go down together.
 8         A    Okay.  Fair enough.
 9              MS. CASEY:  I will state an objection that
10         this is outside the scope.
11              MR. PONCE:  So there we are.  All right.
12    BY MR. PONCE:
13         Q    I just want to make sure I understood how
14    the people whether it's maternal, it won't really
15    matter.  I am just trying to get the family tree a
16    little bit.  I am not sure where we were in terms of
17    the question I was asking.
18              At the time of the confiscation immediately
19    before the confiscation, did William C. Behn live in
20    Cuba?
21         A    It's my understanding he did.
22         Q    Did he stay in Cuba after the confiscation
23    occurred?
24         A    It's my understanding he did not.
25         Q    Where, to the best of your knowledge, where
```

Page 24

1    did Mr. William C. Behn go after the confiscation?

2         A    I am not 100 percent sure on that, Mr.

3    Ponce.  But I believe he came back to New York.

4         Q    At any time, did he live in France after

5    the confiscation?

6         A    Yes, it's my understanding he did.

7         Q    If you know, how long after the

8    confiscation did he go to France?

9         A    I am not sure, Mr. Ponce.  The family, as I

10   understand, they also have a home in Miami.  I

11   understand he spent several years there and probably

12   splitting time between that home and the family home in

13   France.

14        Q    So let me restate it back to make sure I

15   have it right.

16             After he left -- he left Cuba after the

17   confiscation and went initially to New York; is that

18   correct?

19        A    I believe that's correct.

20        Q    Then as best as you know, at some point

21   after that he split time between Miami and France?

22        A    I believe that's correct as I understand.

23        Q    Do you know, and you might not know.  Do

24   you know whether he spent more time in France or in

25   Miami?

Page 25

1              MS. CASEY:  Outside the scope.

2              THE WITNESS:  For all of the years in that

3         expansive time, Mr. Ponce, I don't know the

4         ratio of how many years between each location.

5    BY MR. PONCE:

6         Q    So we started talking about Mr. William C.

7    Behn because I asked you at the time of confiscation

8    and immediately before we made the day-to-day business

9    decision for Havana Docks Corporation.  At that same

10   time, who kind of made the long range planning and

11   strategic business decision for Havana Docks

12   Corporation?

13             MS. CASEY:  Outside the scope.

14             THE WITNESS:  That would be a bit of

15        speculation on my part, Mr. Ponce.  But again,

16        Mr. Behn was at the helm of the corporation as

17        president where there was a full serving board

18        of directors and so forth of a typical

19        corporation.  So I am not sure about how all of

20        those years ago how the strategic planning

21        methods occurred.

22   BY MR. PONCE:

23        Q    So at the time of the confiscation, who

24   served as Havana Docks Corporation's officers,

25   president, vice president, secretary, that sort of

Page 26

```
1    thing?

2                   MS. CASEY:  Outside the scope.

3                   THE WITNESS:  I don't have that listing in

4            front of me, Mr. Ponce.  I think it's available

5            in documentation that we have supplied to Royal

6            Caribbean.  But I apologize.  I don't have that

7            list in front of me.

8    BY MR. PONCE:

9            Q    No apologies necessary.  You mentioned a

10   board of directors.  Do you know who the board members

11   of Havana Docks Corporation were at the time of

12   confiscation?

13                  MS. CASEY:  Outside the scope.

14                  THE WITNESS:  Similar answer, Mr. Ponce.  I

15           don't have that listing in front of me.  It's a

16           long time ago.  But it is as I recall in the

17           corporate records for Havana Docks Corporation.

18   BY MR. PONCE:

19           Q    The board of directors, were they --

20   actually nevermind.  Scratch that.

21                  So I asked you a series of questions with

22   reference to the time frame at immediately before the

23   confiscation in 1960.  I want to switch now to present

24   day from roughly 2019 through today.

25                  So present day 2019 through now, what is
```

1    Havana Docks Corporation's business, what does it do?

2          A    Primary goal or primary business for all of

3    these years since confiscation of the property in Cuba

4    has been to maintain and protect our claim on the

5    certified property as I mentioned earlier.  There were

6    some marketable securities investments that were in the

7    United States at the time of confiscation, and the

8    company has maintained that investment account for all

9    of these years.  But those would be the two principal

10   functions in my opinion.

11         Q    In terms of securities that Havana Docks

12   Corporation has, it's actively trading security or does

13   it just hold onto securities it's had historically over

14   time?

15         A    I would classify those as actively traded

16   securities, typical of an investment account in the

17   United States.

18         Q    So it's not static in the sense that it has

19   legacy investments that it just holds onto.  I mean,

20   it's actively trading in the various markets?

21         A    Yes, sir, that's correct.  There was one

22   legacy investment that had no value in my opinion and

23   it was a legacy investment in the Cuban telephone

24   company.

25         Q    So I am going to ask you questions, like I

Page 28

1    said right now about presently.  What I mean by

2    presently is 2019 through today.  Now, that's only two

3    years.  If at some point something changed within the

4    two years that's relevant to a question I am going to

5    ask you or an answer that you are going to give, please

6    point that out.

7              So presently in the 2019 to 2021 now time

8    frame.  Does Havana Docks Corporation have any

9    employees?

10        A    No, sir, we do not.

11        Q    Who currently makes the day-to-day business

12   decisions for Havana Docks Corporation?  I know earlier

13   you said that you do but you don't just have an

14   administrative role.  Do you do that solely or does

15   anyone else participate in the day-to-day business

16   decision making process for Havana Docks Corporation?

17        A    I would answer that I am largely

18   responsible for that role, however, I do report to

19   Mickael Behn who is the president of Havana Docks

20   Corporation.

21        Q    Where does Mickael Behn live?

22        A    Mr. Behn lives presently in London,

23   England.

24        Q    Do you know for how long he has lived in

25   London, England?

Page 29

```
 1          A    No, sir, I apologize, I do not, no.
 2          Q    When it comes down to decision making
 3     currently for Havana Docks Corporation and someone has
 4     to make the final call on an issue, is that you or Mr.
 5     Michael Behn making that call?
 6              MS. CASEY:  Objection to form.
 7              THE WITNESS:  I believe the answer would
 8              respectively depend on the magnitude of the
 9              decision.  Routine matters, I feel like I can
10              make that call.  Certainly if it's something I
11              felt that Mr. Behn and I needed to discuss, I
12              would do so.
13     BY MR. PONCE:
14          Q    On some of those more important non-routine
15     decisions, if you and Mr. Behn disagreed, who would win
16     out?
17          A    Mr. Behn.
18          Q    Does Havana Docks Corporation currently
19     have any officers?  And I mean officers in my mind,
20     president, vice president, secretaries.  I know you
21     said earlier that you hold a lot of officer titles.
22     Does anyone else?
23          A    Mr. Behn is president as I mentioned and
24     there has been some rotation of officers and I
25     apologize, I meant to look for you this morning.  I
```

Page 30

1   can't remember if Mr. Behn's mother, Aphra Behn, still

2   holds an officer designation.  And, again, I apologize.

3   I am going to have to look at that current status for

4   her.  She has in the past.

5          Q    Where does Ms. Aphra Behn currently live?

6          A    She lives in France.  And also -- excuse

7   me.  Also she has a home in Miami.

8          Q    Which is her primary residence?

9               MS. CASEY:  Objection to form and outside

10          the scope.

11              THE WITNESS:  That would be probably beyond

12          my scope to answer.  I am not sure I know

13          through this COVID-19 situation, she has been

14          locked in France for quite a number of months.

15  BY MR. PONCE:

16         Q    So pre-COVID, you are not sure whether her

17  primary residence was France or the U.S.?

18              MS. CASEY:  Objection to form.

19              THE WITNESS:  I am not.

20  BY MR. PONCE:

21         Q    So, again, thinking through my family tree

22  I am trying to construct and in my mind.  Does Mickael

23  Behn have any siblings?

24         A    No, sir, he does not.

25         Q    Does Aphra Behn have any currently living

Page 31

```
 1    siblings?

 2         A    I am sorry.  Your question is does Aphra

 3    Behn have any current living siblings?

 4         Q    Yes, sir.

 5         A    No, sir, she does not.

 6         Q    Does she have siblings who have passed

 7    away?

 8         A    Yes.

 9         Q    Had you ever had any dealings with those

10    siblings in the time that you have been associated with

11    Havana Docks Corporation?

12         A    No, I have not.  To my remembrance they had

13    already deceased.

14         Q    Does Havana Docks Corporation currently

15    have a board of directors?

16         A    Yes.

17         Q    Who are the current directors?

18         A    The directors are Mr. Behn, Mickael Behn,

19    his mother, Aphra Behn, and myself.

20         Q    There are no other currently serving

21    directors of the corporation?

22         A    That's correct.

23         Q    For how long has that been the composition

24    of Havana Docks Corporation's board?

25         A    That was passed by stockholder vote in
```

Page 32

1    2020.

2         Q    Were there directors other than Mickael

3    Behn, Aphra Behn and you prior to 2020?

4         A    Yes.

5         Q    Who were the board of directors immediately

6    prior to 2020 who are no longer on the board of

7    directors?

8         A    Still the same composition with the

9    exception of Aphra Behn from 2018 to 2020, the board of

10   directors consisted of Michael Behn and myself.

11        Q    So in 2020, Aphra Behn was added as a

12   director?

13        A    Yes, sir, that's correct.

14        Q    For how long were you and Michael Behn the

15   sole directors of the corporation?

16        A    From 2018 until the recent vote in 2020.

17        Q    Prior to 2018, who were the directors of

18   Havana Docks Corporation?

19        A    I would need to check the corporate record

20   on that, Mr. Ponce.  I apologize.  I don't have that in

21   front of me.

22        Q    As best you know, was Michael Behn a

23   director prior to 2018?

24        A    As I recall, I believe he was.

25        Q    Prior to 2018, did you serve as director of

Page 33

1    Havana Docks Corporation?

2         A    I did not.

3         Q    So Mr. Behn, I got to make sure you and I

4    are on the same page about something here.  The amended

5    complaint in this action which, we are going to put up

6    at some point.  I don't know that I necessarily want to

7    put it up now.  Paragraph 6 of the amended complaint

8    refers to certain commercial waterfront real property

9    in the port of Havana, Cuba identified specifically by

10   the Republic of Cuba as the Havana cruise port

11   terminal.  The complaint refers to that as the subject

12   property.  Can we agree when I say the subject property

13   that's what we are referring to?

14        A    Yes, sir, we can.

15        Q    There may be times where I ask you

16   questions about more specific pieces of property and I

17   will make sure to identify that.  And, likewise, if at

18   some point your answer refers to something less than

19   that whole, you know, please point it out.  But kind of

20   just for generic general purposes and let me say

21   subject property, it will have the same kind of meaning

22   it does in the complaint.  Fair enough?

23        A    Yes, sir.

24        Q    Did Royal Caribbean play any role in the

25   Cuban government's confiscation of the subject property

Page 34

1    in 1960?

2          A    Respectfully I am going to refer to my

3    notes as I mentioned earlier and hopefully you have

4    that document in front of you, too, Mr. Ponce.  But we

5    are not aware of any role that Royal Caribbean played.

6          Q    Has Royal Caribbean caused Havana Docks

7    Corporation to suffer a financial injury?

8          A    Yes, sir, we believe they have.

9          Q    What injury do you believe that is?

10          A    Well, again, referring to our written

11    answers, which we have done our best to outline for

12    you.  It's on multi facets where Royal Caribbean has

13    caused the financial harm to us.  I will paraphrase

14    rather than reading the whole thing for you if that's

15    okay.

16          Q    Mr. Johnson, actually I guess let's -- I am

17    fine with you having this document that you are using

18    to look at.  But I mean, I will need answers to the

19    questions.  I mean, if the answer to a question is

20    reading what's written here, that's certainly your

21    prerogative.  But I will need to get the full answers

22    on the record.  And I know I've cut you off as you were

23    getting ready to answer.

24                MR. PONCE:  Marla, Ms. Court Reporter, can

25          you please read back the question that Mr.

Page 35

1        Johnson was just replying to when I cut him off?

2     (Whereupon, the above referred-to question was read

3              back by the court reporter.)

4  BY MR. PONCE:

5        Q    So Mr. Johnson question to you, what do you

6  believe the financial injury is that Royal Caribbean

7  has caused to Havana Docks Corporation?

8        A    Again, respectfully, Mr. Ponce, maybe you

9  and I if we could have a brief discussion about our

10  written answer.  This is our best answer for you.  So I

11  don't know how to state anything different that would

12  give you a better answer than what we have compiled for

13  you on this document.  So how would you like to proceed

14  on those terms?

15        Q    Well, I need your oral response.  If the

16  oral response is you reading what is written on your

17  sheet, then that will be your response.  But I can't

18  just have a response and say I will refer you to page

19  one, block B of my written answers that I have.

20        A    Yes, thank you.  And I fully understand.

21  But this is, again, this is our best response so I

22  would like to read that for the record.

23        Q    It's your answer.  Answer however you would

24  like.

25        A    Okay.  Thanks to all on the call today.  As

Page 36

1    I said, there is multi facet of how we believe Royal

2    Caribbean has caused financial harm for us.  Harm

3    caused by Royal Caribbean to Havana Docks is described

4    on the points which I will read for you from our

5    submission of this morning.  "By paying and entering

6    into a commercial transaction with the Cuban government

7    to use the subject property without the authorization

8    of Havana Docks knowing the subject property was

9    confiscated from Havana Docks and subject to claim

10   number CU-2492 owned by Havana Docks.  Royal Caribbean

11   harmed Havana Docks by aiding and rewarding the Cuban

12   government for its unlawful taking of the subject

13   property from Havana Docks which also provided a

14   distance in it for the Cuban government from ultimately

15   returning the subject property to Havana Docks or

16   resolving the claim.  Further by using and profiting

17   from its use of the subject property without the

18   authorization of Havana Docks.  Knowing the subject

19   property was confiscated from Havana Docks and subject

20   to claim number CU-2492 owned by Havana Docks.  Royal

21   Caribbean harmed Havana Docks by unjustly enriching

22   itself at the expense and to the detriment of Havana

23   Docks through its economic exploitation of the Cuban

24   government's unlawful confiscation of the subject

25   property from Havana Docks.  Royal Caribbean also added

Page 37

```
 1     to the harm to Havana Docks caused by the Cuban
 2     government's confiscation by creating a competing use
 3     and claim to the subject property thereby encumbering,
 4     infringing and complicating Havana Docks' right and
 5     ability ultimately to ultimately recover and repossess
 6     the subject property."  And thank you for your patience
 7     while I made that statement.
 8          Q    Did you write that?
 9          A    I assisted with the writing of that and
10     with multiple reviews.
11          Q    Who did you assist?
12          A    With a law team at Colson Hicks and Mr.
13     Margol, M-a-r-g-o-l.
14          Q    In that long answer, you said that Royal
15     Caribbean acted knowing that the subject property was
16     confiscated.
17               What is your basis for saying that Royal
18     Caribbean knew that the subject property was
19     confiscated?
20          A    Mr. Ponce, our claim was certified by the
21     foreign claim settlement commission in 1972.  It was
22     readily available as public record.
23          Q    So your basis for saying that Royal
24     Caribbean knew it was confiscated is because of the
25     certified claim was a public record?
```

Page 38

1           A     That's one answer.

2           Q     What is the other answer?

3           A     It may come up later in our deposition.

4     But we sent a certified letter to Royal Caribbean in

5     2019 telling them that they were trafficking on our

6     property.

7           Q     Did that letter, did it reference the

8     certified claim?

9           A     I believe it did.  I don't have the letter

10    in front of me.

11          Q     Somewhere in your answer you said that

12    Royal Caribbean's conduct provided distance incentives

13    to the Cuban government ultimately returning the

14    property to Havana Docks or resolving Havana Docks'

15    claim.  Have you spoken with someone in the Cuban

16    government about what incentives or distance incentives

17    the Cuban government had?

18          A     We have not.

19          Q     In your answer to Royal Caribbean created a

20    competing use in claim to the subject property.  What

21    competing claim did it create?

22          A     Respectfully, Mr. Ponce, I think our

23    discovery on this point is still ongoing.  But as we

24    understand, Royal Caribbean signed some type of

25    contract with the Cuban government for the use of the

Page 39

1   subject property so in effect, excuse me, Royal

2   Caribbean, that's your client, has a contract with the

3   Cuban government so they technically as I understand

4   would have a claim to enforcement of that contract.

5            Q    Was Havana Docks Corporation harmed by the

6   Cuban Government's confiscation of the property?

7                 MS. CASEY:  Objection to form.  Asked and

8            answered.

9                 THE WITNESS:  Was Havana Docks Corporation

10           harmed by the Cuban Government's confiscation of

11           the subject property?

12   BY MR. PONCE:

13           Q    Yes.

14           A    Yes.

15           Q    The answer you gave about the financial

16   injury that you believe Royal Caribbean has caused

17   Havana Docks, how can that injury have been avoided?

18           A    I think that's somewhat speculative at this

19   point.  But, perhaps, if Royal Caribbean had reached

20   out to Havana Docks Corporation with their intent to

21   travel to Cuba and to use the subject property,

22   perhaps, something could have been worked out.

23                MR. PONCE:  Ben, can we put up first the

24           final decision?  Off the record for a second.

25                     (Off the record.)

Page 40

```
 1                    (Back on the record.)

 2              THE WITNESS:  Let me ask a technical

 3          question when an exhibit is put up through the

 4          Veritext system, does that require a refresh of

 5          the screen?

 6                         (Off the record.)

 7              MR. PONCE:  All right.  Back on the record.

 8                    (Back on the record.)

 9    BY MR. PONCE:

10         Q     Mr. Johnson, we have put before you what

11    has been marked as Exhibit 2 for your deposition.  It's

12    a document that is titled "Final Decision."

13              So as with every exhibit I show you, please

14    take as much time as you want, look through it and see

15    if you feel comfortable, you know, what it is or if you

16    don't know what it is and let me know that you've had a

17    chance to look through it to your satisfaction.

18         A     Yes, sir.  Thank you.

19         Q     Ready?

20         A     I am ready.

21         Q     Have you seen this document before?

22         A     Yes, sir, I have.

23         Q     Just for the record, this has, it's

24    attached to plaintiff's amended complaint and it still

25    has the electronic court file up at the top.
```

Page 41

```
 1              MR. PONCE:  Ben, can you put up the

 2         proposed decision?

 3              THE WITNESS:  Yes, sir, Mr. Ponce I have

 4         that document.

 5         (Whereupon, the above referred-to document

 6          was marked as Defendant's Exhibit 2.)

 7    BY MR. PONCE:

 8         Q    Mr. Johnson, we have marked as Exhibit 3

 9    for your deposition a document that looks a lot like

10    Exhibit 3, but this is entitled "Proposed Decision."

11    Have you seen this document before?

12         A    Yes, sir, I have.

13         (Whereupon, the above referred-to document

14          was marked as Defendant's Exhibit 3.)

15    BY MR. PONCE:

16         Q    So we have been talking about Exhibits 2

17    and 3 together or we can talk about them specifically.

18    But my question to you -- whatever you feel comfortable

19    with.  My question to you is, what do you understand

20    these documents to be?

21         A    I understand the document we are looking at

22    now to be the initial decision by the Foreign Claims

23    Settlement Commission.  If you can bear with me just a

24    moment.  And that was filed by the Foreign Claims

25    Settlement Commission presented, I should say in April
```

Page 42

1    of 1971.

2            Havana Docks Corporation as I understand

3    appealed that decision and there was another ruling by

4    the Foreign Claims Settlement Commission and that

5    pertains to the document we just looked at on, I

6    believe, would have been Exhibit 2.

7        Q    Understood.  Earlier in response to your

8    questioning, you made reference to the claim or the

9    certified claim or a claim CU-2492.  Are these

10   documents, these Exhibits 2 and 3 to what you were

11   referring?

12       A    Yes, sir, they are.

13       Q    Do you understand these documents to give

14   Havana Docks Corporation any rights?

15       A    Can you define respectfully, Mr. Ponce, in

16   how you are asking the questions in terms of rights?

17       Q    Sure.  Do these documents reflect or give

18   Havana Docks Corporation any rights?

19           MS. CASEY:  Objection to form.  Vague,

20           ambiguous.

21           THE WITNESS:  I would have to answer in

22           layperson's terms, Mr. Ponce, in terms of broad

23           rights.  That this is the definitive document of

24           the harm that was done to Havana Docks

25           Corporation by the Castro regime on the

Page 43

```
 1          confiscation of the stealing of our property and

 2          so as I understand, this ruling, this amount

 3          that was set forth is in the congressional

 4          record.  I hope that answered your question

 5          somewhat.

 6     BY MR. PONCE:

 7          Q    Did Royal Caribbean do anything that

 8     impairs or affects the rights created by or given to or

 9     memorialize Havana Docks in this certified claim?

10               MS. CASEY:  Objection to form.

11               THE WITNESS:  If we are talking about this

12          document itself, the certified claim is

13          obviously the certified claim.  As far as the

14          rights for settlement with the Cuban government

15          as related to this claim, as I testified earlier

16          yes, we believe that Royal Caribbean has done

17          harm to us in relation to that settlement.

18     BY MR. PONCE:

19          Q    Did Royal Caribbean participate in and

20     profit from the Cuban government confiscation of the

21     subject property?

22          A    Yes, we believe they did.

23          Q    How?

24          A    Well, again, respectfully, Mr. Ponce, and I

25     don't mean to insinuate accusations towards you.  But,
```

Page 44

```
1    again, in layperson's terms, it's pretty obvious that

2    Royal Caribbean docked their ships at the subject

3    property and disembarked their passengers and

4    reembarked and all without our permission.

5              Q    Have you ever heard of an entity named the

6    Port of Havana Docks Company?

7              A    Yes, sir, I believe I have.

8              Q    What do you understand that company to be?

9              A    I understand that was the company that ran

10   the port facility in Havana prior to Havana Docks

11   Corporation.

12             Q    Does Port of Havana Docks Company still

13   exist?

14             A    No, sir, I don't believe so.

15             Q    Did Port of Havana Docks Company hold a

16   commission from the Cuban government to do anything?

17                  MS. CASEY:  Objection to form.  I think

18        maybe you misspoke, Mr. Ponce.  You said a

19        commission.

20                  MR. PONCE:  Yes, I am sorry.  I did.  Thank

21        you.

22   BY MR. PONCE:

23             Q    Did -- let me start again.

24                  Did the Port of Havana Docks Company hold a

25   concession from the Cuban government to do something?
```

```
                                                           Page 45

 1          A    I am not sure about that, Mr. Ponce.  I
 2    don't recall that history.
 3               MS. CASEY:  I will belatedly object as to
 4               outside the scope.
 5    BY MR. PONCE:
 6          Q    Does the Port of Havana Docks Company have
 7    any relationship with Havana Docks Corporation?
 8          A    No, sir.
 9          Q    Was the Port of Havana Docks Company
10    reorganized into the Havana Docks Corporation?
11          A    It's my understanding, Mr. Ponce, that they
12    were not.
13          Q    When did Havana Docks Corporation come into
14    existence, what year?
15          A    I believe it was 1917.
16          Q    Were there ever any assignments or transfer
17    of assets between the Port of Havana Docks Company and
18    Havana Docks Corporation?
19          A    Again, Mr. Ponce, I apologize, I can't
20    remember the specific assets -- excuse me.  I can't
21    remember the specific circumstances of what transpired
22    when Havana Docks Corporation became the controlling
23    entity.  But it's my understanding in reading through
24    the corporate records and the corporate history, that
25    Havana Docks Corporation acquired all of the -- all of
```

Page 46

1    the operating resources of Havana Docks Company in

2    1917.

3        Q    Did that include any concession that Port

4    of Havana Docks Company had?

5        A    Again, Mr. Ponce, I can't remember the

6    specifics in regard to a concession when that takeover

7    occurred.

8        Q    At some point in time, did Havana Docks

9    Corporation acquire the concession that had initially

10   been issued to Port of Havana Docks Corporation?

11           MS. CASEY:  Objection to form, asked and

12       answered.

13           THE WITNESS:  I can't remember the

14       specifics on that, Mr. Ponce.  But I believe

15       that would be correct.

16   BY MR. PONCE:

17       Q    Do you know when that occurred?

18       A    I do not specifically.

19       Q    Have you heard of a corporation called, and

20   I will just put this out there.  I am not a Spanish

21   speaker so bear with me with pronunciations here.

22           Have you heard of a corporation called

23   Compania de Porto?

24       A    I can't recall that I have.

25           MR. PONCE:  Ben, can we put up the Gaceta

Page 47

```
 1          Oficial DecreeNo.647?
 2              MR. TAORMINA:  It should be up for
 3          everybody.
 4              THE WITNESS:  Will this be Exhibit Number
 5          4?
 6              MR. PONCE:  It will be.  It should be
 7          marked at the bottom of the first page on what
 8          you are seeing.
 9         (Whereupon, the above referred-to document
10           was marked as Defendant's Exhibit 4.)
11     BY MR. PONCE:
12          Q    Mr. Johnson, I have virtually handed to you
13     a document that has been marked as Exhibit 4 for your
14     deposition.  I will represent to you this was part of
15     Exhibit 2 to the amended complaint that you've seen
16     from the electronic filing language at the top of each
17     page.  Take as much time as you would like to look
18     through it.  But my first question to you is going to
19     be have you seen this before?
20          A    Yes, sir, I have.
21          Q    What do you understand this to be?
22          A    Give me just a moment to refresh myself.
23          Q    Of course.  As you know, please not a rush,
24     not a race.  Take as much time as you would like to
25     look through the document.
```

Page 48

1          A     Thank you, Mr. Ponce, I scanned through it

2     quickly.

3          Q     Do you have an understanding of what this

4     document is?

5          A     I am not an attorney, Mr. Ponce, so I don't

6     know if I am qualified to delve into the intricacies of

7     what this document is.

8          Q     From a general level, do you understand

9     this to be the original concession granted to a company

10    called Compania del Puerto?

11         A     Again --

12         Q     And let me train you in a little bit closer

13    because this is a long document.

14               If you go to page 2 of this document of the

15    second to last paragraph, the last paragraph before

16    numbered paragraph 1.  It looks like the author of this

17    document is granting to Compania del Puerto the

18    concession necessary to carry out the work set forth in

19    the project.  Do you see where I am looking at?

20         A     Yes, sir, I do.

21         Q     Does that do anything to make you think

22    that this is the original concession that was granted

23    to Compania del Puerto?

24         A     I can't definitively testify that that is

25    the original concession.  But that seems reasonable.

Page 49

1      Q    Okay.  And if you flip to page 3 of this

2   document, the first paragraph, which is numbered

3   paragraph 2 cutting out some of the words in the

4   middle.  "This concession is granted for a term of 50

5   years reckoned as of the date of the concession."

6           Do you see where it says that?

7      A    Yes, sir, I do see that.

8      Q    Do you understand that to mean that this

9   concession had run from 50 years from the date of the

10  concession?

11          MS. CASEY:  Objection to form.

12          THE WITNESS:  Again, I am not an attorney,

13       Mr. Ponce.  But yes, I would agree with that.

14  BY MR. PONCE:

15      Q    If you go to page 7 of this document.

16          Do you agree with me that this document on

17  that page 7 shows the date November 29, 1905?

18      A    Yes, sir, I do.

19      Q    All right.  That's it for that document for

20  now.

21          MR. PONCE:  Ben, would you please put up

22       12573?

23          MS. CASEY:  And Scott -- Mr. Ponce,

24       whenever you reach a breaking point, whenever --

25          MR. PONCE:  Let's do it now.  15 minutes

Page 50

1    come back at 11 -- come back at 11:23, 11:24.

2            MS. CASEY:  That's great.

3            MR. PONCE:  11:25 so it's a round number.

4            THE VIDEOGRAPHER:  Off the record at 11:09.

5                    (Off the record.)

6                    (Back on the record.)

7            THE VIDEOGRAPHER:  We are back on record at

8       11:25.

9    BY MR. PONCE:

10           Q    Mr. Johnson, can we look at, I don't know

11   what you have up on your screen.  Can we look at

12   Exhibit 4 again if you don't have that up.  Can you

13   pull up Exhibit 4?

14           A    Yes, sir, I have it up, Mr. Ponce.

15           Q    If you flip to page 7 of this document, I

16   would like you to read numbered paragraph 33 to

17   yourself and just let me know when you've had a chance

18   to finish reading it.

19           A    Yes.  Thank you.  I've read it.

20           Q    Do you understand this numbered paragraph

21   33 to be saying at the end of the concession the person

22   holding the concession must return possession of the

23   works back to the Cuban government?

24           MS. CASEY:  Objection to form.

25           THE WITNESS:  Again, Mr. Ponce, and

1              respectfully I am not an attorney, but in a

2              layperson's reading, yes, I would understand

3              that.

4    BY MR. PONCE:

5         Q    So let's put now to Exhibit 5, which we

6    have not looked at yet but it should be in your queue.

7              (Whereupon, the above referred-to document

8               was marked as Defendant's Exhibit 5.)

9    BY MR. PONCE:

10        Q    Mr. Johnson, if you can take a look at that

11   and while you are taking a look at it, I would say for

12   the record that this document has been marked as

13   Exhibit Number 5.  It's two-page document which has

14   Bates or identification numbers stamped in the bottom

15   right corner HDC012573 is the first page.

16             Mr. Johnson, when you've had a chance, just

17   let me know when you're ready.  Don't rush.  Just tell

18   me when you've looked at it and you are ready to talk.

19        A    Thank you, Mr. Ponce, I've looked over the

20   document.

21        Q    I will represent to you that this was the

22   document, Havana Docks Corporation produced to us in

23   discovery.  Have you seen this before?

24        A    I apologize, Mr. Ponce.  I don't recall

25   this specific document.  I may have seen it but I don't

Page 52

1    recall the specific document.

2         Q    So is my answer fair to say you don't know

3    who wrote this document?

4         A    I do not.

5         Q    So when I look at this document, it seems

6    to be a summary that someone put together kind of

7    tracing the history of the concession that we were

8    talking about, its terms and how it changed or not.

9    And you looking at this document, again, take more time

10   to look at it if you want.  Do you agree with that

11   characterization?

12              MS. CASEY:  Objection to form, lacks

13         foundation.

14              THE WITNESS:  I am not sure what the intent

15         of this document was, Mr. Ponce.  But I think

16         that would be a reasonable assumption.

17   BY MR. PONCE:

18        Q    So if you look at the second page of this

19   document, the page that has 12574 on the bottom.  And

20   the top of that page refers to a decree number of 1944.

21        A    Yes, I see that.

22        Q    Where it discusses various information,

23   there is a row that says term.  And it says term

24   extended to 99 years from November 29, 1905.  Do you

25   see that?

Page 53

1          A    Yes, sir, I do.

2          Q    Do you understand or believe that this is

3     referring to the concession that Havana Docks

4     Corporation ultimately came to hold?

5               MS. CASEY:  Objection to form, lacks

6          foundation.

7               THE WITNESS:  Do you mind repeating that

8          question for me, Mr. Ponce?

9     BY MR. PONCE:

10         Q    Sure.  Do you understand -- or not do you

11    understand.

12              Do you believe based on this description of

13    a term extended to 99 years from November 29, 1905,

14    that this is referring to the concession that Havana

15    Docks Corporation ultimately came to hold?

16              MS. CASEY:  Same objection.

17              THE WITNESS:  I believe that as is stated

18         in the document, that would be a reasonable

19         assumption.

20    BY MR. PONCE:

21         Q    As we talked before, whatever concession it

22    was that Havana Docks Corporation came to possess, you

23    are not sure of the details of exactly when it came to

24    possess it?

25              MS. CASEY:  Can you read that back?

Page 54

1          (Whereupon, the above referred-to question was read

2                    back by the court reporter.)

3                    MS. CASEY:  Objection to form.

4                    THE WITNESS:  I cannot quote the exact

5               history for you, Mr. Ponce, about the term or

6               the advance of how Havana Docks Corporation

7               acquired the concessions over time.

8     BY MR. PONCE:

9          Q    All right.  Let's go back to Exhibit 3 if

10    we could and which with any luck at all --

11         A    Exhibit 3, Mr. Ponce?

12         Q    Yes.  Which should be the proposal

13    decision.

14         A    Yes, sir.

15         Q    Give me one second to get my bearings here.

16              So we talked earlier that this is part of

17    what you refer to as the claim or the certified claim,

18    correct?

19         A    Yes, sir.

20         Q    If you go to the third page of this

21    document, if you look up at the top of each page, not

22    the computer typing but what looks like a typewriter

23    and this should be page number 3.

24         A    Yes, sir.

25         Q    There is a paragraph that begins, "Based

Page 55

1   upon the record, the Commission finds that on September

2   7, 1934, claimant, Havana Docks Corporation obtained

3   from the Government of Cuba the renewal of a concession

4   for the construction and operation of wharves and

5   warehouses in the harbor of Havana, formerly granted to

6   it's predecessor concessionaire, the Port of Havana

7   Docks Company."  Then it goes on.  But I am going to

8   stop reading there.

9          As far as you know, is that a correct

10  statement of how Havana Docks Corporation came to

11  acquire concession what we have been referring to as

12  the subject property?

13          MS. CASEY:  Objection to form.

14          MR. PONCE:  Stephanie, what is wrong with

15       the form?

16          MS. CASEY:  He has already testified that

17       he doesn't remember so, you know, you can ask

18       him 300 times the same question.  But he has

19       already said that he doesn't remember or he

20       doesn't have the documents in front of him.

21  BY MR. PONCE:

22       Q   Do you have any reason to disbelieve this

23  statement that I just read to you from the certified

24  claim?

25       A   No, sir, I do not.  And I remember this

Page 56

 1    particular clause.

 2         Q    If you go to the numbered page five of this

 3    document, and, again, that's numbered page 5 that is

 4    written in the typewriter, not the electronic filing

 5    information.  There is a paragraph that appears

 6    immediately below a table and that paragraph begins,

 7    "The record indicates that the pier property."  Do you

 8    see where I am looking at?

 9         A    Yes, sir, I do.

10         Q    The second sentence in that paragraph

11    reads, "The terms of the concession granted by the

12    Cuban government were to expire in the year 2004 at

13    which time the corporation had to deliver the piers to

14    the government in good state of preservation."

15              Do you have any reason to dispute or

16    disagree with that statement?

17         A    No, I do not.

18         Q    Can you please put up 298.

19         A    Mr. Ponce, would this be Exhibit Number 6

20    or Exhibit 5?

21         Q    I don't think it's up yet.

22              MR. TAORMINA:  It will be 6.  It is just

23         loading.

24         (Whereupon, the above referred-to document

25           was marked as Defendant's Exhibit 6.)

```
1    BY MR. PONCE:

2         Q    Notwithstanding that my undergraduate

3    degree was in finance.  I am trying to figure out which

4    one was 5 or 6.  It threw me for a loop.  It might take

5    a second to load.  It's kind of long and it's a picture

6    of a document.

7              MR. PONCE:  Off the record.

8                   (Off the record.)

9                   (Back on the record.)

10   BY MR. PONCE:

11        Q    Mr. Johnson, I have placed before you

12   virtually as it were Exhibit Number 6, which is a

13   multipage document.  Take your time, look through it.

14   While you are doing that, I will state for the record

15   this is a document that begins with an identification

16   number Bates stamp HDC298.

17             So Mr. Johnson, to make this a little bit

18   more doable for you.  Take a look at it and of course

19   as always as much as you want.  I am not going to quiz

20   you about substances.  You are not going to take a test

21   on it.  I am going to direct you to a couple of

22   specific parts that we will talk about.  But please

23   take your time and look at this now as much as you

24   want.

25        A    Thank you, I scanned over the document.  I
```

Page 58

1    don't know if I can answer detailed questions.  But I

2    will do my best.

3         Q    Have you seen this document before?

4         A    Yes, sir, I have.

5         Q    What do you understand this document to be?

6         A    I understand this was an appraisal to

7    determine the value of the property as was submitted to

8    the Foreign Claims Settlement Commission.

9         Q    If you go to the fourth page of this

10   document, again, there is typed written numbers at the

11   top right corner and on the bottom of page 4, again,

12   it's called Bates labeling, but HDC301.  Are you at

13   that page?

14        A    Page number 4?

15        Q    You see on the bottom left it appears to be

16   dated May 1970?

17        A    Yes, sir.

18        Q    It's signed by someone named Luis Parajon.

19        A    Yes.

20        Q    Do you know who Mr. Parajon is?

21        A    I understand he was the appraiser who

22   prepared this report on behalf of Havana Docks

23   Corporation.

24        Q    Did he have a business relationship with

25   Havana Docks Corporation that preexisted the

Page 59

1    preparation of this appraisal?

2         A    I am not sure about that, Mr. Ponce.  I've

3    never reserved that.  I've never heard that comment.

4         Q    So I would like to, if we can for right now

5    go to page 16 of this document.  Again, page 16, number

6    16 is typed up in the top right corner and on Bates

7    identification numbering it's HDC314.  Let me know if

8    you made it to that page.

9         A    Yes, I have.

10        Q    There is a letter paragraph B, the first

11   sentence of which says that the concession ran for 99

12   years to the year 2004, did I read that correctly?

13        A    Yes, that's what the document states.

14        Q    Do you have any reason to disagree with

15   that statement?

16             MS. CASEY:  Objection to form, lacks

17        foundation.

18             THE WITNESS:  I do not.

19   BY MR. PONCE:

20        Q    As best you know this is a document that

21   was commissioned by the Havana Docks Corporation?

22        A    Yes, sir, that's my understanding.

23        Q    As best as you know it was commissioned for

24   the purpose of being submitted to the Foreign Claim

25   Settlement Commission?

Page 60

1       A    Yes, sir, that's my understanding.

2       Q    We can put this aside for now.

3            MR. PONCE:  Ben, would you please bring up

4       15207.  And while Mr. Taormina is pulling that

5       up.

6  BY MR. PONCE:

7       Q    Mr. Johnson, a question for you is do you

8  know a man named Robert MacArthur?

9       A    Yes, sir, I do.

10      Q    Who is Mr. MacArthur?  Let me ask you a

11 question.  Let me ask you differently because you can

12 say he's a man.  His name is Robert.

13           Did Mr. MacArthur have any relationship to

14 the subject property?

15      A    I would clarify that in my understanding

16 that it was actually Mr. MacArthur's father.

17      Q    Mr. MacArthur's father what?

18      A    As I understand, Mr. MacArthur's father was

19 a principal in an engineering or architectural firm

20 that actually designed some of the work on Havana Docks

21 on the piers and so forth.

22      Q    Does Mr. MacArthur, is he currently,

23 because we talked about two different MacArthurs.  Is

24 Robert MacArthur the son, is he a shareholder currently

25 of Havana Docks Corporation?

Page 61

```
 1        A    He is not.  And again, a clarification
 2   there, the shares of Havana Docks Corporation for the
 3   MacArthur family were held by Robert MacArthur who is
 4   the son, they were held by his mother and they are
 5   still registered in that name.
 6        Q    Have you had occasion over the years to
 7   correspond with Mr. MacArthur by email?
 8        A    I have.
 9        Q    Have you ever spoken to him on the phone?
10        A    I have.
11        Q    Have you ever met him in person?
12        A    I have not.
13        Q    All right.  So let's if we can, open up --
14        A    Before we leave that subject, if I may one
15   other thing --
16        Q    Yes, sir.
17        A    Regarding Mr. MacArthur.
18        Q    Yes, sir.
19        A    He is 96 years old.
20        Q    Let us all get to be that age.
21        A    That's right.
22        Q    So if you could, Mr. Johnson, could you
23   open up what is now if you refresh should be in your
24   queue there, it's going to be Exhibit 7.  While you are
25   looking at that, I will represent for the record that
```

Page 62

1    this document which has been marked Exhibit 7 is a

2    multipage document, the first page of which is Bates

3    number or identification number HDC 15207.  And there

4    are redactions in it and I will say that they were

5    redacted and the copy that was given to us.

6          (Whereupon, the above referred-to document

7            was marked as Defendant's Exhibit 7.)

8    BY MR. PONCE:

9          Q    Mr. Johnson, if you could, I am going to

10   ask you some questions about specific parts of this

11   email string.  Take a second and look through it and

12   let me know when you are ready to start asking you some

13   questions about it.  As always, please take as much

14   time as you would like to look through it, and as

15   always and familiarize yourself with it and just let me

16   know when you are ready.

17         A    Thank you.  It's a rather long email chain,

18   Mr. Ponce.  I scanned through it and will be happy to

19   answer any questions if I am able.

20         Q    Great.  If you can flip to the page that is

21   stamped at the bottom right corner 15209.  It feels

22   like it is the third page.

23         A    Yes, sir, I believe I am on that page.

24         Q    This is an email and it spans over to the

25   next page 15210.  Do you agree that this appears to be

Page 63

1      an email written by Mr. Robert MacArthur?

2           A     At the bottom of the page of Bates number

3      HDC015209?

4           Q     And then if you flip to the next page is

5      where that particular email concludes.  It looks to me

6      that it's signed in typing with Robert?

7           A     Yes, sir, I see that section.

8           Q     Does this appear to you to be an email that

9      Robert wrote?

10          A     Yes, sir, it appears so.

11          Q     Was that email sent to you?  There is a

12     little bit of a contextural clue, I think.  If you look

13     at the top of that page 15209.  This is an email that

14     is on the page before that 15208 where Mr. Behn is

15     responding and it's responding, it looks like it is

16     picking you up in the response.

17          A     Yes, sir, I see that.  I was copied on Mr.

18     Behn's response.

19          Q     Have you seen the email from Robert that

20     appears at 15209 and goes over to 15210.  Have you seen

21     that email before?

22          A     Bear with me just a moment.  I believe I

23     have seen this email before, Mr. Ponce, it has been

24     some time, but I believe I have.

25          Q     I am going to read a sentence to you that

Page 64

1    spans these two pages.  "Clearly the right to operate

2    was stolen when Castro came into power.  But that right

3    would have expired by now under the original terms.  So

4    is it correct to claim the cruise lines are operating

5    with stolen property?  Question mark in that last

6    sentence.

7            A    Yes, sir, I see that.

8            Q    Did you understand, Mr. MacArthur to be

9    saying that the right would have expired by now under

10   the original terms of the concession?

11           MS. CASEY:  Objection to form.  Lacks

12           foundation.

13           THE WITNESS:  I see what Mr. MacArthur

14           wrote in his email.

15   BY MR. PONCE:

16           Q    And this is an email from 2018, correct?

17           A    Yes, sir.

18           Q    Do you understand him when he says the

19   right would have expired by now, is he referring to the

20   concession would have expired in 2004?

21           MS. CASEY:  Objection to form.

22           THE WITNESS:  I respectfully I understand

23           that that's his comment.

24   BY MR. PONCE:

25           Q    You understood that to be his point of

Page 65

```
 1    view, correct?

 2              MS. CASEY:  Objection to form.

 3              THE WITNESS:  It appears to be his point of

 4         view.

 5    BY MR. PONCE:

 6         Q    And he questions in one of those sentences

 7    whether it's correct to say that the cruise line was

 8    operating with stolen property.  He wrote that,

 9    correct?

10         A    He asked that question, yes.

11         Q    That's his point of view, correct?

12              MS. CASEY:  Objection to form, lacks

13         foundation.

14              THE WITNESS:  Again, I apologize.  We may

15         be splitting hairs.  But I am not sure about

16         classifying as his point of view.  He does ask

17         that question.

18    BY MR. PONCE:

19         Q    The preceding sentence that doesn't have

20    the question marks, that's his point of view, correct,

21    that the right would have expired by now under the

22    original terms?

23              MS. CASEY:  Objection to form, lacks

24         foundation.

25              THE WITNESS:  I believe he is expressing
```

Page 66

1           his point of view.

2     BY MR. PONCE:

3           Q    Did you agree with that point of view?

4           A    No, sir.  Respectfully I do not and did

5     not.

6           Q    In that same email this time -- actually

7     let's scratch that.

8                What rights, if any, has Havana Docks

9     Corporation had in the subject property since 2004?

10               MS. CASEY:  Objection to form.

11               THE WITNESS:  Since 2004?

12    BY MR. PONCE:

13          Q    Yes, sir.

14          A    Respectfully, Mr. Ponce, I think that may

15    get into a legal analysis.  I am not qualified to give

16    that answer.  I would have to defer to our attorneys.

17               MR. PONCE:  Ben, can we bring up the

18          amended complaint is the next exhibit.

19    BY MR. PONCE:

20          Q    Mr. Johnson, hopefully you have in front of

21    you a document that's been marked Exhibit 8, and I will

22    represent to you and for the record that this is a copy

23    of plaintiff's amended complaint in this action.

24          (Whereupon, the above referred-to document

25            was marked as Defendant's Exhibit 8.)

Page 67

1   BY MR. PONCE:

2        Q    So please take as much time as you would

3   like to look at it, make sure that's what it is and

4   just let me know when you are ready.

5        A    Yes, sir.  Thank you.  I have the document

6   in front of me.

7        Q    So I would like to direct your attention to

8   numbered paragraph 15, which begins on page 5 of this

9   document and continues onto page 6.

10       A    Yes, sir.

11       Q    I would like you to take a second and read

12  that to yourself, please, and let me know when you've

13  had a chance to read it.

14       A    Thank you, Mr. Ponce.  I have read that

15  section.

16       Q    So the last paragraph -- I am sorry.  The

17  last sentence of that paragraph refers to a

18  reversionary interest.  Does plaintiff have a

19  reversionary interest in the subject property is my

20  question to you?

21            MS. CASEY:  Mr. Johnson, I will caution you

22       in answering this question that you do not

23       reveal any communications or information you've

24       obtained from your counsel.

25            THE WITNESS:  Mr. Ponce, again, thank you

Page 68

```
 1              for your patience when I state that I am not an
 2              attorney.  I am not sure about the legal
 3              definition of a reversionary interest.  I know
 4              that as we state in this paragraph that Havana
 5              Docks Corporation had 44 years left on the
 6              concession at the time that it was stolen.
 7    BY MR. PONCE:
 8         Q    And there is a statement in that sentence
 9    of this paragraph 15 we read that says under the terms
10    of the concession and Cuban law, Havana Docks retains
11    to this day a reversionary interest of 44 years.  Are
12    you aware of what terms of a concession creates that
13    reversionary interest?
14              MS. CASEY:  Same caution, Mr. Johnson, if
15              you can answer without revealing attorney-client
16              communications.
17              THE WITNESS:  Again, I think that's getting
18              into the legal materials of the concession, Mr.
19              Ponce, and I will have to defer to our attorneys
20              for clarification on your question or to answer
21              your question.
22              I understand there was 44 years remaining
23              on the lease, and as I understand by breaking
24              that lease that we have claimed, but I don't
25              know the legal nuances of how to answer that
```

Page 69

1          question for you.
2      BY MR. PONCE:
3          Q    In that same sentence of paragraph 15
4      refers to reversionary interest under Cuban law
5      enforced at the time.  Do you know what Cuban law that
6      is?
7                MS. CASEY:  Same objection.  Same
8                instructions.
9                THE WITNESS:  No, sir, I do not.  That's in
10               follow-up to my prior comment.  I am not sure
11               about the particular Cuban laws that were
12               enforced at the time.
13               MR. PONCE:  Folks, give me one second to
14               grab the next document.  Okay.
15     BY MR. PONCE:
16         Q    Same exhibit, the amended complaint.  If
17     you can now take a look at paragraph 16 which is on
18     page 6, and read that to yourself and let me know when
19     you've had a chance to read it.
20         A    Yes, sir, thank you.
21         Q    And is it plaintiff's position that it
22     currently holds an indemnification right relating to
23     the subject property?
24         A    Yes, sir, that would be my contention and
25     that's in follow-up to my prior comment to you.  This

Page 70

1    was what I was referencing when I said we have a claim

2    or a lien, this section describes that meaning.

3         Q    So we previously marked in your deposition

4    what we were referring to collectively as a certified

5    claim, there was the proposed decision and the final

6    decision.  Those were Exhibits 2 and 3 and I invite you

7    to take a look at either or both of those.

8              But does either of those documents which

9    are the certified claim refer to a reversionary

10   interest or a right of indemnification?

11             MS. CASEY:  Objection to form.

12             THE WITNESS:  I don't recall specifically,

13        Mr. Ponce.  We probably need to go back and

14        review those documents.  I don't recall

15        specifically.

16   BY MR. PONCE:

17        Q    Would you please, if you need to look, that

18   would be great.

19             MS. CASEY:  Mr. Ponce, I don't see you in

20        these little windows here.  Do you want to go

21        off to give him time to review these records?

22             MR. PONCE:  Yes, if you want to.  I was

23        actually and we do not have to get this on the

24        stenographic record.

25                  (Off the record.)

1          (Back on the record.)

2    BY MR. PONCE:

3          Q    Go ahead, Mr. Johnson.  Thank you, sir.

4          A    Yes, sir.  To get us back on point.  Would

5    you mind to ask the question once more?

6          Q    Yes.

7          A    Or have it reread.

8          Q    Yes, sir.  So Exhibits 2 and 3 to your

9    deposition are the proposed and final decisions from

10   the Foreign Claim Settlement Commission, and we have

11   been referring to those as the certified claim.

12          Do you see anything in either of those

13   documents relating to a reversionary interest in the

14   subject property, or a right of indemnification with

15   respect to the subject property?

16          A    I thank you for your patience, Mr. Ponce,

17   in allowing me to review the documents.  I thought

18   there was a reference in that regard but I can't see

19   that, so I would answer I do not see any reference to

20   that.

21          Q    Okay.  So we are going -- for these next

22   series of questions, we are going to start with the

23   amended complaint which is the exhibit we were just on

24   which is Exhibit 8.  We are going to look at paragraph

25   12, which begins on page 4 and runs over to page 5, and

Page 72

```
1    if you could just take a look at that, paragraph 12,

2    Mr. Johnson.  Let me know when you've had a chance to

3    eyeball it.

4         A    Yes, sir.  Thank you.  Give me just a

5    moment.  Thank you.

6         Q    Mr. Johnson, you see in that paragraph, it

7    appears to have a picture or an excerpt of part of the

8    certified claim.  Do you see that?

9         A    Yes, I do.

10        Q    The first and it kind of lists a bunch of

11   line items and then there is a bunch of periods and

12   then the far right of that table, for lack of a better

13   word, is a value, do you see that?

14        A    Yes, I do.

15        Q    The first line item says land in

16   concession.  I know what those words mean as a matter

17   of English.  But in the context of the subject

18   property, what would you say is the land in concession?

19             MS. CASEY:  Objection to form.

20             THE WITNESS:  I think these are the line

21        items obviously this was set forth by the

22        Foreign Claims Settlement Commission.  And I

23        think those obviously are lumped together on

24        that one line item, and that's what I was

25        looking for on that valuation when you gave me
```

Page 73

```
 1              time to review a few moments ago, I was looking
 2              for the value of the concession.
 3                   Obviously, again as stated, the land and
 4              concession valuations are together on this line
 5              item at two million.
 6     BY MR. PONCE:
 7         Q    What would you point to as being, when it
 8     says the land, what would you say is the land?
 9         A    Again, that might require a legal analysis.
10     But I believe it was the investment that Havana Docks
11     Corporation had made through the years in improvements
12     to the property.
13         Q    And same thing, I know we talked about the
14     concession, but when this line item says the
15     concession, what do you understand that to be?
16         A    I understand that to be the lease to
17     operate Havana Docks.
18         Q    And how would you say Royal Caribbean
19     trafficked in either the land or the concession?
20         A    Respectfully, Mr. Ponce, I don't understand
21     that we have made that assertion that we have made that
22     claim.
23         Q    Okay.  So that's the first -- I am sorry.
24         A    If I may continue.  We contend that you
25     have trafficked in the subject property which is
```

Page 74

1    identified in the certified claim.

2           Q    So the second line item in this paragraph

3    12 as excerpted from the certified claim says the San

4    Francisco and Machina piers appears; is that correct?

5           A    Yes, sir.

6           Q    It provides a -- let me backup even more to

7    get my bearings here.

8                How many piers are there at this site?

9           A    There are three.

10          Q    Let's go back to, if we could, Exhibit 6

11   for your deposition.

12          A    I am sorry.  Mr. Ponce, which exhibit was

13   it?

14          Q    Exhibit 6.  Which we have kind of been

15   colloquially referring to as the appraisal and it's the

16   document that is labeled with the Bates identification

17   number it begins with 298.  But it's Exhibit 6 for your

18   deposition.  Are you able to pull that back up?

19          A    I am.

20          Q    Let's look at the page at the bottom right

21   corner.  It's going to say HDC 313.  And at the top

22   right corner there is a typewritten number 15 there.

23          A    Yes, sir.  Thank you.

24          Q    Does that assign the correct number -- I am

25   sorry.  The correct names and the correct positioning

Page 75

```
 1    of the three piers?
 2         A    I apologize.  I am looking at it sort of
 3    upside down.  I believe that's correct.
 4         Q    Which of those three piers did Royal
 5    Caribbean dock its ships at?
 6         A    As I understand, Mr. Ponce, our discovery
 7    is still ongoing as to that point.
 8         Q    So you are not able to tell me which of the
 9    three piers Royal Caribbean docked its ships at?
10              MS. CASEY:  Objection to form, asked and
11         answered.
12              THE WITNESS:  I cannot tell you
13         specifically in reference to all three piers.
14              MR. PONCE:  Ben, can we please bring up
15         174.
16    BY MR. PONCE:
17         Q    So Mr. Johnson, do you have Exhibit 9 in
18    front of you?
19         A    Yes, sir, I do.
20         (Whereupon, the above referred-to document
21          was marked as Defendant's Exhibit 9.)
22    BY MR. PONCE:
23         Q    I will represent to you and for the record
24    that this is a document, the bottom right corner has
25    the Bates or identification number HDC 174, this is a
```

Page 76

1    document that was produced to us by Havana Docks

2    Corporation.  Does this appear to be the three piers at

3    the subject property?

4          A    Yes, sir, I believe that's correct.

5          Q    The pier in the foreground, the facade on

6    it, it looks like it says San Francisco on it.  Do you

7    see that?

8          A    Yes, sir, I do.

9          Q    Do you understand that to be the San

10   Francisco pier?

11         A    Yes, sir, I do.

12         Q    Then behind that -- or maybe it's beyond,

13   not behind.

14              Beyond that there are two other piers in

15   the photograph, do you see that?

16         A    Yes, I do.

17         Q    Do those other two piers in the background

18   there appear to be derelict and run down?

19              MS. CASEY:  Objection to form.

20              THE WITNESS:  From review of this picture,

21         they are in disrepair.

22   BY MR. PONCE:

23         Q    Looking at this photograph, do you think

24   Royal Caribbean docked its ships at either of those two

25   piers and in this photograph appear to be in disrepair?

Page 77

1           MS. CASEY:  Object to form.  Lacks

2      foundation.

3           THE WITNESS:  I am not sure, Mr. Ponce.  As

4      I stated in my earlier testimony, as I

5      understand our discovery is still ongoing as to

6      how Royal Caribbean used the subject property.

7  BY MR. PONCE:

8      Q    This pier in the foreground is the San

9  Francisco pier, the piers behind it or beyond it would

10  be the Machina and Santa Clara piers; is that correct?

11      A    Yes, sir, I believe that's correct.

12      Q    In this Exhibit Number 9 of these three

13  piers that are pictured, the two in the background were

14  your words in disrepair.  The one in the foreground

15  that says San Francisco and the facade, that would seem

16  to be in a state of repair, correct?

17      A    Again, just to clarify my testimony from

18  this picture, the two piers in the background appear to

19  be in a state of disrepair.  I am not sure what the

20  date of this picture is.  But yes, based on what you

21  described it, that's what this picture would appear to

22  show.

23      Q    So this is a photograph that was produced

24  to us by Havana Docks.  Do you know when this

25  photograph was taken?

Page 78

```
 1              MS. CASEY:  Objection to form.  Asked and
 2         answered.
 3              THE WITNESS:  No, sir, I do not.
 4    BY MR. PONCE:
 5         Q    So if we could go back to the complaint
 6    which is Exhibit 8 and the paragraph 12 we were looking
 7    at.
 8              MS. CASEY:  I am sorry.  Paragraph?
 9              MR. PONCE:  12.
10              MS. CASEY:  12.
11    BY MR. PONCE:
12         Q    Let me know when you are there, Mr.
13    Johnson.
14         A    Yes, sir, paragraph 12.
15         Q    Looking at the part on page 5 that has
16    excerpts from the certified claim, the various line
17    items.  You see the second line item has the San
18    Francisco and Machina piers, do you see that?
19         A    Yes, sir, I do.
20         Q    Let me see that again.  Do you see that the
21    second line item has the San Francisco and Machina
22    piers?
23         A    Yes, sir.
24         Q    And it assigns a value of $4,758,829?
25         A    Yes, I see that.
```

Page 79

1          Q    Are those two separate piers put together

2     on the same line item?

3          A    It appears that's what the foreign claims

4     settlement commission did.

5          Q    Are you aware, and if you want to look back

6     at the certified claims that were Exhibits 2 and 3,

7     please do so.

8               Are you aware of any allocation or how that

9     $4 million amount would be allocated among those two

10    separate piers?

11         A    I am not.

12         Q    When we look at the photograph of the piers

13    which was Exhibit 9 to your deposition, the one in the

14    foreground that appears finished had the San Francisco

15    name on the front, and in the two beyond it which

16    appear in a state of disrepair, one of those is the

17    Machina pier; is that correct?

18              MS. CASEY:  Object to the form.

19              THE WITNESS:  Yes, sir, that's correct.

20    BY MR. PONCE:

21         Q    So now the third line item on what we are

22    looking at here is on paragraph 12, it says the Santa

23    Clara pier, do you see that?

24         A    Yes, I do.

25         Q    That provides a value of 42,110,845 for the

Page 80

1    Santa Clara pier; is that correct?

2         A    Yes, sir, I see that.

3         Q    The Santa Clara pier is one the three piers

4    at the subject property?

5         A    Yes, sir, that's correct.

6         Q    Based on the photograph that we looked at

7    which was Exhibit 9, is the Santa Clara pier one of the

8    two piers in the background appear to be in a state of

9    disrepair?

10             MS. CASEY:  Objection to form.

11             THE WITNESS:  Yes, sir, I would agree

12        that's what it appears in the photograph.

13             MR. PONCE:  Ben, can we bring up 176,

14        please.

15   BY MR. PONCE:

16        Q    Mr. Johnson, I am showing you a document, a

17   photograph more specifically that is going to be marked

18   Exhibit 10 for your deposition.  I will represent to

19   you and to the record that the bottom right corner has

20   a Bates or identification number of HDC 176.  This is a

21   photograph that was produced to us by Havana Docks.

22   Have you seen this photograph before?

23        A    I don't recall seeing this particular

24   photograph, Mr. Ponce.

25             (Whereupon, the above referred-to document

```
                                                    Page 81

 1              was marked as Defendant's Exhibit 10.)

 2      BY MR. PONCE:

 3          Q    Does this appear to be a photograph showing

 4      two of the three piers at the subject property?

 5          A    It does appear so.

 6          Q    Based on the photograph that we viewed

 7      before, does the pier on the right side of this

 8      photograph appear to be the San Francisco pier?

 9          A    Yes, sir, it does.

10          Q    The pier on the left of this photograph

11      looking at the drawing that we had before, it looks

12      like it would be the Machina pier?

13          A    Yes, sir, I would agree with that.

14          Q    Do you still agree that that pier there on

15      the left, the Machina pier, it looks like it is in a

16      state of disrepair?

17              MS. CASEY:  Object to the form.

18              THE WITNESS:  I would clarify my comment

19          to, Mr. Ponce, that I am not sure of the date of

20          this photograph.  But yes, that is what it does

21          appear.

22      BY MR. PONCE:

23          Q    Does that look like a pier of which a

24      cruise ship would dock and let passengers on and off

25      the ship?
```

Page 82

1          MS. CASEY:  Objection to form.  Lacks
2          foundation.
3          THE WITNESS:  Again, respectfully, I will
4          clarify.  I don't know the timeframe of this
5          photograph.  But no, it does not look like a
6          pier where a passenger ship would dock.
7     BY MR. PONCE:
8          Q    Do you have any reason to believe that this
9     photograph, which is Exhibit 10 and the photograph we
10    looked at before, Exhibit 9, both of which were by
11    Havana Docks, do you have any reason to believe that
12    these photographs do not depict the piers of the
13    subject property as it existed from 2017 to the present
14    day?
15         MS. CASEY:  Object to the form.  Lacks
16         foundation.
17         THE WITNESS:  Mr. Ponce, I apologize but
18         your question cut out just a little bit.  May I
19         have it read back, please.
20    BY MR. PONCE:
21         Q    Yes, actually let me say it again.
22         Do you have any reason to believe that the
23    photographs in Exhibit 10 and Exhibit 9 do not reflect
24    the state of the piers as they've existed from 2017 to
25    the present?

Page 83

```
 1              MS. CASEY:  Same objection.
 2              THE WITNESS:  Again, and respectfully, Mr.
 3         Ponce, I am not sure of the date of this
 4         photograph.  And I am not sure of the state of
 5         the individual piers during that time up until
 6         today.
 7    BY MR. PONCE:
 8         Q    So you don't know one way or the other
 9    whether that's what those piers looked like from 2017
10    until now?
11         A    Yes, sir, that's correct.
12         Q    Regardless of which pier we are talking
13    about, what is it that Royal Caribbean has done to
14    traffic in those piers?
15              MS. CASEY:  Objection to form.
16              THE WITNESS:  Again, I will answer a non
17         legal way, if I may.  Again, I am not an
18         attorney.  But in layperson's answer to your
19         question, Mr. Ponce, Royal Caribbean pulled
20         their ship up to our property and disembarked
21         their passengers.  There are many, many pictures
22         out on the internet that show, I think it's the
23         Princess of the Seas docked at our property.
24    BY MR. PONCE:
25         Q    So in those pictures you are talking about,
```

Page 84

1    which of the piers is that ship docked at?

2           A    I believe that would be the San Francisco

3    pier.

4           Q    Are you aware of any photographs showing

5    the ships docked at either of the other two piers, the

6    Santa Clara or the Machina?

7           A    I am not.

8           Q    Mr. Johnson, would you please look at

9    Exhibit 10.  It's the most recent one we have been

10   looking at.

11          A    Yes, sir, Exhibit 10, the picture?

12          Q    Yes, sir.

13          A    I have it up.

14          Q    So we have got the piers that extended out

15   into the water, correct?

16          A    Yes, sir.

17          Q    And then it looks like there is a building

18   that the piers run perpendicular to, or in other words,

19   they T-bone into a building.  Do you see that building

20   that they run perpendicular to?

21          A    Yes, sir, I do.

22          Q    Have you ever heard that building referred

23   to as the Marginal building?

24          A    Yes, sir, I have.

25          Q    Bearing with me that I may have

Page 85

```
1    mispronounced that.  How do you pronounce it?

2         A    The Marginal building.

3         Q    Good.  So we are saying it the same way.

4              Is it Havana Dock's position that Royal

5    Caribbean trafficked at all in the Marginal building?

6         A    Yes, sir, it is.

7         Q    What did Royal Caribbean do to traffic in

8    the Marginal building?

9         A    Again, similar as I've answered before.  As

10   I understand, our discovery is still ongoing on those

11   questions as to specific activities.

12        Q    So as of today, the day of your deposition,

13   you are not able to tell me that?

14             MS. CASEY:  Objection, form.

15             THE WITNESS:  In relation to specific

16        activities in the Marginal building, is that

17        your question?

18   BY MR. PONCE:

19        Q    Yes, sir.

20        A    That's correct.

21        Q    What about -- what about specific

22   activities in the piers?

23        A    Specific activity in the pier, yes.  That's

24   obvious and we stated it several times today already

25   about disembarking and reembarking the passengers,
```

Page 86

1    going through customs and so forth.  Money exchange.

2          Q    And so I know the so forth, I mean, I

3    really need to know what the so forth is?

4          A    I am sorry.  What was the question?

5          Q    I really need to know what the so forth is.

6    I really need to know what you are saying the specific

7    activities are that constitute trafficking in the

8    piers.

9               You said embarking and disembarking

10   passengers.  What else in addition to that?

11         A    Please excuse the comments so forth.  We

12   believe there were several activities, and as I've

13   stated a few times today, our discovery is still

14   ongoing.

15         Q    So as of today what are the specific

16   activities that you are able to tell me?

17         A    Again, I will mention those specifics that

18   we believe about disembarking and reembarking

19   passengers.  As your passengers went through our

20   property, they went through the exchange process, you

21   know, for money and so forth, customs.

22              We believe there are many retail shops in

23   our property that your passengers took advantage of,

24   you know, on purchases and so forth.  So there are a

25   few for you.

Page 87

1    Q    Are there any more you can tell me today?

2    A    I believe that's all for today.

3         MR. PONCE:  Okay.  Ms. Casey, I think this

4    is probably a good place for lunch.

5         MS. CASEY:  Okay.

6         THE VIDEOGRAPHER:  Off the record at 12:31.

7         MR. PONCE:  We will reconvene at 1:15.

8              (Off the record.)

9              (Back on the record.)

10        THE VIDEOGRAPHER:  Back on the record at

11   1:16.

12   BY MR. PONCE:

13        Q    Mr. Johnson, welcome back from lunch.  I

14   just remind you that you are still under oath.

15        A    Yes.

16        Q    Did you do anything during the lunch break

17   to prepare for the second session of the deposition

18   here?  Let me try again.

19             Mr. Johnson, how are you?

20        A    I am fine.  Sorry.  Yes.  Your question is

21   did I do anything?

22        Q    Did you do anything during the lunch break

23   to prepare for the second part of the deposition here?

24        A    I wouldn't define it as prepare.  I spoke

25   with Ms. Casey for a moment on the telephone.

Page 88

```
1              Q    Don't tell me what you talked to her about.
2        It's fine to say that you spoke to her.
3                   And what else?
4              A    That's all.
5              Q    Okay.  Let's, if we can, if we can go back
6        to the complaint which was one of the last exhibits
7        here.  It is amended complaint Exhibit 8 in paragraph
8        12.  The part that excerpts the table from the
9        certified claim on page 5, paragraph 12.  Will you let
10       me know when you are there, Mr. Johnson?
11             A    Paragraph 12, yes, sir.
12                       (Off the record.)
13                       (Back on the record.)
14       BY MR. PONCE:
15             Q    Mr. Johnson, on paragraph 12 of the amended
16       complaint looking back at the charts/excerpts from
17       certified claim you see the fourth line item it says
18       equipment?
19             A    Yes, sir, I do.
20             Q    If you track to the right it has a value of
21       $419,056?
22             A    Yes, sir, I see that.
23             Q    So we are going to pull up the next exhibit
24       here which will be Exhibit 11.
25             A    Yes.
```

Page 89

```
 1          (Whereupon, the above referred-to document
 2             was marked as Defendant's Exhibit 11.)
 3    BY MR. PONCE:
 4          Q    Mr. Johnson, you should have in front of
 5    you, or at least shortly, a document that is marked for
 6    your deposition as Exhibit 11.  It's a multipage
 7    document, the first page of which has the Bates
 8    identification number at the bottom right corner HDC
 9    1836.  It has got some other printed numbers down there
10    on the bottom right corner, the exhibit stickers I am
11    seeing them as covering it.  I will represent that it
12    says 7-24-19 which appears to be July 24, 2019.  Foia,
13    F-o-i-a response FCFC00247.  I will represent to you
14    this is a document that was produced to us by Havana
15    Docks Corporation during discovery.  Take a look at it.
16    I am going to ask you at least right off the bat once
17    you've looked at it generally whether you've seen this
18    before.  So let me know when you've had a chance to
19    kind of scroll through it.
20          A    Thank you.  Mr. Ponce, I have seen this
21    document before.  It has been some time.
22          Q    Okay.  So when the cover of this, the first
23    page of this says it has a written paragraph, "The
24    attached physical inventory of general equipment was
25    taken on January 2nd to 7, 1960 and consists of six
```

Page 90

1    pages each initialed by Mr. Mario Rodriguez Lanza,

2    assistant vice president and assistant comptroller as

3    of December 31, 1959."  Then it has got some other

4    folks' names and signatures and titles.

5              Do you recognize the names of any of those

6    people?

7         A    No, sir, I do not.  As stated by the date,

8    it has been a long time ago.

9         Q    Do you have a general understanding of

10   whether these people whose titles and job positions are

11   listed there, whether they're employees of Havana Docks

12   Corporation?

13        A    I cannot answer that definitively for you

14   today.

15        Q    Do you know if this was a document that was

16   submitted to the Foreign Claims Settlement Commission

17   by Havana Docks?

18        A    I believe it was, Mr. Ponce, based on my

19   reading of the history of the Foreign Claims Settlement

20   Commission process.

21        Q    So if you flip to the third page of this

22   document, the one at the bottom right corner that is

23   labeled HDC 1838 and just let me know when you are

24   there.

25        A    Yes, sir, I have it.

Page 91

1        Q    It says summary of general equipment

2    inventory, although inventory is misspelled and it

3    lists concepts and balances.  Do you see that?

4        A    Yes, sir.

5        Q    It comes up with a total amount of the

6    balance column of $419,000 -- let me start again.  It

7    comes up with a total in the balance $419,055.99.  Do

8    you see that?

9        A    Yes, sir.  I to.

10       Q    I will represent to you because I know the

11   one downside about doing the depo this way is you can't

12   put the document side by side.  I will represent to you

13   that the line item in the complaint that we just looked

14   at real quick and it was $419,056, one cent more than

15   what's in this inventory page we are looking at.

16            So do you agree that it looks like the

17   figure for equipment in the certified claim is taken

18   from this document we are looking at, your Exhibit 11?

19       A    I would think that may be the case.

20       Q    So beginning on the next page of this

21   document which page number HDC 1839 and on the pages

22   that follow that, it appears to have a listing of

23   various equipment and the page I referred to you there

24   HDC 1839, at the top says general equipment inventory.

25   Do you see that?

Page 92

1          A    Yes, I do.

2          Q    I would like you to take some time and look

3     through these, and I think we have to stay both on the

4     stenographic and video record for this.  And let me

5     know as you work through this which, if any, piece of

6     equipment on here is a piece of equipment that Havana

7     Docks says Royal Caribbean trafficked in beginning in

8     2017.

9               MS. CASEY:  Is there a specific question.

10              MR. PONCE:  Yes.  I would like him to look

11         through and tell me which of these pieces of

12         equipment, if any, is one that Havana Docks says

13         that Royal Caribbean trafficked in.

14              THE WITNESS:  I can't identify any

15         particular piece of equipment, Mr. Ponce.  But

16         that's respectfully not our contention.

17    BY MR. PONCE:

18         Q    You don't contend, you being Havana Docks,

19    you do not contend that Royal Caribbean trafficked in

20    any equipment?

21              MS. CASEY:  Objection to form,

22         mischaracterizes the testimony.

23              MR. PONCE:  Would you read back -- would

24         you please read back the witness's answer to the

25         last question?

Page 93

1      (Whereupon, the above referred-to answer was read back

2                    by the court reporter.)

3   BY MR. PONCE:

4        Q    What is not your contention, Mr. Johnson?

5        A    My contention is that Royal Caribbean

6   trafficked in our subject property which is identified

7   in its entirety in the certified claim.

8        Q    So you are not including this equipment

9   listed in this report among the subject property?

10            MS. CASEY:  Objection to form,

11            mischaracterizes his testimony.

12  BY MR. PONCE:

13       Q    You can answer, Mr. Johnson.

14       A    I believe these amounts are included in the

15  certified claim.

16       Q    But you are unable to identify any piece of

17  this equipment that Royal Caribbean trafficked in?

18       A    As I answered before, that's correct.  But

19  that's not our contention.

20            MR. PONCE:  Ben, can you pull up, we are

21            not going to look at it quite yet but can you

22            get it ready, 1799.

23  BY MR. PONCE:

24       Q    Mr. Johnson, can we flip back, please, to

25  Exhibits 8 which is the amended complaint and look at

Page 94

1    paragraph 12 on page 5.

2          A    Yes, Mr. Ponce, I would be glad to do so

3    can you give me the exhibit number again?

4          Q    Yes, it's Exhibit 8.

5          A    I am sorry.  Which paragraph again?

6          Q    Paragraph 12 although the part we are going

7    to look at is on page 5, the excerpts from the

8    certified claim.

9          A    Yes, sir.  Thank you.  I am there.

10          Q    The fifth line item there is office

11    furniture and fixtures, do you see that?

12          A    Yes, I do.

13          Q    And if you track that out to the right, it

14    assigns an amount of $90,616?

15          A    Yes, I see that.  Yes.

16          Q    Let's go now.  It may not be up yet.  Let's

17    go to what is going to be Exhibit 12 for your

18    deposition.  It should be there.

19               Mr. Johnson, I am showing you what's been

20    marked for your deposition as Exhibit 12 on the bottom

21    right corner, there is identification Bates number HDC

22    1799, and I will represent to you and to the record

23    that this is a document Havana Docks Corporation

24    produced to us in discovery.  Just like we did with the

25    last exhibits and all of them, take a second, not a

Page 95

1    second literally, take as much time as you would like

2    to thumb through this and look through it.

3              My first question to you is going to be

4    whether you've seen this document before.

5         A    Thank you.  I have seen this document.

6    Again, it has been some time ago.

7         (Whereupon, the above referred-to document

8          was marked as Defendant's Exhibit 12.)

9    BY MR. PONCE:

10        Q    What do you understand this document to be?

11        A    I understand it to be a listing of the

12   valuations on the office furniture and fixtures for

13   Havana Docks Corporation as part of our evidence that

14   was submitted to the Foreign Claim Settlement

15   Commission.

16        Q    And if you go to the second page of this

17   document, which will bear the Bates identification

18   number 1800 and there is a typed paragraph there that

19   says, "The enclosed physical inventory of office

20   furniture and fixtures dated December 31, 1959 was

21   taken by personnel of each department and section of

22   the company under the direct supervision of their

23   respective section heads and the extensions and

24   adjustments were made by the undersigned."

25              Did I read that correctly?

Page 96

```
 1          A     Yes, sir, you did.

 2          Q     Then that paragraph is dated March 1960,

 3    correct?

 4          A     Yes, sir, that's correct.

 5          Q     It's signed by a man named Mario Rodriguez

 6    Lanza, L-a-n-z-a?

 7          A     Yes, sir, that's correct.

 8          Q     It lists his position as assistant vice

 9    president and assistant comptroller?

10          A     Yes, sir.

11          Q     If you flip to the next page of this

12    document, which should be the pages labeled for

13    identification at the bottom right HDC 1802.  Has a

14    list of on the left side Roman numerals and alphabet

15    letters Roman numeral I, II, III, V and then the

16    letters A through W.  Do you see that?

17          A     Yes, sir.

18          Q     Then on the right-hand side, there is a

19    total for each line.  Do you see that?

20          A     Yes.

21          Q     And the total amount in that right-hand

22    column is $9,615.73?

23          A     Yes, sir, I see that.

24          Q     We can go back to the paragraph of the

25    complaint or you can take my word for it.  But the line
```

Page 97

1      item in the settlement -- I am sorry.  The line item in

2      the certified claim for office furniture and fixtures

3      has a value of $90,616.  So 27 cents more than what's

4      in this Exhibit 12 that we are looking at now.  It

5      looks like they took the number from the Exhibit 11

6      inventory and rounded it up to the next whole dollar.

7      Does that sound right?

8              A     Yes, sir.  I would agree with that.

9              Q     Now, like I did it for the last exhibit I

10     would like you to take as much time as you would like

11     and look through and let me know which pieces -- which

12     fixtures and office equipment Havana Dock says that

13     Royal Caribbean trafficked in?

14             A     Yes, sir.  And thank you and respectfully,

15     Mr. Ponce, similar to my other answer, I can't identify

16     it for you today any specific pieces of office

17     furniture or fixtures that we made that contention on.

18     But that is not our contention.

19                   Our contention is that Royal Caribbean

20     trafficked in our subject property in its entirety as

21     referenced in the certified claim.

22             Q     When you say as referenced in the --

23     trafficked in the subject property as referenced in the

24     certified claim.  Can you point to me going back to

25     Exhibits 2 and 3 the part of Exhibit 2 and 3 that you

Page 98

1    are referring to when you say that Royal Caribbean

2    trafficked in the subject property as referenced in the

3    certified claim?

4         A    Yes, sir, I believe I can.  If you would

5    like to go back to Exhibit 2.  Are you there?

6         Q    Yes, sir.

7         A    Yes.  On page 3, 3 of 13 of that document,

8    the final ruling by the Foreign Claim Settlement

9    Commissions said that our claim was valued at

10   $9,179,700.88.

11        Q    So that is the total value of the property

12   that the commission is certifying was confiscated by

13   the Cuban government, correct?

14        A    That is the value of our certified claim as

15   determined by the Foreign Claim Settlement Commission,

16   yes, sir.

17        Q    Do you understand that the value that they

18   are claiming, the value that the commission is

19   certifying here to be the value of the property that

20   was confiscated by the Cuban government?

21             MS. CASEY:  Can you repeat that question?

22   BY MR. PONCE:

23        Q    Sure.  The paragraph you pointed me to of

24   the certified claim, do you understand in that

25   paragraph that the commission is certifying the value

1    of the property that was confiscated by the Cuban

2    government?

3         A    I would state it a little bit differently.

4    I would state it that they are certifying the value of

5    the laws for Havana Docks property for all that was

6    stolen from us by the Castro regime.

7         Q    And included in what was stolen from you by

8    the Castro regime is equipment and office furniture and

9    fixtures, correct?

10        A    Yes, sir.  That's included in the certified

11   claim valuation.

12        Q    So the settlement claims commission was

13   saying equipment and office furniture and fixtures

14   having a specified value was stolen from Havana Docks

15   Corporation, correct?

16        A    I believe that would be a correct

17   statement.

18        Q    You're unable to identify for me today any

19   of the equipment or office furniture and fixtures that

20   Royal Caribbean has trafficked in, correct?

21             MS. CASEY:  Objection, form.

22             THE WITNESS:  Again, respectfully, Mr.

23        Ponce, no, I can't identify a specific pieces of

24        equipment, specific office furniture, but that's

25        not contention of our claim.

Page 100

1    BY MR. PONCE:

2         Q    In each of the last two exhibits we've

3    looked at, Exhibit 11 and Exhibit 12 which were the

4    inventories.  Are those inventories that Havana Docks

5    Corporation commissioned to be made?

6              MS. CASEY:  Objection to form.

7              THE WITNESS:  I apologize, Mr. Ponce, which

8         exhibit would you like to look at or both in

9         unison?

10   BY MR. PONCE:

11        Q    Both in unison, 11 and 12 which were the

12   last two we looked at which were the inventories of

13   first of the equipment and then the office furniture

14   and fixtures.

15             Are those inventories that we looked at,

16   were they commissioned to be made by the Havana Docks

17   Corporation?

18             MS. CASEY:  Objection to form.

19             THE WITNESS:  I am not sure, Mr. Ponce,

20        whether they were outside commissions or

21        prepared internally.  It appears that --

22   BY MR. PONCE:

23        Q    I am sorry.  I spoke right over you.  I am

24   so sorry.

25        A    That's okay.  It appears they were prepared

Page 101

1    internally based on the signatures we reviewed when we

2    were looking at those documents.

3         Q    And are these documents that were submitted

4    by Havana Docks Corporation to the Foreign Claims

5    Settlement Commission?

6         A    It's my understanding that that is correct.

7         Q    Has Havana Docks Corporation taken any

8    efforts to sell the certified claim?

9         A    We have not.

10        Q    Has anyone offered, discussed, contacted

11   Havana Docks about purchasing the certified claim from

12   Havana Docks?

13        A    If you can bear with me just a moment, I

14   would like to refer to one of our answers in the

15   30(b)(6) notification.

16        Q    When you say your answers, you are talking

17   about the document that was prepared that you are

18   looking at?

19        A    Yes.  And I believe was produced for you

20   this morning.  Under topic 3, I will point to you a

21   reference that there was a gentleman a number of years

22   ago, his name was Tim Ashby, they contacted Havana

23   Docks Corporation with an apparent interest to

24   purchasing the claim.  We don't know who Mr. Ashby was

25   associated with.

Page 102

1       Q    Who had these discussions with Mr. Ashby?

2       A    I believe that would have been the attorney

3    for Havana Docks Corporation at the time.  That was a

4    gentleman by the name of Richard McCreedy.  He was the

5    long time attorney for the Behn family and Havana Docks

6    Corporation.

7       Q    Approximately how long ago was that contact

8    for Mr. Ashby?

9       A    I believe it was approximately 15 years

10   ago.

11      Q    Did that predate your relationship and

12   capacity with Havana Docks Corporation?

13      A    Yes, sir, it did.

14      Q    Is there any indication that Mr. Ashby was

15   acting on behalf of Royal Caribbean cruises?

16      A    Again, we are not sure who Mr. Ashby was

17   representing so to answer your question -- if you

18   wouldn't mind, would you mind asking that question once

19   more to make sure I answer correctly?

20      Q    Sure.

21           MR. PONCE:  Madam Court Reporter, would you

22           please read the last question back?

23      (Whereupon, the above referred-to question was read

24              back by the court reporter.)

25           THE WITNESS:  Yes.  And again as I started

Page 103

```
1              my answer, we don't know who Mr. Ashby was

2              representing, but there is no indication that I

3              am aware of that he was representing Royal

4              Caribbean.

5     BY MR. PONCE:

6         Q     Any indication of whether he was acting on

7     his own account or for his own account or on behalf of

8     someone else?

9              MS. CASEY:  Objection to form.

10             THE WITNESS:  I don't know, Mr. Ponce.

11             Again, we don't know who he was representing or

12             what capacity that he was acting in.

13    BY MR. PONCE:

14        Q     Did Havana Docks Corporation ever have

15    discussions with a Norwegian shipping magnate for him

16    or her to buy a certified claim or to enter into a

17    lease agreement of some sort?

18        A     Not that I am aware of.

19             MS. CASEY:  Mr. Ponce, did you mean

20             Norwegian, the company or Norwegian --

21             MR. PONCE:  Norwegian as a person from

22             Norway.  Does that --

23             MS. CASEY:  I don't think it changes the

24             answer.  I just wondered.

25    BY MR. PONCE:
```

Page 104

1      Q    So Mr. Johnson, let me say it a little bit

2    differently because that's a fair point.

3             Are you aware of whether Havana Docks

4    Corporation ever had discussions with a shipping

5    magnate from the country of Norway for him or her to

6    buy the claim or enter into a lease agreement of some

7    sort?

8      A    I am not aware of, Mr. Ponce, of any such

9    discussion.

10     Q    Got it.

11              (Off the record.)

12              (Back on the record.)

13           MR. PONCE:  Moving onto equally fun things.

14        Ben, and let's go back on the record.  Ben,

15        would you please pull up 19064.  It's a long way

16        of saying 19064.

17   BY MR. PONCE:

18     Q    Mr. Johnson, I am showing you or having

19   brought up on your screen Exhibit Number 13 a document

20   which we marked as Exhibit Number 13.  And on the

21   bottom right corner there is a Bates identification

22   number HDC 19064.  And I will represent to you and to

23   the record that this is a document that was produced to

24   us by Havana Docks.

25              (Off the record.)

Page 105

1            (Back on the record.)

2        (Whereupon, the above referred-to document

3          was marked as Defendant's Exhibit 13.)

4    BY MR. PONCE:

5        Q    So Mr. Johnson, in front of you now is

6    Exhibit Number 13 and have you seen this document

7    before?

8        A    Yes, sir, I have.

9        Q    Is this a list of Havana Docks

10   Corporation's common stockholders as of November 2020?

11       A    Yes, sir.

12       Q    So this is going to be a bit of a slog.

13   But I am going to ask you a short series of questions

14   as to each person or group that is listed here.

15            The first is Aphra Behn, and that is the

16   same Aphra Behn that we talked about before?

17       A    Yes, sir, that's correct.

18       Q    And in parentheses it says as agent under

19   agreement.  Do you see where it says that?

20       A    Yes, sir, I do.

21       Q    What does that mean?

22       A    That Ms. Behn is actually serving as an

23   agent for that one particular share that was held in

24   agreement for herself and her two siblings who are both

25   now deceased.

Page 106

1          Q    It lists her mailing address as France; is

2    that correct?

3          A    Yes, sir.

4          Q    Where it has a phone number -- I am not an

5    expert on various country codes.  Does that look like

6    it's a non U.S. phone number?

7          A    That is a phone number in France.

8          Q    Bear with me as I ask these questions

9    because it may not be the most articulate way to ask

10   them, especially to someone who is an expert in this

11   field.

12              But how did Ms. Behn and her now deceased

13   siblings, how did they acquire this share, did they

14   purchase it from somebody?

15         A    The shares were acquired a number of years

16   ago by transference from their father, William C. Behn.

17         Q    And so did they pay money to acquire that

18   share or it was a my work gift?

19         A    It was a combination of both.

20         Q    What was the dollar amount that they paid,

21   if you know?

22         A    We have that, if I may, by reference in our

23   30(b)(6) answers for you, if that would be suitable to

24   you, maybe we can turn to that section of the document.

25         Q    Again, however you want to answer the

Page 107

1    question orally on the record is fine with me.  If you
2    are looking at that document to read from it, that's
3    your prerogative.
4         A    Yes.  If we could look at topic 3C on page
5    7 of that document.  It's where it starts.  I think
6    they are in a little bit different order than the
7    document that we have up on the screen.  But it's the
8    same group of shareholders.
9         Q    So be that as it may going back to the
10   question.  How much in dollars did Aphra Behn pay to
11   acquire the share that she and her siblings had?
12        A    If you can bear with me just a moment.  I
13   believe that share was transferred in 2005, Mr. Ponce,
14   from Mr. Behn to the representation on the title that
15   we have here and the calculated price for that one
16   share for Mr. Behn's records was $1,156.56.
17        Q    So I am trying to keep my Mr. Behn
18   straight, that Mr. Behn in that instance is William C.
19   Behn?
20        A    Yes, sir, William C. Behn.
21        Q    And it is guaranteed that I am going to say
22   it in Spanish at some point and I apologize and I mean
23   no disrespect to you or to the Mr. Behn who is
24   listening onto the deposition.
25        A    Certainly.

Page 108

1          Q     I am going to do my best to remember that
2     is Behn.
3                Getting back to the family tree.  We talked
4     about William C. Behn and we talked about his daughter
5     Aphra Behn and William C. Behn's grandson, Mickael
6     Behn.  I've seen in the documents as I review them, I
7     see a William S. Behn, although I could spell the
8     middle name, I don't dare try to pronounce it.  Who is
9     William S. Behn?
10         A     That was the son of William C. Behn.
11    William S. Behn now being deceased.
12         Q     So that would be one of Aphra's siblings?
13         A     Yes, sir, that's correct.
14         Q     And that would be Mr. Mickael Behn's uncle?
15         A     Yes, sir, that's correct.
16         Q     Did Mr. William S. Behn play any management
17    role in Havana Docks Corporation?  Let me be more
18    specific.
19                Following the confiscation of -- let me be
20    even more specific.
21                At the time the subject property was
22    confiscated in 1960, did Mr. William S. Behn have any
23    employment or management role with Havana Docks
24    Corporation?
25         A     To my recollection of the corporate

Page 109

```
 1    history, he did not.
 2         Q    Did there come a time when Mr. William S.
 3    Behn became involved in the business as it were of
 4    Havana Docks Corporation following the confiscation of
 5    the property?
 6         A    To my recollection, he did not.
 7         Q    Going back to Exhibit 13 in the second
 8    list -- or I am sorry.
 9              The second name on this list of
10    shareholders it is Mickael, am I saying it right,
11    Mickael?
12         A    Mickael, yes.
13         Q    The second name on this list is Mickael S.
14    Behn, do you see that?
15         A    Yes, sir, I do.
16         Q    It lists him as having 46 shares; is that
17    correct?
18         A    Yes, sir.
19         Q    It shows an address in London for him; is
20    that correct?
21         A    Yes, sir, that's correct.
22         Q    In the phone number it shows for him is --
23    again, I don't know what country code is, but is that a
24    non U.S. phone number?
25         A    Yes, sir, that's correct.  That's the
```

Page 110

1  number in France.  Excuse me, I misspoke on that.  That
2  is a number in England.  My bad.
3       Q    And then it shows an email address for him
4  and it's mickaelbehn@havanadockscorp.com.  Do you have
5  a havanadockscorp.com email address?
6       A    Yes, I do.
7       Q    How many people have havanadockscorp.com
8  email addresses?
9       A    I believe there is only two.  Mickael, Mr.
10  Behn and myself.
11            If I may clarify on that point for full
12  answer to the question.  My son, Aaron Johnson, helped
13  us as an intern three summers ago and as I recall, I
14  believe we had signed a Havana Docks Corp email address
15  to him as well.  I am not sure if it's still active.
16       Q    How old is the younger Mr. Johnson today?
17       A    He is 26.
18       Q    So you will be amazed at my math skills,
19  three years ago when he was an intern he was 23?
20       A    If I may brag on him just a minute, he is
21  finishing up his last semester of law school this
22  spring.
23       Q    Congratulations.
24                 (Off the record.)
25                 (Back on the record.)

1    BY MR. PONCE:

2         Q    Congratulations about your son.  That's

3    fantastic and I know from firsthand, as Mr. Taormina

4    and Ms. Casey, how hard that is to get through law

5    school and is not always fun.  He should be proud and

6    you should be proud of him.

7              So what was he doing when he was

8    interning -- was he interning for Havana Docks or for

9    Bank of the Bluegrass?

10        A    For Havana Docks.  He was just helping us

11   with some of the corporate records, some of the

12   corporate history and, especially, the stockholder

13   ledger.  As you can see, or as we have discussed in

14   that deposition today, some of these holders go back

15   years and years, many years, even pre-confiscation of

16   the property.

17             So trying to bring the stockholder register

18   current, that was his main focus while he helped us

19   that summer, and I am sure as we go down through the

20   list of names, it will become hopefully more clear of

21   what I am talking about.  Some of the folks had

22   deceased so there is some reregistration efforts that

23   need to be made.

24        Q    Okay.  So staying with Mickael Behn and the

25   row for him shows him at 46 shares.  Did he acquire

Page 112

1    those 46 shares all in one sitting or was that over

2    time?

3         A    That was all in one transfer and that was

4    from his mother, Aphra Behn as a gift.

5         Q    Did he pay any money to acquire those

6    shares, and understanding he probably didn't in light

7    of the fact, you said it was a gift?

8         A    No, sir, he did not.  Again, it was a gift

9    from his mother.

10         Q    Were those shares that Aphra Behn held

11   individually and not as agent on behalf of her siblings

12   also?

13        A    Yes, sir, that's correct.  Those were

14   shares that Aphra Behn held individually.

15        Q    When was the gift of shares from Aphra Behn

16   to her son Mickael Behn?

17        A    That was in April of 2019.

18        Q    What is the current value of the 46 shares

19   that Mickael Behn owns?

20        A    I am not sure, Mr. Ponce.  We haven't done

21   a current evaluation per share in some time.

22        Q    This is obviously a rhetorical question,

23   but for due diligence.  The shares of Havana Docks

24   Corporation are not publicly traded, correct?

25        A    Yes, sir, that's correct.  They are closely

Page 113

1    held.

2         Q    So the next person on the list is Susan T.

3    Buffett and then in parentheses it says deceased and

4    that she has one share; is that correct?

5         A    Yes, sir, that's correct.  And that's in

6    reference to what I commented on before.  There is

7    still some reregistration work that needs to be done.

8         Q    You kind of knew where I was going.

9         So, is that share currently held in her

10   name?  Is it held in the name of her estate?  How is

11   that recorded in the books of Havana Docks Corporation?

12        A    Recorded it in the books as still being in

13   her name.

14        Q    When did she acquire that share?

15        A    The initial acquisition was many, many

16   years ago, pre-confiscation of the property.  There was

17   a reverse stock split that occurred in the early 2000s

18   and that required if the share -- if the resulting

19   share did not end up being a whole share, it required a

20   buy-up at that time.  And referring to my notes, if I

21   may, I believe that occurred in March of 1984 on that

22   buy-up when both she and Mr. Buffett bought up to one

23   whole share that you see represented on this document.

24        Q    How much did -- talking about Ms. Buffett

25   at this time, how much did she purchase that share for?

Page 114

```
1        A    The buy-up portion to get from the
2   fractional to the whole share, the buy-up amount was
3   $237.08.
4        Q    That was in 1980 what?
5        A    '84.
6        Q    Then kind of handling it in combination.
7   The next person on the list is Warren Buffett who also
8   has one share.  Did he acquire his share under the same
9   circumstances and under the same terms that Ms. Behn
10  did hers -- I am sorry.  Ms. Buffett did hers?
11       A    Yes, sir, in the same circumstances.
12       Q    The same from a buy-up from a fractional
13  share to a whole share?
14       A    Yes, sir, he did.  And I spoke with Mr.
15  Buffett about a month ago and he confirms that he still
16  has his certificate.
17       Q    How did it come to be that Warren Buffett
18  and his wife purchased a share in Havana Docks
19  Corporation?
20       A    It's funny you should ask that question
21  because I had exactly the same question.  I thought
22  that was very interesting how in the world did Warren
23  Buffett come to own a share of Havana Docks
24  Corporation.  And he told me when he was a young man
25  starting out in New York, he would see an ad, perhaps,
```

Page 115

1    in the paper about a company that was offering shares

2    or someone wanted to sell a share, and if it caught his

3    interest, he would buy a few shares.  And he said that

4    he has owned Havana Docks Corporation longer than he

5    owned Berkshire Hathaway.

6         Q    Love it.  That's great.  And backing up a

7    little bit, and Ms. Casey might get mad at me for

8    asking a question that has already been answered.  But

9    I didn't write it down well enough.

10             When did Mr. Mickael S. Behn receive the

11   gift from his mother of the 46 shares?

12        A    Yes, sir.  I don't believe we did state

13   that.

14        Q    Now, I don't feel as bad.

15             MS. CASEY:  I didn't have to lodge an

16        objection.

17             THE WITNESS:  It was in April of 2019.

18   BY MR. PONCE:

19        Q    Prior to that, I think the answer is no.

20   Prior to that, did Mr. Mickael S. Behn own any shares

21   of Havana Docks Corporation?

22        A    No, sir, I don't believe he did.

23        Q    The next name on the list, and I am reading

24   this as best as I can in light of the print, is Dorothy

25   W. Hoch, H-o-c-h, did I read that correct?

1          A     Yes, Hoch or Hoch, yes.

2          Q     In parentheses it says she is deceased; is

3     that correct?

4          A     Yes, sir.  But that is an error on this

5     document.  I prepared this document.  I thought she was

6     but that is not the case.  There is another name if we

7     may jump on down the list a little bit where you see

8     Walter H. Whitaker.

9          Q     Yes, sir.

10         A     Six shares.  I thought Ms. Hoch was Mr.

11    Whitaker's mother.  But she is not.  Ms. Hoch is his

12    sister and she is still alive.

13         Q     I am sure she was happy to hear that the

14    mistake was yours.

15         A     Well, it definitely was mine.  But she is

16    still alive.  Unfortunately we lost Mr. Whitaker just a

17    couple of weeks ago.

18         Q     Sorry to hear that.

19               So Ms. Hoch has five shares.  When did she

20    acquire those five shares?

21         A     I am not sure exactly, Mr. Ponce.  That

22    was, as I understand, through inheritance.  The

23    Whitaker family also as I understand go way back with

24    the relationship of the Havana Docks Corporation to the

25    early days of the company.  I think Mr. Whitaker's

Page 117

1    father was involved with the corporation.  I apologize,

2    I can't remember exactly in the early 1900s.  But then

3    Mr. Whitaker, Walter Whitaker is at the bottom of the

4    list.  You will note that on some of the documents that

5    we have supplied for you, that Mr. Whitaker was

6    referenced as a director and an officer of the

7    corporation through the years.  So the Whitaker family

8    have a long relationship with Havana Docks Corporation.

9    I don't have all of the details for you.

10        Q    So is there any value assigned to

11   Ms. Hoch's five shares?

12        A    Similar answer as I gave before if I

13   understand your question.  Remind me to ask the

14   question back.  What do you mean by value assigned?

15   You mean what it cost her?

16        Q    Let's start with that.

17             Do you know how much it cost her to buy

18   those shares?

19        A    I do not.  Let's see if you don't mind to

20   bear with me and let me look at that reference real

21   quick.  Yes, sir, corporate records did not reflect the

22   purchase price on those shares.  Again, I believe

23   Ms. Hoch obtained her shares through inheritance so

24   they go back many, many decades.

25        Q    With it being a closely held corporation

1    and not trading on any kind of market that comes up

2    with a per share price, how did you value one of

3    Ms. Hoch's shares or, for that matter, any of the

4    shareholders' shares at this point in time?

5              MS. CASEY:  Objection to form.  And Mr.

6         Johnson, to the extent that your answer would

7         constitute work product or would reveal, sorry,

8         work product or attorney-client communications,

9         I would caution you to answer in a way that

10        would not reveal that information.

11             THE WITNESS:  I would respectfully answer

12        for you, Mr. Ponce.  But the current valuation

13        would be done similar to any current valuation

14        on shares for any corporation.  They were

15        closely held.

16   BY MR. PONCE:

17        Q    Humor me.  Is that finding out the market

18   value -- how would you determine that?

19             MS. CASEY:  Objection to form, lacks

20        foundation.

21             THE WITNESS:  Again, I would have to give

22        you my answer, my experience of how that would

23        be done, you know.  I would answer that it would

24        be a value of the company's assets or the

25        stockholder's equity divided by the number of

Page 119

1          shares.

2     BY MR. PONCE:

3          Q    Has anyone made those calculations as of

4     the current time to determine the price per share?

5               MS. CASEY:  Mr. Johnson, I will caution you

6          to answer in a way that does not reveal work

7          product, protected information or

8          attorney-client privilege information.

9               THE WITNESS:  Not to my knowledge.

10    BY MR. PONCE:

11         Q    In looking at this chart, there is a column

12    for certificate numbers in there.  Some of them have

13    them and some of them don't.

14              Is there any significance as to why some

15    have a certificate number and others do not?

16         A    Yes, sir.  Again, it's going back to our

17    corporate records from the lightest stockholders

18    register that we are basing the bring forward on the

19    current holders.  That registering agent years ago was

20    the First National Bank of Boston and in their

21    registry, it did not list the certificate numbers

22    unfortunately.

23         Q    Okay.  Going to the name that is below

24    Ms. Hoch, and I am going to need your help that you

25    recognize this name because I have a hard time reading

Page 120

1  on these documents.  To me it looks like Melanie Behn
2  and I am not sure what the last name is.  Do you see
3  where I am talking about?
4       A    Yes.  The last name is Lucain.
5       Q    Can you spell that for us?
6       A    L-u-c-a-i-n.
7       Q    So her full name is Melanie Behn Lucain?
8       A    Yes.
9       Q    This shows her as having 46 shares; is that
10  correct?
11      A    Yes, sir, that's correct.
12      Q    Who in a generational standpoint or
13  familial standpoint is Melanie Behn Lucain is related
14  to Mickael Behn?
15      A    She is a cousin.  She is the daughter of
16  William S. Behn, a granddaughter of William C. Behn.
17      Q    She has 40 -- does that say 46 shares?
18      A    Yes, sir, that's correct.
19      Q    So she has the same number of shares as her
20  cousin Mickael S. Behn?
21      A    Yes, sir, that's correct.
22      Q    When did Ms. Lucain acquire those 46
23  shares?
24      A    She acquired those by inheritance at her
25  father's death.

Page 121

1          Q     What year did she acquire those shares?

2          A     Bear with me just a moment.  I apologize,

3     Mr. Ponce, I don't have Mr. William S. Behn's date of

4     death in front of me.

5          Q     Did she acquire those shares upon her

6     father's passing after 1996?

7          A     Yes.

8          Q     It shows an address for her also in France;

9     is that correct?

10         A     I am sorry.  What was the question, Mr.

11    Ponce?

12         Q     Yes.  On Ms. Lucain on the row for her

13    underneath mailing address, it has an address in

14    France; is that correct?

15         A     Yes, sir, that's correct.

16         Q     Then in the column for phone number, again,

17    I don't know country codes, but it's a non U.S. phone

18    number?

19         A     Yes, sir, that's correct.

20         Q     Next line or next person rather.  We talked

21    about this a little bit earlier.  Initials A.L

22    MacArthur, do I have that correct?

23         A     Yes, sir.  A.L Fanget MacArthur.

24         Q     Is Fanget F-a-n-g-e-t?

25         A     Yes, sir, I believe that's correct.

Page 122

1      Q    What is that person's familial relationship
2   to the Robert MacArthur we talked about earlier?
3      A    Yes, sir.  A.L Fanget MacArthur is Robert
4   MacArthur's mother.  Was Robert MacArthur's mother.
5   Excuse me.
6      Q    When did Ms. MacArthur acquire these 18
7   shares?
8      A    I am not sure, Mr. Ponce.  It was many,
9   many, many years ago.  And I believe she acquired those
10  by inheritance from her late husband who, as I
11  mentioned, I believe earlier in the testimony was one
12  of the engineers who helped build Havana Docks.
13     Q    And the chart we are looking at has in
14  parentheses deceased after her name.  So on the current
15  books of the corporation, she is still listed as the
16  owner of those shares, correct?
17     A    Yes, sir, that's correct.
18     Q    Next person on the list is again, I am
19  going to need your help .  It looks like Romain le
20  Pelletier?
21     A    Yes.  Romain le Pelletier.
22     Q    So the last name le Pelletier?
23     A    Yes, sir.
24     Q    That first name R-o-m-a-i-n.  Last name
25  lower case l-e, second word capital P-e-l-l-e-t-i-e-r.

Page 123

1          A    Yes, sir, that's correct.

2          Q    I apologize.  Is Romain a man or a woman?

3          A    A man.

4          Q    What is Mr. le Pelletier's familial

5     relationship, if any, with Mickael S. Behn?

6          A    Romain is also a first cousin of Mickael

7     Behn.  He is the son of Monica Behn who is deceased.

8     Monica Behn was the daughter of William C. Behn.

9          Q    So William C. Behn's three children were

10    Aphra, Monica and who is the third sibling?

11         A    William S. Behn.

12         Q    All right.  And Mr. la Pelletier is

13    Monica's son?

14         A    Yes, sir, that's correct.

15         Q    He owns 46 shares, correct?

16         A    Yes, sir, that's correct.

17         Q    When did he acquire those 46 shares?

18         A    If you can bear with me again for just a

19    moment.  Let me refer to my notes on that.

20              Mr. Ponce, those were acquired by Mr. la

21    Pelletier in sequences from his grandfather.  They

22    happened in three different years in 2000, 2001 and

23    2005.

24         Q    So he acquired those from his grandfather

25    William C. Behn?

                                                            Page 124

1          A     Yes, sir.

2          Q     And he purchased them from him?  This is a

3     lot of them and pronouns.

4                Mr. la Pelletier purchased those shares in

5     three transactions from his grandfather, William C.

6     Behn?

7          A     They were structured -- they transferred

8     structured some of the shares were through a purchase

9     contract and some of the shares were buy-out right gift

10    from Mr. Behn, William C. Behn.

11         Q     Which transactions of the three you

12    mentioned involved purchased versus a gift?

13         A     Bear with me just a moment.  I believe the

14    purchase, Mr. Ponce was 9 shares in 2000 and 28 shares

15    in 2001.  I don't have the specific dollar amounts

16    between those two transactions.  But the average share

17    price for those shares was $1,255.81.

18         Q     Then so that was 9 shares in 2000; 28

19    shares in 2001 so that's 37 shares.  That means 9

20    shares were a gift in 2005?

21         A     Yes, sir, 9 shares were a gift.

22         Q     Is Mr. William C. Behn still alive?

23         A     He is not.

24         Q     When did he pass away, if you know?

25         A     I believe it was 2015.

Page 125

1       Q      Looking back at the chart that is Exhibit
2    13, Mr. le Pelletier's mailing address is in France?
3       A      Yes, sir, that's correct.
4       Q      The phone number listed here again, I don't
5    know the country codes, that's a non U.S. telephone
6    number?
7       A      Yes, sir, that's correct.
8       Q      Then the name beneath Mr. la Pelletier is
9    unknown holder.  So there is a share that someone owns
10   but we don't know who, is that what that means?
11      A      Yes, sir, that's correct.  It's held in
12   what's referred to as nominee name at a brokerage firm.
13      Q      Which brokerage firm?
14      A      Bear with me again.  Just a moment, Mr.
15   Ponce.  Let me look at -- it was originally held by a
16   brokerage firm, but I don't have that right in front of
17   me.  That is no longer in existence.  It has been
18   acquired two or three times through the years.  But
19   it's now the resulting firm it's called Jeffreys.
20      Q      Has any inquiry been made of the resulting
21   firm Jeffreys about for whose benefit this share is
22   owned or who the beneficial owner of the share is?
23      A      Yes, sir.  I sent correspondence as best I
24   could to the addresses we had on file and then also to
25   the corporate headquarters of Jeffreys but I received

Page 126

1   no response.

2        Q    Okay.  So the last name on this list is

3   Walter H. Whitaker who we talked before about briefly

4   is that he is deceased?

5        A    Yes, sir.  Just recently so.

6        Q    He or his estate he owned six shares; is

7   that correct?

8        A    Yes, sir, that's correct.

9        Q    When did Mr. Whitaker acquire those six

10  shares?

11       A    Let me refer to our 30 (b)(6) answer and

12  let me see if I can give you some definition on that.

13  I am not exactly sure, Mr. Ponce, but it was prior to

14  1970.

15       Q    So according to this chart if I added up

16  all the numbers we went through, I would come up with

17  171 total outstanding shares; is that correct?

18       A    Yes, sir, that's correct.

19       Q    That equals 100 percent of the total

20  outstanding shares of Havana Docks Corporation?

21       A    Yes, sir, it does.

22       Q    Now, I noticed at the top of this document

23  it refers to series -- I can barely read it.  Series 19

24  something common stock without par value.  Did I read

25  that close to correctly?

Page 127

1          A     Yes, series 1983.

2          Q     Are there any other classes of stock that

3     have been issued for Havana Docks Corporation?

4          A     There are not.

5          Q     So there is no preferred stock, the

6     preferred stock this is all the shares of any class

7     that exists?

8          A     Yes, sir, to my knowledge, that's correct.

9          Q     So the three largest shareholders of Havana

10    Docks Corporation are Mickael Behn with 46 shares,

11    Melanie Behn Lucain with 46 shares and Romain le

12    Pelletier, also with 46 shares; is that correct?

13         A     Yes, sir, that's correct.

14         Q     And all three of those shareholders live

15    outside of the United States; is that correct?

16              MS. CASEY:  Objection to form.

17              THE WITNESS:  They do.  I might add that

18         they are U.S. citizens with the exception of

19         Melanie Behn Lucain.

20    BY MR. PONCE:

21         Q     What country is Ms. Lucain a citizen?

22         A     As I understand, she is a citizen of

23    France.

24              MS. CASEY:  Mr. Ponce, when you're ready

25         for a break.

Page 128

1           MR. PONCE:  Let's do it.  Now is as good a
2        time as any.
3           MS. CASEY:  I don't want to take you away
4        from anything.
5           MR. PONCE:  I was going to suggest soon.
6        Really now is a good time.
7           MS. CASEY:  Great.  I was going to ask for
8        15 minutes because the ICU was calling me.
9           MR. PONCE:  Yes.  Come back at 2:40 we will
10        come back.
11           MS. CASEY:  That sounds great.  Thank you.
12           THE VIDEOGRAPHER:  We are off the video at
13        2:23 and off the record.
14                (Off the record.)
15                (Back on the record.)
16           THE VIDEOGRAPHER:  Back on the record at
17        2:45.
18    BY MR. PONCE:
19        Q    All right.  Mr. Johnson, jumping right back
20    in, has Havana Docks Corporation made any attempt to
21    obtain compensation from the Cuban government as
22    reparations for the confiscation?
23        A    We have not.
24        Q    Has Havana Docks Corporation made any
25    attempts to obtain compensation from the United States

Page 129

1    government in connection with the certified claim?

2         A    We have not, to my knowledge.

3         Q    I know we talked a little bit before about

4    any attempts to buy or sell a certified claim and I

5    don't mean to reask that.

6              But has Havana Docks Corporation made any

7    attempt to obtain compensation from any

8    non-governmental third-party as reparations for the

9    confiscation or otherwise in connection with the

10   certified claim?

11        A    We have not.

12        Q    Has Havana Docks Corporation had any

13   communications with United States government related to

14   the Helms-Burton Act?

15        A    If you can give me just a moment, Mr.

16   Ponce.  I believe that was one of our responses

17   submitted in relation to the 30(b)(6) questions, Mr.

18   Ponce, and I believe we have submitted to Royal

19   Caribbean all of our communications in that regard.

20        Q    So let's -- I hear you.  Let's go back to

21   the question.

22             Has Havana Docks Corporation had any

23   communications with the United States government

24   relating to the Helm-Burton Act?

25        A    Yes.  And, again, respectfully, that would

Page 130

1    be in the documents that we submitted emails and so

2    forth.

3        Q    Were you, Jerry Johnson, a participant in

4    any of those communications with the U.S. government?

5        A    Yes, I was.

6        Q    Were other people on behalf of Havana Docks

7    Corporation participants in those communications?

8            MS. CASEY:  Objection to form, overbroad.

9            THE WITNESS:  Mr. Ponce, would you ask the

10           question one more time, please?

11   BY MR. PONCE:

12       Q    Of course.

13           Did anyone else besides you on behalf of

14   Havana Docks Corporation have communications with the

15   U.S. government related to the Helms-Burton Act?

16           MS. CASEY:  Same objection.

17           THE WITNESS:  I don't believe so as I

18           recall.

19   BY MR. PONCE:

20       Q    So, for example, Mickael Behn never

21   communicated with United States government relating to

22   the Helms-Burton Act?

23       A    To my recollection, I don't believe Mr.

24   Behn did.

25       Q    I am not going to ask you to try to tell me

Page 131

1    every single communication that you participate in with

2    the U.S. government relating to the Helms-Burton Act.

3    As a general matter, what do you recall discussing with

4    the U.S. government about the Helms-Burton Act?

5                   MS. CASEY:  Objection to form, overbroad.

6                   THE WITNESS:  I think the most direct

7            discussion would have been a meeting, as I

8            recall in December of 2017, with representatives

9            from the state department.

10   BY MR. PONCE:

11        Q    Was that an in-person meeting?

12        A    Yes, it was.

13        Q    Geographically, where did that meeting take

14   place?

15        A    In Washington D.C.

16        Q    Was it state department offices?

17        A    Yes, sir.

18        Q    Who do you recall participating -- let me

19   say it differently.

20             Who do you recall attending the meeting on

21   behalf of the U.S. government?

22        A    It was the gentleman who was, as I

23   understand, his position who was the head of the Cuba

24   desk and the state department and he had also with him

25   an attorney from the state department.  His

Page 132

1    understanding was in the -- I will probably state this

2    incorrectly.  But in the general legal staff of the

3    state department.

4        Q    So the first person you mentioned, the man,

5    do you remember that person's name?

6        A    I believe his last name is Gutierrez.

7        Q    What was your best recollection of Mr.

8    Gutierrez's position?

9        A    As I understand, he was the head of the

10   Cuba desk, I believe that's the position.

11       Q    And then you mentioned that he had with

12   him -- I mean that's not fair to say that he had with

13   him.

14            Also in attendance on behalf of the U.S.

15   government was an attorney; is that correct?

16       A    Yes, sir.

17       Q    Do you recall the name of the attorney?

18       A    Yes, I believe her last name was Albert.  I

19   believe her first name was Rachel.

20       Q    And so was there anyone else attending the

21   meeting representing the U.S. government?

22       A    No, sir.  I believe those were the only --

23       Q    On the other side, you were there.  Who

24   else was there among the non U.S. government attendees?

25       A    There was another gentleman who traveled

Page 133

1    with me, his name was Javier Garcia-Bengochea.

2         Q    What was Mr. -- what was or what is Mr.

3    Bengochea's relationship with Havana Docks Corporation?

4         A    We were working in unison on common

5    interest, wherever it applied.  As I understand, Mr.

6    Bengochea has a certified claim for his family's

7    property for the dock in Santiago to Cuba.

8         Q    I think that takes us to four attendees at

9    this meeting.  Were there any more attendees?

10        A    No, sir.

11        Q    Same type question.

12             Do you recall Havana Docks -- let me --

13   sorry.

14             To your knowledge, did Havana Docks have

15   any communications with the U.S. government relating to

16   Royal Caribbean Cruise Lines?

17        A    No, sir, I don't recall that we did.

18        Q    Again, not that it didn't.  But as you sit

19   here today, you don't recall that, correct?

20        A    I am sorry.  I didn't quite hear that

21   question, Mr. Ponce.

22        Q    Not necessarily that you never did.  But

23   sitting here today, you don't recall any communications

24   between Havana Docks Corporation and the U.S.

25   government relating to Royal Caribbean?

Page 134

1          A    Yes, sir, that's correct.  I don't recall.

2               MR. PONCE:  Ben, could you put up 1320,

3          please.

4               MR. YORMAK:  It's up.

5    BY MR. PONCE:

6          Q    Mr. Johnson, I am showing you an email that

7    has been marked to this deposition as Exhibit 14, and

8    it has a Bates or identification number at the bottom

9    right corner HDC 1320.  I represent this is a document

10   that was produced to us by Havana Docks Corporation.  I

11   don't think that you are a recipient or sender of this

12   email so I want to ask you.

13              At the very very top of the email there is

14   a from line, do you see that?

15         A    Yes, sir, I do.

16         (Whereupon, the above referred-to document

17          was marked as Plaintiff's Exhibit 14.)

18   BY MR. PONCE:

19         Q    It says from JGB home and then in brackets

20   it says JGB@BellSouth.net.  Do you recognize that email

21   address as being Javier Garcia-Bengochea's email

22   address?

23         A    Yes, sir, I do.

24         Q    Then down at the bottom of this email it's

25   signed by Javier?

Page 135

1          A     Yes, sir, I see that.

2          Q     It would appear that that's Javier

3     Garcia-Bengochea?

4          A     Yes, sir.

5          Q     I want to read to you in the first

6     paragraph, the second sentence begins, "I have

7     partnered with the owners of the Havana port.  Would

8     Havana port -- would the owners of Havana Port be

9     Havana Docks Corporation, is that what he is referring

10    to.

11                MS. CASEY:  Objection to form, lacks

12          foundation.

13                THE WITNESS:  I am sorry, Mr. Ponce.  Would

14          you mind asking the question once more and have

15          it read back.

16    BY MR. PONCE:

17          Q     Sure.  Do you understand him in that part

18    of the sentence I read you, where it says I have

19    partnered with the owners of Havana port.  Do you

20    understand him to be saying that he has partnered with

21    Havana Docks Corporation?

22                MS. CASEY:  Same objection, lack of

23          foundation.

24                THE WITNESS:  I believe that would be

25          correct.  With the exception, if I may, about

Page 136

```
 1            his wording about partnered.  That is probably a
 2            misstatement respectfully on Dr.
 3            Garcia-Bengochea's part.  We never had a
 4            partnership or any formal arrangement.
 5       BY MR. PONCE:
 6            Q    I notice you referred to him as doctor.
 7       Where does Dr. Garcia-Bengochea live?
 8            A    He lives in Jacksonville, Florida.  He's a
 9       prominent neurosurgeon in Jacksonville.
10                 MR. PONCE:  Ben, can we put up 14348?
11                 MR. TAORMINA:  It's up.
12            (Whereupon, the above referred-to document
13             was marked as Defendant's Exhibit 15.)
14       BY MR. PONCE:
15            Q    Mr. Johnson, I am going to show you what's
16       been marked for this deposition as Exhibit 15 and it's
17       an email string, multipage email string.  The first
18       page of the document has a Bates or identification
19       number HDC 14348.  And I will represent to you in the
20       record that this is a document that was produced to us
21       by Havana Docks.  Will you take a second and - or as
22       long as you want.  I don't mean a second literally and
23       scroll this and let me know when you are ready for me
24       to ask just a couple of questions on it.
25                 As you are looking at it, I don't think you
```

Page 137

1    need to memorize it.  Just kind of get a sense of what

2    it is.

3          A    Yes, thank you.

4          Q    The bottom of the first page HDC 14348 has

5    an email and then a second page 14349.  Do you see what

6    I am talking about there?

7          A    Yes, sir, I think so.  Perhaps if you could

8    reference a particular paragraph.

9          Q    Of course.  Well, it's even more broadly.

10         The email on the first page 14348 that

11   heads over to the second page 14349, it looks like it

12   is an email from Javier Garcia-Bengochea dated December

13   15, 2018.  You see where I am looking at?

14         A    Yes.

15         Q    It appears that you are copied on this with

16   your bankofthebluegrass.com email address; is that

17   correct?

18         A    Yes, sir, that's correct.

19         Q    When -- let's go through the email first.

20         In that first paragraph on this first page

21   14348.  Dr. Garcia-Bengochea writes, "I am also

22   partnered with the American owners of the cruise

23   facility in Havana, Cuba who are copied above."

24         Did you understand him to be referring to

25   the American owners -- I am sorry.

Page 138

1          When he refers to the American owners of

2    the cruise facility in Havana, Cuba who are copied

3    above.  Do you understand that to be a reference to

4    Havana Docks Corporation?

5               MS. CASEY:  Object to form.

6               THE WITNESS:  I think I might have gotten

7          off section.  Can you refer to that section

8          where he makes that statement again?

9    BY MR. PONCE:

10         Q    Of course.  On the bottom of the first page

11   of this exhibit which is number 14348.

12         A    Yes, thank you.  Yes.  Thank you.  I am

13   sorry.  I have it.

14         Q    When he refers to the American owners of

15   the cruise facility in Havana, Cuba who are copied

16   above, do you understand that to be referring to Havana

17   Docks Corporation?

18         A    Yes, sir.  I believe that would be correct.

19   I also referenced as I did in my prior testimony, I

20   think Dr. Bengochea used the word partnered there

21   probably incorrectly, so to speak, that we had no

22   formal partnership.

23         Q    Did you ever tell him not to use the word

24   partner?

25         A    No, sir, we did not.

Page 139

1       Q    If you go to the last page of this
2    document, which bears the page identification number
3    14350.  It looks like it's an email from Dr.
4    Garcia-Bengochea dated December 14, 2018.  Do you see
5    what I am talking about?
6       A    Yes, sir, I do.
7       Q    In the first paragraph of this email, Dr.
8    Garcia-Bengochea writes, "I am the claimant and
9    legitimate owner of the port facilities in Santiago,
10   Cuba and represent the American claimants to the cruise
11   port facilities in Havana, Cuba."
12            Did I read that correctly?
13      A    Yes, sir.
14      Q    Did you understand the American claimant to
15   the cruise port facilities in Havana, Cuba to be a
16   reference to Havana Docks Corporation?
17            MS. CASEY:  Objection to form.
18            THE WITNESS:  Yes, sir, I believe that
19        would be correct.
20   BY MR. PONCE:
21      Q    Is Dr. Garcia-Bengochea correct in his
22   statement that he represents Havana Docks Corporation?
23      A    We did give Dr. Bengochea permission to
24   represent us in correspondence like the email we are
25   looking at.

Page 140

1        Q    Was that permission given in writing?

2        A    No, sir, to my recollection, it was not.

3        Q    Did Havana Docks Corporation ever execute

4    any type of power of attorney in favor of Dr.

5    Garcia-Bengochea?

6        A    No, sir, we did not.

7             MR. PONCE:  Ben, can we please pull up

8        1180.

9             MR. TAORMINA:  It's up.

10   BY MR. PONCE:

11       Q    Mr. Johnson, we marked this document that I

12   would like you to take a look at that should be up in

13   front of your screen.  We marked it as Exhibit 16 for

14   your deposition.  It is a multipage email.  The first

15   page of which at the bottom right corner has the Bates

16   or identification number HDC 1180.

17             And I will represent to you in the record

18   that this is a document that Havana Docks Corporation

19   produced to us.  I Don't need you to memorize this by

20   any stretch.  But if you can take as much time as you

21   would like just to kind of scroll through it so you get

22   a sense of what it is and then I will have a couple of

23   questions for you.

24       A    Okay.  Thank you, Mr. Ponce.

25             (Whereupon, the above referred-to document

Page 141

1           was marked as Plaintiff's Exhibit 16.)

2    BY MR. PONCE:

3           Q    So at the very top of this first page, the

4    page that's numbered 1180, it would appear to be an

5    email from Dr. Garcia-Bengochea dated April 3rd, 2018,

6    do you see where I am looking?

7           A    Yes, sir.

8           Q    It looks like in the cc line that you were

9    copied on this email, do you see that?

10          A    Yes, I do.

11          Q    Do you recall receiving this email?  Does

12   it look familiar?

13          A    I believe I do recall.

14          Q    If you go down to the seventh paragraph,

15   Dr. Garcia writes, "Someone argued that this is

16   evidence for the quote, unquote, "deep state"."

17               Do you believe that there is a deep state

18   within the United States government?

19               MS. CASEY:  Objection to form,

20          argumentative.

21               THE WITNESS:  No, I have no opinion on

22          that, Mr. Ponce.

23   BY MR. PONCE:

24          Q    So there could be and you just don't have

25   an opinion or you think there is or is not?

Page 142

1           MS. CASEY:  Objection to form,

2        argumentative.  Asked and answered.

3           THE WITNESS:  I don't have an opinion.  I

4        watch a lot of movies as we all do.  But I don't

5        know what Dr. Garcia meant by this.

6    BY MR. PONCE:

7        Q    You don't know what he meant or you don't

8    agree with him?

9           MS. CASEY:  Objection to form.  Same

10       objection, argumentative.  Asked and answered.

11          THE WITNESS:  I don't have an opinion.

12   BY MR. PONCE:

13       Q    Can you flip to the next page of this

14   document, the one that is labeled HDC 1181 and it's a

15   photograph there.  Do you see that?

16       A    Can you give me the reference number one

17   more time, please?

18       Q    Yes, sir.  It's the second page of Exhibit

19   16 and at the bottom right corner it said HDC 1181.

20       A    Yes, sir.  Thank you.

21       Q    Do you see the photograph?

22       A    I do.

23       Q    Do you know who took this photograph?

24       A    I believe I do based on the conversations

25   we've had about this photograph.

1      Q    Who do you believe took this photograph?

2      A    I believe it was Mickael Behn's

3  grandmother.

4      Q    That would be William C. Behn's wife?

5      A    Yes, sir, I believe that to be the case.

6      Q    What is her name?

7      A    I don't have that right in front of me.  I

8  apologize.  I think it's Conchita.

9      Q    Is Mr. Conchita Behn still alive?

10      A    She is not.

11      Q    Have you ever spoken with her?

12      A    I have not.

13      Q    Do you know who the men are in this

14  photograph?

15      A    By name I only know one and that's the

16  gentleman sitting at the desk.  That is Mr. William C.

17  Behn.

18      Q    I guess so we are clear.  There are three

19  people seated at the desk.  You are talking about the

20  man on the left of the photograph?

21      A    Excuse me.  Yes, the man on left, that's

22  correct.

23      Q    So the men standing behind -- the men

24  standing in the background, you don't know who those

25  men are?

Page 144

1        A    I do not.  I believe them to be officers of

2    Havana Docks Corporation.

3        Q    Have you spoken to any of the people that

4    appear in this photograph?

5        A    I have not.

6        Q    Do you know the date on which the

7    photograph was taken?

8        A    I do not know the specific date.

9        Q    We are finished with that exhibit.

10        Have you, whether on behalf of Havana Docks

11    Corporation or otherwise, ever had communications with

12    someone affiliated with the U.S. government named Tim

13    Zuniga-Brown?

14        A    I have not.

15        Q    Have you ever heard of that name Tim

16    Zuniga-Brown?

17        A    Yes, sir, I have.

18        Q    Who do you understand Tim Zuniga-Brown to

19    be?

20        A    Presently his position, is that what you

21    are referring to?

22        Q    That wasn't the most artful question in the

23    world.

24        I have seen documents, communications

25    between Dr. Garcia-Bengochea and Mr. Zuniga-Brown in

Page 145

1    the context of Helms-Burton Act and I am trying to get

2    a feel of who Mr. Zuniga-Brown was at that time in the

3    government such that Dr. Garcia-Bengochea would be

4    corresponding with him about the Helms-Burton Act con?

5         A    I believe Mr. Zuniga-Brown, at least for a

6    time, took over the position as the head of the Cuba

7    desk that I am mentioned earlier that we met with the

8    head of the Cuba desk in December of 2017.  And I

9    believe going back to that testimony, Mr. Ponce, I may

10   have misspoken his name of the gentleman we met with.

11   I apologize.  I would like to check my notes.  I am

12   drawing a blank on his exact name.

13        Q    Was that person's name Gabriel Escobar?

14        A    Gabriel Escobar is correct.  I think I

15   incorrectly said in my testimony Gutierrez.  Gabriel

16   Escobar is correct.

17        Q    What was the date of that in-person

18   meeting, Mr. Johnson?

19        A    It was in December of 2017.  I don't have

20   the exact date in front of me.

21        Q    So to run back through the attendees now

22   that we got the name straightened out.  It was Mr.

23   Gabriel Escobar on behalf of the state department; is

24   that correct?

25        A    Yes, sir.

Page 146

1          Q     Ms. Albert or Ms. Alpert on behalf of the
2     state department?
3          A     Yes, sir.  I believe the last name is
4     Alpert, A-l-p-e-r-t.
5          Q     And then you were attending the meeting,
6     correct?
7          A     Correct.
8          Q     Dr. Garcia-Bengochea?
9          A     Yes, sir, that's correct.
10         Q     Those were the only four attendees at the
11    meeting?
12         A     Yes, sir, that's correct.
13         Q     How many times did you meet in person with
14    Mr. Escobar?
15         A     Only the one time in December of 2017.
16         Q     During that meeting, did Mr. Escobar tell
17    you that the American cruise lines were not trafficking
18    in the subject property in Havana?
19         A     He did not.
20         Q     During that in-person meeting, did Mr.
21    Escobar tell you that it was necessary for the American
22    cruise line to use the subject property in Havana?
23         A     He did not.
24               MR. PONCE:  Ben, can we pull up 1013.
25    BY MR. PONCE:

Page 147

1    Q    Mr. Johnson, I am going to show you a

2  document that's been marked for the deposition as

3  Exhibit 17.  It's a multipage document, a two-page

4  document, the first page of which has the Bates or

5  identification number of HDC 1013, and I will represent

6  to you on the record that this is a document that was

7  produced to us by Havana Docks Corporation.  If you can

8  take a second.  It's going to be more than a second.

9  Can you read through this document and then let me know

10  when you are ready for me to ask you some questions on

11  it?

12    A    I read through it quickly.

13    (Whereupon, the above referred-to document

14     was marked as Plaintiff's Exhibit 17.)

15  BY MR. PONCE:

16    Q    Can we flip to the last page of this email,

17  the last page which is marked 1014.  It looks like

18  that's an email from Mr. Escobar to Dr.

19  Garcia-Bengochea with a copy to Rachel Alpert.  Do you

20  see that?

21    A    Yes, I do.

22    Q    And in it Mr. Escobar says, "It was a

23  pleasure to meet with you yesterday."  Do you see that?

24    A    Yes.

25    Q    So in context does it seem like the

Page 148

1    in-person meeting you referred to was on December 20,

2    2017?

3         A    Yes, sir, I believe that would be correct.

4         Q    If we flip to the first page of the

5    document and that page is numbered as 1013.  We are

6    going to go to the sixth full paragraph, which begins,

7    "I am sorry."  You see where I am talking about?

8         A    Yes, I am reading now.

9         Q    Perfect.  Thank you.

10        A    Thank you.  I've read that paragraph.

11        Q    So that references a video of the CEO of

12   Norwegian Cruise Lines.  Do you recall what it is about

13   that video that Dr. Garcia-Bengochea is pointing out in

14   this paragraph?

15        A    Let me read the paragraph one more time.

16             I am not sure what Dr. Bengochea is

17   referring to about Mr. Escobar's response to the video.

18        Q    Having read this now, does that trigger

19   anything in your mind that Mr. Escobar said that it was

20   necessary for the American cruise lines to use the port

21   facilities in Havana?

22             MS. CASEY:  Objection to form.

23             THE WITNESS:  No, sir, it does not.

24   BY MR. PONCE:

25        Q    Let's go down three paragraphs there, what

Page 149

1    would be the ninth paragraph on this first page, the

2    paragraph that begins, "let's be intellectually

3    honest."  Let me read it out loud.  It says, "Let's be

4    intellectually honest and frank.  He was basically

5    confirming that they are trafficking and you should

6    have acknowledged that fact rather than double down on

7    the obviously incorrect position."

8            Did I read that correctly?

9        A    You did.

10       Q    What is your understanding of the position

11   that Mr. Escobar took during the meeting that Dr.

12   Bengochea is saying is obviously incorrect?

13           MS. CASEY:  Object to form, lacks

14           foundation.

15           THE WITNESS:  I don't know, Mr. Ponce.

16           That may have been, so to speak, a sidebar

17           conversation with Dr. Bengochea and Mr. Escobar

18           which happened in the meeting.  I was speaking

19           with Ms. Alpert over on one end of the office

20           for a bit.  I don't recall this conversation or

21           was not party to it.  I don't remember.

22   BY MR. PONCE:

23       Q    In the email we are looking at on this page

24   1013, you are copied on that email, correct?

25       A    Yes, sir.

Page 150

1    Q    After you received this email, did you ask
2    Dr. Garcia-Bengochea what is he talking about here,
3    what did Gabriel Escobar say to you?
4    A    I apologize, Mr. Ponce, I don't recall.
5         As you can tell, there were a lot of emails
6    over the years.  I don't remember.
7    Q    But these were the only emails that were
8    sent, the one two days after the only in-person meeting
9    with the state department, correct?
10   A    Yes, I am speaking in general terms.  I
11   don't remember follow-up on specific email including
12   this one.
13   Q    And you don't recall any conversation with
14   Dr. Garcia-Bengochea after the in-person meeting where
15   he said that Gabriel Escobar he said they are necessary
16   to use in there, that's probably contrary to what CEO
17   of Norwegian Cruise Line said?
18        MS. CASEY:  Objection to form, lacks
19        foundation.
20        THE WITNESS:  I don't recall any such
21        conversation, Mr. Ponce.
22        MR. PONCE:  Ben, let pull up 83, please.
23             (Off the record)
24             (Back on the record.)
25   BY MR. PONCE:

1        Q    Mr. Johnson, I am showing you a document

2    that has been labeled as Exhibit 18 for the deposition.

3    It's a multipage document.  The first page of which at

4    the bottom right corner has the Bates or identification

5    number HDC 83.  And I will represent to you in the

6    record that this is a document that was produced to us

7    by Havana Docks.  So if you could take however long you

8    need to take, kind of thumb through this and get a

9    sense of it and let me know when you are ready for me

10   to ask you a couple of questions about it.

11       A    Thank you, Mr. Ponce.  I have scanned

12   through it very quickly.

13       (Whereupon, the above referred-to document

14        was marked as Plaintiff's Exhibit 18.)

15   BY MR. PONCE:

16       Q    We can skip to the last page -- well, let

17   me ask you this before you skip anywhere.

18            Have you seen this document before?

19       A    Yes, sir, I believe I have.

20       Q    What do you understand this document to be?

21       A    As I recall, this was produced by Dr.

22   Bengochea.  I can't remember the exact context in which

23   he used it.

24       Q    So now if we can, let's skip to the last

25   page of this document and that last page has the number

Page 152

1    HDC 85 at the bottom right-hand corner.  Let me know

2    when you are there.

3            A    Yes, sir.  I am there.

4            Q    It's signed albeit and typed, signed Javier

5    Garcia-Bengochea, M.D. representing the port of

6    Santiago de Cuba.  Then beneath that it says, "Mickael

7    Behn and Jerry Johnson representing the Havana Docks

8    Corporation."  Did I read that correctly?

9            A    Yes, sir, you did.

10           Q    This would have your name?

11           A    Yes, sir, that's correct.

12           Q    If we go to the second page of this

13   document, in that second page on the bottom right

14   corner it has HDC 84 identification number on it.  And

15   it's the third partial paragraph on that page and I

16   will read it aloud.  It says, "Heretofore the state

17   department has asserted that the use of the confiscated

18   port properties in Cuba has been, quote, unquote,

19   "necessary" to the conduct of such travel that is

20   allowed for in the law."

21               Did I read that correctly?

22           A    Yes, you did.

23           Q    Do you disagree with the assertion in this

24   letter that went out over your name that the state

25   department has here before asserted that the use of the

1    confiscated port properties in Cuba was necessary to

2    the conduct of such travel as allowed for in the law?

3                    MS. CASEY:  Objection to form.  Lacks

4              foundation.

5                    THE WITNESS:  I can't remember the exact

6              context of when this letter was formed.  The

7              timing of this letter, there was an email

8              correspondence which I think we produced to you

9              that was from a representative at the state

10             department that used the term necessary in that

11             email.

12   BY MR. PONCE:

13        Q    I appreciate that.  Let me go back to my

14   question.

15                   Do you dispute that the state department

16   asserted that the use of the confiscated port

17   properties in Cuba was quote, unquote, necessary for

18   the conduct of such travel as allowed for in the law?

19        A    That's why I gave you that reference in the

20   email where the word necessary was used.  To the best

21   of my remembrance, that's the only time that I've seen

22   or heard that word used by the state department.

23                   MR. PONCE:  Ben, can we pull up 1328.

24                   MR. TAORMINA:  It's up.

25   BY MR. PONCE:

Page 154

1          Q    Mr. Johnson, I am going to show you what's
2     been marked to the deposition as Exhibit 19.  It's a
3     multipage document, the first page of which at the
4     bottom right corner has the Bates or identification
5     number HDC 1328.  Please take as much time as you would
6     like to thumb through this and get a sense of what it
7     is and in the for what it's worth department, I am only
8     going to ask you about the email that appears at the
9     top of the first page.
10         A    Okay.  Thank you.  Give me just a moment to
11    scroll through the email.
12              Thank you, Mr. Ponce, I will attempt to
13    answer your question.
14         (Whereupon, the above referred-to document
15           was marked as Plaintiff's Exhibit 19.)
16    BY MR. PONCE:
17         Q    So the top email, let me say that better.
18    The email at the top of the first page, which is number
19    1328, looks to be an email from Dr. Garcia-Bengochea to
20    Mickael Behn.  Do you see that?
21         A    Yes, sir, I do.
22         Q    You are not -- don't appear to be copied on
23    this email, correct?
24         A    That's correct.
25         Q    Have you nonetheless seen this email

Page 155

1    before?

2         A    I don't recall, Mr. Ponce.

3         Q    I am going to read aloud the last sentence

4    of this email.  "The state department lawyer

5    specifically told me they viewed docking on our

6    property as quote, unquote, "necessary" and so they

7    wouldn't consider it trafficking."

8              Did I read that correctly?

9         A    Yes, sir, you did as is stated on the

10   document.

11        Q    Do you have any reason to disagree with

12   that statement by Dr. Garcia-Bengochea that that's what

13   the state department lawyer told him?

14             MS. CASEY:  Objection to form, lacks

15             foundation and asked and answered.

16             THE WITNESS:  I have no reason not to

17             believe Dr. Bengochea.  He's a man of high

18             integrity.  I have no reason to dispute what he

19             has written here on this form.  However, I will

20             note for you that that email occurred in April

21             of 2017 well before our trip to the state

22             department so I don't know what Dr. Bengochea is

23             referring to when he says that the state

24             department, lawyers specifically told me and so

25             forth.  I don't know what he means.

Page 156

1    BY MR. PONCE:

2        Q    Have you ever communicated by email or

3    otherwise with someone from the state department named

4    Dianna Kim?

5        A    I believe so.

6        Q    Do you have any recollection of who Dianna

7    Kim was?

8        A    I am not sure what her position was in the

9    state department.  As I understand, she temporarily

10   filled what I have been referring to today as the Cuba

11   desk, but I am not 100 percent sure on that.

12            MR. PONCE:  Ben, can you pull up 14361.

13            THE WITNESS:  Will this be Exhibit Number

14       20?

15            MR. TAORMINA:  That's correct.

16            (Whereupon, the above referred-to document

17        was marked as Plaintiff's Exhibit 20.)

18   BY MR. PONCE:

19       Q    Mr. Johnson, I am going to show you a

20   document that's been marked for the deposition as

21   Exhibit 20.  It is a multipage document, the first page

22   at which at the bottom right corner has Bates HDC

23   14361.  And I will represent to you in the record that

24   this is a document that Havana Docks Corporation

25   produced to us.  I would like you to take a look at as

1   much of the email as you care to take a look at.  My

2   questions to you are going to focus on the email that

3   appears on the first page of the document, but that is

4   not a reason why you shouldn't take as much time as you

5   want to read this entire document in as much detail as

6   you would like.

7          A    Yes, sir, thank you.

8          (Whereupon, the above referred-to document

9           was marked as Plaintiff's Exhibit 20.)

10  BY MR. PONCE:

11         Q    So I would like to look at -- before we

12  look at anything.  Does looking at this remind you at

13  all of whether you corresponded by email or otherwise

14  with Ms. Dianna Kim?

15         A    Yes, if you consider that I was copied on

16  this email with her.

17         Q    Did you ever meet Ms. Kim in person?

18         A    No, sir, I did not.

19         Q    Ever speak with her on the phone?

20         A    No, sir, I don't recall that I did.

21         Q    So I would like to look at this email on

22  the first page of this document and that page is

23  labeled 14361.  And it's an email that says it's

24  written by Dianna Kim and it's addressed to Mr. Johnson

25  and Dr. Garcia.  So Mr. Johnson would be you, correct?

1    A    Yes, sir.

2    Q    And as we are looking at this, the email --

3  in the email, Ms. Kim identifies herself as the acting

4  coordinator for Cuban affairs, correct?

5    A    Yes, sir, that's correct.

6    Q    How did it come to be that you and she were

7  having this email exchange, do you recall?

8    A    I am sorry.  Mr. Ponce, you cut out just a

9  little bit there.  Would you mind restating?

10    Q    I am sorry.  Do you recall how it came to

11  be or what the circumstances were that saw you and

12  Ms. Kim exchanging emails with each other?

13    A    Yes, this email chain indicates, I believe

14  Mr. Escobar left for another assignment and I believe

15  that's why Ms. Kim into the email exchange.

16    Q    So I am going to read aloud a sentence from

17  just about the middle of Ms. Kim's email.  I am going

18  to read the entirety of the sentence aloud.  We may go

19  in and talk about portions of it.

20         So there is a sentence in her email that

21  says, "As previously discussed given the clear

22  exclusion in title 4's definition of traffics of

23  transactions and uses of property, incidents and lawful

24  travel to Cuba, we are not currently pursuing title 4

25  actions in relation to commercial cruise lines."

Page 159

1              So let's start at the beginning of that.
2    Do you see where in the beginning of that sentence she
3    says as previously discussed?
4         A    Yes.
5         Q    Do you know to what previous discussions
6    she is referring?
7         A    I do not.
8         Q    You don't recall having ever had any
9    discussions with her, correct?
10        A    Yes, sir, that's correct.
11        Q    So it could be she is referring to previous
12   discussions between the state department folks
13   generally and you and Dr. Garcia-Bengochea, correct?
14             MS. CASEY:  Objection to form, calls for
15             speculation.
16             THE WITNESS:  I am not sure what she is
17             referring to, Mr. Ponce.
18   BY MR. PONCE:
19        Q    She refers here to the definition of
20   traffics and says, "Given the clear exclusion and title
21   4's definition of traffics."
22             Do you know what the definition of traffics
23   is in title 4?
24        A    I don't have the title 4 up in front of me.
25   We can call it up and look at it if you would like.

Page 160

1      Q    No, just if you remember.  I mean, do you

2   recall what the -- you might not.  It's not a trick

3   question.

4           Do you recall what the definition in title

5   4 is of traffics?

6           MS. CASEY:  Objection to form, asked and

7       answered.

8           THE WITNESS:  I don't specifically on title

9       4.

10  BY MR. PONCE:

11     Q    And do you recall if the definition of

12  traffics in title 3 is different than the definition of

13  traffics in title 4?

14          MS. CASEY:  Objection to form, asked and

15      answered.

16          THE WITNESS:  I apologize.  I did not look

17      at those two titles in preparation for the

18      deposition today, so I do not recall if there is

19      a difference.

20  BY MR. PONCE:

21     Q    Do you understand the sentence that I read

22  to you or her email as a whole as saying the state

23  department didn't consider the use of the port

24  facilities in Cuba as trafficking?

25          MS. CASEY:  Objection to form,

Page 161

```
 1          mischaracterizes the document.
 2               THE WITNESS:  Mr. Ponce, would you mind to
 3          try me one more time on that question or have
 4          the question read back?
 5    BY MR. PONCE:
 6          Q    Of course.  I will repeat it.
 7               Did you understand in that sentence Ms. Kim
 8    to be saying that the state department did not consider
 9    the American cruise lines use of the confiscated port
10    facilities in Cuba to be trafficking as that term is
11    defined in the statute?
12               MS. CASEY:  Objection to form.
13               THE WITNESS:  Respectfully, I am not sure
14          who Ms. Kim is, what authority she had to write
15          this email, what their conferences were on this
16          issue.  She gave no background information of
17          making this statement.  So to answer your
18          question, I am not sure -- I am not sure what
19          this statement is.
20    BY MR. PONCE:
21          Q    So be that as it may, that's certainly what
22    she wrote there, correct?
23          A    That is what she wrote there.
24          Q    Let's go to the email that appears on the
25    top of this page 14361, which appears to be an email
```

Page 162

```
 1    from Dr. Garcia-Bengochea responding to Ms. Kim on

 2    August 2nd, 2018.  And it looks like you are copied on

 3    that, do you see where I am looking now?

 4         A    Yes, sir, I do.

 5         Q    Did I get that right with the sender and

 6    the date and the recipient and the cc'd on there?

 7         A    Yes, sir, I do.

 8         Q    Can you take a second and just read that

 9    top part of that email to yourself?

10         A    Yes.  I would be glad to answer a question

11    if I can.

12         Q    Dr. Garcia-Bengochea in that first, I don't

13    know if you call it paragraph or line.  And in that

14    first line of paragraph of that email seems to be

15    voicing his disagreement with that reply, is that fair

16    to say?

17         A    Yes, I believe that is fair to say.

18         Q    In the second paragraph in that last

19    sentence again refers to the CEO of Norwegian Cruise

20    Lines is on a video and a conference asserting this

21    very fact completely contradicting you.

22              What is it that the CEO of Norwegian Cruise

23    Lines said on the video, does that remind you at all of

24    what he said?

25         A    I am familiar with what he said on the
```

1    video if that's your question.

2         Q    Okay.  Yes.  What is your recollection of

3    what the CEO of Norwegian Cruise Lines said on the

4    video?

5         A    Would you mind to frame that -- if you can,

6    would you mind to frame that question in a specific

7    context of what you would like me to answer?

8         Q    I haven't seen the video.  Rereading in

9    context here, did the CEO of Norwegian Cruise Lines at

10   a conference make a statement about whether using port

11   facilities in Cuba was necessary or incident to travel

12   to Cuba?

13        A    In my opinion he did.

14        Q    What is your recollection of what he said

15   on that score?

16        A    It would be paraphrasing his comments, if I

17   may.  But he was asked that question specifically by

18   the moderator and he answered something along the

19   lines, port facilities are nice but they are not

20   necessary.

21        Q    In a context of Ms. Kim's email that we

22   just went over and Dr. Garcia-Bengochea's response to

23   her saying that that statement by the CEO of Norwegian

24   completely contradicted Ms. Kim.  Ms. Kim appears to be

25   saying that the use of the port facilities in Cuba is

                                                      Page 164

1     incident or necessary to travel to Cuba; is that
2     correct?
3                    MS. CASEY:  Objection to form.
4                    THE WITNESS:  Again, in all due respect to
5                Ms. Kim, it seems to be that's what she is
6                saying.  But I don't know who she is, what
7                authority she has to make that statement.  There
8                is no documentation supporting her statement.
9                And if you will read on, if I may, in her email
10               to where she says, "As we receive multiple
11               requests for title 4 enforcement and we are
12               operating under limited resources.  We
13               prioritize cases according to the number of
14               factors, including the availability of
15               information and assessment and the strength of
16               title 4 cases."
17                   I took to mean that she just blew us off
18               and I am not sure if anybody ever really looked
19               at our issue.  We asked them over and over for
20               our case file, a case number.  They never
21               produced anything for us.  And then we mentioned
22               Zuniga-Brown earlier in the deposition when he
23               came to be at the Cuba desk, as I recall, Dr.
24               Garcia followed up with him and he had no file
25               on us.  So I don't know how a reasonable person

Page 165

1        would interpret all of those facts.

2    BY MR. PONCE:

3        Q    So I wrote down as best as I could.  It

4    sounded to me like you just said there was no

5    documentation supporting her statement.  What

6    documentation would you have expected to see?

7        A    For example, that would just be my personal

8    thought process.  But it would have been nice to see

9    meeting notes of, you know, state department officials,

10   what secretary of state Pompeo said about it.  All we

11   have is this lady, Dianna Kim, so that's not much

12   respectfully.

13       Q    When I look at, again, the top of this page

14   on the cc line, and Scott, you, Jerry Johnson and it

15   lists your email address as

16   jjohnson@bankofthebluegrass.com.  Did you

17   interchangeably use havanadocks.com email address and

18   bankofthebluegrass.com email address when making --

19       A    No, sir.

20       Q    I am sorry.  Let me start again.

21       A    I am sorry.  Go ahead.

22       Q    On the cc line of the email, it identifies

23   the email address to which it is being sent as

24   jjohnson@bankofthebluegrass.com.  How did you -- did

25   you interchangeably use bankofthebluegrass.com email

Page 166

1    address and Havana Docks' email address when

2    transacting business on behalf of Havana Docks

3    Corporation?

4         A    I wouldn't say that it was interchangeably

5    used.  There was, as we transitioned over to the Havana

6    Docks Corp email portal, there still were some email

7    exchanges where people had my bankofthebluegrass email

8    address that I received for a time.  But that

9    transition has been completely made over to

10   havanadockscorp.com.  And I believe that portal for

11   havanadockscorp.com occurred in 2018.

12              MS. CASEY:  Scott, since it seems like

13         maybe we are transitioning to another document

14         or another area, can we have like a five minute

15         comfort break?

16              MR. PONCE:  Yes.  Can we do it in five

17         minutes?

18              MS. CASEY:  Yes, of course.  I am sorry.  I

19         thought we had just finished this.

20              MR. PONCE:  Ben, can we pull up 1498.

21   BY MR. PONCE:

22         Q    Mr. Johnson, I am showing you what has been

23   marked for the deposition as Exhibit 21.  It's a

24   multipage document, the first page of which at the

25   bottom right corner has the Bates or identification

1    number HDC 1498.  And I will represent to you in the

2    record that this is a document that Havana Docks

3    produced to us.  Take as much time as you would like to

4    thumb through this.  I am going to ask you kind of

5    targeted questions about specific portions of it.  But

6    I want to make sure that you feel comfortable with it

7    so you know what this is before we jump into it.

8             A    Thank you, Mr. Ponce.  It's a rather

9    lengthy document.  I scanned it again quickly.

10                       (Whereupon, the above referred-to document

11            was marked as Plaintiff's Exhibit 21.)

12   BY MR. PONCE:

13            Q    Okay.  On the first page of the document,

14   that page is number 1498, the second paragraph said

15   "That I am particularly grateful for the opportunity to

16   testify as the owner of the port of Santiago de Cuba in

17   representing the owners of the Havana Docks Corporation

18   and the principal court in Havana."  Did I read that

19   right?

20            A    Yes, sir, you did.

21            Q    With the benefit of that statement, does

22   this appear to be something that Dr. Bengochea wrote?

23            A    Yes, sir, that's correct.

24            Q    Have you seen this document before?

25            A    I don't recall that I have seen this

Page 168

1    specific document.

2         Q    Can you flip, please, to the fourth page of

3    this document in the bottom right corner of that page

4    has the Bates identification number 1501.

5         A    Yes, sir.

6         Q    The second full paragraph on this page

7    says, "On three separate occasions when I presented

8    these facts to state department officials and requested

9    a title 4 action against the foreign executives and

10   directors of the cruise lines, state officials

11   determined without any investigation that it was

12   necessary for the cruise lines to use our properties to

13   cruise Cuba.  This occurred even after showing them the

14   video of Norwegian CEO, specifically and unequivocally

15   refuting that assertion."  Did I read that correctly?

16        A    Yes, sir, you did.

17        Q    Again, is this Dr. Garcia-Bengochea

18   recounting instances of people at the state department

19   telling him that it was necessary for the cruise lines

20   to use the confiscated port facilities in order to

21   cruise to Cuba?

22             MS. CASEY:  Objection to form, lacks

23        foundation.

24             THE WITNESS:  I am not sure how to

25        interpret your question.  I will do my best with

Page 169

1              the answer if you wouldn't mind to try to reform

2              the question a bit if you can.

3       BY MR. PONCE:

4              Q    Sure.  Is this another instance of Dr.

5       Garcia-Bengochea recounting that someone at the state

6       department told him that they believed it necessary for

7       the American cruise lines to use the confiscated port

8       facilities to cruise to Cuba?

9              MS. CASEY:  Objection to form.

10             THE WITNESS:  It appears to be so, but I

11             would point out to you his clarifier that he

12             puts in that paragraph without any

13             investigation.

14      BY MR. PONCE:

15             Q    Well, what does that mean, without any

16      investigation?

17             MS. CASEY:  Objection to form, lacks

18             foundation.

19             THE WITNESS:  Getting back to my earlier

20             testimony, we don't know what they base that.

21             What it appears that Dr. Bengochea is stating

22             here about the comment on being necessary, we

23             don't know how they base that.

24      BY MR. PONCE:

25             Q    You don't know that they didn't conduct an

Page 170

1    investigation, correct?

2         A    We don't know what they did.

3         Q    All right.

4              MR. PONCE:  I think now is the time for the

5         comfort break, Ms. Casey.

6              THE VIDEOGRAPHER:  We will go off the

7         record at 3:53.

8                   (Off the record.)

9                   (Back on the record.)

10             THE VIDEOGRAPHER:  Back on the record at

11        4:00.

12   BY MR. PONCE:

13        Q    Mr. Johnson, has Havana Docks Corporation

14   had any communications with the Cuban government

15   relating to any aspect of the Helms-Burton Act or the

16   cruise lines' use of the subject property?

17        A    They have not.

18        Q    Can we look at Exhibit 8 with which any

19   luck at all is the amended complaint.  And specifically

20   I would like to look at number paragraph 22 which

21   appears on page 8.

22                   (Off the record.)

23                   (Back on the record.)

24   BY MR. PONCE:

25        Q    Mr. Johnson, do you see paragraph 22 of the

Page 171

1   amended complaint on page 8 of that document?

2        A    Yes, sir, I do.

3        Q    And in it, it says, "The defendant

4   knowingly and intentionally commenced, conducted and

5   promoted its commercial cruise line business to Cuba

6   using a subject property by regularly embarking and

7   disembarking its passengers on the subject property."

8             I know we talked about this at length

9   earlier and I don't want to go back through it, but the

10  embarking and disembarking as passengers on the subject

11  property is what we talked about earlier, people

12  getting on and off a cruise ship, going through

13  customs, the specifics acts that we talked about

14  earlier, correct?

15       A    Yes, sir, correct.

16       Q    Now, where it says at the beginning of what

17  I just read, "The defendant knowingly and intentionally

18  did that."

19            Explain to me, if you can, what that means

20  that they knowingly and intentionally did what?

21            MS. CASEY:  Objection to form, vague.

22            THE WITNESS:  If I understand your

23            question, Mr. Ponce, we would contend that Royal

24            Caribbean knew that we had a claim on the

25            subject property, a certified claim and that in

Page 172

```
 1            order to use that property, they were supposed
 2            to contact us.
 3    BY MR. PONCE:
 4            Q    And in paragraph 3 of the same exhibit,
 5    which is the amended complaint.  "Information and
 6    belief beginning on or about April 23rd, 2017, the
 7    defendant also knowingly and intentionally participated
 8    in and profited from the Communist Cuban government
 9    possession of the subject property without the
10    authorization of plaintiff or any U.S. national who
11    holds a claim to the subject property."
12            Again, that's the embarking and
13    disembarking passengers and the specific acts that you
14    mentioned earlier in the deposition?
15            A    Yes, sir, that's correct.
16            Q    Again, the words there, "the knowingly and
17    intentionally," your understanding is that that relates
18    to Royal Caribbean knew that you had a certified claim
19    for the subject property; is that correct?
20            A    Yes, sir, that's correct.
21            Q    All right.
22            MR. PONCE:  Ben, can you pull up the
23            statute, the 22 USC 6023.  I apologize.  This is
24            going to be a little bit of a slog but I got to
25            go through it.
```

```
 1              MR. TAORMINA:  It's up.
 2         (Whereupon, the above referred-to document
 3          was marked as Plaintiff's Exhibit 22.)
 4    BY MR. PONCE:
 5         Q    Mr. Johnson, I am showing you what has been
 6    marked for the deposition Exhibit 22.  This is a copy
 7    of a federal statute 22, United States Code section
 8    6023 which is part of the LIBERTAD Act or the
 9    Helms-Burton Act, whatever you would like to call it
10    and I am going to have a couple of questions about a
11    specific part of this.  The questions I am going to
12    have for you are on the second page of this exhibit and
13    so the document, each page of the document has kind of
14    a left column and a right column.
15              On second page of the document, the bottom
16    of the left column, you will see that there is a
17    parentheses number 13 with traffic appearing after it?
18         A    Yes, sir.
19         Q    It says a person, quote, unquote, "traffics
20    and confiscated property if that person knowingly and
21    intentionally."  And then it goes to a Roman Numeral i.
22              Do you see that, lower case Roman Numeral i
23    in the top of the column?
24         A    Yes, sir, I do.
25         Q    So in context and following through from
```

Page 174

1    the left column , it says, "A person traffics and

2    confiscated property.  If that person knowingly and

3    intentionally" and the first word there is, "sells --

4    blah, blah, blah "the confiscated property."

5              It's not your contention that Royal

6    Caribbean sold the subject property, correct?

7         A    Yes, sir, that is correct.  That is not our

8    contention.

9         Q    Next one transfers.  It's not your

10   contention that Royal Caribbean transferred the subject

11   property, is it?

12        A    That's correct.

13        Q    It's not your contention that Royal

14   Caribbean distributes the subject property, is it?

15             MS. CASEY:  I am going to object that these

16        call for conclusions, legal conclusions.

17             THE WITNESS:  I was just going to say the

18        same.

19             Mr. Ponce, respectfully, we are getting

20        into some legal definitions now that I am

21        probably not comfortable in answering.

22   BY MR. PONCE:

23        Q    Well, as a factual matter, are you aware of

24   Royal Caribbean distributing the subject property?

25             MS. CASEY:  Same objection, calls for a

Page 175

1          legal conclusion.

2                    THE WITNESS:  I am not aware.

3     BY MR. PONCE:

4          Q    Are you aware of anything that you would

5     say that Royal Caribbean did as dispensing the subject

6     property?

7                    MS. CASEY:  Same objection.

8                    THE WITNESS:  I am not sure what the legal

9               definition of dispenses means, Mr. Ponce, as

10              it's used in this statute so I can't comment.

11    BY MR. PONCE:

12         Q    In your day-to-day understanding of the

13    word dispenses, did Royal Caribbean do anything that

14    you are aware of that you would describe as dispensing

15    the subject property?

16                   MS. CASEY:  Same objection.

17                   THE WITNESS:  Again, I am not sure what

18              legal context this word is used here, Mr. Ponce,

19              so I am not going to answer it, respectfully.

20    BY MR. PONCE:

21         Q    And equally respectfully, if I went through

22    every word in this lower case Roman Numeral i, would

23    your response be the same?

24         A    I think that response would be appropriate

25    given that we are looking at many words that I believe

Page 176

1    require a legal analysis.

2         Q    So it gets back to as we talked about

3    earlier, what your, you being Havana Docks, what your

4    contention is that Royal Caribbean was doing a specific

5    act as you mentioned earlier in the deposition?

6              MS. CASEY:  Objection to form.  Unclear.

7              THE WITNESS:  When you talk about specific

8         acts that was mentioned earlier in the

9         deposition, can you give me reference on one or

10        two?

11   BY MR. PONCE:

12        Q    Sure.  It was disembarking and embarking

13   the passengers and then going through customs there,

14   there were specific acts that you mentioned there?

15        A    Yes, sir.  That is correct.

16        Q    If we go to the same statute.  Instead of

17   the lower case Roman numeral i, we are going to go to

18   lower case Roman numeral ii, which reading over from

19   the introduction said, "the first in traffics

20   confiscated property if that person knowingly and

21   intentionally engages in a commercial activity, using

22   or otherwise benefiting from confiscated property."

23             Is it your contention that Royal Caribbean

24   by doing the specific acts that we talked about is

25   engaging in commercial activity using or other

Page 177

1    otherwise benefiting from the property?

2              MS. CASEY:  Objection to form.

3              THE WITNESS:  I believe that also calls for

4         a legal analysis, Mr. Ponce.  But I would say

5         yes, we do contend on Roman numeral II that that

6         is correct.

7    BY MR. PONCE:

8         Q    Then Roman numeral III, I assume your

9    answer would be the same, that you are contending Royal

10   Caribbean traffics because it's doing the specific acts

11   that we have been talking about?

12             MS. CASEY:  Objection to form.

13             THE WITNESS:  Yes, we believe that Royal

14        Caribbean was engaged in the specific acts that

15        we talked about earlier.  As to Roman numeral

16        III, again, I think that calls for a legal

17        analysis.  And also I might add our discovery is

18        still ongoing, I believe, as to exactly what

19        actions Royal Caribbean undertook on our

20        property.

21   BY MR. PONCE:

22        Q    We are done with that part of that section.

23             Mr. Johnson, was Royal Caribbean from 2017

24   through 2019 lawfully traveling to Cuba?

25             MS. CASEY:  Objection to form, calls for a

Page 178

```
 1          legal conclusion.
 2                  THE WITNESS:  I believe that Royal
 3          Caribbean has raised that as an affirmative
 4          defense.  I don't have an opinion on that.
 5          That's not our opinion to make.
 6     BY MR. PONCE:
 7          Q    Is it your position, your being Havana
 8     Docks that Royal Caribbean is factually incorrect in
 9     saying it lawfully traveled to Cuba?
10                  MS. CASEY:  Objection to form, vague and
11          ambiguous.
12                  THE WITNESS:  Was the question factually --
13          do we believe that Royal Caribbean was factually
14          incorrect?
15     BY MR. PONCE:
16          Q    Yes.
17                  MS. CASEY:  Objection to form.
18                  THE WITNESS:  We believe that Royal
19          Caribbean's travel using our property was not
20          legal.
21     BY MR. PONCE:
22          Q    What is the factual basis for that?
23          A    Respectfully, Mr. Ponce, I believe those
24     issues will come out in trial.
25          Q    Well, that might be.  But what are the
```

Page 179

1    factual basis for your statement?

2              MS. CASEY:  Objection to form.  I am not

3         sure what the question is.

4              MR. PONCE:  Madam Court Reporter, will you

5         please read back the last question to which Mr.

6         Johnson answered that that would come out at

7         trial?

8      (Whereupon, the above referred-to question was read

9              back by the court reporter.)

10   BY MR. PONCE:

11        Q    Do you know whether between 2017 and 2019

12   United States law allowed for cruise ships to take

13   passengers to Cuba?

14             MS. CASEY:  Objection to form, calls for

15        legal conclusion.

16             THE WITNESS:  I do not in terms of if you

17        are referring to specific law.

18   BY MR. PONCE:

19        Q    Are you aware of whether from 2017 through

20   2019 it was lawful for cruise lines to travel to take

21   passengers to Cuba?

22             MS. CASEY:  Objection to form.

23             THE WITNESS:  I am not sure on the

24        structure of how the cruise lines were allowed

25        to travel to Cuba.

Page 180

1            As I understand, President Obama lifted the
2       travel restrictions but I am not sure if that
3       was by executive order.  I am not aware of any
4       law.
5   BY MR. PONCE:
6       Q    Do you know whether Royal Caribbean was
7   required by the Cuban government to use the San
8   Francisco pier in Havana?
9       A    I do not.
10      Q    Are you aware of whether Royal Caribbean
11  used the San Francisco pier in Havana in the marginal
12  building in any other part of the subject property for
13  any purpose other than in its cruise business to
14  Havana?
15      A    For any other purpose other than its cruise
16  business?
17      Q    Yes.
18      A    I am not aware.
19      Q    Mr. Johnson, what was the value of the
20  subject property at the time the Cuban government
21  confiscated it in 1960?
22      A    You are referring to the value as set forth
23  in the certified claim which is the value that I am
24  familiar with.  I believe it was 9,000,179.
25      Q    Mr. Johnson, do you know what the fair

1    market value of the subject property was at the time

2    that it was confiscated by the Cuban government in

3    1960?

4        A    Other than a reference to the valuation

5    report that we spoke of earlier today in the deposition

6    that was prepared for us in conjunction with the filing

7    of the certified claim, and I don't have that right in

8    front of me.  But as I recall that valuation indicated

9    an amount of some over 16 million.

10       Q    Do you know or what would you say was the

11   fair market value of the subject property on August 27,

12   2019?

13       A    We have not made any such valuation for

14   that date, to my knowledge, Mr. Ponce.

15       Q    Similar question, do you know what the fair

16   market value of the subject property was on April 20,

17   2020?

18       A    Also, to my knowledge, we have not made any

19   valuation of the property as of that date.

20       Q    Do you anticipate that you will be using an

21   expert witness to provide those valuations?

22           MS. CASEY:  Object to form and Mr. Johnson,

23       that invades work product protection and I will

24       instruct you not to reveal any work product

25       protected information at this time.

Page 182

1    BY MR. PONCE:

2         Q    Okay.  Let me try again.

3              Do you anticipate calling an expert witness

4    to testify at trial regarding the fair market value of

5    the property in either or any of the time of

6    confiscation in 1960 on August 27, 2019 or April 20th,

7    2020?

8              MS. CASEY:  Objection.  Mr. Johnson, I will

9         instruct you not to answer that question as it

10        would reveal work product protected information

11        at this time.

12             THE WITNESS:  Mr. Ponce, based on the

13        advice of our counsel, I respectfully decline to

14        answer that question.

15             MR. PONCE:  Okay.  Ben, can we put up the

16        interrogatory responses, please.

17        (Whereupon, the above referred-to document

18          was marked as Plaintiff's Exhibit 23.)

19   BY MR. PONCE:

20        Q    Mr. Johnson, I am going to show you what's

21   been marked for the deposition as Exhibit 23.  I will

22   represent to you these are Havana Docks Corporation's

23   answers and objections to Royal Caribbean's first set

24   of interrogatories.  And feel free to look through them

25   as much as you would like.  I am going to ask you a

Page 183

1   question about a specific one of these.  Take a look

2   through them and then when you kind of generally thumb

3   through them and satisfy yourself, it's Havana Docks'

4   signed interrogatory responses.  I would like you to

5   take a look at interrogatory number 7, which begins at

6   the bottom of page 5.

7        A    Yes, sir.  Thank you.  I reviewed these

8   responses yesterday in anticipation of the deposition

9   today so I am somewhat familiar.  If you would, just

10  give me a moment to look at number 7.

11       Q    Yes, sir.

12       A    Yes, sir.  Thank you.  I will do my best to

13  answer your questions on this section.

14       Q    Let me give you a little bit of

15  introduction here so I can try to navigate us through

16  this as quickly as I can.

17            These interrogatories were propounded by

18  Royal Caribbean and answers by Havana Docks Corporation

19  at the time where the object of the complaint -- it was

20  the initial complaint.  So what I mean Havana Docks

21  Corporation had not yet filed its amended complaint

22  when these responses were shown on December 2nd, 2019.

23            So interrogatory number 7 asks, "With

24  respect to the amounts referred to in paragraphs 20

25  (a)(i) through a (iii) of the complaint, quantify each

Page 184

1    amount and explain how you calculate each amount,

2    including an identification of the documents you used

3    to support the quantification and explanation."

4              So I will represent to you that paragraphs

5    20 (a)(i) through 20 (a)(i)(iii) of the initial

6    complaint are exactly what's in paragraph 32 (a)

7    through (c) of the amended complaint.  And I've got the

8    initial complaint.  I could show you if you would like

9    to see it.  We got the amended complaint already as an

10   exhibit.  I am happy for you to take the time to

11   satisfy yourself that the interrogatories referenced to

12   paragraph 20 (a)(i) through (iii) correspond perfectly

13   to the amended complaints paragraph 32 (a)(i) through

14   (iii).

15        A    I will take your word for it, Mr. Ponce, if

16   that's suitable to our counsel.

17             MS. CASEY:  Yes, that's fine with me.

18   BY MR. PONCE:

19        Q    So that was the question which I just read.

20   And then in response there was a written response to

21   interrogatory number 7 that begins on page 6 and runs

22   through page 7.  And I will ask you the question and

23   then you can take as much time as you want to answer

24   it.

25             Do you have any updates or changes to make

1    to the calculation of damages as set forth in this

2    response to interrogatory number 7?

3         A    No, sir, I don't think we do.  I am sorry.

4    Did someone make a comment?

5         Q    I did.  I threw an if you know at the end

6    of my question.

7         A    I don't believe we do, Mr. Ponce, other

8    than the point that came up in your prefaced comments

9    about the filing of the amended complaint on December.

10   As you can see here on this document that we are

11   looking at, the calculations that we present here, I

12   believe are based on the date of the original filing of

13   the complaint, August 27th, 2019.

14        Q    Have you run these numbers out?  Do you

15   have any update to give me running these numbers out

16   through the filing of the amended complaint?

17        A    We do not.

18        Q    All right.  So I talked earlier about

19   famous attorney's last words.  I am going to give

20   another one now.  This may be it.  Let me confer

21   offline with my colleague to see if we got anything

22   more.  But if this is not the end, you can definitely

23   see it from here.

24             MS. CASEY:  It's the end of the beginning.

25             MR. PONCE:  I heard that somewhere.  It's

Page 186

1        not the beginning of the end, that's for sure.

2                MS. CASEY:  Gosh, I hope not.

3                MR. PONCE:  Let's come back in five

4        minutes.

5                THE VIDEOGRAPHER:  Off the record at four

6        4:29.

7                        (Off the record.)

8                        (Back on the record.)

9                THE VIDEOGRAPHER:  Back on the record at

10       4:38.

11   BY MR. PONCE:

12       Q    All right.  So we are really, really close

13   to being done.

14               MR. PONCE:  Ben, can you mark as an exhibit

15       the document we received this morning from

16       plaintiff's counsel?

17               MR. TAORMINA:  It's up.

18   BY MR. PONCE:

19       Q    All right.  Mr. Johnson, we had marked as

20   Exhibit 24 for the deposition the document that was

21   sent to me by counsel for Havana Docks Corporation for

22   this morning.  You've mentioned periodically throughout

23   your deposition a document that was sent to me.  Is

24   this the one that has been marked as Exhibit 24?

25       A    Yes, sir, it is.  This is the document that

Page 187

1    I have been referring to to today.

2           (Whereupon, the above referred-to document

3            was marked as Plaintiff's Exhibit 24.)

4    BY MR. PONCE:

5           Q    Have you been looking at any other

6    documents in addition to this during the course of your

7    deposition?

8           A    I have a copy of the certified claim with

9    me.  I think I referred to that once today.

10          Q    And we had marked that as an exhibit

11   earlier to the deposition, correct?

12          A    I believe that's correct, yes, two and

13   three, I believe as I recall.

14          Q    Yes.  Good memory.  This document that has

15   been marked as Exhibit 24, did you write the -- the

16   column of these pages, it says responses.  Did you

17   write those responses?

18          A    Respectfully I assisted with the writing of

19   those columns and review and so forth.

20          Q    How would you explain the way in which you

21   assisted with writing that?

22          A    Assisting with our legal counsel,

23   specifically members of the law firm of Colson Hicks.

24          Q    Well, that's the who assisted.

25               What did you do to assist in the drafting

Page 188

1    of what appears in the response column?

2          A    Well, if you could picture, there were many

3    drafts that went back and forth between myself, Colson

4    Hicks, Mr. Behn and we -- as I recall, we all had

5    commentary as we were drafting these answers.

6          Q    So for example, on page 1 going onto page

7    2, I believe that's an answer you read almost verbatim

8    is your response to a question, correct?

9          A    Yes, sir, that's correct.

10          Q    There have been numerous points in the

11    deposition today.  I've asked you questions and you

12    said it sounded like it needed a legal response that

13    you weren't comfortable in giving.  But as I read, for

14    example, this part on the bottom of page 1, top of page

15    2.  That sounds like it's legal language written by a

16    lawyer.

17          Do you disavow the things in here that are

18    written that are legal conclusions?

19          MS. CASEY:  Objection to form.

20          THE WITNESS:  Again, these are responses,

21          Mr. Ponce, were drafted in consult with our

22          lawyers.  So I am not sure how to answer your

23          question.  Our lawyers had a strong hand in the

24          drafting of these responses.

25    BY MR. PONCE:

1          Q    So you mentioned drafts going back and

2     forth and the drafting process.  I mean, did you say

3     no, I want to say X and not Y?

4               MS. CASEY:  Objection.  To the extent that

5               that question calls for a specific

6               attorney-client communications that you had with

7               your counsel, I will instruct you not to answer.

8               THE WITNESS:  Respectfully, Mr. Ponce, I

9               believe, that discussion does come into play on

10              attorney-client privilege.

11    BY MR. PONCE:

12         Q    So we have been talking back and forth now

13    since 10 with breaks and there.  For example, this

14    response that we are looking at now, it just doesn't

15    sound like your voice.  And I am trying to get a sense,

16    I mean, did you tell the attorneys that this is the

17    information that I need to answer this question or did

18    they tell you this is the answer that you should give?

19              MS. CASEY:  Objection.  That question

20              specifically asks for attorney-client

21              communications between Havana Docks and its

22              counsel and so to that extent, I would instruct

23              you not to answer.

24    BY MR. PONCE:

25         Q    Would you describe this as a script of

Page 190

```
 1   answers that you were told to give?
 2              MS. CASEY:  Objection to form,
 3         argumentative.  Mischaracterizes any testimony
 4         and I will also instruct you, Mr. Johnson, that
 5         question calls specifically for a
 6         communication -- to reveal a communication that
 7         you may have had with counsel and so I instruct
 8         you not to answer.
 9   BY MR. PONCE:
10         Q    Just for example, I've seen witnesses use
11   notes before.  But I mean this seems like scripted
12   answers.  Would you describe these as scripted answers?
13              MS. CASEY:  Objection to form,
14         argumentative.
15   BY MR. PONCE:
16         Q    You can answer, Mr. Johnson.
17              MS. CASEY:  If you can answer without
18         revealing any client -- attorney-client
19         communication, you can do so.
20              THE WITNESS:  I am not sure how you are
21         using the term scripted answers that could have
22         various meanings.  I believe these are our
23         answers respectfully and thoughtfully submitted
24         to you and I stand by those answers, especially
25         this one that we are looking at on page 1.  I've
```

Page 191

1          read for you in my testimony earlier today.

2     BY MR. PONCE:

3          Q    And so this one that we are looking at on

4     page 1 that you just specifically referenced.  To you,

5     that does not contain any legal conclusions in it,

6     that's a pure factual statement?

7               MS. CASEY:  Objection, argumentative.

8               THE WITNESS:  Again, Mr. Ponce, I am not an

9          attorney.  I can't draw legal conclusions for

10         you, but I believe in these statements as we

11         have them listed for you in terms of as the

12         question read.  I will read just the first part

13         of that where the plaintiff contends that Royal

14         Caribbean caused in whole or in part Havana

15         Docks did suffer financial injury.  These are

16         our comments in relation to that question and I

17         stand by those.

18    BY MR. PONCE:

19         Q    When did the process of drafting this

20    document begin?

21              MS. CASEY:  Mr. Johnson, I am going to

22         caution you not to reveal the substance of any

23         attorney-client communications.  But you can

24         answer the specific question if you remember

25         with respect to when.  But just that specific

1          question.

2                 THE WITNESS:  I apologize, Mr. Ponce, I

3          can't remember the specific date of when we have

4          been working on these.  Hopefully you can tell

5          we put a lot of good faith, thought and effort

6          in giving you our answers.  I can't remember the

7          specific date.

8     BY MR. PONCE:

9          Q    Specific date aside, ball-parking it, do

10    you think you started just a month ago, two months ago,

11    a week ago?

12         A    I would say it would have been within the

13    last few weeks.

14         Q    Without telling me what you and your

15    attorney spoke about, the mode of communication, was it

16    by phone, was it in person, was it by email?

17         A    It was a combination by phone and email.

18         Q    Again, without telling me what you

19    discussed with your attorneys.  How many emails do you

20    think you exchanged as part of this drafting process?

21         A    Respectfully, Mr. Ponce, and specific on

22    the drafting of this document, I am not sure.  As you

23    can imagine, our attorneys and myself and Mr. Behn, we

24    exchanged hundreds and hundreds of emails.  I don't

25    know how many were specifically involved on the

1    drafting of these responses.  There could have been

2    other emails of other substance where we also talked

3    about a point in this string.

4         Q    What about phone calls, again, without

5    telling me what you spoke about with your attorneys on

6    the phone.  Do you have any recollection of how many

7    phone calls you had with the attorneys as part of the

8    process of drafting this document?

9         A    I don't have a specific number, Mr. Ponce.

10   We have had several telephone exchanges.

11        Q    Is several less than ten, less than five?

12        A    I would say probably more than ten.

13        Q    Specifically relating to the drafting of

14   this document?

15        A    In context of where topics in this

16   document, I believe, came up in the telephone

17   conversation.  The call may not have been all about

18   this document.

19        Q    All right.  So let's put the document

20   aside.  I think we are done with that.

21             So we talked at the very, very beginning of

22   your deposition, you have been, and tell me if I'm

23   saying this wrong.  You have been designated by Havana

24   Docks Corporation as the person to testify in the

25   topics, testify regarding the topics that were listed

Page 194

1    in the renotice of taking deposition, correct?

2           A    I am sorry.  Mr. Ponce, you broke up a

3    little bit there.

4           Q    I am sorry.  Let me start fresh.  I

5    apologize for that.  Starting now.

6                So at the beginning of the deposition, we

7    talked about the fact that you are the person who has

8    been designated by Havana Docks Corporation to provide

9    testimony regarding the topics that are listed in the

10   renotice of taking deposition, correct?

11          A    Yes, sir, that's correct.

12          Q    We have also noticed separately a

13   deposition of Mr. Jerry Johnson in an individual

14   capacity, are you aware of that?

15          A    Yes, sir, I am.

16          Q    Would you have answered any of the

17   questions that I've asked you thus far differently in

18   your individual capacity in the answers you've already

19   given?

20               MS. CASEY:  Objection to form, overbroad.

21               THE WITNESS:  Respectfully I will try to

22          answer that, Mr. Ponce.  I think that's a

23          speculative question.  Preparing for this

24          deposition today, again, many consultations with

25          our counsel, I don't know any other way to

Page 195

1          approach it that would make sense.
2    BY MR. PONCE:
3          Q    If I were going to take your deposition
4    beginning in five minutes in your individual capacity,
5    would the answers you give to the questions be any
6    different than the answers you gave to the same
7    questions I've just asked you?
8              MS. CASEY:  Objection to form.
9              THE WITNESS:  I don't believe so.  In other
10             words, if you are saying if I didn't have this
11             document to refer to, would my answers be any
12             different?  I think substantially the answers
13             would be the same.  I might use more of my
14             Kentucky accent and colloquial terms that
15             probably you are not familiar with.  But the
16             gist of the answers would be the same.
17   BY MR. PONCE:
18         Q    So you don't recall any question I've asked
19   you thus far that substance wise you would answer
20   differently if I were to depose you beginning in five
21   minutes in your individual capacity and not as the
22   corporate representative with Havana Docks?
23             MS. CASEY:  Objection to form.
24             THE WITNESS:  I don't believe so.  I have
25             always tried to answer fair and truthfully.  If

Page 196

1           you would like to have that personal deposition,

2           though, I am all for it if you would like.

3    BY MR. PONCE:

4           Q    I don't think that it's necessary.  I think

5    we are good.  Subject to having some redirect based on

6    any questions that Ms. Casey might ask you, I don't

7    have any more questions.

8               MS. CASEY:  Can we take five to ten

9           minutes?  Let's make it ten.

10              MR. PONCE:  Come back at 5?

11              MS. CASEY:  Yes.

12              THE VIDEOGRAPHER:  Off the record at 4:53.

13                   (Off the record.)

14                  (Back on the record.)

15              THE VIDEOGRAPHER:  Back on the record at

16          5:00.

17                     CROSS-EXAMINATION

18   BY MS. CASEY:

19          Q    Good afternoon, Mr. Johnson, how are you?

20          A    Good afternoon, Ms. Casey.

21          Q    Now I did not notice my appearance at the

22   beginning of this deposition but you know me of course.

23   I am Stephanie Casey.  I represent Havana Docks

24   Corporation in this litigation.  I just -- you answered

25   questions piecemeal on how Royal Caribbean trafficked

Page 197

1    on the subject property.  So I just wanted to ask you

2    so we have sort of a complete answer to the question.

3              Could you identify for me the ways that you

4    are aware of in which Royal Caribbean trafficked on the

5    subject property?

6         A    Well, yes.  Ms. Casey, and to all parties,

7    on the call today, as I understand our discovery is

8    still ongoing as to those points.  But as I tried to

9    testify earlier, there are specific points that we

10   believe and are aware of.  But also we believe the role

11   that Royal Caribbean entered into commercial

12   transaction with the Cuban government to use our

13   property in order to dock their ships there, and then

14   to the points that I was trying to explain to Mr. Ponce

15   earlier, of course by the docking of the ships there,

16   Royal Caribbean disembarked their passengers and

17   reembarked their passengers.

18             They used our facility for foreign currency

19   exchange for the passengers.  And then also as we

20   understand, they used our property to stage for the

21   paid excursions that disembarked from our property.

22   When I say disembarked, meaning, the buses and then

23   reembarked on our property after the buses returned.

24   So we believe there were numerous things that happened.

25             In addition, I think also as I mentioned in

Page 198

1    my earlier testimony, we believe that Royal Caribbean's

2    passengers shopped in the stores in the shops that are

3    located on our subject property.  So many different

4    ways that our facility facilitated Royal Caribbean's

5    venture to Cuba, so to speak.

6              And as I might add, also, unfortunately

7    Royal Caribbean never sought our permission to use our

8    property.  I wish they had.  But that didn't happen.

9    So all of those things that I've just mentioned and

10   mentioned earlier in my deposition today, in our belief

11   those activities happened without our permission.

12        Q    That's all I have.

13                  REDIRECT EXAMINATION

14   BY MR. PONCE:

15        Q    I have a couple of follow-up questions just

16   to make sure I understand some of the things that you

17   just said.

18             Did the buses that the passengers went on

19   for excursions, did they come onto the subject property

20   or were they on the public road?

21        A    We believe they came onto our subject

22   property.

23        Q    And the currency exchange, was Royal

24   Caribbean exchanging passenger's currency on the

25   property or was some other business doing that currency

Page 199

1    exchange?

2         A    I am not sure about the answer to that

3    question, Mr. Ponce.  But we believe the currency

4    exchange was facilitated and occurred on our property.

5    So our property served as the vehicle to make that

6    currency exchange happen which benefited Royal

7    Caribbean and your passengers.

8         Q    But you don't know who was actually doing

9    the exchanging of the passenger's money, whether that

10   was Royal Caribbean or some other entity, correct?

11        A    No, sir, I don't.

12        Q    And have you spoken to any Royal Caribbean

13   passengers who bought any merchandise at any shop that

14   you say was on the property?

15        A    We have not.  I have not.

16        Q    One more question.  And feel free to flip

17   back to the amended complaint which is Exhibit 8 and

18   specifically it's paragraph 12, numbered paragraph 12

19   of Exhibit 8, the amended complaint which begins on

20   page 4, but the bulk of it is on page 5.

21        A    Yes, sir.

22        Q    And looking again, the lined items on page

23   5, they are excerpted from the certified claim.  The

24   last line item on there is railroad tracks, do you see

25   that?

Page 200

1              MS. CASEY:  Objection, outside the scope

2          for redirect.

3      BY MR. PONCE:

4          Q    If you track to the right of that, it has a

5      value of $22,883, do you see that?

6              MS. CASEY:  Objection, outside the scope of

7          redirect.

8              THE WITNESS:  I do see that.

9      BY MR. PONCE:

10         Q    And are there currently railroad tracks on

11     the subject property?

12             MS. CASEY:  Same objection.

13             THE WITNESS:  I am not sure, Mr. Ponce.

14     BY MR. PONCE:

15         Q    I think this probably flows necessarily

16     from your answer that you are not sure.

17             Do you know whether railroad tracks on the

18     subject property were used in any manner in connection

19     with Royal Caribbean's cruises to Havana?

20             MS. CASEY:  Same objection.  Outside the

21         scope of redirect.

22             THE WITNESS:  I am not.

23             MR. PONCE:  I don't have any further

24         questions.

25             MS. CASEY:  We will read.

Page 201

1            MR. SOLOMON:  That's that as they say in

2        the business.  Let's go off the record if we

3        could.

4            THE VIDEOGRAPHER:  Off the record at 5:06.

5            MR. PONCE:  Yes, we do order.  For sure

6        right now the written transcript.

7            MS. CASEY:  Copy, yes, please.

8     (Whereupon, the deposition was concluded at 5:06 p.m)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 202

```
 1              VERITEXT LEGAL SOLUTIONS
     One Biscayne Tower, 2 S. Biscayne Boulevard, Suite 2250
 2                  Miami, Florida 33131
                    (800) 726-7007
 3                                    February 5, 2021
 4   Stephanie A. Casey, Esq.
     255 Alhambra Circle, PH
 5   Coral Gables, Florida 33134
 6   In Re:  Havana Docks v. Royal Caribbean
 7   Dear Ms. Casey,
 8       This letter is to advise you that the transcript
     of Jerry Johnson's deposition is completed and is
 9   available for reading and signing.
10       Please call the above number to make an
     appointment to come to the office closest to you to
11   read and sign the transcript.
12       Our office hours are from 8:45 a.m. until 4:30
     p.m., Monday through Friday.
13
         In the event other arrangements are made,
14   please send us a notarized list of any and all
     corrections and/or changes, noting page and line
15   numbers, and the reason for such changes, so that we
     can furnish respective counsel with a copy.  If the
16   reading and signing has not been completed prior to
     the above-referenced date, we shall conclude that
17   the witness has waived the reading and signing of
     the deposition transcript.
18
         Your prompt attention to this matter is
19   appreciated.
20           Sincerely,
21   _____
          Marla Schreiber, Shorthand Reporter
22
23
24
25
```

Page 203

                              CERTIFICATE OF OATH

1

2    STATE OF FLORIDA          )

3                                          SS:

4    COUNTY OF MIAMI-DADE )

5

6    I, MARLA SCHREIBER, Shorthand Reporter, Notary

7    Public, State of Florida, certify that Jerry Johnson

8    appeared before me on the 19th day of January, 2021

9    and was duly sworn.

10

11         Signed this 5th day of February 2021.

12

13

14

15    _____

          MARLA SCHREIBER, SHORTHAND REPORTER

16        NOTARY PUBLIC, State of Florida

17

18

19

20

21

22

23

24

25

Page 204

1                    REPORTER'S CERTIFICATE

2     STATE OF FLORIDA)

3     COUNTY OF MIAMI-DADE )

4          I, Marla Schreiber, Shorthand Reporter, certify

5     that I was authorized to and did stenographically

6     report the foregoing proceedings; and that the

7     transcript is a true record.

8          I further certify that I am not a relative,

9     employee, or counsel of any of the parties, nor am I

10    a relative or employee of any of the parties'

11    attorney or counsel connected with the action, nor

12    am I financially interested in the action.

13         Dated this 5th day of February, 2021.

14

15

16    _____

17    MARLA SCHREIBER, SHORTHAND REPORTER

18    NOTARY PUBLIC, Commission # DD 723489

19    MY COMMISSION EXPIRES:

20    October 14, 2023

21

22

23

24

25

Page 205

```
 1                      ERRATA SHEET
 2          DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
            In Re: Havana Docks Corporation vs.
 3                  Royal Caribbean Cruises Ltd.
            CASE NO.:  19-23590-CIV-BLOOM/LOIS
 4          DATE: 1/19/2021
            DEPONENT: JERRY JOHNSON
 5
            _____
 6          PAGE   LINE           CORRECTION & REASON
            _____
 7          _____
            _____
 8          _____
            _____
 9          _____
            _____
10          _____
            _____
11          _____
            _____
12          _____
            _____
13          _____
            _____
14          _____
            _____
15          _____
            _____
16          _____
            _____
17          _____
            _____
18
19          Under penalties of perjury, I declare that I have
20          read the foregoing document and that the facts stated
21          are true.
22
23
24          _____
25          DATE                       JERRY JOHNSON
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-23590-CIV-BLOOM/LOUIS

HAVANA DOCKS CORPORATION,

     Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES LTD.,

     Defendant.

_____/

**DEFENDANT'S RE-NOTICE OF TAKING
VIDEOTAPED DEPOSITION OF PLAINTIFF**

     Defendant Royal Caribbean Cruises Ltd., pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, gives notice that it will take the deposition upon oral examination of Plaintiff **Havana Docks Corporation**. The videotaped deposition will be taken via remote teleconferencing service provided by Veritext Legal Solutions on **January 19, 2021**, commencing at **10:00 a.m.**, and will continue until completed. The video deposition will be before an officer duly authorized by law to administer oaths and testimony.

     Pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiff must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on Plaintiff's behalf and such person(s) must testify about information known or reasonably available to Plaintiff regarding the matters set forth in Attachment A.

     NOTICE IS FURTHER GIVEN that the undersigned will conduct this deposition utilizing the secure web-based deposition option afforded by Veritext Legal Solutions or, in the alternative, the video conferencing services offered by Veritext Legal Solutions and will provide remote access for those parties wishing to participate in this deposition. Also take notice that the [...] will also be remote via one of the options above for the purposes of reporting the [...]

**Exhibit
0001**

Jerry Johnson

will not be in the presence of the deponent. This deposition will be recorded by stenographic means and videotape.

Please contact Veritext Legal Solutions to obtain the necessary credentials to access the remote deposition as well as information related to any technical assistance you may require to assist with carrying out the attendance at the virtual deposition.

Respectfully submitted,

HOLLAND & KNIGHT LLP
Attorneys for Royal Caribbean
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
(305) 374-8500 (telephone)
(305) 789-7799 (facsimile)

By: /s/ Scott D. Ponce
Sanford L. Bohrer (FBN 160643)
Scott D. Ponce (FBN 0169528)
Email: sbohrer@hklaw.com
Email: sponce@hklaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** a true and correct copy of the foregoing was served on the following counsel of record via email on this 8th day of January 2021:

Roberto Martinez
bob@colson.com
Stephanie A. Casey
scasey@colson.com
Aziza Elayan-Martinez
aziza@colson.com
Zachary A. Lipshultz
zach@colson.com
Colson Hicks Eidson, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

Rodney S. Margol
Rodney@margolandmargol.com
Margol & Margol, P.A.
2029 3rd Street North
Jacksonville, FL 32250

By: /s/ Scott D. Ponce

2

#81215234_v1

# SCHEDULE A

## DEFINITIONS

1.      "Plaintiff," "Havana Docks," "You," and/or "Your" means Havana Docks Corporation as well as any officers, directors, agents, trustees, employees, representatives, affiliates, predecessors in interest with respect to the Subject Property or the Certified Claim (as defined herein), or anyone acting or purporting to act on Plaintiff's behalf, including its counsel or legal representatives in these or other proceedings.

2.      "Royal Caribbean" means Royal Caribbean Cruises Ltd. as well as any officers, directors, agents, trustees, employees, representatives, affiliates, or anyone acting or purporting to act on its behalf, including its counsel or legal representatives in these or other proceedings.

3.      "Cuban Government" means the executive, judiciary, and/or legislative branches of Cuba's government, including, but not limited to each of its departments, agencies, committees, offices, and boards; and any current or former directors, officers, employees, agents, representatives or other persons acting, or purporting to act, on behalf of the preceding entities. As used here, the term Cuban Government includes both the pre- and post-revolution Government.

4.      "Employee" means any person who at any time acted or purported to act on behalf of another person or persons, including all present and former directors, officers, executives, agents, representatives, attorneys, accountants, independent contractors, contact persons, advisors, and consultants of such other person or persons.

5.      "Involved" means having a part or being included in something.

6.      "United States Government" means the executive, judiciary, and/or legislative branches of the United States' government, including, but not limited to each of its departments, agencies, committees, offices, and boards; and any current or former directors, officers,

#81215234_v1

employees, agents, representatives or other persons acting, or purporting to act, on behalf of the preceding entities.

7.      "Relating to," "relate(s) to," "related to", and "referring to" means concerning, constituting, embodying, evidencing, comprising, reflecting, refuting, identifying, indicating, stating, referring to, alluding to, dealing with, commenting on, responding to, describing, discussing, showing, reflecting, analyzing or containing information concerning a given subject matter.

8.      "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all documents that might otherwise be construed to be outside the scope.

9.      "All," "any," and "each" shall each be construed to mean "any and all."

10.      "Including" shall be construed to mean "including without limitation" and "including but not limited to."

11.      The present tense shall be construed as the past tense and vice-versa.

12.      The singular includes the plural and vice-versa.

13.      Words in the masculine, feminine, or neuter form shall include each of the other genders.

14.      "Subject Property" shall have the same meaning as defined in paragraph 6 of Plaintiff's Amended Complaint.

4

## EXAMINATION TOPICS

In accordance with Fed. R. Civ. P. 30(b)(6), Havana Docks Corporation shall identify, designate, and produce for deposition one or more officers, directors, managing agents or other person(s) most knowledgeable to testify on its behalf regarding the subject matter of the following categories:

I.   **Claims And Assertions**

   A.  Whether Plaintiff contends that Royal Caribbean caused, in whole or in part, the Cuban Government to confiscate the Subject Property.

   B.  Whether Plaintiff contends that Royal Caribbean caused, in whole or in part, Havana Docks to suffer financial injury, and if yes, how such financial injury would have been avoided if Royal Caribbean had not engaged in the activities alleged in the Amended Complaint.

   C.  How Royal Caribbean's alleged actions in the Amended Complaint impaired Plaintiffs' rights in Certified Claim No. CU-2492 (the "Certified Claim").

   D.  How Royal Caribbean participated in and profited from the Cuban government's confiscation of the Subject Property as alleged in the Amended Complaint.

II.  **Corporate Formation**

   A.  When and how Plaintiff was formed and whether interest in the Subject Property was ever held by any predecessors in interest, subsidiary or affiliate of Plaintiff, and if so, any transfer of such interest to Plaintiff.

   B.  The terms of the concession identified in the Concession for use of the Subject Property.

   C.  The rights Plaintiff held in the Subject Property after the Concession identified in the Certified Claim expired in 2004.

III. **The Certified Claim**

   A.  Each piece of property identified in Certified Claim No. CU-2492 (the "Certified

#81215234_v1

Claim") in which You contend Royal Caribbean trafficked, including the subtopics listed below, as well as the names and positions of Plaintiff's employees with substantive knowledge of such:

    i. When Plaintiff acquired an interest in each piece of property identified in the Certified Claim;

    ii. What interest Plaintiff acquired in each piece of property identified in the Certified Claim;

    iii. How Plaintiff acquired an interest in each piece of property identified in the Certified Claim;

    iv. The manner in which Royal Caribbean trafficked in each piece of property identified in the Certified Claim in which You contend such trafficking occurred;

    v. The injury or damage caused by Royal Caribbean's trafficking in each piece of property identified in the Certified Claim in which You contend such trafficking occurred;

B. Any effort(s) to buy and/or sell the Certified Claim, or any interest therein, including any valuation of the Certified Claim, and the names and positions of the employees of the Plaintiff who were involved as well as the names of any others who engaged in such efforts, such as potential buyers.

C. The following information concerning the past or present shareholders (each a "shareholder") of Plaintiff, and the names and positions of the Plaintiff's employees with substantive knowledge of such:

    i.  When each shareholder acquired his, her, or its share(s) in Plaintiff;

    ii.  How each shareholder acquired his, her, or its share(s) in Plaintiff;

    iii. The nationality of each shareholder; and

iv.  If each shareholder acquired his, her, or its share(s) in Plaintiff via a stock purchase, the value of the stock at the time of sale.

D.  Each company, person, and/or trust that has had ownership, control, or interest in Plaintiff from Plaintiff's incorporation to present, not already identified in Topic III(C), including but not limited to Plaintiff's mortgagees, lessors, financers, and third-party litigation funders, and the names and positions of the Plaintiff's employees with substantive knowledge of such.

E.  All attempts by Plaintiff to obtain compensation from the Cuban Government pursuant to its Certified Claim, the outcome of such attempts, and the names and positions of the employees of Plaintiff and the Cuban Government involved.

F.  All attempts by Plaintiff to obtain compensation from the United States Government pursuant to its Certified Claim, the outcome of such attempts, and the names and positions of the employees of Plaintiff and the United States Government involved.

G.  All attempts by Plaintiff to obtain compensation from any third-party – that is not the Cuban Government or the United States Government – pursuant to its Certified Claim, the outcome of such attempts, and the names and positions of the employees of Plaintiff and the names of any third-party involved.

### III.   Enforcement of the Helms-Burton Act

A.  Oral and written communications between Plaintiff and the United States Government relating to the Helms-Burton Act; the Subject Property; the Certified Claim, including the property interests identified in it; and/or the general and specific licenses issued by the United States Government concerning carrier

#81215234_v1

services to Cuba; and the names and positions of the employees of Plaintiff and the United States Government involved.

B. Oral and written communications between Plaintiff and the Cuban Government relating to the Helms-Burton Act; the Subject Property; the Certified Claim, including the property interests identified in it; and/or the general and specific licenses issued by the United States Government concerning carrier services to Cuba; and the names and positions of the employees of Plaintiff and the Cuban Government involved.

C. All attempts by Plaintiff to enforce any title of the Helms-Burton Act against Royal Caribbean or any other cruise line for transactions and uses of the Subject Property ("Enforcement Attempts"), including when such Enforcement Attempts were made, and the names and positions of the employees of Plaintiff and the United States and Cuban Governments involved.

D. All responses to Plaintiff by (a) the United States Government and/or (b) the Cuban Government concerning all Enforcement Attempts, including when Plaintiff received such responses to its Enforcement Attempts, and the names and positions of the employees of Plaintiff and the United States and Cuban Governments involved.

IV. **Trafficking Allegations**

A. The manner(s) in which You contend that Royal Caribbean commenced, conducted, and promoted its commercial cruise line business to Cuba using the Subject Property by regularly embarking and disembarking its passengers on the Subject Property, and the names and positions of the Plaintiff's employees with substantive knowledge of such.

#81215234_v1

B. The manner(s) in which You contend that Royal Caribbean used the Subject Property without the authorization of Plaintiff or any United States national who holds a claim to the Subject Property, and the names and positions of the Plaintiff's employees with such substantive knowledge of such.

C. The manner(s) in which You contend that Royal Caribbean knowingly and intentionally embarked and disembarked its passengers on confiscated property, as defined in 22 U.S. Code § 6023(4), and the names and positions of the Plaintiff's employees with substantive knowledge of such.

D. The manner(s) in which You contend that Royal Caribbean participated in and profited from the Cuban Government's possession of the Subject Property, and the names and positions of the Plaintiff's employees with substantive knowledge of such.

E. The manner(s) in which You contend that Royal Caribbean participated in and profited from the Cuban Government's possession of the Subject Property without the authorization of Plaintiff or any United States national who holds a claim to the Subject Property, and the names and positions of the Plaintiff's employees with substantive knowledge of such.

F. The manner(s) in which You contend that Royal Caribbean knowingly and intentionally participated in and profited from the Cuban Government's possession of confiscated property, as defined in 22 U.S. Code § 6023(4), and the names and positions of the Plaintiff's employees with substantive knowledge of such.

G. To the extent not already covered by Topics IV(A)-(F), the manner(s) in which You contend that Royal Caribbean did any of the following relating to the Subject

#81215234_v1

Property, including when, and the names and positions of the Plaintiff's employees with substantive knowledge of such:

    i. sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of the Subject Property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in the Subject Property,

    ii. engages in a commercial activity using or otherwise benefiting from the Subject Property, or

    iii. causes, directs, participates in, or profits from, the activities described in clause (i) or (ii) above by another person, or otherwise engages in those activities through another person.

**V.**      <u>**22 U.S.C. § 6023 (13)(B)(iii)**</u>

A. The manner(s) in which You contend that Royal Caribbean's cruises to Havana were not "lawful travel" to Cuba.

B. The manner(s) in which You contend that Royal Caribbean's transactions and uses of the Subject Property were not "lawful travel" under United States law, and the names and positions of Plaintiff's employees with substantive knowledge of such.

C. The manner(s) in which You contend that Royal Caribbean's transactions and uses of the Subject Property were not incident to "lawful travel to Cuba," and the names and positions of Plaintiff's employees with substantive knowledge of such.

D. The manner(s) in which You contend that Royal Caribbean's transactions and uses of the Subject Property were not "necessary to the conduct of such travel," and the names and positions of Plaintiff's employees with substantive knowledge of such.

#81215234_v1

VI. **Valuation/Damages**

 A. The value of each piece of property identified in the Certified Claim in which You contend such trafficking occurred and/or the injury or damage caused by Royal Caribbean' trafficking in each piece of property identified in the Certified Claim in which You contend such trafficking occurred.

 B. The value of the Subject Property at the time the Cuban Government allegedly confiscated it in 1960, and the names and positions of the Plaintiff's employees with substantive knowledge of such.

 C. The value of the Subject Property on August 27, 2019.

 D. The value of the Subject Property on April 20, 2020.

 E. Any calculations made by Plaintiff or by any of Plaintiff's employees of the damages allegedly recoverable under the Helms-Burton Act against Royal Caribbean or any other cruise line, and the names and positions of Plaintiff's employees with substantive knowledge of such.

 F. Plaintiff's valuation of its stock, and the names and positions of Plaintiff's employees with substantive knowledge of such.

 G. Any and all efforts by Plaintiff, or by any person acting on behalf of Plaintiff, to value the Subject Property, or the ownership interest in the claim to the Subject Property.

 H. All assertions of a claimed ownership interest in any portion of the Certified Claim and/or the Subject Property from October 24, 1960, to the present by any person or entity other than You, including the identity of all such persons and/or entities, when such assertions were made, how such assertions were transmitted, and Your response to such assertions.

11

FOREIGN CLAIMS SETTLEMENT COMMISSION
OF THE UNITED STATES
WASHINGTON, D.C. 20579

IN THE MATTER OF THE CLAIM OF

HAVANA DOCKS CORPORATION

Under the International Claims Settlement
Act of 1949, as amended

Claim No CU -2492

Decision No. CU -6165

Counsel for claimant:

Davis Polk & Wardwell
by Douglas M. Galin, Esquire

Appeal and objections from a Proposed Decision entered April 12, 1971.
Oral hearing requested.

Oral argument September 15, 1971 by Douglas M. Galin, Esquire

FINAL DECISION

The Commission issued its Proposed Decision on this claim on
April 21, 1971, certifying that claimant suffered a loss of $7,669,420.88
within the scope of Title V of the International Claims Settlement Act
of 1949, as amended, resulting from actions of the Government of Cuba.

Claimant, through counsel, objected to the Proposed Decision,
and requested an oral hearing which was held on September 15, 1971.
In support of the objections claimant submitted an affidavit of John C.
Hover, a member of counsel's firm.

In the objections, claimant stated that the concessions and dock
facilities had a higher value than the amount determined by the Com-
mission, and that an item of $10,280.00 for handling charges was
improperly denied.

Full consideration having been given to claimant's objections,
the supporting affidavit, counsel's argument at the hearing, and the
entire record, the Commission now finds that in view of the consid

Exhibit
0002
Jerry Johnson

increase of land values along the Havana waterfront between 1934 and 1960, the value of claimant's concession and tangible assets should be increased from $7,184,360.18 to $8,684,360.18.

Regarding the appraisal of Luis Parajon who valued the above properties at $16,180,000.00, the Commission holds that this appraisal cannot be relied upon to the exclusion of other evidence of record because, *inter alia*, it does not specify the size and value of the land and improvements thereon separately and individually; and because its findings are based on generalities, not appropriate in this type of evaluation of valuable improved real property.

The Commission further considered claimant's objections with respect to the item of $10,280.00 for handling charges, and finds that these are, in fact, storage charges for unclaimed merchandise, due and payable by the Government of Cuba, and that they should be included in the loss, which is restated as follows:

|  |  | Date of Loss |
|---|---|---|
| Concession and tangible assets | $8,684,360.18 | October 24, 1960 |
| Securities | 184,005.70 | August 6, 1960 |
| Accounts receivable | 301,055.00 | October 24, 1960 |
| Debt of Cuban Government | 10,280.00 | October 24, 1960 |
| Total loss | $9,179,700.88 |  |

The interest at the rate of 6% per annum will be included in the instant case as follows:

| FROM | ON |
|---|---|
| August 6, 1960 | $ 184,005.70 |
| October 24, 1960 | 8,995,695.18 |

Accordingly, the Certification of Loss in the Proposed Decision is set aside; the following Certification of Loss will be entered; and the remainder of the Proposed Decision, as amended herein, is affirmed.

CU-2492

Case 1:19-cv-21724-BB Document 331-102 Entered on FLSD Docket 09/20/2021 Page 220
Case 1:19-cv-23530-BB Document 46-1 Entered on FLSD Docket 04/29/2020 Page 4 of 459
- 3 of 459

## CERTIFICATION OF LOSS

The Commission certifies that HAVANA DOCKS CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Nine Million One Hundred Seventy-nine Thousand Seven Hundred Dollars and Eighty-eight Cents($9,179,700.88) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D. C.,
and entered as the Final
Decision of the Commission

**SEP 28 1971**

Lyle S. Garlock, Chairman

Theodore Jaffe, Commissioner

CU-2492

FOREIGN CLAIMS SETTLEMENT COMMISSION
OF THE UNITED STATES
WASHINGTON, D.C. 20579

IN THE MATTER OF THE CLAIM OF

HAVANA DOCKS CORPORATION

Claim No. CU-2492

Decision No. CU- 6165

Under the International Claims Settlement
Act of 1949, as amended

Counsel for claimant:

Davis, Polk & Wardwell
By Peter H. Madden, Esq.

PROPOSED DECISION

This claim against the Government of Cuba, under Title V of the Inter-
national Claims Settlement Act of 1949, as amended, was presented by HAVANA
DOCKS CORPORATION for $9,915,879.00, based upon the asserted ownership and
loss of its assets nationalized by the Government of Cuba.

Under Title V of the International Claims Settlement Act of 1949
[78 Stat. 1110 (1964), 22 U.S.C. §§1643-1643k (1964), as amended, 79 Stat.
988 (1965)], the Commission is given jurisdiction over claims of nationals
of the United States against the Government of Cuba. Section 503(a) of the
Act provides that the Commission shall receive and determine in accordance
with applicable substantive law, including international law, the amount
and validity of claims by nationals of the United States against the Govern-
ment of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation,
> intervention or other taking of, or special measures di-
> rected against, property including any rights or interests
> therein owned wholly or partially, directly or indirectly
> at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or inter-
> est including any leasehold interest, and debts owed by
> the Government of Cuba or by enterprises which have been

Exhibit
0003

Jerry Johnson

- 2 -

nationalized, expropriated, intervened, or taken by
the Government of Cuba and debts which are a charge
on property which has been nationalized, expropriated,
intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United
States" as a corporation or other legal entity which is organized under the
laws of the United States, or of any State, the District of Columbia, or
the Commonwealth of Puerto Rico, if natural persons who are citizens of
the United States own, directly or indirectly, 50 per centum or more of the
outstanding capital stock or other beneficial interest of such corporation
or entity.

The record shows that in 1917 claimant corporation was organized under
the laws of the State of Delaware. Claimant's Vice-President and Assistant
Comptroller stated that at all times between August 14, 1917 and the pre-
sentation of the claim, more than 50 percent of the outstanding capital
stock of all classes has been owned by persons who were United States
nationals, and that at the time of filing the claim, of 35,505 outstanding
shares of stock of HAVANA DOCKS CORPORATION only 1,003 or approximately 3%
of the total outstanding shares were held by persons who were not nationals
of the United States. The Commission therefore holds that claimant is a
national of the United States within the meaning of Section 502(1)(B) of
the Act.

Claimant states that on the basis of a concession granted by the
Government of Cuba, it owned and operated, at the entrance of the harbor
of Havana three piers: the "San Francisco", "Machina" and "Santa Clara"
linked with a large marginal building. The piers and buildings were used
for warehousing purposes, cargo deposits, and for merchandise provisionally
stored pending Customs clearance. Each pier consisted of a two-story
concrete building with an apron equipped with platforms, and a double rail-
road track to permit direct unloading of cargo from ships to railroad cars
and vice versa. All official port authorities were located within the

- 3 -

marginal building, such as the Customs House of Havana, the Inspector
General of the Port, the Immigration Department  and other governmental
agencies.  Elevators, escalators, portable cranes, tractors, trailers, fork
lift trucks, and other port and dock equipment were part of claimant's
installations on the piers and in the warehouses, which were located in the
center of harbor activities of the port of Havana.

Based upon the record, the Commission finds that on September 7, 1934,
claimant HAVANA DOCKS CORPORATION obtained from the Government of Cuba the
renewal of a concession for the construction and operation  of wharves and
warehouses in the harbor of Havana, formerly granted to its predecessor
concessionaire, the Port of Havana Docks Company; that claimant acquired at
the same time the real property with all improvements and appurtenances
located on the Avenida del Puerto between Calle Amargura and Calle Santa
Clara in Havana, facing the Bay of Havana; that in June, 1946,
the property was encumbered with a mortgage in favor of certain bondholders
for the amount of $1,600,000.00 in accordance with Public Instrument of
June 1, 1946, recorded in Havana on July 25, 1946; and that claimant corpora-
tion also owned the mechanical installations, loading and unloading equip-
ment, vehicles and machinery, as well as furniture and fixtures located in
the offices of the corporation.

The record further shows that the Cuban assets of claimant corporation
were nationalized by Resolution No. 3, published in the Official Gazette of
October 24, 1960, pursuant to Law No. 851 of July 6, 1960, and that the
facilities of the company were physically occupied by agents of the Cuban
Government on November 21, 1960.  Accordingly, the Commission finds that the
Cuban assets of HAVANA DOCKS CORPORATION were nationalized by the Government
of Cuba on October 24, 1960.

- 4 -

Claimant states that the corporation suffered the following losses:

| | |
|---|---:|
| Land and Concession . . . . . . . . . . . . | $ 2,000,000.00 |
| Buildings . . . . . . . . . . . . . . . . . | 6,892,557.00 |
| Personal property, equipment, etc. . . . . | 595,315.00 |
| Securities (1000 common stock shares of Cuban Telephone Company) . . . . | 100,000.00 |
| Debts owed by nationalized enterprises and by the Government of Cuba. . . . . . . . | 328,007.00 |
| | $ 9,915,879.00 |

In support of this valuation of losses claimant submitted, among other things, the following evidence:

(1) Trial balance as of December 31, 1958;

(2) Balance sheets for the years 1956, 1957, 1958 and 1959;

(3) Auditor's report as of December 31, 1958;

(4) An evaluation of the properties by Mr. Louis Parajon, a civil engineer and former professional appraiser in Cuba; and

(5) An inventory of the equipment, furniture and fixtures as of December 31, 1959.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

CU-2492

The record contains a report of the Office of the Property Register of Havana which shows that in 1928, the concession, then owned by the Port of Havana Docks Company, had an assessed market value of $600,000.00, and that a subsequent assessment established the value of the concession at $5,000,000.

Upon consideration of the entire record, the Commission finds that the valuation most appropriate to the property and equitable to the claimant is that shown in the Balance Sheet for the year ended 1959, supported by the Trial Balance for December 31, 1958. These financial statements reflect the following book values adopted by claimant corporation:

| | |
|---|---:|
| Land and Concession . . . . . . . . . . . | $ 2,000,000.00 |
| San Francisco and Machina Piers . . . . . | 4,758,829.00 |
| Santa Clara Pier . . . . . . . . . . . . | 2,110,845.00 |
| Equipment . . . . . . . . . . . . . . . | 419,056.00 |
| Office Furniture and Fixtures . . . . . . | 90,616.00 |
| Railroad Tracks . . . . . . . . . . . . . | 22,883.00 |
| Total | $ 9,402,229.00 |

The record indicates that the pier properties are stated at values appraised as of December 31, 1920, plus subsequent additions at cost. The terms of the concession granted by the Cuban Government were to expire in the year 2004, at which time the corporation had to deliver the piers to the government in good state of preservation. The equipment, office furniture were acquired more recently and are stated at cost. The appraiser, Louis Parajon states in his report that in 1960 the concession, real property, office and general equipment had a value of $16,180,000.00 after depreciation, which is considerably more than what the claimant describes as the loss.

The Commission is aware that from 1920 to 1960 real property prices in Havana had increased, and that the values expressed in prices of the year 1920 may not have been realistic in 1960. The Commission, however, notes

- 6 -

that during the prior years claimant corporation allowed for depreciation
of the real property and amortization of the concession approximately 1-1/2
per cent per year; and that nothing was added to show any appreciation of
the property.

The Commission, therefore, concludes that it would be equitable and
appropriate to consider as basic the year 1934 when HAVANA DOCKS CORPORATION
obtained the concession for the operation of the docks; to deduct from that
year up to the year 1960 one per cent (1%) yearly for amortization of the
concession and for the depreciation of the buildings; and further deduct 25%
from the stated value of the equipment, furniture and fixtures for wear and
tear, assuming that most equipment was in operation during an average time
of five years, when it was taken by the Government of Cuba.

The Commission finds that the amount of $2,000,000 includes not only
the value of the concession but also the value of the land and of the piers
alongside the property which, in the opinion of the Commission, had a value
of $1,000,000 in the year 1960.

Amortization and depreciation is therefore applicable as follows:

(a)  1% per year from 1934 to 1960, or 26% on the following values:

```
Concession . . . . . . . . . . . . $ 1,000,000
San Francisco and Machina Piers  .   4,758,829 (structures only)
Santa Clara Pier . . . . . . . . .   2,110,845 (structures only)
Railroad Tracks  . . . . . . . . .      22,883
                          Total   $ 7,892,557
```

26% thereof  . . . . . . . . . . . . . . . . . $ 2,052,064.82

(b)  25% from the value of the equipment, office
     furniture and fixtures of $509,672 . . . . . . . .    127,418.00

                          Total depreciation     $ 2,179,482.82

As stated above, the real property was encumbered with a mortgage of
$1,600,000 in favor of certain bondholders, but the balance sheet for the
year ended December 31, 1959 shows that this funded debt has been reduced
to a balance of $38,386.00 as of that date. Consequently, from the value

- 7 -

| | |
|---|---:|
| of the property of | $ 9,402,229.00 |

| | | |
|---|---:|---:|
| must be deducted for depreciation | $ 2,179,482.82 | |
| and the balance of the funded debt | 38,386.00 | 2,217,868.82 |

| | |
|---|---:|
| resulting in the net value of the tangible property, including concession, of | $ 7,184,360.18 |

The Commission further finds that claimant corporation was the owner of 1,000 shares of common stock of the Cuban Telephone Company. The Commission has held that the Cuban Telephone Company was nationalized on August 6, 1960 by Resolution No. 1 published by the Government of Cuba pursuant to Law 851, and that the loss sustained by the holders of common stock shares amounted to $184.0057 per share. (See Claim of International Telephone & Telegraph Corporation, Claim No. CU-2615.) Accordingly, claimant suffered a loss as the owner of 1,000 common stock shares in the aggregate amount of $184,005.70.

The Commission further finds that the amount claimed of $328,007 for debts owed by nationalized enterprises and by the Cuban Government, included a debt of $99,097 due from the Government of Cuba, and accounts receivable of $218,630 due to claimant corporation from trade enterprises nationalized, expropriated or intervened by the Government of Cuba. The Commission, therefore, concludes that claimant is entitled to an additional certification of losses for accounts receivable in the amount of $317,727.00.

The Commission does not deduct liabilities of United States corporations and other entities, except for taxes due to the Cuban Government. (See Claim of Simmons Company, Claim No. CU-2303, 1968 FCSC Ann. Rep. 77.) In the present claim the record shows that taxes accrued at the end of 1959 due to the Cuban Government amounted to $16,672.00.

| | |
|---|---:|
| Therefore, from the sum of accounts receivable of | $317,727.00 |
| the tax indebtedness of | 16,672.00 |
| is deducted, leaving a net amount of receivables of | $301,055.00 |

Included in the debt claim is also an amount of $10,280.00 for handling charges, but the evidence does not disclose that this amount was due from

- 8 -

enterprises nationalized, expropriated, intervened or taken by the Govern-
ment of Cuba, or that the amount was a charge on property which was
nationalized, expropriated, intervened or taken by the Cuban Government,
as required by Section 502(3) of the Act.  Accordingly, the claim for
$10,280.00 for handling charges is denied.

Summarizing, claimant corporation suffered the following losses with-
in the meaning of Title V of the International Claims Settlement Act of
1949, as amended:

|  |  | Date of loss |
|---|---|---|
| Loss of concession and tangible assets | $7,184,360.18 | October 24, 1960 |
| Loss of securities | 184,005.70 | August 6, 1960 |
| Loss of accounts receivable | 301,055.00 | October 24, 1960 |
| Total loss | $7,669,420.88 | |

The Commission has decided that in certifications of loss on claims
determined pursuant to Title V of the International Claims Settlement Act
of 1949, as amended, interest should be included at the rate of 6% per
annum from the date of loss to the date of settlement (see Claim of Lisle
Corporation, Claim No. CU-0644) and in the instant case it is so ordered
as follows:

| FROM | ON |
|---|---|
| October 24, 1960 | $7,485,415.18 |
| August 6, 1960 | 184,005.70 |

- 9 -

## CERTIFICATION OF LOSS

The Commission certifies that HAVANA DOCKS CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Seven Million Six Hundred Sixty-Nine Thousand Four Hundred Twenty Dollars and Eighty-Eight Cents ($7,669,420.88) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D. C., and entered as the Proposed Decision of the Commission

APR 21 1971

_Lyle S. Garlock, Chairman_

_Theodore Jaffe, Commissioner_

The statute <u>does not provide for the payment of claims</u> against the overnment of Cuba. Provision is only made for the determination by the ommission of the validity and amounts of such claims. Section 501 of the tatute specifically precludes any authorization for appropriations for ayment of these claims. The Commission is required to certify its indings to the Secretary of State for possible use in future negotiations ith the Government of Cuba.

OTICE: Pursuant to the Regulations of the Commission, if no objections ¬ filed within 15 days after service or receipt of notice of this ⌐posed Decision, the decision will be entered as the Final Decision of ιe Commission upon the expiration of 30 days after such service or receipt ⌐ notice, unless the Commission otherwise orders. (FCSC Reg., 45 C.F.R. ₃1.5(e) and (g), as amended (1970).)

Year IV – No. 139      Havana, Thursday, December 14, 1905      Volume II – Page 4285

# GACETA  OFICIAL

### OF THE
### REPUBLIC OF CUBA

| SUBSCRIPTION POINTS | | Subscription prices in American currency | |
|---|---|---|---|
| HAVANA, at the Printshop Administration, Obispo 35 P.O. Box 600 Telephone No: 675 PROVINCES, at the houses of the respective agents. | ADVERTISEMENTS AND SUBSCRIPTIONS are received at the Administration from 7 to 10 in the morning and from 11 to 5 in the afternoon, every day except holidays. | HAVANA, per quarter ........ $3.00 PROVINCES, per quarter ......$3.75 | OUTSIDE THE ISLAND, per quarter $5.30 Subscriptions shall be paid in advance. |
| | | Price per copy – 10 CENTS | |

[…]

## PUBLIC WORKS DEPARTMENT

DECREE NO. 467

Having seen again the file opened at the Civil Government of the Province of Havana by reason of the application and project submitted by Mr. Sylvester Scovel related to an administrative concession for the construction of a jetty pier with machinery, a building for the Customs Department, a special department to be used by customs inspectors, and devices for loading and offloading, and all other accessory works in the port of this capital city.

Whereas: A decree from this Office of the President of February 27 last declared said works to be of public usefulness, providing that the concession necessary for the execution thereof be opened to public bidding on the basis of the petitioner's project upon appraisal of said project and the appropriate publishing having been made.

Whereas: An appraisal of the project having been made, the value thereof was set at fifty-nine thousand five hundred forty-seven pesos and forty-five cents ($59,547.45) Cy. and the conditions were set under which the concession was to be granted, the petitioner having represented his agreement with said appraisal and conditions.

Whereas: the ninth day of this month of November, at two p.m., was set for the bidding, notice of which was published in *Gaceta Oficial* and in the newspapers of this city, "Diario de la Marina," "Discusión," and "Mundo" in five consecutive issues and repeated during the first ten days of the months of July, August, September, and October last, as well as in the Paris newspapers "Le Figaro," "Le Matin," and "Le Temps" and "Le Journal"; in Berlin's "Track Kischer Kurier"; and in London and New York, where printed copies of the projects were sent and made available to the public, together with copies of the plans thereof.

Whereas: on the day and time and at the place indicated the Board that was to act in the public bidding in the presence of a Notary, prepared appropriate certificate; of the three [bids] that

Exhibit
0004

Jerry Johnson

were submitted, Mr. D. Aceituno's was the most advantageous; he offered a twenty-seven per cent (27%) reduction on the rates submitted by the original applicant and lowered to fifty (50) years the ninety-nine (99) years the latter had requested, and the original applicant insisted on the entirety of his project in regards to said features; and the other one, albeit it reduced to nine (9) years the term of the concession, only offered a six per cent (6%) rate reduction.

Whereas: the legitimate representative of Compañía del Puerto, the successor of Mr. Scovel, the author of the project, availing itself at the same proceeding of its preemptive right within the legal term therefor, accepted Mr. Aceituno's proposal on behalf of its constituent.

Whereas all requirements and formalities required by law for the granting of the concession in question have been met in this file.

Whereas according to the rules and regulations for the execution of the Public Works Act, the project approved must serve as the basis for the public bidding and proposals must address, first of all, rate reductions for the construction of the works, and, according to Article 8 of the Instruction, in order to process concessions to private persons of port works in this Island, the public bidding therefor must also address, first of all, a reduction of the rates and, secondly, of the term of the concession.

Whereas, in light of this, the declaration by the Board presiding over the public bidding that Mr. D. Aceituno's proposal is the most advantageous is legal and proper inasmuch as it abides by the legal provisions currently in effect and previously referred to, being the one that reduced the rates to the lowest level.

Whereas, Compañía del Puerto, as Mr. Scovel's successor, duly availed itself within the legal term of the preemptive right conferred upon it by Article 28 of the Rules and Regulations of the Public Works Act, and was fully subrogated in Mr. Aceituno, whose proposal it accepted and, therefore, it is proper that it be deemed the winner in the public bidding and that that the concession be granted to it.

In accordance with the provisions cited above and those contained in the General Public Works Act and in the Rules and Regulations for the Execution thereof; in the Ports Act, and in the Instruction therefor; and in the Law of September 11, 1879, on public bidding for works and services.

Upon the proposal by the Secretary of Public Works, an availing myself of the powers vested in me, I grant Compañía del Puerto, Mr. Scovel's successor, the concession necessary to carry out the works set forth in the project submitted by the aforesaid Mr. Scovel on August 22, 1904, subject to the following conditions:

1.-   The works shall conform in all respects to the project submitted by the applicant, Mr. Sylvester Scovel, dated August 22, 1904, except as otherwise modified by the clauses below.

2

2.-	This concession is deemed included among those contemplated in Articles 44 and 45 of the Ports Act of October 31, 1890, and Article 97 of the General Public Works Act of April 19, 1883, and is granted for a term of fifty (50) years, reckoned as of the date of the concession, and is subject to the provisions of Article 50 of the aforesaid Ports Act.

3.-	Authorization is given for the establishment of the coal deposit referred to in the project and for the operations thereof on the south side of the jetty, but the concession-holder is obligated to avail itself of all possible means to prevent coal dust from getting inside the buildings of the Customs offices and buildings in the city or from becoming a nuisance to the public.

4.-	The State assigns in usufruct during the term of the concession that part of the San Francisco docks, as well as the public domain area, that will be occupied by the project's works.

5.-	As compensation and in payment for the occupation of this site and the inconvenience to general use caused by construction work, the concession holder undertakes:

(a)	To freely assign to the State the building for the Customs Inspectors that is part of the project.

(b)	To widen up to thirty-six (36) feet the entrance to the jetty, as shown in the plans of the project.

(c)	To build on the jetty a twenty-four (24) feet wide street, paved in the same manner as all others in the project, running north to south on the jetty and separating it from the Customs Inspectors Department; the roof covering this street shall have a height of at least fifteen (15) feet.

(d)	To place a platform scale at the entrance to the Customs Inspectors Department, at such location as the Administration of the Port's Customs may designate, of the make indicated by said Administration, which shall be used to weigh articles going from the public docks into said Department, whether using the concession holder's own means or on carts.

(e)	To definitely assign to the State, free of charge, all expansions of passenger landing booths intended for the Customs Offices, albeit with the condition that said building may not be used for any purpose other than said offices.

(f)	To set aside for public use the dock on the north side of the projected jetty, albeit with the condition that the concession holder, at any time during the concession when, at its discretion, should port traffic so require it, may install on said north side devices, equipment, and machinery for loading and offloading vessels and steamers, enlarging the building for this purpose so that it will be in keeping with the plant thus improved.  It may exercise this right with two-month notice given to the Department of Public Works, submitting at the same time the respective plans, and the added works will then be included within the concession.

3

6.-    In case that, in accordance with the provisions of Article 50 of the Ports Act, there should be a need to expropriate the works, the concession holder shall be entitled to remove from the jetty pier the machinery, rolling stock, equipment, and devices being used at the time.

7.-    If at any time during the term of the concession the works were to be expropriated, also by virtue of the application of the aforesaid Article 50 of the Ports Act, the Government or its agencies shall indemnify the concession holder for the value of all works built by the latter, including the Customs Inspectors Department and the dock on the north side of the jetty, but not for the value of the machinery, rolling stock, equipment, and devices referred to in the previous clause, in case that the concession holder should decide to remove them.

8.-    In the case of expropriation referred to in the previous two clauses, works shall be appraised through direct volume calculation, applying the prices set for the work units shown in the budget and after meeting the requirements established in paragraph 2 of Article 14 of the Instruction of the Ports Act of November 17, 1890.

9.-    The State shall allow the concession holder free use of an ample space in the jobsite, as well as access thereto, to keep and handle tools and materials and for any other suitable operation related to the construction of the works.

10.-    During the term of the concession, the concession holder shall, for its own account, maintain in good repair and in such condition the foundations, streets, buildings, and all other plant facilities that, upon the conclusion of said term, it may surrender the works to the Government in perfectly serviceable condition. Any repairs and renovations that it may be necessary to make to the building intended for Customs offices and on that part on the north side of the jetty dock set aside for the public shall be for the Government's account, as shall also be the maintenance of the pavement of the service shorefront all along the front the jetty on the land side.

11.-    The concession holder shall not be responsible for any damages resulting from delays on its part in the construction of the projected plant when such delays should be caused by strike, shipwreck, hurricane, epidemic or any other instance of force majeure.

12.-    The concession holder may, during the term of this concession, add to the machinery, devices, and equipment of the projected plant whatever he may deem necessary for the appropriate handling of said plant's traffic; it may also apply to said machinery, devices, and equipment any or all improvements which may from time to time be advantageous.

13.-    The concession holder shall install the machines necessary to generate electricity using steam engines, but its right is reserved to acquire electric current under contracts with companies able to supply it, in which case it shall not be obligated to install the aforesaid machines or to use them, if they should be already installed.

14.-    The means of execution, the agents, and all other employees for the construction, maintenance, and administration of the works shall be chosen by the concession holder.

15.- The concession holder may have free use of the elevated rail that goes by the Customs Inspectors Department and the right of ingress and egress to and from said building in order to do all repair and maintenance work it may deem necessary for the purposes of the concession.

16.- During the term of the concession, neither that part of the jetty pier, on the north side, intended for the public, nor the Customs Inspectors Department, may be set aside for any purpose different from the one assigned to them in this project. The State shall not allow mechanical services of the kinds that are comprised within the concession holder's operations to be provided on that part of the jetty.

17.- The concession holder makes a final assignment to the State of all works related to the expansion of passenger landing booths intended for the Customs Offices, albeit with the condition that said building may not be used for any purpose other than the establishment of said offices.

18.- Should it come to pass that the State abandons the use of the works referred to in the two previous clauses, the Government shall deliver the dock and the Customs Inspectors Department to the concession holder for the latter's use and operation during the term of the concession but shall retain ownership of the works related to the expansion of the Customs Offices building, albeit indemnifying the concession holder for the price thereof in accordance with the appraisal to be done at that time and depending on the condition in which they find themselves, and the Government may then use the building for any purpose it may deem suitable.

19.- The works that make up the project are granted for public service, subject to the rates accepted for them at the public bidding, whose bases and rules and regulations for their application are set forth in the project's documents; and no rate higher than the authorized one may be demanded, said rate to be posted in a conspicuous location. *Dl. 85 1905 Art. 113, Ports Act.*

20.- Application of these rates shall be governed by the accompanying rules and regulations, but, it being understood, only to the extent that they are not contrary to Customs rules, regulations, and ordinances, and all other provisions in effect on this matter or those of a general nature which may be issued in the future.

21.- Employees charged with the maintenance and policing of the State docks shall, upon notice from the concession holder, duly act pursuant to the provisions of Article 26 of the Rules and Regulations for the Maintenance and Policing of State Docks against vessel and merchandise consignees who allow refuse resulting from broken crockery, tiles, bricks, etc., as well as straw, cane, and other materials used as stowage on the vessels, to be thrown onto the jetty in violation of Article 4 of the aforesaid Rules and Regulations.

22.- Government vessels and those carrying items intended for the different agencies of the State shall have preferential docking, loading, and offloading rights, provided that the head of

the appropriate office should so request it, half of the rate established for other vessels being paid for this service.

23.- The concession holder may afford no preference for the use of the jetty and its devices --except in the case contemplated in the previous condition-- other than priority order, to which effect it shall keep a chronological register of all applications made to it, which it shall be obliged to exhibit to any who so requests.

24.- All provisions the concession holder may issue for jetty operations shall be in full harmony with Customs Rules and Regulations and Ordinances in effect or with those which may be issued in the future, as well as with the monitoring and intervention by Customs authorities.

25.- Before commencing the work, the Head Engineer of the District shall, in the presence of the concession holder, review the works to be done according to the project, a certificate of said proceeding to be issued in triplicate; one of the copies, with the corresponding plan, shall be submitted to the Department of Public Works for its approval and, once this has been obtained, another copy shall be delivered to the concession holder and the third shall be kept in the files of the Public Works Office of the District.

26.- The concession holder shall commence the work within a term of four (4) months reckoned as of the date of the concession, and shall do the work in the order and within the terms set forth below:

(1) The new Custom Offices shall unfailingly be ready for occupancy in thirteen months.

(2) The Customs Inspectors Department in the steel-and-concrete building, with its parcel-handling electrical mechanism, shall all be ready for use in thirteen months.

(3) The sidings [*chuchos viajadores*] and the five southerly transverse sections of the steel-and-cement building that include a portion thereof six hundred and forty (640) feet long, from east to west, by eighty (80) feet wide, from north to south, with installed fixed rails for the "locohoists," shall be ready for use in twenty-two (22) months.

(4) The next seven transverse sections of the building, with their complete equipment, ready for use, in twenty-eight (28) months.

(5) The rest of the landfill for the building and the public dock, in forty (40) months.

(6) Thus, operation of all parts of the projected plant can take place upon the expiration of the forty-month term.

27.- All deadlines mentioned in the previous article are understood to be reckoned as of the date of the concession.

28.-    The Head Engineer of the Public Works District shall be in charge of inspecting the execution of the work and compliance with these conditions.

29.-    The works having been completed, the Head Engineer shall make a detailed inspection thereof and, should he find that all the terms of the concession have been complied with and that said works are in perfectly serviceable condition, he shall so note for the record in a certificate to be issued in triplicate, one copy of which shall be forwarded to the Public Works Department for its approval, and once this has been obtained, the others shall be distributed in the manner indicated for the certificate of review of the project.

30.-    All expenses incurred in connection with the review, inspection, and delivery of the works shall be for the account of the concession holder, as well as the costs of inspection at overseas factories of the steel intended for the building and machinery, to which effect the concession holder shall deposit at the location to be indicated to it, the sum of one thousand pesos ($1,000.00) per month for the duration of the inspection at the factories in order to cover the expenses thereof.

31.-    This concession is understood to be granted with no prejudice to third parties, except as regards the right of ownership, and on the understanding that the concession holder is bound by such laws of a general nature as have been, or may in the future be, issued with respect to this class of concessions.

32.-    This concession shall be terminated if the concession holder should default on any of these conditions, which are mandatory upon him, the consequences of such termination being those set forth in the General Public Works Act and its Rules and Regulations.

33.-    Upon the expiration of the term of concession, the State shall replace the concession holder in the possession of the works and shall enter immediately into the enjoyment of the concession and the products thereof, with any and all of its machinery, rolling stock, equipment, devices, and improvements that may have been introduced.  The concession holder shall have the obligation to surrender the works and the material for the operation thereof in good repair and serviceable condition.

Within the five years preceding the end of the concession, the Government shall be entitled to retain the liquid proceeds from the works and to use them to maintain the works in good repair, if the concession holder should attempt not to discharge this obligation fully.

Havana, November 29, 1905

<div align="right">

T. ESTRADA PALMA,
President

</div>

*Rafael Montalvo,*
*Secretary of Public Works*

Case 1:19-cv-23596-BB   Document 46-2   Entered on FLSD Docket 04/29/2020   Page 9 of 33

[…]

# LOPEZ AND DURAN
## INTERPRETING AND TRANSLATING
740 Malaga Avenue, Coral Gables, Florida  33134
Tel.: (305) 443-3432

### CERTIFICATE OF ACCURACY

STATE OF FLORIDA )
              ) SS.
COUNTY OF DADE   )

Before me, a notary public in and for the State of Florida at large, appears Nelson Duran, Ph.D., who is personally known to me, for and on behalf of Lopez and Duran Interpreting and Translating, who, after being duly sworn, deposes and says that the foregoing is a true and correct translation from the _Spanish_ of the attached document consisting of _eight (8)_ pages, and that this is the last of the attached.

Nelson Duran, Ph.D.

Sworn to and subscribed this ___31st___ day of ___January___, 20_20_.



Armando Escoto
Notary Public,
State of Florida at Large

My commission expires:

ARMANDO M. ESCOTO
MY COMMISSION # GG 07572
EXPIRES: June 24, 2021
Bonded Thru Notary Public Underwriters

The utmost care has been taken to ensure the accuracy of all translations.  Lopez and Duran Interpreting and Translating and its employees shall not be liable for any damages due to negligence or error in typing or translation.

HAVANA DOCKS CORPORATION

## NOTES ON CONCESSION AND SUPPLEMENTS THERETO

| | |
|---|---|
| Decree No: | 467 |
| Dated: | Nov. 29, 1905. Published in the Official Gazette and made a law Dec. 14, 1905. |
| Powers Granted to: | Compania del Puerto, successor to Sylvester Seonel to carry into effect the project presented by Mr. Seonel Aug. 22, 1904. |
| Concession: | To build a dock with machinery and a building for the Custom House. |
| Term: | 50 years |
| Payment for Site Occupied: | To assign to state the building for Custom House Inspectors and make certain other improvements. |
| Expropriation: | If made during concession, cost of work done to be paid by government. |
| Tariff: | 27% less than tariff in Seonel's plan. |
| Government Vessels: | Shall be given preference in docking, unloading, etc., at $\frac{1}{2}$ of rate for other vessels. |
| Preference: | No other preferences shall be given any one. |
| Plans: | Must be approved by the Sec. of Public Works. |
| Completion: | Within 40 months. |
| Succession of Government: | At the end of the concession the government shall succeed the concessionary in the possession of the works with all its machinery. |
| Signed by: | T. Estrada Palma, President. |

### 1st Supplement

| | |
|---|---|
| Decree No.: | 1022. |
| Date: | Nov. 11, 1910. |
| Concession: | Changed from one dock to four, a, b, c and d. A and b shall contain warehouses. A and b to be constructed at once. c to be constructed ten years after completion of b. d  "    "    "    five  "      "      "      "  c. |
| Coal Storage: | The Storage of coal is prohibited. |

Exhibit 0005
Jerry Johnson

HDC 012573

- 2 -

## 2nd Supplement

Decree No.:          1944

Date:                Dec. 13, 1920 — Published in Official Gazette
                     Dec. 15, 1920.

Agreement:           Company agrees to begin immediately the rest of the
                     work to be done if certain modifications are agreed to.

                     (1) Docks C and D to be consolidated in one body.
                     (2) Amplify actual docks A and B.

Term:                Term extended to 99 years from Nov. 29, 1905.

Completion of
Construction:        30 months allowed.

## 3rd Supplement

Decree No.:          140.

Date:                Jan. 25, 1922.

Permit:              Permission is given to continue construction work,
                     which was suspended by the Secretary of Public Works.

Reports:             The Dept. of Public Works will report on work done to
                     date.

HDC 012574

Report on the properties of:

HAVANA DOCKS CORPORATION

In the Port of Havana, Cuba.

with an introduction indicating:

The method of valuation and
the scope of the report.

The main report with:

Descriptions and valuations.
Maps.
Photographs.

And an appendix including:

Qualifications of the Appraiser.
Letters in support of qualifications.
A chart of construction costs in Cuba.

**Exhibit 0006**
Jerry Johnson

HDC 000298

# I N D E X

|  | Page |
|---|---|
| Introduction. | 3 |
| Summary of values. | 5 |
| General Description. | 6 |
| Map of Havana. | 9 |
| Detailed Description of Buildings and Piers. | 10 |
| Photographs. | 13 |
| Map of the Property. | 15 |
| Concession. | 16 |
| Other Properties. | 20 |
| Qualifications of Appraiser. | 25 |
| Letters in support of the qualifications. | 32 |
| A chart of construction costs in Cuba. | 43 |

oOo

HDC 000299

3

Report on the value of certain properties
of the Havana Docks Corporation, situated
at the Port of Havana, Havana, Cuba.


This appraisal has been prepared from the available in-
formation, and includes not only descriptions of the proper-
ties, but also accounting information like balance sheets,
photographs of the properties, maps of the surrounding area of
the city, and the recollections of the appraiser, who was per-
sonally familiar with the properties.


I feel that the values contained in this report reflect
the actual values of the properties of Havana Docks Corporation
at the Port of Havana, as described elsewhere in this report.


The value of all the physical properties have been calculat-
ed from the detailed measurements available to the appraiser and
the costs of construction with which I was very familiar. The
values are all actual values, as defined in the insurance of these
types of properties, that is replacement value less depreciation.


The replacement value has been determined from that of
a similar property which would be used in mid 1960, if replace-
ment were contemplated, and valuing the buildings on the

HDC 000300

basis of their area of construction, and of a unit price in each case.

Depreciation was then applied, depending not only on age but on conditions of maintenance, expenditures over the years, general appearance of the warehouse, piers, etc. In general it has not been severe, as the properties were in excellent state of repair and maintenance, and therefore the chief component in the depreciation has been obsolescence. It bears no relation to any depreciation on the Company's books, as it is the depreciation used for insurance valuations.

The value of the concession and that of the other properties included in this report has been determined in specific ways as fully described in the text.

The margin of error in the building and structures section is believed to be within 10% and in every case an effort has been made to be conservative.

This appraisal includes only what is expressly included, and its parts should not be taken by themselves but within the context of the descriptions and explanations. It has been made from sources I believe accurate, but no responsibility is accepted for them, nor representation is made as to ownership, legal title, specially regarding the concession, or anything else except values, which I believe are fair and reasonable.

May 1970                                        Luis Parajón

SUMMARY OF VALUES:

> Marginal Building, San Francisco,
> Machina and Santa Clara Piers and
> warehouses, wharves, including
> piles, fire protection equipment and
> dredging. Depreciated value       $ 13,000,000.00

> Office Equipment, depreciated
> value       100,000.00

> General Equipment, depreciated
> value       580,000.00

> Concession       2,500,000.00
>       $ 16,180,000.00

HDC 000302

General Description of the Properties:

On the Avenida del Puerto, a very busy street in downtown Havana, the Havana Docks Corporation had the properties described hereinafter.

They were situated on the south, or city side of the port, and the first from the entrance of the port, of the numerous other warehouses and piers that lined this side of the Port of Havana.

The properties included the long Marginal Building, which fronted on the Avenida del Puerto, with three piers perpendicular to it, and thrusting into the port. They were certainly among the top two or three facilities of this kind in Havana, and many people would say they were the best property. All official Port and Customs offices were located in the premises, including the Customhouse, the Port Inspector General, the Immigration Department, the Passenger Department, the Medical Inspector for the Port, the Maritime Police and the Quarantine Services.

Particular attention is called to the included photographs. One shows the entire structure, from the city side and reveals the length of the Marginal Building, as well as conveys the beauty of the facade. The towers concealed water tanks used in the fire protection equipment system.

The picture taken from the port side shows the three

HDC 000303

piers and permits a view of the extensive docking facilities, with an indication of the wharf areas.

The picture showing the section of Havana where these properties are located indicates their excellent and probably un-equaled location.

The Marginal Building had three floors in its entire length, and four floors in certain sections, and was all built on concrete piles. The structure is steel and concrete, with concrete slabs, covered with terrazzo floors in the office or certain public areas, and cement or even granite blocks on the others. The building is oc-cupied by warehouses, offices, and Government Departments. The fire protection system was excellent, with all the warehouses protected with sprinklers.

The three piers were approximately equal in length and width, about 600 by 200 feet. (Exact measurements are given later, in the following section). Their construction as that of the Mar-ginal Building, was excellent, all steel and reinforced concrete, with a double railroad line running on the platforms around them.

There were two floors on each pier, and these areas were used for warehouse, cargo handling and passenger accomodation.

The Marginal Building, with the first two piers, called San Francisco and Machina, were built around 1914 and 1915. The third pier, called the Santa Clara pier, and its corresponding section of the Marginal Building, were built much later, about

HDC 000304

8

1925.

The piers were dredged all around. The precise drafts are shown in the following section, and were perfectly adequate for the ships that regularly docked in Havana.

Some of the companies that owned or operated these boats are well known and are the following:

| | |
|---|---|
| Holland America Line | Rotterdam, Holland |
| French Line | Paris, France |
| Naviera Aznar | Bilbao, Spain |
| Kawasaki Kissen KK | Kobe, Japana. |
| Independence Line | San Francisco, California |
| Cia. Colonial de Navegacao | Lisboa, Portugal |
| Lykes Brothers Steamship Co. | New Orleans, La. |
| Swedish America Line | Gothenburg, Sweden |
| American President Lines | New York, N.Y. |
| Italian Line | Genoa, Italy |
| Home Lines | New York, N.Y. |
| Mitsui Lines | Tokyo, Japan |
| Cunard Steamship Lines | Liverpool, England |
| Moore McCormack Lines | New York, N.Y. |
| Cia. Transatlántica Española | Madrid, Spain. |

HDC 000305



HDC 000306



HDC 000307



Valor Promedio Proporcional
de las construcciones en la República de Cuba
desde el Año 1913 hasta el Año 1959

S. M. Parajón.
Arquitecto

Luis Parajón
Ingeniero

HDC 000308

10

Detailed Description of Buildings and Piers:

As shown in the accompanying map, there were four prin-
cipal structures:

a) The Marginal Building, 1,153 feet by 65 feet.
This was a concrete and steel structure on a concrete slab resting
on concrete piles. The structure consisted of 16" x 24" columns
every 20 feet, concrete beams which supported concrete slabs pre-
pared to receive large loads and 12" walls of poured concrete. There
were several steel doors to permit easy access to the street. The
floor adjoining the street, and where there was heavy truck traffic,
was made of granite blocks. Roofs were flat slabs covered with Spa-
nish tiles.

b) The piers were all of steel and concrete,
beams, slabs and piles, as was the Marginal Building, and of the
same excellent construction. They had two floors, and a platform
running around them on three sides, which supported a double rail-
road line. These aprons were about 30 feet wide and extended the
entire length and width of the pier, except at the end, where they
were 40 feet wide. They had all the necessary equipment to facilit-
ate the docking of all ships. There were a number of doors open-
ing onto the platforms to permit the movement of merchandise to
and from the warehouses.

The dimensions of the piers were as follows:

HDC 000309

11

San Francisco Pier: North Side, 662 feet.

                South Side, 662 feet.

Machina Pier:       North Side, 661 feet.

                South Side, 602 feet.

Santa Clara Pier:  North Side, 625 feet.

                South Side, 562 feet.

     Adjoining the Marginal Building, there was a smaller wharf, to the east, which was about 16 feet by 130 feet; and there were two more wharves, between the main piers, that is on both sides of the Machina Pier, which was the middle one, and adjoining the Marginal Building, which were approximately 16 feet wide and 250 feet in length, as pictured in the map included.

     The Marginal Building had 10,000 square feet of piers and a covered area for warehouses and offices of 250,000 square feet. The three principal piers, San Francisco, Machina and Santa Clara had a warehouse covered area of 500,000 square feet.

     The draft around the piers, was as follows in 1959:

San Francisco Pier: North Side, from 29 to 32 feet.

                South Side, from 20 to 36 feet.

Machina Pier:       North Side, from 24 to 37 feet.

                South Side, from 22 to 25 feet.

HDC 000310

Santa Clara Pier: North Side, from 20 to 25 feet.

South Side, from 21 to 32 feet.

This area around the piers was originally dredged, and then maintained at the appropriate level by means of subsequent dredgings at regular intervals. The value of the dredging as was needed originally, but as done in 1959 has been valued here.

HDC 000311



HDC 000312



HDC 000313

16

The Concession:

        In order to value the concession, I have relied on the following points as given to me by the Company. In addition I have read the Decrees as listed below, and studied the balance sheets and profit and loss statements for the ten years prior to 1959, of the Havana Docks Corporation, and appended some of the information contained therein.

        a) That the concession was granted by Decree No. 467 of November 29, 1905 amended by Decree No. 1022 of November 11, 1910 and by Decree No. 1944 of December 13, 1920 published in the Official Gazettes of December 14, 1905, of November 19, 1910 and of December 15, 1920.

        b) That the concession ran for 99 years, to the year 2004. That the other relevant conditions in the concession for the purposes of this appraisal are that the structures would revert to the Cuban State after the term of the concession, and that they had to be in good maintenance and operating condition.

        I have then developed a reasoning based on the fact that the operation of the concession produced in excess of net income a sufficient cash flow, which, invested annually would produce at the end of the life of the concession, a capital equal to the appraised value of the entire property, including the value of the concession.

HDC 000314

A study of the depreciation account for the 1949-1958 period, shows that the ten year average is $ 133,354 per year. Over this period this figure had been increasing, and the average for the last five years is $ 138,745.00.

Taking however only the ten year average, at an interest rate of 4¼%, making over the 45 year period to the end of the concession regular yearly payments of $133,354.00, at the end of the period, the capital obtained is $17,000,000.00.

The interest rate of 4¼% has been chosen as a very conservative and low one, for the 45 years, because in this way the effect of taxes is eliminated. Either invested in tax exempts at that level, or in other more productive investments but tax-paying ones the result should be the same, specially because a low rate is being considered.

Sidney Homer an acknowledged authority on interest rates, in his book A History of Interest Rates, shows that interest rates in prime American Corporate bonds, rose from 3.2% in 1899 to 5.5% in 1919, dropped then to 2.5% in 1946, and then started a rise to the 9% where they stand to-day. Homer's book published in 1963 goes to 4.5% in 1961 only. The 9% has been taken from newspapers.

In Cuba, Government bonds produced over 4% in many cases, and real estate mortgages, as well as direct real estate ownership produced higher returns.

HDC 000315

Valuing the concession at $2,500,000.00, the value of the entire property is $16,180,000.00, including the furniture, fixtures and other equipment, as shown in the Summary of Values page. Therefore, the $17,000,000 obtained at the end of the period, still leaves almost one million dollars as a further reserve for possible claims by the Cuban State, arising from the condition that the properties have to be returned in good state of maintenance. This reserve would probably not be necessary as the Havana Docks properties were maintained in such a way that they were able to attract the clients of the highest calibre. Furthermore, there seems to be a limit to the Cuban State's claim. Clause 33 of the November 29, 1905 Decree, stipulates that the Government could retain the "liquid revenues" of the Havana Docks and apply such revenues to the maintenance of the properties, for the last five years of the concession.

Should the reserve not be necessary, the value of the concession, under the above reasoning, would rise accordingly. If the depreciation and amortization figure should continue to rise after 1959, as it did, from $122,874 in 1949 to $138,134 in 1958, a total of 12% in ten years, the final figure would have come out much higher. Regular payments of $138,134 at 4½% produces $18,000,000, and a reasonably higher one of $170,000 produces $22,000,000.

In view of so many imponderables over such an extended period of forty five years, I feel that a conservative value of $2,500,000 for the concession is fair.

HDC 000316

## HAVANA DOCKS CORPORATION

Selected Data from Annual Reports

| Year | Depreciation | Net Income | Operating Income | Taxes |
|------|-------------|------------|------------------|-------|
| 1949 | $ 122,874.42 | $ 97,825.57 | $ 2,291,181.00 | $ 179,000.00 |
| 1950 | 123,351.00 | 249,299.46 | 2,940,769.00 | 251,000.00 |
| 1951 | 127,116.56 | 227,980.27 | 3,156,754.00 | 262,000.00 |
| 1952 | 131,539.04 | 148,650.54 | 2,783,676.00 | 229,000.00 |
| 1953 | 134,940.17 | 194,650.91 | 2,931,689.00 | 264,000.00 |
| 1954 | 135,992.48 | 83,084.06 | 2,546,334.00 | 144,000.00 |
| 1955 | 138,050.44 | 27,543.20 | 2,338,300.00 | 99,000.00 |
| 1956 | 139,966.00 | 84,424.00 | 2,610,710.00 | 156,000.00 |
| 1957 | 141,581.00 | 167,212.00 | 2,823,318.00 | 194,000.00 |
| 1958 | 138,134.00 | 51,097.00 | 2,477,754.00 | 128,000.00 |
| Average: | $ 133,354.00 | $ 133,176.00 | | |

Note: The year 1959 is not included (there was a loss of $424,113.00) as the Company was already operating under the Castro Government.

HDC 000317

Other properties:

There were other properties, mainly equipment. These have been classified under two headings, the office equipment and the general equipment.

The valuation is based on inventories taken by employees of the Company, as described in detail in the following pages.

HDC 000318

Other Equipment:

   In the Company's records, there are two documents that are physical inventories of the contents of the buildings, taken as of December 31, 1959.

   One of the inventories is a detailed, sixteen page long report, that appears to have been taken by the different Department Heads under the supervision of Mr. M. Rodriguez Lanza, Asst. Vice President and Comptroller. It lists the office furniture and fixtures, grouped under the following headings, with the values as they appear in the inventory:

| | |
|---|---:|
| Conference room: | $ 755.00 |
| General Administration | 4,255.51 |
| Vice President of Operations | 2,409.20 |
| Vice President and Asst. Comptroller | 894.90 |
| Asst. Vice President and Asst. Comptroller | 365.10 |
| Accounting and Auditor's Office | 7,782.80 |
| Records and Claims office | 9,989.53 |
| Liquidation office | 7,401.66 |
| Cashier Section | 4,432.85 |
| Personnel Section | 29,158.61 |
| Purchasing Section and Office | 6,032.03 |
| Surveillance | 2,591.98 |
| Operations Inspector's Office | 1,181.10 |
| Lobby | 827.16 |
| Workshop | 1,430.12 |
| General Warehouse | 444.48 |

HDC 000319

| | |
|---|---|
| San Francisco Wharf | $  3,201.77 |
| Machina Wharf | 3,858.84 |
| Santa Clara Wharf | 3,603.09 |
| | $ 90,615.73 |

The inventory has been carefully studied, and some of the values seem so low, that it is quite possible that they are book values, but it is difficult to value items such as those on this list without a better knowledge of them. However, I think that a rounding up to $100,000.00, or about 10% is a much fairer value, for the articles described in the list, after a depreciation, is applied.

There is another inventory, taken also as of December 31, 1959, of the general equipment. This one is six pages long, again seems to have been conducted under the general supervision of Mr. M. Rodriguez Lanza, Asst. Vice President and Asst. Comptroller. In this one, it is expressly stated that the values are "costs per books", meaning probably what I would call value per books, or simply book values, with a total of $419,055.99

I have studied this inventory, and valued the items described therein as follows:

| | |
|---|---|
| Nineteen elevators, including portables, stackers, endless belts, etc. Depreciated value | $   150,000.00 |
| Construction equipment, portable compressors, concrete mixers, vibrators, wagons, etc. Depreciated value | 35,000.00 |

HDC 000320

Workshop equipment, depreciated value          $  25,000.00

Six hundred cars, push carts, etc. De-
preciated value                                   70,000.00

Fifteen scales, depreciated value                 10,000.00

Fifty five tractors, depreciated value           250,000.00

Air conditioning, and refrigerating
equipment, depreciated value                      25,000.00

Miscellaneous, including wooden platforms,
pallets, etc. Depreciated value                   15,000.00
                                                $ 580,000.00

HDC 000321

APPENDIX

Statement of qualifications, education
and general outline of professional activ-
ity and experience of Mr. Luis Parajón.

Graduated from top Preparatory School, Belen, in Havana,
Cuba, in 1945, suma cum laude, with degree of Bachelor of
Sciences, required to enter the University of Havana.

Five years of Civil Engineering receiving the degree of
Civil Engineer in 1950 with the top mark Outstanding, and
suma cum laude. Received the scholarship prize in competit-
ion with three other graduating classes. Concurrently complet-
ed three of the four years required for the Doctor of Science
degree. One further year at the Mass. Institute of Technology
( MIT) in Cambridge, Mass. studying several engineering and
business disciplines.

Since 1950 to 1960, I was a partner in the firm of Parajón
e Hijo, at Havana. This firm engaged in engineering and apprai-
sal work, was the direct successor of Aguiar y Hno., the name
having changed in 1950 when I joined the firm.

Aguiar y Hno. was founded in 1910 by Antonio G. de Aguiar
and Octavio G. de Aguiar, also to engage in engineering and
appraisal work. In 1925, my Father S.M. Parajón entered the
firm, a nephew of both founders, upon his graduation from
the University of Havana as Engineer and Arquitect.

He was a partner until 1944 when, the last of the Aguiars
having died, he became the sole proprietor.

In 1950 I entered the firm upon my graduation from the
University of Havana. At this time the name was changed and
I became a partner.

HDC 000323

Over the years, the main activity of the firm was the conduct of appraisals and adjusting work for insurance companies relating to property losses caused by fire, cyclones and other similar risks. In 1959 we were conducting approximately 75% to 80% of the appraisal work in property losses in Cuba for domestic and foreign companies.

In addition to this appraisal activity, we also inspected buildings or other structures in course of construction for mortgage lenders, like Banks, Life Insurance Companies, and other Institutions. Also valuations were conducted of industrial concerns, mainly sugar estates for insurance purposes or otherwise. Being the main industry in Cuba, the largest proportion of the valuations were in the sugar industry, and therefore we have had considerable experience in the valuation of sugar plants and properties.

Some of the sugar plant and properties appraised by our office over the years were:

Centrals Gómez Mena, Mercedita, Santa Teresa, Algodonal, Resolución, Santa Lutgarda, Natividad, San José, Soledad ( Cienfuegos ), Perseverancia, Washington and Ermita. Miranda, Palma, Alto Cedro and Santa Ana of the West Indies Sugar Co., Agramonte, Estrella and Vertientes, of the Vertientes-Camagüey Sugar Co.

Boston and Preston of the United Fruit Sugar Co. Baraguá, Florida and Macareño of the former Punta Alegre Sugar Co. and finally Chaparra, Delicias and Mero

HDC 000324

cedita of the North American Sugar Industries, formerly Cuban American Sugar group of Companies. Recently the Czarnikow-Rionda group, including Cáspedes, Francisco, Elia, and Manatí with their subsidiaries, were also appraised.

In the Dominican Republic we appraised Boca Chica, Barahona, Consuelo, Quisqueya and Las Pajas; and in Haiti Centrales Hasco and Dessalines.

We appraised the properties of the Cuba Distilling Company and the Old Time Molasses, which consisted mainly of molasses pipes and tanks; the Arechabala Refinery for sugar, the largest in the Island. We visited every sugar mill in Cuba to evaluate the feasibility of changing the warehousing system to ship sugar in bulk. We designed new warehouses, ports, piers and ships specially adapted to this technique, in the early fifties. To this effect we visited, not only all the Mills in Cuba, but every major installation in the world, handling bulk sugar, as those in Hawaii, Trinidad, Puerto Rico and Jamaica.

As to engineering experience, in addition to the design and construction of major structures, office and apartmentsbuildings, we designed several theaters, major residences, piers, warehouses, a small bridge and several port developments. Served as consultants to many sugar companies, and kept the only statistical chart on construction costs in Cuba from 1913 to 1960. Finally in 1958, designed the then only structure in

28.

Cuba for sugar in bulk, two parabola shaped concrete warehouses.

These activities were carried on by the firm and directed by
one or the other of the partners, but from the middle fifties,
I was the managing partner of the firm. In addition I personal-
ly took over the inspection of properties for mortgagespurposes
the appraisal of sugar properties in general, the design of eng-
ineering structures, the appraisal of some of the losses for the
Insurance Companies, and the financial end of the operations.

Of the thirty four mills listed above and appraised by our
firm at one time or another, I personally inspected fourteen,
Santa Lutgarda, Natividad, Perseverancia, Miranda, Palma, Al-
to Cedro, Santa Ana, and Washington, Barahona, Consuelo, Quis-
queya, Las Pajas, Nasco and Dessalines. The other twenty were
inspected by three or four different members of our staff un-
der the direction of my father. In addition I appraised Merce-
dita, Chaparra, Delicias, Céspedes, Francisco, Elia, and Manati.

I also directed the entire project described above to study
the feasibility of changing the warehousing system to handle
sugar in bulk at all the mills and ports of Cuba.

The work included the study of the shipping system also, n
not only for the marine portion but also for the transportation
from the Mills to the ports, for which a special system of con-
tainers was designed.

HDC 000326

Under my direction all the Mills were inspected by one or more members of our staff, and then after adequate drawings we were prepared in the field and the office, a special system was designed for everyone of them. It was part of my duties to design a special bulk carrier ship, which was designed in a preliminary way under my instructions at the Mass. Institute of Technology in Cambridge, Mass.

I also co-directed with another firm the inspection of all the sugars in Cuba at another time in order to certify the number of sugar bags then in existence, which again carried the combined staffs of both firms under my direction to everysugar mill and port in Cuba.

Appraisals of losses for Insurance Companies, under my supervision were those of commercial risks, group losses of catastrophic proportions, in which several blocks in one town were destroyed, and losses at sugar mills and other industries. I also supervised all the other losses handled by the office, and every report that was sent to an Insurance Company during those years went over my signature. There were an average of five hundred reports a year, in the last half of the decade, with some of the very busy years, approaching the 900.

Included were marine inspections of both cargo and hulls in a new department that I inaugurated in the middle fifties with very good results and ever expanding business.

HDC 000327

30

Our insurance adjustment business took us to Peru, Colombia and Puerto Rico a few times, but to Central America and the Dominican Republic, Haiti and Jamaica fairly often.

As to engineering experience, besides routine inspections for Insurance Companies of their risks for safety recomendations, and appraisals for insurance purposes, we designed and built major structures, office and apartment buildings, several theaters, major residences, piers, warehouses, a small bridge and several port developments. We served as consultants to some sugar companies, and kept the only chart on construction costs in Cuba, from 1913 to 1960.

Then in 1960, I left Cuba for obvious reasons, and settled in the United States. After three years with the General Adjustment Bureau, a Company owned adjusting organization, and a very brief period in the export-import business, I went back to the appraisal business.

Since 1966, I have been submitting appraisals of the Cuban properties of United States companies, for presentation to the Foreign Claims Settlements Commission. This Commission set up by an Act of Congress, has a Cuban Division which certifies the losses the U.S. citizens suffered in Cuba, and I have been engaged by most of the large companies. My clients range from Warner Lambert Int. to United Fruit Company, United Shoe Machinery, and all the Sugar Companies but one.

These appraisals total close to U.S. $ 700,000,000.00 and the largest one was for U.S. $ 120,000,000.00

HDC 000328

31

        In engineering I had under my direct supervision the design
of all the structures which during my time, were either built or
or studied by our office. I worked in many instances with firms
like the Frederick Snare Corp. of New York, Raymond International,
and specially John Graham and Co. of New York and Seattle; with
this last one I cooperated in the design of several office build-
ings in Haiti, the Dominican Republic and of course, Havana.


        There were many other projects, special and interesting,
and other activities and duties carried on by me during those years
but I should think the above gives an idea of my capabilities.


                                        Luis Parajón



May 1970

HDC 000329

32

## MARSH & McLENNAN
### INTERNATIONAL, INC.

70 PINE STREET
NEW YORK 10005

HARRY FANJUL
VICE PRESIDENT

June 28, 1967

Mr. Luis Parajón
c/o Czarnikow Rionda & Co.
120 Wall St.
New York, N.Y.

Dear Luis:

In accordance with your request I am pleased to attest to the following:

1- That I independently operated under my name an insurance brokerage firm in Havana, Cuba, from 1947 to 1959, when I then became Vice President & General Manager of Marsh & McLennan-Harry Fanjul Corredores de Seguros S.A. until my departure from Cuba in October 1960.

2- That during the above period the firm of Parajón e Hijo, of which your father and you were the principals, was well known to me and that both of you were highly regarded for your outstanding professional services in all matters concerning appraisals and adjustment of losses.

3- That your firm also extended your services to other areas in the Caribbean as well as Central America.

The above-stated testimony may be used without restriction, as you may best deem advisable.

Best regards.

Harry Fanjul
frt



ROLLINS BURDICK HUNTER CO.

NEW YORK

LAWRENCE E. GILBERT
VICE PRESIDENT

INTERNATIONAL DIVISION
ROOM 5400-30 ROCKEFELLER PLAZA
AREA CODE 212-CIRCLE 7-3000

January 11, 1967

Mr. Luis Parajón
55 Mallard Drive
Greenwich, Connecticut

Dear Luis:

As you know, I was resident in Cuba from the beginning of 1940 until mid 1960. As a Director of American International Corporation, and later as Vice President and General Manager of Marsh & McLennan of Cuba, I was almost continually in business contact with the firm of Parajón e Hijo of which you and your father S. M. Parajón, were the principals. You will recall that these contacts were of a professional nature due to the fact that our business activities comprised insurance brokerage on behalf of most of the major U. S. companies in the Sugar and other industrial operations. We utilized your services, including appraisals and loss adjusting not only in Cuba but throughout the Caribbean area, including Central America, because of your demonstrated professional competence combined with integrity and character, for which you were recognized as outstanding.

Although due to present circumstances it is rather painful to recall, during the last 8-10 years of my residence in Cuba my principal contact with your firm was through you and in all respects you demonstrated the afore-mentioned qualities, both personally and professionally. Almost constantly during the period indicated, we dealt with all aspects of the sugar industry, due to our representation of the interests of the American Sugar Refining Co., The Cuban American Sugar Co. (now North American Sugar Industries) as well as other producers, totalling approximately 12% of the entire sugar producing facilities in Cuba.

As a Director of the American Chamber of Cuba and active in the business community, I had ample confirmation of your reputation, from many sources other than my own.

With best wishes, I am,

Sincerely,

LEG:caf

UNITED STATES:  CHICAGO   NEW YORK   DETROIT   ST. LOUIS   SAN FRANCISCO   SEATTLE   BOSTON   LOS ANGELES   TULSA
SOUTH AMERICA:  ROLIBEC   SAO PAULO   RIO DE JANEIRO   BUENOS AIRES   CARACAS   VALENCIA   BOGOTA   CALI
CANADA:  ROLLINS-REED, LTD.,   MONTREAL   REGINA   CALGARY   EDMONTON   VANCOUVER   ENGLAND: LONDON   ASIA: TOKYO   BANGKOK

HDC 000331

34

ESTABLISHED 1875

CABLE ADDRESS "DESPARD"
TELEX 421645

# DESPARD & CO., INC.

161 WILLIAM STREET
NEW YORK, N. Y. 10038
TELEPHONE 964-9100

INSURANCE BROKERS
CONSULTANTS

ADJUSTERS OF AVERAGE
WORLDWIDE SERVICE

January 6th, 1967

Mr. Luis Parajon,
    55 Mallard Drive,
        Greenwich, Conn.

TO WHOM IT MAY CONCERN:

        I have known the firm of Aguiar y Hno. and its successor, Parajon e Hijo, for approximately thirty years. On numerous occasions, I have had to call upon the principals, Mr. S. M. Parajon and Mr. L. Parajon, for appraisals and loss surveys pertaining to properties in Cuba as well as Puerto Rico. The properties involved were primarily sugar mills and contents and properties of leading tobacco interests in Cuba. Mr. Luis Parajon has always done an outstanding and thorough job in a workmanlike manner, as regards to all of the appraisals and surveys requested. Approximately twelve years ago, Mr. Luis Parajon undertook an appraisal of several hundred buildings for one of the leading tobacco companies in Cuba, with the result that the principals were very well satisfied and complimentary as to the outcome of the work which had been done.

        We have observed, on numerous occasions, that the principals of the firm of Parajon e Hijo were the outstanding appraisers of properties of sugar interests in Cuba, and at no time did the writer ever question their integrity or ability. Many of our outstanding clients were very well satisfied with their services, and at no time were we advised of any criticism of their work. The principals of this firm, Messrs. S. M. Parajon and Mr. Luis Parajon, are outstanding, honorable citizens and very capable and honest in their profession. The writer has been very happy with having had the benefit of their ability and knowledge in the past and does not hesitate to recommend them very highly in undertaking appraisals of properties.

DESPARD & CO., INC.

Chairman

GAH/HW

# Royal-Globe Insurance
## COMPANIES

ROYAL INSURANCE COMPANY • LIVERPOOL & LONDON & GLOBE    LONDON AND LANCASHIRE INSURANCE COMPANY    NEWARK INSURANCE COMPANY • AMERICAN AND FOREIGN
INSURANCE COMPANY • ROYAL INDEMNITY COMPANY • GLOBE    SAFEGUARD INSURANCE COMPANY • STANDARD MARINE    INSURANCE COMPANY • BRITISH & FOREIGN MARINE INSURANCE
INDEMNITY COMPANY • QUEEN INSURANCE COMPANY OF AMERICA    INSURANCE COMPANY • THE MARINE INSURANCE COMPANY    COMPANY • THAMES & MERSEY MARINE INSURANCE COMPANY



150 WILLIAM STREET        NEW YORK, N. Y. 10038

January 17, 1967

Mr. Luis Parajon
55 Mallard Drive
Greenwich, Connecticut

Dear Luis:

You have asked me to set down my knowledge of your professional activities as a civil engineer and property insurance adjuster in Havana, until you were forced to leave Cuba with your family five years ago.

Our business in Cuba was transacted through general agencies in Havana, the largest of whom was G. F. Kohly S.A. who had represented us there for over 100 years. It was their business in The Liverpool and London and Globe Insurance Company Ltd. and Queen Insurance Company of America that I helped to underwrite and service for over 20 years. I feel, therefore, I can speak with some authority of the insurance industry in Cuba.

Our property losses were adjusted exclusively by your father's firm, Parajon e Hijo, not only in Cuba but also in the Dominican Republic and Haiti. We have no hesitation in saying that Parajon e Hijo were the outstanding adjusters in the area, with an unrivalled knowledge of the sugar industry in all its property aspects. Our risks were extensive--many of the largest sugar producers were our insureds--and we had on occasion to settle some very substantial claims. These were adjusted by you and your father with great technical skill and always to the highest ethical standards. I can also vouch for the high regard in which Parajon e Hijo were held by all other insurance companies who used your services.

I am happy to send this commendation to you. You are at liberty to use it as you deem necessary, and I will indeed be pleased to expand on the above or answer additional questions from any person whom you may refer to me.

Sincerely,

*Roderick Gerrard*

R. H. Gerrard
Secretary

RHG:sl

36

PRICE WATERHOUSE & CO.

60 BROAD STREET

NEW YORK 10004

January 5, 1966

Mr. Luis Parajon
55 Mallard Drive
Greenwich, Connecticut

Dear Mr. Parajon:

I understand that you have been engaged by one or more companies to make appraisals of sugar cane properties and mill facilities in connection with claims against the Government of Cuba to be filed with the Foreign Claims Settlement Commission of the United States, Washington, D.C. You have asked whether I am in a position to comment on your professional qualifications to make such appraisals.

At the outset, I wish to explain that since July 1, 1943 I have been a partner of Stagg, Mather & Hough and since the early 1950s I have been associated with Price Waterhouse & Co. as a manager in its New York office and a partner in its West Indian firm. The independent accounting practice of Stagg, Mather & Hough was combined with that of Price Waterhouse & Co. in the West Indies in 1952 and elsewhere in 1954.

During the years the aforementioned firms practiced in Cuba, my partners and I were well acquainted with the firm of Parajon & Hijo, of which I understand you became a partner in about 1950. Although I do not personally know you, I can attest that the firm of Parajon & Hijo had gained an excellent professional reputation as appraisers and particulary as appraisers of cane sugar properties and mill facilities. On many occasions we recommended that firm to our clients and others both in Cuba and the Dominican Republic and, to the best of my knowledge, the several companies that made use of its services were entirely satisfied. Several years ago, the Chairman of the Board of one of the largest American-owned raw sugar companies operating in Cuba stated to me that, in his opinion, the firm of Parajon & Hijo, because of its extensive practice in Cuba and elsewhere and because of its intimate knowledge of conditions in Cuba, was better qualified to perform an appraisal of Cuban sugar properties than any of the major continental appraisal companies.

37

Mr. Luis Parajon          - 2 -          January 5, 1966


        Anyone desiring to confirm the foregoing should feel
free to communicate with me or with Mr. T. L. Wilkinson or
Mr. G. F. Gardner at Price Waterhouse & Co., 60 Broad Street, New
York, N. Y. 10004 (telephone:  212 - 943-5900).

                    Sincerely yours,

                    *signature*

                    E. Reginald Harding
                    Certified Public Accountant

HDC 000335

JULIO FORCADE
440 E. 82ND ST (APT. 4V)
NEW YORK, N. Y. 10028

     I, Julio Forcade, a Cuban citizen, of legal age, married, a lawyer, residing at 440 East 82 Street, New York City, do hereby depose and affirm:

     That in Cuba I was President of La Cubana, Cia. Nacional de Seguros S.A. of Aguiar 411, Havana, one of the oldest and largest insurance companies in Cuba;

     That La Cubana, Cia. Nacional de Seguros S.A. used, as official appraisers, Messrs. S. M. Parajon and Luis Parajon, members of the firm of Parajon e Hijo, one of the best, if not the best, appraisers in the country;

     That besides being the appraisers for the above-mentioned company, they inspected all construction done by La Cubana;

     That at all times their work was most satisfactory, and that they enjoyed an exceptionally fine reputation, not only because of their professional knowledge, but also because of their integrity;

     That since 1960 I have been employed by Messrs. Carl Marks & Co., Inc., Foreign Securities Specialists of 20 Broad Street, New York City, and that I have kept in touch with Mr. Luis Parajon, and have always heard people refer to him very highly.

                     Julio Forcade

January 9, 1967

*Lorenzo Toral*

104-40 Queens Blvd.
Apat. 4 X
Forest Hills, N.Y.

The Federal Ins. Co.
90 John St.
New York, N.Y.

January 9, 1967

Mr. Luis Parajón
55 Mallard Dr.
Greenwich, Conn.

Dear Luis:

I am pleased to confirm our conversation of to day regarding the length of time I have known your firm in Cuba.

As you know I was President of Dussaq y Toral S.A. for twenty years, since 1941. Dussaq y Toral S.A. was General Agent and Manager for The Federal Insurance Company of Cuba, Prudential Assurance Co. Ltd. of London, England, and Union Assurance Society of London, American Institute of Marine Underwriters, and U.S. Salvage Association, in addition to several steamship companies among them The Havana-Florida Car Ferry Operating Co. and the Holland America Line.

Personally, I was also a VicePresident of The Federal Insurance Company of Cuba.

I have known the firm of Aguiar y Hno. since 1919, and later when the name was changed to Parajón e Hijo in 1951, using always your services in the appraisal of losses in which our Companies were involved, among them several sugar mills. I know that since the time I knew your firm you were one of the leading firms for appraisals and valuations in Cuba and that your services were utilized by Insurance Companies, both Cuban, American and British, as well as Banks and other institutions.

I knew you and your father, the principals of the firm not only in a business way, but also socially for many years, having also known your grandfather, and found you all persons of the highest character and moral standards.

Your ethics as well as the high degree of professional ability were the reasons why my firm as well as the Insurance Companies we represented used the services of your firm without interruption for forty-one years.

Yours sincerely,

Lorenzo Toral

Lorenzo Toral

HDC 000337

40

201 East 79th Street,
New York, New York.
January 21st, 1967.

Mr. Luis Parajon,
55 Mallard Drive,
Greenich, Conn.

TO WHOM IT MAY CONCERN:

This is to certify that I was a partner of the firm Carrillo y La Guardia, and later vice-president of Carrillo y La Guardia, S.A., General Agents in Cuba for the Great American Insurance Company, the Phoenix Insurance Company of Hartford, and the St. Paul Fire and Marine Insurance Company from the time of their admittance -1918, 1925, and 1949, respectively - until October 1960, when their interests were confiscated.

I joined the firm in 1927, and I can certify that at that time our principals used the services of Mr. S. M. Parajon, of the firm of Aguiar y Hermano, as their main loss adjuster.

Later on Mr. S. M. Parajon was joined by his son, Luis, and the firm became Parajon e Hijo (in English "Parajon & Son"). The Companies represented by us continued to use their services.

The fact that these companies utilized their services over this period of over forty years should be sufficient proof of the ability and integrity of Mr. S. M. Parajon and his son, Luis.

As Cuba's principal industry was the sugar industry it stands to reason that Parajon & Son should have been proficient in the appraisals of sugar properties.

I was very happy to have had the benefit of the above mentioned ability and integrity when settling losses for the account of the underwriters represented by us, and do not hesitate to recommend S. M. Parajon and Luis Parajon, jointly or individually, in undertaking appraisals of property values.

Andres G. Carrillo

HDC 000338

· 41



METROPOLITAN BRANCH   130 WILLIAM STREET   NEW YORK, N.Y. 10038

PHŒNIX
LONDON
GROUP

January 9, 1967

Mr. Luis Parajon,
55 Mallard Drive,
Greenwich, Connecticut

Dear Luis:

I am pleased to confirm our conversation as follows:

As you know I was employed by the Phoenix Assurance Company, Ltd.,
of London in Cuba from 1935 to 1961, and for the last of those
ten years I was their Manager in that country.  In connection with
my work in Havana, Cuba, I came to know the firm of Parajon e Hijo,
of which you and your father S.M. Parajon were the principals, as
we employed them as our Loss Assessors and Appraisers for Cuba.

I knew the firm as appraisers of losses and properties, especially
sugar mills and you were well known to us as persons of good character
with a reputation of honesty widespread in the insurance industry,
as your services were untilized as adjusters of losses.

Since leaving Cuba I have been assigned to the Phoenix Assurance
Company of New York in the United States of America, which is the
American subsidiary of the Phoenix Assurance Company, Ltd., of London.

Yours truly,

G.W. Coster
Vice President

PHŒNIX ASSURANCE COMPANY OF NEW YORK     LONDON GUARANTEE & ACCIDENT CO., LTD.     THE UNION MARINE & GENERAL INSURANCE CO., LTD.

42



FIFTY NINE MAIDEN LANE · NEW YORK 8, N.Y.

ROBERT O. BODET
VICE PRESIDENT AND SECRETARY

January 12, 1967

PERSONAL

Dear Luis:

Following our recent conversation I am pleased to address this letter to you to be used for reference purposes.

My position as Vice President of my Company's activity outside the United States included supervision of our branch office operation in Cuba up to 1960, when our business was nationalized. That association began in 1939 when I was first employed by The Home. At that time I became acquainted with the firm of Aguiar y Hno., which was later succeeded by Parajon e Hijo who not only maintained, but if possible enhanced a well-deserved superior reputation as property damage adjusters and appraisers.

The Home's adjusting needs were principally directed to that office by our branch and handled personally either by your father, Mario Parajon, or yourself. Our experience to my understanding was characterized by the excellent handling of our assignments and demonstrated insight into the specialized varying aspects of the sugar industry, so prominent in Cuba's economic life.

It is a pleasure unreservedly to offer these comments to attest your ability and integrity.

Cordially and sincerely yours

Robert O. Bodet

Mr. Luis Parajon
55 Mallard Drive
Greenwich, Conn.

43

The construction cost curve that follows, was prepared in our office in Cuba around 1940 at the request of several insurance companies.

The curve starts in 1913 and the data for the years between 1913 and 1940, was obtained from records in our office derived from the actual constructions done by our firm in those years. Once prepared it was kept current by posting every year the necessary information and continuing the graph.

The curve reflects costs in the construction industry, both of materials and labor, and therefore is not a statistic of costs of items like machinery, which was mainly imported, although it could be used as a very good guide in evaluating installation costs by Cuban labor.

On the vertical axis the numbers express what usually are now shown as percentages. If construction costs in 1913 were 100% then the scale could be re-written as 133%, 166%, 200%, etc. up to 600%, the highest figure on that scale. Instead we used numerals which express the same concept, 1, 1.33, 1.66, 2. and so forth.

As may be seen from the above explanation, the curve does not show absolute figures but the relative increase taking the costs in 1913 as a base.

HDC 000341

Message

| | |
|---|---|
| **From**: | romac106@comcast.net [romac106@comcast.net] |
| **Sent**: | 4/30/2019 10:49:12 PM |
| **To**: | 'Mickael Behn' [mickaelbehn@havanadockscorp.com] |
| **Subject**: | RE: Havana Docks small Progress |

Hi Michael:

██████████████████████████████████████████████████████

███████████████

What is the thrust of the lawsuit?  Can you explain what you mean by  "we have won the Title III political battle"?

All this sounds encouraging and you have my support.

Cheers,
Robert

**From:** Mickael Behn <mickaelbehn@havanadockscorp.com>
**Sent:** Tuesday, April 30, 2019 12:48 PM
**To:** Robert MacArthur <romac106@comcast.net>
**Subject:** Re: Havana Docks small Progress

Hello Robert,

Just a quick update. We have won the Title III political battle and are now moving forward with lawsuits.
I wanted to thank you for your support and hopefully we will all have a resolution after all these years. Still a long battle ahead of us.
But we have managed to get over the biggest hurdle of all. So in that I am very happy for us all.

Warmest regards,

Mickael

--

**Mickael Sosthenes Behn**
**President | HAVANA DOCKS CORPORATION**
mickaelbehn@havanadockscorp.com

On 3 Nov 2018, at 16:54, romac106@comcast.net wrote:

Thanks Mickael:
This is all very interesting.  I hope we can achieve a business solution and not have to wait for a legal or political one (which could be messy and prolonged).  That said, the more political pressure we can bring the greater probability of our achieving a business arrangement.

███████████████████████████████████  Especially since this administration may be doing our bidding.

We will see.
Cheers,
Robert

**Exhibit
0007**
Jerry Johnson

CONFIDENTIAL

**From:** Mickael Behn <mickaelbehn@havanadockscorp.com>
**Sent:** Friday, November 2, 2018 7:19 PM
**To:** romac106@comcast.net
**Subject:** Re: Havana Docks small Progress

Hi Robert,


I hope all is well


In case you haven't seen these yet. Things are starting to move in our direction


Cuban standard mentioning us at the end.
https://www.cubastandard.com/?p=20350


It looks like this are starting to move in the right direction for us.


https://www.mcclatchydc.com/news/politics-government/white-house/article220909345.html


I also put a quote from me in this article.
https://www.breitbart.com/latin-america/2018/10/30/activists-launch-protests-against-cruises-hateful-bloody-tyranny-cuba/

It feels like the sand is starting to shift in our favor.


Regards
Mickael


Sent from my iPhone

On 10 Sep 2018, at 22:52, "romac106@comcast.net" <romac106@comcast.net> wrote:

> Thanks for the clarification. Comforting to know
> Robert
>
> **From:** Mickael Behn <mickaelbehn@havanadockscorp.com>
> **Sent:** Monday, September 10, 2018 5:38 PM

CONFIDENTIAL

HDC 015208

**To:** romac106@comcast.net
**Cc:** Jerry Johnson <jjohnson@bankofthebluegrass.com>
**Subject:** Re: Havana Docks small Progress

I understood the issue with the state dept and violators at the time. It was just an example that it's been done before to fine citizens. Albeit in different scenario.
We had the lease under the understanding at the time that we build the docks. So yes all the docks but the current one in use (which was built by Havana docks company) was paid and built by us. The issue then becomes that of lease of the land that has expired. What is part of our Cuban claim that was recognized as loss of material buildings and material items within those building as well at the operational period of the lease.
The claim covers the fact that the building where ours under the lease and we would lose the land (with the building) if we didn't renew our lease.
We technically still own that lease of time lost and the materials on that land within our claim.
I don't have the records of that lease at hand. They are in my house in Miami. As are the incorporation papers of the company in 1917. All that paperwork was submitted to the be able to get recognition of our claims. It's really why we have the claim system to avoid having to prove every time.
I have had a few people question the fact that lease had run out so we don't own. But actually since the claim was recognized by the government as we are the property owners its ownership has stayed frozen in time. The cruise lines can try to argue it but really can't without putting the whole claims system in jeopardy.
The Cruise lines have only the state dept waiver that says that they "can use any means possible to reach Cuba without prosecution." An executive order by Obama which apparently trumps (no pun intended) any other law.

I know it not as clear cut as we would like to have it. But ultimately the American Cuban claim we have states very specifically that we are the owners. No other proof should be needed. I'll have a look through what I have to see if it can help further.

Mickael

Sent from my iPhone

On 10 Sep 2018, at 20:02, "romac106@comcast.net" <romac106@comcast.net> wrote:

> Thanks
> The State Department was enforcing a law forbidding US citizens to travel to Cuba, and setting fines for violators. ▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>
> I'm suggesting a civil action, which is different than what the State Dept was doing. I'm seeking a way that may not need to involve the State Dept. other than getting passenger lists. This would disrupt the cruise lines and might bring about a quick resolution.
>
> Would you have records of the Concession (the leasing of the docks).
>
> I do not believe Havana Docks owns any property in Cuba or ever did. The cruise lines may be taking comfort in that. We need to establish exactly what has been stolen before we can establish a claim. Clearly the right-to-operate was 'stolen' when Castro came into

HDC 015209

power. But, that right would have expired by now under the original terms. So, is it correct to claim that the cruise lines are operating with stolen property? We need to prove Havana Docks property ownership.

Nice video----I'm ready to go there.

Robert

**From:** Mickael Behn <mickaelbehn@havanadockscorp.com>
**Sent:** Monday, September 10, 2018 1:26 PM
**To:** romac106@comcast.net
**Cc:** Jerry Johnson <jjohnson@bankofthebluegrass.com>
**Subject:** Re: Havana Docks small Progress

Robert, I scanned this article form my Grandfathers Cuba files.

It looks like the State dept. was doing this in 2001. Obviously things changed because of Obamas
Decree for traveling to Cuba. But at least there is some precedence in fines being issued to travelers.


Also you might like to see this video Javier Garcia-Bengochea (owner of Santiago de Cuba Ports) found.
Its shows the current state of Havana Docks. They spent a lot of money on the docks. And even sell cuban cigars inside
The Docks as the rep in the video describes. I would have to assume that the taxes on those items would go directly to the
Cuban Military which in turn would violate the the Liberated Act. And would be considered "Trafficking" on our Docks.

Its long shot but to me would seem an easy case to argue. Lets see what your lawyers would think of that.

Youtube link: https://youtu.be/391D-n_pIPY

Mickael


--

**Mickael Sosthenes Behn**
**President │ HAVANA DOCKS CORPORATION**
mickaelbehn@havanadockscorp.com

> On 10 Sep 2018, at
> 18:12, romac106@comcast.net wrote:
>
> Excellent, Mikael

HDC 015210

Also, the following statement is not right. MacArthur Brothers build the docks ~1910 and subsequently owned part of The Port of Havana Docks Company (a Maine Co.), which owned the concession from Cuba to operate the docks.  To my knowledge the land was never purchased . Port of Havana Docks was reorganized in 1918 in Delaware into Havana Docks Co. with your great-grandfather as a principal.     "Behn's great-grandfather Sosthenes Behn, founder of International Telephone & Telegraph, purchased the Havana land and built docks on it in 1920. The property was passed on to Behn's grandfather William Behn in the 1940s but nationalized on Nov. 21, 1960. Behn inherited the claim two years ago."

We need to be careful what we put in the press, should it come back and haunt us.

Interestingly, the MacArthur family still has an involvement after more that 110 years.  I see this as a great story of two families that have kept watch on the Docks for many generations.

Keep it up.  We will prevail

Robert

---

**From:** Mickael Behn
<mickaelbehn@havanadockscorp.com>
**Sent:** Monday, September 10, 2018 11:55 AM
**To:** Robert MacArthur <romac106@comcast.net>
**Subject:** Havana Docks small Progress

Dear Robert,

I hope all is well and congratulations on such a long a prestigious career.

I thought you might like to see that we are starting to progress a bit with media and government attention. Im starting to get other Claims property owners in the Havana Harbor contacting me. Im hoping to create a Consortium of Havana Harbor claim owners. With a bit of luck we could get a more press and more attention that we need.

Latest Press
https://www.tampabay.com/news/business/tourism/A
ds-take-aim-at-cruises-to-Cuba_171553283

And the latest subcommittee hearing with Ted Yoho
that seems to want to fight in our corner.
Here is a small clip.


Mickael

--

**Mickael Sosthenes Behn**
**President | HAVANA DOCKS CORPORATION**
mickaelbehn@havanadockscorp.com

CONFIDENTIAL

HDC 015212

Case 1:19-cv-21724-BB Document 331-102 Entered on FLSD Docket 09/20/2021 Page 291
Case 1:19-cv-23590-BB Document 46-1 Entered on FLSD Docket 10/22/2020 Page 146 of 459
of 459

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No.: 19-cv-23590-BLOOM/LOUIS

HAVANA DOCKS CORPORATION,

       Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES, LTD.

       Defendant.

_____/

## AMENDED COMPLAINT

Plaintiff Havana Docks Corporation ("Plaintiff") hereby sues Royal Caribbean Cruises, Ltd. ("Defendant" or "Royal"), pursuant to the Cuban Liberty and Democratic Solidarity Act ("LIBERTAD Act"), for trafficking in Plaintiff's confiscated property located in Cuba.

### INTRODUCTION

The LIBERTAD Act was enacted to assist the Cuban people in regaining their freedom and prosperity, strengthen international sanctions against the communist Cuban Government, and to deter the exploitation of wrongfully confiscated property in Cuba belonging to United States nationals. Although every U.S. President has suspended the right to bring an action under the LIBERTAD Act since its enactment in 1996, the Defendant has been on notice since 1996 that trafficking in property confiscated by the communist Cuban Government without the authorization of the owner of a certified claim to such property would subject it to liability under the

Exhibit
0008

Jerry Johnson

LIBERTAD Act. As of the date of filing this Complaint, the United States Government has ceased suspending the right to bring an action under the LIBERTAD Act, which therefore permits Plaintiff to seek damages for the Defendant's conduct in exploiting Plaintiff's wrongly confiscated property.

## PARTIES

1. Plaintiff, Havana Docks Corporation, 215 Southland Drive, Lexington, Kentucky, 40503, is a Delaware corporation and a U.S. National under 22 U.S.C. § 6023(15)(B).

2. Defendant is a foreign corporation doing business and maintaining its principal place of business, its principal executive offices, and headquarters at 1050 Caribbean Way, Miami, County, Florida 33132. Defendant controls and operates four global cruise brands: Royal Caribbean International, Celebrity Cruises, Azamara Club Cruises and Silversea Cruises, and also owns interests in two partner brands: TUI Cruises and Pullmantur.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), because Plaintiff's claim arises under 22 U.S.C. § 6021, *et seq.*, and the amount in controversy exceeds the sum or value of $50,000, exclusive of interest, costs, and attorneys' fees.

4. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(1), because the Defendant resides in the Southern District of Florida, and under 28 U.S.C. §§ 1391(b)(2) and 1391(d), because a substantial part of the events

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

or omissions giving rise to Plaintiff's claims occurred in the Southern District of Florida.

<div align="center">

### THE CUBAN LIBERTY AND DEMOCRATIC SOLIDARITY ACT

</div>

5.     The LIBERTAD Act was enacted on March 12, 1996.  One of the LIBERTAD Act's purposes is to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro Regime." 22 U.S.C. § 6022(6).  Title III of the LIBERTAD Act ("Title III") establishes a private right of action for money damages against any person who "traffics" in such property as defined by 22 U.S.C. § 6023(13).  *See* 22 U.S.C. § 6082. Title III's effective date, August 1, 1996, was never suspended. Liability for trafficking under Title III therefore attached irreversibly beginning November 1, 1996.

<div align="center">

### FACTUAL ALLEGATIONS

</div>

6.     Plaintiff, a U.S. national as defined by 22 U.S.C. § 6023(15), is the rightful owner of an interest in and certified claim to certain commercial waterfront real property in the Port of Havana, Cuba identified specifically by the Republic of Cuba ("Cuba") as the Havana Cruise Port Terminal (the "Subject Property").

7.     Plaintiff and its predecessor in interest constructed and managed the Subject Property. The Subject Property was continuously, owned, possessed, used, and managed in Cuba by Plaintiff from 1917 until the communist Cuban Government confiscated it in 1960.

8.     From 1960 to present, Plaintiff has remained active for the purpose of preserving its claim to the Subject Property. Plaintiff has diligently pursued its

<div align="center">

3

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

</div>

rights, filing this lawsuit within months of the United States Government lifting the suspension of Title III's right to bring an action. Plaintiff could not have filed this lawsuit earlier than it did due to the suspension of Title III's right to bring an action.

## Cuba's Confiscation of the Subject Property

9.     The communist Cuban Government confiscated the Subject Property on October 24, 1960.  The communist Cuban Government maintains possession and control of the Subject Property and has not paid any compensation to Plaintiff for its seizure.

10.     More specifically, the communist Cuban Government nationalized, expropriated, and seized ownership and control of the Subject Property.  The Subject Property has not been returned and adequate and effective compensation has not been provided.  Further, the claim to the Subject Property has not been settled pursuant to an international claims settlement agreement or other settlement procedure.

11.     Plaintiff never abandoned its legitimate interest in and claim to the Subject Property.

## The Certified Claim

12.     Plaintiff's ownership interest in and claim to the Subject Property has been certified by The Foreign Claims Settlement Commission of the United States ("FCSC"). A copy of the FCSC's Certified Claim ("Claim No.CU-2492") is attached hereto as **Exhibit A**. Claim No. CU-2492, which has no time limit and has not

4

expired, provides an itemized listing of the property interests certified by the FCSC, as follows:

Upon consideration of the entire record, the Commission finds that the valuation most appropriate to the property and equitable to the claimant is that shown in the Balance Sheet for the year ended 1959, supported by the Trial Balance for December 31, 1958. These financial statements reflect the following book values adopted by claimant corporation:

| | |
|---|---|
| Land and Concession . . . . . . . . . . . . | $ 2,000,000.00 |
| San Francisco and Machina Piers . . . . . . | 4,758,829.00 |
| Santa Clara Pier . . . . . . . . . . . . | 2,110,845.00 |
| Equipment . . . . . . . . . . . . . . . . | 419,056.00 |
| Office Furniture and Fixtures . . . . . . . | 90,616.00 |
| Railroad Tracks . . . . . . . . . . . . . | 22,883.00 |
| Total | $ 9,402,229.00 |

13.     After taking into account amortization, depreciation, accrued interest, and other adjustments, the FCSC's final decision certified the loss at "Nine Million One Hundred Seventy-nine Thousand Seven Hundred Dollars and Eighty-eight Cents ($9,179,700.88) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement." (**Exhibit A** at 3.)

14.     The largest portion of the loss certified in Claim No. CU-2492 consisted of the structures on the San Francisco, Machina, and Santa Clara Piers. (**Exhibit A** at 9.)

15.     A concession was one of the several property interests certified. The concession granted the Plaintiff a term of 99 years for the use of, improvement,

5

construction upon, operation and management of the Subject Property. The Plaintiff

used, operated, managed and made significant improvements on the Subject Property

from 1905 until 1960, when it was confiscated by the communist Cuban Government.

The concession never expired by its term. It was confiscated by the Cuban

Government in 1960. When the Subject Property was confiscated in 1960, Havana

Docks still had a balance of 44 years of concessionary rights remaining; those 44 years

of concessionary rights still remain in balance, and Havana Docks has never been

indemnified by the Cuban Government or anyone for the loss of that property

interest. As a result, under the terms of the concession and Cuban law in force at the

time, Havana Docks still retains, to this day, a reversionary interest of 44 years

remaining in the Subject Property (i.e., a future or contingent possessory right).

16.     Further, the concession granted to the Plaintiff the contractual right to

be indemnified for the value of the work constructed by it on the Subject Property in

the event of expropriation, as follows:

> *Seventh:* If during the continuance of the concession the works may be
> expropriated by virtue of Article 50 of the Law of Ports, the government
> or its departments will indemnify the concessionary to the value of the
> work constructed by it, including the Custom House Inspectors
> Department and the wharf on the north side of the pier, but not the
> value of the machinery, rolling stock, equipment and apparatus referred
> to in the preceding clause, in case the concessionary may decide to
> remove them.

(*See* **Exhibit B**).

17.     This indemnity right gave the Plaintiff an interest in the Subject

Property that was not time-limited. As an express term of the concession, the

indemnity right—which by the terms of the concession was not time limited—was

6

certified by the FCSC. The "value of the work constructed by" Havana Docks and its predecessor-in-interest include the value of the San Francisco, Machina and Santa Clara Piers, as reflected in the certified claim. This claim to indemnity remains unpaid. The LIBERTAD Act expressly contemplates this type of property interest and recognizes such an unpaid debt as an obligation that attaches to the confiscated property, as would a mechanic's lien: the LIBERTAD Act defines the term "confiscated" to include "the failure of the Cuban Government to pay, on or after January 1, 1959-- . . . a debt <u>which is a charge on property</u> nationalized, expropriated, or otherwise taken by the Cuban Government." 22 U.S.C. § 6023(4)(B)(ii) (emphasis added); *see also* 22 U.S.C. § 6023(12)(A) (defining "property" to include "any property. . . whether real, personal, or mixed, and <u>any</u> present, <u>future, or contingent right, security, or other interest therein</u>, including any leasehold interest" (emphasis added)). So too does Cuban law in effect at the time of confiscation. *See e.g.,* Codigo Civil, Title II, Art. 349 ("No one shall be deprived of his property, except by competent authority and with sufficient cause of public utility, always after the proper indemnity. If this requisite has not been fulfilled the judges shall protect, and in a proper case, replace the condemned party in possession.") (emphasis added).

18.     Plaintiff has never received any compensation nor been indemnified for the expropriation of the Subject Property, including for the concession or any other property interests.

19.     Under the LIBERTAD Act, Plaintiff's ownership of Claim No. CU-2492 is a property interest in the Subject Property entitling the Plaintiff to sue under Title

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

Case 1:19-cv-21724-BB Document 331-102 Entered on FLSD Docket 09/20/2021 Page 298
Case 1:19-cv-23590-BB Document 46-1 Entered on USD Docket 06/20/021 Page 8 of 459
of 459

III against whomever traffics in the Subject Property. 22 U.S.C. § 6082(a)(1)(A).

20.     The terms of Claim No. CU-2492 <u>expressly state</u> that the claim does not expire until "the date of settlement." (**Exhibit A**, at 11.)  That date has not yet come. The certified claim is still actionable. Claim No. CU-2492 has no time limit.

21.     Under federal law, Plaintiff's claim is an equitable lien on the Subject Property that is only discharged by the payment of just compensation, as determined by the certified claim.

<u>Royal's Trafficking in the Confiscated Subject Property</u>

22.     On information and belief, beginning on or about April 23, 2017 and continuing for at least two years thereafter, the Defendant knowingly and intentionally commenced, conducted, and promoted its commercial cruise line business to Cuba using the Subject Property by regularly embarking and disembarking its passengers on the Subject Property without the authorization of Plaintiff or any U.S. national who holds a claim to the Subject Property.

23.     On information and belief, beginning on or about April 23, 2017, the Defendant also knowingly and intentionally participated in and profited from the communist Cuban Government's possession of the Subject Property without the authorization of Plaintiff or any U.S. national who holds a claim to the Subject Property.

24.     Defendant has had constructive knowledge of Plaintiff's publicly available certified claim to the Subject Property, Claim CU-2492, since the FCSC completed the Cuban Claims Program on July 6, 1972.

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

Case 1:19-cv-21724-BB Document 331-102 Entered on FLSD Docket 09/20/2021 Page 299
Case 1:19-cv-23591-BB Document 46-1 Entered on FLSD Docket 09/20/2021 Page 9 of 459
of 459

25.     Defendant has had actual knowledge of Plaintiff's certified claim to the Subject Property, Claim CU-2492, since at least February 11, 2019, due to a notice letter sent by Plaintiff to it pursuant to 22 U.S.C. § 6082(a)(3)(D).

26.     On information and belief, Defendant trafficked in the Subject Property until June 2019.

27.     The Defendant's knowing and intentional conduct with regard to the confiscated Subject Property is "trafficking" as defined in 22 U.S.C. § 6023(13)(A).

28.     As a result of the Defendant's trafficking in the Subject Property, the Defendant is liable to Plaintiff for all money damages allowable under 22 U.S.C. § 6082(a).

### CLAIM FOR DAMAGES

### TITLE III OF THE LIBERTAD ACT

29.     Plaintiff incorporates by reference paragraphs 1 through 28 as if fully stated herein.

30.     This claim is brought pursuant to Title III of the LIBERTAD Act, 22 U.S.C. § 6082.

31.     As set forth in Title III and alleged above, beginning on or around April 2017 and continuing for at least two years thereafter, the Defendant did traffic, as that term is defined in 22 U.S.C. § 6023(13)(A), in the Subject Property which was confiscated by the communist Cuban Government on or after January 1, 1959 and is therefore liable to Plaintiff, who owns the claim to the Subject Property for money damages.

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

Case 4:19-cv-23590-BB Document 381-1 Entered on FLSD Docket 04/20/2020 Page 1 of 10

32.     Plaintiff is entitled to all money damages allowable under 22 U.S.C. § 6082(a), including, but not limited to, those equal to the sum of:

    a.     The amount greater of: (i) the amount certified by the Foreign Claims Settlement Commission, plus interest; (ii) the amount determined by a special master pursuant to 22 U.S.C. § 6083(a)(2); or (iii) the "fair market value" of the Subject Property, plus interest;

    b.     Three times the amount determined above (treble damages); and

    c.     Court costs and reasonable attorneys' fees.

33.     As of the date of filing this Amended Complaint, the United States Government has ceased suspending the right to bring an action under Title III, 22 U.S.C. § 6085, which therefore permits Plaintiff to seek the relief requested herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant as follows:

    A.  Ordering the Defendant to pay damages (including treble damages);

    B.  Ordering the Defendant to pay pre- and post-judgment interest on any amounts awarded;

    C.  Order the Defendant to pay attorneys' fees, costs, and expenses; and

    D.  Ordering such other relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable, and a trial pursuant to Rule 39(c), Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury.

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

Case 1:19-cv-21724-BB Document 381-102 Entered on FLSD Docket 09/20/2021 Page 301
Case 1:19-cv-23590-BB Document 381-1 Entered on FLSD Docket 04/20/2020 Page 11 of 459
of 459

Dated:  April 20, 2020.      Respectfully submitted,

**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
E-mail: eservice@colson.com

By: s/ Roberto Martínez
Roberto Martínez
Florida Bar No. 305596
bob@colson.com
Stephanie A. Casey
Florida Bar No. 97483
scasey@colson.com
Aziza F. Elayan-Martínez
Florida Bar No. 92736
aziza@colson.com
Zachary Lipshultz
Florida Bar No. 123594
zach@colson.com

- and -

**MARGOL & MARGOL, P.A.**
2029 3rd Street North
Jacksonville Beach, Florida 32250
Telephone: (904) 355-7508
Facsimile: (904) 619-8741

Rodney S. Margol
Florida Bar No. 225428
Rodney@margolandmargol.com

*Attorneys for Plaintiff Havana Docks Corporation*

11

Case 1:19-cv-21724-BB Document 381-102 Entered on FLSD Docket 09/20/2021 Page 302
Case 1:19-cv-23590-BB Document 381-102 Entered on FLSD Docket 04/20/2020 Page 12
of 459

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of the Court. I also certify that the foregoing document is being served this 20th day of April, 2020, on all counsel of record or pro se parties either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/ Roberto Martínez
Roberto Martínez

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

Case 1:19-cv-21724-BB   Document 331-102   Entered on FLSD Docket 09/20/2021   Page 303
Case 1:19-cv-23590-BB   Document 46-1   Entered on FLSD Docket 04/29/2020   Page 3 of 13
of 459

# Exhibit "A"

FOREIGN CLAIMS SETTLEMENT COMMISSION
OF THE UNITED STATES
WASHINGTON, D.C. 20579

In the Matter of the Claim of

HAVANA DOCKS CORPORATION

Under the International Claims Settlement
Act of 1949, as amended

Claim No CU -2492

Decision No. CU -6165

Counsel for claimant:                          Davis Polk & Wardwell
                                               by Douglas M. Galin, Esquire

Appeal and objections from a Proposed Decision entered April 12, 1971.
Oral hearing requested.

Oral argument September 15, 1971 by Douglas M. Galin, Esquire

FINAL DECISION

The Commission issued its Proposed Decision on this claim on
April 21, 1971, certifying that claimant suffered a loss of $7,669,420.88
within the scope of Title V of the International Claims Settlement Act
of 1949, as amended, resulting from actions of the Government of Cuba.

Claimant, through counsel, objected to the Proposed Decision,
and requested an oral hearing which was held on September 15, 1971.
In support of the objections claimant submitted an affidavit of John C.
Hover, a member of counsel's firm.

In the objections, claimant stated that the concessions and dock
facilities had a higher value than the amount determined by the Com-
mission, and that an item of $10,280.00 for handling charges was
improperly denied.

Full consideration having been given to claimant's objections,
the supporting affidavit, counsel's argument at the hearing, and the
entire record, the Commission now finds that in view of the considerable

increase of land values along the Havana waterfront between 1934 and 1960, the value of claimant's concession and tangible assets should be increased from $7,184,360.18 to $8,684,360.18.

Regarding the appraisal of Luis Parajon who valued the above properties at $16,180,000.00, the Commission holds that this appraisal cannot be relied upon to the exclusion of other evidence of record because, _inter alia_, it does not specify the size and value of the land and improvements thereon separately and individually; and because its findings are based on generalities, not appropriate in this type of evaluation of valuable improved real property.

The Commission further considered claimant's objections with respect to the item of $10,280.00 for handling charges, and finds that these are, in fact, storage charges for unclaimed merchandise, due and payable by the Government of Cuba, and that they should be included in the loss, which is restated as follows:

|  |  | Date of Loss |
|---|---|---|
| Concession and tangible assets | $8,684,360.18 | October 24, 1960 |
| Securities | 184,005.70 | August  6, 1960 |
| Accounts receivable | 301,055.00 | October 24, 1960 |
| Debt of Cuban Government | 10,280.00 | October 24, 1960 |
| Total loss | $9,179,700.88 |  |

The interest at the rate of 6% per annum will be included in the instant case as follows:

| FROM | ON |
|---|---|
| August 6, 1960 | $  184,005.70 |
| October 24, 1960 | 8,995,695.18 |

Accordingly, the Certification of Loss in the Proposed Decision is set aside; the following Certification of Loss will be entered; and the remainder of the Proposed Decision, as amended herein, is affirmed.

CU-2492

## CERTIFICATION OF LOSS

The Commission certifies that HAVANA DOCKS CORPORATION suffered a

loss, as a result of actions of the Government of Cuba, within the scope

of Title V of the International Claims Settlement Act of 1949, as

amended, in the amount of Nine Million One Hundred Seventy-nine

Thousand Seven Hundred Dollars and Eighty-eight Cents($9,179,700.88)

with interest thereon at 6% per annum from the respective dates of

loss to the date of settlement.

Dated at Washington, D. C.,
and entered as the Final
Decision of the Commission

## SEP 28 1971

Lyle S. Garlock, Chairman

Theodore Jaffe, Commissioner

CU-2492

FOREIGN CLAIMS SETTLEMENT COMMISSION
OF THE UNITED STATES
WASHINGTON, D.C. 20579

IN THE MATTER OF THE CLAIM OF

HAVANA DOCKS CORPORATION

Claim No. CU-2492

Decision No. CU- 6165

Under the International Claims Settlement
Act of 1949. as amended

Counsel for claimant:

Davis, Polk & Wardwell
By Peter H. Madden, Esq.

PROPOSED DECISION

This claim against the Government of Cuba, under Title V of the Inter-
national Claims Settlement Act of 1949, as amended, was presented by HAVANA
DOCKS CORPORATION for $9,915,879.00, based upon the asserted ownership and
loss of its assets nationalized by the Government of Cuba.

Under Title V of the International Claims Settlement Act of 1949
[78 Stat. 1110 (1964), 22 U.S.C. §§1643-1643k (1964), as amended, 79 Stat.
988 (1965)], the Commission is given jurisdiction over claims of nationals
of the United States against the Government of Cuba. Section 503(a) of the
Act provides that the Commission shall receive and determine in accordance
with applicable substantive law, including international law, the amount
and validity of claims by nationals of the United States against the Govern-
ment of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation,
> intervention or other taking of, or special measures di-
> rected against, property including any rights or interests
> therein owned wholly or partially, directly or indirectly
> at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or inter-
> est including any leasehold interest, and debts owed by
> the Government of Cuba or by enterprises which have been

- 2 -

> nationalized, expropriated, intervened, or taken by
> the Government of Cuba and debts which are a charge
> on property which has been nationalized, expropriated,
> intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that in 1917 claimant corporation was organized under the laws of the State of Delaware. Claimant's Vice-President and Assistant Comptroller stated that at all times between August 14, 1917 and the presentation of the claim, more than 50 percent of the outstanding capital stock of all classes has been owned by persons who were United States nationals, and that at the time of filing the claim, of 35,505 outstanding shares of stock of HAVANA DOCKS CORPORATION only 1,003 or approximately 3% of the total outstanding shares were held by persons who were not nationals of the United States. The Commission therefore holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

Claimant states that on the basis of a concession granted by the Government of Cuba, it owned and operated, at the entrance of the harbor of Havana three piers: the "San Francisco", "Machina" and "Santa Clara" linked with a large marginal building. The piers and buildings were used for warehousing purposes, cargo deposits, and for merchandise provisionally stored pending Customs clearance. Each pier consisted of a two-story concrete building with an apron equipped with platforms, and a double railroad track to permit direct unloading of cargo from ships to railroad cars and vice versa. All official port authorities were located within the

- 3 -

marginal building, such as the Customs House of Havana, the Inspector General of the Port, the Immigration Department and other governmental agencies. Elevators, escalators, portable cranes, tractors, trailers, fork lift trucks, and other port and dock equipment were part of claimant's installations on the piers and in the warehouses, which were located in the center of harbor activities of the port of Havana.

Based upon the record, the Commission finds that on September 7, 1934, claimant HAVANA DOCKS CORPORATION obtained from the Government of Cuba the renewal of a concession for the construction and operation of wharves and warehouses in the harbor of Havana, formerly granted to its predecessor concessionaire, the Port of Havana Docks Company; that claimant acquired at the same time the real property with all improvements and appurtenances located on the Avenida del Puerto between Calle Amargura and Calle Santa Clara in Havana, facing the Bay of Havana; that in June, 1946, the property was encumbered with a mortgage in favor of certain bondholders for the amount of $1,600,000.00 in accordance with Public Instrument of June 1, 1946, recorded in Havana on July 25, 1946; and that claimant corporation also owned the mechanical installations, loading and unloading equipment, vehicles and machinery, as well as furniture and fixtures located in the offices of the corporation.

The record further shows that the Cuban assets of claimant corporation were nationalized by Resolution No. 3, published in the Official Gazette of October 24, 1960, pursuant to Law No. 851 of July 6, 1960, and that the facilities of the company were physically occupied by agents of the Cuban Government on November 21, 1960. Accordingly, the Commission finds that the Cuban assets of HAVANA DOCKS CORPORATION were nationalized by the Government of Cuba on October 24, 1960.

- 4 -

Claimant states that the corporation suffered the following losses:

| | |
|---|---:|
| Land and Concession . . . . . . . . . . . . | $ 2,000,000.00 |
| Buildings . . . . . . . . . . . . . . . . | 6,892,557.00 |
| Personal property, equipment, etc.  . . . . | 595,315.00 |
| Securities (1000 common stock shares of Cuban Telephone Company) . . . . | 100,000.00 |
| Debts owed by nationalized enterprises and by the Government of Cuba.  . . . . . . . . | 328,007.00 |
| | $ 9,915,879.00 |

In support of this valuation of losses claimant submitted, among other things, the following evidence:

(1)  Trial balance as of December 31, 1958;

(2)  Balance sheets for the years 1956, 1957, 1958 and 1959;

(3)  Auditor's report as of December 31, 1958;

(4)  An evaluation of the properties by Mr. Louis Parajon, a civil engineer and former professional appraiser in Cuba; and

(5)  An inventory of the equipment, furniture and fixtures as of December 31, 1959.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

The record contains a report of the Office of the Property Register of Havana which shows that in 1928, the concession, then owned by the Port of Havana Docks Company, had an assessed market value of $600,000.00, and that a subsequent assessment established the value of the concession at $5,000,000.

Upon consideration of the entire record, the Commission finds that the valuation most appropriate to the property and equitable to the claimant is that shown in the Balance Sheet for the year ended 1959, supported by the Trial Balance for December 31, 1958. These financial statements reflect the following book values adopted by claimant corporation:

| | |
|---|---:|
| Land and Concession . . . . . . . . . . . . | $ 2,000,000.00 |
| San Francisco and Machina Piers . . . . . . | 4,758,829.00 |
| Santa Clara Pier . . . . . . . . . . . . . | 2,110,845.00 |
| Equipment . . . . . . . . . . . . . . . . | 419,056.00 |
| Office Furniture and Fixtures . . . . . . . | 90,616.00 |
| Railroad Tracks . . . . . . . . . . . . . . | 22,883.00 |
| Total | $ 9,402,229.00 |

The record indicates that the pier properties are stated at values appraised as of December 31, 1920, plus subsequent additions at cost. The terms of the concession granted by the Cuban Government were to expire in the year 2004, at which time the corporation had to deliver the piers to the government in good state of preservation. The equipment, office furniture were acquired more recently and are stated at cost. The appraiser, Louis Parajon states in his report that in 1960 the concession, real property, office and general equipment had a value of $16,180,000.00 after depreciation, which is considerably more than what the claimant describes as the loss.

The Commission is aware that from 1920 to 1960 real property prices in Havana had increased, and that the values expressed in prices of the year 1920 may not have been realistic in 1960. The Commission, however, notes

that during the prior years claimant corporation allowed for depreciation of the real property and amortization of the concession approximately 1-1/2 per cent per year; and that nothing was added to show any appreciation of the property.

The Commission, therefore, concludes that it would be equitable and appropriate to consider as basic the year 1934 when HAVANA DOCKS CORPORATION obtained the concession for the operation of the docks; to deduct from that year up to the year 1960 one per cent (1%) yearly for amortization of the concession and for the depreciation of the buildings; and further deduct 25% from the stated value of the equipment, furniture and fixtures for wear and tear, assuming that most equipment was in operation during an average time of five years, when it was taken by the Government of Cuba.

The Commission finds that the amount of $2,000,000 includes not only the value of the concession but also the value of the land and of the piers alongside the property which, in the opinion of the Commission, had a value of $1,000,000 in the year 1960.

Amortization and depreciation is therefore applicable as follows:

(a) 1% per year from 1934 to 1960, or 26% on the following values:

Concession . . . . . . . . . . . . $ 1,000,000
San Francisco and Machina Piers . 4,758,829 (structures only)
Santa Clara Pier . . . . . . . . . 2,110,845 (structures only)
Railroad Tracks . . . . . . . . .  22,883
                           Total   $ 7,892,557

26% thereof . . . . . . . . . . . . . . . . . . . $ 2,052,064.82

(b) 25% from the value of the equipment, office
    furniture and fixtures of $509,672 . . . . . . . .  127,418.00

                           Total depreciation     $ 2,179,482.82

As stated above, the real property was encumbered with a mortgage of $1,600,000 in favor of certain bondholders, but the balance sheet for the year ended December 31, 1959 shows that this funded debt has been reduced to a balance of $38,386.00 as of that date. Consequently, from the value

- 7 -

| | |
|---|---|
| of the property of | $ 9,402,229.00 |

| | | |
|---|---|---|
| must be deducted for depreciation | $ 2,179,482.82 | |
| and the balance of the funded debt | 38,386.00 | 2,217,868.82 |

| | |
|---|---|
| resulting in the net value of the tangible | |
| property, including concession, of | $ 7,184,360.18 |

The Commission further finds that claimant corporation was the owner of 1,000 shares of common stock of the Cuban Telephone Company. The Commission has held that the Cuban Telephone Company was nationalized on August 6, 1960 by Resolution No. 1 published by the Government of Cuba pursuant to Law 851, and that the loss sustained by the holders of common stock shares amounted to $184.0057 per share. (See Claim of International Telephone & Telegraph Corporation, Claim No. CU-2615.) Accordingly, claimant suffered a loss as the owner of 1,000 common stock shares in the aggregate amount of $184,005.70.

The Commission further finds that the amount claimed of $328,007 for debts owed by nationalized enterprises and by the Cuban Government, included a debt of $99,097 due from the Government of Cuba, and accounts receivable of $218,630 due to claimant corporation from trade enterprises nationalized, expropriated or intervened by the Government of Cuba. The Commission, there-fore, concludes that claimant is entitled to an additional certification of losses for accounts receivable in the amount of $317,727.00.

The Commission does not deduct liabilities of United States corporations and other entities, except for taxes due to the Cuban Government. (See Claim of Simmons Company, Claim No. CU-2303, 1968 FCSC Ann. Rep. 77.) In the present claim the record shows that taxes accrued at the end of 1959 due to the Cuban Government amounted to $16,672.00.

| | |
|---|---|
| Therefore, from the sum of accounts receivable of | $317,727.00 |
| the tax indebtedness of | 16,672.00 |
| is deducted, leaving a net amount of receivables of | $301,055.00 |

Included in the debt claim is also an amount of $10,280.00 for handling charges, but the evidence does not disclose that this amount was due from

- 8 -

enterprises nationalized, expropriated, intervened or taken by the Government of Cuba, or that the amount was a charge on property which was nationalized, expropriated, intervened or taken by the Cuban Government, as required by Section 502(3) of the Act. Accordingly, the claim for $10,280.00 for handling charges is denied.

Summarizing, claimant corporation suffered the following losses within the meaning of Title V of the International Claims Settlement Act of 1949, as amended:

|  |  | Date of loss |
|---|---|---|
| Loss of concession and tangible assets | $7,184,360.18 | October 24, 1960 |
| Loss of securities | 184,005.70 | August 6, 1960 |
| Loss of accounts receivable | 301,055.00 | October 24, 1960 |
| Total loss | $7,669,420.88 | |

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see Claim of Lisle Corporation, Claim No. CU-0644) and in the instant case it is so ordered as follows:

| FROM | ON |
|---|---|
| October 24, 1960 | $7,485,415.18 |
| August 6, 1960 | 184,005.70 |

- 9 -

## CERTIFICATION OF LOSS

The Commission certifies that HAVANA DOCKS CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Seven Million Six Hundred Sixty-Nine Thousand Four Hundred Twenty Dollars and Eighty-Eight Cents ($7,669,420.88) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D. C., and entered as the Proposed Decision of the Commission

APR 21 19/1

Lyle S. Garlock, Chairman

Theodore Jaffe, Commissioner

The statute <u>does not provide for the payment of claims</u> against the Government of Cuba. Provision is only made for the determination by the Commission of the validity and amounts of such claims. Section 501 of the statute specifically precludes any authorization for appropriations for payment of these claims. The Commission is required to certify its findings to the Secretary of State for possible use in future negotiations with the Government of Cuba.

NOTICE: Pursuant to the Regulations of the Commission, if no objections are filed within 15 days after service or receipt of notice of this Proposed Decision, the decision will be entered as the Final Decision of the Commission upon the expiration of 30 days after such service or receipt of notice, unless the Commission otherwise orders. (FCSC Reg., 45 C.F.R. §1.5(e) and (g), as amended (1970).)

CU-2492

# Exhibit "B"

Year IV – No. 139         Havana, Thursday, December 14, 1905         Volume II – Page 4285

# GACETA  OFICIAL

**OF THE**
**REPUBLIC OF CUBA**

SUBSCRIPTION POINTS

HAVANA, at the Printshop Administration, Obispo 35
P.O. Box 600
Telephone No: 675
PROVINCES, at the houses of the respective agents.

ADVERTISEMENTS AND SUBSCRIPTIONS are received at the Administration from 7 to 10 in the morning and from 11 to 5 in the afternoon, every day except holidays.

Subscription prices in American currency

HAVANA, per quarter ........ $3.00     OUTSIDE THE ISLAND, per quarter $5.30
PROVINCES, per quarter ......$3.75     Subscriptions shall be paid in advance.

Price per copy – 10 CENTS

[...]

## PUBLIC WORKS DEPARTMENT

DECREE NO. 467

Having seen again the file opened at the Civil Government of the Province of Havana by reason of the application and project submitted by Mr. Sylvester Scovel related to an administrative concession for the construction of a jetty pier with machinery, a building for the Customs Department, a special department to be used by customs inspectors, and devices for loading and offloading, and all other accessory works in the port of this capital city.

Whereas: A decree from this Office of the President of February 27 last declared said works to be of public usefulness, providing that the concession necessary for the execution thereof be opened to public bidding on the basis of the petitioner's project upon appraisal of said project and the appropriate publishing having been made.

Whereas: An appraisal of the project having been made, the value thereof was set at fifty-nine thousand five hundred forty-seven pesos and forty-five cents ($59,547.45) Cy. and the conditions were set under which the concession was to be granted, the petitioner having represented his agreement with said appraisal and conditions.

Whereas: the ninth day of this month of November, at two p.m., was set for the bidding, notice of which was published in *Gaceta Oficial* and in the newspapers of this city, "Diario de la Marina," "Discusión," and "Mundo" in five consecutive issues and repeated during the first ten days of the months of July, August, September, and October last, as well as in the Paris newspapers "Le Figaro," "Le Matin," and "Le Temps" and "Le Journal"; in Berlin's "Track Kischer Kurier"; and in London and New York, where printed copies of the projects were sent and made available to the public, together with copies of the plans thereof.

Whereas: on the day and time and at the place indicated the Board that was to act in the public bidding in the presence of a Notary, prepared appropriate certificate; of the three [bids] that

were submitted, Mr. D. Aceituno's was the most advantageous; he offered a twenty-seven per cent (27%) reduction on the rates submitted by the original applicant and lowered to fifty (50) years the ninety-nine (99) years the latter had requested, and the original applicant insisted on the entirety of his project in regards to said features; and the other one, albeit it reduced to nine (9) years the term of the concession, only offered a six per cent (6%) rate reduction.

Whereas: the legitimate representative of Compañía del Puerto, the successor of Mr. Scovel, the author of the project, availing itself at the same proceeding of its preemptive right within the legal term therefor, accepted Mr. Aceituno's proposal on behalf of its constituent.

Whereas all requirements and formalities required by law for the granting of the concession in question have been met in this file.

Whereas according to the rules and regulations for the execution of the Public Works Act, the project approved must serve as the basis for the public bidding and proposals must address, first of all, rate reductions for the construction of the works, and, according to Article 8 of the Instruction, in order to process concessions to private persons of port works in this Island, the public bidding therefor must also address, first of all, a reduction of the rates and, secondly, of the term of the concession.

Whereas, in light of this, the declaration by the Board presiding over the public bidding that Mr. D. Aceituno's proposal is the most advantageous is legal and proper inasmuch as it abides by the legal provisions currently in effect and previously referred to,  being the one that reduced the rates to the lowest level.

Whereas, Compañía del Puerto, as Mr. Scovel's successor, duly availed itself within the legal term of the preemptive right conferred upon it by Article 28 of the Rules and Regulations of the Public Works Act, and was fully subrogated in Mr. Aceituno, whose proposal it accepted and, therefore, it is proper that it be deemed the winner in the public bidding and that that the concession be granted to it.

In accordance with the provisions cited above and those contained in the General Public Works Act and in the Rules and Regulations for the Execution thereof; in the Ports Act, and in the Instruction therefor; and in the Law of September 11, 1879, on public bidding for works and services.

Upon the proposal by the Secretary of Public Works, an availing myself of the powers vested in me, I grant Compañía del Puerto, Mr. Scovel's successor, the concession necessary to carry out the works set forth in the project submitted by the aforesaid Mr. Scovel on August 22, 1904, subject to the following conditions:

1.-     The works shall conform in all respects to the project submitted by the applicant, Mr. Sylvester Scovel, dated August 22, 1904, except as otherwise modified by the clauses below.

2

2.- This concession is deemed included among those contemplated in Articles 44 and 45 of the Ports Act of October 31, 1890, and Article 97 of the General Public Works Act of April 19, 1883, and is granted for a term of fifty (50) years, reckoned as of the date of the concession, and is subject to the provisions of Article 50 of the aforesaid Ports Act.

3.- Authorization is given for the establishment of the coal deposit referred to in the project and for the operations thereof on the south side of the jetty, but the concession-holder is obligated to avail itself of all possible means to prevent coal dust from getting inside the buildings of the Customs offices and buildings in the city or from becoming a nuisance to the public.

4.- The State assigns in usufruct during the term of the concession that part of the San Francisco docks, as well as the public domain area, that will be occupied by the project's works.

5.- As compensation and in payment for the occupation of this site and the inconvenience to general use caused by construction work, the concession holder undertakes:

(a) To freely assign to the State the building for the Customs Inspectors that is part of the project.

(b) To widen up to thirty-six (36) feet the entrance to the jetty, as shown in the plans of the project.

(c) To build on the jetty a twenty-four (24) feet wide street, paved in the same manner as all others in the project, running north to south on the jetty and separating it from the Customs Inspectors Department; the roof covering this street shall have a height of at least fifteen (15) feet.

(d) To place a platform scale at the entrance to the Customs Inspectors Department, at such location as the Administration of the Port's Customs may designate, of the make indicated by said Administration, which shall be used to weigh articles going from the public docks into said Department, whether using the concession holder's own means or on carts.

(e) To definitely assign to the State, free of charge, all expansions of passenger landing booths intended for the Customs Offices, albeit with the condition that said building may not be used for any purpose other than said offices.

(f) To set aside for public use the dock on the north side of the projected jetty, albeit with the condition that the concession holder, at any time during the concession when, at its discretion, should port traffic so require it, may install on said north side devices, equipment, and machinery for loading and offloading vessels and steamers, enlarging the building for this purpose so that it will be in keeping with the plant thus improved. It may exercise this right with two-month notice given to the Department of Public Works, submitting at the same time the respective plans, and the added works will then be included within the concession.

3

6.- In case that, in accordance with the provisions of Article 50 of the Ports Act, there should be a need to expropriate the works, the concession holder shall be entitled to remove from the jetty pier the machinery, rolling stock, equipment, and devices being used at the time.

7.- If at any time during the term of the concession the works were to be expropriated, also by virtue of the application of the aforesaid Article 50 of the Ports Act, the Government or its agencies shall indemnify the concession holder for the value of all works built by the latter, including the Customs Inspectors Department and the dock on the north side of the jetty, but not for the value of the machinery, rolling stock, equipment, and devices referred to in the previous clause, in case that the concession holder should decide to remove them.

8.- In the case of expropriation referred to in the previous two clauses, works shall be appraised through direct volume calculation, applying the prices set for the work units shown in the budget and after meeting the requirements established in paragraph 2 of Article 14 of the Instruction of the Ports Act of November 17, 1890.

9.- The State shall allow the concession holder free use of an ample space in the jobsite, as well as access thereto, to keep and handle tools and materials and for any other suitable operation related to the construction of the works.

10.- During the term of the concession, the concession holder shall, for its own account, maintain in good repair and in such condition the foundations, streets, buildings, and all other plant facilities that, upon the conclusion of said term, it may surrender the works to the Government in perfectly serviceable condition. Any repairs and renovations that it may be necessary to make to the building intended for Customs offices and on that part on the north side of the jetty dock set aside for the public shall be for the Government's account, as shall also be the maintenance of the pavement of the service shorefront all along the front the jetty on the land side.

11.- The concession holder shall not be responsible for any damages resulting from delays on its part in the construction of the projected plant when such delays should be caused by strike, shipwreck, hurricane, epidemic or any other instance of force majeure.

12.- The concession holder may, during the term of this concession, add to the machinery, devices, and equipment of the projected plant whatever he may deem necessary for the appropriate handling of said plant's traffic; it may also apply to said machinery, devices, and equipment any or all improvements which may from time to time be advantageous.

13.- The concession holder shall install the machines necessary to generate electricity using steam engines, but its right is reserved to acquire electric current under contracts with companies able to supply it, in which case it shall not be obligated to install the aforesaid machines or to use them, if they should be already installed.

14.- The means of execution, the agents, and all other employees for the construction, maintenance, and administration of the works shall be chosen by the concession holder.

4

15.-    The concession holder may have free use of the elevated rail that goes by the Customs Inspectors Department and the right of ingress and egress to and from said building in order to do all repair and maintenance work it may deem necessary for the purposes of the concession.

16.-    During the term of the concession, neither that part of the jetty pier, on the north side, intended for the public, nor the Customs Inspectors Department, may be set aside for any purpose different from the one assigned to them in this project. The State shall not allow mechanical services of the kinds that are comprised within the concession holder's operations to be provided on that part of the jetty.

17.-    The concession holder makes a final assignment to the State of all works related to the expansion of passenger landing booths intended for the Customs Offices, albeit with the condition that said building may not be used for any purpose other than the establishment of said offices.

18.-    Should it come to pass that the State abandons the use of the works referred to in the two previous clauses, the Government shall deliver the dock and the Customs Inspectors Department to the concession holder for the latter's use and operation during the term of the concession but shall retain ownership of the works related to the expansion of the Customs Offices building, albeit indemnifying the concession holder for the price thereof in accordance with the appraisal to be done at that time and depending on the condition in which they find themselves, and the Government may then use the building for any purpose it may deem suitable.

19.-    The works that make up the project are granted for public service, subject to the rates accepted for them at the public bidding, whose bases and rules and regulations for their application are set forth in the project's documents; and no rate higher than the authorized one may be demanded, said rate to be posted in a conspicuous location. *Dl. 85 1905 Art. 113, Ports Act.*

20.-    Application of these rates shall be governed by the accompanying rules and regulations, but, it being understood, only to the extent that they are not contrary to Customs rules, regulations, and ordinances, and all other provisions in effect on this matter or those of a general nature which may be issued in the future.

21.-    Employees charged with the maintenance and policing of the State docks shall, upon notice from the concession holder, duly act pursuant to the provisions of Article 26 of the Rules and Regulations for the Maintenance and Policing of State Docks against vessel and merchandise consignees who allow refuse resulting from broken crockery, tiles, bricks, etc., as well as straw, cane, and other materials used as stowage on the vessels, to be thrown onto the jetty in violation of Article 4 of the aforesaid Rules and Regulations.

22.-    Government vessels and those carrying items intended for the different agencies of the State shall have preferential docking, loading, and offloading rights, provided that the head of

the appropriate office should so request it, half of the rate established for other vessels being paid for this service.

23.-    The concession holder may afford no preference for the use of the jetty and its devices --except in the case contemplated in the previous condition-- other than priority order, to which effect it shall keep a chronological register of all applications made to it, which it shall be obliged to exhibit to any who so requests.

24.-    All provisions the concession holder may issue for jetty operations shall be in full harmony with Customs Rules and Regulations and Ordinances in effect or with those which may be issued in the future, as well as with the monitoring and intervention by Customs authorities.

25.-    Before commencing the work, the Head Engineer of the District shall, in the presence of the concession holder, review the works to be done according to the project, a certificate of said proceeding to be issued in triplicate; one of the copies, with the corresponding plan, shall be submitted to the Department of Public Works for its approval and, once this has been obtained, another copy shall be delivered to the concession holder and the third shall be kept in the files of the Public Works Office of the District.

26.-    The concession holder shall commence the work within a term of four (4) months reckoned as of the date of the concession, and shall do the work in the order and within the terms set forth below:

(1)    The new Custom Offices shall unfailingly be ready for occupancy in thirteen months.

(2)    The Customs Inspectors Department in the steel-and-concrete building, with its parcel-handling electrical mechanism, shall all be ready for use in thirteen months.

(3)    The sidings [*chuchos viajadores*] and the five southerly transverse sections of the steel-and-cement building that include a portion thereof six hundred and forty (640) feet long, from east to west, by eighty (80) feet wide, from north to south, with installed fixed rails for the "locohoists," shall be ready for use in twenty-two (22) months.

(4)    The next seven transverse sections of the building, with their complete equipment, ready for use, in twenty-eight (28) months.

(5)    The rest of the landfill for the building and the public dock, in forty (40) months.

(6)    Thus, operation of all parts of the projected plant can take place upon the expiration of the forty-month term.

27.-    All deadlines mentioned in the previous article are understood to be reckoned as of the date of the concession.

28.- The Head Engineer of the Public Works District shall be in charge of inspecting the execution of the work and compliance with these conditions.

29.- The works having been completed, the Head Engineer shall make a detailed inspection thereof and, should he find that all the terms of the concession have been complied with and that said works are in perfectly serviceable condition, he shall so note for the record in a certificate to be issued in triplicate, one copy of which shall be forwarded to the Public Works Department for its approval, and once this has been obtained, the others shall be distributed in the manner indicated for the certificate of review of the project.

30.- All expenses incurred in connection with the review, inspection, and delivery of the works shall be for the account of the concession holder, as well as the costs of inspection in overseas factories of the steel intended for the building and machinery, to which effect the concession holder shall deposit at the location to be indicated to it, the sum of one thousand pesos ($1,000.00) per month for the duration of the inspection at the factories in order to cover the expenses thereof.

31.- This concession is understood to be granted with no prejudice to third parties, except as regards the right of ownership, and on the understanding that the concession holder is bound by such laws of a general nature as have been, or may in the future be, issued with respect to this class of concessions.

32.- This concession shall be terminated if the concession holder should default on any of these conditions, which are mandatory upon him, the consequences of such termination being those set forth in the General Public Works Act and its Rules and Regulations.

33.- Upon the expiration of the term of concession, the State shall replace the concession holder in the possession of the works and shall enter immediately into the enjoyment of the concession and the products thereof, with any and all of its machinery, rolling stock, equipment, devices, and improvements that may have been introduced. The concession holder shall have the obligation to surrender the works and the material for the operation thereof in good repair and serviceable condition.

Within the five years preceding the end of the concession, the Government shall be entitled to retain the liquid proceeds from the works and to use them to maintain the works in good repair, if the concession holder should attempt not to discharge this obligation fully.

Havana, November 29, 1905

T. ESTRADA PALMA,
President

*Rafael Montalvo,*
*Secretary of Public Works*

[...]

Case 1:19-cv-21724-BB Document 331-102 Entered on FLSD Docket 09/20/2021 Page 325
of 459
Case 1:19-cv-21724-BB Document 46-1 Entered on FLSD Docket 09/20/2021 Page 10 of 25

# LOPEZ AND DURAN
## INTERPRETING AND TRANSLATING
740 Malaga Avenue, Coral Gables, Florida   33134
Tel.: (305) 443-3432

### CERTIFICATE OF ACCURACY

STATE OF FLORIDA )
              ) SS.
COUNTY OF DADE   )

   Before me, a notary public in and for the State of Florida at large, appears

Nelson Duran, Ph.D., who is personally known to me, for and on behalf of Lopez and

Duran Interpreting and Translating, who, after being duly sworn, deposes and says

that the foregoing is a true and correct translation from the _Spanish_

of the attached document consisting of _eight (8)_ pages, and that this is

the last of the attached.



Nelson Duran, Ph.D.

Sworn to and subscribed this ___31st___ day of ___January___, 20_20_.

Armando Escoto
Notary Public,
State of Florida at Large

My commission expires:

> ARMANDO M. ESCOTO
> MY COMMISSION # GG 075721
> EXPIRES: June 24, 2021
> Bonded Thru Notary Public Underwriters

The utmost care has been taken to ensure the accuracy of all translations.  Lopez and Duran Interpreting
and Translating and its employees shall not be liable for any damages due to negligence or error in typing
or translation.

Case 1:19-cv-21724-BB   Document 381-102   Entered on FLSD Docket 09/20/2021   Page 326 of 459

Año IV.—Núm. 139    Habana, Jueves 14 de diciembre de 1905.    Tomo II.—Pág. 4285



# GACETA OFICIAL

## DE

## REPUBLICA DE CUBA

| Puntos de suscripción | Precio de suscripción en moneda americana |
|---|---|
| Sa r.ina, en la Administración de la Imprenta, Obispo 55.—Apartado núm. 600.—Teléfono núm. 675. Provincias, en casa de los respectivos agentes. | Los anuncios y suscripciones, se reciben en la Administración, de 7 á 10 de la mañana, de 11 á 5 de la tarde, todos los días, menos los festivos. |

HABANA, por un trimestre...$ 3-00    EXTERIOR DE LA ISLA, por un trimestre........................ 5-30
PROVINCIAS, por un trimestre 3-75    el pago de la suscripción será adelantado.
Precio del ejemplar...10 CENTAVOS

# PARTE OFICIAL

## PODER EJECUTIVO

### SECRETARÍA DE ESTADO Y JUSTICIA

#### DIRECCIÓN DE JUSTICIA

A propuesta de la Sala de Gobierno de la Audiencia de la Habana y de conformidad con el parecer del Secretario de Estado y Justicia, vengo en nombrar, Magistrado Suplente de la propia Audiencia, para el año de 1906, al señor Vidal Morales y Flores de Apodaca.

Habana, Diciembre 11 de 1905.

T. ESTRADA PALMA,
Presidente.

Juan F. O'Farrill,
Secretario de Estado y Justicia.

A propuesta de la Sala de Gobierno de la Audiencia de la Habana y de conformidad con el parecer del Secretario de Estado y Justicia, vengo en nombrar, Magistrado Suplente de la propia Audiencia, para el año de 1906, al señor Luis Rosainz.

Habana, Diciembre 11 de 1905.

T. ESTRADA PALMA,
Presidente.

Juan F. O'Farrill,
Secretario de Estado y Justicia.

A propuesta de la Sala de Gobierno de la Audiencia de la Habana y de conformidad con el parecer del Secretario de Estado y Justicia, vengo en nombrar, Magistrado Suplente de la propia Audiencia, para el año de 1906, al señor Juan de Dios García Kohly.

Habana, Diciembre 11 de 1905.

T. ESTRADA PALMA,
Presidente.

Juan F. O'Farrill,
Secretario de Estado y Justicia.

A propuesta de la Sala de Gobierno de la Audiencia de la Habana y de conformidad con el parecer del Secretario de Estado y Justicia, vengo en nombrar, Magistrado Suplente de la propia Audiencia, para el año de 1906, al señor Manuel Enrique Gómez.

Habana, Diciembre 11 de 1905.

T. ESTRADA PALMA,
Presidente.

Juan F. O'Farrill,
Secretario de Estado y Justicia.

A propuesta de la Sala de Gobierno de la Audiencia de Matanzas y de conformidad con el parecer del Secretario de Estado y Justicia, vengo en nombrar para el cargo de Juez Municipal Suplente de Macagua y por el tiempo que resta del bienio de 1905 á 1907, al señor José Rafael Martínez Cepero, que figura en el primer lugar de la terna respectiva.

Habana, 30 de Noviembre de 1905.

T. ESTRADA PALMA,
Presidente.

Juan F. O'Farrill,
Secretario de Estado y Justicia.

### SECRETARÍA DE HACIENDA

#### SECCIÓN DE CONSULTORÍA Y BIENES DEL ESTADO.

*Aviso*

Acordado por esta Secretaría enagenar en pública subasta dos locomotoras sistema "Baldwin" marcadas con los números 1 y 2, nombradas "Wycoff" y "Capron", respectivamente, y diez y nueve planchas ó carros descubiertos para el servicio de transporte de mercancías, cuyo material procede del Ferrocarril de "Triscornia" en desuso, propiedad del Estado, y se encuentra depositado en los talleres del Ferrocarril de Cárdenas y Júcaro, por el presente se hace público para general conocimiento, y á fin de que los que quieran hacer

REV0003845

GACETA OFICIAL

proposiciones acudan al acto que tendrá lugar á las dos de la tarde del día 22 del corriente mes en el local de la Sección de Consultoría y Bienes del Estado de esta Secretaría, presentando sus ofertas hasta las 2 y media ante la Comisión nombrada al efecto y con arreglo al pliego de condiciones siguiente:

1ª.—Las proposiciones se presentarán por escrito en idioma castellano y en pliego cerrados, autorizadas con la firma entera del licitador, expresándose en ellas su domicilio, así como la conformidad y aceptación de todas las cláusulas del presente pliego y haberse reconocido las referidas locomotoras y planchas.—El hecho de presentarse la proposición implicará tenerse cabal conocimiento del estado en que se encuentra dicho material rodante.

2ª.—Para optar á la subasta será requisito indispensable consignar conjuntamente en la mesa de la Comisión el 10% del importe de la proposición, en moneda americana efectiva; cuya suma será devuelta inmediatamente de terminado el acto á los licitadores cuyas proposiciones hayan sido rechazadas, depositándose en Arcas Públicas hasta la resolución del señor Secretario de Hacienda las consignadas por los postores cuyas proposiciones hayan sido tomadas en consideración.

3ª.—Adjudicada la subasta se devolverán los depósitos constituídos á excepción del que corresponda al adjudicatario, cuyo depósito quedará en garantía del cumplimiento de la oferta y como parte del precio ofrecido, cuyo completo deberá realizarse dentro de los tres días siguientes al en que le sea notificada la adjudicación de la subasta.

Transcurrido dicho término sin cumplirse este compromiso podrá considerarse en quiebra la subasta con pérdida á favor del Estado de la cantidad depositada.

4ª.—Servirá de tipo para la subasta la suma de cuatro mil setecientos cincuenta pesos moneda americana ($4,750) por cada locomotora, y la de cuatrocientos pesos ($400) en igual moneda por cada una de las planchas ó carros descubiertos.

5ª.—No se admitirá proposición que sea inferior al tipo indicado; y en caso de presentarse dos ó más que sean iguales, se abrirá una puja á la llana por espacio de 10 minutos entre los autores de las mismas, y la Mesa determinará la que estime más conveniente con vista del resultado que se obtenga, la que será sometida á la resolución de la Secretaría de Hacienda, en unión de las demás proposiciones presentadas que hayan sido aceptadas igualmente.

6ª.—La recepción de las locomotoras y planchas que hayan sido adjudicadas la verificará el rematador directamente de la Administración del Ferrocarril de Cárdenas y Júcaro, en el lugar en que se encuentran depositadas; debiendo á ese efecto entenderse la entrega realizada por el Estado desde el momento de la adjudicación y una vez comunicada ésta á la citada Administración y al interesado.

7ª.—Los gastos de anuncios, otorgamientos de es-

crituras y demás que se originen con motivo [...] basta serán por cuenta y cargo del rematador.

8ª.—Queda reservado á la Secretaría de [...] el derecho de aceptar cualquiera de las proposiciones presentadas ó el de rechazarlas todas.

Habana, Diciembre 8 de 1905.—*Gu[...] ple y S.*, Sub-Secretario.

### CERTIFICADOS DEL EJÉRCITO

Habiéndose comprobado en el expedien[...] al efecto, que el Certificado número 47,53[...] favor del Soldado fallecido del Quinto C[...] Martínez, fué recojido indebidamente [...] de dicho Cuerpo por doña Pilar Martínez[...] por este medio á la expresada señora para q[...] término de 10 días, á contar desde la fec[...] blicación del presente anuncio, lo devuelva[...] cretaría con la advertencia de que transc[...] plazo sin efectuarlo se declarará nulo el r[...] mento expidiéndose en substitución del n[...] rrespondiente Atestado.

Habana, Diciembre 6 de 1905.—*Gu[...] ple y S.*, Sub-Secretario de Hacienda.

## SECRETARIA DE OBRAS PUBLICAS

DECRETO Nº. 467.

Visto de nuevo el expediente instruído e[...] no Civil de la Provincia de la Habana, con [...] solicitud y proyecto presentados por el Sr. S[...] el sobre concesión administrativa para la [...] de un muelle espigón con instalaciones mecán[...] para Oficinas de Aduana, Departamento espe[...] servicio de los Vistas, aparato para carga y [...] demás obras accesorias en el puerto de esta Capital.

Resultando que por Decreto de esta Presidencia de 27 de Febrero último, fueron declaradas esas obras de utilidad pública, disponiéndose se procediera á la su basta de la concesión necesaria para su ejecución, bajo la base del proyecto del peticionario, previa la tasación de dicho proyecto y los anuncios correspondientes.

Resultando que verificada esa tasación fué aprecia do el valor del proyecto en cincuenta y nueve mil qui nientos cuarenta y siete pesos, cuarenta y cinco c[...] ($59,547.45) Cy. y se fijaron las condicio[...] cuales debía otorgarse la concesión, habiendo [...] tado el peticionario su conformidad con di[...] condiciones.

Resultando que fué señalado para el acto de [...] basta el día nueve del corriente mes de Nov[...] dos P. M. en esta Secretaría, la cual fué anu[...] GACETA OFICIAL y en los periódicos de [...] "Diario de la Marina", "Discusión" y "Mun[...] co números consecutivos, repitiéndose en la p[...] cena de los meses de Julio, Agost[...] Septiem[...]

Case 1:19-cv-21724-BB Document 381-102 Entered on FLSD Docket 09/20/2021 Page 328 of 459

bre próximo pasado, así como en los de París, "Le Fígaro", "Le Matin" y "Le Temps" y "Le Journal"; en el "Track Kischer Kurier" de Berlín y en Londres y New York, donde se remitieron ejemplares impresos del proyecto y se facilitaron al público, como también la copia de los planos referentes al mismo.

Resultando que constituido en el día, hora y lugar señalado el Tribunal que debía entender en la subasta, con la asistencia de un Notario, se levantó la correspondiente acta, de las tres proposiciones que se presentaron, fué declarada más ventajosa la del señor D. Aceituno, que ofreció la rebaja de un veinte y siete por ciento (27%) en el tipo de las tarifas presentadas por el proyectista y redujo á cincuenta (50) años los noventa y nueve (99) que el mismo había solicitado, puesto que las obras se limitaban, la del peticionario, á insistir en su proyecto en toda su integridad, respecto de dichos extremos, y la otra si bien reducía á nueve (9) años el plazo de la concesión, solo hacía en las tarifas el rebajo de un seis por ciento (6%).

Resultando que la legítima representación de la Compañía del Puerto, sucesora del señor Scovel, autor del proyecto, haciendo uso en el mismo acto de la subasta del derecho de tanteo dentro del término legal, aceptó la proposición del señor Aceituno, para la Compañía su representada.

Considerando que en este expediente se han cumplido todos los requisitos y formalidades que exige la Ley para el otorgamiento de la concesión de que se trata.

Considerando que según el Reglamento para la ejecución de la Ley General de Obras Públicas, á la subasta debe servir de base el proyecto aprobado y las proposiciones deben recaer en primer término, sobre rebaja en las tarifas para el uso de la obra, y según el Artículo 8.° de la Instrucción, para tramitar las concesiones á particulares de obras de puertos de esta Isla, también debe versar esa subasta, en primer lugar sobre la rebaja de las tarifas, y del plazo de la concesión en el segundo.

Considerando que en este concepto la declaración de ser más ventajosa la proposición del señor D. Aceituno, hecha por el Tribunal de subasta, es legal y procedente, toda vez que está ajustada á las disposiciones legales vigentes, antes citadas, por ser la que redujo á más bajo tipo de las tarifas.

Considerando que habiendo hecho uso en tiempo y forma legal la Compañía del Puerto, como sucesora del señor Scovel, del derecho de tanteo que le otorga el Artículo 38 del Reglamento de la Ley de Obras Públicas, quedó subrogada en un todo al señor Aceituno, cuya proposición aceptó, por lo que es procedente se le estime adjudicataria en la subasta, y se otorgue á su favor la concesión.

De acuerdo con las disposiciones citadas y las contenidas en la Ley General de Obras Públicas y en el Reglamento para su ejecución, en la de Puertos é Instrucción de la misma, y en la de 11 de Septiembre de 1886 sobre subastas de obras y servicios.

De conformidad con lo propuesto por el Secretario de Obras Públicas, y haciendo uso de las atribuciones que me están conferidas, otorgo á la Compañía del Puerto, sucesora del señor Sylvester Scovel, la concesión necesaria para llevar á efecto las obras expresadas en el proyecto presentado por dicho señor Scovel de fecha 22 de Agosto de 1904, con sujeción á las siguientes condiciones:

1ª.—Las obras se ajustarán al proyecto presentado por el peticionario, señor Sylvester Scovel, que lleva fecha 22 de Agosto de 1904, en todo aquello que no resulte modificado en las siguientes cláusulas.

2ª.—Esta concesión se considera comprendida entre las que determinan los Artículos 44 y 45 de la Ley de Puertos de 31 de Octubre de 1890 y el 97 de la Ley General de Obras Públicas de 19 de Abril de 1883, y se otorga por el plazo de cincuenta (50) años, á contar de la fecha de la concesión, quedando sujeta á lo prevenido en el Artículo 50 de la citada Ley de Puertos.

3ª.—Se autoriza el establecimiento del depósito de carbón y las operaciones en el mismo en el costado Sur del espigón, de que trata el proyecto, pero en el concepto de que el concesionario queda obligado á poner todos los medios para evitar la invasión del polvo de este carbón en los edificios de las Oficinas de la Aduana, en los de la Ciudad ó molestias al público.

4ª.—Se cede por el Estado en usufructo durante el término de la concesión, la parte de los muelles de San Francisco, así como el área del dominio público que ha de ocuparse con las obras del proyecto.

5ª.—Como compensación y en pago de la ocupación de esta parte, así como del perjuicio que el uso general se causa por la ejecución de las obras, el concesionario se obliga:

(a) A ceder gratuitamente al Estado el edificio para el Departamento de Vistas que forma parte del proyecto.

(b) A ensanchar hasta treinta y seis (36) piés la calle de entrada del espigón, indicado en los planos del proyecto.

(c) A construir en el espigón una calle de veinte y cuatro (24) piés de ancho y de igual pavimentación que las otras del proyecto, que correrá de Norte á Sur de dicho espigón, separando á éste del Departamento de Vistas: el techo sobre esta calle, tendrá por lo menos quince (15) piés de altura.

(d) A colocar una báscula á la entrada del Departamento de Vistas en el lugar que designe la Administración de la Aduana del Puerto, del fabricante que indique dicha Administración, y que servirá para pesar los artículos que de allí pasaren á dicho Departamento, ya sea por medio de los aparatos del concesionario ó por carretones, desde los muelles públicos.

(e) A ceder definitiva y gratuitamente al Estado todas las obras de ampliación de la casilla de pasajeros, destinadas á las Oficinas de Aduanas, si bien con la condición de que ese edificio no podrá ser aplicado á otro objeto que á las mencionadas Oficinas.

REV0003845

4288  GACETA OFICIAL

(f)  A destinar al uso público el muelle del costado Norte del espigón proyectado, si bien con la condición de que el concesionario en cualquier tiempo durante la concesión, cuando á su juicio el tráfico del puerto lo exigiese, podrá instalar en dicho costado Norte aparatos, equipos y maquinarias para la carga y descarga de buques y vapores, ampliando el edificio para este objeto, de manera que quedare ajustado á la planta así mejorada. Podrá ejercer este derecho, previo aviso de dos meses anticipadamente á la Secretaría de Obras Públicas, presentando al mismo tiempo los planos correspondientes, y entonces las obras adicionadas se incluirán dentro de la concesión.

6ª.—En caso de que con arreglo á lo dispuesto en el Artículo 50 de la Ley de Puertos hubiese necesidad de expropiar las obras, tendrá derecho el concesionario á retirar del muelle espigón la maquinaria, material rodante, equipos y aparatos que entonces se esté usando.

7ª.—Si en cualquier tiempo durante el plazo de concesión se expropiasen las obras por virtud también de aplicación del citado Artículo 50 de la Ley de Puertos, el Gobierno ó sus dependencias, indemnizará al concesionario del valor de todas las obras construídas por él, incluyendo el Departamento de Vistas y el muelle del costado Norte del espigón, pero no el valor de la maquinaria, material rodante, equipos y aparatos á que hace referencia la cláusula que precede, en el caso en que el concesionario decidiese retirarlas.

8ª.—En el caso de expropiación á que se refieren las dos cláusulas anteriores, se valorarán las obras mediante cubicación directa de las mismas, aplicando los precios fijados á las unidades de obras que figuran en el presupuesto, y previos los requisitos prevenidos en el párrafo 2.º del Artículo 14 de la Instrucción de la Ley de Puertos de 17 de Noviembre de 1890.

9ª.—El Estado permitirá al concesionario el uso libre de un espacio amplio en el lugar de las obras, así como el acceso á él, para guardar y manipular herramientas y materiales y para cualquiera operación propia á la erección de las obras.

10ª.—Durante el plazo de concesión será de cuenta del concesionario mantener en buen estado de conservación los cimientos, calles, edificios, maquinarias y demás instalaciones de la planta, en tales condiciones, que al finalizar dicho plazo, éste entregue las obras al Gobierno en perfecto estado de servicio. Las reparaciones y renovaciones que haya necesidad de verificar en el edificio destinado á Oficinas de la Aduana, y en la parte del muelle espigón destinado al público, al costado Norte, serán de cuenta del Gobierno, así como la conservación del pavimento de la zona litoral de servicio en todo el frente del espigón con la parte de tierra.

11ª.—El concesionario no será responsable de los perjuicios que resulten por demora de su parte, en la construcción de la planta en proyecto, cuando esta demora fuese causada por huelga, naufragio, ciclones, epidemias ó cualquiera otra causa de fuerza mayor.

12ª.—Durante el plazo de concesión podrá el conce-

sionario adicionar la maquinaria, aparatos y [...] la planta proyectada, con lo que juzgue nece[...] el oportuno manejo del tráfico de dicha plan[...] bién podrá aplicar á dicha maquinaria, aparatos [...] cualquiera, ó todos los perfeccionamientos que [...] po en tiempo resulten ventajosos.

13ª.—El concesionario instalará las má[...] cesarias para la generación de electricidad, u[...] tores de vapor, pero se le reserva el derecho de [...] la corriente eléctrica por contrato con Comp[...] que puedan facilitarla, en cuyo caso no estará obligad[...] hacer las indicadas instalaciones, ni á usar las estu[...] ren hechas ya.

14ª.—Serán de la elección del con[...] medios de ejecución, los agentes y demás emp[...] la construcción, conservación y Administración de las obras.

15ª.—El concesionario podrá usar libremente [...] rail suspendido que pasa por el Departamento de Vistas, y el derecho de entrada y salida del mismo edificio, para hacer todos los trabajos de reparación y conservación que él estime necesarios para los fines de la concesión.

16ª.—Durante el plazo de concesión, no podrá destinarse á otro objeto que al que en este proyecto se les asignan, la parte del muelle espigón, al costado Norte, que se destina al público, ni el Departamento de Vistas. El Estado no permitira que sobre dicha parte del espigón se presten servicios mecánicos de las clases que constituyen la explotación del concesionario.

17ª.—El concesionario cede en firme al Estado lo [...] las obras de ampliación de la Casilla de Pasajeros destinada á Oficinas de la Aduana, si bien con la condición de que ese edificio no podrá ser aplicado á otro objeto que al establecimiento de dichas Oficinas.

18ª.—Si llegare el caso de que el Estado [...] se el uso de las obras á que se refieren las dos cláusulas que preceden, el Gobierno entregará al concesionario el muelle y Departamento de Vistas para su uso [...] ción durante el plazo de concesión, pero conservará la propiedad de las obras de ampliación del edifi[...] Oficinas de Aduana, si bien indemnizando al [...] nario el importe de ellas conforme á tasación que entonces se practique, según el estado en que s[...] tren, y pudiendo entonces el Gobierno destin[...] ficio á cualquier uso que tenga por conveniente.

19ª.—Las obras que constituyen el proyecto [...] ceden para servicio público, con sujeción á la [...] aceptadas en la subasta respecto á las mismas, [...] ses y reglamentos para su aplicación, constan [...] documentos del proyecto, y no podrá exigirse [...] rifa que la autorizada, que deberá estar ex[...] público en sitio visible. Dic. 15. 1905. Art. 113. Ley Pto.

20ª.—Regirá para la aplicación de estas [...] reglamento que la acompaña, pero entendi[...] únicamente, en cuanto no se opongan sus reg[...] Reglamentos y Ordenanzas de Aduana y dem[...] siciones vigentes sobre la materia, ó que en lo [...] se dicten con carácter general.

REV0003845

GACETA OFICIAL 4289

21ª.—Los empleados encargados de la conservación y policía de los muelles del Estado, cuidarán, previa denuncia del concesionario, de proceder como corresponde con arreglo á lo dispuesto en el Artículo 26 del Reglamento para la conservación y policía de los muelles del Estado, contra los consignatarios de barcos y de mercancías que permitan arrojar sobre el espigón las basuras procedentes de roturas de lozas, tejas, ladrillos, etc., así como las pajas, cañas y demás que sirven para la estiva de los buques, que constituyen infracción del Artículo 4º. del expresado Reglamento.

22ª.—Tendrán derecho preferente para el atraque, carga y descarga en el espigón, las embarcaciones del Gobierno y las que conduzcan efectos destinados al Estado en sus diferentes ramos, siempre que así lo reclame el Jefe de la Oficina á quien corresponda, y abonándose por este servicio la mitad de la tarifa establecida para las demás embarcaciones.

23ª.—El concesionario no podrá dar otra preferencia para el uso del espigón y aparatos, salvo el caso de que trata la condición anterior que la corresponda á la prioridad de solicitud para lo cual llevará un registro cronológico de todas las peticiones que se le hagan, y que estará obligada á mostrar á los que lo soliciten.

24ª.—Todas las disposiciones que dictare el concesionario para las operaciones en el espigón, estarán en completa armonía con los Reglamentos y Ordenanzas de Aduana vigentes, ó con los que en lo sucesivo puedan dictarse, así como con la fiscalización é intervención de las Autoridades de Aduana.

25ª.—Antes de dar principio á los trabajos, el Ingeniero Jefe del Distrito practicará con asistencia del concesionario el replanteo de las obras que se han de ejecutar, con arreglo al proyecto, de cuya operación se extenderá acta por triplicado, uno de cuyos ejemplares con el plano correspondiente, se someterá á la aprobación de la Secretaría de Obras Públicas, y obtenida ésta, se entregará otro ejemplar al concesionario, archivándose el tercero en la Oficina de Obras Públicas del Distrito.

26ª.—El concesionario dará comienzo á las obras en el plazo de cuatro (4) meses, á contar desde la fecha de la concesión, y las ejecutará en el orden y plazo siguiente:

1º.—Las Oficinas nuevas de la Aduana quedarán indefectiblemente listas para ocuparse, á los trece meses.

2º.—El Departamento de Vistas en el edificio de acero y cemento con su mecanismo eléctrico para la manipulación de bultos, todo listo para usarse en trece meses.

3º.—Los chuchos viajadoras y los cinco tramos transversales del Sur del edificio de cemento y de acero, que comprenden una porción del mismo de seiscientos cuarenta (640) piés de largo de Este á Oeste por ochenta unidas piés de ancho de Norte á Sur, con una instalación Reglamarriles fijos de los "Locohoists" listos para usarse, trucecveinte y dos (22) meses.

1879 4º.—Los siguientes siete tramos transversales del

edificio con sus equipos completos y listos para usarse, en veinte y ocho (28) meses.

5º.—El resto del relleno de tierra del edificio y muelle público, en cuarenta (40) meses.

6º.—De modo que se puede hacer la explotación de la planta proyectada en todas sus partes, al expirar el plazo de los cuarenta (40) meses.

27ª.—Todos los plazos que se mencionan en el artículo anterior, se entienden á partir de la fecha de la concesión.

28ª.—La inspección de la ejecución de las obras, así como del cumplimiento de estas condiciones, se hallará á cargo del Ingeniero Jefe de Obras Públicas del Distrito.

29ª.—Terminadas las obras, el Ingeniero Jefe hará un detenido reconocimiento de ellas, y si encontrase que en la ejecución se han cumplido todas las prescripciones de esta concesión, y que dichas obras se hallan en perfecto estado de servicio, lo hará así constar en acta que se extenderá por triplicado, una de las cuales se remitirá á la Secretaría de Obras Públicas para su aprobación, y una vez obtenida ésta, se distribuirán las otras en la forma indicada para el acta de replanteo.

30ª.—Todos los gastos que se originen en el replanteo, inspección y recepción de las obras, serán de cuenta del concesionario, así como los de la inspección en las fábricas en el extranjero, del acero destinado á los edificios y maquinarias, para lo cual el concesionario depositará en el lugar que se le indique, la cantidad de mil pesos ($1,000.00) mensuales mientras dure la inspección en las fábricas para responder á los gastos de la misma.

31ª.—Esta concesión se entiende hecha sin perjuicio de tercero, salvo el derecho de propiedad y en la inteligencia de quedar obligado el concesionario á cuantas disposiciones de carácter general se hayan dictado ó en lo sucesivo se dictaren respecto á esta clase de concesiones.

32ª.—Esta concesión caducará, si el concesionario faltase á cualquiera de estas prescripciones, que le son obligatorias, siendo las consecuencias de dicha caducidad, las que señala la Ley General de Obras Públicas y su Reglamento.

33ª.—Al expirar el plazo de concesión, el Estado reemplazará al concesionario en la posesión de las obras y entrará inmediatamente en el disfrute de ella y de sus productos, con toda su maquinaria, material rodante, equipos, aparatos y mejoras que puedan haberse introducido. El concesionario tendrá obligación de entregar las obras y su material de explotación, en buen estado, de conservación y servicio.

En los cinco años que precedan al término de la concesión, el Gobierno tendrá derecho de retener los productos líquidos de las obras, y de emplearlas en conservación en buen estado, si el concesionario no tratase de llenar completamente esta obligación.

Habana, Noviembre 29 de 1905.

T. ESTRADA PALMA,
Presidente.

Rafael Montalvo,
Secretario de Obras Públicas.

REV0003845



**Exhibit 0009**

Jerry Johnson



Exhibit
0010
Jerry Johnson

## HAVANA DOCKS CORPORATION

THE ATTACHED PHYSICAL INVENTORY OF GENERAL EQUIPMENT WAS
TAKEN ON JANUARY 2 TO 7, 1960, AND CONSISTS OF SIX PAGES,
EACH DULY INITIALED BY MR. MARIO RODRIGUEZ LANZA, ASSISTANT
VICE PRESIDENT & ASSISTANT COMPTROLLER AS OF DECEMBER 31, 1959.

Physical count made by:

Eugenio Ortega
Acct. Dept. Clerk

Marcelo Alemán
Workshop-Office Clerk

José M. Navarro
Workshop Superintendent

Extensions and adjustments
made by:-

Mario Rodriguez Lanza
Asst. Vice President and
Asst. Comptroller

**Exhibit 0011**
Jerry Johnson

# HAVANA DOCKS CORPORATION

## INVENTORY EQUIPMENT ACCOUNT 105
## (PHYSICAL)

### DECEMBER 31, 1959

7-24-19 FOIA Response FCSC 00248

HDC 001837

HAVANA DOCKS CORPORATION

## SUMMARY OF GENERAL

## EQUIPMENT EIVENTORY

| C O N C E P T | BALANCE IN DEC. 31, 1959 |
|---|---|
| San Francisco Wharf | $  32,818.46 |
| Machina Wharf | 42,468.99 |
| Santa Clara Wharf | 299.50 |
| Elevators | 7,300.48 |
| Stackers | 16,739.98 |
| Roilers | 2,192.67 |
| Fire Fighting Equipment | 6,532.69 |
| Construction Equipment | 21,044.94 |
| Whorshop | 13.122.26 |
| Cars, Flat-cars and Hand Pushed Carts | 40,686.68 |
| Surveillance | 1,484.54 |
| Tractors | 209,774.51 |
| Garage | 2,849.09 |
| Car Scales and Scales | 5,190.70 |
| Wooden Platforms for Hauling Cargo | 850.50 |
| Complete Air Conditioning Unit | 15,700.00 |
| TOTALS: | $ 419,055.99 |

7-24-19 FOIA Response FCSC 00249

HDC 001838

HAVANA DOCKS CORPORATION
Comptroller Department

December 31, 1959

## GENERAL EQUIPMENT INVENTORY
### (1)

### SAN FRANCISCO

#### Fixed Equipment

C O S T
PER BOOKS

| | | | | | | |
|---|---|---|---|---|---|---|
| Fixed 1-F | "Watson" Elevator | 10,000 Lbs Machine No. | 1-ENT | $ 5,000.00 |
| 2-F | "Otis" | " | 8,000 " | " " | 031,331 | 5,000.00 |
| 3-F | " | " | 8,000 " | " " | Q-31,652 | 5,000.00 |
| 8-F | No brand | " | 2,500 " | Motor " | 578,106 | 5,000.00 |
| 5-F | "Otis" | " | 8,000 " | Machine." | D- 1,413 | 3,346.89 |
| 1-F | Chaparra | | 2,800 " | 10HP Motor | 578,105 | 2,000.00 |
| 2-F | " | | 2,800 " | " " | 753,231 | 2,000.00 |
| 2-F | Endless Belt | B-2 & B-3 Warehouses | | | | 400.00 |

Tank for fire fighting service    1,000.00
    "    "    "    "    "       1,000.00
Water Collection Tank          55.00
Water Tank                145.00
Water motor pump             715.00
Pressure water pumping equipment    1,053.16
    "       "       "       "        1,053.16
. Fixed Cooler                50.25
$32,818.46

### MACHINA

#### Fixed Equipment

| | | | | | |
|---|---|---|---|---|---|
| Fixed 1-M | "Otis" Elevator | 8,000 Lbs. Machine No. | 35,337 | $ 5,500.00 |
| " 2-M | Fast | " | 2,500 " | Motor " | 43,016Y | 5,000.00 |
| " 3-M | "Otis" | " | 8,000 " | Machine " | D-2,772 | 5,000.00 |
| " 5-M | " | " | 8,000 " | M.-35338-Mot.2,394 | 5,000.00 |
| " 1-M | 'Chaparra" | 2,800 " | 12-HP Motor 622,286 | 1,500.00 |

Tank for fire fighting service       1,000.00
    "    "    "    "    "          1,000.00
Pressure water pumping equipment      1,053.16
    "       "       "       "    (Yale add. equip.)  1,473.16
"Otis" elevator for cars-6,000 lbs. No number    15,942.67
$ 42,468.99

### SANTA CLARA

#### Fixed Equipment

| | | | | | |
|---|---|---|---|---|---|
| 1-C | "Otis" Elevator | 8,000 Lbs. Machine No. | 89,889 |
| 2-C | " | " | 8,000 " | " " | 89,891 |
| 3-C | " | " | 8,000 " | " " | 89,890/2 |
| 4-C | " | " | 8,000 " | " " | 89,892/0 |
| 1-C | "Chaparra" 2,500 lbs. Motor 7 1/2 HP " | 3.940,623 |
| 2-C | " | 2,500 " | " | 7.1/2 HP. " | 3.881,894 |

Pump with "Marathon" motor

299.50

7-24-19 FOIA Response FCSC 00250

HDC 001839

HAVANA DOCKS CORPORATION
Comptroller Department

December 31, 1959

## GENERAL EQUIPMENT INVENTORY

### (2)

### ELEVATORS (Portable)

| | | |
|---|---|--:|
| 1-G "Link Belt" Brand S-HP Motor | | $ 2,215.56 |
| 2-G " " " S-HP " | | 1,271.23 |
| 3-G " " " S-HP " | | 1,271.23 |
| 4-G " " " S-HP " | | 1,271.23 |
| 5-G " " " S-HP " | | 1,271.23 |
| | | $ 7,300.48 |

### STACKERS (Portable)

| | |
|---|--:|
| 1-G "Brown" Portable | $ 1,758.75 |
| 2-G " " | 1,758.74 |
| 3-G " " | 1,758.75 |
| 4-G " " | 1,758.74 |
| 5-G With motor portable | 427.50 |
| 6-G " " " | 427.50 |
| 7-G "Chaparra Type portable | 1,500.00 |
| 8-G " " " | 1,500.00 |
| 9-G " " " | 1,500.00 |
| 10-G " " " | 1,450.00 |
| 11-G " " " | 1,450.00 |
| 12-G " " " | 1,450.00 |
| | $16,739.98 |

### ROLLERS (Portable)

| | |
|---|--:|
| 14 Sections of 21 "Speedway" Rollers | $ 1,100.92 |
| 6 Aluminum rollers | 366.00 |
| 12 Roller sections | 725.75 |
| | $ 2,192.67 |

### FIRE FIGHTING EQUIPMENT

| | |
|---|--:|
| 75 Sections of 50 with outlets | $ 3,051.68 |
| 38 Various extinguishers | 1,646.01 |
| 5 "Deluge" portable extinguishers | 1,750.00 |
| 1 "Burget" differential | 85.00 |
| | $ 6,532.69 |

### CONSTRUCTION EQUIPMENT (Portable)

| | |
|---|--:|
| 1 "Ingersol-Rand" portable compressor | $ 4,063.06 |
| 2 Cement Gun | 3,618.60 |
| 1 Set of tools (hammer, chisels, etc.) | 863.58 |
| 2 Motorized concrete mixers | 400.00 |
| 2 Wagons for cement | 24.00 |
| 1 "Jaeger" G-92-89 Compressor | 8,400.00 |
| 1 Concrete Vibrator | 310.00 |
| 1 "Jaeger" tower 31' 6 with engine | 3,195.70 |
| 1 Transit and level | 112.00 |
| 2 wheel-borrows | 58.00 |

HDC 001840

HAVANA DOCKS CORPORATION    GENERAL EQUIPMENT
Comptroller Department      INVENTORY      December 31, 1959
(3)

WORKSHOP (Fixed and portable)

| | |
|---|---:|
| 1 "Higgs" 1 1/2 HP drill #686378 | $ 200.00 |
| 1 Saw with "Conz" 5 HP motor #21894 | 200.00 |
| 1 Carpenter equipment (Sander, Drill) | 217.08 |
| 1 Automatic hacksaw | 60.00 |
| 1 "Oswald" oxygen welding apparatus | 120.00 |
| 1 "Little Giant" 1/8 of 1 inch pipe threading apparatus | 60.00 |
| 1 Fixed ice box (water cooler) | 50.24 |
| 1 Emery wheel | - |
| 1 "Paud" electric clock | 15.00 |
| 3 water meters (1 for each wharf) | 385.04 |
| 1 Mechanical strecher | 17.00 |
| 1 Set of lift forks (motor) for marble | 215.72 |
| 1 Amplifier (microphones, speaker, control) | 350.00 |
| 1 Street light (entrance to the garage) | 428.06 |
| 1 Wart-O-Matic equipment (mount rails) | 420.92 |
| 1 Double support gang plank | 3,762.00 |
| 1 Centrifugal pump for draining | 781.85 |
| 1 Diver equipment | 516.76 |
| 1 "Dayton-Dow" pump | 411.40 |
| 1 Gas adapter | 192.34 |
| 1 "Otis" motor for elevator | 600.00 |
| 1 "Jene" vapor cleaner #1250-G | 1,237.50 |
| 1 Tool Grinder Tumbar General Electric | 189.35 |
| 1 "HM Co." vise equiped with 3 HP AV-1591 motor | 1,900.00 |
| 1 Spare "Mercury" motor | 686.00 |
| 1 "Yale" triplex lift | 106.00 |
| | $ 13,122.26 |

CARS, FLAT-CARS AND TWO-WHEEL HAND PUSHED CARTS (Portable)

San Francisco Wharf

| | |
|---|---:|
| 131 Hauling trailer carts for tractors | $ 15,515.64 |
| 90 Different types two-wheel hand pushed carts | 1,905.54 |

Machina Wharf

| | |
|---|---:|
| 55 Trailer cars | 6,514.02 |
| 132 Different types two-wheel hand pushed carts | 2,764.08 |

Santa Clara Wharf

| | |
|---|---:|
| 83 Trailer cars | 9,830.52 |
| 99 Different types two-wheel hand pushed carts | 2,073.06 |

General Order

| | |
|---|---:|
| 8 Trailer cars | 947.52 |
| 0 Hand pushed carts | |

Workshop

| | |
|---|---:|
| 7 Trailer cars | 829.08 |
| 13 Different types two-wheel hand pushed carts | 272.22 |
| 2 Flat trailers | 35.00 |
| | $ 40,686.68 |

7-24-19 FOIA Response FCSC 00252

HDC 001841

HAVANA DOCKS CORPORATION
Comptroller Department

December 31, 1959

## GENERAL EQUIPMENT INVENTORY
### (4)

SURVEILLANCE

| | | |
|---|---|---|
| 23 Colt Revolvers | $ | 889.54 |
| 2 Watchman clocks | | 390.00 |
| 20 Stations (inside & outside wharfs) | | 205.00 |
| | | 1,484.54 |

TRACTORS (Portable)

| | | | | |
|---|---|---|---|---|
| 3 | Yale No. 3-G | | $ | 4,715.13 |
| 4 | " " 4-G | | | 5,008.73 |
| 11 | McCormick (Gasoline) | | | 889.13 |
| 12 | " " | | | 1,400.00 |
| 13 | Mercury Serial | 24051 | | 1,976.19 |
| 14 | " " | 24052 | | 1,976.20 |
| 15 | " " | 24050 | | 1,976.20 |
| 18 | International Serial Of M-265 | | | 1,900.00 |
| 19 | " " HM 282 | | | 1,900.00 |
| 20 | " " HM 242 | | | 1,900.00 |
| 21 | Krane Kar " 8787 | | | 8,088.74 |
| 22 | " " " 297974 | | | 8,360.09 |
| 27 | Mercury " 24238 | | | 1,999.79 |
| 28 | " " 24239 | | | 1,999.79 |
| 29 | Krane Kar " 288443 | | | 9,908.24 |
| 34 | Tow Motor " 445064 | | | 3,907.48 |
| 36 | International " HM-282 | | | 1,800.00 |
| 37 | " " HM-248 | | | 1,800.00 |
| 38 | Tow Motor " 4451151 | | | 4,332.79 |
| 39 | " " " 4451150 | | | 4,332.80 |
| 40 | Mercury " 34071 | | | 2,118.19 |
| 41 | " " 34070 | | | 2,118.20 |
| 42 | Tow Motor " 4451779 | | | 4,310.08 |
| 43 | " " " 445351 | | | 4,310.07 |
| 44 | " " " 42052438 | | | 4,769.97 |
| 47 | " " " 42053346 | | | 6,774.20 |
| 48 | Mercury " 4991 | | | 1,296.68 |
| 49 | " " 14020 | | | 1,296.69 |
| 50 | Tow Motor (Paper Bales) 4205487 | | | 6,590.01 |
| 51 | " " " 42054117 | | | 4,857.22 |
| 52 | Mercury 34417 | | | 2,689.16 |
| 53 | Tow Motor Serial 42055199 | | | 3,708.79 |
| 54 | " " 420560310 | | | 3,700.00 |
| 55 | " " (Paper Bales) 420560291 | | | 7,115.64 |
| 56 | " " 420560292 | | z | 7,115.64 |
| 57 | Mercury 34839 | | | 4,917.73 |
| 58 | Klank Mod. Utilitruck | | | 3,487.97 |
| 59 | " | | | 5,200.00 |
| 60 | Mercury Serial 4806 | | | 1,958.42 |
| 61 | " " 4776 | | | 1,958.41 |
| 62 | " " 4806/1 | | | 1,958.41 |
| 63 | " " 4816 | | | 1,958.41 |
| 64 | " " 14023 | | | 1,958.41 |
| 65 | Klank Mod. Calvader | | | 2,100.00 |
| 66 | " " " | | | 2,100.00 |
| 67 | " " " | | | 2,100.00 |
| 68 | Tow Motor Serial | | | 50,293.72 |

7-24-19 FOIA Response FCSC 00293

HDC 001842

HAVANA DOCKS CORPORATION
Comptroller Department

December 31, 1959

GENERAL EQUIPMENT INVENTORY
(5)

TRACTORS (CONT.)

| | | | | |
|---|---|---|---|---|
| 69 | Tow Motor Serial | 460580071 | $ | 5,699,71 |
| 70 | Klark        " | CM-42349 | | 1,050.00 |
| 71 | Mercury      " | 570013 | | 7,153.76 |
| 72 | Klark cargo loader | 463183/78 | | 5,583.95 |
| 73 | "        " | 171/183/78 | | 5,583.95 |
| 74 | Tow Motor | 540580589 | | 5,459.69 |
| 75 | Klark | 443/272/98 | | 5,452.06 |
| 76 | " | 444/272/98 | | 5,452.07 |
| | | | | $209,774.51 |

GARAGE (Fixed and Portable)

| | | |
|---|---|---|
| 1 Hand pump for gasoline | $ | 33.23 |
| 1 Electric pump for gasoline | | 390.00 |
| 1 Gasoline tank | | 185.36 |
| 1 Gasoline pump | | 30.00 |
| 1 Shier oil changer equipment | | 275.00 |
| 1 Electric switch-board (Santa Clara) | | 120.00 |
| 1 5 ton Hydraulic Jack | | 250.00 |
| 1 Villiers compressor 5006 Vilbiss with 5HP Peerles motor P-3098-JH | | 913.50 |
| 1 "Frigan" Refrigerator 6-R-83382 | | 82.00 |
| 1 Spark plugs cleaner | | 70.00 |
| 1 Endless belt (lean-to) | | 500.00 |
| | $ | 2,849.09 |

CAR SCALES AND SCALES (Fixed and portable)

Workshop

| | | |
|---|---|---|
| 1 "Fairbank" portable platform 500K E28409 | $ | 100.00 |
| 1   "         "         " 200K 854437 | | 86.00 |
| 1   "         "         " 1000K E889070 | | 150.00 |

Materials Warehouse

| | |
|---|---|
| 1 Table scale, plate & platform | 45.00 |

San Francisco Wharf

| | |
|---|---|
| 1 "Ohaus" grams scale- 1 plate  50K | 20.50 |

General Order - San Francisco

| | |
|---|---|
| 1 "Fairbank"  500 K | 165.00 |
| 1 Buffalo Table Scale, platform 100 K | 92.00 |

Ground Floor - San Francisco

| | |
|---|---|
| 1 "Fairbank" portable platform  1500 K | 509.45 |

7-24-19 FOIA Response FCSC 00254

HDC 001843

HAVANA DOCKS CORPORATION
Comptroller Department

December 31, 1959

## GENERAL EQUIPMENT INVENTORY

### (6)

Machina Wharf

1 "Ohaus" scale platform program                                        $    22.00

Machina Mercantile

1 "Fairbank" portable platform 500 K 1555255                              100.00

Machina Sacks Storage

1 "Fairbank" portable platform 500 K 166027                               100.00

Ground Floor - Machina and Santa Clara

1 "Fairbank" platform fixed to 5D warehouse 2500 K                         250.00
1      "         "       "    "  8D       "                                378.75

Fabrics - Santa Clara

1 "Fairbank" platform fixed to 8 warehouse  2500 K                         400.00
1 "Ohaus" grams scale platform 0500 K                                       22.00

Trucks

1 Fairbanks"  29300 K W-B-28                                             2,500.00

For Weighing Cotton

1 200 lbs. scale 436                                                       250.00
                                                                       $ 5,190.70

Wooden Platforms for Hauling Cargo (Portable)

105 Wooden platforms for hauling cargo                                     858.50

Air Conditioning Unit (Fixed)

2 "Chrysler Air Temp" Units
2 Compressors 25 T
  "Delco" 25 HP motors No. G-51 and G-52
  "Allis Chalmers" evaporator S HP #4101
1 "Warner Elect." condenser (3HP) #B-1254-M-308                         15,700.00

                                                    T O T A L:     $ 419,055.99

I, J. E. de la Torriente, Jr., hereby certify that I am a qualified
Spanish/English translator-interpreter and that the above is a
true translation from Spanish of the document in that language.

Sworn to and subscribed before me this
29th day of October, 1967.
                                                    J. E. de la Torriente, Jr.
          Raúl Santiago
Notary Public, State of Florida at Large            7-24-19 FOIA Response FCSC 00255
My Commission Expires Aug. 4, 1968

HDC 001844

HAVANA DOCKS CORPORATION
Physical Inventory Equipment
Emilio Dup# 539
Habana 9-6-60

# Havana Docks Corporation

7-24-19 FOIA Response FCSC 00256

HDC 001845

HAVANA DOCKS CORPORATION

INVENTORY· EQUIPMENT ACCOUNT 105

(PHYSICAL)

DECEMBER 31, 1959

7-24-19 FOIA Response FCSC 00257

HDC 001846

## HAVANA DOCKS CORPORATION

THE ATTACHED PHYSICAL INVENTORY OF GENERAL EQUIPMENT WAS
TAKEN ON JANUARY 2 TO 7, 1960, AND CONSISTS OF SIX PAGES,
EACH DULY INITIALED BY MR. MARIO RODRIGUEZ LANZA, ASSISTANT
VICE PRESIDENT & ASSISTANT COMPTROLLER AS OF DECEMBER 31,1959.

Physical count made by:

Eugenio Ortega
Acct. Dept. Clerk

Marcelo Alemán
Workshop-Office Clerk

José M. Navarro
Workshop Superintendent

Extensions and adjustments
made by:-

Mario Rodriguez Lanza
Asst. Vice President and
Asst. Comptroller

7-24-19 FOIA Response FCSC 00258

HDC 001847

# HAVANA DOCKS CORPORATION

## RESUMEN DE INVENTARIO
## DEL EQUIPO GENERAL

| C O N C E P T O | BALANCE EN<br>DIC. 31, 1959 |
|---|---|
| Muelle San Francisco | $    32,818.46 |
| Muelle Machina | 42,468.99 |
| Muelle Santa Clara | 299.50 |
| Elevadores | 7,300.48 |
| Entongadoras | 16,739.98 |
| Rolleteras | 2,192.67 |
| Equipo de Incendio | 6,532.69 |
| Equipo de Construcción | 21,044.94 |
| Taller | 13,122.26 |
| Carros, Planchas y Carretillas | 40,686.68 |
| Vigilancia | 1,484.54 |
| Tractores | 209,774.51 |
| Garage | 2,849.09 |
| Básculas y Romanas | 5,190.70 |
| Cuarteles | 850.50 |
| Aparato completo Aire-Acondicionado | 15,700.00 |
| TOTALES: | $ 419,055.99 |

HAVANA DOCKS CORPORATION

ASSISTANT COMPTROLLER

7-24-19 FOIA Response FCSC 00259

HDC 001848

HAVANA DOCKS CORPORATION
Case 1:19-cv-21724-BB   Document 331-102   Entered on FLSD Docket 09/20/2021   Page 346
of 459
Departamento del Comptroller

Diciembre 31 de 1959

## INVENTARIO DE EQUIPO GENERAL

### (1)

**SAN FRANCISCO**

Equipo Fijo

|  |  |  |  |  |  |  |  | COSTO SEGUN LIBROS |  |
|---|---|---|---|---|---|---|---|---|---|
| Fijo 1-F | Elevador | "Watson" | 10,000 Lbs. | Máquina No. | | 1-ENT | $ | 5,000.00 | |
| 2-F | " | "Otis" | 8,000 " | " | " | 031,331 | | 5,000.00 | |
| 3-F | " | " | 8,000 " | " | " | Q- 31,652 | | 5,000.00 | |
| 8-F | " | sin marca | 2,500 " | Motor | " | 578,106 | | 5,000.00 | |
| 5-F | " | "Otis" | 8,000 " | Máquina " | D- 1,413 | | | 3,346.89 | |
| 1-F | Chaparra | | 2,800 " | Motor 10HP | 578,105 | | | 2,000.00 | |
| 2-F | " | | 2,800 " | " 10HP | 753,231 | | | 2,000.00 | |
| 2-F | Sinfin | | Nave B-2 y B-3 | | | | | 400.00 | |
| | Tanque Servicio Incendio | | | | | | | 1,000.00 | |
| | " " " | | | | | | | 1,000.00 | |
| | Tanque Colector Agua | | | | | | | 55.00 | |
| | " Agua | | | | | | | 145.00 | |
| | Bomba Motor Agua | | | | | | | 715.00 | |
| | Boquete con Equipo | | | | | | | 1,053.16 | |
| | " " " | | | | | | | 1,053.16 | |
| | Nevera fija | | | | | | | 50.25 | $ 32,818.46 |

**MACHINA**

Equipo Fijo

|  |  |  |  |  |  |  |  | | |
|---|---|---|---|---|---|---|---|---|---|
| Fijo 1-M | Elevador | "Otis" | 8,000 Lbs. | Máquina No. | 35,337 | | $ | 5,500.00 | |
| " 2-M | " | "Tiro Rápido | 2,500 " | Motor | " 43,016Y | | | 5,000.00 | |
| " 3-M | " | "Otis" | 8,000 " | Máquina " | D- 2,772 | | | 5,000.00 | |
| " 5-M | " | " | 8,000 " | Maq.35338 Mot. | 2,394 | | | 5,000.00 | |
| " 1-M | Chaparra | | 2,800 " | Motor 12-HP | 622,286 | | | 1,500.00 | |
| | Tanque Servicio Incendio | | | | | | | 1,000.00 | |
| | " " " | | | | | | | 1,000.00 | |
| | Boquete con Equipo | | | | | | | 1,053.16 | |
| | " " " | | (Adic.Equipo Yale) | | | | | 1,473.16 | |
| | Elevador "Otis" para autos 6,000 lbs. Sin Número | | | | | | | 15,942.67 | 42,468.99 |

**SANTA CLARA**

Equipo Fijo

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| 1-C | Elevador | "Otis" | 8,000 lbs. | Máquina No. | 89,889 | | | |
| 2-C | " | " | 8,000 " | " " | 89,891 | | | |
| 3-C | " | " | 8,000 " | " " | 89,890/2 | | | |
| 4-C | " | " | 8,000 " | " " | 89,892/0 | | | |
| 1-C | Chaparra | 2,500 lbs. | Motor 7 1/2 HP | " | 3.940,623 | | | |
| 2-C | " | 2,500 " | " 7 1/2 HP | " | 3.881,894 | | | |
| | Bomba con motor Marathon | 3/4 HP | | | | | | 299.50 |

7-24-19 FOIA Response FCSC 00260

HDC 001849

Departamento del Controller

Diciembre 31 de 1959

INVENTARIO EQUIPO GENERAL

(2)

ELEVADORES   (Portátil)

| | | | | | |
|---|---|---|---|---|---|
| 1-G Marca "Link Belt" motor de S-HP | | | | | $ 2,215.56 |
| 2-G " " " " S-HP | | | | | 1,271.23 |
| 3-G " " " " S-HP | | | | | 1,271.23 |
| 4-G " " " " S-HP | | | | | 1,271.23 |
| 5-G " " " " S-HP | | | | | 1,271.23   $ 7,300.48 |

ENTONGADORES   (Portátil)

| | |
|---|---|
| 1-G Portátiles "Brown" | $ 1,758.75 |
| 2-G " " | 1,758.74 |
| 3-G " " | 1,758.75 |
| 4-G " " | 1,758.74 |
| 5-G " con motor | 427.50 |
| 6-G " " " | 427.50 |
| 7-G " tipo Chaparra | 1,500.00 |
| 8-G " " " | 1,500.00 |
| 9-G " " " | 1,500.00 |
| 10-G " " " | 1,450.00 |
| 11-G " " " | 1,450.00 |
| 12-G " " " | 1,450.00   16,739.98 |

ROLLETERAS   (Portátil)

| | |
|---|---|
| 14 Secciones de 21 Rolleteras Speedway | $ 1,100.92 |
| 6 Rolleteras de aluminio | 366.00 |
| 12 Secciones Rolleteras | 725.75   2,192.67 |

EQUIPO DE INCENDIO

| | |
|---|---|
| 75 Tramos de 50 con pitones | $ 3,051.68 |
| 38 Extinguidores Varios | 1,646.01 |
| 5 " Deluge Portátil | 1,750.00 |
| 1 Diferencial "Burget" | 85.00   6,532.69 |

EQUIPO DE CONSTRUCCION   (Portátil)

| | |
|---|---|
| 1 Compresor portátil Ingersol-Rand | $ 4,063.06 |
| 2 Cement Gun | 3,618.60 |
| 1 Juego herramientas (Martillos, cinceles etc.) | 863.58 |
| 2 Concreteras con motor | 400.00 |
| 2 Vagonetas para cemento | 24.00 |
| 1 Compresor Jaeger G-92-89 | 8,400.00 |
| 1 Vibrador concreto | 310.00 |
| 1 Torre "Jaeger" 31'6 con motor | 3,195.70 |
| 1 Transito y nivel | 112.00 |
| 2 Carretillas para concreto | 58.00   21,044.94 |

7-24-19 FOIA Response FCSC 00261

HDC 001850

HAVANA DOCKS CORPORATION
Departamento de comptroller

Diciembre 31 de 1959

INVENTARIO DE EQUIPO GENERAL
(3)

TALLER (Fijo y portátil)

| | | |
|---|---:|---:|
| 1 Taladro "Higgs" #686378 de 1 1/2 HP | $ 200.00 | |
| 1 Sierra con motor "Gonz" # 21894 de 5 HP | 200.00 | |
| 1 Equipo carpintería (Lijadora, Barrena) | 217.08 | |
| 1 Segueta automática | 60.00 | |
| 1 Aparato oxiacetileno Oswald | 120.00 | |
| 1 Terraja "Little Giant" de 1/8 de 1 pulgada | 60.00 | |
| 1 Nevera fija (enfriadora agua) | 50.24 | |
| 1 Mandril para piedra esmeril | - | |
| 1 Reloj eléctrico "Paud" | 15.00 | |
| 3 Metros contadores de agua (1 cada muelle) | 385.04 | |
| 1 Camilla mecánica | 17.00 | |
| 1 Set tenedores para motor (Para mármol) | 215.72 | |
| 1 Amplificador (micrófono, trompeta (Control) | 350.00 | |
| 1 Semáforo (entrada garage) | 428.06 | |
| 1 Equipo Wart-O-Matic (montar carriles) | 420.92 | |
| 1 Pasarela 2 torres (escala) | 3,762.00 | |
| 1 Turbina de achique | 781.85 | |
| 1 Equipo buzo | 516.76 | |
| 1 Bomba Dayton-Dow | 411.40 | |
| 1 Adaptador para gas | 192.34 | |
| 1 Motor "Otis" para elevador | 600.00 | |
| 1 Limpiadora a vapor "Jene" # 1250-G | 1,237.50 | |
| 1 Tool Grinder Tumbar General Electric | 189.35 | |
| 1 Torno HM Co Equipado con motor AV-1591 de 3 HP | 1,900.00 | |
| 1 Motor repuesto Mercury | 686.00 | |
| 1 Aparejo Yale Triplex | 106.00 | $ 13,122.26 |

CARROS, PLANCHAS Y CARRETILLAS (Portátil)

Muelle San Francisco

| | | |
|---|---:|---:|
| 131 Carros para tiro con tractores Traillers | $ 15,515.64 | |
| 90 Carretillas de mano distintos tipos | 1,905.54 | |

Muelle Machina

| | | |
|---|---:|---:|
| 55 Carros Traillers | 6,514.02 | |
| 132 Carretillas de mano de distintos tipos | 2,764.08 | |

Muelle Santa Clara

| | | |
|---|---:|---:|
| 83 Carros Traillers | 9,830.52 | |
| 99 Carretillas de mano de distintos tipos | 2,073.06 | |

Orden General

| | | |
|---|---:|---:|
| 8 Carros Traillers | 947.52 | |
| 0 Carretillas de mano | - | |

Taller

| | | |
|---|---:|---:|
| 7 Carros Traillers | 829.08 | |
| 13 Carretillas de mano de distintos tipos | 272.22 | |
| 2 Carros Zorras | 35.00 | $ 40,686.68 |

7-24-19 FOIA Response FCSC 00262

HDC 001851

HAVANA DOCKS CORPORATION

Diciembre 31 de 1959

INVENTARIO DE EQUIPO GENERAL

(4)

VIGILANCIA

| | | | |
|---|---|---|---|
| 23 Revolvers Colt | | $ 889.54 | |
| 2 Relojes sereno | | 390.00 | |
| 20 Estaciones (Interior y exterior muelles) | | 205.00 | $ 1,484.54 |

TRACTORES (Portátil)

| | | |
|---|---|---|
| 3 Yale No. 3-G | | $ 4,715.13 |
| 4 " " 4-G | | 5,008.73 |
| 11 Mc Cormick (Gasolina) | | 889.13 |
| 12 " " " | | 1,400.00 |
| 13 Mercury Serie 24051 | | 1,976.19 |
| 14 " " 24052 | | 1,976.20 |
| 15 " " 24050 | | 1,976.20 |
| 18 International Serie Of M-265 | | 1,900.00 |
| 19 " " HM 282 | | 1,900.00 |
| 20 " " HM 242 | | 1,900.00 |
| 21 Krane Kar " 8787 | | 8,088.74 |
| 22 " " " 297974 | | 8,360.09 |
| 27 Mercury " 24238 | | 1,999.79 |
| 28 " " 24239 | | 1,999.79 |
| 29 Krane Kar " 288443 | | 9,908.24 |
| 34 Tow Motor " 445064 | | 3,907.48 |
| 36 International " HM-282 | | 1,800.00 |
| 37 " " HM-248 | | 1,800.00 |
| 38 Tow Motor " 4451151 | | 4,332.79 |
| 39 " " " 4451150 | | 4,332.80 |
| 40 Mercury " 34071 | | 2,118.19 |
| 41 " " 34070 | | 2,118.20 |
| 42 Tow Motor " 4451779 | | 4,310.08 |
| 43 " " " 445351 | | 4,310.07 |
| 44 " " " 42052438 | | 4,769.97 |
| 47 " " " 42053346 | | 6,774.20 |
| 48 Mercury " 4991 | | 1,296.68 |
| 49 " " 14020 | | 1,296.69 |
| 50 Tow Motor (Bobinas) 4205487 | | 6,590.01 |
| 51 " " " 4205A117 | | 4,857.22 |
| 52 Mercury 34417 | | 2,689.16 |
| 53 Tow Motor Serie 42055199 | | 3,708.79 |
| 54 " " 420560310 | | 3,700.00 |
| 55 " " (Bobinas) 420560291 | | 7,115.64 |
| 56 " " 420560292 | | 7,115.64 |
| 57 Mercury 34839 | | 4,917.73 |
| 58 Klank Mod. Utilitruck | | 3,487.97 |
| 59 " | | 5,200.00 |
| 60 Mercury Serie 4806 | | 1,958.42 |
| 61 " " 4776 | | 1,958.41 |
| 62 " " 4806/1 | | 1,958.41 |
| 63 " " 4816 | | 1,958.41 |
| 64 " " 14023 | | 1,958.41 |
| 65 Klank Mod. Calvader | | 2,100.00 |
| 66 " " " | | 2,100.00 |
| 67 " " " | | 2,100.00 |
| 68 Tow Motor serie | | 5,699.72 |

7-24-19 FOIA Response FCSC 00263

Departamento del Controller

Diciembre 31 de 1959

INVENTARIO DE EQUIPO GENERAL

(5)

TRACTORES

| | | | | |
|---|---|---|---|---|
| 69 | Tow Motor serie | 460580071 | $ 5,699.71 | |
| 70 | Klark " | GM-42349 | 1,050.00 | |
| 71 | Mercury " | 570013 | 7,153.76 | |
| 72 | Klark montacarga | 463183/78 | 5,583.95 | |
| 73 | " " | 171/183/78 | 5,583.95 | |
| 74 | Tow Motor | 540580589 | 5,459.69 | |
| 75 | Klark | 443/272/98 | 5,452.06 | |
| 76 | " | 444/272/98 | 5,452.07 | $209,774.51 |

GARAGE  (Fijo y portátil)

| | | |
|---|---|---|
| 1 Bomba # 131 gasolina (Mang. port.) de mano | $ 33.23 | |
| 1 " # A280783 electrica para gasolina | 390.00 | |
| 1 Tanque para gasolina | 185.36 | |
| 1 Bomba gasolina | 30.00 | |
| 1 Equipo Shier Ois Changer | 275.00 | |
| 1 Tablero electrico (Santa Clara) | 120.00 | |
| 1 Gato hidráulico 5 tons. | 250.00 | |
| 1 Compresor de Villiers 5006 de Vilbiss con motor | | |
| 5 HP Peerless P-3098-JH | 913.50 | |
| 1 Refrigerador Fringan 6-R-83382 | 82.00 | |
| 1 Limpiador bujías | 70.00 | |
| 1 Sinfin (Nave del portal) | 500.00 | $ 2,849.09 |

BASCULAS Y ROMANAS  (Fijo y portátil)

Taller

| | | |
|---|---|---|
| 1 Fairbank plataforma portátil 500 K  E-28409 | $ 100.00 |
| 1 " " " 200 K  854437 | 86.00 |
| 1 " " " 1000 K E-889070 | 150.00 |

Almacen de Materiales
1 Balanza de mesa plato y plataforma 50 K          45.00

Muelle San Francisco
1 Balanza "Ohaus" para gramos 1 plato 500 K        20.50

Orden General - San Francisco
1 Fairbank  500 K                                  165.00
1 Bufalo de mesa, plataforma 100 K                  92.00

Planta Baja - San Francisco
1 Fairbank plataforma portátil 1500 K              509.45

Muelle Machina
1 Balanza "Ohaus" programa plataforma              22.00

Mercantil Machina
1 Fairbank plataforma portátil 500 K 1555255       100.00

Saqueria - Machina
1 Fairbank plataforma portátil 500 K 166027        100.00

Planta Baja - Machina y Santa Clara
1 Fairbank plataforma fija Nave 5D 2500 K          250.00
1 " " " " 8D              378.75

7-24-19 FOIA Response FCSC 00264

HDC 001853

Departamento del Controller

Diciembre 31 de 1959

## INVENTARIO DE EQUIPO GENERAL

### (6)

BASCULAS Y ROMANAS (Cont.)

Tejidos – Santa Clara
1 Fairbank plataforma fija Nave 8  2500 K           $   400.00
1 Balanza "Ohaus" para gramos plataforma 0500 K        22.00

Camiones
1 Fairbanks  29300 K W-B-28                           2,500.00

Para pesar algodon
1 Romana de 200 libras 436                            250.00 $  5,190.70

CUARTELES – (Portátil)
105 Cuarteles                                                  858.50

AIRE ACONDICIONADO (Fijo)
2 Equipos "Crysler Air Temp"
2 Compresores 25 T
Motores "Delco" de 25 HP No. C-51 y C-52
Evaporador "Allis Chalms" S HP # 4101
1 Condensador "Warner Elect." de 3 HP # B-1254-M-308         15,700.00
                                                       _____

                                                       $419,055.99
                                                       ===========

hv
II-18-60

7-24-19 FOIA Response FCSC 00265

HDC 001854

# Havana Docks Corporation

**Exhibit 0012**

Jerry Johnson

7-24-19 FOIA Response

HDC 001799

The enclosed physical inventory of Office Furniture and Fixtures
dated December 31st, 1959, was taken by personnel of each Depart-
ment and Section of the Company, under the direct supervision of
their respective Section heads, and the extensions and adjustments
were made by the undersigned.

Havana,     March, 1960.

HAVANA DOCKS CORPORATION

Mario Rodriguez Lanza
Asst. Vice Pres. & Asst. Comptroller

7-24-19 FOIA Response FCSC 00211

HDC 001800

## FINAL SUMMARY OF INVENTORY OF

## OFFICE FURNITURE AND FIXTURES

## PERFORMED IN DECEMBER 31, 1959

T O T A L

| | | |
|---|---|---:|
| I | Conference Room | $ 755.00 |
| II | General Administration | 4,255.51 |
| III | Vice President of Operations | 2,409.20 |
| IV | Vice President and Assistant Comptroller | 894.90 |
| A | Assitant Vice President and Assistant Comptroller | 365.10 |
| B | Accounting and Auditor's Office | 7,782.80 |
| C | Records and Claims | 9,989.53 |
| D | Liquidation | 7,401.66 |
| E | Cashier Section | 4,432.85 |
| F | Personnel Section | 29,158.61 |
| G | Purchasing Section and Office | 6,032.03 |
| T | Surveillance | 2,591.98 |
| Z | Operations Inspection | 1,181.10 |
| O | Lobby | 827.16 |
| U | Workshop | 1,430.12 |
| V | General Warehouse | 444.48 |
| Y | San Francisco Wharf | 3,201.77 |
| X | Machina Wharf | 3,858.84 |
| W | Santa Clara Wharf | 3,603.09 |

$ 90,615.73

HAVANA DOCKS CORPORATION

Assistant Comptroller

7-24-19 FOIA Response FCSC 00212

HDC 001801

## FIXTURES AND OFFICE EQUIPMENT INVENTORY

### DECEMBER 31, 1959

|  |  |  | T O T A L |
|---|---|---|---|
| **I** | | COFFERENCE ROOM: | |
| | 1 | Mahogany table - Executive type | $ 150.00 |
| | 8 | Mahogany arm-chairs | 160.00 |
| | 1 | Auxiliary mahogany table | 14.00 |
| | 1 | "Yale" steel safety box | 254.00 |
| | 1 | Mahogany book-shelf - 3 glass doors | 70.00 |
| | 1 | "Toilet" cabinet | 18.00 |
| | 1 | Telephone Table | - |
| | 1 | Table clock | 75.00 |
| | 1 | Table barometer | 14.00 |
| | | | $ 755.00 |

| **II** | | OFFICE OF THE PRESIDENCE: | |
|---|---|---|---|
| | 1 | "Steel Age" Executive type double-desk | $ 384.16 |
| | 1 | Time-Master dictaphone equipment | 605.15 |
| | 1 | "Sturgiss" swivel arm-chair | 120.00 |
| | 1 | "All Steel" large auxiliary table with glass top | 180.00 |
| | 1 | "Invincible" small auxiliary table with glass top | 152.00 |
| | 1 | "Cole Steel" auxiliary file cabinet - 2 drawers | 75.00 |
| | 1 | "Art Metal" steel book-shelf | 207.20 |
| | 3 | "Steel Age" file cabinet - 4 legal size drawers | 410.00 |
| | 1 | Mahogany tree hanger | 8.50 |
| | 1 | Barometer, thermometer, etc set. | 35.00 |
| | 1 | Venetian blind | 46.50 |
| | 1 | Metal deposit for papers | 7.00 |
| | 3 | Fixed arm-chairs | 85.50 |

| **III** | | PRESIDENT'S SECRETARY | |
|---|---|---|---|
| | 1 | "Steel Age" table mod. 3860-L with addition for typewriter | 240.00 |
| | 1 | "Underwood" electric typewriter #12-8134131 | 564.00 |
| | 1 | "Sturgiss" swivel chair mod. 1210 | 70.00 |
| | 1 | "Cole Steel" file cabinet mod. 201- telephone and file cabinet | 75.00 |
| | 1 | Mahogany table with formica top | 40.50 |
| | 1 | "Secretary" photocopy machine | 475.00 |
| | 1 | Dictaphone equipment (transcribe only) | 440.00 |
| | 1 | Mobile stand for the dictaphone | 35.00 |
| | | | $ 4,255. 51 |

HDC 001802

III     VICE PRESIDENT OF OPERATIONS                          T O T A L

   1   "All Metal" single table                        $    280.00
   1   "All Metal" swivel arm-chair                          151.20
   3   Mahogany arm-chairs mod. 117                           60.00
   1   "All Steel" book-shelf with glass doors               115.00
   1   Mahogany auxiliary table with formica top             40.50
   1   Small auxiliary table with formica top                35.00
   1   "Steel Age" file cabinet with 4 drawers              135.00
   1   Mahogany tree hanger                                   8.50
   1   Dictaphone                                           493.43
   1   Metal basket for papers                               13.50
   1   Magnetic board                                       344.07
   1   Metal file cabinet 4 drawers                         135.00


III     SECRETARY TO THE VICE PRESIDENT OF OPERATIONS

   1   "Steel Age" double table mod. 3860                    240.00
   1   "Underwood" typewriter # 12-6260238                   190.00
   1   "Steel Age" swivel chair                               70.00
   1   Steel file cabinet 4 legal size drawers                98.00

                                                        $  2,409.20


IV      VICE PRESIDENT AND ASSISTANT COMPTROLLER

   1   "All Steel" double table with glass              $    280.00
   1   "All Steel" swivel arm-chair                           80.00
   4   Mahogany arm-chairs mod. 117                          105.00
   1   Mahogany book-shelf- 3 formica shelfs                 49.50
   1   Mahogany table 64 x 15 with formica top               32.00
   1   3 doors mahogany book-shelf with formica top         150.00
   1   Metal file cabinet 4 legal size drawers               85.80
   1   Mahogany tree hanger                                   11.00
   1   "All Steel" book-shelf with glass doors               60.00
   1   Venetian blind                                         41.60

                                                        $    894.90


A       DEPARTMENT OF THE COMPTROLLER:

   1   "All Steel" table                                $    210.00
   1   "All Steel" swivel chair                               75.00
   3   Mahogany arm-chairs                                    61.60
   1   Mahogany table for the telephone                        9.00
   1   Mahogany tree hanger                                    9.50

                                                        $    365.10

HDC 001803

B    <u>ACCOUNTING AND AUDITOR OFFICE SECTION:</u>      <u>T O T A L</u>

| | | |
|---|---|---:|
| 1 | "Steel Age" table 30 x 60 | $ 195.00 |
| 1 | "Sturgiss" swivel chair | 75.00 |
| 1 | "Steel Age"table 30 x 60 | 195.00 |
| 1 | "Sturgiss" swivel chair | 75.00 |
| 1 | Mahogany and formica table with glass | 110.00 |
| 1 | Mahogany swivel chair without arms | 52.00 |
| 1 | Mahogany and formica table 34 x 54 | 89.70 |
| 1 | Mahogany swivel chair without arms | 40.00 |
| 1 | Mahogany and formica table 36 x 60 | 89.70 |
| 1 | Mahogany swivel arm-chair | 52.00 |
| 1 | Mahogany and formica table 36 x 60 | 67.00 |
| 1 | Mahogany swivel arm-chair | 20.00 |
| 1 | Mahogany and formica table 36 x 60 | 89.70 |
| 1 | Mahogany swivel chair without arms | 25.00 |
| 1 | Mahogany table for typewriter 18 x 34 | 18.00 |
| 1 | Mahogany swivel arm-chair | 52.00 |
| 1 | Mahogany table for typewriter 24 x 36 | 21.17 |
| 1 | Mahogany swivel chair without arms | 52.00 |
| 1 | Mahogany table with wing for typewriter | 17.00 |
| 1 | Metal stand with wheels for adding machine | 42.75 |
| 1 | Mahogany and formica table 32 x 60 | 10.75 |
| 1 | Steel safety box | 210.00 |
| 1 | Steel safety box | 200.00 |
| 1 | Steel cabinet 2 doors | 60.00 |
| 1 | "Sturgiss" steel file cabinet - 4 legal size drawers | 84.00 |
| 1 | "   "   "   "   4 "   "   "   " | 84.00 |
| 1 | "Cole"   "   "   "   2 "   "   "   " | 80.00 |
| 1 | "   "   "   "   2 "   "   "   " | 75.00 |
| 1 | "G. F." Vouchers steel file cabinet | 148.00 |
| 1 | Mahogany arm-chair | 20.00 |

<u>Office Equipment:</u>

| | | |
|---|---|---:|
| 1 | "Sundstrand" electric adding machine #604729 | 240.00 |
| 1 | "   "   "   "   #716783 | 525.00 |
| 1 | "Olivetti" electric calculating machine ID #027765 (add) | 750.00 |
| 1 | "Remington"   "   "   " 6615/1204207 ( " ) | 809.20 |
| 1 | "Friden" electric calculating machine ST-10-187605 | 1,080.00 |
| 1 | "   "   "   "   CW-10-70059 | 702.00 |
| 1 | "   "   "   "   CW-10-7082555 | 400.00 |
| 1 | "Dalton" manual adding machine M-298869 | 135.00 |
| 1 | "Underwood" typewriter 11-6660191 | 225.00 |
| 1 | "   "   S-11-584556 | 230.00 |
| 1 | "Remington"   "   5-2315265 | 201.83 |
| 1 | "Sundstrand" adding machine | 135.00 |
| | | $ 7,782.80 |

C    <u>RECORD AND CLAIMS SECTION</u>

| | | |
|---|---|---:|
| 1 | "Steel Age" steel table | $ 195.00 |

## C    RECORD AND CLAIMS SECTION (CONT.)      T O T A L

| | | |
|---|---|---|
| 1 | "Steel Age" swivel steel chair | $ 75.00 |
| 1 | "Cole" steel file cabinet 2 drawers | 78.00 |
| 1 | Large mahogany and formica double table | 75.00 |
| 1 | Mahogany swivel chair without arms | 20.00 |
| 1 | Mahogany swivel chair without arms | 72.50 |
| 1 | Large mahogany and formica double table | 90.50 |
| 1 | Large mahogany and formica double table | 95.51 |
| 1 | Mahogany swivel chair without arms | 20.00 |
| 1 | Large mahogany and formica double table | 75.65 |
| 1 | Mahogany swivel chair without arms | 20.00 |
| 1 | Large mahogany and formica double table | 49.50 |
| 1 | Mahogany swivel chair without arms | 20.00 |
| 1 | Medium mahogany and formica double table | 89.70 |
| 1 | Mahogany swivel chair without arms | 42.00 |
| 1 | Medium mahogany and formica single table | 49.50 |
| 1 | Mahogany swivel chair without arms | 42.00 |
| 1 | Medium mahogany and formica single table | 35.00 |
| 1 | Mahogany swivel chair without arms | 42.00 |
| 1 | Medium mahogany and formica single table | 44.00 |
| 1 | Mahogany swivel chair without arms | 42.00 |
| 1 | Medium mahogany and formica single table | 44.00 |
| 1 | Mahogany swivel chair without arms | 49.50 |
| 1 | Medium mahogany and formica single table | 52.00 |
| 1 | Mahogany swivel chair without arms | 23.00 |
| 1 | Medium mahogany and formica single table | 54.00 |
| 1 | Mahogany swivel arm-chair | 42.00 |
| 1 | Small mahogany and formica single table | 49.50 |
| 1 | Mahogany swivel arm-chair | 42.00 |
| 1 | Small mahogany and formica single table | 40.50 |
| 1 | Mahogany swivel arm-chair | 42.00 |
| 1 | Small mahogany and formica single table | 40.50 |
| 1 | Mahogany swivel arm-chair | 42.00 |
| 1 | Small mahogany and formica single table | 49.50 |
| 1 | Mahogany swivel arm-chair | 42.00 |
| 1 | Small mahogany and formica single table | 27.50 |
| 1 | Mahogany swivel arm-chair | 25.00 |
| 1 | Small mahogany and formica single table | 22.05 |
| 1 | Fixed mahogany chair without arms | 28.00 |
| 1 | "   "   "   "   " | 8.00 |
| 1 | "   "   "   "   " | 14.50 |
| 1 | Fixed mahogany arm-chair | 14.50 |
| 1 | "   "   "   " | 23.00 |
| 1 | "Underwood" typewriter #11-6593948 | 290.00 |
| 1 | "   "   #12-6178355 | 290.00 |
| 1 | "   "   #12-6178249 | 290.00 |
| 1 | "   "   (Electric) #12-8110452 | 740.00 |
| 1 | "Remington" typewriter #J-2346221 | 236.00 |
| 1 | "   "   #J-2346209 | 236.00 |
| 1 | "   "   #J-210496 | 201.83 |
| 1 | "   "   (statements) BV-83999 | 185.00 |
| 1 | "IBM" electric typewriter #146294 | 595.00 |
| 1 | "   "   "   #146331 | 595.00 |
| 1 | "Sundstrand electric adding machine #1053098 | 356.00 |
| 1 | "   "   "   "   #1003560 | 356.00 |
| 1 | "   manual   "   "   #309228 | 245.00 |

7-24-19 FOIA Response FCSC 00216

HDC 001805

C    <u>RECORD AND CLAIMS SECTION</u>: (CONT.)       <u>T O T A L</u>

| | | | |
|---|---|---|---|
| 1 | "Friden" electric calculating machine | SW-8-722815-JJ | $   820.00 |
| 1 | "    "     "      " | DW-8-293241-JJ | 576.00 |
| 1 | "    "     "      " | C10-56915 | 702.00 |
| 1 | Steel table for electric typewriter | | 274.48 |
| 1 | "   "    "     "      " | | 274.48 |
| 1 | "   "    "     "      " | | 274.48 |
| 1 | Steel swivel chair | | 52.00 |
| 1 | "    "     " | | 23.85 |
| 1 | Mahogany tree hanger | | 9.50 |
| 1 | "     "     " | | 9.50 |
| 1 | "     "     " | | 9.50 |
| 1 | Shelf next to the wall | | 300.00 |

                                                           $ 9,989.53

D    <u>LIQUIDATION SECTION</u>:

| | | |
|---|---|---|
| 1 | Mahogany and formica table 60 x 36 | $   49.50 |
| 1 | Mahogany swivel chair | 21.60 |
| 1 | Mahogany and formica table 60 x 36 | 55.00 |
| 1 | Mahogany swivel chair | 50.00 |
| 1 | Mahogany and formica table 60 x 36 | 75.00 |
| 1 | Mahogany swivel chair | 20.00 |
| 1 | Mahogany and formica table | 35.00 |
| 1 | Mahogany swivel chair | 23.95 |
| 1 | Mahogany and formica table | 35.00 |
| 1 | Mahogany swivel chair | 23.95 |
| 1 | Mahogany and formica table | 49.50 |
| 1 | Mahogany swivel chair | 23.95 |
| 1 | Mahogany and formica table | 75.00 |
| 1 | Mahogany swivel chair | 23.95 |
| 1 | Mahogany and formica table | 55.00 |
| 1 | Mahogany swivel chair | 50.00 |
| 1 | Mahogany formica table | 55.00 |
| 1 | Mahogany swivel chair | 50.00 |
| 1 | Metal file cabinet 3 legal size drawers | 90.00 |
| 1 | "    "     "     "     "     " | 90.00 |
| 1 | "    "     "     "     "     " | 90.00 |
| 1 | "    "     "     "   2 letter " | 45.00 |
| 1 | "    "     "     "     "     " | 45.00 |
| 1 | "    "     "     "   " legal "     " | 45.00 |
| 1 | "    "     "     "   " legal "     " | 49.50 |
| 1 | "    "     "     "     "     " | 49.50 |
| 1 | "    "     "     "     "     " | 15.00 |
| 1 | Metal card index | 15.00 |
| 1 | "    "     " | 15.00 |
| 1 | "    "     " | 15.00 |
| 1 | Metal cabinet | 65.00 |
| 1 | Addressograph machine | 200.00 |
| 1 | "Monroe" electric calculating machine   CSA-8-632973 | 800.00 |
| 1 | "    "     "     "     "   CSA-8-646638 | 800.00 |
| 1 | "    "     "     "     "   CSA-8-632984 | 800.00 |
| 1 | "    "     "     "     "   CST-8-571746 | 639.00 |
| 1 | "    "     "     "     "   #78574 | 275.00 |
| 1 | "   manual     "     "   #167770 | 275.00 |

7-24-19 FOIA Response FCSC 00217

HDC 001806

D. LIQUIDATION SECTION (CONT.)

|  |  | TOTAL |
|---|---|---|
| 1 | "Merchant" electric calculating machine #8-EFA-358321 | $ 973.79 |
| 1 | "Underwood" adding machine 418224-8140 | 320.00 |
| 1 | Mahogany tree hanger | 9.50 |
| 1 | " " " | 9.50 |
| 1 | Intercom equipment (5 stations) | 754.50 |
| 1 | Metal file cabinet - 1 drawer | 22.05 |
| 1 | Glass and metal screen | 122.92 |
|  |  | $ 7,401.66 |

E. CASHIER SECTION:

|  |  | TOTAL |
|---|---|---|
| 1 | "Remington" electric adding machine #93-N-955746 | $ 462.40 |
| 1 | " " " " #93-N-993160 | 462.40 |
| 1 | "Todd" check punshing machine W-608-P-3759 | 135.00 |
| 1 | Large mahogany and formica desk | 98.50 |
| 1 | Mahogany swivel chair | 35.00 |
| 1 | Large mahogany and formica desk | 65.00 |
| 1 | Mahogany swivel chair | 34.15 |
| 1 | Medium mahogany and formica desk | 65.00 |
| 1 | Mahogany swivel chair | 34.15 |
| 1 | Medium mahogany and formica desk | 50.00 |
| 1 | Mahogany swivel chair | 19.00 |
| 1 | Small table with drawers | 25.00 |
| 1 | Mahogany swivel chair | 30.00 |
| 1 | Mahogany fixed chair | 7.50 |
| 1 | Metal seal with dates | 25.00 |
| 1 | "Johnson" paying machine | 360.00 |
| 1 | " " " | 175.00 |
| 1 | " " " | 175.00 |
| 1 | " " " | 353.00 |
| 1 | " " " | 353.00 |
| 1 | " " " | 353.00 |
| 1 | Large "Mosler" iron box | 390.00 |
| 1 | " "Yale" " " | 200.00 |
| 1 | Small "York" " " 410101 | 150.00 |
| 1 | Mosler iron box | 285.00 |
| 1 | "Westinghouse" fan | 17.50 |
| 1 | " " | 17.50 |
| 1 | "Mahogany tree hanger | 16.50 |
| 2 | Wodden benches | 39.25 |
|  |  | $ 4,432.85 |

F. PERSONNEL SECTION:

|  |  |  |
|---|---|---|
| 1 | Steel desk | $ 195.00 |
| 1 | Swivel chair | 75.00 |
| 1 | Mahogany and formica single desk | 43.00 |
| 1 | Swivel arm-chair | 23.85 |
| 1 | Mahogany and formica double table | 45.00 |
| 1 | Mahogany swivel chair | 23.85 |
| 1 | Mahogany and formica double table | 40.00 |

7-24-19 FOIA Response FCSC 00218

HDC 001807

## F    PERSONNEL SECTION (CONT.)                                          T O T A L

| | | |
|---|---|---|
| 1 | Mahogany swivel chair | 23.85 |
| 1 | Mahogany and formica double table | 40.00 |
| 1 | Mahogany swivel chair | 25.62 |
| 1 | Mahogany and formica double table | 40.00 |
| 1 | Mahogany swivel chair | 23.85 |
| 1 | Mahogany and formica double table | 46.58 |
| 1 | Mahogany swivel chair | 23.85 |
| 1 | Mahogany and formica double table | 46.58 |
| 1 | Mahogany swivel chair | 42.34 |
| 1 | Mahogany table for Elliot Fisher machine | 102.18 |
| 1 | Plain pine table | 18.00 |
| 1 | Metal table for machine | 62.65 |
| 1 | "      "      "      " | 62.64 |
| 1 | "      "      "      " | 62.64 |
| 1 | Fixed mahogany chair | 19.80 |
| 1 | "      "      " | 19.81 |
| 1 | "      "      " | 19.80 |
| 1 | "      "      " | 19.81 |
| 1 | Mahogany tree hanger | 9.50 |
| 1 | "      "      " | 9.50 |
| 1 | "Sundstrand" accounting machine M.D-284090 | 5,007.63 |
| 1 | "      "      "      "      M.D-284091 | 4,018.05 |
| 1 | "National Cash"      "      "      M.3-35426 | 3,628.30 |
| 1 | "      "      "      "      "      M.3-37435 | 3,520.00 |
| 1 | "Elliot Fisher" machine mod. #13586 | 1,250.00 |
| 1 | "Sundstrand" adding machine #486567 | 292.50 |
| 1 | "      "      "      "      #572183 | 472.50 |
| 1 | "Monroe" electric calculating machine | 800.00 |
| 1 | "      "      manual      "      " | 375.00 |
| 1 | "Underwood" typewriter #6824509 | 290.00 |
| 1 | "Remington"      "      #J-2346261 | 236.00 |
| 1 | Addressograph machine mod. F2-153 | 1,064.75 |
| 1 | Graphotype machine mod. 255018 | 276.79 |
| 1 | Wooden file cabinet 12 drawers | 65.00 |
| 1 | Metal      "      " | 88.02 |
| 1 | "      "      " | 87.00 |
| 1 | "      "      "      " 3 sections | 99.00 |
| 1 | "      "      "      " auxiliary | 73.00 |
| 1 | Wooden cabinet 8 drawers | 23.00 |
| 1 | "      "      " | 10.00 |
| 1 | Metal file cabinet 4 drawers | 62.65 |
| 1 | "      "      "      "      " | 62.64 |
| 1 | "      "      "      "      " | 62.64 |
| 1 | Wooden file case with wheels | 22.05 |
| 1 | "      "      "      "      " | 22.05 |
| 1 | "      "      "      "      " | 22.05 |
| 1 | "      "      "      "      " | 22.05 |
| 1 | Drawer chest with wheels for accounting machine | 21.16 |
| 1 | "      "      "      "      "      " | 21.17 |
| 1 | Chest for accounting machine bars | 21.60 |
| 1 | "      "      "      "      " | 21.60 |
| 1 | "      "      "      "      " | 21.60 |
| 1 | Cabinet for addressograph plates - 24 drawers | 32.00 |
| 1 | Metal card case - 10 drawers | 110.90 |
| 1 | Wooden cabinet with glass doors | 40.00 |
| 1 | Wooden shelf with 2 sections for accounting machine | 30.00 |

7-24-19 FOIA Response FCSC 00219

HDC 001808

F   PERSONNEL SECTION (CONT.)                                     T O T A L

1   Stapler                                                   $      20.00
1   Steel card case 6 x 6                                            27.00

    Press Room
1   Multilith machine                                             4,815.96
1   Electric paper cutting machine                                  620.00
1   Air conditioning unit                                            75.00
1   Lamp for multilith                                               25.75
1   Electric stapler                                                112.50
1   Wooden shelf with 2 sections for paper cutting machine           25.00

                                                              $ 29,158.61

G   PURCHASING AGENCY SECTION:

    Office:

1   "Steel Age" steel table mod. 3860                         $     240.00
1   "Steel Age" swivel chair mod. 1210                               70.00
1   "Cole Steel" steel file cabinet with shelf for tel.              70.00
1   "Underwood" typewriter #11-653402                               225.00
1   Auxiliary mahogany and formica telephone table                  25.00
1   Legal size steel file cabinet- 4 drawers                         98.96
1   Legal size steel file cabinet- 4 drawers                         98.97
1   Fixed arm-chair type 117                                         20.00
1        "    "    "    "    "                                        19.00
1   Formica top table 28 x 42                                        25.00
1   Swivel arm-chair                                                 40.00
1   Machine for franking correspondence                             105.00
1   Electric sharpening machine                                      34.00
1   Hanger                                                            9.50

G   Warehouse "A":

1   Cedar table 36 x 96                                              55.00
1   Swivel arm-chair                                                 40.50
1   "Cestetner" Duplicator                                          270.00
1   Tripode base for duplicator                                      18.00
1   "Lewyt" vacuum cleaner                                          122.82
1   Pine cabinet (dep. mat.)                                        105.00
1   Remington" typewriter RKO9-88                                   245.00
1   Aluminum ladder                                                  51.95

G   Ladies' Room:

1   Steel cabinet                                                    25.00
1   "Hotpoint" refrigerator                                         150.00
1   2 plate stove                                                    25.78
1   Mahogany chair                                                    6.00
1   Paper basket                                                        -
1   Electric dryer                                                  169.00
2   Tables                                                           19.00

G   Mens' Room

1   Electric dryer                                                  199.50

7-24-19 FOIA Response FCSC 00220

HDC 001809

G   Mens's Room (Cont.)

| | | | |
|---|---|---|---|
| 1 | Electric dryer | $ | 175.56 |
| 1 | Paper basket | | 20.70 |

G   <u>Administrator's Bar:</u>

| | | |
|---|---|---|
| 1 | Refrigerator | 150.00 |
| 1 | Enamel Cabinet | 50.00 |

G   <u>Office:</u>

| | | |
|---|---|---|
| 1 | Paper basket | 20.70 |
| 1 | Television set | 250.00 |
| 1 | G.E. water cooler | 289.00 |
| 1 | Punch clock for employees | 460.00 |
| 6 | Card cases | 860.00 |
| 1 | General file | 1,973.09 |

$ 5,946.25

T   <u>SURVEILLANCE SECTION:</u>

| | | | |
|---|---|---|---|
| 1 | Double mahogany table 70 x 36 | $ | 125.00 |
| 1 | Swivel chair | | 32.67 |
| 1 | Double mahogany table 60 x 36 | | 58.00 |
| 1 | Swivel chair | | 33.00 |
| 1 | Mahogany table | | 55.00 |
| 1 | Swivel chair | | 32.67 |
| 1 | Single mahogany table (tilt) 44 x 32 | | 52.00 |
| 1 | Fixed wooden chair | | 19.00 |
| 1 | Wooden table - 1 drawer 32 x 18 | | 21.00 |
| 1 | Wooden table for telephone 16 x 14 | | 10.00 |
| 1 | Wooden bench (plain) | | 8.00 |
| 1 | Wooden bench (plain) | | 7.00 |
| 1 | "Remington" typewriter J-2346285 | | 236.00 |
| 1 | Metal file cabinet - 4 drawers | | 225.00 |
| 1 | Wooden cabinet - 12 drawers | | 18.00 |
| 1 | Wooden cabinet - 30 compartments for flags | | 33.34 |
| 1 | Wooden shelf with doors | | 146.60 |
| 1 | Wooden medicine cabinet | | 10.00 |
| 1 | "Fedder" air conditioning unit 2 T | | 399.00 |
| 1 | "G.E." water cooler (demijohn) | | 263.20 |
| 1 | Two section cabinet with 34 lockers | | 680.00 |
| 1 | Wooden and glass frame (photographs) | | 8.00 |
| 1 | "   "   "   " (references) | | 7.00 |
| 1 | Wooden box for keys | | 5.00 |
| 1 | Bulleting board | | 8.00 |
| 1 | "Westinghouse" fan- 10 inches | | 17.50 |
| 1 | Roof ventilator with blades | | 46.00 |
| 4 | Fluorescent light lamps - 2 tubes | | 10.00 |
| 3 | "   "   "   " - 1 tube | | 8.00 |
| 4 | Glass plates for bulbs | | 8.00 |
| 9 | Kerosene lamps - 3 large & 6 small | | 10.00 |

7-24-19 FOIA Response FCSC 00221

$ 2,591.98

HDC 001810

Z     <u>OPERATIONS INSPECTION:</u>

| | | |
|---|---|---:|
| 1 | "Steel Age" steel table mod. 360 | $ 235.00 |
| 1 | "Sturgiss" steel swivel chair | 85.00 |
| 1 | Wood and formica table for typewriter | 60.00 |
| 1 | "   "   "   "   "   " | 21.60 |
| 1 | Swivel chair | 24.00 |
| 1 | Legal size metal file cabinet | 110.00 |
| 1 | "Monroe" calculating machine | 375.00 |
| 1 | "Underwood" typewriter 5-5747473-14 | 261.00 |
| 1 | Hanger | 9.50 |
| | | $ 1,181.00 |

O     <u>WAITING ROOM:</u>

| | | |
|---|---|---:|
| 1 | Sofa | $. 180.00 |
| 1 | Arm-chair | 70.00 |
| 4 | Tables | 103.00 |
| 2 | Picture frames | 70.00 |
| 1 | Mural | 65.00 |
| 1 | Bench | 25.00 |
| 1 | " | 25.00 |

O     <u>TELEPHONE OPERATOR:</u>

| | | |
|---|---|---:|
| 1 | Swivel chair | $ 19.16 |
| 1 | Swichboard special table | 85.00 |
| 1 | Public telephone stand | 25.00 |
| 1 | Auxiliary table | 25.00 |

D     <u>INFORMATION:</u>

| | | |
|---|---|---:|
| 1 | Steel table 45 x 30 | $ 90.00 |
| 1 | "Sturgiss" steel chair | 45.00 |
| | | $ 827.16 |

U     <u>WORKSHOP:</u>

| | | |
|---|---|---:|
| 1 | Mahogany table | $ 50.00 |
| 1 | Swivel chair | 20.00 |
| 1 | Mahogany table for typewriter | 54.00 |
| 1 | Swivel chair | 35.00 |
| 1 | Water cooler (demijohn) | 35.00 |
| 1 | Bookcase with glass doors | 35.00 |
| 1 | Wooden hanger | 11.00 |
| 1 | Lamp (4 tubes) | 21.00 |
| 1 | "Burroughs" adding machine | 125.00 |
| 1 | "Underwood" typewriter 4998677 | 160.00 |
| 1 | Metal cabinet | 46.50 |
| 1 | "   " | 18.00 |
| 1 | Employees time clock | 375.00 |
| 4 | Card cases for clock | 40.00 |

7-24-19 FOIA Response FCSC 00222

HDC 001811

U   GARAGE:

| | | |
|---|---|---:|
| 1 | Wooden cabinet | $ 40.00 |
| 1 | Card case | 43.00 |
| 1 | Hahogany table | 145.00 |
| 1 | Swivel chair | 21.60 |
| 1 | Mahogany table | 49.50 |
| 1 | Swivel chair | 21.60 |
| 1 | "Westinghouse" fan | 33.20 |
| 1 | Lamp (2 tubes) | 30.00 |
| 1 | Wall electric clock | 20.72 |

$ 1,430.12

V   GENERAL ORDER WAREHOUSE:

| | | |
|---|---|---:|
| 1 | Small mahogany table | $ 67.15 |
| 1 | Swivel chair | 45.00 |
| 1 | Large mahogany table | 145.00 |
| 1 | Swivel chair | 40.33 |
| 1 | Typewriter #1278344 | 110.00 |
| 1 | Wooden table for typewriter | 16.00 |
| 1 | Glass case for materials | 21.00 |

$ 444.48

Y   SAN FRANCISCO WHARF:

Superintendence:

| | | |
|---|---|---:|
| 1 | Double desk | $ 95.00 |
| 1 | Typewriter | 275.00 |
| 1 | Adding machine | 185.00 |

List Room:

| | | |
|---|---|---:|
| 1 | Double wooden desk | $ 56.86 |
| 1 | Wall cabinet for tickets | 18.00 |
| 1 | Electric adding machine, mod. 9034 #248854 | 236.00 |
| 1 | Barred Cell | 45.00 |

Office:

| | | |
|---|---|---:|
| 1 | Plain table without drawers | $ 40.00 |
| 1 | Single table | 40.00 |
| 1 | Plain table - 1 drawer | 40.00 |
| 1 | Table with 4 divisions | 44.00 |
| 1 | Wooden cabinet | 31.00 |
| 1 | "    " | 18.00 |
| 1 | "    " | 31.00 |
| 1 | Metal  " | 50.00 |
| 1 | "Underwood" typewriter 6180915 | 120.00 |
| 1 | "    "    " 425255 | 245.00 |
| 1 | Fixed Chair | 8.00 |
| 1 | Swivel chair | 37.00 |
| 1 | Double desk | 100.00 |

HDC 001812

Y    VEGETABLE QUARANTINE INSPECTOR:

1   Wooden table - 1 drawer               $   40.00

Fabrics Department:

| | | |
|---|---|---|
| 1 | Single wooden table | 69.11 |
| 1 | Swivel chair | 30.00 |

Sacks Storage Department:

| | | |
|---|---|---|
| 1 | Table (single drawer) | 67.00 |
| 1 | Fan | 26.00 |
| 4 | Card cases | 40.00 |
| 1 | Clock for remissions | 150.00 |
| 1 | Water cooler | 345.00 |
| 1 | Employees time clock | 375.00 |
| | | $ 3,201.77 |

X    MACHINA WHARF:

Superintendence:

| | | |
|---|---|---|
| 1 | Plain table with single drawer | $ 41.05 |
| 1 | "    "   "   three   " | 44.00 |
| 1 | Swivel chair | 25.00 |

Export:

| | | |
|---|---|---|
| 1 | Plain table with - 6 drawers | 41.05 |
| 1 | Swivel chair | 25.00 |
| 1 | "Sundstrand" adding machine | 185.00 |
| 1 | "Underwood" typewriter #848438-16 | 135.00 |
| 1 | Plain table - 3 drawers | 50.00 |

List Room:

| | | |
|---|---|---|
| 1 | Plain table - 6 drawers | 49.50 |
| 1 | "Underwood" adding machine #902-A258874 | 236.00 |
| 1 | Stool | 8.00 |
| 1 | Cabinet with 5 doors | 35.00 |

Surveillance:

| | | |
|---|---|---|
| 1 | Plain table - 3 drawers | 37.73 |

Damage Inspection:

| | | |
|---|---|---|
| 1 | Plain table - 6 drawers | 40.00 |
| 1 | Swivel Chair | 35.00 |
| 1 | "Remington" typewriter #12-346243 | 236.00 |
| 1 | Plain table - 6 drawers | 56.66 |
| 1 | Typewriter | 135.00 |
| 1 | Arm-chair | 35.00 |

7-24-19 FOIA Response FCSC 00224

HDC 001813

X    Plant Quarantine:

1  Plain table - 3 drawers                        $    61.15

Order Clerk:

| | | |
|---|---|---|
| 1 | Swivel chair | 35.00 |
| 1 | Plain table - 6 drawers | 89.70 |

Ground Floor Office:

| | | |
|---|---|---|
| 1 | Plain table - 6 drawers | 40.00 |
| 1 | "    " - 4 " | 38.00 |
| 1 | "Underwood" typewriter | 100.00 |
| 1 | Cabinet | 29.99 |
| 1 | File Cabinet - 3 drawers | 123.60 |
| 1 | Cabinet | 12.00 |
| 1 | Wooden cabinet | 9.00 |
| 1 | Wooden file cabinet | 30.00 |
| 1 | " " " | 60.00 |
| 1 | " " " | 60.00 |
| 1 | " " " | 18.06 |
| 1 | " " " | 30.00 |
| 1 | " " " | 28.22 |
| 1 | " " " | 21.75 |

Classifier:

1  Table - 4 drawers                            67.00

Vessels Consignee:

| | | |
|---|---|---|
| 1 | Plain table - 3 divisions | 65.38 |
| 1 | Swivel chair | 20.00 |

Various:

| | | |
|---|---|---|
| 1 | Personnel timing electric clock | 375.00 |
| 1 | Remission clock | 150.00 |
| 1 | Water cooler | 345.00 |
| 1 | " " | 345.00 |
| 4 | Card cases | 40.00 |
| 1 | Amplifier | 215.00 |

                                      $ 3,858.84

W    SANTA CLARA WHARF:

Superintendence:

| | | |
|---|---|---|
| 1 | Large wooden table | $ 110.00 |
| 1 | Swivel chair | 58.00 |
| 1 | " " | 22.00 |
| 1 | Cabinet for materials | 14.00 |

7-24-19 FOIA Response FCSC 00225

HDC 001814

W  SANTA CLARA WHARF (CONT.)

### Export Administrator:

| | | |
|---|---|---|
| 1 | Large wooden table | $ 90.00 |
| 1 | Small " " | 50.00 |
| 1 | "Burroughs" adding machine 3-381256 | 101.90 |
| 1 | Small wooden table for machine | 12.00 |
| 1 | "Underwood" typewriter #44476559 | 120.00 |
| 1 | Wooden table for typewriter | 50.00 |
| 1 | "Underwood" typewriter # 4321785 | 135.00 |
| 1 | Metal table for typewriter | 10.00 |
| 1 | "Monroe" calculating machine | 130.00 |
| 1 | Stand fan | 26.00 |
| 1 | Swivel chair | 33.00 |

### List Room:

| | | |
|---|---|---|
| 1 | Large wooden table | 58.00 |
| 1 | Swivel chair | 33.00 |
| 1 | Large wooden cabinet | 100.00 |
| 1 | 3 leg stool | 8.00 |
| 1 | Fan with 2 blades | 17.50 |
| 1 | "Fiat Lux" typewriter ZA-127728 | 125.00 |

### Orders Office:

| | | |
|---|---|---|
| 1 | Large wooden table | 45.00 |
| 1 | Medium wooden table | 40.00 |
| 1 | Wooden desk (for clasifying) | 56.66 |
| 1 | " " | 56.66 |
| 1 | " " | 50.00 |
| 1 | " " | 62.32 |
| 1 | " " | 50.00 |
| 1 | "Underwood" typewriter #4378682 | 135.00 |
| 1 | Roof fan | 26.00 |
| 1 | Large bench | 12.00 |

### Damage Inspection Office:

| | | |
|---|---|---|
| 1 | Wooden table with glass | 215.00 |
| 1 | Wooden cabinet (materials) | 18.00 |
| 1 | Swivel chair | 42.00 |
| 1 | "Fiat Lux" typewriter ZA-130432 | 125.00 |
| 1 | Small fan | 17.50 |
| 1 | Large table (surveillance) | 19.55 |

### Fabrics:

| | | |
|---|---|---|
| 1 | Large wooden table | 50.00 |
| 1 | Small " " | 29.00 |
| 1 | Wooden cabinet - glass doors | 15.00 |
| 1 | " " " " | 15.00 |
| 1 | " " " " | 15.00 |

W   SANTA CLARA WHARF: (CONT.)

Various:

| | | |
|---|---|--:|
| 1 | Ice box | $ 85.00 |
| 1 | Employees time clock | 375.00 |
| 4 | Card cases | 40.00 |
| 1 | Remissions clock | 150.00 |
| 1 | Water cooler | 345.00 |
| 1 | Water cooler | 345.00 |
| | | $ 3,738.09 |

I, J. E. de la Torriente, Jr., hereby certify that I am a
qualified Spanish/English translator-interpreter and that the above
is a true translation from Spanish of the document in that language

*Edela Tunnent*

J. E. de la Torriente, Jr.

Sworn to and subscribed before me this 29th day
of October, 1967

*Raúl Santiago*

Notary Public, State of Florida at Large
My Commission Expires Aug. 4, 1968

7-24-19 FOIA Response FCSC 00227

HDC 001816

urniture & Fixtures

Inventory

Encl 6  to Dept 539
Habana  9-6-60

$\frac{5c5}{\phantom{x}}$

# Havana Docks Corporation

7-24-19 FOIA Response FCSC 00228

HDC 001817

The enclosed physical inventory of Office Furniture and Fixtures dated December 31st, 1959, was taken by personnel of each Department and Section of the Company, under the direct supervision of their respective Section heads, and the extensions and adjustments were made by the undersigned.

Havana,        March,  1960.

HAVANA DOCKS CORPORATION

Mario Rodriguez Lanza
Asst. Vice Pres. & Asst. Comptroller

7-24-19 FOIA Response FCSC 00229

HDC 001818

RESUMEN FINAL DEL INVENTARIO DE

MUEBLES Y EQUIPOS DE OFICINA

PRACTICADO EN DICIEMBRE 31, 1959

|   |   | T O T A L |
|---|---|---|
| I | Salón Sesiones | $ 755.00 |
| II | Administración General | 4,255.51 |
| III | Vicepresidente de Operaciones | 2,409.20 |
| IV | Vicepresidente y Comptroller Auxiliar | 894.90 |
| A | Vicepresidente Aux. y Comptroller Aux. | 365.10 |
| B | Contabilidad y Auditoría | 7,782.80 |
| C | Record y Reclamaciones | 9,989.53 |
| D | Liquidación | 7,401.66 |
| E | Sección de Caja | 4,432.85 |
| F | Sección de Personal | 29,158.61 |
| G | Sección de Compras y Oficina | 6,032.03 |
| T | Vigilancia | 2,591.98 |
| Z | Inspección de Operaciones | 1,181.10 |
| O | Vestíbulo | 827.16 |
| U | Taller | 1,430.12 |
| V | Almacenes Generales | 444.48 |
| Y | Muelle San Francisco | 3,201.77 |
| X | Muelle Machina | 3,858.84 |
| W | Muelle Santa Clara | 3,603.09 |
|   |   | $ 90,615.73 |

HAVANA DOCKS CORPORATION

ASSISTANT COMPTROLLER

INVENTARIO DE MUEBLES Y EQUIPOS DE OFICINA

DICIEMBRE 31, 1959

T O T A L

## I. SALON DE CONFERENCIA:

| | | |
|---|---|---:|
| 1 | Mesa tipo "Ejecutivo" de caoba | $ 150.00 |
| 8 | Butacas de caoba con brazos | 160.00 |
| 1 | Mesita auxiliar de caoba | 14.00 |
| 1 | Caja seguridad "Yale" de acero | 254.00 |
| 1 | Librero de caoba 3 puertas cristal | 70.00 |
| 1 | Gabinete "Toilet" | 18.00 |
| 1 | Mesita teléfono | — |
| 1 | Reloj de mesa | 75.00 |
| 1 | Barómetro de mesa | 14.00 |
| | | $ 755.00 |

## II. OFICINA DE LA PRESIDENCIA:

| | | |
|---|---|---:|
| 1 | Buró "Steel Age" 2 torres tipo "Ejecutivo" | $ 384.16 |
| 1 | Equipo Dictaphone Time-Master | 605.15 |
| 1 | Silla giratoria "Sturgiss" con brazos | 120.00 |
| 1 | Mesa auxiliar grande "all steel" con tapa cristal | 180.00 |
| 1 | Mesa auxiliar chica "Invincible" con tapa cristal | 152.00 |
| 1 | Archivo auxiliar 2 gavetas "Cole Steel" | 75.00 |
| 1 | Librero de acero "Art Metal" | 207.20 |
| 3 | Archivos "Steel Age" 4 gavetas tamaño legal | 410.00 |
| 1 | Percha caoba "Arbol" | 8.50 |
| 1 | Set barómetro, termómetro, etc. | 35.00 |
| 1 | Cortina Veneciana | 46.50 |
| 1 | Depósito de metal para papeles | 7.00 |
| 3 | Butacas fijas con brazos | 85.50 |

## III. SECRETARIA-PRESIDENTE:

| | | |
|---|---|---:|
| 1 | Mesa "Steel Age" Mod.3860-L aditamento para máquina de escribir | 240.00 |
| 1 | Máquina escribir eléctrica "Underwood" #12-8134131 | 564.00 |
| 1 | Silla giratoria "Sturgiss" Mod. 1210 | 70.00 |
| 1 | Archivo "Cole Steel" Mod. 201- Teléfono y archivo | 75.00 |
| 1 | Mesa de caoba con tapa formica | 40.50 |
| 1 | Máquina fotocopiadora "Secretary" | 475.00 |
| 1 | Equipo Dictaphone (transcriptor solamente) | 440.00 |
| 1 | Stand móvil para el Dictaphone | 35.00 |
| | | $ 4,255.51 |

7-24-19 FOIA Response FCSC 00231

HDC 001820

**III**     **VICEPRESIDENTE DE OPERACIONES:**                        **T O T A L**

1    Mesa "All Metal" una torre                           $    280.00
1    Silla giratoria "All Metal" con brazos                   151.20
3    Butacas caoba con brazos Mod.117                          60.00
1    Librero "All Steel" puertas de cristal                  115.00
1    Mesa aux. de caobá con tapa formica                       40.50
1    Mesa aux. chica con tapa formica                          35.00
1    Archivo "Steel Age" 4 gavetas                            135.00
1    Perchero caoba de Arbol                                    8.50
1    Dictaphone                                               493.43
1    Cesto metal para papeles                                  13.50
1    Pizarra magnética                                        344.07
1    Archivo de metal 4 gavetas                               135.00

**III**     **SECRETARIO-VICEPRESIDENTE-OPERACIONES:**

1    Mesa "Steel Age" 2 torres Mod. 3860                      240.00
1    Máquina escribir "Underwood" #12-6260238                 190.00
1    Butaca "Steel Age" giratoria                              70.00
1    Archivo acero 4 gavetas tipo legal                        98.00

                                                         $  2,409.20

**IV**      **VICEPRESIDENTE Y COMPTROLLER AUXILIAR:**

1    Mesa "All Steel" 2 torres con cristal                $   280.00
1    Butaca giratoria "All Steel" con brazos                   80.00
4    Butacas caoba con brazos Mod.117                         105.00
1    Estante libros de caoba 3 entrepaños formica              49.50
1    Mesa caoba 64 x 15 con tapa formica                       32.00
1    Librero 3 puertas caoba tapa formica                     150.00
1    Archivo metal 4 gavetas tipo legal                        85.80
1    Perchero caoba de Arbol                                   11.00
1    Librero "All Steel" puertas cristal                       60.00
1    Cortina Veneciana                                         41.60

                                                         $    894.90

**A**       **DEPARTAMENTO COMPTROLLER:**

1    Mesa "All Steel"                                     $   210.00
1    Silla giratoria "All Steel"                               75.00
3    Butacas caoba con brazos                                  61.60
1    Mesita caoba para teléfono                                 9.00
1    Perchero caoba                                             9.50

                                                         $    365.10

7-24-19 FOIA Response FCSC 00232

HDC 001821

B        SECCION DE CONTABILIDAD Y AUDITORIA:                          T O T A L

| | | |
|---|---|---|
| 1 | Mesa "Steel Age" de 30 x 60 | $ 195.00 |
| 1 | Silla giratoria "Sturgiss" | 75.00 |
| 1 | Mesa "Steel Age" de 30 x 60 | 195.00 |
| 1 | Silla giratoria "Sturgiss" | 75.00 |
| 1 | Mesa caoba y formica con cristal | 110.00 |
| 1 | Butaca caoba giratoria sin brazos | 52.00 |
| 1 | Mesa caoba y formica 34 x 54 | 89.70 |
| 1 | Silla caoba giratoria sin brazos | 40.00 |
| 1 | Mesa caoba y formica 36 x 60 | 89.70 |
| 1 | Silla caoba giratoria con brazos | 52.00 |
| 1 | Mesa caoba y formica 36 x 60 | 67.00 |
| 1 | Silla caoba giratoria con brazos | 20.00 |
| 1 | Mesa caoba y formica 36 x 60 | 89.70 |
| 1 | Silla caoba giratoria sin brazos | 25.00 |
| 1 | Mesa caoba mecanógrafo 18 x 34 | 18.00 |
| 1 | Silla caoba giratoria con brazos | 52.00 |
| 1 | Mesa caoba mecanógrafo 24 x 36 | 21.17 |
| 1 | Silla caoba giratoria sin brazos | 52.00 |
| 1 | Mesa caoba mecanógrafo con ala | 17.00 |
| 1 | Stand metal con ruedas para máquina de sumar | 42.75 |
| 1 | Mesa caoba y formica 32 x 60 | 10.75 |
| 1 | Caja de caudales de acero | 210.00 |
| 1 | Caja de caudales de acero | 200.00 |
| 1 | Estante de acero 2 puertas | 60.00 |
| 1 | Archivo acero "Sturgiss" 4 gavetas legal | 84.00 |
| 1 | "      "      "      "      " | 84.00 |
| 1 | "      "      "Cole"   2   "   carta | 80.00 |
| 1 | "      "      "      "      " | 75.00 |
| 1 | "      "      "      "G. F." Vouchers | 148.00 |
| 1 | Butaca de caoba con brazos | 20.00 |

Equipo de Oficina:

| | | |
|---|---|---|
| 1 | Máq. de sumar eléctrica Sundstrand #604729 | 240.00 |
| 1 | "      "      "      #716783 | 525.00 |
| 1 | Máq. de calcular eléctrica Olivetti ID #027765(sumar) | 750.00 |
| 1 | "      "      "      Remington 6615/1204207 " | 809.20 |
| 1 | "      "      "      Friden ST-10-187605 | 1,080.00 |
| 11 | "      "      "      Friden CW-10-70059 | 702.00 |
| 1 | "      "      "      Friden CW-10-7082555 | 400.00 |
| 1 | "      de sumar Mannual Dalton M-298869 | 135.00 |
| 1 | Máq. de escribir Underwood 11-6660191 | 225.00 |
| 1 | "      "      Underwood S-11-584556 | 230.00 |
| 1 | "      "      Remington 5-2315265 | 201.83 |
| 1 | Máq. de sumar Sundstrand | 135.00 |

$ 7,782.80

C        SECCION DE RECORD Y RECLAMACIONES

| | | |
|---|---|---|
| 1 | Mesa de acero "Steel Age" | $ 195.00 |
| 1 | Silla de acero "Steel Age" giratoria | 75.00 |
| 1 | Archivo de acero "Cole" 2 gavetas | 78.00 |
| 1 | Mesa caoba y formica 2 torres grande | 75.00 |
| 1 | Silla caoba giratoria sin brazos | 20.00 |
| 1 | Silla caoba giratoria sin brazos | 72.50 |
| 1 | Mesa caoba y formica 2 torres grande | 90.50 |

F24-19 FOIA Response FCSC 00239

| C | SECCION DE RECORD Y RECLAMACIONES (Cont.) | TOTAL |
|---|---|---|
| 1 | Mesa caoba y formica 2 torres grande | $ 95.51 |
| 1 | Silla caoba giratoria sin brazos | 220.00 |
| 1 | Mesa caoba y formica 2 torres grande | 75.65 |
| 1 | Silla " giratoria sin brazos | 20.00 |
| 1 | Mesa " y formica 2 torres grande | 49.50 |
| 1 | Silla " giratoria sin brazos | 20.00 |
| 1 | Mesa " y formica 2 torres mediana | 89.70 |
| 1 | Silla " giratoria sin brazos | 42.00 |
| 1 | Mesa " y formica 2 torres mediana | 49.50 |
| 1 | Silla " giratoria sin brazos | 42.00 |
| 1 | Mesa " y formica 1 torre mediana | 35.00 |
| 1 | Silla " giratoria sin brazos | 42.00 |
| 1 | Mesa " y formica 1 torre mediana | 44.00 |
| 1 | Silla " giratoria sin brazos | 42.00 |
| 1 | Mesa " y formica 1 torre mediana | 44.00 |
| 1 | Silla " giratoria sin brazos | 49.50 |
| 1 | Mesa " y formica 1 torre mediana | 52.00 |
| 1 | Silla " 1 giratoria sin brazos | 23.00 |
| 1 | Mesa " y formica 1 torre mediana | 54.00 |
| 1 | Silla " giratoria con brazos | 42.00 |
| 1 | Mesa " y formica 1 torre chica | 49.50 |
| 1 | Silla " giratoria con brazos | 42.00 |
| 1 | Mesa " y formica 1 torre chica | 40.50 |
| 1 | Silla " giratoria con brazos | 42.00 |
| 1 | Mesa " y formica 1 torre chica | 40.50 |
| 1 | Silla " giratoria con brazos | 42.00 |
| 1 | Mesa " y formica 1 torre chica | 49.50 |
| 1 | Silla " giratoria con brazos | 42.00 |
| 1 | Mesa " y formica 1 torre chica | 27.50 |
| 1 | Silla " giratoria con brazos | 25.00 |
| 1 | Mesa " y formica 1 torre chica | 22.05 |
| 1 | Silla " fija sin brazos | 28.00 |
| 1 | Silla " " " | 8.00 |
| 1 | Silla " " " " | 14.50 |
| 1 | Silla " " con " | 14.50 |
| 1 | Silla " " | 23.00 |
| 1 | Máq. de escribir Underwood #11-6593948 | 290.00 |
| 1 | " " " #12-6178355 | 290.00 |
| 1 | " " " #12-6178249 | 290.00 |
| 1 | " " " elec.#12-8110452 | 740.00 |
| 1 | " " Remington #J-2346221 | 236.00 |
| 1 | " " " #J-2346209 | 236.00 |
| 1 | " " " #J-210496 | 201.83 |
| 1 | " " " (estados) BV-83999 | 185.00 |
| 1 | " " IBM eléctrica #146294 | 595.00 |
| 1 | " " IBM eléctrica #146331 | 595.00 |
| 1 | " de sumar Sundstrand (elect.) #1053098 | 356.00 |
| 1 | " " " #1003560 | 356.00 |
| 1 | " " " (manual) #309228 | 245.00 |
| 1 | " de calcular Friden (elect.) SW-8-722815 JJ | 820.00 |
| 1 | " " " DW-8-293241-JJ | 576.00 |
| 1 | " " " C10-56915 | 702.00 |
| 1 | Mesa acero para máquina escribir eléctrica | 274.48 |
| 1 | " " " " | 274.48 |
| 1 | " " " " " " | 274.48 |
| 1 | Silla acero giratoria | 52.00 |
| 1 | " " " | 23.85 |
| 1 | Perchero caoba de árbol | 34.50 |

7-24-19 FOIA Response FCSC 0023

HDC 001823

C     SECCION DE RECORD Y RECLAMACIONES: (Cont.)     T O T A L

| | | |
|---|---|---|
| 1 | Perchero caoba de arbol | $ 9.50 |
| 1 | " | 9.50 |
| 1 | Estante junto a la pared | 300.00 |
| | | $ 9,989.53 |

D.     SECCION LIQUIDACION

| | | |
|---|---|---|
| 1 | Mesa caoba y formica 60 x 36 | $ 49.50 |
| 1 | Silla " giratoria | 21.60 |
| 1 | Mesa " y formica 60 x 36 | 55.00 |
| 1 | Silla " giratoria | 50.00 |
| 1 | Mesa " y formica 60 x 36 | 75.00 |
| 1 | Silla " giratoria | 20.00 |
| 1 | Mesa " y formica | 35.00 |
| 1 | Silla " giratoria | 23.95 |
| 1 | Mesa " y formica | 35.00 |
| 1 | Silla " giratoria | 23.95 |
| 1 | Mesa " y formica | 49.50 |
| 1 | Silla " giratoria | 23.95 |
| 1 | Mesa " y formica | 75.00 |
| 1 | Silla " giratoria | 23.95 |
| 1 | Mesa " y formica | 55.00 |
| 1 | Silla " giratoria | 50.00 |
| 1 | Mesa " y formica | 55.00 |
| 1 | Silla " giratoria | 50.00 |
| 1 | Archivo metal 3 gavetas tamaño legal | 90.00 |
| 1 | " " 3 " " | 90.00 |
| 1 | " " 3 " " | 90.00 |
| 1 | " " 2 " " carta | 45.00 |
| 1 | " " 2 " " | 45.00 |
| 1 | " " 2 " " | 45.00 |
| 1 | " " 2 " " legal | 49.50 |
| 1 | " " 2 " " | 49.50 |
| 1 | " " 2 " " | 15.00 |
| 1 | Tarjetero metal | 15.00 |
| 1 | " " | 15.00 |
| 1 | " " | 15.00 |
| 1 | Escaparate metal | 65.00 |
| 1 | Máquina addressograph | 200.00 |
| 1 | " calcular eléctrica Monroe CSA-8-632973 | 800.00 |
| 1 | " " " CSA-8-646638 | 800.00 |
| 1 | " " " CSA-8-632984 | 800.00 |
| 1 | " " " CST-8-571746 | 639.00 |
| 1 | " " " #78574 | 275.00 |
| 1 | " " manual " #167770 | 275.00 |
| 1 | " " Eléctrica Merchant #8-EFA-358321 | 973.79 |
| 1 | " sumar Underwood 418224-8140 | 320.00 |
| 1 | Perchero caoba de arbol | 9.50 |
| 1 | " | 9.50 |
| 1 | Equipo intercomunicador (5 estaciones) | 754.50 |
| 1 | Archivo metal 1 gaveta | 22.05 |
| 1 | Parabán cristal y metal | 122.92 |
| | | $ 7,401.66 |

7-24-19 FOIA Response FCSG 00233

HDC 001824

E  SECCION DE CAJA      T O T A L

| | | |
|---|---|---|
| 1 | Máq. sumar eléctrica Remington #93-N-955746 | $ 462.40 |
| 1 | " " " #93-N-993160 | 462.40 |
| 1 | " taladrar cheques Todd W-608-P-3759 | 135.00 |
| 1 | Buró caoba y formica grande | 98.50 |
| 1 | Silla " giratoria | 35.00 |
| 1 | Buró " y formica grande | 65.00 |
| 1 | Silla " giratoria | 34.15 |
| 1 | Buró " y formica mediano | 65.00 |
| 1 | Silla " giratoria | 34.15 |
| 1 | Buró " y formica mediano | 50.00 |
| 1 | Silla " giratoria | 19.00 |
| 1 | Mesa chica con gaveteros | 25.00 |
| 1 | Silla caoba giratoria | 30.00 |
| 1 | Butaca caoba fija | 7.50 |
| 1 | Cuño metálico fechador | 25.00 |
| 1 | Máq. pagadora Johnson | 360.00 |
| 1 | " " " | 175.00 |
| 1 | " " " | 175.00 |
| 1 | " " " | 353.00 |
| 1 | " " " | 353.00 |
| 1 | " " " | 353.00 |
| 1 | Caja hierro Mosler grande | 390.00 |
| 1 | Caja hierro Yale grande | 200.00 |
| 1 | Caja hierro York chica 410101 | 150.00 |
| 1 | Caja hierro Mosler 230185 | 285.00 |
| 1 | Ventilador Westinghouse | 17.50 |
| 1 | " | 17.50 |
| 1 | Perchero caoba arbol | 16.50 |
| 2 | Bancos madera | 39.25 |

              $ 4,432.85

F  SECCION DE PERSONAL

| | | |
|---|---|---|
| 1 | Buró de acero | $ 195.00 |
| 1 | Silla giratoria | 75.00 |
| 1 | Buró caoba y formica 1 torre | 43.00 |
| 1 | Silla giratoria con brazos | 23.85 |
| 1 | Mesa caoba y formica 2 torres | 45.00 |
| 1 | Silla caoba giratoria | 23.85 |
| 1 | Mesa " y formica 2 torres | 40.00 |
| 1 | Silla " giratoria | 23.85 |
| 1 | Mesa " y formica 2 torres | 40.00 |
| 1 | Silla " giratoria | 25.62 |
| 1 | Mesa " y formica 2 torres | 40.00 |
| 1 | Silla " giratoria | 23.85 |
| 1 | Mesa " y formica 2 torres | 46.58 |
| 1 | Silla " giratoria | 23.85 |
| 1 | Mesa " y formica 2 torres | 46.58 |
| 1 | Silla " giratoria | 42.34 |
| 1 | Mesa " para máquina Elliot Fisher | 102.18 |
| 1 | Mesa plana de pino | 18.00 |
| 1 | Mesa metálica para máquina | 62.65 |
| 1 | " " " " | 62.64 |
| 1 | " " " | 62.64 |
| 1 | Butaca caoba fija | 19.80 |
| 1 | " " " | 19.81 |
| 1 | " " " | 19.80 |

7-24-19 FOIA Response FCSC 00238

SECCION DE PERSONAL (Cont.)                                       T O T A L

| | | |
|---|---|---:|
| 1 | Butaca caoba fija | $    19.81 |
| 1 | Perchero caoba de arbol | 9.50 |
| 1 | "             "             " | 9.50 |
| 1 | Maq.de contabilidad Sundstrand M.D-284090 | 5,007.63 |
| 1 | "                "                " M.D-284091 | 4,018.05 |
| 1 | "                "           National Cash M.3-35426 | 3,628.30 |
| 1 | "                "                " M.3-37435 | 3,520.00 |
| 1 | " Elliot Fisher Mod. #13586 | 1,250.00 |
| 1 | " de sumar Sundstrand #486567 | 292.50 |
| 1 | "         "         " #572183 | 472.50 |
| 1 | " de calcular eléctrica Monroe | 800.00 |
| 1 | "         " a mano " | 375.00 |
| 1 | " de escribir Underwood #6824509 | 290.00 |
| 1 | "         " Remington #J-2346261 | 236.00 |
| 1 | " addressograph Mod. F2-153 | 1,064.75 |
| 1 | " Graphotype Mod. 255018 | 276.79 |
| 1 | Archivo de madera 12 gavetas | 65.00 |
| 1 | "       " metal | 88.02 |
| 1 | "       "       " | 87.00 |
| 1 | "       "       " 3 cuerpos | 99.00 |
| 1 | "       "       " auxiliar | 73.00 |
| 1 | Escaparate de madera 8 gavetas | 23.00 |
| 1 | "             " | 10.00 |
| 1 | Archivo de metal 4 gavetas | 62.65 |
| 1 | "       "       " | 62.64 |
| 1 | "       "       " | 62.64 |
| 1 | Fichero madera con ruedas | 22.05 |
| 1 | "       "       " | 22.05 |
| 1 | "       "       " | 22.05 |
| 1 | "       "       " | 22.05 |
| 1 | Gavetero con ruedas para maq. contabilidad | 21.16 |
| 1 | "       "       "       "       "       " | 21.17 |
| 1 | Estante para barras maq. contabilidad | 21.60 |
| 1 | "       "       "       " | 21.60 |
| 1 | "       "       "       " | 21.60 |
| 1 | Gabinete para placas addressograph 24 gavetas | 32.00 |
| 1 | Tarjetero metal 10 gavetas | 110.90 |
| 1 | Escaparate madera puertas cristal | 40.00 |
| 1 | Estante madera de 2 secciones máq. contabilidad | 30.00 |
| 1 | Presilladora | 20.00 |
| 1 | Tarjetero acero 6 x 6 | 27.00 |
| | Cuarto Impresor: | |
| 1 | Máquina Multilith | 4,815.96 |
| 1 | Máquina eléctrica de picar papel | 620.00 |
| 1 | Aparato aire acondicionado | 75.00 |
| 1 | Lámpara para Multilith | 25.75 |
| 1 | Presilladora eléctrica | 112.50 |
| 1 | Estante madera 2 secciones máq. cortar papel | 25.00 |
| | | $ 29,158.61 |

HDC 001826

G

## SECCION AGENCIA DE COMPRAS

### Oficina:

|   |   |   |
|---|---|---|
| 1 | Mesa de acero "Steel Age" - Modelo 3860. | $  240.00 |
| 1 | Silla giratoria "Steel Age" - Modelo 1210. | 70.00 |
| 1 | Archivo acero "Cole Steel" - con tabla teléfono. | 70.00 |
| 1 | Máquina de escribir "Underwood" #11-653402 | 225.00 |
| 1 | Mesa Aux. caoba y formica telef. | 25.00 |
| 1 | Archivo acero tamaño legal, 4 gavetas, | 98.96 |
| 1 | "  "  "  "  " | 98.97 |
| 1 | Butaca fija de brazos tipo 117 | 20.00 |
| 1 | "  " | 19.00 |
| 1 | Mesa 28 x 42 con tapa formica | 25.00 |
| 1 | Silla giratoria de brazos | 40.00 |
| 1 | Máquina para franquear correspondencia | 105.00 |
| 1 | Máquina eléctrica saca-puntas | 34.00 |
| 1 | Perchero | 9.50 |

G

### Almacén "A":

|   |   |   |
|---|---|---|
| 1 | Mesa de cedro 36 x 96 | 55.00 |
| 1 | Silla giratoria de brazos | 40.50 |
| 1 | Duplicador "Gestetner" | 270.00 |
| 1 | Trípode base para duplicador | 18.00 |
| 1 | Aspiradora de polvo "Lewyt" | 122.82 |
| 1 | Estantería de pino (dep. mat.) | 105.00 |
| 1 | Máquina de escribir "Remington" RK09-88 | 245.00 |
| 1 | Escalera de aluminio. | 51.95 |

G

### Cuarto de Señoras:

|   |   |   |
|---|---|---|
| 1 | Gabinete de acero | 25.00 |
| 1 | Refrigerador "Hotpoint" | 150.00 |
| 1 | Cocinilla 2 hornillas | 25.78 |
| 1 | Silla caoba | 6.00 |
| 1 | Depósito para papeles | - |
| 1 | Secador eléctrico | 169.00 |
| 2 | Mesitas | 19.00 |

G

### Cuarto de Caballeros:

|   |   |   |
|---|---|---|
| 1 | Secador eléctrico | 199.50 |
| 1 | "  " | 175.56 |
| 1 | Depósito para papeles | 20.70 |

### Bar del Administrador:

|   |   |   |
|---|---|---|
| 1 | Refrigerador | 150.00 |
| 1 | Gabinete esmaltado | 50.00 |

G       Oficina:

7-24-19 FOIA Response FCSC 00238

G

## AGENCIA DE COMPRAS        (cont.)

### Oficina:

| | | |
|---|---|---|
| 1 | Depósito de papeles | $ 20.70 |
| 1 | Televisor | 250.00 |
| 1 | Enfriador de agua G. E. | 289.00 |
| 1 | Reloj horario para empleados | 460.00 |
| 6 | Tarjeteros | 60.00 |
| 1 | Archivo General | 1.973.09 |
| | | $ 6,032.03 |

### SECCIÓN DE VIGILANCIA

| | | |
|---|---|---|
| 1 | Mesa caoba 2 torres 70 x 36 | 125.00 |
| 1 | Silla giratoria | 32.67 |
| 1 | Mesa caoba 2 torres 60 x 36 | 58.00 |
| 1 | Silla giratoria | 33.00 |
| 1 | Mesa caoba | 55.00 |
| 1 | Silla giratoria | 32.67 |
| 1 | Mesa caoba – volteo – una torre, 44 x 32 | 52.00 |
| 1 | Silla madera fija | 19.00 |
| 1 | Mesita madera 1 gaveta, 32 x 18. | 21.00 |
| 1 | Mesita madera para teléfono 16 x 14 | 10.00 |
| 1 | Banco madera (plano) | 8.00 |
| 1 | "        "        " | 7.00 |
| 1 | Máquina de Escribir "Remington" J-2346285 | 236.00 |
| 1 | Archivo de Metal 4 gavetas | 225.00 |
| 1 | Mueble de madera 12 gavetas | 18.00 |
| 1 | Mueble de madera 30 aptos. banderas | 33.34 |
| 1 | Estante de madera con puertas | 146.60 |
| 1 | Botiquín de madera | 10.00 |
| 1 | Aparato de Aire Acondicionado "Fedders" 2 T. | 399.00 |
| 1 | Enfriador agua G. E. (botellón) | 263.20 |
| 1 | Mueble de dos cuerpos con 34 taquillas | 680.00 |
| 1 | Cuadro madera y cristal (fotografías) | 8.00 |
| 1 | "        "        "        " (Referencias) | 7.00 |
| 1 | Caja de madera para llaves | 5.00 |
| 1 | Tablilla de avisos | 8.00 |
| 1 | Ventilador "Westinghouse" 10 plgds. | 17.50 |
| 1 | Ventilador techo de paletas | 46.00 |
| 4 | Lámparas de luz fría 2 tubos | 10.00 |
| 3 | Lámparas de luz fría 1 tubo | 8.00 |
| 4 | Platos de cristal para bombillos | 8.00 |
| 9 | Faroles Luz-Brillante, 3 grandes y 6 chicos. | 10.00 |
| | | $ 2,591.98 |

HDC 001828

Z

## INSPECCION DE OPERACIONES

| | | | |
|---|---|---|---|
| 1 | Mesa de acero "Steel Age", Modelo 360 — | $ | 235.00 |
| 1 | Silla de acero "Sturgis"; giratoria | | 85.00 |
| 1 | Mesa de madera y formica para máquina de escribir | | 60.00 |
| 1 | " " " | | 21.60 |
| 1 | Silla giratoria | | 24.00 |
| 1 | Archivo de metal tamaño legal | | 110.00 |
| 1 | Máquina de calcular Monroe | | 375.00 |
| 1 | Máquina de escribir "Underwood" 5-5747473-14 | | 261.00 |
| 1 | Perchero | | 9.50 |
| | | $ | 1,181.10 |

O

## SALON DE ESPERA

| | | |
|---|---|---|
| 1 | Sofá | 180.00 |
| 1 | Butaca | 70.00 |
| 4 | Mesas | 103.00 |
| 2 | Cuadros | 70.00 |
| 1 | Mural | 65.00 |
| 1 | Banco | 25.00 |
| 1 | Banco | 25.00 |

O

## TELEFONISTA

| | | |
|---|---|---|
| 1 | Silla giratoria | 19.16 |
| 1 | Mesa esp. pizarra | 85.00 |
| 1 | Estante teléfono público | 25.00 |
| 1 | Mesa Auxiliar | 25.00 |

O

## INFORMACION

| | | |
|---|---|---|
| 1 | Mesa acero 45x 30 | 90.00 |
| 1 | Silla acero "Sturgis" | 45.00 |
| | | $ 827.16 |

HDC 001829

## U 4    TALLER

| | | |
|---|---|---:|
| 1 | Mesa caoba | $ 50.00 |
| 1 | Silla giratoria | 20.00 |
| 1 | Mesa caoba para máquina de escribir | 54.00 |
| 1 | Silla giratoria | 35.00 |
| 1 | Nevera botellón | 35.00 |
| 1 | Librero con puertas de cristal | 35.00 |
| 1 | Perchero de madera | 11.00 |
| 1 | Lámpara de 4 tubos | 21.00 |
| 1 | Máquina sumar "Burroughs" | 125.00 |
| 1 | Máquina de escribir "Underwood" #4998677 | 160.00 |
| 1 | Gabinete metálico | 46.50 |
| 1 | Gabinete metálico | 18.00 |
| 1 | Reloj horario empleados | 375.00 |
| 4 | Tarjeteros para Reloj | 40.00 |

## U    GARAGE

| | | |
|---|---|---:|
| 1 | Escaparate de madera | 40.00 |
| 1 | Tarjetero | 43.00 |
| 1 | Mesa de caoba | 145.00 |
| 1 | Silla giratoria | 21.60 |
| 1 | Mesa caoba | 49.50 |
| 1 | Silla giratoria | 21.60 |
| 1 | Ventilador "Westinghouse" | 33.20 |
| 1 | Lámpara de 2 tubos | 30.00 |
| 1 | Reloj de pared eléctrico | 20.72 |
| | | $ 1,430.12 |

## V    ALMACEN DE ORDEN GENERAL

| | | |
|---|---|---:|
| 1 | Mesa caoba chica | 67.15 |
| 1 | Silla giratoria | 45.00 |
| 1 | Mesa caoba grande | 145.00 |
| 1 | Silla giratoria | 40.33 |
| 1 | Máquina de escribir #1278344 | 110.00 |
| 1 | Mesita madera para máquina de escribir | 16.00 |
| 1 | Vitrina para materiales | 21.00 |
| | | $ 444.48 |

## Y    MUELLE SAN FRANCISCO

### Superintendencia:

| | | |
|---|---|---:|
| 1 | Buró de 2 torres | 95.00 |
| 1 | Máquina de escribir | 275.00 |
| 1 | Máquina de sumar | 185.00 |

HDC 001830

Y

## MUELLE SAN FRANCISCO (Cont.)

### Listería:

| | | |
|---|---|---|
| 1 | Buró de madera 2 torres | $ 56.66 |
| 1 | Estante de pared para tickets | 18.00 |
| 1 | Máquina de sumar eléctrica, Modelo 9034 #258854 | 236.00 |
| 1 | Cuarto Reja | 45.00 |

### Oficina:

| | | |
|---|---|---|
| 1 | Mesa plana sin gavetas | 40.00 |
| 1 | " de una torre | 40.00 |
| 1 | " plana una gaveta | 40.00 |
| 1 | " con 4 divisiones | 44.00 |
| 1 | Escaparate de madera | 31.00 |
| 1 | " | 18.00 |
| 1 | " | 31.00 |
| 1 | " metálico | 50.00 |
| 1 | Máquina de escribir "Underwood" 6180915 | 120.00 |
| 1 | " " " 425255 | 245.00 |
| 1 | Silla Fija | 8.00 |
| 1 | Silla Giratoria | 37.00 |
| 1 | Buró de dos torres | 100.00 |

### INSP. SANIDAD VEGETAL:

| | | |
|---|---|---|
| 1 | Mesa madera una gaveta | 40.00 |

### Departamento de Tejidos:

| | | |
|---|---|---|
| 1 | Mesa madera una torre | 69.11 |
| 1 | Silla giratoria | 30.00 |

### Departamento de Saquería:

| | | |
|---|---|---|
| 1 | Enfriador de Agua | 345.00 |
| 1 | Mesa una gaveta | 67.00 |
| 1 | Ventilador | 26.00 |
| 4 | Tarjeteros | 40.00 |
| 1 | Reloj para remisiones | 150.00 |
| 1 | Enfriador de agua | 345.00 |
| 1 | Reloj horario empleados | 375.00 |

3,201.77

HDC 001831

X   MUEBLE MACHINA

Superintendencia:

| | | | |
|---|---|---|---|
| 1 | Mesa Plana con 1 gaveta | $ | 41.05 |
| 1 | "    "    "  3    " | | 44.00 |
| 1 | Silla giratoria | | 25.00 |

Exportación:

| | | |
|---|---|---|
| 1 | Mesa plana con 6 gavetas | 41.05 |
| 1 | Silla giratoria | 25.00 |
| 1 | Máquina de sumar"Sundstrand" | 185.00 |
| 1 | "    "    escribir "Underwood" #848438-16 | 135.00 |
| 1 | Mesa plana 3 gavetas | 50.00 |

Listería:

| | | |
|---|---|---|
| 1 | Mesa plana 6 gavetas | 49.50 |
| 1 | Máquina Sumar "Underwood" #902-A258874 | 236.00 |
| 1 | Banqueta | 8.00 |
| 1 | Estante con 5 puertas | 35.00 |

Vigilancia:

| | | |
|---|---|---|
| 1 | Mesa plana 3 gavetas | 37.73 |

Insp. Averías:

| | | |
|---|---|---|
| 1 | Mesa plana 6 gavetas | 40.00 |
| 1 | Silla giratoria | 35.00 |
| 1 | Máquina escribir "Remington" #12-346243 | 236.00 |
| 1 | Mesa plana 6 gavetas | 56.66 |
| 1 | Máquina escribir | 135.00 |
| 1 | Butaca | 35.00 |

Sanidad Vegetal:

| | | |
|---|---|---|
| 1 | Mesa plana 3 gavetas | 61.15 |

Girador de Ordenes:

| | | |
|---|---|---|
| 1 | Silla giratoria | 35.00 |
| 1 | Mesa plana 6 gavetas | 89.70 |

7-24-19 FOIA Response FCSC 00243

HDC 001832

X   MUELLE MACHINA

   Oficina Planta Baja:

| | | | |
|---|---|---|---|
| 1 | Mesa plana 6 gavetas | $ | 40.00 |
| 1 | "     "  4  " | | 38.00 |
| 1 | Máquina de escribir "Underwood" | | 100.00 |
| 1 | Escaparate | | 29.99 |
| 1 | Archivo 3 gavetas | | 123.60 |
| 1 | Escaparate | | 12.00 |
| 1 | Estante de madera | | 9.00 |
| 1 | Escaparate madera archivo | | 30.00 |
| 1 | "          "          " | | 60.00 |
| 1 | "          "          " | | 60.00 |
| 1 | "          "          " | | 18.06 |
| 1 | "          "          " | | 30.00 |
| 1 | "          "          " | | 28.22 |
| 1 | "          "          " | | 21.75 |

   Clasificador:

| | | |
|---|---|---|
| 1 | Mesa 4 gavetas | 67.00 |

   Consignatarios de Buques:

| | | |
|---|---|---|
| 1 | Mesa plana 3 divisiones | 65.38 |
| 1 | Silla giratoria | 20.00 |

   Varios:

| | | | |
|---|---|---|---|
| 1 | Reloj eléctrico horario personal | | 375.00 |
| 1 | "        remisiones | | 150.00 |
| 1 | Enfriador agua | | 345.00 |
| 1 | "        " | | 345.00 |
| 4 | Tarjeteros | | 40.00 |
| 1 | Amplificador | | 215.00 |
| | | $ | 3,858.84 |

W   MUELLE SANTA CLARA

   Superintendencia:

| | | | |
|---|---|---|---|
| 1 | Mesa madera grande | $ | 110.00 |
| 1 | Silla giratoria | | 58.00 |
| 1 | "        " | | 22.00 |
| 1 | Armario para materiales | | 14.00 |

HDC 001833

W

## MUELLE SANTA CLARA

### Encargado de Exportación:

| | | | |
|---|---|---|---|
| 1 | Mesa madera grande | $ | 90.00 |
| 1 | "      "     chica | | 50.00 |
| 1 | Máquina de sumar "Burroughs" 3-381256 | | 101.90 |
| 1 | Mesa madera chica para máquina | | 12.00 |
| 1 | Máquina escribir "Underwood" #44476559 | | 120.00 |
| 1 | Mesa madera maquina de escribir | | 50.00 |
| 1 | Máquina escribir "Underwood" #4321785 | | 135.00 |
| 1 | Mesa metal para máquina escribir | | 10.00 |
| 1 | Máquina calcular Monroe | | 130.00 |
| 1 | Ventilador de pie | | 26.00 |
| 1 | Silla giratoria | | 33.00 |

### Listería:

| | | |
|---|---|---|
| 1 | Mesa madera grande | 58.00 |
| 1 | Silla giratoria | 33.00 |
| 1 | Armario madera grande | 100.00 |
| 1 | Banqueta 3 puertas | 8.00 |
| 1 | Ventilador de 2 paletas | 17.50 |
| 1 | Maquina escribir Piat Lux ZA-127728 | 125.00 |

### Oficina de Ordenes:

| | | |
|---|---|---|
| 1 | Mesa madera grande | 45.00 |
| 1 | "      "     mediana | 40.00 |
| 1 | Escritorio madera(Para clasif.) | 56.66 |
| 1 | "            " | 56.66 |
| 1 | "            " | 50.00 |
| 1 | "            " | 62.32 |
| 1 | "            " | 50.00 |
| 1 | Máquina escribir "Underwood" #4378682 | 135.00 |
| 1 | Ventilador de techo | 26.00 |
| 1 | Banco grande | 12.00 |

### Oficina Insp. de Averías:

| | | |
|---|---|---|
| 1 | Mesa madera con cristal | 215.00 |
| 1 | Escaparate madera (materiales-) | 18.00 |
| 1 | Silla giratoria | 42.00 |
| 1 | Máquina escribir Piat Lux ZA-130432 | 125.00 |
| 1 | Ventilador chico | 17.50 |
| 1 | Mesa grande (Vigilancia) | 19.55 |

### Tejidos:

| | | |
|---|---|---|
| 1 | Mesa madera grande | 50.00 |
| 1 | "      "     chica | 29.00 |
| 1 | Escaparate madera puertas cristal | 15.00 |
| 1 | "         "         "      " | 15.00 |
| 1 | "         "         "      " | 15.00 |

7-24-19 FOIA Response FCSC 00245

HDC 001834

W

## MUELLE SANTA CLARA

### Varios:

| | | | |
|---|---|---|---:|
| 1 | Nevera | $ | 85.00 |
| 1 | Reloj Horario Empleados | | 375.00 |
| 4 | Tarjeteros | | 40.00 |
| 1 | Reloj Remisiones | | 150.00 |
| 1 | Enfriador de Agua | | 345.00 |
| 1 | "          " | | 345.00 |
| | | $ | 3,738.09 |

LIST OF STOCKHOLDERS
OF
HAVANA DOCKS CORPORATION

SERIES 1983 COMMON STOCK WITHOUR PAR VALUE

UPDATED AS OF - NOVEMBER 19, 2020

FURNISHED BY:
HAVANA DOCKS CORPORATION
215 SOUTHLAND DRIVE
LEXINGTON, KY 40503

| Stockholder Name (last, first, middle) | No. of Shares | Certificate Number | Stockholder Mailing Address | Stockholder Telephone Number | Stockholder E-mail Address |
|---|---|---|---|---|---|
| Behn, Aphra (As Agent Under Agreement) | 1 | 23 | Res Haize Kantari, Villa 1, 1449 Vielle Route De Saint Pee,Saint Jean De Luz 64 64500, France | 011-33-68-373-2188 | aphrab2@yahoo.com |
| Behn, Mickael S. | 46 | 51 | 110 Wimbledon Park Road, Southfields, London LO SW18 5UA | 011-44-759-085-1412 | mickaelbehn@havanadockscorp.com |
| Buffett, Susan T. (Deceased) | 1 | | 3555, Farnham St, Omaha, NE 68132 | (402) 346-1400 | |
| Buffett, Warren E. | 1 | | 3555, Farnham St, Omaha, NE 68132 | (402) 346-1400 | |
| Hoch, Dorothy W. (Deceased) | 5 | | Stonegates, 4031 Kennett Pike-71, Wilmington, DE 19807 | (302) 984-0208 | |
| Lucain, Melanie Behn | 46 | 53 | Res Haize Kantari, Ville 1, 1449 Vielle Route De Saint Pee,Saint Jean De Luz 64 64500, France | 011-33-66-225-4527 | bmellanny@gmail.com |
| MacArthur, A.L. Fanget (Deceased) | 18 | | Attn: Robert MacArthur, 106 Appleton St., Cambridge, MA 02138 | (517) 354-2233 | romac106@comcast.net |
| Pelletier, Romain le | 46 | 52 | 11 Chemin D'Olaeo Bidaxuna, Quartier Helbarron, Saint Pee-Sur-Nivelle 64310, France | 011-33-78-243-6479 | remain.6@icloud.com |
| Unknown Holder | 1 | | | | |
| Whittaker, Walter H. | 6 | | Stonegates, 4031 Kennett Pike-71, Wilmington, DE 19807 | (302) 984-0208 | |
| Total Shares Outstanding | 171 | | | | |

NOVEMBER 19, 2020

HAVANA DOCKS CORPORATION BY:

JERRY M. JOHNSON
SECRETARY-TREASURER

MICKAEL BEHN
PRESIDENT

Exhibit 0013
Jerry Johnson

CONFIDENTIAL

| | |
|---|---|
| **From:** | JGB Home <jgb@bellsouth.net> |
| **Sent:** | Monday, April 24, 2017 5:49 PM |
| **To:** | Fabiola Santiago |
| **Cc:** | Mickael Behn |
| **Subject:** | Op Ed |

Fabiola,

You saw I CC'd you on an email I submitted with an opinion piece re Carnival's cruises to my property. I have partnered with the owners of the Havana port (we think we've found the owners in Cienfuegos) and as you can see, we are outraged about what's going on.

While our opinions might not be shared by some at the Herald, they are data driven and rooted in fact (and the law). We strongly believe that the property issue must be part of the Cuba conversation. If engagement- commerce- is to be transformative or even sustainable, it's going to be 100% about property and property rights.

It must also be lawful. If we don't like the laws, debate them in a public space like the editorial page and get them changed or improved.

If it is appropriate I hope you would nudge the Board to publish our piece this weekend on the anniversary of the cruises.

Thank you.

Javier
Sent from my iPad

**Exhibit 0014**
Jerry Johnson

| | |
|---|---|
| **From:** | Javier Garcia-Bengochea <jgb1@icloud.com> |
| **Sent:** | Monday, December 17, 2018 11:19 PM |
| **To:** | OFAC_Feedback@treasury.gov |
| **Cc:** | Mickael Behn; Jerry Johnson; Zuniga-Browntp@state.gov |
| **Subject:** | Re: Cuban Assets Control Regulations |

Dear Sir or Madam,

I'm sorry, But I have already done that and Mr. Tim Zúñiga-Brown at the State Department instructed me this issue is clearly an OFAC concern and to contact OFAC. I have cc'ed Mr. Zuniga-Brown.

Please connect me with the appropriate person in your office responsible for CACR/OFAC sanctions violations.

Thank you,

JavierGarcia-Bengochea, MD
Sent from my iPad

On Dec 17, 2018, at 3:47 PM, OFAC_Feedback@treasury.gov wrote:

> Thank you for the additional detail. For claims related to property confiscated in Cuba, you should address your concerns to the U.S. State Department.
>
> Regards,
>
> Office of Foreign Assets Control
> U.S. Department of the Treasury
> 1500 Pennsylvania Ave. NW
> Washington, DC 20220
> Toll Free: 1-800-540-6322
> Email: OFAC_Feedback@treasury.gov
> Website: OFAC FAQs
> bv
>
> ---
>
> **From:** Javier Garcia-Bengochea <jgb1@icloud.com>
> **Sent:** Saturday, December 15, 2018 1:11 PM
> **To:** OFAC_Feedback <OFAC_Feedback@treasury.gov>
> **Cc:** Mickael Behn <mickaelbehn@havanadockscorp.com>; Jerry Johnson <jjohnson@bankofthebluegrass.com>
> **Subject:** Re: Cuban Assets Control Regulations

**Exhibit
0015**
Jerry Johnson

> Thank you for the prompt reply.
>
> As stated previously, I am a US citizen and the claimant and legitimate owner of the port facilities in Santiago de Cuba. I am also partnered with the American owners of the cruise facilities in Havana, Cuba, who are copied above.

Specifically, we are referring to the CACR, Title 31,

## "§515.208 Restrictions on loans, credits and other financing.

No United States national, permanent resident alien, or United States agency may knowingly make a loan, extend credit or provide other financing for the purpose of financing transactions involving confiscated property the claim to which is owned by a United States national, except for financing by a United States national owning such a claim for a transaction permitted under United States law."

This was incorporated into the Federal Register on July 18, 1996 from The Cuban Liberty and Democratic Solidarity Act of 1996 (Helms-Burton), Sec. 103(a), which states,

"Prohibition.--Notwithstanding any other provision of law, no loan, credit, or other financing may be extended knowingly by a United States national, a permanent resident alien, or a United States agency to any person for the purpose of financing transactions involving any confiscated property the claim to which is owned by a United States national as of the date of the enactment of this Act, except for financing by the United States national owning such claim for a transaction permitted under United States law."

We also note that Helms-Burton explicitly states in Sec. 102(c) regarding "Existing Regulations.--The President shall instruct the Secretary of the Treasury and the Attorney General to enforce fully the Cuban Assets Control Regulations set forth in part 515 of title 31, Code of Federal Regulations." This is certainly the position of the Trump Administration as reflected in the NSPM 5 from 11/17.

Thank you for your prompt attention to this important matter. We eagerly await a response from the appropriate person and look forward to discussing this situation in more detail.

Javier Garcia-Bengochea, MD
Mickael S. Behn, Havana Docks Corp.
Jerry Johnson, Havana Docks Corp.
Sent from my iPad

On Dec 14, 2018, at 5:39 PM, OFAC_Feedback@treasury.gov wrote:

Good afternoon and thank you for your email.

Would you please tell us more about question regarding the Cuban Assets Control Regulations so that we can better direct your inquiry?

Regards,

Office of Foreign Assets Control
U.S. Department of the Treasury

1500 Pennsylvania Ave. NW
Washington, DC 20220
Toll Free: 1-800-540-6322
Email: OFAC_Feedback@treasury.gov
Website: OFAC FAQs
by


-----Original Message-----
From: Javier Garcia-Bengochea <jgb1@icloud.com>
Sent: Friday, December 14, 2018 1:13 PM
To: OFAC_Feedback <OFAC_Feedback@treasury.gov>
Subject: Cuban Assets Control Regulations

Dear Sir or Madam,

I am the claimant and legitimate owner of the port facilities in Santiago de Cuba
and represent the American claimants to the cruise port facilities in Havana, Cuba.
We have serious ongoing concern regarding the trafficking in our confiscated
properties by the cruise line industry in clear violation of U.S. law.

This trafficking has been compounded by serial violations of Helms-Burton and
the CACR prohibiting knowingly financing any transaction involving a
confiscated property. The cruise line companies and some or many of the group
tour operators who book these cruises "know" these ports are confiscated.

I would like to speak with someone regarding this important matter. Thank you.

Javier Garcia-Bengochea, MD
Sent from my iPad

HDC 014350

| From: | JGB Home <jgb@bellsouth.net> |
|---|---|
| Sent: | Wednesday, May 23, 2018 4:01 PM |
| To: | cjasper@bloomberg.net |
| Cc: | mickaelbehn@gmail.com; Jerry M. Johnson; apalazzo@bloomberg.net |
| Subject: | Cuba cruises |

Dear Mr. Jasper,

My name is Javier Garcia-Bengochea and I am the legitimate owner of the port and cruise ship facilities in Santiago de Cuba. Mickael Behn and Jerry Johnson, copied here, are the legitimate owners of the Havana Docks Corp., the cruise facilities in Havana. Both our properties were confiscated in violation of Cuban and International law in late 1960.

The cruise lines are trafficking in our stolen property in clear violation of US law. Please see the link below.

https://mycubaproperty.wordpress.com/2018/03/11/the-cruise-lines-traffic-in-stolen-property-the-criminalty-of-obamas-cuba-policy-and-why-it-must-be-changed/

Alternatively, you can view my recent Congressional testimony, (https://youtu.be/t9kwbdyQI4o).

Damages are accruing under the law that cannot be extinguished and are treble, since the cruise lines are aware of our claims. We estimate these to already be in excess of $50 million.

The cruise lines use our property with the protection of the bureaucracy at the State and Treasury Department who remain sympathetic with former President Obama's capitulation with the white male military dictatorship in Cuba. They refuse to enforce US law.

Some would argue this is evidence for the "Deep State". Irrefutably, it casts enterprises like Cuba cruises as little more than politically sanctioned and protected organized crime. In that sense, the Obama Administration and the Castro dictatorship were well suited as partners.

Unfortunately, no one at the cruise lines were honest enough to tell you any of the above. Disappointingly, media outlets apply zero critical thinking on the subject of Cuba. I would hope you would be eager to clarify or correct the record and report these facts.

Thank you.

Javier Garcia-Bengochea, MD
Below is the late Mr. William Behn, the owner of The Havana Docks Corp., the day Castro rebels came to steal his property.

**Exhibit 0016**
Jerry Johnson



HDC 001181



HDC 001182



Sent from my iPad

HDC 001183

| From: | Javier Garcia-Bengochea <jgb1@icloud.com> |
| Sent: | Friday, December 22, 2017 9:05 PM |
| To: | Escobar, Gabriel |
| Cc: | Alpert, Rachel K; Jerry Johnson; Mickael Behn |
| Subject: | Re: Suspension of Title III of Libertad |

Yes. Thanks, Gabriel, I have a copy of the actual letter to the committees.

There's no lack of irony that the Kerry letter explicitly states that the waiver is "necessary to the national interests of the United States and will expedite a transition to democracy in Cuba".

This is proven to be patently false. It's a complete fabrication. After 21 years of waivers and not enforcing the law Cuba is further from democracy than ever- it's a full fledged white male military dictatorship and apartheid with institutionalized slavery (the 2 currencies) that was validated by the the previous administration and now supported by US tourism.

Why is it in the national interests to allow American companies to traffic in the stolen property of other Americans and exploit Cuban slave labor?

What's definition of insanity again?

I'm sorry, but I would also be remiss not to mention the absolutely surreal if not incomprehensible moment in our meeting regarding your response to the video of the CEO of Norwegian Cruise Lines at a conference at Wharton Business School specifically on the subject of "doing business" in Cuba during a session specifically about cruising Cuba.

He explicitly stated and incontrovertibly refuted, when specifically asked about the need for a port, your assertion that the cruise lines were not trafficking by virtue of Sec. 401(c)(2)(B)(iii) of H-B. He was indisputably clear: that using a port was " not necessary" to cruise Cuba. He arrogantly scoffed at- ridiculed- that notion.

If the cruise lines want to dock at a port while cruising Cuba- so be it. They do so at their own risk. However, if they dock at our properties they are trafficking. Period.

Let's be intellectually honest and frank, he was basically confirming that they are trafficking and and you should have acknowledged that fact, rather than double down on an obviously incorrect position.

The cruise lines must be subjected to a Title IV action and we will not relent until this occurs. It's a matter of law.

I hope you both have a happy and safe holiday season and I look forward to pursuing this issue January 2, 2018.

Javier
Sent from my iPad

On Dec 21, 2017, at 1:29 PM, Escobar, Gabriel <EscobarG@state.gov> wrote:

Perhaps this can be useful:

https://2009-2017.state.gov/p/wha/rls/prsrl/2017/266595.htm

**Exhibit
0017**
Jerry Johnson

**Official**
**UNCLASSIFIED**

**From:** Escobar, Gabriel
**Sent:** Thursday, December 21, 2017 1:21 PM
**To:** 'Javier Garcia-Bengochea' <jgb1@icloud.com>
**Cc:** Alpert, Rachel K <AlpertRK@state.gov>
**Subject:** Suspension of Title III of Libertad

Dr. Garcia-Bengochea,

It was a pleasure to meet with you yesterday. During the meeting you had asked for an official announcement or note for the suspension of Title III of Libertad in relation to your lawsuit. The document you left had no date stamp. Can you remind me what year you need this for?

Gabe

**Official**
**UNCLASSIFIED**

WARNING: This email originated outside of our organization's email system. Do not click links or open attachments unless you recognize the sender and you are expecting the message.

In May of 2015 the US Treasury began issuing licenses to cruise ship and ferry lines to travel to Cuba.  On May 1, 2016 the first cruise ship to Cuba from the United States left the port of Miami for Havana, Cienfuegos and Santiago de Cuba.

The cruise ship terminals in Havana and Santiago are confiscated properties claimed by us.  The former was privately held US corporation owned by the Behn Family, whose claim for loss has been certified by the Foreign Claims Settlement Commission (FCSC Claim number CU#2492; see attached).  The Santiago property, as you know, was privately held Cuban Corporation with a major shareholder who was a US citizen at the time the business was confiscated (FCSC Claim CU#1231).

Cruises that use these properties are clear violation of US law trafficking in stolen property in Cuba on at least 3 counts.

They are in violation of Section 103(a),

"(a) Prohibition.--Notwithstanding any other provision of law, no loan, credit, or other financing may be extended knowingly by a United States national, a permanent resident alien, or a United States agency to any person for the purpose of financing transactions involving any confiscated property the claim to which is owned by a United States national as of the date of the enactment of this Act, except for financing by the United States national owning such claim for a transaction permitted under United States law. "

They are engaging in a commercial relationship with the Cuban Revolutionary Armed Forces (FAR) and its financial arm, GAESA (Grupo de Administracion Empresarial).

They are in violation of Sec. 306(a) and Sec. 401(a)(2),

"(2) traffics in confiscated property, a claim to which is owned by a United States national;",

and, therefore, are subject to a Title IV action based on the definition of trafficking below,

"(A) Except as provided in subparagraph (B), a person "traffics" in confiscated property if that person knowingly and intentionally—

(i)(I) transfers, distributes, dispenses, brokers, or otherwise disposes of confiscated property, (II) purchases, receives, obtains control of, or otherwise acquires confiscated property, or (III) improves (other than for routine maintenance), invests in (by contribution of funds or anything of value, other than for routine maintenance), or begins

Exhibit
0018
Jerry Johnson

after the date of the enactment of this Act to manage, lease, possess, use, or hold an interest in confiscated property,

(ii) enters into a commercial arrangement using or otherwise benefiting from confiscated property".

Heretofore The State Department has asserted that the use of the confiscated port properties in Cuba has been "necessary" to the conduct of such travel as allowed for in the law,

"(iii) transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel;"

This is false.

The cruise lines are clearly trafficking in our confiscated property.  They do not remotely meet any of the criteria for an exemption to trafficking stated as well in the law.  In particular, subparagraph (iii) above does not apply to the cruise lines as previously argued by Mr. Kovar and Mr. Richard Figueroa of the U.S. State Department.

The use of our confiscated properties is NOT necessary for the purpose of the license to cruise Cuba.  This has ben publicly stated by the CEO of Norwegian Cruise Lines Holdings when asked explicitly by cNBC reporter Michelle Caruso-Cabrera at a conference specifically dealing with cruising Cuba at Wharton Business School at the University of Pennsylvania about the "necessity" of a "good port".  The CEO, Frank Del Rio, arrogantly dismissed this notion, explicitly stating that a port was "not necessary" to cruise Cuba, citing the numerous ports of call made by cruise ships around the world where they do not dock and ferry passengers to shore by the use or tenders.

Title IV requires that if the Secretary of State determines trafficking occurs involving stolen Cuban property then the visas of the officers and agents, as well as their family members, of the trafficking entities **must** be revoked.

Title IV notifications have been issued on five previous occasions and enforced in two instances. The following is from then Deputy National Security Advisor Sandy Berger and Under Secretary of State for Political Affairs Peter Tarnoff at a press conference in July of 1996 on behalf of President Clinton,

"Title IV has come into effect. And as you know, Title IV prohibits or requires us to not permit visas for individuals whose companies are engaged in trafficking in confiscated Cuban property. We have enforced -- are enforcing Title IV very vigorously. A number

of companies have received notices indicating that their executives and officers will not receive visas to the United States."

Although the largest cruise lines now going to Cuba as a result of the commercial engagement of the Cuban dictatorship are US entities, many of their officers and Board members are not US citizens.  We have attached a list of the foreign Board members of Norwegian Cruise Lines Holdings, Carnival, PLC and Royal Caribbean Cruises, Ltd.

We respectfully request that the Secretary of State review the facts involving the use of our properties and US law to determine that these companies are in violation of the law and are trafficking in our confiscated properties.  We then respectfully request that the State Department issue notifications of pending Title IV actions in 45 days to these companies as required in the law.

Thank you,

Javier Garcia-Bengochea, MD representing the port of Santiago de Cuba

Mickael Behn and Jerry Johnson representing the Havana Docks Corporation.

| | |
|---|---|
| **From:** | JGB Home <jgb@bellsouth.net> |
| **Sent:** | Sunday, April 23, 2017 11:50 PM |
| **To:** | Mickael Behn |
| **Subject:** | Re: Miami Herald Op Ed |

Absolutely on the logistics. That is why they will negotiate with us if we can get visas threatened. The admission by the CEO they don't need to dock is very damning as far as the OFAC licenses providing immunity. The State Dept lawyer specifically told me they viewed docking on our property as "necessary" and so they wouldn't consider it trafficking.

JGB
Sent from my iPad

On Apr 23, 2017, at 6:36 PM, Mickael Behn <mickaelbehn@gmail.com> wrote:

> Interesting and agreed on the point that cruise do not need to dock to service a route. but of course docking on our ports makes it cheaper for them on fuel and getting 800 people on and off is a long process, so it becomes an advantage for them to dock. so the value is there. and that value is gained as a profit to the cruise lines on illegally taken American property.
>
> My full name is Mickael Sosthenes Behn .so S middle initial.
>
> Great news there is a path forward for your property. whats the angle on the Chinese using your property in the sense of recovery. I have had a bit a dealings in the media world and they are hard to deal with in general.
>
> If we can get one Cruise line to negotiated, i think that would be enough of a threat to bring most to the table.
>
> Mickael

>> On 23 Apr 2017, at 16:44, JGB Home <jgb@bellsouth.net> wrote:
>>
>> Yes. I know the writer at the Herald who outed Carnival and I'm going to ask her to help get this published. I'm going to clean the piece up a bit. I'm hopefully that the timing makes it relevant. I think another piece I did is being published today in the Orlando Sentinel. It's less about our specific problem and more on the disinformation campaign of the Castro regime. #FakeNews Cuba
>>
>> I'm speaking with the chief of staff of my Congressman tomorrow about getting in front of someone at State and the White House to discuss not waiving Title III and enforcing Title IV. He is very willing to help make this happen. We can't wait around for the Trump Admin to shape up, although I may have mentioned the Deputy Sec of Sec nominee is the son in law of a former Bacardi CEO (and Cuban exile).
>>
>> On a related front, it appears that DC attorney Greg Craig may be interested in my situation with the Chinese on my property. Craig has been chief White House council and has represented former Presidents and other very high profile clients, including Elian Gonzalez' father. Evidently, he's known in DC as the "expert" in all things Cuba. Rodney got connected with him through an attorney friend at Skadden Arps, Craig's firm.

**Exhibit 0019**
Jerry Johnson

HDC 001328

Finally, watch this short video clip below of cNBC's Michelle Caruso-Cabrera's interview of Norwegian Cruise Lines CEO, Frank Del Río, at a Cuba conference almost 2 years ago. He actually boasts that it is not necessary for cruise ships to dock at a port- this is at a Cuba conference. Below is the language in the law re exemptions to trafficking. This is proof positive the licenses are not immunity from trafficking.

The significance is that with this evidence, we may be able to threaten the cruise lines with visa revocations of their foreign directors. The effect would be that it would bring them to the table to negotiate with us- basically it's the same as if we were threatening litigation.

Mickael, what's your middle initial? I was just going to put your full name and list Havana Docks Corp. below.

Click to Download

IMG_0052.MOV
67.7 MB

Javier
Sent from my iPad

(B) The term "traffics" does not include--

(i) the delivery of international telecommunication signals to Cuba;

(ii) the trading or holding of securities publicly traded or held, unless the trading is with or by a person determined by the Secretary of the Treasury to be a specially designated national;

(iii) **transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel;** or

(iv) transactions and uses of property by a person who is both a citizen of Cuba and a resident of Cuba, and who is not an official of the Cuban Government or the ruling political party in Cuba.

JGB
Sent from my iPad
On Apr 23, 2017, at 7:28 AM, Mickael Behn <mickaelbehn@gmail.com> wrote:

> Javier,
>
> Thats great and to the point. Seeing the current evolution of Trumps foreign policy failures, it starting to feel as this might be an easy win for him, if it gets to his
> attention. Hopefully Miami Herald will jump to publish this.
>
> Thank you and you need anything from me please let me know.
>
> Mickael
>
>> On 22 Apr 2017, at 17:57, JGB Home <jgb@bellsouth.net> wrote:

HDC 001329

Gentlemen,

I was going to submit this opinion piece to the Miami Herald and or USA Today with Mickael's and my name attached. Any comments to this draft?  I still make some changes, but you get the gist. The limit is 600 words.

<Miami Herald Op Ed.docx>

I hope you are both well.

Javier
Sent from my iPad

HDC 001330

Message

| | |
|---|---|
| **From:** | JGB Home [jgb@bellsouth.net] |
| **on behalf of** | JGB Home <jgb@bellsouth.net> [jgb@bellsouth.net] |
| **Sent:** | 8/2/2018 8:37:33 PM |
| **To:** | Kim, Deanna G [KimDG@state.gov] |
| **CC:** | Jerry Johnson [jjohnson@bankofthebluegrass.com]; Mickael Behn [mickaelbehn@gmail.com]; Aaron Johnson (ajohnson.hdc@gmail.com) [ajohnson.hdc@gmail.com]; Tarantolo, Sonia S [TarantoloSS@state.gov]; Alpert, Rachel K [AlpertRK@state.gov]; Patel, Nutan B [PatelNB@state.gov]; Magallon, Erica G [MagallonEG@state.gov] |
| **Subject:** | Re: (5) Javier Garcia-Bengochea, MD Title IV Cuba Claims |

Thank you, Deana. I appreciate the thoughtful reply. However, it is entirely unsatisfactory and unjustified.

You must pursue Title IV actions on the cruise lines. They are in clear, indisputable violation of the law and do not meet any of the 4 exceptions to trafficking. The CEO of Norwegian Cruise Lines is on video at a conference at Wharton asserting this very fact, completely contradicting you.

As you know, the requirement to revoke the visas of any foreign traffickers is statutory. The owners of Havana Docks Corp and I fully expect you to comply with the law.

We would appreciate your prompt attention to this issue.

Thank you.

Javier
Sent from my iPad

On Aug 2, 2018, at 8:51 AM, Kim, Deanna G <KimDG@state.gov> wrote:

> Mr. Johnson, Dr. Garcia:
>
> Given Gabe's departure, I wanted to take stock and make sure that we have addressed the specific concerns you identified below. I have confirmed that we have opened cases/files for each of the requests noted in the chain below, including Title IV enforcement requests in relation to the port, port facilities, and area surrounding the harbor of Santiago de Cuba; port properties in Havana; and entities that may be docking at both properties. As previously discussed, given the clear exclusion in Title IV's definition of "traffics" of transactions and uses of property incident to lawful travel to Cuba, we are not currently pursuing Title IV actions in relation to commercial cruise lines. As we receive multiple requests for Title IV enforcement action and are operating under limited resources, we prioritize cases according to a number of factors, including the availability of information and our assessment of the strength of the Title IV case. That said, we are actively working on Title IV enforcement actions regarding activities related to the port, port facilities, and area surrounding the harbor of Santiago de Cuba, including seeking additional information from foreign entities concerned. We have also opened a file for your request regarding port properties in Havana and will reach out should additional information be necessary for our investigation.
>
> Thank you
>
> Deanna Kim
> Acting Coordinator for Cuban Affairs
>
> **From:** Jerry Johnson <jjohnson@bankofthebluegrass.com>
> **Sent:** Friday, July 6, 2018 4:46 PM
> **To:** Escobar, Gabriel <EscobarG@state.gov>

**Exhibit
0020**
Jerry Johnson

**Cc:** Mickael Behn <mickaelbehn@gmail.com>; Javier Garcia-Bengochea (jgb@bellsouth.net) <jgb@bellsouth.net>; Aaron Johnson (ajohnson.hdc@gmail.com) <ajohnson.hdc@gmail.com>; Patel, Nutan B <PatelNB@state.gov>

**Subject:** RE: (5) Javier Garcia-Bengochea, MD Title IV Cuba Claims

Excellent Gabriel. I see from Nutan's out-of-office e-mail response of today that she is on Temporary Duty Assignment in Havana. I was thinking that she may be able to see first hand what is happening with our property there.

Very best wishes,

Jerry

**Jerry M. Johnson**
**Senior Vice President, Director of Wealth Management**
<image001.png>
*Direct Telephone: (859) 233-8903*
*Fax: (859) 252-0304*
*215 Southland Drive, Lexington, Kentucky 40503*

**From:** Escobar, Gabriel <EscobarG@state.gov>
**Sent:** Friday, July 06, 2018 4:40 PM
**To:** Jerry Johnson <jjohnson@bankofthebluegrass.com>
**Subject:** RE: (5) Javier Garcia-Bengochea, MD Title IV Cuba Claims

Jerry,

Yes, all of the information that you and Dr. Garcia-Bengochea have shared is being looked into by both our Legal Department (Rachel and Jeff Kovar) and our Cuban Affairs team (Nutan and Erica). We largely overlap but we each have a piece of it, which is why you may get separate emails requesting different information. We coordinate closely.

Thank you as well.

Best regards,

Gabriel

**From:** Jerry Johnson <jjohnson@bankofthebluegrass.com>
**Sent:** Friday, July 06, 2018 4:35 PM
**To:** Escobar, Gabriel <EscobarG@state.gov>; Mickael Behn <mickaelbehn@gmail.com>; Home <jgb@bellsouth.net>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson <aamjohnson17@gmail.com>
**Subject:** RE: (5) Javier Garcia-Bengochea, MD Title IV Cuba Claims

Thank you for the clarification Gabriel. One last clarification question for today if I may. Does your response below, where you say - "Despite my transfer, it will not require to be restarted.", include our Title IV action request for our Havana Docks Corporation property in Havana as well as for Dr. Carcia-Bengochea's Title IV action request for his docks in Santiago de Cuba?

Again, many sincere thanks, and very best regards for your new endeavor related to your transfer.

Jerry

HDC 014362

**Jerry M. Johnson**
**Senior Vice President, Director of Wealth Management**
<image002.png>
Direct Telephone: (859) 233-8903
Fax: (859) 252-0304
215 Southland Drive, Lexington, Kentucky 40503

**From:** Escobar, Gabriel <EscobarG@state.gov>
**Sent:** Friday, July 06, 2018 4:17 PM
**To:** Jerry Johnson <jjohnson@bankofthebluegrass.com>; Mickael Behn <mickaelbehn@gmail.com>; Home <jgb@bellsouth.net>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson <aamjohnson17@gmail.com>
**Subject:** RE: (5) Javier Garcia-Bengochea, MD Title IV Cuba Claims

All of the people you have copied will continue to work on this issue with the exception of Kevin Murakami and myself. Despite my transfer, it will not require it to be restarted.

**From:** Jerry Johnson <jjohnson@bankofthebluegrass.com>
**Sent:** Friday, July 06, 2018 4:06 PM
**To:** Escobar, Gabriel <EscobarG@state.gov>; Mickael Behn <mickaelbehn@gmail.com>; Home <jgb@bellsouth.net>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson <aamjohnson17@gmail.com>
**Subject:** RE: (5) Javier Garcia-Bengochea, MD Title IV Cuba Claims

Thank you for your prompt reply Gabriel. Respectfully, when you say "…please stay in touch with the folks who are continuing to work on Cuban issues", can you tell me specifically who those folks are as it relates to our Title IV action request for the trafficking violations that we perceive are happening to our port properties in Havana and Santiago de Cuba? Again, and respectfully, we seem to have received a bit of conflicting messages from a couple of prior e-mail exchanges, one from you on 6/5/18 (attached), and one from your colleague, Rachel Alpert from the legal team, that she sent on 6/12/18 (attached) in response to my e-mail to her. Let me attempt to explain as follows:

> In your e-mail of 6/5/18, you write in part, *"I have passed this information and the information provided by Dr. Bengochea to our legal team. Once they have additional requests for information or a response, I will be back in touch."*
> In Rachel Alpert's e-mail to me of 6/12/18, she writes, *"Jerry – Thank you for your email. Per the attached Federal Register notice, the Office of Cuban Affairs is the appropriate POC for Title IV-related inquiries."*

With your pending departure (and based on what appears to be conflicting e-mails above in terms of center of responsibility) frankly we are concerned that we may not have an open file at the State Department dealing with our Title IV request. In other words, we would hate to have to start our process over again once you are gone. We hope there is an active file presently established for us, and if you could confirm this point we would appreciate.

To further clarify, we are asking for Title IV enforcement action for the docks properties in both Santiago de Cuba and Havana. The Santiago docks are owned by Dr. Javier Garcia-Bengochea, and the docks in Havana are owned by Havana Docks Corporation, with whom I am affiliated. Dr. Garcia has requested Title IV action against the Chinese companies that are trafficking in his stolen property in Santiago, and we appreciate your forwarding of his information to your colleagues who work on China.

HDC 014363

For the docks in Havana, owned by Havana Docks Corporation, we in particular would like to commence Title IV proceedings by the denying of United States visas to the officers and directors of Global Ports Holding, PLC as outlined in my e-mail to you of 5/29/18 (attached). Global Ports Holding, a Turkish company, has struck a deal with the Cuban company Aries S.A. (a probable shell company of the Cuban regime) to operate Havana Docks for the next 15 years. If this is not a clear example of trafficking in our confiscated Havana Docks property, we don't know what an example of trafficking as defined by Helms-Burton would be.

Further, for both of our Santiago de Cuba and Havana port properties, we respectfully request that Title IV action be brought against non-U.S. directors and officers of all of the commercial cruise lines that are docking at our properties (Norwegian Cruise Lines Holdings, Carnival, PLC, an Royal Caribbean Cruises, Ltd., Viking Ocean Cruises, Pearl Seas Cruises, Victory Cruise Lines, Et al.). We feel the trafficking in our properties by the cruise lines is the most egregious situation of all, as here we have a situation where U.S. companies are stealing from Dr. Garcia and Havana Docks Corporation, a U.S. citizen and a U.S. Corporation respectively, who are supposed to be protected from such action by Helms-Burton. Respectfully, I site again for you and the persons copied on this e-mail the section in Title IV that was written to give us this protection, which reads in part:

   TITLE IV—EXCLUSION OF CERTAIN ALIENS
       SEC.401. EXCLUSION FROM THE UNITED STTES OF ALIENS WHO HAVE
       CONFISCATED PROPERTY OF UNTIED STATES NATIONALS OR WHO TRAFFIC IN
       SUCH PROPERTY.

reading in part:
   (a) <!--[if !supportLists]--><!--[endif]-->**Grounds for Exclusion.—The Secretary of State shall deny a visa to, and the Attorney General shall exclude from the United States, any alien who the Secretary of State determines is a person who, after the date of the enactment of this Act—**
   (1) <!--[if !supportLists]--><!--[endif]-->**Has confiscated, or has directed or overseen the confiscation of, property a claim to which is owned by a United States national, or converts or has converted for personal gain confiscated property, a claim to which is owned by a United States national;**
       (2) <!--[if !supportLists]--><!--[endif]-->**Traffics in confiscated property, a claim to which is owned by a United States national;**
       (3) <!--[if !supportLists]--><!--[endif]-->**Is a corporate officer, principal, or shareholder with a controlling interest of an entity which has been involved in the confiscation of property or trafficking in confiscated property, a claim to which is owned by a United States national; or**

If we have not proved our case for you that we have been and are continuing to be wronged as outlined above, or if we have not proven to you that we are the legitimate owners of the docks properties stolen by the Cuban government, we would appreciate directive from the State Department as to what we may do in order to activate the provisions of Helms-Burton.

Very respectfully yours,

Jerry

**Jerry M. Johnson**
**Senior Vice President, Director of Wealth Management**
<image003.png>
Direct Telephone: (859) 233-8903
Fax: (859) 252-0304
215 Southland Drive, Lexington, Kentucky 40503


**From:** Escobar, Gabriel <EscobarG@state.gov>
**Sent:** Friday, July 06, 2018 12:14 PM
**To:** Jerry Johnson <jjohnson@bankofthebluegrass.com>; Mickael Behn <mickaelbehn@gmail.com>; Home <jgb@bellsouth.net>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin

T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson
<aamjohnson17@gmail.com>
**Subject:** RE: (5) Javier Garcia-Bengochea, MD Title IV Cuba Claims

Jerry,

We've looked at all the information you've provided and found it to be a good start for moving toward
further investigation. We have taken the information you provided and shared it with our colleagues
who work on China to ask for information about the Chinese companies operating in the port. We will
continue to monitor developments on the port as well. That's as much as I can share at this point, but
please stay in touch with the folks who are continuing to work on Cuban issues.

Best regards,

Gabriel

**From:** Jerry Johnson <jjohnson@bankofthebluegrass.com>
**Sent:** Friday, July 06, 2018 10:31 AM
**To:** Escobar, Gabriel <EscobarG@state.gov>; Mickael Behn <mickaelbehn@gmail.com>; Home
<jgb@bellsouth.net>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin
T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson
<aamjohnson17@gmail.com>
**Subject:** RE: (5) Javier Garcia-Bengochea, MD Title IV Cuba Claims

Good morning Gabriel. I hope all is well for you. Hope you don't mind, but I just wanted to check in with
you for a moment as I know your departure date is soon. Do you have any update for us in regard to our
request for Title IV action?

Best regards,

Jerry

**Jerry M. Johnson**
**Senior Vice President, Director of Wealth Management**
<image004.png>
*Direct Telephone: (859) 233-8903*
*Fax: (859) 252-0304*
*215 Southland Drive, Lexington, Kentucky 40503*

**From:** Escobar, Gabriel <EscobarG@state.gov>
**Sent:** Tuesday, June 05, 2018 3:42 PM
**To:** Jerry Johnson <jjohnson@bankofthebluegrass.com>; Mickael Behn <mickaelbehn@gmail.com>;
Home <jgb@bellsouth.net>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin
T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson
<aamjohnson17@gmail.com>
**Subject:** RE: (5) Javier Garcia-Bengochea, MD Title IV Cuba Claims

Mr. Johnson,

I depart this position in mid-July. I will aim to get something substantive back to you before then.

Gabriel

**From:** Jerry Johnson <jjohnson@bankofthebluegrass.com>
**Sent:** Tuesday, June 05, 2018 2:03 PM
**To:** Escobar, Gabriel <EscobarG@state.gov>; Mickael Behn <mickaelbehn@gmail.com>; Home <jgb@bellsouth.net>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson <aamjohnson17@gmail.com>
**Subject:** RE: Javier Garcia-Bengochea, MD Title IV Cuba Claims

Thank you very much for the reply Gabriel, and understood.  Not to hold you to any time frame commitment in regard to your answer, but would you have an estimate as to how long your legal team might need to provide us with their analysis?

Please forgive if we sound  a bit impatient, but what Global Ports Holding and the cruise lines are doing with our Havana and Santiago Docks properties in our opinion is just blatantly wrong.

Thank you again and best regards,

Jerry

**Jerry M. Johnson**
**Senior Vice President, Director of Wealth Management**
<image005.png>
*Direct Telephone: (859) 233-8903*
*Fax: (859) 252-0304*
*215 Southland Drive, Lexington, Kentucky 40503*


**From:** Escobar, Gabriel <EscobarG@state.gov>
**Sent:** Tuesday, June 05, 2018 1:45 PM
**To:** Jerry Johnson <jjohnson@bankofthebluegrass.com>; Mickael Behn <mickaelbehn@gmail.com>; Home <jgb@bellsouth.net>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson <aamjohnson17@gmail.com>
**Subject:** RE: Javier Garcia-Bengochea, MD Title IV Cuba Claims

Mr. Johnson,

Apologies for my late response. I was out all of last week. I have passed this information and the information provided by Dr. Bengochea to our legal team. Once they have additional requests for information or a response, I will be back in touch.

Best regards,

Gabriel Escobar

**From:** Jerry Johnson <jjohnson@bankofthebluegrass.com>
**Sent:** Tuesday, June 05, 2018 10:45 AM
**To:** Escobar, Gabriel <EscobarG@state.gov>; Mickael Behn <mickaelbehn@gmail.com>; Home <jgb@bellsouth.net>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson

HDC 014366

<aamjohnson17@gmail.com>

**Subject:** RE: Javier Garcia-Bengochea, MD Title IV Cuba Claims

Good morning Gabriel. I just wanted to send a follow-up in regard to my e-mail to you of last Tuesday (listed below). Have you had an opportunity to review the listed points and our request for action in reference to Title IV?

Best regards,

Jerry

*Jerry M. Johnson*
*Senior Vice President, Director of Wealth Management*
<image004.png>
*Direct Telephone: (859) 233-8903*
*Fax: (859) 252-0304*
*215 Southland Drive, Lexington, Kentucky 40503*

**From:** Jerry Johnson
**Sent:** Tuesday, May 29, 2018 12:44 PM
**To:** Home <jgb@bellsouth.net>; escobarg@state.gov; Mickael Behn <mickaelbehn@gmail.com>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; Aaron Johnson <aamjohnson17@gmail.com>
**Subject:** RE: Javier Garcia-Bengochea, MD Title IV Cuba Claims

Dr. Garcia,
Thank you very much for forwarding the copy of your correspondence from last week with Gabriel regarding a request to him to give us a status update on the State Department's efforts in enforcing Title IV of the Cuban Liberty and Democratic Solidarity (Libertad) Act of 1996 (the Act), regarding our Title IV claims against Norwegian Cruise Lines Holdings, Carnival, PLC, an Royal Caribbean Cruises, Ltd., Viking Ocean Cruises, Pearl Seas Cruises, Victory Cruise Lines, Et al. (the cruise lines). This being the claims request (attached) that you had sent to Gabriel in your 2/22/18 correspondence.

Gabriel,
I would like to come into the conversation with you as well, if that would be ok. By way of refresher, I am the gentleman who visited with you on behalf of Havana Docks Corporation property. You will note on the picture the name of to your office on Wednesday December 20th of last year. Quite a bit has happed on the world stage since that time, including a very disturbing event regarding our Havana Docks property that was announced on Tuesday of last week through a news report at the following link (if you would kindly click on the link for a moment and review, I would appreciate): http://www.globalportsholding.com/news-details/113/awarded-agreement-for-operation-of-havana-cruise-port-cuba.

The picture of the docks that Global Ports Holding, Plc so proudly touts in their news article through the link above is our very same Havana Docks Corporation property. You will note on the picture the name of the building, "Terminal Sierra Maestra". This is the same building where Mr. William C. Behn's office was located in reference to the picture I've attached for you showing Castro's thugs when they came to steal the property from Mr. Behn in 1960 (Mr. Behn is seated at his desk. Note the gun belts on the rebels and their riffles between their legs. The gentlemen standing are officers of Havana Docks Corporation). This picture of Mr. Behn is the same picture I gave for your file to your associate who was with us in our December 20th meeting.

I've also attached for your review our Certified Claim for the property (Claim CU-2492), as certified by the Foreign Claims Settlement Commission of the United States on April 21, 1971 (copy of this document was also given to your associate at our meeting on December 20th). Further, I've attached for you a copy of our Havana Docks Corporation's Form 1120 U.S. Corporate Income Tax Return for 2016 (Tax Identification Numbers on the Form 1120 are redacted for security purposes for this e-mail transmission,

HDC 014367

however, I can supply you with those Tax ID's if you would like. Also, our 2017 filing of Form 1120 is on extension, but I will be happy to supply you with a copy of that return when completed.

The reason that I am attaching the Certified Claim and the Corporate Tax Return for your review is to show you that Havana Docks is indeed a legitimate corporation that has never ceased to be in existence, even though the core of its business assets were stolen by the Castro regime. The company had a small amount of investment assets (bank accounts, etc.) in the United States at the time the docks in Cuba were stolen, and the earnings on those U.S. investments represents the income we have reported to the IRS faithfully every year through the filing of Form 1120, like the one attached. I provide you with this proof of legitimacy in support of the requirement of the Act (Helms-Burton).

I know that you and your staff know the Act backwards and forwards, but on this legitimacy of ownership issue I would like to cite a brief section of the Act for the parties to this e-mail, with that citation found under "*Title III-Protection of Property Rights of United States Nationals, SEC. 303. Proof of Ownership of Claims to Confiscated Property*", which reads in part:

    (a) <!--[if !supportLists]--><!--[endif]-->**Evidence of Ownership.—**
    (1) <!--[if !supportLists]--><!--[endif]-->**Conclusiveness of certified claims.—In any action brought under this title, the court shall accept as conclusive proof of ownership of an interest in property a certification of a claim to ownership of that interest that has been made by the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 (22 U.S.C. 1643 and following).**

In that Havana Docks Corporation has conclusive proof of ownership and is further considered a *"United States National"*, it is my hope and belief that we are an entity that is under your protectorate, and that part of your department's role is to help entities such as ours with the enforcement of domestic and international laws, laws that might alleviate the injustice we are blatantly being further subjected to by the wholesale trafficking in our Certified Claim property by other U.S. domiciled companies (i.e. Carnival, Royal Caribbean, Norwegian, etc.), and now a Turkish company, Global Ports Holding, Plc.

On the point of aiding with the enforcement of laws, admittedly I wasn't exactly sure of what the U.S. Department of State does, so I looked at your Mission Statement on your web site. One part of that Mission Statement that caught my eye was in reference to the aims set forth in the President's National Security Strategy and its three underlying and interdependent components of diplomacy, development, and defense. The component objective regarding development was of particular interest to me, whereby your Mission Statement sets forth:

> *Third, in confronting the intersection of traditional and transnational challenges, we will combine our diplomatic skills and development assistance to act boldly to foster a more democratic and prosperous world integrated into the global economy. We will not waver in our belief that all human beings deserve lives of dignity and the opportunity to achieve their aspirations. We will promote freedom of speech, conscience, and religion, the rule of law, and economic freedom. In concert with civil society organizations, we will speak out against human rights abuses and the trafficking of human beings.*

Obviously I was focused in on the "rule of law" part above in reference to our Certified Claims for Havana Docks and the port of Santiago de Cuba on behalf of Dr. Garcia, but so many of the other poignant words in this paragraph I believe probably apply toward the State Department's goals for Cuba as whole.

In further review of the Act, another section I would like to briefly quote for our readers of this e-mail is also found under Title III, in the opening part of *"SEC.301. FINDINGS"*, which reads:

    **The Congress makes the following findings:**
    (1) <!--[if !supportLists]--><!--[endif]-->**Individuals enjoy a fundamental right to own and enjoy property which is enshrined in the United States Constitution.**
    (2) <!--[if !supportLists]--><!--[endif]-->**The wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development.**

As a final quote from the Act, I bring our readers' attention to:

HDC 014368

*TITLE IV—EXCLUSION OF CERTAIN ALIENS*
*SEC.401. EXCLUSION FROM THE UNITED STTES OF ALIENS WHO HAVE CONFISCATED PROPERTY OF UNTIED STATES NATIONALS OR WHO TRAFFIC IN SUCH PROPERTY.*
reading in part:

(a) <!--[if !supportLists]--><!--[endif]-->**Grounds for Exclusion.—The Secretary of State shall deny a visa to, and the Attorney General shall exclude from the United States, any alien who the Secretary of State determines is a person who, after the date of the enactment of this Act—**

(1) <!--[if !supportLists]--><!--[endif]-->**Has confiscated, or has directed or overseen the confiscation of, property a claim to which is owned by a United States national, or converts or has converted for personal gain confiscated property, a claim to which is owned by a United States national;**

(2) <!--[if !supportLists]--><!--[endif]-->**Traffics in confiscated property, a claim to which is owned by a United States national;**

(3) <!--[if !supportLists]--><!--[endif]-->**Is a corporate officer, principal, or shareholder with a controlling interest of an entity which has been involved in the confiscation of property or trafficking in confiscated property, a claim to which is owned by a United States national; or**

Well, enough of my rambling and back to the purpose of my writing to you Gabriel and in support of Dr. Garcia's request to you for an information status.

The purpose of my writing is basically a single question. Is the State Department going to help us by enforcement of Title IV of the Act through notification to the appropriate officers and directors of the cruise lines (Norwegian Cruise Lines Holdings, Carnival, PLC, an Royal Caribbean Cruises, Ltd., Viking Ocean Cruises, Pearl Seas Cruises, Victory Cruise Lines, Et al. ) of the pending denial of U.S. visas?

In hopes that the answer to the above question is yes, and given the events that I mentioned above that transpired last week regarding Global Ports Holding, Plc's announcement of the agreement they reached with the Cuban shell entity to manage Havana Docks for the next 15 years, we also respectively ask that Title IV action be brought against the appropriate officers and directors of Global Ports Holding, Plc. From their annual report of last year, I've attached for your review a listing of Global Port Holding, Plc's officers and directors.

I close with a couple of points. First, I thank you for reading this long plea to you for help. Second, I would ask you to note the "To" copy on this e-mail to Mr. Mickael Sosthenes Behn, President of Havana Docks Corporation and the grandson of Mr. William C. Behn, the gentleman seated at the desk in the attached photograph. Further, Mickael is the great-grandson of Sosthenes Behn, the founder of International Telephone & Telegraph.

My sincere thanks to all readers on this e-mail.

Jerry

*Jerry M. Johnson*
*Senior Vice President, Director of Wealth Management*
<image006.png>
*Direct Telephone: (859) 233-8903*
*Fax: (859) 252-0304*
*215 Southland Drive, Lexington, Kentucky 40503*

**From:** Home <jgb@bellsouth.net>
**Sent:** Tuesday, May 29, 2018 11:25 AM
**To:** Mickael Behn <mickaelbehn@gmail.com>; Jerry Johnson <jjohnson@bankofthebluegrass.com>
**Cc:** Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>; Murakami, Kevin T <MurakamiKT@state.gov>; Alpert, Rachel K <AlpertRK@state.gov>; escobarg@state.gov
**Subject:** Re: Javier Garcia-Bengochea, MD Title IV Cuba Claims

FYI.

JGB
Sent from my iPhone

On May 23, 2018, at 4:42 PM, Escobar, Gabriel <EscobarG@state.gov> wrote:

Dr. Garcia-Bengochea:

I apologize for the delay in responding to your earlier messages. I was on travel last week.

Thank you for the information you have thus far provided in response to our February 22, 2018 letter requesting additional documentation. We continue to review and assess available documentation and information related to the port, port facilities, and area surrounding the harbor of Santiago de Cuba (the Property). We have carefully evaluated the information you have provided, and have a few follow-on requests:

- Can you explain how you came to learn of and acquire the deeds/documents showing ownership in the Property? In the affidavit of Desiderio Parreno, page 4 refers to the whereabouts of "all the real estate property deeds and all of the stock certificates in the various corporations in which we owned stock." He notes that such documents were originally with his aunt, Mrs. Maria Luisa Velazquez de Salcedo, but that it was unclear where these documents were at the time of his writing the affidavit. He explains that some documents may have been sent to a Havana attorney, Dr. Fernando Figueredo, who had subsequently moved to New York City, and that some may have been left with Mr. Angel del Castillo, someone who had managed the family's real estate investments and who never left Cuba before his passing. However, in your March 29 letter you stated that "the deeds could not be removed from Cuba without jeopardizing our safety and, thus, remain there. They are hidden in a place known only to me."

- Could you provide copies of the deeds to the Property, demonstrating your ownership interests. If such documentation is unavailable, please explain why and additionally provide an affidavit attesting to the contents of the deeds as you understand them and any other information or documentation that is available regarding their contents.

Sincerely,
Gabriel

-----Original Message-----
From: Home <jgb@bellsouth.net>
Sent: Thursday, March 29, 2018 6:58 AM
To: Escobar, Gabriel <EscobarG@state.gov>
Cc: Magallon, Erica G <MagallonEG@state.gov>; Patel, Nutan B <PatelNB@state.gov>
Subject: Javier Garcia-Bengochea, MD Title IV Cuba Claims

Gabriel,

Please see the attached letter in regards to your 2/22/18 correspondence to me relating to my Title IV claims against CCCC and the cruise lines..

Thank you.

Javier

**Official**

**UNCLASSIFIED**

WARNING: This email originated outside of our organization's email system. Do not click links or open attachments unless you recognize the sender and you are expecting the message.

This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments. Investments offered by Wealth Management Division at Bank of the Bluegrass & Trust Co.: Are not FDIC Insured * Are not Bank Guaranteed * May Lose Value. Please do not transmit trading orders or instructions regarding a Bank of the Bluegrass account by e-mail. For your protection, Bank of the Bluegrass does not accept and act on such instructions. Similarly, Bank of the Bluegrass does not accept trading instructions via voicemail, text messages, instant messaging, or facsimile. Please speak directly with your Wealth Management Advisor if you need to give instructions related to your account. The information presented in this email is general in nature. It is not intended to provide, and should not be relied upon for accounting, investment, legal or tax advice. Investors should consider their individual financial circumstances and the inherent risks of investing prior to making any investment decision. This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments.

WARNING: This email originated outside of our organization's email system. Do not click links or open attachments unless you recognize the sender and you are expecting the message.

This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments. Investments offered by Wealth Management Division at Bank of the Bluegrass & Trust Co.: Are not FDIC Insured * Are not Bank Guaranteed * May Lose Value. Please do not transmit trading orders or instructions regarding a Bank of the Bluegrass account by e-mail. For your protection, Bank of the Bluegrass does not accept and act on such instructions. Similarly, Bank of the Bluegrass does not accept trading instructions via voicemail, text messages, instant messaging, or facsimile. Please speak directly with your Wealth Management Advisor if you need to give instructions related to your account. The information presented in this email is general in nature. It is not intended to provide, and should not be relied upon for accounting, investment, legal or tax advice. Investors should consider their individual financial circumstances and the inherent risks of investing prior to making any investment decision. This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments.

WARNING: This email originated outside of our organization's email system. Do not click links or open attachments unless you recognize the sender and you are expecting the message.

This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no

viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments. Investments offered by Wealth Management Division at Bank of the Bluegrass & Trust Co.: Are not FDIC Insured * Are not Bank Guaranteed * May Lose Value. Please do not transmit trading orders or instructions regarding a Bank of the Bluegrass account by e-mail. For your protection, Bank of the Bluegrass does not accept and act on such instructions. Similarly, Bank of the Bluegrass does not accept trading instructions via voicemail, text messages, instant messaging, or facsimile. Please speak directly with your Wealth Management Advisor if you need to give instructions related to your account. The information presented in this email is general in nature. It is not intended to provide, and should not be relied upon for accounting, investment, legal or tax advice. Investors should consider their individual financial circumstances and the inherent risks of investing prior to making any investment decision. This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments.

WARNING: This email originated outside of our organization's email system. Do not click links or open attachments unless you recognize the sender and you are expecting the message.

This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments. Investments offered by Wealth Management Division at Bank of the Bluegrass & Trust Co.: Are not FDIC Insured * Are not Bank Guaranteed * May Lose Value. Please do not transmit trading orders or instructions regarding a Bank of the Bluegrass account by e-mail. For your protection, Bank of the Bluegrass does not accept and act on such instructions. Similarly, Bank of the Bluegrass does not accept trading instructions via voicemail, text messages, instant messaging, or facsimile. Please speak directly with your Wealth Management Advisor if you need to give instructions related to your account. The information presented in this email is general in nature. It is not intended to provide, and should not be relied upon for accounting, investment, legal or tax advice. Investors should consider their individual financial circumstances and the inherent risks of investing prior to making any investment decision. This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments.

WARNING: This email originated outside of our organization's email system. Do not click links or open attachments unless you recognize the sender and you are expecting the message.

This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments. Investments offered by Wealth Management Division at Bank of the Bluegrass & Trust Co.: Are not FDIC Insured * Are not Bank Guaranteed * May Lose Value. Please do not transmit trading orders or instructions

HDC 014372

regarding a Bank of the Bluegrass account by e-mail. For your protection, Bank of the Bluegrass does not accept and act on such instructions. Similarly, Bank of the Bluegrass does not accept trading instructions via voicemail, text messages, instant messaging, or facsimile. Please speak directly with your Wealth Management Advisor if you need to give instructions related to your account. The information presented in this email is general in nature. It is not intended to provide, and should not be relied upon for accounting, investment, legal or tax advice. Investors should consider their individual financial circumstances and the inherent risks of investing prior to making any investment decision. This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments.

WARNING: This email originated outside of our organization's email system. Do not click links or open attachments unless you recognize the sender and you are expecting the message.

This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments. Investments offered by Wealth Management Division at Bank of the Bluegrass & Trust Co.: Are not FDIC Insured * Are not Bank Guaranteed * May Lose Value. Please do not transmit trading orders or instructions regarding a Bank of the Bluegrass account by e-mail. For your protection, Bank of the Bluegrass does not accept and act on such instructions. Similarly, Bank of the Bluegrass does not accept trading instructions via voicemail, text messages, instant messaging, or facsimile. Please speak directly with your Wealth Management Advisor if you need to give instructions related to your account. The information presented in this email is general in nature. It is not intended to provide, and should not be relied upon for accounting, investment, legal or tax advice. Investors should consider their individual financial circumstances and the inherent risks of investing prior to making any investment decision. This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of Bank of the Bluegrass. Warning: Although precautions have been taken to make sure no viruses are present in this email, Bank of the Bluegrass cannot accept responsibility for any loss or damage that arise from the use of this email or attachments.

HDC 014373

Good morning and thank you, Chairman DeSantis, for holding this timely and critical review examining many of the lamentable and preventable consequences resulting from the last three years of what has been wrongly termed as "engagement" of Cuba. It is fair and prudent to assess at this point the "progress" for Cuba promised to the American people such engagement would foster.

I am particularly grateful for the opportunity to testify as the owner of the port of Santiago de Cuba and representing the owners of the Havana Docks Corporation, the principal port in Havana.

As you are aware, the embargo of Cuba began and has existed for the primary purpose of protecting property. Foreign entities and more recently US cruise ships have been trafficking in our stolen property without our consent or consideration to us. Incredibly, because of the malfeasance of the last Administration, for a second time we are the victims in another sorry chapter of American and Cuban history. This must be rectified.

I'm going to follow up my previous testimony in June of 2015, which predicted the criminal behavior and consequences we confront today, and discuss the sole object for which our human rights exist: protecting our self interests; protecting our property.

I will let the other supremely qualified witnesses attest to and discuss the many predictable failures and other crimes that occur inherently when capitulating with what, if we are intellectually honest, can only be termed as Cuba's white male military dictatorship.

I will not touch on the property rights we normally refer to as human rights- our inalienable right to the property of self and the property of conscience; that is, free speech, association, religion and self-determination, including our health and educational needs.

Instead I will focus on the fundamental right to real property, the critical social and economic importance of property rights and how these were and continue to be raped in Cuba going back decades and accelerated since December 17, 2014.

It should be clear and necessitate the absolute minimum of critical thinking, and certainly not a congressional hearing, that unprincipled engagement with a dictatorship and a society devoid of these rights even ostensibly to promote desired political change is foolish. A dictatorship, one now validated by the world's greatest superpower, will adapt, strengthen, choose its partners and flourish. Yet, it will remain a dictatorship. China is the perfect example.

Like millions of Americans who owned property in Cuba, as a result of the actions by the Obama Administration that has resulted in trafficking by Americans in our stolen properties, we have been completely disenfranchised a second time by our government with respect to our claims.

The Castro Dictatorship still owes us, the port owners, many hundreds of millions if not more than a trillion dollars over six decades. The Cuban dictatorship has used and benefited from our properties over this period without any compensation or consideration to us.

Foreign entities have similarly trafficked in our stolen properties for decades. Judicial custom- not law- has prevented us from seeking redress in US courts. Such parochial legal traditions are woefully out of step with economic globalization and borderless, modern day connectivity. Certainly, if foreign terrorists who harm Americans or their properties abroad can be tried in US courts as has been determined, so can foreign traffickers in stolen property.

**Exhibit 0021**

Jerry Johnson

Claimants, however, do have some recourse in US law against such foreigners. The Cuban Liberty and Solidarity Act of 1996, the Helms-Burton Act, requires- I repeat, requires- in Title IV that if the Secretary of State determines there is trafficking by a foreign entity in the confiscated property of an American in Cuba, then he shall- he must- revoke the visas of those people and their families.

In June of 2015 I testified that a Chinese company, China Harbor Engineering Company (CHEC), a subsidiary of China Communications Construction Company (CCCC), has been trafficking in my port property.

I submitted a detailed account of CCCC's activity to the State Department with evidence and a request that State issue a letter to CCCC notifying them that unless they could prove otherwise or negotiate a settlement with me, US law required that the visas of their executives and their families be revoked. Unfortunately, Mark Wells, head of the Cuba desk, refused to act and serially lied to me and my proxies that work was being done on my behalf when, in fact, nothing had been done. This cost me approximately $100,000 in advocacy fees.

Hopeful that Secretary of State Kerry might intervene if he knew the facts and his obligations under the law and that perhaps pressure from inside the Obama White House, specifically from Ben Rhodes, Obama's Rasputin on all things Cuba and Iran, may have prohibited any action from Wells, I hired close friends of Sec. Kerry's to make him aware of my predicament and act on my behalf.

Sec. Kerry was initially very receptive and understood his obligations under the law. However, he requested we go through the proper channels- State Department lawyers and career bureaucrats- again prior to his intervening. This produced more obstruction. The lawyers at State were intransigent the Chinese were not trafficking, despite the overwhelming evidence and their public pronouncements, prompting me to ask incredulously, "who's side are you on?"

We returned to Sec Kerry in December of 2016 who tentatively agreed to sign a letter notifying CCCC that State was "investigating" trafficking and that visas may be revoked. Clearly, the Chinese would respond either by proving their innocence or negotiating a settlement with me.

However, on Friday morning, January 20, 2017, before the Trump inauguration as a last act Sec. Kerry informed us he would not sign the letter on the advice of the lawyers for reasons of "policy". The law does not allow for policy considerations. Sec. Kerry violated his oath to enforce the laws of the United States. He should have returned his silver stars that day. This cost anther $100,000.

Who is CCCC? They are one of the largest construction companies in the world and the world's largest dredging company. In 2011 they were barred by the World Bank from projects receiving World Bank funds due to graft and corruption. More recently, they built the hotly disputed South China Sea Islands for the Chinese military. They've built huge satellite dishes in Patagonia and Cuba, ostensibly for the Chinese space program.

They are, indeed, bad guys; and they're coming to the US. In the same December as Obama's announcement they purchased a city block off Brickell here in Miami with plans to build a greater than $1 billion vertical Chinatown exclusively for Chinese nationals. They've also resuscitated a moribund Frank Gehry project in Los Angeles with a $300 million investment. What's at best capital flight from China is more likely money laundering and organized crime.

Regardless, bureaucrats at the State Department allow them to violate my property rights and laws that protect me regarding my property confiscated in Cuba, while allowing the Chinese to protect assets and take advantage of our rule of law that protects property ownership in general.

In my previous testimony of 2015 I also warned that because the claims have been ignored and almost everything in Cuba is stolen, virtually every American enterprise in Cuba will result in trafficking in the stolen property of many Americans. This is true for hotels, renting rooms through AirBnB, sipping mojitos made with stolen rum brands and smoking stolen cigar brands.

Ironically, it has been and continues to be our port properties that have been the most egregious and public example of this trafficking and violations of US law.

In the spring of 2015 the US cruise lines, most notably Carnival, Royal Caribbean and Norwegian, received licenses from the Treasury to cruise Cuba. It was a testament to the irrationality of the Obama initiative. Tourism to Cuba is patently illegal. The standard for approved travel is a requirement for "people to people" contact.

A cruise is the antithesis of people to people travel. The overwhelming majority of the time passengers are cradled in the luxurious confines of the ship, insulated from the blight and deprivations Cubans suffer, where they eat the majority of their meals, spend their nights comfortably and do onboard activities. Cubans are not allowed on the ship. The passengers rarely interact with ordinary Cubans.

Actually, it is illegal in Cuba for Cubans- including Cuban Americans- to board a ship or enter or leave Cuba by boat. It is illegal for a Cuban to even own a boat. During the months Carnival was negotiating with the dictatorship over the terms of their partnership, they were aware of this Cuban law. Carnival denying passage to Cuban-Americans on a Cuba cruise violated the 1964 Civil Rights Act by discriminating based on country of birth.

Carnival didn't care about the law and did the deal. The money was too great. It is astonishing they lacked the insight that they couldn't actually get away with such behavior. They were repentant only once they were discovered, shamed and sued. It was all greed. It was disgraceful.

This appears to be the ethos of the cruise lines. They were immediately notified of my claim in 2015 and my intent to prosecute them to the full extent of the law for any unauthorized use of my property. They were already aware of the Havana Docks' claim, having tried to buy their claim in the nineties. Again, they didn't care.

Irrespective of the immorality of partnering with the Cuban dictatorship that has murdered tens of thousands of its citizens, exiled more than 20% of its population, disenfranchised tens of millions more and has institutionalized slavery through its two currency system, American corporations who operate in Cuba must do so lawfully.

Yes, they can legally cruise Cuba. However, they cannot do so in violation of US trafficking laws. The only exception to trafficking in the law the cruise lines could reasonably claim that would exempt them from the definition of trafficking is in 401(b)(2)(B)(iii), that use of the property is "necessary" for the purpose of the travel.

This is patently false. It is well known that cruise lines often drop anchor rather than dock at a port and ferry passengers to shore using smaller boats. Shortly after the licenses were issued, the CEO of Norwegian Cruise Lines, a Cuban-American named Frank Del Río, boasted to cNBC's Michelle Cabrera-Caruso during an interview at a Wharton Business School conference specifically devoted to doing business in Cuba, in a segment specifically on cruising Cuba, that a port "was nice, but not necessary" to cruise Cuba. He openly scoffed at and ridiculed the notion of the necessity of docking at a port.

If anyone doubts Mr. Del Río's credibility as an expert, Norwegian paid him $32 million in the year he made that statement.  He's the expert.

On 3 separate occasions when I presented these facts to State Department officials and requested a Title IV action against the foreign executives and directors of the cruise lines, State officials determined without any investigation that it was necessary for the cruise lines to use our properties to cruise Cuba. This occurred even after showing them the video of Norwegian's CEO specifically and unequivocally refuting that assertion.

Recently, the US Cuba Trade Council estimated that in the 3 years beginning in 2017 the cruise lines will receive more than $761 million in gross revenues from ticket sales to Cuba.  Passengers will spend more than $80 million in revenue to Cuban State run enterprises.  The cruise lines will pay more than $21 million in port fees to the Cuban military, the dictatorship, for the use of our properties.

Keep in mind that the 3 largest cruise lines, Carnival, Norwegian and Royal Caribbean, all Miami based, grossed almost $29 billion in 2016.  Will their political power through hefty lobbying corrupt our politicians and protect them?  The safe bet is that, like in the novel Animal Farm, some animals are more equal than others; so, yes.

That is certainly the bet of the cruise lines.  They claim to be fully in compliance with the law, which is clearly wrong as demonstrated above.  They also interpret the waiver of Title III of Helms-Burton, which defines the civil damages for trafficking and allows for civil lawsuits in Federal court to recover these damages, as immunity.  Wrong again.

Title III in the law has two components.  The first is the cause of action- the actual definition and enactment of the trafficking provision.  The other is the right to action, the ability to sue a trafficker.

The law allows the President to waive both components for 6 months initially and then every 6 months, thereafter.  Each President since 1996 has waived the right to action every 6 months.  The initial intent was to encourage the cessation of trafficking and thereafter to appease other countries already in Cuba who complained of the territorial overreach of Title III: allowing an American to sue a foreigner in a US court for a crime committed in Cuba.

However, President Bill Clinton did not suspend and enacted the cause of action in Title III to go into effect as per Section 306(a) on August 1, 1996 and that liability for trafficking would begin on November 1, 1996.

That is, as his Deputy National Security Advisor Sandy Berger clarified during a White House press briefing on July 16, 1996 explaining the President's actions, "liability for those who traffic in or profit from confiscated property in Cuba will arise on November 1st as provided under the law that liability is not extinguishable".  He reiterated throughout the session that, "during this period liability will continue to accrue, the meter will be ticking" and that the President "cannot simply then say the liability no longer accrues".

Moreover, Berger asserted something that has been overlooked in the Helms-Burton debate, that the President has the authority to "make a judgment about whether that suspension continues in whole or in part. He could continue that suspension with respect to all suits, he could continue that suspension with respect to certain countries or certain companies."

After Obama's Cuba opening, the argument of territorial overreach doesn't apply to American entities. Why should the cruise lines or any American be allowed to traffic in the stolen property claimed by another American in Cuba in violation of US law?

How is this violation any different from the cruise lines violation of the Civil Rights Act?  It is not. President Trump should no longer waive Title III for the cruise lines or any American entity.

The failure of the United States Government to follow and enforce the law regarding confiscated property in Cuba is a reflection of 2 broader problems.

First is the failure to recognize that fundamentally Cuba has a property rights problem.  The human rights abuses and violations for which the dictatorship is infamous are simply the measures necessary to defend the unjustifiable, the theft of all property in Cuba.

How, then, will trafficking in stolen property by American companies bring democracy as some argue?  How will capitalism work, much less be transformative, without clear title or property rights?  How can there be credit?

Or the legal transfer of goods and services? In Cuba there is no contract sanctity, no independent judiciary or transparent enforcement and regulatory agencies.  Americans cannot hire Cubans independently, who are not legal entities and have no property rights.

Such ventures are only viable while the dictatorship remains.  A democratic government will almost certainly restore clear title and traffickers will likely be prosecuted.  We will certainly prosecute traffickers and it is unlikely that we will ever permit the major cruise lines to use our properties in a free and democratic Cuba.

American corporations will, therefore, not want regime change.  The dictatorship eliminates or restricts any competition for them. Like with Tiananmen Square, when Cubans begin to demand political freedoms with economic liberalization, these companies will be silent and absent as violent repression ensues. They are partners with the dictatorship.  They will not bite the hand that feeds them. Investment seeks certainty.

The Chinese and the cruise lines are indisputably trafficking in our stolen properties in Cuba.  They must receive Title IV notifications.  If they are innocent, they have ample resources to defend themselves. Moreover, if they are not trafficking there should be no worry for them.

Until then, there is absolutely no justification to provide political and legal cover to shield these Americans from the consequences of trafficking in the stolen property in Cuba claimed by another American.  This would never happen if the property was anywhere, but Cuba.

The second and more serious problem is the culture of entitlement and lack of accountability that has developed amongst the elites and within the bureaucracy of our government.  They abandon their sworn obligations to uphold and enforce the law when there is a conflict with their personal feelings and opinions concerning a matter.

This could not be more evident in my treatment by the State Department, which has been exactly what the American public has witnessed recently by the various Justice Department and FBI officials in the Russia collusion investigation.  This is a cancer in our democracy and to our freedom.

HDC 001502

Among the many things that makes America great is our system of equal protection under the law. These rogue officials have confiscated those protections guaranteed to us by law and made them political decisions. This erodes our freedoms.

In summary, the fact remains that everything in Cuba is stolen and, as predicted, every American venture there will likely result in stolen property. Property theft and risks from trafficking have been marginalized as "market conditions", rather than crimes. Because there is no precedent for indemnification to claimants who've lost property there and our leaders have done little to protect property by enforcing the law, confiscation by the dictatorship will continue.

How our claims are handled is, ironically, more important to the burgeoning Cuban "entrepreneurs" so many falsely claim to help. They've invested what little they have, yet risk capricious and arbitrary confiscation. They, in effect, own nothing. We are that precedent that underwrites them. If a primary goal of US policy towards Cuba is to empower Cubans, prove this by demonstrating and not simply talking about protecting property.

I will end how The President began on June 16, 2017 here in Miami by explaining his Cuba policy with the obvious change that needs to occur: "we will enforce existing law".

Not doing so has been the constant since 1996 and would be the logical explanation for what some claim that sanctions against Cuba are failed. The waiver of the right to action and the failure to enforce Title IV surely meets the oft-quoted definition of insanity, doing the same thing over and over again and expecting different results.

Instead, what has evolved is policy towards Cuba that is little more than politically sanctioned and protected organized crime.

HDC 001503

(28) For the past 36 years, the Cuban Government has posed and continues to pose a national security threat to the United States.

(Pub. L. 104–114, § 2, Mar. 12, 1996, 110 Stat. 786.)

REFERENCES IN TEXT

The Cuban Democracy Act of 1992, referred to in par. (11), is title XVII of div. A of Pub. L. 102–484, Oct. 23, 1992, 106 Stat. 2575, which is classified principally to chapter 69 (§ 6001 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6001 of this title and Tables.

The Foreign Assistance Act of 1961, referred to in par. (12), is Pub. L. 87–195, Sept. 4, 1961, 75 Stat. 424, as amended, which is classified principally to chapter 32 (§ 2151 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2151 of this title and Tables.

The FREEDOM Support Act, referred to in par. (12), is Pub. L. 102–511, Oct. 24, 1992, 106 Stat. 3320, as amended, also known as the Freedom for Russia and Emerging Eurasian Democracies and Open Markets Support Act of 1992. For complete classification of this Act to the Code, see Short Title note set out under section 5801 of this title and Tables.

SHORT TITLE

Section 1(a) of Pub. L. 104–114 provided that: "This Act [enacting this chapter and sections 1643*l* and 1643m of this title, amending sections 2295a, 2295b, 2370, 6003, and 6004 of this title, section 1611 of Title 28, Judiciary and Judicial Procedure, and section 16 of Title 50, Appendix, War and National Defense, repealing sections 1465 to 1465f, 1465aa to 1465ff, 6003, and 6005 of this title, amending provisions set out as a note under section 1446g of Title 7, Agriculture, and repealing provisions set out as notes under sections 1465, 1465c, and 1465aa of this title] may be cited as the 'Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996'."

### § 6022. Purposes

The purposes of this chapter are—

(1) to assist the Cuban people in regaining their freedom and prosperity, as well as in joining the community of democratic countries that are flourishing in the Western Hemisphere;

(2) to strengthen international sanctions against the Castro government;

(3) to provide for the continued national security of the United States in the face of continuing threats from the Castro government of terrorism, theft of property from United States nationals by the Castro government, and the political manipulation by the Castro government of the desire of Cubans to escape that results in mass migration to the United States;

(4) to encourage the holding of free and fair democratic elections in Cuba, conducted under the supervision of internationally recognized observers;

(5) to provide a policy framework for United States support to the Cuban people in response to the formation of a transition government or a democratically elected government in Cuba; and

(6) to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime.

(Pub. L. 104–114, § 3, Mar. 12, 1996, 110 Stat. 788.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 104–114, Mar. 12, 1996, 110

Stat. 785, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 6021 of this title and Tables.

### § 6023. Definitions

As used in this chapter, the following terms have the following meanings:

**(1) Agency or instrumentality of a foreign state**

The term "agency or instrumentality of a foreign state" has the meaning given that term in section 1603(b) of title 28.

**(2) Appropriate congressional committees**

The term "appropriate congressional committees" means the Committee on International Relations and the Committee on Appropriations of the House of Representatives and the Committee on Foreign Relations and the Committee on Appropriations of the Senate.

**(3) Commercial activity**

The term "commercial activity" has the meaning given that term in section 1603(d) of title 28.

**(4) Confiscated**

As used in subchapters I and III of this chapter, the term "confiscated" refers to—

(A) the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959—

(i) without the property having been returned or adequate and effective compensation provided; or

(ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure; and

(B) the repudiation by the Cuban Government of, the default by the Cuban Government on, or the failure of the Cuban Government to pay, on or after January 1, 1959—

(i) a debt of any enterprise which has been nationalized, expropriated, or otherwise taken by the Cuban Government;

(ii) a debt which is a charge on property nationalized, expropriated, or otherwise taken by the Cuban Government; or

(iii) a debt which was incurred by the Cuban Government in satisfaction or settlement of a confiscated property claim.

**(5) Cuban Government**

(A) The term "Cuban Government" includes the government of any political subdivision of Cuba, and any agency or instrumentality of the Government of Cuba.

(B) For purposes of subparagraph (A), the term "agency or instrumentality of the Government of Cuba" means an agency or instrumentality of a foreign state as defined in section 1603(b) of title 28, with each reference in such section to "a foreign state" deemed to be a reference to "Cuba".

**(6) Democratically elected government in Cuba**

The term "democratically elected government in Cuba" means a government deter-

Exhibit 0022

Jerry Johnson

mined by the President to have met the requirements of section 6066 of this title.

**(7) Economic embargo of Cuba**

The term "economic embargo of Cuba" refers to—

(A) the economic embargo (including all restrictions on trade or transactions with, and travel to or from, Cuba, and all restrictions on transactions in property in which Cuba or nationals of Cuba have an interest) that was imposed against Cuba pursuant to section 2370(a) of this title, section 5(b) of title 50, Appendix, the Cuban Democracy Act of 1992 (22 U.S.C. 6001 and following), or any other provision of law; and

(B) the restrictions imposed by section 902(c) of the Food Security Act of 1985.

**(8) Foreign national**

The term "foreign national" means—

(A) an alien; or

(B) any corporation, trust, partnership, or other juridical entity not organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States.

**(9) Knowingly**

The term "knowingly" means with knowledge or having reason to know.

**(10) Official of the Cuban Government or the ruling political party in Cuba**

The term "official of the Cuban Government or the ruling political party in Cuba" refers to any member of the Council of Ministers, Council of State, central committee of the Communist Party of Cuba, or the Politburo of Cuba, or their equivalents.

**(11) Person**

The term "person" means any person or entity, including any agency or instrumentality of a foreign state.

**(12) Property**

(A) The term "property" means any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest.

(B) For purposes of subchapter III of this chapter, the term "property" does not include real property used for residential purposes unless, as of March 12, 1996—

(i) the claim to the property is held by a United States national and the claim has been certified under title V of the International Claims Settlement Act of 1949 [22 U.S.C. 1643 et seq.]; or

(ii) the property is occupied by an official of the Cuban Government or the ruling political party in Cuba.

**(13) Traffics**

(A) As used in subchapter III of this chapter, and except as provided in subparagraph (B), a person "traffics" in confiscated property if that person knowingly and intentionally—

(i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization of any United States national who holds a claim to the property.

(B) The term "traffics" does not include—

(i) the delivery of international telecommunication signals to Cuba;

(ii) the trading or holding of securities publicly traded or held, unless the trading is with or by a person determined by the Secretary of the Treasury to be a specially designated national;

(iii) transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel; or

(iv) transactions and uses of property by a person who is both a citizen of Cuba and a resident of Cuba, and who is not an official of the Cuban Government or the ruling political party in Cuba.

**(14) Transition government in Cuba**

The term "transition government in Cuba" means a government that the President determines is a transition government consistent with the requirements and factors set forth in section 6065 of this title.

**(15) United States national**

The term "United States national" means—

(A) any United States citizen; or

(B) any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States.

(Pub. L. 104–114, §4, Mar. 12, 1996, 110 Stat. 789.)

REFERENCES IN TEXT

Subchapters I and III of this chapter, referred to in pars. (4), (12)(B), and (13)(A), were in the original references to titles I and III, meaning titles I and III of Pub. L. 104–114, Mar. 12, 1996, 110 Stat. 791, 814. Title I of Pub. L. 104–114 enacted subchapter I (§6031 et seq.) of this chapter, amended sections 2295a, 2295b, 6003, and 6004 of this title and section 16 of Title 50, Appendix, War and National Defense, and repealed subchapters V–A (§1465 et seq.) and V–B (§1465aa et seq.) of chapter 18 of this title. Title III of Pub. L. 104–114 enacted subchapter III (§6081 et seq.) of this chapter and sections 1643l and 1643m of this title and amended section 1611 of Title 28, Judiciary and Judicial Procedure. For complete classification of titles I and III to the Code, see Tables.

The Cuban Democracy Act of 1992, referred to in par. (7)(A), is title XVII of div. A of Pub. L. 102–484, Oct. 23, 1992, 106 Stat. 2575, which is classified principally to

chapter 69 (§ 6001 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6001 of this title and Tables.

Section 902(c) of the Food Security Act of 1985, referred to in par. (7)(B), is section 902(c) of Pub. L. 99–198, title IX, Dec. 23, 1985, 99 Stat. 1443, which was set out as a note under former section 1446g of Title 7, Agriculture.

The International Claims Settlement Act of 1949, referred to in par. (12)(B)(i), is act Mar. 10, 1950, ch. 54, 64 Stat. 12, as amended. Title V of the Act is classified generally to subchapter V (§ 1643 et seq.) of chapter 21 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1621 of this title and Tables.

### CHANGE OF NAME

Committee on International Relations of House of Representatives changed to Committee on Foreign Affairs of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007.

### § 6024. Severability

If any provision of this chapter or the amendments made by this chapter or the application thereof to any person or circumstance is held invalid, the remainder of this chapter, the amendments made by this chapter, or the application thereof to other persons not similarly situated or to other circumstances shall not be affected by such invalidation.

(Pub. L. 104–114, § 5, Mar. 12, 1996, 110 Stat. 791.)

SUBCHAPTER I—STRENGTHENING INTERNATIONAL SANCTIONS AGAINST THE CASTRO GOVERNMENT

### § 6031. Statement of policy

It is the sense of the Congress that—

(1) the acts of the Castro government, including its massive, systematic, and extraordinary violations of human rights, are a threat to international peace;

(2) the President should advocate, and should instruct the United States Permanent Representative to the United Nations to propose and seek within the Security Council, a mandatory international embargo against the totalitarian Cuban Government pursuant to chapter VII of the Charter of the United Nations, employing efforts similar to consultations conducted by United States representatives with respect to Haiti;

(3) any resumption of efforts by any independent state of the former Soviet Union to make operational any nuclear facilities in Cuba, and any continuation of intelligence activities by such a state from Cuba that are targeted at the United States and its citizens will have a detrimental impact on United States assistance to such state; and

(4) in view of the threat to the national security posed by the operation of any nuclear facility, and the Castro government's continuing blackmail to unleash another wave of Cuban refugees fleeing from Castro's oppression, most of whom find their way to United States shores, further depleting limited humanitarian and other resources of the United States, the President should do all in his power to make it clear to the Cuban Government that—

(A) the completion and operation of any nuclear power facility, or

(B) any further political manipulation of the desire of Cubans to escape that results in mass migration to the United States,

will be considered an act of aggression which will be met with an appropriate response in order to maintain the security of the national borders of the United States and the health and safety of the American people.

(Pub. L. 104–114, title I, § 101, Mar. 12, 1996, 110 Stat. 791.)

### § 6032. Enforcement of economic embargo of Cuba

**(a) Policy**

**(1) Restrictions by other countries**

The Congress hereby reaffirms section 1704(a) of the Cuban Democracy Act of 1992 [22 U.S.C. 6003(a)], which states that the President should encourage foreign countries to restrict trade and credit relations with Cuba in a manner consistent with the purposes of that Act [22 U.S.C. 6001 et seq.].

**(2) Sanctions on other countries**

The Congress further urges the President to take immediate steps to apply the sanctions described in section 1704(b)(1) of that Act [22 U.S.C. 6003(b)(1)] against countries assisting Cuba.

**(b) Diplomatic efforts**

The Secretary of State should ensure that United States diplomatic personnel abroad understand and, in their contacts with foreign officials, are communicating the reasons for the United States economic embargo of Cuba, and are urging foreign governments to cooperate more effectively with the embargo.

**(c) Existing regulations**

The President shall instruct the Secretary of the Treasury and the Attorney General to enforce fully the Cuban Assets Control Regulations set forth in part 515 of title 31, Code of Federal Regulations.

**(d) Omitted**

**(e) Denial of visas to certain Cuban nationals**

It is the sense of the Congress that the President should instruct the Secretary of State and the Attorney General to enforce fully existing regulations to deny visas to Cuban nationals considered by the Secretary of State to be officers or employees of the Cuban Government or of the Communist Party of Cuba.

**(f), (g) Omitted**

**(h) Codification of economic embargo**

The economic embargo of Cuba, as in effect on March 1, 1996, including all restrictions under part 515 of title 31, Code of Federal Regulations, shall be in effect on March 12, 1996, and shall remain in effect, subject to section 6064 of this title.

(Pub. L. 104–114, title I, § 102, Mar. 12, 1996, 110 Stat. 792.)

### REFERENCES IN TEXT

The Cuban Democracy Act of 1992, referred to in subsec. (a), is title XVII of div. A of Pub. L. 102–484, Oct.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

HAVANA DOCKS CORPORATION,

No. 19-cv-23590-BLOOM/LOUIS

Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES, LTD.

Defendant.

_____/

### HAVANA DOCKS CORPORATION'S ANSWERS AND OBJECTIONS TO
### ROYAL CARIBBEAN CRUISES, LTD. FIRST SET OF INTERROGATORIES

Plaintiff, Havana Docks Corporation ("HDC" or ("Plaintiff") by and through undersigned counsel, and pursuant to the Federal Rules of Civil Procedure 26 and 33 and Local Rule 26.1, serves its Answers and Objections to Royal Caribbean Cruises Ltd., First Set of Interrogatories dated October 23, 2019.

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

A.        Plaintiff objects to Definition B (You), as well as accompanying Definition F (Person), as ambiguous and overly broad to the extent that they refer to unnamed, unspecified, agents, representatives, affiliates, or other persons acting, or purporting to act, on behalf of HDC and undefined entities and persons, including "any individual, corporation, proprietorship, partnership, trust, association, or any other entity" and to the extent that they purport to include within the scope of the requests entities or persons other than itself and requires Plaintiff to answer on behalf of entities and persons other than itself.  These answers are on behalf of Plaintiff only, and Plaintiff

**Exhibit 0023**

Jerry Johnson

will interpret "you" or "your" to mean Plaintiff only.

B.      Plaintiff objects to Instructions 1 and 3 as they impose obligations beyond or different from those imposed or required by the Federal Rules of Civil Procedure, the Local Rules of the Southern District of Florida, and applicable case law, including requiring that Plaintiff provide a privilege log "on or before the due date of the answers to the interrogatories herein" and requiring the identification of additional information about each withheld document under a claimed privilege, the disclosure of which would itself constitute a waiver of any privilege claimed.

## INTERROGATORIES

1.      If you contend that your concession relating to the Subject Property did not expire in 2004, state the basis of and substantiate that contention.

**Response**:

The Plaintiff owns Claim No. CU-2492. The properties that are described in Claim No. CU-24992 ("Subject Property") were confiscated on October 24, 1960 by the Communist Cuban Government. Plaintiff refers Defendant to the Proposed Decision and Final Decision issued by the Foreign Claims Settlement Commission on Claim Number 2492, as well as Resolution No. 3 published on October 24, 1960 in the Gaceta Oficial. The Defendant trafficked in the properties that were confiscated in 1960. The Plaintiff still owns Claim No. CU-2492, which has never expired.

2.      If you contend that you have standing to assert, or otherwise own a claim permitting you to assert a cause of action under the LIBERTAD Act arising from the use of the Subject Property after the concession to the Subject Property expired, state

2

the basis of and substantiate that contention.

**Response**:

See the Answer to Interrogatory No. 1. Plaintiff's ownership of Claim No. CU-2492 gives it standing pursuant to the LIBERTAD Act. *Havana Docks Corp. v. Carnival Corp.*, 19-cv-21724, D.E. 47 at p. 8 (S.D. Fla. Aug. 28, 2019); 22 U.S.C. § 6082(a).

3.    Identify every communication between you and anyone else (other than communications in which you sought or received legal advice from an attorney) relating to the expiration of the concession for the Subject Property.

**Response**:

Plaintiff objects to this Interrogatory as vague, undefined, and overly broad in scope and time, as it seeks information that is unlimited in time. Plaintiff was incorporated in 1917. Plaintiff also objects to this Interrogatory as it seeks information that is neither relevant to any party's claims or defenses nor proportional to the needs of the case. Plaintiff owns a claim to the Subject Property, which was confiscated in 1960.

4.    Identify all written notices relating to the Subject Property that you have provided to anyone else pursuant to 22 U.S.C. §6082(a)(3)(B).

**Response**:

A.    Carnival Corporation, PLC c/o Arnaldo Perez, sent via certified mail on February 11, 2019.

B.    China Communications Construction Company c/o Stephen Peng, sent via certified mail on February 11, 2019.

C.    Carnival Corporation, PLC c/o Micky Arison, sent via certified mail on February 11, 2019.

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

D.  Noble Caledonia c/o Andrew Cochrane, sent via certified mail on February 11, 2019.

E.  MSC c/o Gianni Onorato, sent via certified mail on February 11, 2019.

F.  Pearl Mist c/o Charles Robertson, sent via certified mail on February 11, 2019.

G.  Victory Cruises Lines c/o Bruce Nierenberg, sent via certified mail on February 11, 2019.

H.  SeaDream Yacht Club c/o Atle Brynstad, sent via certified mail on February 11, 2019.

I.  Viking Ocean Cruises c/o Torsten Hagen, sent via certified mail on February 11, 2019.

J.  Oceana c/o Robert J. Binder, sent via certified mail on February 11, 2019.

K.  Regent Seven Seas Cruises c/o Jason M. Montague, sent via certified mail on February 11, 2019.

L.  Azamara c/o Richard D. Fain, sent via certified mail on February 11, 2019.

M.  Royal Caribbean Cruise Lines c/o Bradley H. Stein, sent via certified mail on February 11, 2019.

N.  Seaborne Cruise Line c/o Stein Kruse, sent via certified mail on February 11, 2019.

O.  Holland America c/o Stein Kruse, sent via certified mail on February 11, 2019.

P.  Celestyal Cruises c/o Kyriakos Anastassiadis, sent via certified mail on February 11, 2019.

Q.  Pearl Seas Cruises c/o Charles Robertson, sent via certified mail on February 11, 2019.

R.  Royal Caribbean International c/o Bradley H. Stein, sent via certified mail on February 11, 2019.

S.  Fred Olsen Cruise Lines, Ltd., sent via certified mail on February 11, 2019.

T.  Norwegian Cruise Line Holdings, Ltd. c/o Frank Del Rio, sent via certified mail on February 11, 2019.

U.  Global Ports Holding c/o Emre Sayin, sent via certified mail on May 31, 2018.

5.  If you contend that Royal Caribbean's transactions relating to the use of the Subject Property or Royal Caribbean's use of the Subject Property, as alleged in paragraphs 13 through 16 of the Complaint, were/was not incident to lawful travel to Cuba, state the basis and substantiate the contention.

**Response**:

Plaintiff disputes Defendant's contention that Defendant's use of the Subject Property was incident to lawful travel to Cuba.

Discovery is ongoing. Pursuant to Rule 33(a)(2), Plaintiff will supplement this answer as additional information is made known during the discovery process, to the extent it may do so without waiving the privileges protected by the attorney-client privilege and work product doctrine.

6.      If you contend that Royal Caribbean's transactions relating to the use of the Subject Property or Royal Caribbean's use of the Subject Property, as alleged in paragraphs 13 through 16 of the Complaint, were/was not necessary to lawful travel to Cuba, state the basis and substantiate the contention.

 **Response:**

Plaintiff disputes Defendant's contention that Defendant's use of the Subject Property was not necessary to lawful travel to Cuba.  Defendant's ships could have anchored off shore or used other property besides the Subject Property.

Discovery is ongoing. Pursuant to Rule 33(a)(2), Plaintiff will supplement this answer as additional information is made known during the discovery process, to the extent it may do so without waiving the privileges protected by the attorney-client privilege and work product doctrine.

7.      With respect to the amounts referred to in paragraphs 20(a)(i)-(iii) of the Complaint, quantify each amount and explain how you calculate each amount, including an identification of the documents you used to support the quantification and

explanation.

**Response:**

Plaintiff is entitled to all money damages allowable under the LIBERTAD Act. Damages are calculated pursuant to the formula set forth at 22 U.S.C. § 6082. The amounts referred in paragraphs 20(a)(i)-(iii) of the Complaint are the money damages allowable under 22 U.S.C. § 6082(a)(1)(A)(i), which is three times the amount which is the greater of the amounts set forth in 22 U.S.C. § 6082 (a)(1)(A)(i)(I)-(III) plus court costs and reasonable attorney's fees.

The amount referred in paragraph 20(a)(i) is the amount set forth in 22 U.S.C. § 6082(a)(1)(A)(i)(I), and is derived from the amount certified by the Foreign Claims Settlement Commission, plus interest. That amount is calculated as follows:

### Number of Years Elapsed Between the Confiscation of the Property and the Filing of the Complaint:

| | |
|---|---|
| Date of the Confiscation | 10/24/1960 |
| Date of the Filing of the Complaint | 8/27/2019 |
| Total Years Elapsed | 58.88 |

### Calculation Based on 22 U.S.C. §6082 (a)(1)(A)(i)(I)

| | |
|---|---|
| Present Value of the Claim on 10/24/1960 | $9,179,701 |
| Total Years Elapsed | 58.88 |
| Interest Rate | 5.08% |
| Payments Received Over the 58.88 Year Period | 0 |
| Amount | $169,792,350 |

| | |
|---|---|
| Damages = 3 x Amount per 22 U.S.C. §6082 (a)(1)(A)(i)(I) | $509,377,050 |

The value of the claim on October 24, 1960 is the value of the Subject Property ($9,179,701) as determined by the Foreign Claims Settlement Commission of the

United States in Claim No. CU-CU-2492. The rates are available on the website of the Federal Reserve Bank of St. Louis ("The Fed"), https://fred.stlouisfed.org/series/GS1. The Fed provides the data of the weekly average of the 1-year constant maturity Treasury yield from the present going back to January 5, 1962 and the monthly average from the present going back to April 1, 1953.  From the date of the confiscation of the property, on October 24, 1960, to the date of filing the action, on August 27, 2019, the applicable interest rate is computed as the average of the weekly average of the 1-year constant maturity Treasury yield going back to January 5, 1962, and the monthly average from October 24, 1960 to January 5, 1962.  That results in an interest rate of 5.08%.

The amount referred in paragraph 20(a)(ii) is the amount set forth in 22 U.S.C. § 6082(a)(1)(A)(i)(II) as it relates to the portion of the claim that is not certified, and is determined by a special master, including the Foreign Claims Settlement Commission of the United States, pursuant to 22 U.S.C. § 6083(a)(2), should the Court make that appointment.

The amount referred in paragraph 20(a)(iii) is the amount set forth in 22 U.S.C. § 6082(a)(1)(A)(i)(III), and relates to the fair market value of the property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater. No determination has yet been made as to that amount.

8.      Identify each person whom you believe has knowledge relating to the facts alleged in the Complaint and, for each such person, identify and explain the

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

knowledge that he or she has.

**Response:**

Mickael Behn and Jerry Johnson have knowledge of Plaintiff's claim, Defendant's failure to compensate Plaintiff for its use of the Subject Property, and Defendant's failure to obtain authorization from Plaintiff to use the Subject Property. Upon information and belief, discovery will reveal that Defendant's employees and representatives, including those identified in the Rule 26 Disclosures, have knowledge of the following matters: Defendant's cruises to Cuba in general and specifically, among others, to Havana; the use of the Subject Property by the Defendant's cruise ships; the disembarkation and embarkation of passengers on Defendant's cruise ships at the Subject Property; alternatives to the use of the Subject Property for disembarking and embarking passengers on its Cuba cruises; the failure to obtain authorization from Plaintiff to use the Subject Property; the failure to compensate Plaintiff for its use of the Subject Property; the financial benefit and profits of Defendant from its cruises to Cuba and the use of the Subject Property, and the cost/benefit analysis of docking at the Subject Property versus using tender ships or stopping at a different port.

Plaintiff further believes that discovery will reveal that Defendant's employees and representatives knew or should have known that the Subject Property was confiscated by Fidel Castro's government; that a claim had been certified by the Foreign Claim Settlement Commission relating to the Subject Property; and that liability attached pursuant to Title III of the LIBERTAD Act on whomever trafficked after November 1, 1996 in property in Cuba confiscated from a U.S. national.

Discovery is ongoing. Plaintiff will supplement this answer as additional information is made known during the discovery process, to the extent it may do so without waiving the privileges protected by the attorney-client privilege and work product doctrine.

9.      Identify every communication between you and a person who was a passenger aboard a Royal Caribbean cruise to Cuba.

**Response:**

None.

10.      Identify every communication between you and the Cuban government relating to Royal Caribbean, including Royal Caribbean's use of the Subject Property.

**Response:**

None.

11.      Identify every communication between you and the United States government, including elected officials, relating to Royal Caribbean, including Royal Caribbean's use of the Subject Property.

**Response:**

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff refers the Defendant to the documents to be produced in response to Request number 17 of Defendant's First Request for Production of Document to Plaintiff in this case.

**Colson Hicks Eidson**
255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134-5008 Telephone: (305) 476-7400 Fax: (305) 476-7444

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, or belief.

Executed on this 2nd Day of December, 2019.

Miami, Florida

_____
Mickael Behn
President
Havana Docks Corporation

DATED: December 2, 2019.                    Respectfully submitted,

**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
E-mail: eservice@colson.com

By: s/ Roberto Martínez
Roberto Martínez, Esquire
Florida Bar No. 305596
bob@colson.com
Stephanie A. Casey, Esquire
Florida Bar No. 97483
scasey@colson.com
Zachary A. Lipshultz
Florida Bar No. 123594
zach@colson.com
Aziza F. Elayan-Martinez
Florida Bar No. 92736
aziza@colson.com

*Attorneys for Plaintiff Havana Docks Corporation*

## Certificate of Electronic Service List

I HEREBY CERTIFY that, on December 2, 2019, I served the foregoing document

via electronic mail on the following counsel for the Defendant:

**Sanford Lewis Bohrer, Esquire**
**Scott Daniel Ponce, Esquire**
Holland & Knight
701 Brickell Ave., Ste. 3000
Miami, FL 33131
Telephone: (305) 374-8500
Fax: (305) 789-7799
E-mail: sbohrer@hklaw.com
E-mail: sponce@hklaw.com

*Attorneys for Royal Caribbean Cruises, Ltd.*

/s/ Roberto Martínez
Roberto Martínez

01/19/2021

Exhibit
0024

Jerry Johnson

# HAVANA DOCKS' RESPONSE TO ROYAL'S RULE 30(b)(6) NOTICE

## Topic I. Claims And Assertions

| Subtopic | Response |
|---|---|
| A. Whether Plaintiff contends that Royal Caribbean caused, in whole or in part, the Cuban Government to confiscate the Subject Property. | HDC is not aware that Royal Caribbean caused, in whole or in part, the Cuban Government in 1960 to confiscate the Subject Property. |
| B. Whether Plaintiff contends that Royal Caribbean caused, in whole or in part, Havana Docks to suffer financial injury, and if yes, how such financial injury would have been avoided if Royal Caribbean had not engaged in the activities alleged in the Amended Complaint. | Yes.

The economic harm caused by Royal Caribbean to Havana Docks described below would have been avoided had Royal Caribbean not used, and had it not paid the Cuban Government for the use of, the unlawfully taken Subject Property.

By paying and entering into a commercial transaction with the Cuban Government to use the Subject Property without the authorization of Havana Docks, knowing the Subject Property was confiscated from Havana Docks and subject to Claim No. CU-2492 owned by Havana Docks, Royal Caribbean harmed Havana Docks by aiding and rewarding the Cuban Government for its unlawful taking of the Subject Property from Havana Docks, which also provided a disincentive to the Cuban Government from ultimately returning the Subject Property to Havana Docks or resolving the claim.

By using, and profiting from its use of, the Subject Property without the authorization of Havana Docks, knowing the Subject Property was confiscated from Havana Docks and subject to Claim No. CU-2492 owned by Havana Docks, Royal Caribbean harmed Havana Docks by unjustly enriching itself at the expense and to the detriment of Havana Docks |

1

01/19/2021

| | |
|---|---|
| | through its economic exploitation of the Cuban Government's unlawful confiscation of the Subject Property from Havana Docks.<br><br>Royal Caribbean also added to the harm to Havana Docks caused by the Cuban Government's confiscation by creating a competing use and claim to the Subject Property, thereby encumbering, infringing, and complicating Havana Docks' right and ability to ultimately recover and repossess the Subject Property. |
| C. How Royal Caribbean's alleged actions in the Amended Complaint impaired Plaintiffs' rights in Certified Claim No. CU-2492 (the "Certified Claim"). | See response to Topic I(B).<br><br>Royal Caribbean did not seek, nor obtain, Havana Docks' authorization to use the Subject Property or to enter into a commercial transaction with the Cuban Government relating to the Subject Property, even though it knew that the Subject Property was subject to Claim No. CU-2492 owned by Havana Docks. |
| D. How Royal Caribbean participated in and profited from the Cuban government's confiscation of the Subject Property as alleged in the Amended Complaint. | See response to Topic I(B).<br><br>Royal Caribbean unjustly enriched itself at the expense of, and to the detriment of, Havana Docks through its economic exploitation of the Cuban Government's unlawful confiscation of the Subject Property, as follows: entering into commercial transactions with the Cuban Government to use the Subject Property; using the Subject Property to dock its ships; and, using the Subject Property for its passengers to disembark from and embark onto the ships, to be processed for entry into Cuba, to exchange U.S. Dollars for the Cuban currency, to purchase goods at stores located in the Subject Property, and, to begin their paid excursion visits to Havana by embarking onto and disembarking from buses located at the Subject Property.<br><br>Discovery of Royal Caribbean is still ongoing. Additional facts may be obtained in the ongoing discovery. |

2

## Topic II.   Corporate Formation

| Subtopic | Response |
|---|---|
| A.  When and how Plaintiff was formed and whether interest in the Subject Property was ever held by any predecessors in interest, subsidiary or affiliate of Plaintiff, and if so, any transfer of such interest to Plaintiff. | According to the records of the Secretary of State of the State of Delaware, Havana Docks Corporation was duly incorporated under the laws of the State of Delaware and is in good standing, with a certificate of incorporation filed on August 14, 1917.<br><br>Please refer to Foreign Claims Settlement Commission (FCSC) Claim No. CU-2492 and to the various decrees related to the concession which have been provided to Royal Caribbean. |
| B.  The terms of the concession identified in the Concession for use of the Subject Property. | The terms of the concession are set forth in the various decrees related to the concession which have been provided to Royal Caribbean. |
| C.  The rights Plaintiff held in the Subject Property after the Concession identified in the Certified Claim expired in 2004. | The Subject Property, including the concession, was confiscated in 1960. The concession did not expire in 2004. Havana Docks' concession was for a period of 99 years and did not end on a date certain.<br><br>Havana Docks owns Claim No. CU-2492, which is a claim to the Subject Property. |

01/19/2021

3

**Topic III.  The Certified Claim**

| Subtopic | Response |
|---|---|
| A.  Each piece of property identified in Certified Claim No. CU-2492 (the "Certified Claim") in which You contend Royal Caribbean trafficked, including the subtopics listed below, as well as the names and positions of Plaintiff's employees with substantive knowledge of such: | Please refer to the Foreign Claims Settlement Commission (FCSC) Claim No. CU-2492, to the file produced by the FCSC through the Freedom of Information Act (FOIA), and to the various decrees related to the concession which have been provided to Royal Caribbean. |
| | On September 28, 1971, the FCSC certified Claim No. CU-2492. Claim No. CU-2492 is owned by Havana Docks. It is a claim to the Subject Property. |
| i.  When Plaintiff acquired an interest in each piece of property identified in the Certified Claim; | As referenced in FCSC No. CU-2492: |
| | "[O]n  September  7,  1934,  claimant  HAVANA  DOCKS CORPORATION obtained from the Government of Cuba the renewal of a concession for the construction and operation of wharves and warehouses in the harbor of Havana, formerly granted to its predecessor concessionaire, the Port of Havana Docks Company; *that* claimant acquired at the same time the real property with all improvements and appurtenances located on the Avenida del Puerto between Calle Amargura and Calle Santa Clara in Havana, facing the Bay of Havana; |
| ii.  What interest Plaintiff acquired in each piece of property identified in the Certified Claim; | that the property was encumbered with a mortgage in favor of certain bondholders for the amount of $1,600,000.00 in accordance with Public Instrument of June 1, 1946, recorded in Havana on July 25, 1946; and that the claimant corporation also owned the mechanical installations, loading and unloading equipment, vehicles and machinery, as well as furniture and fixtures located in the offices of the corporation. |
| iii.  How Plaintiff acquired an interest in each piece of property identified in the Certified Claim; | "[O]n the basis of a concession granted by the Government of Cuba, [Havana Docks] owned and operated, at the entrance of the harbor of Havana three piers: the 'San Francisco,' 'Machina' and 'Santa Clara' linked with a large marginal building. The piers and buildings were used |

4

01/19/2021

| | |
|---|---|
| | for warehousing purposes, cargo deposits, and for merchandise provisionally stored pending Customs clearance. Each pier consisted of a two-story concrete building with an apron equipped with platforms, and a double railroad track to permit direct unloading of cargo from ships to railroad cars and vice versa. All official port authorities were located within the marginal building, such as the Customs House of Havana, the Inspector General of the Port, the Immigration Department and other governmental agencies. Elevators, escalators, portable cranes, tractors, trailers, fork lift trucks, and other port and dock equipment were part of claimant's installations on the piers and in the warehouses, which were located in the center of harbor activities of the port of Havana."<br><br>The individuals at Havana Docks with knowledge of this information are Jerry Johnson and Mickael Behn. |
| iv. The manner in which Royal Caribbean trafficked in each piece of property identified in the Certified Claim in which You contend such trafficking occurred; | Discovery of Royal Caribbean is still ongoing. Additional facts may be obtained in the ongoing discovery.<br><br>Also, see responses to Topics IV(A) through IV(G). |
| v. The injury or damage caused by Royal Caribbean's trafficking in each piece of property identified in the Certified Claim in which You contend such trafficking occurred. | Royal Caribbean's trafficking in, and exploitation of, the Subject Property injured, damaged, and harmed Havana Docks in a number of ways, including:<br><br>- By paying and entering into a commercial transaction with the Cuban Government to use the Subject Property without the authorization of Havana Docks, knowing the Subject Property was confiscated from Havana Docks and subject to Claim No. CU-2492 owned by Havana Docks, Royal Caribbean harmed Havana Docks |

5

by aiding and rewarding the Cuban Government for its unlawful taking of the Subject Property from Havana Docks, which also disincentivized the Cuban Government to ultimately return the Subject Property to Havana Docks or resolve the Certified Claim.

- By using, and profiting from its use of, the Subject Property without the authorization of Havana Docks, knowing the Subject Property was confiscated from Havana Docks and subject to Claim No. CU-2492 owned by Havana Docks, Royal Caribbean harmed Havana Docks by unjustly enriching itself at the expense and to the detriment of Havana Docks through its economic exploitation of the Cuban Government's unlawful confiscation of the Subject Property from Havana Docks. Havana Docks still has received no compensation for its claim.

- Royal Caribbean also added to the harm to Havana Docks caused by the Cuban Government's confiscation by creating a competing use and claim to the Subject Property, thereby encumbering, infringing, and complicating Havana Dock's right and ability to ultimately recover and repossess the Subject Property.

- Royal Caribbean unjustly enriched itself at the expense of and to the detriment of Havana Docks through its economic exploitation of the Cuban Government's unlawful confiscation of the Subject Property, as follows: entering into commercial transactions with the Cuban Government to use the Subject Property; using the Subject Property to dock its ships; and, using the Subject Property for its passengers to disembark from and embark onto the ships, to be processed for entry into Cuba, to exchange U.S. Dollars for the Cuban currency, to purchase goods at stores located in the Subject Property, and, to begin their paid excursion visits to Havana by embarking onto and disembarking from buses located at the Subject Property.

01/19/2021

6

01/19/2021

| | |
|---|---|
| B. Any effort(s) to buy and/or sell the Certified Claim, or any interest therein, including any valuation of the Certified Claim, and the names and positions of the employees of the Plaintiff who were involved as well as the names of any others who engaged in such efforts, such as potential buyers. | Discovery of Royal Caribbean is still ongoing. Additional facts may be obtained in the ongoing discovery.<br><br>There have been no efforts by Havana Docks to sell the Certified Claim.<br><br>A person named Tim Ashby contacted a representative of Havana Docks, Richard McCready, approximately 15 years ago expressing an interest in purchasing the claim. He was not affiliated nor engaged by Havana Docks. Havana Docks does not know who he was affiliated, engaged by, or represented, but has recently learned in discovery from Carnival Corporation (Carnival) that a Tim Ashby was an "external advisor" to Carnival by, at least, 2015. Nothing came of it. |
| C. The following information concerning the past or present shareholders (each a "shareholder") of Plaintiff, and the names and positions of the Plaintiff's employees with substantive knowledge of such:<br><br>i. When each shareholder acquired his, her, or its share(s) in Plaintiff;<br><br>ii. How each shareholder acquired his, her, or its share(s) in Plaintiff;<br><br>iii. The nationality of each shareholder; and | There were ten shareholders in Havana Docks at the time this lawsuit was filed.<br><br>(1) Shareholder 1: Deceased at time lawsuit was filed; held eighteen (18) shares, corporate records do not reflect per share purchase price.<br>Nationality of Shareholder: Shareholder was a U.S. citizen.<br><br>(2) Shareholder 2: Owner of one (1) share. First purchased shares in Havana Docks in the 1950s for a price unknown. After reverse stock split, shareholder bought up to one whole share on 3/13/1984 for a cost of $237.08.<br>Nationality of Shareholder: Shareholder is a U.S. citizen.<br><br>(3) Shareholder 3: Deceased at time lawsuit was filed; held one (1) share. First purchased shares in Havana Docks in the 1950s for a |

7

01/19/2021

iv. If each shareholder acquired his, her, or its share(s) in Plaintiff via a stock purchase, the value of the stock at the time of sale.

price unknown. After reverse stock split, shareholder bought up to one whole share on 3/13/1984 for a cost of $237.08. Nationality of Shareholder:  Shareholder was a U.S. citizen.

(4) <u>Shareholder 4</u>: Deceased at time lawsuit was filed; held five (5) shares. Shares acquired prior to 3/31/1970. Corporate records do not reflect per share purchase price.
Nationality of Shareholder:  Shareholder was a U.S. citizen.

(5) <u>Shareholder 5</u>: Owner of six (6) shares, which were acquired prior to March 31, 1970. Corporate records do not reflect per share purchase price.
Nationality of Shareholder:  Shareholder is a U.S. citizen.

(6) <u>Shareholder 6</u>: Owner of forty-six (46) shares. Purchased nine (9) shares on May 20, 2000; nine (9) shares on January 5, 2001; and twenty-eight (28) shares on October 1, 2005. Average purchase price per share was $1,255.81.
Nationality of Shareholder:  Shareholder is a U.S. citizen.

(7) <u>Shareholder 7</u>: Deceased at time lawsuit was filed; held forty-six (46) shares. Purchased nine (9) shares on May 20, 2000; nine (9) shares on January 5, 2001; and twenty-eight (28) shares on October 1, 2005. Average purchase price per share was $1,255.81.
Nationality of Shareholder (through accrued inheritance) at time of lawsuit filing:  Shareholder was a citizen of France.

(8) <u>Shareholder 8</u>: Owner of one (1) share, which was purchased on October 1, 2005 for $1,156.56.
Nationality of Shareholder:  Shareholder is a U.S. citizen.

| | |
|---|---|
| D. Each company, person, and/or trust that has had ownership, control, or interest in Plaintiff from Plaintiff's incorporation to present, not already identified in Topic III(C), including but not limited to Plaintiff's mortgagees, lessors, financers, and third-party litigation funders, and the names and positions of the Plaintiff's employees with substantive knowledge of such. | (9) Shareholder 9: Owner of forty-six (46) shares, which were acquired by gift on April 19, 2019. The cost basis assigned for the gift transfer was $1,255.81. Nationality of Shareholder: Shareholder is a U.S. citizen.<br><br>(10) Shareholder 10: Owner of one (1) share. Corporate records do not reflect the share acquisition date, or the per share purchase price. Nationality of Shareholder: Unknown. Shares are held in a broker nominee name.<br><br>Aside from those identified in Topic III(C), above, Havana Docks is not aware of any company, person or trust that had ownership, control or interest in Havana Docks at the time this lawsuit was filed. Further, Havana Docks refers to CU-2492 and to its FCSC file, which have been produced. |
| E. All attempts by Plaintiff to obtain compensation from the Cuban Government pursuant to its Certified Claim, the outcome of such attempts, and the names and | On April 28, 1967, Havana Docks submitted to the Foreign Claims Settlement Commission a claim against the Government of Cuba for losses arising from the confiscation of the Subject Property. The claims certification process lasted four-and-a-half years, and ultimately resulted in the certification of CU-2492, on September 28, 1971. From that time |

01/19/2021

01/19/2021

| | |
|---|---|
| positions of the employees of Plaintiff and the Cuban Government involved. | forward, Havana Docks has relied on the United States Government and its efforts for compensation and resolution from the Cuban Government for its certified claim. |
| F. All attempts by Plaintiff to obtain compensation from the United States Government pursuant to its Certified Claim, the outcome of such attempts, and the names and positions of the employees of Plaintiff and the United States Government involved. | See response to Topic III(E) above.<br><br>Havana Docks has not made any attempts to obtain compensation from the United States Government for the Certified Claim. |
| G. All attempts by Plaintiff to obtain compensation from any third-party – that is not the Cuban Government or the United States Government – pursuant to its Certified Claim, the outcome of such attempts, and the names and positions of the employees of Plaintiff and the names of any third party involved. | Havana Docks has filed lawsuits against Norwegian Cruise Line Holdings, Ltd., Carnival Corporation, Royal Caribbean Cruises, Ltd., and MSC Cruises S.A., MSC Cruises (USA) Inc, and MSC Cruises S.A. CO, under Title III of the LIBERTAD Act. Havana Docks has received no compensation from these actions, which remain pending. |

01/19/2021

## Topic III.[1]  Enforcement of the Helms-Burton Act

| Subtopic | Response |
|---|---|
| A. Oral and written communications between Plaintiff and the United States Government relating to the Helms-Burton Act; the Subject Property; the Certified Claim, including the property interests identified in it; and/or the general and specific licenses issued by the United States Government concerning carrier services to Cuba; and the names and positions of the employees of Plaintiff and the United States Government involved. | These communications have been produced to Royal Caribbean. |
| B. Oral and written communications between Plaintiff and the Cuban Government relating to the Helms-Burton Act; the Subject Property; the Certified Claim, including the property interests identified in it; and/or the general and specific licenses issued by the United States Government concerning carrier services to Cuba; and the names and positions of the employees of Plaintiff and the Cuban Government involved. | There are none. |

[1] The examination topics in Royal Caribbean's Notice of Deposition contained two topics numbered as "Topic III." This chart uses the same numbering as Royal Caribbean's Notice.

11

01/19/2021

| | |
|---|---|
| C. All attempts by Plaintiff to enforce any title of the Helms-Burton Act against Royal Caribbean or any other cruise line for transactions and uses of the Subject Property ("Enforcement Attempts"), including when such Enforcement Attempts were made, and the names and positions of the employees of Plaintiff and the United States and Cuban Governments involved. | This lawsuit concerns Title III.<br><br>Communications with the United States Government regarding Title IV have been produced to Royal Caribbean.<br><br>With respect to the Cuban Government, there are none. |
| D. All responses to Plaintiff by (a) the United States Government and/or (b) the Cuban Government concerning all Enforcement Attempts, including when Plaintiff received such responses to its Enforcement Attempts, and the names and positions of the employees of Plaintiff and the United States and Cuban Governments involved. | See response to Topic III(C) above. |

12

## Topic IV.  Trafficking Allegations

| Subtopic | Response |
|---|---|
| A. The manner(s) in which You contend that Royal Caribbean commenced, conducted, and promoted its commercial cruise line business to Cuba using the Subject Property by regularly embarking and disembarking its passengers on the Subject Property, and the names and positions of the Plaintiff's employees with substantive knowledge of such. | Discovery of Royal Caribbean is still ongoing. Additional facts may be obtained in the ongoing discovery.<br><br>Royal Caribbean entered into commercial transactions with the Cuban Government to use the Subject Property; used the Subject Property to dock its ships; and, used the Subject Property for its passengers to disembark from and embark onto the ships, to be processed for entry into Cuba, to exchange U.S. Dollars for the Cuban currency, to purchase goods at stores located in the Subject Property, and, to begin their paid excursion visits to Havana by embarking onto and disembarking from buses located at the Subject Property. |
| B. The manner(s) in which You contend that Royal Caribbean used the Subject Property without the authorization of Plaintiff or any United States national who holds a claim to the Subject Property, and the names and positions of the Plaintiff's employees with such substantive knowledge of such. | See response to Topic IV(A).<br><br>Royal Caribbean never sought Havana Docks' authorization to undertake any of the conduct described in Topic IV(A). Jerry Johnson and Mickael Behn have knowledge that Royal Caribbean never sought or obtained authorization. |
| C. The manner(s) in which You contend that Royal Caribbean knowingly and intentionally embarked and disembarked its passengers on confiscated property, as | See response to Topic IV(B). |

13

01/19/2021

| | |
|---|---|
| defined in 22 U.S. Code § 6023(4), and the names and positions of the Plaintiff's employees with substantive knowledge of such. | |
| D. The manner(s) in which You contend that Royal Caribbean participated in and profited from the Cuban Government's possession of the Subject Property, and the names and positions of the Plaintiff's employees with substantive knowledge of such. | See response to Topic IV(B).<br><br>Royal Caribbean received money from exploiting the Cuban Government's confiscation of the Subject Property. Also, see response to Topic III(A)(v). |
| E. The manner(s) in which You contend that Royal Caribbean participated in and profited from the Cuban Government's possession of the Subject Property without the authorization of Plaintiff or any United States national who holds a claim to the Subject Property, and the names and positions of the Plaintiff's employees with substantive knowledge of such. | See response to Topic IV(D). |
| F. The manner(s) in which You contend that Royal Caribbean knowingly and intentionally participated in and profited from the Cuban Government's possession | See response to Topic IV(D). |

14

01/19/2021

| | |
|---|---|
| of confiscated property, as defined in 22 U.S. Code § 6023(4), and the names and positions of the Plaintiff's employees with substantive knowledge of such. | |
| G. To the extent not already covered by Topics IV(A)-(F), the manner(s) in which You contend that Royal Caribbean did any of the following relating to the Subject Property, including when, and the names and positions of the Plaintiff's employees with substantive knowledge of such:<br><br>    i.    sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of the Subject Property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in the Subject Property,<br><br>    ii.    engages in a commercial activity using or otherwise benefiting from the Subject Property, or<br><br>    iii.    causes, directs, participates in, or profits from, the activities described in clause (i) or (ii) above | Discovery of Royal Caribbean is still ongoing. Additional facts may be obtained in the ongoing discovery. |

15

01/19/2021

by another person, or otherwise engages in those activities through another person.

16

## Topic V.   22 U.S.C. § 6023 (13)(B)(iii)

| Subtopic | Response |
| --- | --- |
| A. The manner(s) in which You contend that Royal Caribbean's transactions and uses of the Subject Property were not "lawful travel" to Cuba. | Royal Caribbean has raised the affirmative defense that its transactions and uses of the Subject Property were necessary to lawful travel to Cuba. Royal Caribbean has the burden to prove that its transactions and uses of the Subject Property were lawful travel under the LIBERTAD Act.<br><br>Havana Docks does not believe that Royal Caribbean's transactions and uses of the Subject Property were lawful travel under the LIBERTAD Act.<br><br>Discovery of Royal Caribbean is still ongoing. Additional facts may be obtained in the ongoing discovery. |
| B. The manner(s) in which You contend that Royal Caribbean's transactions and uses of the Subject Property were not "lawful travel" under United States law, and the names and positions of Plaintiff's employees with substantive knowledge of such | See response to Topic V(A). |
| C. The manner(s) in which You contend that Royal Caribbean's transactions and uses of the Subject Property were not incident to "lawful travel to Cuba," | Royal Caribbean has raised the affirmative defense that its transactions and uses of the Subject Property were incident to lawful travel to Cuba. Royal Caribbean has the burden to prove that its transactions and uses of the Subject Property were incident to lawful travel under the LIBERTAD Act. |

01/19/2021

17

| Subtopic | Response |
|---|---|
| and the names and positions of Plaintiff's employees with substantive knowledge of such. | Havana Docks does not believe that Royal Caribbean's transactions and uses of the Subject Property were incident to lawful travel under the LIBERTAD Act.<br><br>Discovery of Royal Caribbean is still ongoing. Additional facts may be obtained in the ongoing discovery. |
| D. The manner(s) in which You contend that Royal Caribbean's transactions and uses of the Subject Property were not "necessary to the conduct of such travel," and the names and positions of Plaintiff's employees with substantive knowledge of such. | Royal Caribbean has raised the affirmative defense that its use of the Subject Property was necessary to lawful travel to Cuba. Royal Caribbean has the burden to prove that its use of the Subject Property was necessary. Royal Caribbean could have used, and did use, other ports or anchorages in its cruises to Cuba beside the Subject Property. |

**Topic VI. Valuation/Damages**

| Subtopic | Response |
|---|---|
| A. The value of each piece of property identified in the Certified Claim in which You contend such trafficking occurred and/or the injury or damage caused by Royal Caribbean's trafficking in each piece of property identified in the Certified Claim in which You contend such trafficking occurred. | Any effort to value the Subject Property in connection with this litigation is protected by the attorney-client privilege and the work product doctrine at this time.<br><br>The FCSC valued the property identified in the Certified Claim.<br><br>No determination has yet been made as to the fair market value of the Subject Property at the time of the confiscation.<br><br>No determination has yet been made as to the current fair market value of the Subject Property. |

01/19/2021

| | |
|---|---|
| | See also response to Topic III(A)(v).<br><br>Discovery of Royal Caribbean is still ongoing. Additional facts may be obtained in the ongoing discovery. |
| B. The value of the Subject Property at the time the Cuban Government allegedly confiscated it in 1960, and the names and positions of the Plaintiff's employees with substantive knowledge of such. | The FCSC valued the property identified in the Certified Claim.<br><br>No determination has yet been made by Plaintiff as to the fair market value of the Subject Property at the time of the confiscation. |
| C. The value of the Subject Property on August 27, 2019. | Any effort to value the Subject Property in connection with this litigation is protected by the attorney-client privilege and the work product doctrine at this time.<br><br>No determination has yet been made as to the fair market value of the Subject Property on August 27, 2019. |
| D. The value of the Subject Property on April 20, 2020. | Any effort to value the Subject Property in connection with this litigation is protected by the attorney-client privilege and the work product doctrine at this time.<br><br>No determination has yet been made as to the fair market value of the Subject Property on April 20, 2020. |
| E. Any calculations made by Plaintiff or by any of Plaintiff's employees of the damages allegedly | Non-privileged, non-work product documents and information have been produced to Royal Caribbean. |

01/19/2021

| | |
|---|---|
| recoverable under the Helms-Burton Act against Royal Caribbean or any other cruise line, and the names and positions of Plaintiff's employees with substantive knowledge of such. | |
| F. Plaintiff's valuation of its stock, and the names and positions of Plaintiff's employees with substantive knowledge of such. | See response to Topic III(C). |
| G. Any and all efforts by Plaintiff, or by any person acting on behalf of Plaintiff, to value the Subject Property, or the ownership interest in the claim to the Subject Property. | Any effort to value the Subject Property in connection with this litigation is protected by the attorney-client privilege and the work product doctrine at this time. No determination has yet been made by Plaintiff as to the fair market value of the Subject Property at the time of the confiscation or at the present time. According to Claim No. CU-2492, the FCSC certified the loss at $9,179,700.88 with interest thereon at 6% per annum from the date of loss. |
| H. All assertions of a claimed ownership interest in any portion of the Certified Claim and/or the Subject Property from October 24, 1960, to the present by any person or entity other than You, including the identity of all such persons and/or entities, when such assertions | The Cuban Government, including Aires Transportes S.A., has claimed an ownership interest in the Subject Property since confiscation. Havana Docks also understands that Costa Crociere and Global Ports Holdings have participated in concession and management agreements with the Cuban Government involving the Subject Property after November 1, 1996. |

20

01/19/2021

were made, how such assertions were transmitted, and

Your response to such assertions.

21