UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

HAVANA DOCKS CORPORATION,                    Case No: 19-cv-21724-
                                             BLOOM/MCALILEY
      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____/

HAVANA DOCKS CORPORATION,                    Case No: 19-cv-23588-
                                             BLOOM/LOUIS
      Plaintiff,

v.

MSC CRUISES SA *et al.*,

      Defendants.

_____/

HAVANA DOCKS CORPORATION,                    Case No: 19-cv-23590-
                                             BLOOM/LOUIS
      Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,

      Defendant.

_____/

HAVANA DOCKS CORPORATION,                    Case No: 19-cv-23591-
                                             BLOOM/LOUIS
      Plaintiff,

v.

NORWEGIAN CRUISE LINE HOLDINGS LTD.,

Defendant.

_____/

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION
## TO EXCLUDE OPINION OF JULIAN ACKERT

Plaintiff, Havana Docks Corporation, filed a Motion to Exclude Opinion of Julian

Ackert and Pablo Spiller (the "Motion") under Federal Rule of Evidence 702 and *Daubert*

*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). (ECF No. 328). Defendants filed a

response memorandum in opposition[1] and Plaintiff filed a reply memorandum. (ECF

Nos. 364, 398). The Honorable Beth Bloom referred the Motion to me for a Report and

Recommendation. (ECF No. 393). In this Report and Recommendation, I address only

Defendants' expert, Julian Ackert.[2]

### I.      Background

Defendants offer Julian Ackert's opinions to support their argument, on summary

judgment, that Plaintiff lacks statutory standing, to bring this lawsuit under the Cuban

Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, *et seq.* (the "LIBERTAD Act"

---

[1] Plaintiff filed four identical actions against various cruise lines. The Defendants in each care are:
(1) Carnival Corporation (No. 19-cv-21724); (2) MSC Cruises SA, MSC Cruises SA CO, and
MSC Cruises (USA) Inc. (No. 19-cv-23588); (3) Royal Caribbean Cruises, Ltd. (No. 19-23590);
and (4) Norwegian Cruise Line Holdings, Ltd. (No. 19-23591). These lawsuits have common
issues, and the Court permitted the parties to file global summary judgment and *Daubert* motions.
(ECF No. 289). The record that I cite here is to *Havana Docks v. Carnival Corp.*, No. 19-cv-21724.

[2] In a separate Report and Recommendation, I will address Plaintiff's motion regarding Pablo
Spiller and Defendants' Omnibus Motion to Exclude Testimony of Plaintiff's Experts. *See* (ECF
No. 320).

or the "Act").[3] Title III of the LIBERTAD Act authorizes only a "United States national" to bring an action under the Act for trafficking in confiscated property. 22 U.S.C. § 6082(a)(1). The Act defines the term "United States national" as:

> (A) Any United States citizen; or
>
> (B) any other legal entity which is organized under the laws of the United States, or of any State, ... and which has its principal place of business in the United States.

22 U.S.C. § 6023(15)(A)-(B). In their summary judgment motion, Defendants contend that subsection (A) applies only to natural persons, and subsection (B) governs legal persons, such as Plaintiff. Although the parties agree that Plaintiff is organized under the laws of the State of Delaware, (ECF No. 331 ¶ 29; 371 ¶ 29), Defendant contends that Plaintiff does not have its principal place of business in the United States, and therefore Plaintiff is not a United States national and does not have standing to bring this suit. (ECF No. 330 at 22-26).

Defendants offer Ackert as a computer forensics expert who provides evidence that supports their conclusion that Plaintiff's principal place of business is outside the United States. Ackert examined emails Plaintiff produced in discovery, in particular the headers of emails of Plaintiff's only two directors and officers: Mickael Behn and Jerry Johnson. In his Amended Declaration, Ackert explains that the metadata in email headers commonly includes the Internet Protocol ("IP") addresses associated with the computer used to create the email, those through which the email traveled to its destination, and the computer used

---

[3] Defendants' consolidated motion for summary judgment, (ECF No. 330), is fully briefed and pending before Judge Bloom.

to receive the email. (ECF No. 325-1 ¶¶ 16-17, 19). IP addresses identify the geographic location of those computers. (*Id*. ¶ 19). Ackert's analysis reveals that a significant number of the emails he analyzed were routed to or from computers in the United Kingdom ("UK") or European Union ("EU").[4]

More specifically, Ackert reviewed 801 emails (what he calls the "Production Set"). (*Id*. ¶¶ 9, 20). Of those, he was able to identify the geographic locations associated with IP address, from the email header of 675 emails. (*Id*. ¶ 20).[5] Among this subset, Ackert identified 42 emails Behn sent, and 165 emails sent between Behn and Johnson, and he analyzed those emails to determine the geographic location of computers used in their transmission. (*Id*. ¶¶ 25-27). Based on his analysis, Ackert formed two opinions:

1) Based on an analysis of the available email metadata in the Production Set, 41 of the 42 (98%) of the emails collected from custodian Mickael Behn that were sent from email addresses associated with Mickael Behn routed through computers physically located in the United Kingdom (UK) or European Union (EU). The email metadata for these 41 emails indicates that at the time the email was sent, the sender was geographically located in the UK or EU.

2) Based on an analysis of the available email metadata in the Production Set, 114 of 165 (69%) emails collected from custodians Mickael Behn and Jerry Johnson that were communications between email addresses associated with Mickael Behn and Jerry Johnson routed through computers physically located in the UK or EU, and up to 164 out of 165 emails (99%) were routed from or to an individual located in

---

[4] London has been Behn's primary place of residence since 1999, although he also owns a residence in Florida. (ECF No. 331 ¶ 36; 371 ¶ 36). At all relevant times, Kentucky was Johnson's primary residence. (ECF No. 331 ¶37; 371 ¶ 37).

[5] The other 126 emails either did not contain IP address information in the email header metadata or the IP addresses could not be mapped geographically. (*Id*. ¶ 20 n.2).

> the UK or the EU. The email metadata for these 114 emails
> indicates that at the time the email was sent or received, either
> the sender or the recipient was geographically located in the
> UK or EU.

(*Id.* ¶¶ 11, 12).

Plaintiff asks the Court to exclude Ackert's opinions because they are based on

"flawed methodology", and they are "irrelevant" and "unduly prejudicial." (ECF No. 328

at 2). Defendants dispute each of Plaintiff's assertions.

## II.     Standard

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert* govern

the admissibility of expert testimony. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized
>     knowledge will help the trier of fact to understand the
>     evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and
>     methods; and
>
> (d) the expert has reliably applied the principles and methods
>     to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires this Court to act as a gatekeeper, admitting only scientific,

technical, or other specialized expert testimony that is both reliable and relevant. *Daubert*,

509 U.S. at 597; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The

ultimate objective of this gatekeeping function is "to make certain that an expert, whether

basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

The Eleventh Circuit Court of Appeals set forth a "rigorous three-part inquiry" that trial courts must engage in to perform their gatekeeping function. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Specifically, courts must consider whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id*. (citation omitted). These are the "qualifications," "reliability," and "helpfulness" inquiries. *Id*.

Defendants, as the proponent of the expert testimony, must demonstrate by a preponderance of the evidence that the testimony is admissible. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). Importantly, when a court conducts its *Daubert* analysis, it must focus "solely on [the] principles and methodology [that experts employ], not on the conclusions that they generate." *Id.* at 1312. "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The decision whether to admit or exclude expert testimony is within the court's discretion, and the court enjoys "considerable leeway" when determining the admissibility

6

of such testimony. *Cook v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005).

### III.   Analysis

### a.   Qualifications

I find, and Plaintiff does not dispute, that Ackert has sufficient education, training, or experience to serve as an expert on computer forensics, and in particular metadata analysis of electronically stored information ("ESI"). *See* (ECF No. 325-1 ¶ 3).

In his Amended Declaration, Ackert sets out the following experience and training that qualify him to conduct metadata analysis. Ackert is a Managing Director at iDiscovery Solutions, Inc., an expert services and consulting firm that provides independent computer forensics, electronic discovery expert testimony and analysis, original authoritative studies, and strategic consulting services to the business and legal community. (ECF No. 325-1 ¶ 1). He has a Bachelor of Science degree in Computer Science from the University of Virginia and more than 20 years of experience working in computer forensics. (*Id.* ¶ 2). Ackert has extensive experience creating and implementing preservation, collection, and production strategies, and performing computer forensics and metadata analysis on ESI, including email metadata, in hundreds of matters. (*Id.* ¶ 3). He has previously consulted or testified regarding metadata analysis. (*Id.* ¶ 4).[6]

---

[6] Ackert's curriculum vitae details his consulting and testifying experience. It also provides his speaking engagements, publications, and the organizations that he is a member of. *See* (ECF No. 325-1, Ex. A).

### b.  Reliability

Plaintiff argues that Ackert's opinions are unreliable for two reasons, neither of which are persuasive.

First, Plaintiff complains that Ackert does not cite any authority, references or bibliography that validate his methodology. (ECF No. 328 at 7). While recognizing that Ackert identifies software programs he used to analyze the emails, Plaintiff also complains that he does not "adequately explain how he applied these programs." (*Id.*).

Plaintiff gives short shrift to this Court's authority to "determine the reliability prong under *Daubert* based primarily upon an expert's experience and general knowledge in the field ...." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010). When an expert, such as Ackert, testifies based upon specialized experience, a reliable methodology means that the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000 amends.); *Frazier*, 387 F.3d at 1261.

Ackert does this in his report and deposition testimony. He sets forth, in detail, the method he employed to identify emails with headers that included IP addresses and his use of publicly available directories of IP addresses, that allowed him to identify the geographical location of computers assigned the IP address. Ackert explains that "[t]he email metadata [he] reviewed in the Production Set is consistent with email metadata [he has] analyzed in hundreds of prior matters" and that "[s]ome of the matters in which [he has] consulted or testified that relate to the issues at hand include: ... [t]he analysis of email

metadata to ascertain sender and recipient computer Internet Protocol (IP) addresses." (ECF No. 325-1 ¶¶ 15, 4). Ackert further explains that he conducted his own tests, which support his findings, and that "[those] test results are in line with [his] expectations, based on [his] years of experience with, and analysis of, email header metadata." (*Id.* ¶¶ 23(a), 23(b)). Based on Ackert's experience and general knowledge in the field, as well as the detailed analysis he provides in his report and deposition testimony, the Court finds that his opinions "rest[] on a reliable foundation". *Daubert*, 509 U.S. at 597.

Plaintiff's second argument addresses the possibility that Behn and or Johnson remotely logged onto a computer, at a location different than what the IP address indicates, to access their email accounts. (ECF No. 328 at 7-9). Ackert acknowledged "that certain remote access programs, such Virtual Private Networks ("VPNs"), can 'skew your IP addresses and make it look like [your email] is coming' from another location." (ECF No. 328 at 8) (alteration in original) (quoting Ackert Dep., ECF No. 325-3 at 72:3-7). Knowing that Ackert cannot rule out that Behn or Johnson used a remote access program for any of the emails at issue, Plaintiff urges that Ackert's conclusion about the location of the computers they used is unreliable.

The trier of fact can address this uncertainty with the weight it assigns Ackert's opinions and, should the Court hold an evidentiary hearing on the disputed facts that underlie the question of standing, Plaintiff can address this through cross-examination. *See Kleiman v. Wright*, No. 18-cv-80176, 2020 WL 6729362, at *26 (S.D. Fla. Nov. 16, 2020) ("Whether Dr. Edman could have been more diligent in aspects of conducting his analysis...these features go to questions of weight rather than admissibility."); *Ostroski v.*

*United States*, No. 06-80327-CIV, 2007 WL 9701868, at *2 (S.D. Fla. Aug. 23, 2007) ("Any claimed weakness in the factual basis for [the expert's] conclusion…goes at best to weight and credibility, and can certainly be explored on cross examination."). Plaintiff might also introduce the testimony of its principals about their computer usage. And, of course, Plaintiff's *Daubert* motion and reply memorandum lay out its critiques of Ackert, and this is available to the Court as it resolves the standing dispute.

In reply, Plaintiff argues that it "cannot adequately cross examine Ackert" because he did not identify by Bates number, the 41 emails that Behn sent, and the 114 emails that Behn and Johnson exchanged, for which he identifies computer locations. (ECF No. 398 at 11). I disagree. Plaintiff can certainly bring up this lack of information and question Ackert about this. Again, this bears on the weight, not the admissibility, of Ackert's testimony.

I thus conclude that the methodology by which Ackert reached his opinions is sufficiently reliable.

### c.  Helpfulness

"For testimony to satisfy the third requirement – assisting the trier of fact – the testimony must concern matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 Fed. App'x 816, 823 (11th Cir. 2014) (citation omitted). The inquiry "goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quotation marks and citation omitted).

Defendants argue that that Plaintiff has standing only if its principal place of business is in the United States, and Ackert's opinions are relevant because they are evidence that Plaintiff's principal place of business was not in this country.  (ECF No. 364 at 17). Plaintiff outlines four arguments that either, the Court need not determine its principal place of business to resolve standing, or, if it does need to resolve that question, then Ackert's opinions are otherwise irrelevant.

*First*, Plaintiff argues that it is not limited to the definition of "United States national" under subsection (B) of Title 22 U.S.C. § 6023(15) and that it meets the definition of that term under subsection (A), as "any United States citizen". (ECF No. 398 at 13). Plaintiff also argues that it qualifies as a "United States national" simply "[b]y virtue of" its Certified Claim to the confiscated property, issued by the Foreign Claims Settlement Commission. (*Id.*).

*Second*, Plaintiff argues that even if it must establish standing under subsection (B), Defendants apply the wrong test to determine the location of Plaintiff's "principal place of business." (ECF No. 328 at 10). Defendants utilize the current "nerve center" test, adopted by the United States Supreme Court in 2010, in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010). That decision provides that a corporation's "principal place of business" is the single place where its "officers direct, control, and coordinate the corporation's activities." *Id.* at 92-93. Plaintiff counters that the proper test is the "total activities" test because that was the test in this Circuit when the LIBERTAD Act was enacted in 1996. (ECF No. 398 at 13-14). That test "looks to the location of managerial functions *and* day-to-day activities, such as the location where a company maintains its mailing address, stores its records, conducts

annual meetings, and keeps its assets. (*Id.* at 14) (emphasis in original) (citing *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1248 (11th Cir. 2005)). Plaintiff contends that the factors under that test "point overwhelmingly—and indisputably—toward Kentucky" as its "principal place of business." (*Id.*).

*Third*, Plaintiff argues that even under the "nerve center" test, Ackert's opinions are irrelevant because they do not show the content of the emails, and, therefore, "Ackert's opinions shed no light on whether the communications evince direction or control of the company's activities (as opposed to, for example, Behn simply asking for information or updates from Johnson, who directed, controlled, and coordinated the company's activities)." (ECF No. 328 at 10-11).

*Fourth*, Plaintiff argues that even if the content of the emails showed direction or control of Plaintiff's company's activities, "the location from which they were sent remains irrelevant because there is another corporate officer—in Kentucky—who is primarily responsible for those activities, thus satisfying the nerve center test." (*Id.* at 11).

If the Court agrees with Plaintiff's first argument and concludes that Plaintiff meets the definition of a United States national under Title 22 U.S.C. § 6023(15)(A) or concludes that the Certified Claim itself establishes that Plaintiff has standing, then Ackert's opinions are irrelevant, not helpful, and therefore not admissible.

If, on the other hand, the Court decides that Plaintiff must establish standing under Title 22 U.S.C. § 6023(B), then Ackert's opinions are relevant because they could help the Court determine the location of Plaintiff's principal place of business. This would be so if the Court applies the "nerve center" or "total activities" test because the parties dispute the

application of both tests to Plaintiff's conduct, and Ackert's opinions are relevant under both tests.

Plaintiff's third argument – regarding the content of the emails – may be strong when it comes to the weight to be given Ackert's opinions, but it does not preclude the admission of that evidence. *See Daubert*, 509 U.S. at 596 ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

As for Plaintiff's final argument – that Johnson's activities in Kentucky settle the question of Plaintiff's principal place of business – it does not make Ackert's opinions inadmissible. The Court can weigh all the evidence that sheds light on Plaintiff's principal place of business. At this juncture, "it is not the role of the district court to make the ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341.

In sum, I conclude that Defendants have demonstrated, by a preponderance of the evidence, that Ackert is qualified to offer his opinions and that those opinions are sufficiently reliable – and helpful (to the extent the Court determines that it must determine Plaintiff's principal place of business) – and that they are therefore admissible.

### d.  Exclusion under Rule 403

Plaintiff also argues that Ackert's opinions are misleading and prejudicial, and therefore, the Court should exclude his testimony under Federal Rule of Evidence 403. (ECF No. 328 at 11-12). That Rule states:

> The court may exclude relevant evidence if its probative value
> is substantially outweighed by a danger of one or more of the
> following: unfair prejudice, confusing the issues, misleading
> the jury, undue delay, wasting time, or needlessly presenting
> cumulative evidence.

Fed. R. Ev. 403. "Rule 403 is an extraordinary remedy...which should be used only
sparingly...." *United States v. Fallen*, 256 F.3d 1082, 1091 (11th Cir. 2001) (quotations and
citation omitted).

Plaintiff argues that "[b]ecause Ackert assigns such an exaggerated weight to the
small number of emails identified in his opinions..., his testimony is likely to mislead the
finder of fact and so should be excluded." (ECF No. 328 at 11). Plaintiff also argues that
Ackert provides misleading percentages of 98% (41 of 42 emails) and 69% (114 of 165
emails) in his conclusions. (*Id.* at 12).

In his report and deposition testimony, Ackert explains the use of the smaller email
datasets and how he arrived at the percentages used. Plaintiff asserts several arguments
why the Court should not rely on his opinions, which go to the weight of the evidence that
the Court will evaluate when it resolves the standing issue.

I conclude that Plaintiff's concerns do not warrant the "extraordinary remedy" of
exclusion under Rule 403. *Fallen*, 256 F.3d at 1091; *see also Coquina Invs. v. Rothstein*,
No. 10-60786-Civ, 2011 WL 4949191, at *6 (S.D. Fla. Oct. 18, 2011) ("That Mr. Rubin
reviewed only a sample of data goes to the weight of his testimony, rather than its
admissibility. The fact that there may be other e-mails in the data set, which Mr. Rubin did
not review, does not alter the reliability of his conclusion that he identified ten e-mails that
were purportedly forged.").

## IV.    Recommendation

If the Court determines that Plaintiff must establish that its principal place of business was in the United States, so that Plaintiff can establish that it has standing to bring suit, then I **RESPECTFULLY RECOMMEND** that the Court **DENY** Plaintiff's Motion to Exclude Opinion of Julian Ackert (ECF No. 328). Alternatively, should the Court decide that Plaintiff's principal place of business is not an issue in dispute, then I **RESPECTFULLY RECOMMEND** that the Court **GRANT** Plaintiff's Motion to Exclude Opinion of Julian Ackert (*id.*) because his opinions would not be relevant.

## V.    Objections

**No later than fourteen days from the date of this Report and Recommendation** the parties may file any written objections to this Report and Recommendation with the Honorable Beth Bloom, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985), *Henley v.* Johnson, 885 F.2d 790, 794 (11th Cir. 1989), 28 U.S.C. § 636(b)(1), 11th Cir. R. 3-1 (2016).

RESPECTFULLY RECOMMENDED in Miami, Florida, this 10th day of December 2021.

CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

cc:   The Honorable Beth Bloom
       Counsel of Record