# DEFENDANTS' OMNIBUS SUMMARY JUDGMENT MOTION

Hearing on January 12, 2022
9:30 a.m.

# Cruise Lines Travel To Cuba Was Encouraged At Highest Level Of U.S. Government

# Defendants Are Entitled To Summary Judgment Because They Did Not Traffic In HDC's Property—Which Was Only A Non-exclusive Right To Conduct A Cargo Business



# HDC Never Owned The Piers

- HDC owned only a limited concession to operate a cargo business at the Piers, based on the plain language of the concession and Cuban law.

- This limited interest is the only "property" that was confiscated from HDC—but Defendants **never used** this property or benefitted from it in any way.

- HDC's contrary claim is based on an *ex parte* certification from the FCSC, which was based on HDC's misrepresentations of its own property interest.

- **The Helms Burton Act states (22 U.S. Code § 6083(a)(1))  expressly incorporates the ICSA:**

  **(1) CONCLUSIVENESS OF CERTIFIED CLAIMS**

  In any action brought under this subchapter, the court shall accept as conclusive proof of ownership of an interest in property a certification of a claim to ownership of that interest that has been made by the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 (22 U.S.C. 1643 and following)

- **Under the ICSA, , any person who makes a "materially false statement" to the FCSC "forfeit[s] all rights" under the ICSA.**

  **18 USC § 1001:** "…whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully … makes any materially false, fictitious, or fraudulent statement or representation … shall be fined under this title …."

  **22 U.S.C. § 1623(e):** "[A]ny person guilty of any act, as provided [in 18 USC § 1001], with respect to any matter under this subchapter, shall forfeit all rights under this subchapter, and, if payment shall have been made or granted, the Commission shall take such action as may be necessary to recover the same." (Incorporated in Title V of the ICSA, at 22 USC § 1643(h).)

- *De Gaster v. Dillon*, 247 F. Supp. 511, 516 n.5 (D.D.C 1963) (noting that under 22 USC § 1623(h), *(refusing to enforce FCSC decision based on fraudulent evidence), *aff'd sub nom. Degaster v. Fowler*, 354 F.2d 515 (D.C. Cir. 1965) (noting "general agreement with the excellent opinion filed by the District Court").

- "Having found that a fraud was worked upon the Foreign Claims Settlement Commission by filing with it a false document, I conclude the relief sought here must be denied the plaintiffs. Applicable here is the equity maxim: 'he who comes into equity must come with clean hands.' *Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); Duncan Townsite Co. v. Lane, 245 U.S. 308, 311-312, 38 S.Ct. 99, 62 L.Ed. 309 (1917)."*

- Court rejected conclusiveness even where "there is no evidence that plaintiffs … participated in or were informed of or otherwise knew of the fraud worked upon the Commission…." *Id.* at 517.

# Due Process Requires an Opportunity To Challenge Elements Of Plaintiff's Claim, Irrespective Of False Representations

- Plaintiffs must establish property at issue was "confiscated" as an element of Plaintiff's claim

- Under the Due Process clause, Defendants cannot be bound by an *ex parte* proceeding of which they had no opportunity to participate

  - *See, e.g.*, *Hansberry v. Lee*, 311 U.S. 32, 40-41 (1940) (explaining "principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process").

  - *Richards v. Jefferson Cnty.*, 517 U.S. 793, 802–03 (1996) (rejecting attempt to bind non-parties to earlier decision).

  - *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1169 (11th Cir. 2019) (finding third-party was not bound by Patent and Trade Office finding "because it was not a party to any prior proceeding").

- The MDLEA gives the Executive a "diplomatic" role: where a seized boat's captain claims the vessel is registered in some other country, the United States' "jurisdiction" is conclusively established by a certification from the Secretary of State.

- "[B]ecause the jurisdictional requirement under the Maritime Drug Law Enforcement Act ("MDLEA") is not an element of the offense, neither the Due Process Clause nor the Sixth Amendment to the Constitution are implicated when the jurisdictional requirement under the MDLEA is not proven to the satisfaction of a jury." *United States v. Cruickshank*, 837 F.3d 1182, 1191-92 (11th Cir. 2016).

  - *See* 46 U.S.C. § 70504(a): "Jurisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense."

- By contrast, Title III requires, as an element of the claim, that the property at issue was confiscated by the Cuban Government.

  - 22 U.S.C. § 6082(a)(1)(A):

# HDC's Claim Form Identified Property As Piers

IN THE MATTER OF THE CLAIM OF

HAVANA DOCKS CORPORATION (DELAWARE)

Against the Government of Cuba under Title V of the International Claims Settlement Act of 1949, as amended by Public Law 88–666, approved October 16, 1964.

CLAIM No. CU ........ 2492



RECEIVED
APR 28 1967
Mail Room
Foreign Claims

(DO NOT WRITE IN THIS SPACE)

An original and *one* copy of this form and each supporting exhibit must be filed. Each document in a foreign language must be accompanied by a verified English translation. Answers should be typed or printed. Attach additional sheets as needed for any items where space on the form is insufficient. The information and instruction sheet attached hereto, with directions for each numbered item on the claim form, was prepared for the purpose of assisting you in the preparation of your claim. It is suggested that you read it thoroughly before completing this claim form.

*See also CU-2493*

IMPORTANT—ALL QUESTIONS CONTAINED IN THIS FORM MUST BE ANSWERED.— If claimant does not know the answer to a question or the question is not applicable to his claim, claimant should write "UNKNOWN" or "INAPPLICABLE" in the proper space.

14. If the claim is based upon real or personal property, please furnish description of property, location at time of loss or damage, and nature of claimant's interest.

Piers and warehouses, known as: "San Francisco", "Machina" and "Santa Clara",

located in the Port of Havana, Havana, Cuba. These piers and buildings were

constructed by the claimant and predecessor company under a concession granted

by the Cuban Government.

# HDC Represented To The FCSC That It Owned The Piers



HDC's "Questionnaire" submission to FCSC (Defs. Ex. 3):

**Answers to:**

**INFORMATION QUESTIONNAIRE FOR
UNITED STATES PROPERTY OWNERS IN CUBA**

I.   The HAVANA DOCKS CORPORATION owns and operates in Havana Harbor, three Ocean Steamship piers, named respectively, the San Francisco, Machina and Santa Clara piers linked by a marginal building.   This terminal company offers docking and warehousing facilities for import and export, bonded warehouses and provisional cargo deposits for merchandise pending customs appraisement, etc.

# Evidence That HDC Knew It Did Not Own The Piers

On 10 Sep 2018, at 20:02, "romac106@comcast.net" <romac106@comcast.net> wrote:

Thanks
The State Department was enforcing a law forbidding US citizens to travel to Cuba, and setting fines for violators. ████████████████████████████

I'm suggesting a civil action, which is different than what the State Dept was doing. I'm seeking a way that may not need to involve the State Dept. other than getting passenger lists. This would disrupt the cruise lines and might bring about a quick resolution.

████████████████████████████████████████

Would you have records of the Concession (the leasing of the docks).

I do not believe Havana Docks owns any property in Cuba or ever did. The cruise lines may be taking comfort in that. We need to establish exactly what has been stolen before we can establish a claim. Clearly the right-to-operate was 'stolen' when Castro came into power. But, that right would have expired by now under the original terms. So, is it correct to claim that the cruise lines are operating with stolen property? We need to prove Havana Docks property ownership.

Nice video----I'm ready to go there.

Robert

## 2018, HDC Shareholder Robert Macarthur (Defs. Ex. 2):

I do not believe Havana Docks owns any property in Cuba or ever did. The cruise lines may be taking comfort in that. We need to establish exactly what has been stolen before we can establish a claim. Clearly the right-to-operate was 'stolen' when Castro came into power. But, that right would have expired by now under the original terms. So, is it correct to claim that the cruise lines are operating with stolen property? We need to prove Havana Docks property ownership.

10

# HDC's Own Vice President Could Not Say Whether HDC Made An Accurate Claim

Q. You're telling me you can't say whether or not this is a true or false statement. That claimant states that on the basis of a concession, granted by the Cuban government, it owned three piers?

A. Mr. Singer, again, respectfully, I think you're asking for a legal conclusion about how ownership may tie into concession and so forth and I'm not qualified to answer that.

> Defs. Ex. 133, Carnival's Depo. Of J. Johnson at 52:14 – 53:10 (Apr. 1, 2021).

# Cuban Law Confirms That Port Is "National Property" For "Public Use"

LAW OF PORTS FOR THE ISLAND OF CUBA.

CHAPTER I.

OWNERSHIP OF COAST WATERS, OF THE SHORES OF THE SEA, ACCRETIONS
AND EASEMENTS OF ADJOINING LANDS.

ARTICLE I. The following are national property and for public use,
without prejudice to the rights of individuals:

First. The littoral zone, which is that portion of the coast or sea
limits of the Spanish territory which lies between ebb and flow, where
tides are perceptible, or which is covered by the highest surfs during
storms, where they are not.

Said littoral zone extends also along the banks of rivers as far as
they are navigable or tides are perceptible.

Second. The coast waters or maritime zone which girt the coasts of
Spanish domain, throughout the width determined by international
law, with their coves, roadsteads, bays, harbors and other havens avail-
able for fishing and navigation    Within said zone the State is in charge
of the surveillance and utilities, as also of the right of asylum and
immunity, in accordance to law and international treaties.

ART. 4. Anchorages, ship-yards, docks, arsenals, and other estab-
lishments intended by the Government for the exclusive use of the
navy, are the property of the State. First and second class harbors
of general interest are national property and for public use.

CHAPTER III.

CLASSIFICATION OF PORTS.

ART. 13. For the purposes of this law ports are those places on the
coast more or less protected, either by reason of the natural lay of
the land or by expressly constructed works, and wherein maritime
traffic is carried on in a permanent and legal manner.

ART. 16. Ports of the island which are qualified for foreign trade
or commerce on the high seas are declared first-class ports of general
interest.

Ports not so qualified, at which coasting vessels engaged between
two or more provinces make a stop, are declared second-class ports of
general interest.

ARTICLE 1. The following are national property and for public use, without prejudice to the rights of individuals:

Second. The coast waters or maritime zone which girt the coasts of Spanish domain, throughout the width determined by international law, with their coves, roadsteads, bays, harbors and other havens available for fishing and navigation    Within said zone the State is in charge of the surveillance and utilities, as also of the right of asylum and immunity, in accordance to law and international treaties.

# The Translation of "Law of Ports" Uses "Harbors" And "Ports" Interchangeably

Although the U.S. Government's translation uses the term "harbors" here, the original Spanish document uses the word "puertos," which is translated as "ports" in the remainder of the translation—including in the title of the "Law of Ports" ("Ley de Puertos").

LAW OF PORTS FOR THE ISLAND OF CUBA.

CHAPTER I.

OWNERSHIP OF COAST WATERS, OF THE SHORES OF THE SEA, ACCRETIONS AND EASEMENTS OF ADJOINING LANDS.

ARTICLE 1. The following are national property and for public use, without prejudice to the rights of individuals:

First. The littoral zone, which is that portion of the coast or sea limits of the Spanish territory which lies between ebb and flow, where tides are perceptible, or which is covered by the highest surfs during storms, where they are not.

Said littoral zone extends also along the banks of rivers as far as they are navigable or tides are perceptible.

Second. The coast waters or maritime zone which girt the coasts of Spanish domain, throughout the width determined by international law, with their coves, roadsteads, bays, harbors and other havens available for fishing and navigation   Within said zone the State is in charge of the surveillance and utilities, as also of the right of asylum and immunity, in accordance to law and international treaties.

LEY DE PUERTOS PARA LA ISLA DE CUBA

CAPÍTULO PRIMERO

Del dominio de las aguas del mar litoral y de sus playas, de las accesiones y servidumbres de los terrenos contiguos.

Artículo 1.° Son del dominio nacional y uso público, sin perjuicio de los derechos que correspondan á los particulares:

1.° La zona marítima terrestre, que es el espacio de las costas ó fronteras marítimas del territorio español que baña el mar en su flujo y reflujo, en donde son sensibles las mareas y las mayores olas en los temporales en donde no lo sean.

Esta zona marítima terrestre se entiende también por las márgenes de los ríos hasta el sitio en que sean navegables ó se hagan sensibles las mareas.

2.° El mar litoral, ó bien la zona marítima, que ciñe las costas ó fronteras de los dominios de España, en toda la anchura determinada por el derecho internacional, con sus ensenadas, radas, bahías, puertos y demás abrigos utilizables para la pesca y navegación. En esta zona dispone y arregla el Estado la vigilancia y los aprovechamientos, así como el derecho de asilo é inmunidad, conforme todo á las leyes y á los Tratados internacionales.

# Ports Are Expressly Defined To Include "Constructed Works," Thus Including The Piers Here

LAW OF PORTS FOR THE ISLAND OF CUBA.

CHAPTER I.

OWNERSHIP OF COAST WATERS, OF THE SHORES OF THE SEA, ACCRETIONS AND EASEMENTS OF ADJOINING LANDS.

ARTICLE 1. The following are national property and for public use, without prejudice to the rights of individuals:

First. The littoral zone, which is that portion of the coast or sea limits of the Spanish territory which lies between ebb and flow, where tides are perceptible, or which is covered by the highest surfs during storms, where they are not.

Said littoral zone extends also along the banks of rivers as far as they are navigable or tides are perceptible.

Second. The coast waters or maritime zone which girt the coasts of Spanish domain, throughout the width determined by international law, with their coves, roadsteads, bays, harbors and other havens available for fishing and navigation   Within said zone the State is in charge of the surveillance and utilities, as also of the right of asylum and immunity, in accordance with law and international treaties.

ART. 4. Anchorages, ship-yards, docks, arsenals, and other establishments intended by the Government for the exclusive use of the navy, are the property of the State.   First and second class harbors of general interest are national property and for public use.

CHAPTER III.

CLASSIFICATION OF PORTS.

ART. 13. For the purposes of this law ports are those places on the coast more or less protected, either by reason of the natural lay of the land or by expressly constructed works, and wherein maritime traffic is carried on in a permanent and legal manner.

ART. 16. Ports of the island which are qualified for foreign trade or commerce on the high seas are declared first-class ports of general interest.

Ports not so qualified, at which coasting vessels engaged between two or more provinces make a stop, are declared second-class ports of general interest.

---

ART. 13. For the purposes of this law ports are those places on the coast more or less protected, either by reason of the natural lay of the land or by expressly constructed works, and wherein maritime traffic is carried on in a permanent and legal manner.

14

LAW OF PORTS FOR THE ISLAND OF CUBA.

## CHAPTER I.

OWNERSHIP OF COAST WATERS, OF THE SHORES OF THE SEA, ACCRETIONS AND EASEMENTS OF ADJOINING LANDS.

ARTICLE 1. The following are national property and for public use, without prejudice to the rights of individuals:

First. The littoral zone, which is that portion of the coast or sea limits of the Spanish territory which lies between ebb and flow, where tides are perceptible, or which is covered by the highest surfs during storms, where they are not.

Said littoral zone extends also along the banks of rivers as far as they are navigable or tides are perceptible.

Second. The coast waters or maritime zone which girt the coasts of Spanish domain, throughout the width determined by international law, with their coves, roadsteads, bays, harbors and other havens available for fishing and navigation. Within said zone the State is in charge of the surveillance and utilities, as also of the right of asylum and immunity, in accordance to law and international treaties.

ART. 4. Anchorages, ship-yards, docks, arsenals, and other establishments intended by the Government for the exclusive use of the navy, are the property of the State. First and second class harbors of general interest are national property and for public use.

## CHAPTER III.

CLASSIFICATION OF PORTS.

ART. 13. For the purposes of this law ports are those places on the coast more or less protected, either by reason of the natural lay of the land or by expressly constructed works, and wherein maritime traffic is carried on in a permanent and legal manner.

ART. 16. Ports of the island which are qualified for foreign trade or commerce on the high seas are declared first-class ports of general interest.

Ports not so qualified, at which coasting vessels engaged between two or more provinces make a stop, are declared second-class ports of general interest.

ART. 4. Anchorages, ship-yards, docks, arsenals, and other establishments intended by the Government for the exclusive use of the navy, are the property of the State. First and second class harbors of general interest are national property and for public use.

ART. 16. Ports of the island which are qualified for foreign trade or commerce on the high seas are declared first-class ports of general interest.

# HDC Did Not Have The Right To Provide Passenger Services

- HDC's Concession was granted based on a proposal to operate a *cargo* business.

- Nothing in the Concession documents authorized HDC to provide passenger services; instead, they refer to cargo operations.

- Nothing in the concession reflected ownership of the piers

Whereas: The proposed works will undoubtedly facilitate the operations merchandise handling operations, and will additionally result in greater available capacity at the aforesaid docks, thereby meeting a significant need and affording the significant advantage of being able to transport cargo intended for the interior of the Republic without the current lighterage charges, which advantages redound to the benefit of the public service; and, taking into account the present congested situation existing in the port of Havana and the volume of commercial activity therein, it is necessary to provide for the improvement thereof in every respect.

Concession, Decree 1944 at 4th Whereas Clause (1920) (Defs. Ex. 125 at p.45).

# HDC Was Required To Transfer Passenger Facilities To The Cuban Government

- HDC's Concession required HDC to **transfer to the Government** the "Passenger Ticket Office," and portion of the dock used for it. HDC was not allowed to operate its cargo services there.

16.- During the term of the concession, neither the section of the dock/jetty on the north side that is intended for the public, or the Customs Inspectors' Department, may be set aside for any use other than those assigned to them in this project. The State will not permit the provision of mechanical services such as those used by the concessionaire for its operations on said part of the jetty.

17.- The concessionaire permanently transfers to the State all expansion work on the Passenger Ticket Office intended for the Customs Offices, subject to the condition that this building may not be used for any purpose other than the establishment of said Offices.

Concession, Decree 467 at Art. 16 & 17 (1905) (Defs. Ex. 1-3).

# HDC Did Not Have The Right To Exclude Ships From The Piers

Under Cuban law, the Concessionaire could not establish a monopoly, make its services compulsory, or interfere with the public's right to use this port.



ART. 44. It is the duty of the colonial secretary to grant authorization, after hearing the naval authorities, for the construction on the sea or beaches and adjoining lands, or in ports, whether for private or public use, of such wharves, quays, dockyards, floating docks, shipyards, and other similar works as are complementary and auxiliary to those existing for the service of the port. Such authorization shall not constitute a monopoly, and therefore others may be granted for the same class of works in the same harbor, beach, or stretch of coast, provided the public service or use does not suffer thereby.

ART. 48. When the works of a port the concession of which is applied for, whether in conformity with the plan of the applicant, or subject to the one surveyed and approved by the colonial department, refers to one in which, although no work has yet been executed, there exists a legally authorized maritime commerce, and services are performed with more or less perfection, the concession must be granted under such conditions as may be necessary to reserve in full force the existing rights of entering the port, anchoring, loading, and unloading, afloat or on the coast, so that none of the services that are freely exercised or enjoyed by the public may be made compulsory.

# HDC Had No Right to Operate Passenger Services

HDC's 1959 "Yearly Report"
(P's Omnibus Ex. 35, at HDC 009226)

- The concession was limited to cargo operations and ceded passenger services to the State.

- HDC earned de minimis passenger revenue, not even considered part of "pier operations." to its cargo operations.



| ACCOUNTS | | 1959 | 1958 |
|---|---|---|---|
| 201.- | Handling | $1,736,425.35 | $2,002,022.97 |
| 202.- | Handling G. O. | 21.37 | 4.81 |
| 203.- | Wharfage | 151,917.48 | 161,800.60 |
| 204.- | Storage | 299,385.74 | 235,630.33 |
| 205.- | Insurance | 52,553.46 | 45,916.09 |
| 206.- | Moving | 3,404.68 | 4,537.10 |
| 208.- | Other Pier Revenue | 3,517.58 | 4,644.52 |
| 209.- | Delivery Handling | ( 3,632.50) | 5,458.00 |
| 210.- | Total Pier Operations | $2,243,593.16 | $2,460,014.42 |
| 211.- | Lighters | $ - | $ - |
| 212.- | Tugs | | |
| 213.- | Cranes | 155.00 | 471.96 |
| 214.- | Cold Storage | - | |
| 215.- | Baggage | - | - |
| 216.- | Passengers | 12,427.65 | 14,664.11 |
| 217.- | Other Aux. Operations | 1,639.14 | 2,603.24 |
| 220.- | Total Auxiliary Operations | $ 14,221.79 | $ 17,739.31 |
| 230.- | Total Non-Operating | $ 18,174.29 | $ 26,360.08 |
| | Total Gross Income | $2,275,989.24 | $2,504,113.81 |

19

# HDC's Lease To United Fruit Co. Was A Sublease Of *Only* The Limited Concession Rights

PORT OF HAVANA DOCKS COMPANY

AND

UNITED FRUIT COMPANY

Lease.

19.   The Tenant agrees to occupy and use the piers under this lease under and in conformity to the laws of the Republic, the provisions of the Concession which it hereby expressly accepts in so far as the same relates to its occupancy and use of the said piers, and all rules, regulations and ordinances of the City of Havana or the Government of Cuba including compliance with the laws and regulations of the Customs and Port authorities and the execution and delivery of any bonds that may be necessary in connection with the operation of the piers, including the Workmen's Liability Law if required.

P.'s Omnibus Ex. 12

- HDC leased its concession interests to United Fruit, but that lease was subject to all limitations of the concession and Cuban law.

- The private lease agreement incorporated the concession and Cuban law and could not give HDC rights it never possessed before the lease.

# Unrebutted Expert Testimony Of Ambar Diaz Confirms That Under Cuban Law, All HDC Owned Was Non-Exclusive Concession For Cargo Operation

- Based on her analysis of the Concession and understood in light of applicable Cuban laws, Ms. Diaz concluded:

  – The Cuban Government always owned the Piers and the property on which they were built

  – Havana Docks held only a non-exclusive right to operate a cargo loading and unloading business at the Piers

  – Havana Docks was not granted any right to operate passenger services or to exclude passenger ships—including cruise lines—from using the Piers

- "If the Concession were still in effect today, cruise lines and other vessel owners could use the Piers without any legal obligation to contract with or use the services of Havana Docks."

Diaz Report, at p. 5.

# Unrebutted Expert Testimony Of Ambar Diaz Is Properly Relied Upon

- Although this court can rely on the plain language of the translated Cuban laws and decrees, this Court can also consider the expert report of Ambar Diaz.

  - This Court denied Plaintiff's motion to exclude  Ms. Diaz.

  - Rule 44.1 is clear that this Court can fully consider her report: "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

    - World Fuel Services, Inc. v. M/V PARKGRACHT, 489 F. Supp. 3d 1340, 1345–46 (S.D. Fla. 2020) (considering expert testimony on how foreign law should be "interpreted **and applied**" on the facts of the case, at summary judgment stage (emphasis added)).

    - Wheelings v. Seatrade Groningen, BV, 516 F. Supp. 2d 488, 499 (E.D. Pa. 2007) (relying on expert affidavit "interpreting the contract [at issue] under Dutch law" at summary judgment stage).

## Defendants Did Not Use The "Property" Confiscated From HDC

- Under the Act, Defendants are only liable for "trafficking" in the specific "property" that was confiscated from Plaintiff:

  - 22 USC § 6082(a)(1)(A): "…any person that … traffics in **property which was confiscated by the Cuban Government** on or after January 1, 1959, shall be liable to any United States national who owns the claim to **such property** for money damages …." (Emphasis added.)

  - As this Court explained: "Further, '**such property**' in the phrase 'the claim to such property' **refers to 'property which was confiscated by the Cuban Government.'**". *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, 454 F. Supp. 3d 1277 (S.D. Fla. 2020).

- At most, the Cuban government confiscated HDC's non-exclusive right to operate a cargo business at the Piers—but Defendants did not use that confiscated cargo business.

# Defendants Use of the Piers is Protected by the Lawful Travel Exclusion

# In Havana, President Obama Encouraged Cruise Travel To Cuba





Def.'s Omn. MSJ at 14, n. 24
(https://obamawhitehouse.archives.gov/the-press-office/2016/03/21/remarks-president-obama-and-president-raul-castro-cuba-joint-press)

"We're moving ahead with more opportunities for Americans to travel to Cuba and interact with the Cuban people. Over the past year, the number of Americans coming here has surged. Last week, we gave approval for individual Americans to come here for educational travel. U.S. airlines will begin direct commercial flights this year. **With last week's port security announcement, we've removed the last major hurdle to resuming cruises and ferry service,** all of which will mean even more Americans visiting Cuba in the years ahead and appreciating the incredible history and culture of the Cuban people."

# The Obama Administration
## Sanctioned Travel To Cuba

THE WHITE HOUSE
WASHINGTON

Presidential Policy Directive

**United States-Cuba Normalization**
October 14, 2016

SUBJECT: United States-Cuba Normalization

I. Introduction

"Bearing in mind the limits imposed by the Cuban Liberty and Democratic (LIBERTAD) Solidarity Act of 1996 ('Libertad Act') and other relevant statutes, <u>the Departments of the Treasury and Commerce implemented six packages of regulatory amendments to the Cuba sanctions program, easing restrictions on travel, trade, and financial transactions</u>. . . . Future U.S. citizen travel will be supported by scheduled air service, which began in August 2016, and the first U.S. cruise liner visited Cuban ports in May 2016. . . . <u>The United States will continue to encourage people-to-people linkages through government and privately sponsored exchanges</u>, . . . . As permitted by law, we will continue to support the development of scheduled and chartered air service and maritime links, including ferries…"

between members of the diaspora who left Cuba and those who remain on the island. Normalization necessarily extends beyond government-to-government rapprochement -- it includes rebuilding bridges between individuals and families.

This directive: (1) describes the U.S. vision for normalization with Cuba and how our policy aligns with U.S. national security interests; (2) assesses progress toward normalization; (3) describes the current and foreseen strategic landscape; (4) describes

Def.'s Omn. MSJ at 14, n. 1 Presidential Policy Directive -- United States-Cuba Normalization, The White House (Oct. 14, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/10/14/presidential-policy-directive-united-states-cuba-normalization

# U.S. Government Regulations Promulgated
## General Licenses For Carrier Services



Code of Federal Regulations

**The President**

31 C.F.R. § 515.572
September 21, 2015

**September 21, 2015:**
OFAC promulgated a general license authorizing cruise lines to provide carrier services to and from Cuba.

**September 21, 2015:**
U.S. Dept. of Commerce, Bureau of Industry and Security ("BIS") authorized cruise ship transport to Cuba.

**March 22, 2016:**
U.S. Dept. of Homeland Security removed conditions for U.S. entry for vessels from Cuba

# U.S. Government Regulations Promulgated
## General Licenses For Carrier Services



Code of Federal Regulations

**The President**

31 C.F.R. § 515.572

September 21, 2015

(2) *Authorization to provide carrier services.*

(i) Persons subject to U.S. jurisdiction are <u>authorized to provide carrier services to, from, or within Cuba in connection with travel or transportation, directly or indirectly, between the United States and Cuba</u> of persons, baggage, or cargo authorized pursuant to this part. 31 C.F.R. § 515.572(a)(2)(i)

# U.S. Government Regulations Promulgated
## General Licenses For Carrier Services



**The President**
_____

31 C.F.R. § 515.572

September 21, 2015

(2) *Authorization to provide carrier services.*
(i) Persons subject to U.S. jurisdiction are <u>authorized to provide carrier services to, from, or within Cuba in connection with travel or transportation, directly or indirectly, between the United States and Cuba</u> of persons, baggage, or cargo authorized pursuant to this part. 31 C.F.R. § 515.572(a)(2)(i)

(4) *Authorization to provide lodging services.* Persons subject to U.S. jurisdiction who are providing carrier services by vessel authorized <u>pursuant to paragraph (a)(2) of this section are authorized to provide lodging services</u> onboard such vessels to persons authorized to travel to or from Cuba pursuant to this part during the period of time the vessel is traveling to, from, or within Cuba, *including when docked at a port in Cuba.* 31 C.F.R. § 515.572(4)(a)(2)

# U.S. Government Regulations Promulgated
## General Licenses For Carrier Services



Code of Federal Regulations

**The President**

31 C.F.R. § 515.560

(c) Except as provided in paragraph (d) of this section, <u>persons generally or specifically licensed</u> under this part to engage in transactions in connection with travel to, from, and within Cuba may engage in the following transactions:

(1) *Transportation to, from, and within Cuba; Cuban visas.* <u>All transportation-related transactions ordinarily incident to travel to, from, and within Cuba</u>, including the acquisition of Cuban visas, *<u>are authorized</u>*. 31 C.F.R. § 515.560(c)(1)

# The Helms Burton Act Expressly Codified OFAC's Authority To Promulgate Foreign Travel Regulations



**The Helms Burton Act Expressly Codified OFAC's Authority To Promulgate Foreign Travel Regulations**

The economic embargo of Cuba, as in effect on March 1, 1996, including all restrictions under part <u>515 of title 31, Code of Federal Regulations</u>, shall be *in effect on March 12, 1996*, and <u>shall remain in effect</u>, subject to section 6064 of this title.

22 U.S.C. §6032(h)



"<u>Licenses will be issued by the Office of Foreign Assets Control</u> acting on behalf of the Secretary of the Treasury, acting <u>in accordance with such regulations, rulings and instructions as</u> the Secretary of the Treasury or the Office of Foreign Assets Control *<u>may from time to time prescribe</u>*."

31 C.F.R. § 515.801(b)(6) (1996)

# Plaintiff Must Sue OFAC Under
## The Administrative Procedure Act

- OFAC regulations have the force of law.

  – *Davis v. Bowen*, 840 F.2d 822, 824 (11th Cir. 1988) (**"Without deciding that the regulation is invalid, it, of course, has the force of law"**)

- To the extent Plaintiff challenges OFAC's authority, it must do so pursuant to the Administrative Procedure Act.

  – 5 U.S.C. § 706(2)(C) (establishing that a "reviewing court shall hold unlawful and set aside agency action, findings, and conclusions **found to be in excess of statutory jurisdiction, authority or limitations"**)

# The Eleventh Recognizes OFAC's Authority
## And Discretion To Regulate Foreign Travel

- **The CACR** promulgated in the 1960's **are still valid** by virtue of these extensions as well as **by Congress' subsequent codification in 1996 of the economic embargo against Cuba**, *see* 22 U.S.C. § 6032(h), though **the regulations have been** "*alternately loosened and tightened* in response to specific circumstances."

  *Odebrecht Constr., Inc. v. Sec'y, Fla. Dept. of Transp.*, 715 F. 3d 1268, 1276 (11th Cir. 2013) (quoting Regan v. Wald, 468 U.S. 222, 228, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984))

- "[T]he **executive branch has promulgated the [CACR]**, which are enforced by the Department of the Treasury, **and the President has enormous discretion to calibrate the sanctions therein**."

  *Id.* at 1284

- "The **considerable discretion afforded the President** has been **amply evidenced** by the **periodic tightening and loosening of sanctions related to travel**."

  *Id.*

# By Law, OFAC Has Discretion To Issue
## Licenses And Regulate Foreign Travel

- "The CACR creates **both** *general licenses*…**and** *specific licenses…* OFAC, **acting on behalf of the President**, enjoys **considerable discretion** to authorize otherwise prohibited transactions by way of licenses. Moreover, OFAC has the **same discretion to amend, modify or revoke both the licensing provisions of the CACR, as well as individual licenses, at any time**."

  *Havana Club Holding, S.A. v. Galleon S.A.*, 961 F.Supp. 498, 500-01 (S.D.N.Y. 1997)

- "Given that the CACR are an **instrument of foreign policy**, OFAC's issuance of or failure to revoke a license rests upon foreign policy considerations and **judgments of the Executive Branch should not be disturbed by the courts**."

  *Id.* at 503

# Use Of Confiscated Property Was
## "Incident To" Lawful Travel To Havana

- The H-BA requires Defendants' use of the Terminal be "incident to lawful travel." There is no requirement that carrier services expressly fall within on of the twelve enumerated lawful travel categories.

  22 U.S.C. §6023(13)(B)(iii) (excluding from "traffics" "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel.)

- Use of property is **"incident to lawful travel"** when the use **"arises out of"** or is "otherwise connected with" the travel.

  *Comnet Wireless, LLC v. Benning Power Elecs., Inc.*, No. 15-cv-3424, 2016 WL 8578007, at *2 (D. Colo. Feb. 8, 2016)

- Defendants' Use of the Terminal **arose out of** and was directly **connected with** conducting **carrier services to and from Havana**.

- The record proves that Defendants began sailing to Havana under the authorization of general and/or specific licenses and stopped sailing when those authorizations ended.

# "Necessary" Means "Reasonably Necessary"
## Not "Absolutely Necessary And Having No Other Alternative"

- "As a basic rule of statutory interpretation," courts "read the statute using the normal meanings of its words."

  *Consol. Bank, N.A., Hialeah v. U.S. Dept. of Treasury, Office of Comptroller of Currency*, 118 F.3d 1461, 1463 (11th Cir. 1997)

- Chief Justice Marshall established the framework for applying the term "necessary" in *McCulloch v. Maryland*.

  17 U.S. 316, 388 (1819); *United States v. Comstock*, 560 U.S. 126, 134 (2010) (citing *McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819) (Chief Justice Marshall emphasized that the word "necessary" **does not mean** "absolutely necessary.")

- **Eleventh Circuit**:  "[N]ecessity" is governed by a "test of reasonableness, not of absolute necessity."

  *Inbesa Am., Inc. v. M/V Anglia*, 134 F.3d 1035, 1036 (11th Cir. 1998)

37

# A Broad Definition of "Necessary" Reflects with Congressional Purpose



104TH CONGRESS
2d Session
HOUSE OF REPRESENTATIVES
REPORT
104–468

CUBAN LIBERTY AND DEMOCRATIC SOLIDARITY
(LIBERTAD)

MARCH 1, 1996.—O...

Mr. GILMAN, from the c...
submitted t...

CONFERENCE...

[To accompa...

The committee of conferenc...
two Houses on the amendment of the...
to seek international sanctions a...
Cuba, to plan for support of a tr...
democratically elected government...
having met, after full and free...
ommend and do recommend to th...
That the House recede from...
ment of the Senate and agree to the same with an amendment as
follows:
In lieu of the matter proposed to be inserted by the Senate
amendment, insert the following:
SECTION 1. SHORT TITLE; TABLE OF CONTENTS.
(a) SHORT TITLE.—This Act may be cited as the "Cuban Liberty
and Democratic Solidarity (LIBERTAD) Act of 1996".
(b) TABLE OF CONTENTS.—The table of contents of this Act is
as follows:
Sec. 1. Short title; table of contents.
Sec. 2. Findings.
Sec. 3. Purposes.
Sec. 4. Definitions.
Sec. 5. Severability.

TITLE I—STRENGTHENING INTERNATIONAL SANCTIONS AGAINST THE
CASTRO GOVERNMENT

Sec. 101. Statement of policy.
Sec. 102. Enforcement of the economic embargo of Cuba.
Sec. 103. Prohibition against indirect financing of Cuba.
Sec. 104. United States opposition to Cuban membership in international financial
institutions.

29–006

The definition of "traffics," as used in Title III, has been modified to remove any liability for… any activities related to lawful travel to Cuba[.]"
142 CONG. REC. H1645-02, 1996 WL 90487, at H1656

# Contracts Requires Defendants' Use Of The Terminal



- The Cuban government **explicitly required and contractually obligated** Defendants to dock at the Terminal, and to embark and disembark passengers at the Terminal.

  -Omnibus SUMF Ex. 26, 46, 47, 48, 49, 53

# Contracts Require use of Havana Terminal



Q. Now, can you identify any documents in which the Cuban Government required Carnival Corporation to use the Sierra Maestra Port Terminal in order to cruise to Cuba? Identify the document, sir.

A. Finally, it is the contract that the Cuban Government had presented us with no choices. That's the place we're going to. It was never a choice, and our contract specifically specified where we are going.

-Omnibus SUMF Ex. 53, G. Israel Depo Tr., 123:18-22



- The Cuban government harbor pilots physically boarded Defendants' ships and docked them to the Terminal in Havana, Cuba.

  -Omnibus SUMF Ex. 28, 72-77

```
          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA

     CASE NO.


HAVANA DOCKS CORPORAT
     Plaintiff,
-vs-
ROYAL CARIBBEAN CRUIS
LTD.,
     Defendant.
_____


     VIDEO-RECO
   CORPORATE REPRES
        (Pages

        Nove
        9:34 a

   Remotely Via
        Mia


Examination of the witness stenographically taken
   before:  Lance W. Steinbeisser, RPR
          NCRA-Certified Stenographic Reporter
```

**A.** **We had to dock at a pier. And then the pilots took us there.**

Q. And, again, this is all specific to if Royal wanted to cruise to the Havana, the city of Havana, it had to use the Havana Port Terminal?

A. Correct

Q. Just limited to the cruises to Havana?

A. Correct.

-Omnibus SUMF Ex. 26 B. Stein Depo. Tr., 107:8-9



- The Cuban government **rejected every request** Defendants made to anchor or tender in Havana.

Omnibus SUMF Ex. 1, 16, 24, 26, 30, 44-67

**Message**

| | |
|---|---|
| From: | José Luis Perdigón Ramirez [presidente.ejecutivo@aries.transnet.cu] |
| Sent: | 3/23/2018 5:14:40 PM |
| To: | Parodi, Mario [mparodi@nclcorp.com] |
| CC: | Del Rio, Frank J. [frankdelrio@nclcorp.com]; Marmanillo, Jennifer [jmarmanillo@nclcorp.com]; 'Hugo Cancio' [hugo.ncl@oncubatravel.com]; 'Massiel Obregón' [comercial.esp2@aries.transnet.cu] |
| Subject: | RE: Request to anchor |

I appreciate your communication, but for the moment <u>the mode that you propose in the port of Havana anchored and operated by tender launch boats is not authorized by the maritime authorities</u>, nor do we have the infrastructure in the Sierra Maestra pier that [sic] our only current property for providing this service.

-Omnibus SUMF Ex. 64



-Omnibus SUMF Ex. 77

# Under any Definition, Defendants' Use Of The Terminal Was Necessary For Travel To Havana

Under any Definition, Defendants' Use Of The



- Even if the Cuban government allowed Defendants to tender, passengers would still need to use the Terminal for customs and immigration services.

  -Omnibus SUMF Ex. 77, 78



-Omnibus SUMF Ex. 77



A. Tendering to the Sierra Maestra facility. It's the only place they could go.

Q. I'm sorry?

A. That was the only place they could tender to.

Q. How do you know that, sir?

A. Because that's our understanding that's the only facility that has the capability of receiving passengers.

-Omnibus SUMF Ex. 78, A. Perez Depo. Tr., 189:8-16

# Viking Travel To Cienfuegos Does Not
## Make Use Of The Havana Port Unnecessary

- The Cuban government **denied Viking access** to the Terminal, **so Viking could not lawfully sail to Havana at all**.

  (ECF No. 322-15 at 74:22–77:22, 79:01–07.)

- As a result, Viking was forced to sail elsewhere. The Cuban government permitted Viking to sail to Cienfuegos. Viking tbussed a limited number of its passengers to Havana. Each bus only had **44 seats** and the busses were **not always air-conditioned**. (ECF 322 at 94:8–23.) Viking only offered these trips to a limited number of passengers.

  (ECF 322-15 at Exs. 1-B (**maximum of 250 for day trip**), 1-C (**maximum of 470 for overnight trip**).)

- **Bussing passengers from Cienfuegos was not feasible for Defendants** because: It would **require thousands of passengers** to spend **over eight hours round-trip**.

  (ECF No. 322-15 at 81:7–82:15; ECF No. 308-6 at 127:12–129:4.)

49

# The Cuban Government Did Not Allow
## Defendants To Use The Container Terminal



- The Cuban government **never authorized any Defendant,** to use the Havana Container Terminal "because they could not have customs and immigrations operations there for all the passengers.

  -Omnibus SUMF Ex. 53, 55, 56, 57

# The Cuban Government Did Not Allow
## Defendants To Use The Container Terminal

**The Cuban government denied Defendants' requests to use the Container Terminal**



"We looked at the cargo pier…And we encouraged them. 'Can we use the cargo piers? No, you cannot use it'…there's a pier on the other side. 'Can we use that? No.'"

- Omnibus SUMF Ex. 53, G. Israel Depo Tr., 308-2, at 141:08–19

"[The Cuban] authority denied the container terminal of Havana. The only option you have is to go at [Pier No. 1] north without any dolphin, any – any facility. This is . . . the authorization we receive."

-Omnibus SUMF Ex. 55, Pastena Depo. Tr., 107:9-15

"[T]he Cuban authorities . . . said that this was not possible to use this pier [at the TCH] because they could not have customs and immigration operations there for all the passengers. That's why they gave us as the only option the [Pier No. 1].

-Omnibus SUMF Ex. 56, Onorato Dep. Tr., 136:15-22

51

Given Gabe's departure, I wanted to take stock and make sure that we have addressed the specific concerns you identified below. I have confirmed that we have opened cases/files for each of the requests noted in the chain below, including Title IV enforcement requests in relation to the port, port facilities, and area surrounding the harbor of Santiago de Cuba; port properties in Havana; and entities that may be docking at both properties. As previously discussed, given the clear exclusion in Title IV's definition of "traffics" of transactions and uses of property incident to lawful travel to Cuba, we are not currently pursuing Title IV actions in relation to commercial cruise lines. As we receive multiple requests for Title IV enforcement action and are operating under limited resources, we prioritize cases according to a number of factors, including the availability of information and our assessment of the strength of the Title IV case. That said, we are actively working on Title IV enforcement actions regarding activities related to the port, port facilities, and area surrounding the harbor of Santiago de Cuba, including seeking additional information from foreign entities concerned. We have also opened a file for your request regarding port properties in Havana and will reach out should additional information be necessary for our investigation.

**Plaintiff repeatedly asked the United States Government to declare Defendants' conduct illegal under Title IV of the Act. SUMF No. 27**

# The U.S. State Department's Position Was That Defendants' Use Of The Terminal Was Lawful

Message

**From:** Kim, Deanna G [KimDG@state.gov]
**Sent:** 8/2/2018 12:51:47 PM
**To:** Jerry Johnson [O=Exchange Labs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=302f3ed959214dd5b5a435d77a9fc8d1-johnson]; Javier Garcia-Bengochea [jgb@bellsouth.net] [jgb@bellsouth.net]
**CC:** Mickael Bohn [mickaelbehn@gmail.com]; Aaron Johnson [ajohnson.hdc@gmail.com] [ajohnson.hdc@gmail.com]; Tarantola, Sonia S [TarantolaSS@state.gov]; Alpert, Rachel K [AlpertRK@state.gov]; Patel, Nutan B [PatelNB@state.gov]; Magalion, Erica G [MagalionEG@state.gov]
**Subject:** RE: (S) Javier Garcia-Bengochea, MD Title IV Cuba Claims

Mr. Johnson, Dr. Garcia:

Given Gabe's departure, I wanted to take stock and make sure that we have addressed the specific concerns you identified below. I have confirmed that we have opened cases/files for each of the requests noted in the chain below, including Title IV enforcement requests in relation to the port, port facilities, and area surrounding the harbor of Santiago de Cuba; port properties in Havana; and entities that may be docking at both properties. As previously discussed, given the clear exclusion in Title IV's definition of "traffics" of transactions and uses of property incident to lawful travel to Cuba, we are not currently pursuing Title IV actions in relation to commercial cruise lines. As we receive multiple requests for Title IV enforcement action and are operating under limited resources, we prioritize cases according to a number of factors, including the availability of information and our assessment of the strength of the Title IV case. That said, we are actively working on Title IV enforcement actions regarding activities related to the port, port facilities, and area surrounding the harbor of Santiago de Cuba, including seeking additional information from foreign entities concerned. We have also opened a file for your request regarding port properties in Havana and will reach out should additional information be necessary for our investigation.

Thank you

Deanna Kim
Acting Coordinator for Cuban Affairs

**From:** Jerry Johnson <johnson@bankofthebluegrass.com>
**Sent:** Friday, July 6, 2018 4:46 PM
**To:** Escobar, Gabriel <EscobarG@state.gov>
**Cc:** Mickael Behn <mickaelbehn@gmail.com>; Javier Garcia-Bengochea (jgb@bellsouth.net) <jgb@bellsouth.net>; Aaron Johnson (ajohnson.hdc@gmail.com) <ajohnson.hdc@gmail.com>; Patel, Nutan B <PatelNB@state.gov>
**Subject:** RE: (S) Javier Garcia-Bengochea, MD Title IV Cuba Claims

Excellent Gabriel. I see from Nutan's out-of-office e-mail response of today that she is on Temporary Duty Assignment in Havana. I was thinking that she may be able to see first hand what is happening with our property there.

Very best wishes,

Jerry

*Jerry M. Johnson*
*Senior Vice President, Director of Wealth Management*

**BANK of BLUEGRASS**
WEALTH MANAGEMENT

Direct Telephone: (859) 233-8903
Fax: (859) 252-3304

---

Given Gabe's departure, I wanted to take stock and make sure that we have addressed the specific concerns you identified below. I have confirmed that we have opened cases/files for each of the requests noted in the chain below, including Title IV enforcement requests in relation to the port, port facilities, and area surrounding the harbor of Santiago de Cuba; port properties in Havana; and entities that may be docking at both properties. As previously discussed, given the clear exclusion in Title IV's definition of "traffics" of transactions and uses of property incident to lawful travel to Cuba, we are not currently pursuing Title IV actions in relation to commercial cruise lines. As we receive multiple requests for Title IV enforcement action and are operating under limited resources, we prioritize cases according to a number of factors, including the availability of information and our assessment of the strength of the Title IV case. That said, we are actively working on Title IV enforcement actions regarding activities related to the port, port facilities, and area surrounding the harbor of Santiago de Cuba, including seeking additional information from foreign entities concerned. We have also opened a file for your request regarding port properties in Havana and will reach out should additional information be necessary for our investigation.

**Plaintiff repeatedly asked the United States Government to declare Defendants' conduct illegal under Title IV of the Act. SUMF No. 27**



# The United States Government Agreed That Defendants' Use Of The Terminal Was Lawful

THE WHITE HOUSE
WASHINGTON
Presidential Policy Directive
United States-Cuba Normalization
October 14, 2016
SUBJECT: United States-Cuba Normalization

I. Introduction

On December 17, 2014, I announced that [...] would chart a new course with Cuba, en[...] policy that had failed to advance U.S. inte[...] reform and a better life for the Cuban people[...] several decades. Under the new policy, [...] expands and promotes authorized engagem[...] advance cooperation on areas of mutual inte[...] travel to, commerce with, and the free flow[...] Cuba. The objective of the new policy is [...] people to achieve a better future for th[...] encourage the development of a partner in [...] of working with the United States to [...] challenges, such as climate change, di[...] trafficking.

- **<u>Neither the Obama nor the Trump administrations ever imposed any penalty</u>** under the Act against Defendants for any alleged "trafficking" in the Terminal.
- The Court should defer to these determinations by State Department officials that the lawful travel exclusion applies to the conduct at issue.

*Havana Club*, 961 F.Supp. at 504
(Considering that OFAC's actions as an Executive Branch agency rest upon sensitive foreign policy concerns, the courts should not lightly take on the role of second-guessing its determinations.)

# Plaintiff Cannot Bring A Title III Claim As Its Principal Place Of Business Is Outside The U.S.

# Havana Docks Is Not Entitled To Bring A Claim

- The Helms Burton Act only allows U.S. Nationals to recover.

- As pled under 22 U.S.C. § 6023(15)(b), Plaintiff does not qualify as a U.S. National because it cannot show that it had its Principal Place of Business in the U.S. at the time of filing.

- Mr. Behn, the President of Havana Docks Corporation has **directed** and **controlled** the corporation's operations from the United Kingdom, where he has lived since the 1990s.

- Under the 'nerve center' test that the Eleventh Circuit applies, administrative support from Mr. Johnson does not make Kentucky—a place HDC is not registered to conduct business-- the corporation's Principal Place of Business is in the U.S.

- The Helms Burton Act states (22 U.S.C. § 6082(a)(1)(A)):
  - **(a) Civil Remedy**
    - **(1) Liability for Trafficking**
    - **(A)** Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this subchapter, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any **Unites States national** who owns the claim to such property for money damages [.]

- The Helms Burton Act defines **U.S. National** as (22 U.S.C. § 6023(15)):
  - **(15) United States national**
    - The term "United States national" means—
    - **(A)** any United States citizen; or
    - **(B)** any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States.

# Plaintiff Pled Only That It Was Proceeding Under Section § 6023(15)(B)

- The definition for U.S. National is (22 U.S.C. § 6023(15)):
  - (15)  United States national
    - The term "United States national" means—
    - (A) any United States citizen; or
    - (B) any other legal entity which is organized under the laws of the  United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States.

**Plaintiff pleaded it was proceeding under subsection (B). Plaintiff never plead a basis for proceeding under subsection (A).**

*Mahgoub v. Miami-Dade Comty. Coll.*, No. 05-11520, 2006 WL 952278, at *2-3 (11th Cir. April 13, 2006) (affirming a grant of summary judgment and finding that a theory of liability that was not asserted in the complaint was improperly before the Court)

> **PARTIES**
>
> 1.   Plaintiff, Havana Docks Corporation, 215 Southland Drive, Lexington, Kentucky, 40503, is a Delaware corporation and a U.S. National under 22 U.S.C. § 6023(15)(B).

[I]n the Libertad Act there are various provisions that apply to a "United States national," which is defined by the statute as "any United States citizen" or "any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States." 22 U.S.C. § 6023(15). In other words, **U.S. citizens and U.S. corporations**.

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.,*
*715 F.3d 1268, 1282 n.5 (11th Cir. 2013).*

# "National of The United States" Under "Claims Act" Is Different Than "United States National" Under Helms Burton

| | Claims Act - 22 U.S.C. § 1643a(1) | Helms Burton Act - 22 U.S.C. § 6023(15) (b) |
|---|---|---|
| **TERM DEFINED** | "National of the United States" | "United States National" |
| **JURISDICTIONAL REQUIREMENT** | If the claimant satisfies this definition at this time of confiscation *through the time of filing of a claim*, they can get a certified claim. | To bring suit, the plaintiff must show it is a business with a principal place of business in the US. |

# Principal Place Of Business Is Determined As Of The Time Of Filing The Lawsuit

- *See Alps S., LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379, 1386 (Fed. Cir. 2015) (determining statutory standing as of the time plaintiff filed the lawsuit).


- *See Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571 (2004) (measuring "all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of the facts that existed at the time of filing").

# Principal Place of Business Refers To The "Nerve Center" Where A Corporation's Officers Direct, Control, And Coordinate The Corporation's Activities

*""Our test nonetheless points courts in a single direction, toward the center of overall direction, control, and coordination."*

Hertz Corp., 559 U.S. at 96.

## SUPREME COURT OF THE UNITED STATES

Syllabus

### HERTZ CORP. v. FRIEND ET AL.

2. The phrase "principal place of business" in §1332(c)(1) refers to the place where a corporation's high level officers direct, control, and coordinate the corporation's activities, *i.e.*, its "nerve center," which will typically be found at its corporate headquarters. Pp. 5–19.

# The 'Total Activities' Test No Longer Applies

*Plaintiff contends that the Court should not apply the "nerve center" test set forth in* Hertz Corp. v. Friend*, 559 U.S. 77 (2010), because, prior to Hertz, the Eleventh Circuit applied the "total activities" test.*

Pl.'s Opp. at 25-56

- That the Eleventh Circuit at one point applied the "total activities" test (at the same time other circuits were applying the nerve center test) does not mean Congress had the total activities test in mind when it passed the Helms-Burton Act

- Under *Hertz*, "[t]he word 'principal' requires us to pick out the 'main, prominent' or 'leading' place." 559 U.S. at 93 (citation omitted).

- Plaintiff fails under the "total activities" test, too because under Eleventh Circuit precedent (prior to *Hertz*), "[w]here a company's activities are not concentrated in one place, a district court is entitled 'to give these "nerve-center"-related facts greater significance.'"

  *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1239 (11th Cir. 2005)

- There is no genuine dispute that the "nerve-center"-related facts in this case establish that Plaintiff's principal place of business was outside of U.S. in 2019.

# Where Officers Work in Different Locations, The Location From Which An Officer Manages The Corporation Is The Corporation's Principal Place of Business

*See Powers v. Mandarin Oriental Miami, Inc.*, No. 09-23681, 2010 WL 11506140, at *1 (S.D. Fla. Mar. 2, 2010) (finding that the principal place of business of the corporation was in Florida, where the president managed the corporation, and that the presence of the treasurer and financial records in California was ***not sufficient*** to show that its nerve center was in California).

```
13      BY MR. PONCE:

14          Q      On some of those more important non-routine

15      decisions, if you and Mr. Behn disagreed, who would win

16      out?

17          A      Mr. Behn.
```

Ex. 82 to Def.'s Omnibus Statement of Material Facts, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 29:14–29:17, Case No. 19-23590 (Jan. 19, 2021) (undisputed)

## The 'Nerve Center' Test Requires More Than Just Listing Officers In The United States

In *Wylie v. Red Bull North America, Inc.*, the Eleventh Circuit held that "[t]he fact that the CEO, CFO, and Secretary of defendant Red Bull are listed on [a state corporate filing] as sharing [a] 'Principal Office Address'" was "insufficient under *Hertz*" to establish that Red Bull's principal place of business was in California where no other facts were alleged that showed that said office in California was defendant Red Bull's "actual center of direction, control, and coordination."

627 F. App'x 755, 757-58 (11th Cir. 2015)

# The Two Out-Of-Circuit Cases That Plaintiff Relies On Are Inapposite

- *3123 SMB LLC v. Horn*, 880 F.3d 461, 470 (9th Cir. 2018) found that because a company's minimal activity was conducted from Missouri, including the mere intent to hold board meetings there, was sufficient to establish jurisdiction.

  - In this case, Plaintiff's 'minimal activity' is directed from London.

  - Mr. Behn signs written consents from London.

- *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 353 (3d Cir. 2013) found that because Holding Companies have limited operations, short quarterly board meetings being conducted from Wilmington was enough.

  - In this case, Plaintiff's 'minimal activity' is directed from London.

  - Mr. Johnson has testified that Mr. Behn controls and directs decision-making from London.

Executive Decisions Were Made By Mr. Behn In The United Kingdom, Not Kentucky

# Executive Decisions Were Made By Mr. Behn
# In The United Kingdom, Not Kentucky

**As of Dec. 2020, Mr. Behn hadn't been to Kentucky since he was a child (undisputed)**

> 9    Q.   Okay.  And have you ever been to Lexington,
> 10   Kentucky?
> 11   A.   As a child, with my grandfather on business.

Behn Dep. at 20:9–11 (Dec. 14, 2020)

**As of Dec. 2020, Mr. Behn had never been to the Kentucky address.**

> 9    Q.   Have you ever been to the Bank of the Bluegrass
> 10   Nazareth that Mr. Johnson mentioned to us during his
> 11   deposition?  I think it was on Southland Drive.
> 12   A.   Yeah, 215 Southland Drive.
> 13        No, I have not.

Behn Dep. at 21:9–21:13 (Dec. 14, 2020)

# HDC Is Not Authorized To Do Business in Kentucky



President and CEO of HDC
Principal Place of Business

**Behn**



Not Authorized to
Do Business Here

**Johnson**

Behn gives directions to Johnson

- Johnson works full time for Bank of the Bluegrass while being secretary and treasurer of HDC.
- Johnson receives no salary for his work for HDC.

69

# HDC Is Not Authorized To Do Business In Kentucky

**Deposition of Jerry Johnson – 1/19/21**



President and CEO of HDC
Principal Place of Business

**Behn**



Q. Who currently makes the day-to-day business decisions for Havana Docks Corporation? I know earlier you said that you do but you don't just have an administrative role. Do you do that solely or does anyone else participate in the day-to-day business decision making process for Havana Docks Corporation?

A. I would answer that I am largely responsible for that role, however, I do report to Mickael Behn who is the president of Havana Docks Corporation.

Q. Where does Mickael Behn live?

A. Mr. Behn lives presently in London, England.

28:11-23



Not Authorized to Do Business Here

**Johnson**

- Johnson works full time for Bank of the Bluegrass while being secretary and treasurer of HDC.
- Johnson receives no salary for his work for HDC.

Q. On some of those more important non-routine decisions, if you and Mr. Behn disagreed, who would win out?

A. Mr. Behn.

29:14-17

# HDC Is Not Authorized To Do Business In Kentucky

**Deposition of Jerry Johnson – 11/24/20**



**Behn**

President and CEO of HDC
Principal Place of Business



Q. Can you tell me where each of the three principal owners lives?
A. Yes. Mickael Behn lives in London, England, Romain Lepelletier and Melanie Behn Lucain live in a small village in the south of France. I believe it's pronounced Saint-Jean-de-Luz.

82:10-16

A. My discussions with Mr. Behn regarding the business of Havana Docks Corporation I believe he has been in London basically the entire time we've had those discussions.

146:5-8



Not Authorized to Do Business Here

**Johnson**

Behn

- Johnson works full time for Bank of the Bluegrass while being secretary and treasurer of HDC.
- Johnson receives no salary for his work for HDC.

Q. And if someone wants to reach the head of Havana Docks, then they can reach him, that's Mr. Behn, at an address in London, correct?
A. I would assume that would be a correct statement.

209:24 – 210:3

71

# Plaintiff's Principal Place Of Business Is In The United Kingdom, Not Kentucky

| Nerve Center Factors | Undisputed Facts |
|---|---|
| **(1) Type of business** | • Mr. Behn, the person for whom HDC is a matter of personal as well as business interest, is a resident of the U.K.<br><br>• Jerry Johnson merely coordinated and executed limited, non-executive services from Kentucky. |
| **(2) Physical address of the business** | Bank of Bluegrass in Kentucky<br>• Plaintiff is not registered to do business in Kentucky. |
| **(3) Location of executive decisions** | London, United Kingdom<br><br>• Mr. Behn is the corporation's only real employee and he is located in the U.K.<br><br>• Mr. Behn gets paid monthly while Mr. Johnson receives little to no compensation. Def's Omnibus SUMF ¶¶60-62 |

**Mr. Behn Signed Corporate Docs From London**

> 12  Q.  Okay. Do you know where Mr. Behn was when he
> 13  signed via DocuSign the written consents in lieu that we
> 14  have been talking about?
> 15  A.  I believe he was in London.

Johnson as Corporate Representative of Havana Docks Corporation Dep. at 38:13-15 (Dec. 8, 2020)

**HDC Is Not Registered in Kentucky (Undisputed)**

> 18  Q.  Is Havana Docks Corporation registered to do
> 19  business in Kentucky?
> 20  A.  No, sir. We are registered in the state of
> 21  Delaware.

Johnson as Corporate Representative of Havana Docks Corporation Dep. at 53:18-20 (Dec. 8, 2020)

# Plaintiff's Principal Place Of Business Is In The United Kingdom, Not Kentucky

| Nerve Center Factors | Undisputed Facts |
|---|---|
| **(4) Where bills are sent** | • Electronic mail was received in the United Kingdom.<br><br>• 98% of Mr. Behn's business emails were sent from Europe. Ackert Dep. 20:10-18 |
| **(5) Where mail is received** | |
| **(6) Where documents are maintained** | • Plaintiff's corporate records were not maintained in Ketucky. See MAC001315 (undisputed). |



Locations where Behn sent 98% of his HDC Business Emails Based on Metadata Forensic Analysis

```
10        My opinions, again, are in paragraphs 11
11    and 12 of the June report, the June 8th report, and
12    my opinions are two:  The first one is based on
13    analysis of the metadata that I analyzed of the
14    production sets, 41 of 42 emails or 98 percent
15    collected from Michael Behn routed through
16    computers in the UK or EU, and the email metadata
17    indicates that at the time the email was sent the
18    sender was in the UK or the EU geographically.
```

Ackert Dep. 20:10-18

| "Managing Havana Docks' investments" | • Mr. Johnson as Plaintiff's Treasurer in 2019 was in "charge of the financial affairs of the corporation," but it was Mr. Behn who had "general charge of the business and affairs of the corporation." Defs.' Omnibus SUMF, ¶¶40, 42. |
| | • Plaintiff admits Mr. Behn's decision controls. Defs.' Omnibus SUMF, ¶43. |
| "Hiring and coordinating" | • Plaintiff has no employees in the United States– the closest thing Plaintiff has to an employee is Mr. Behn himself, and he is actually an independent contractor. Defs.' Additional Fact No. 94. |
| | • The hiring of Plaintiff's accountant, corporate lawyer, and counsel representing Plaintiff in this suit (Mr. Rodney Margol) was done only with Mr. Behn's approval from London. Defs.' Omnibus SUMF, ¶53. |
| | • And Mr. Behn is the ultimate decision-making officer with respect to lobbying and legal strategy. Defs.' Omnibus SUMF, ¶57. |
| | • Payment to Mr. Johnson was made "per the request" of Mr. Behn. Defs.' Omnibus SUMF ¶62. |

Acct Name:  HAVANA DOCKS CORPORATION
Acct Number: 51 00 3508 0 01

Disbursement Transactions January 1, 2012 Through December 31, 2016

| 04/09/18 | JERRY M. JOHNSON DISTRIBUTION PER REQUEST OF MICKAEL BEHN FOR CONSULTING FEE | $ | (5,000.00) |
| 06/26/18 | MICKAEL BEHN REIMBURSEMENT FOR TRIP EXPENSESES TO MIAMI | $ | (1,612.22) |
| 09/28/18 | JERRY M. JOHNSON DISTRIBUTION PER REQUEST OF MICKAEL BEHN FOR CONSULTING FEE | $ | (3,000.00) |

| | |
|---|---|
| **"Maintaining Havana Docks' address, telephone, and corporate records"** | • Merely listing Mr. Johnson's place of employment as Plaintiff's corporate address does not establish Plaintiff's principal place of business was in Kentucky in 2019.<br><br>• Corporate records were not even maintained in Kentucky, they were maintained in Behn's family home in Miami. Defs.' Omnibus<br><br>• SUMF, ¶58. |
| **"Maintaining Havana Docks' ledger and stockholder registry," and "[r]ecording and preparing the results of Plaintiff's annual meetings"** | • This was done under the explicit direction of Mr. Behn in a role that was subordinate to Mr. Behn, as prescribed by Plaintiff's By-laws. Defs.' Omnibus SUMF, ¶¶42-43. |



**Defendants Are  Entitled To Summary Judgment Because HDC's Interpretation of The Act Violates The Constitution.**