# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| HAVANA DOCKS CORPORATION,<br>  Plaintiff,<br>v.<br>CARNIVAL CORPORATION,<br>  Defendant.<br>_____/ | Case No. 19-cv-21724<br>BLOOM/MCALILEY |
| HAVANA DOCKS CORPORATION,<br>  Plaintiff,<br>v.<br>MSC CRUISES SA, *et al.*,<br>  Defendants.<br>_____/ | Case No. 19-cv-23588<br>BLOOM/LOUIS |
| HAVANA DOCKS CORPORATION,<br>  Plaintiff,<br>v.<br>ROYAL CARIBBEAN<br>CRUISES, LTD.,<br>  Defendant.<br>_____/ | Case No. 19-cv-23590<br>BLOOM/LOUIS |
| HAVANA DOCKS CORPORATION,<br>  Plaintiff,<br>v.<br>NORWEGIAN CRUISE LINE<br>HOLDINGS, LTD.,<br>  Defendant.<br>_____/ | Case No. 19-cv-23591<br>BLOOM/LOUIS |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' PARTIAL OBJECTIONS TO THE OMNIBUS REPORT AND RECOMMENDATION REGARDING *DAUBERT* MOTIONS**

The Report and Recommendation (the "Report") correctly concludes that Title III's damages provision gives *claimants* a choice: recover the amount certified by the Foreign Claims Settlement Commission ("FCSC") or, if the amount is *greater*, recover the fair market value of the confiscated property (if that greater amount is proven by clear and convincing evidence). So understood, the Report properly recommends excluding Professor Pablo Spiller's opinions regarding the "(in)appropriateness" of the certified claim amount and his *lesser* 1960 valuation.

I.  **Defendants' Urge a Textually Unsupported Interpretation of Title III's Damages Provision.**

Defendants seek to argue at trial that (1) the loss the FCSC certified to Havana Docks is "(in)appropriate" and (2) the "more appropriate" amount of liability is nearly six times lower. (*See* Defs.' Objections at 2.)[1] But nothing in Title III's text contemplates an inquiry into the correctness of the FCSC's valuation or the assessment of damages in an amount less than the value of a certified claim. Instead, adhering to basic legislative drafting principles, Title III expressly links the "appropriate amount of liability" under the rebuttable presumption to "the greater of" its three potential measures of damages. The statute thus allows a claimant to try and recover an amount that is *greater* than the certified claim (plus interest), but only if that greater amount is proved by clear and convincing evidence. Should a claimant not meet this burden, then damages default to the certified claim amount. Because Defendants' interpretation of the rebuttable presumption is incorrect and misconstrues the meaning of "appropriate," their objections should be overruled.

Title III's damages provision contains a three-step process. First, it identifies the closed universe of potential damages, providing that liability shall be assessed as:

(i) the amount which ***is the greater of***—

  (I) the amount, if any certified to the claimant by the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949, plus interest;[2]

---

[1] Defendants' Objections appear at *Carnival*, ECF No. 502; *MSC*, ECF No. 359; *Royal*, ECF No. 278; *Norwegian*, ECF No. 392. The Report appears at *Carnival*, ECF No. 485; *MSC*, ECF No. 341; *Royal*, ECF No. 265; *Norwegian*, ECF No. 378. Unless otherwise noted, citations are to the CM/ECF pagination.

[2] The calculation of interest is important. For a jury to choose "the greater of" the three potential measures of damages, it must be instructed regarding the interest to be added to a certified claim and (if relevant) the fair market value of the confiscated property at the time of confiscation. *See* 22 U.S.C. § 6081(a)(1)(A)(i)(I), (III). Those amounts are to be "computed by the court from the date of confiscation of the property involved to the date on which the action is brought." § 6082 (a)(1)(B). Spiller used a static, simple rate of 0.09% for the nearly 59 years that elapsed between the confiscation and the filing of Havana Docks' complaints. (*See* Def's Objection at 6, n.2.) To

> > (II) the amount determined under section 6083(a)(2) of this title, plus interest; or
>
> > (III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, **whichever is greater**;

22 U.S.C. § 6082(a)(1)(A)(i) (emphases added).

Next, it establishes a presumption in favor of the amount of a plaintiff's certified claim: the statute presumes that liability "under clause (i) of paragraph (1)(A)" will be the amount certified in "subclause (I) of that clause." § 6082(a)(2).

Finally, Title III permits the presumption to be rebutted, but only if the claimant proves by clear and convincing evidence that the amount in "subclause (II) or (III)" is the "appropriate amount of liability *under that clause*," a direct reference to "clause (i) of paragraph (1)(A)." *Id.* (emphasis added).

This structure, including Title III's use of the terms "clause" and "subclause," is not by accident. As explained by the Supreme Court in *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004), "Congress ordinarily adheres to a hierarchical scheme in subdividing statutory sections." (citation omitted). To put a finer point on it, *Koons* quotes from the Senate's drafting manual, *id.* at 61, which calls for subdivisions to take the following form:

---

the extent Defendants seek to use a fixed rate that does not account for market fluctuations, their approach is ill suited to calculate pre-filing interest. *See Serricchio v. Wachovia Sec., LLC*, 706 F. Supp. 2d 237, 252 (D. Conn. 2010), *aff'd*, 658 F.3d 169 (2d Cir. 2011) ("While the 1-year constant maturity Treasury yield provides an accurate rate at a given point in time, applying only the rate for the week preceding judgment fails to account for [] significant rate fluctuations[.]"). Defendants' position "overlooks the fact that [28 U.S.C. § 1961] is directed to *post*-judgment interest [.]" *Id.* (emphasis in original). "To calculate the interest that [a] [p]laintiff could have earned on income [it] should have received," the Court should use "an average of the rates [a plaintiff] could have received on money during that period[.]" *Id.* Spiller's 0.09%—or any other fixed rate—fails to capture the loss of the use of Havana Docks' assets over this pre-filing period, and so should be rejected.

3

    (a) SUBSECTION.—

        (1) PARAGRAPH.—

            (A) SUBPARAGRAPH.—

                (i) CLAUSE.—

                    (I) SUBCLAUSE.—

Senate Office of the Legislative Counsel, Legislative Drafting Manual at 10 (1997).[3]

Section 6082 conforms precisely to this structure. And if one were to substitute the rebuttable presumption's use of "clause" and "subclause" with the actual language in clause (i) of paragraph (1)(A), it would read like this:

> There shall be a presumption that <u>the amount which is the greater</u> ("clause (i) of paragraph (1)(A)") is the amount that is certified <u>to the claimant by the FCSC, plus interest</u> ("subclause (I) of that clause"). The presumption shall be rebuttable by clear and convincing evidence that the amount <u>determined under § 6083(a)(2) (by a special master)</u> or <u>the fair market value of that property</u> ("the amount described in subclause (II) or (III)") is <u>the amount which is the greater</u> ("the appropriate amount of liability under that clause").

Thus, Judge McAliley correctly concludes that Title III's damages provision "gives [Havana Docks] a choice: recover from Defendants the amount the Commission certified, *or if it is greater*, recover (in this instance) the current fair market value of the property; with a strong presumption for the Commission's valuation." (Report at 30) (emphasis added). This is, Judge McAliley notes, the reading of Title III that "presumes, as [the Court] must, that in the damages provision of the Act, Congress said what it meant and meant what it said." (*Id.*) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). And nowhere in this reading is there room to revalue

---

[3] The Senate manual is available at https://law.yale.edu/sites/default/files/documents/pdf/Faculty/SenateOfficeoftheLegislativeCounsel_LegislativeDraftingManual%281997%29.pdf (last visited May 5, 2022). The manual is consistent with earlier guides, which cover the timeframe during which the LIBERTAD Act was drafted. *See Koons*, 543 U.S. at 61 n.4 (quoting the relevant portions of prior drafting manuals).

the FCSC's factual determinations or rely on a past fair market value that is *less than* both the property's current value and the amount certified in Havana Docks' claim.

Yet, Defendants urge an interpretation of "appropriate" that does just that. (*See* Defs.' Objections at 1) (arguing that Title III invites an inquiry into "the ***(in)appropriateness*** of the FCSC's valuation and other ***more appropriate*** valuations.") (emphasis in original). If, however, Congress had meant for damages to be based on Defendants' nebulous concept of "appropriateness," it could have said so. It didn't, instead expressly modifying "appropriate" with the phrase "under that clause."

"[C]ontext is king." *Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1267 (11th Cir. 2006) ("Courts should avoid slicing a single word from a sentence, mounting it on a definitional slide, and putting it under a microscope in an attempt to discern the meaning of an entire statutory provision."). And in the context of Title III, "appropriate amount of liability" is modified by the prepositional phrase "under *that clause.*" 22 U.S.C. § 6082(a)(2) (emphasis added). "[T]hat clause" is clause (i) of the preceding paragraph—(1)(A)—which requires damages to be "the amount *which is the greater of*" a certified claim, a special master's determination, or the property's fair market value. § 6082(a)(1)(A)(i) (emphasis added). This same construction is used in Title III's provision for increased liability. Section § 6082(3)(C)(ii) provides for treble damages (in certain cases) based upon "the amount determined applicable under paragraph (1)(A)(i)." Stated differently, the value that is trebled is the amount determined under clause (i)—"the greater of"— not "the appropriate amount of liability." Thus, Defendants' proffered interpretation of § 6082(a)(2) creates disharmony with Title III's trebling provision in § 6082(3) and so should be rejected. *See In re Shek*, 947 F.3d 770, 777 (11th Cir. 2020) ("We must interpret statutes 'harmoniously,' reconciling separate sections so that they are compatible and not contradictory.")

5

(citing Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012)).

If Havana Docks fails to prove a greater fair market value by clear and convincing evidence, the presumption remains that the certified claim is the greater amount under § 6082(a)(1)(A)(i) (and, thus, the controlling measure of damages). But nothing in clause (i) contemplates damages being awarded in an amount *less than* the certified claim. And no twisting of the rebuttable presumption's language can change that. *Cf. Koons*, 543 U.S. at 63 (finding, based on a contextual analysis of the Truth in Lending Act's damages provision, that "[t]here [was] scant indication that Congress meant to alter the meaning of clause (i) when it added clause (iii).").

At bottom, Defendants' argument that the certified claim amount is inappropriate (and a lesser 1960 value more appropriate) is rooted in an incorrect interpretation of a single word. In the Report, Judge McAliley fully considered—and wisely rejected—this reading. Her holistic interpretation of Title III's damages provision is textually correct and contextually consistent. The Court should adopt it and exclude Dr. Spiller's first and second opinions on this basis alone.

## II. Spiller's Criticisms of the FCSC's Valuation Remain Irrelevant and Unhelpful.

Considering that Title III treats the amount certified to a claimant as the minimum recovery, Spiller's critique of the FCSC's valuation will not assist the trier of fact. *See McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004) (under *Daubert*, expert testimony "must be relevant to the task at hand" and "logically advance[] a material aspect of the case") (alterations omitted). Spiller's opinion that the FCSC should have certified Havana Docks' loss in the amount of $826,721 is not a damages measure that Title III recognizes. Moreover, this opinion is premised on redetermining the FCSC's findings of *ownership*, something both Title III and the International Claims Settlement Act (the "Settlement Act") prohibit. And as far as Defendants' due process

argument goes, nothing prevents Congress from identifying prohibited conduct (trafficking) and providing the amount of statutory damages for noncompliance (the certified claim amount). Insofar as Defendants wish to peak behind the curtain of the FCSC's adjudicative process, their objections should be overruled.

### A. Spiller's first opinion invites the fact finder to redetermine Havana Docks' ownership interests, contrary to Title III and the Settlement Act.

For context, it is worth summarizing the FCSC's findings. On a fully developed record, the FCSC determined that Havana Docks obtained a concession *and* "acquired … the real property with all improvements and appurtenances located" in the Havana harbor, including the Havana Port Terminal's (the "Terminal") piers and marginal building. (Certified Claim No. CU-2492 at 7.)[4] It then valued these interests, something it could not have done unless it first found that Havana Docks owned them in whole or in part. *See* 22 U.S.C. § 1643(c) ("A claim shall not be considered … unless the property on which the claim was based was owned wholly or partially, directly or indirectly [by the claimant].").

Spiller's first opinion begins by challenging these determinations. In relevant part, his Report states:

> Contrary to what [the Certified Claim] seems to indicate, [Havana Docks] did not have the right to use the real property in perpetuity, nor did it have the right to use and dispose of such property at will, as would be with standard ownership of real estate assets. As a consequence, the FCSC should have only assessed the value of [Havana Docks'] concession rights[.]

(Spiller Report at 39, ¶ 72.)[5]

---

[4] Havana Docks' Certified Claim appears at *Carnival*, ECF No. 73-8; *MSC*, ECF No. 41-8; *Royal*, ECF No. 31-8; *Norwegian*, ECF No. 43-8.

[5] Spiller's Report appears at *Carnival*, ECF No. 325-4; *MSC*, ECF No. 213-4; *Royal*, ECF No. 136-4; *Norwegian*, ECF No. 225-4. Citations are to the report's internal pagination.

In other words, Spiller is of the opinion that Havana Docks did not possess traditional property rights vis-à-vis the piers and the marginal building and, as a result, the FCSC could not assign any value to them. As far as this resembles a legal opinion regarding the impropriety of valuing the improvements that Havana Docks (and its subsidiary) constructed at their own cost, Spiller is wrong. *See Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 471 (1973) (long-term lessee entitled to compensation for "extensive buildings and other improvements that had been erected on the land[.]").[6] More importantly, Spiller's opinion challenges (incorrectly) the very notion that the FCSC could certify an interest in the structures if Havana Docks did not own them in fee simple.[7] On that point, Title III and the Settlement Act have spoken—the FCSC's determination is conclusive.

---

[6] For this same reason, Defendants' continued reliance on Ambar Diaz to undermine the FCSC's findings is misplaced. (*See* Defs.' Objections at 2 n.1.) Under a long-term lease, just compensation still requires assigning value to improvements. *See Almota*, 409 U.S. at 474 ("By failing to value the improvements" built by a long-term lessee, the lower court "failed to recognize what a willing buyer would have paid for the improvements."); *see also In re U.S. Comm'n to Appraise Wash. Mkt. Co. Prop.*, 295 F. 950 (D.C. Cir. 1924) (holding that just compensation for the taking of a market built and operated at the expense of a lessee under the terms of a 99-year lease required the use of a depreciated reproduction cost of the market's structures to assess fair market value, notwithstanding that the market was to be fully forfeited to the government at the end of the lease); *Carnival*, ECF No. 454-12 at 2-3; ECF No. 454-15 at 10, 43-45 (describing Royal Caribbean's current long-term lease at PortMiami, the taking of which would require Miami-Dade County to pay for the fair market value of the structure *plus* the unexpired term of the lease). Contrary to Defendants' claim, nothing suggests that the FCSC "fail[ed] to take into account" the time-limited nature of Havana Docks' interests in the Terminal's structures. (Defs.' Objections at 2 n.1.) In fact, the FCSC specifically recognized that the "terms of the concession . . . *were to expire in the year 2004*[.]" (Certified Claim at 9) (emphasis added). To accord Havana Docks just compensation, the FCSC properly assigned value to the Terminal's structures.

[7] Spiller's insistence on viewing Havana Docks' property interests through the lens of Anglo-Saxon common law is also misguided. Cuba, a civil law country, granted Havana Docks a usufruct. "A usufruct might be in land *or buildings* … in fact in anything except things which [are] destroyed by use." Usufruct, Black's Law Dictionary (11th ed. 2019) (quoting R.W. League, *Roman Private Law* 181-82 (C.H. Ziegler ed., 2d ed. 1930)).

8

As the Court found in its Omnibus Order on summary judgment, courts must "accept as true the FCSC's certification of an ownership interest in confiscated property made in favor of [a claimant]." (Omnibus Order at 100.)[8] Though "Defendants may seek to have the Court usurp the FCSC's role and issue its own legal and factual conclusions," Title III and the Claims Act render the "Court [] unable to do so[.]" (*Id.* at 112-13) (citing 22 U.S.C. §§ 1622g, 1623(h); 22 U.S.C. § 6083(a)(1)). And, as noted by Judge McAliley, this mandate forecloses the very premise upon which Spiller grounds his opinion:

> A component of Spiller's first opinion is that the Commission did not value Plaintiff's actual property interest. That is, with this opinion Defendants directly dispute the ownership interest that the Commission certified, contrary to [Title III's] mandate of the "[c]onclusiveness of [the] certified claim[]

(Report at 41) (quoting 22 U.S.C. § 6083(a)(1)).

In response, Defendants—much like Spiller—cloak their objections in valuation speak. (*See* Defs.' Objections at 9) ("Dr. Spiller's opinion does not challenge the FCSC's determinations of ownership; instead, his opinion is that the FCSC should have used an income-based valuation method[.]") (emphasis omitted). But Spiller's opinion that the FCSC erred in using a book-value approach is only possible because he assumes—as a premise—that no value can be attributed to the Terminal's structures (because Havana Docks had no fee simple ownership interest in them). Indeed, Spiller acknowledges as much when he explains that the FCSC "[i]ncorrectly assessed the value of the concession *and* the real property (the Three Piers and the Marginal Building) as if those were two distinct assets[.]" (Spiller Report at 36, ¶ 65(a)) (emphasis in original). In his mind, the FCSC's true error was finding that the Terminal's structures were Havana Docks' assets—a premise Defendants wholeheartedly embrace. (*See* Defs.' Objections at 16) (criticizing the FCSC's

---

[8] The Court's Omnibus Summary Judgment Order appears at *Carnival*, ECF No. 477; *MSC*, ECF No. 330; *Royal*, ECF No. 253; *Norwegian*, ECF No. 367.

valuation as a measure of damages because it is "entirely untethered from Plaintiff's actual ownership value[.]"). However, for the Court to accept this premise and so open the door to Spiller's criticisms, it would have to ignore the finality of the FCSC's ownership determinations. That, it can't do. *See* 22 U.S.C. § 6083(a)(1).

Even on the merits, Spiller's claim that the FCSC should not have used a book-value approach to value Havana Docks' interest misses the mark.[9] The Settlement Act provides that the FCSC may arrive at the fair market value of confiscated property "in accordance with the method most appropriate to the property taken and equitable to the claimant[.]" 22 U.S.C. § 1623(a)(2)(B). One of the statutorily enumerated options is "book value." § 1623(a)(2)(B)(iv). In its report to Congress, the FCSC stressed that, for any given claim, it selected the applicable approach "by determining each such case on its own merits, and thereby applying the valuation 'most appropriate' and 'most equitable.'"[10] And in Havana Docks' Certified Claim, the FCSC expressly found that "[u]pon consideration of the entire record … the valuation most appropriate to the property and equitable to the claimant is that shown in the Balance Sheet for the year end[ing] 1959"—book value. (Certified Claim at 9.) Although Spiller may personally disagree with the

---

[9] Similarly misplaced are Spiller's criticisms aimed at the FCSC's upward adjustments to the value of Havana Docks' concession and tangible assets. (*See* Spiller Report at 45-46.) Though Spiller claims there is "no evidence" to suggest that the value of the land and improvements increased during the years before the confiscation, (*id.* at 46, ¶ 90), the FCSC previously "took administrative notice that land and improved real property values increased substantially in value between 1954 and 1959[.]" *See* Final Report of the FCSC's First Cuba Claims Program at 89 (available at https://www.justice.gov/sites/default/files/fcsc/docs/final-report-cuba-1972.pdf) (citing *Claim of Mac Gache*, Claim No. CU-0050). And while Spiller faults the FCSC for accordingly increasing the value of Havana Docks' assets, this critique—again—is rooted in his belief that Havana Docks' assets consisted *only* of an income producing concession. (*See* Spiller Report at 46, ¶ 90) ("[S]uch increase does not necessarily translate in an increase in the value of the Property, as the value of the Property *depended on the profit potential of its operations*.") (emphasis added).

[10] *See* Final Report of the FCSC's First Cuba Claims Program, note 4 *supra*, at 83.

FCSC's selection of book value, the Commission operated well within the bounds of its statutory authority in choosing it. That choice is "conclusive on all questions of law and fact and not subject to review" in this proceeding. 22 U.S.C. § 1623(h).

On the whole, Spiller's first opinion is rooted in his mistaken belief that the FCSC wrongly granted Havana Docks an ownership interest in the Terminal's structures. Not only is this a flawed premise, but it invites a conclusion that the Court must decline. The Report properly recommended its exclusion.

### B. Defendants' due process challenge to the FCSC's valuation falls short.

Next, Defendants contend that they must be allowed to present Spiller's first opinion lest they be impermissibly bound to the FCSC's valuation. (Defs.' Objections at 14.) But contrary to Defendant's argument, Title III's damages provision does not bind them to the FCSC's "adjudicative judgment." (*Id.* at 15.) Rather, it binds them to *Congress's legislative judgment*— codified in democratically enacted law—regarding the measure of statutory damages to be assessed for violating Title III of the LIBERTAD Act. For corporations that decide to traffic in confiscated property without the authorization of a certified claimant, Title III fixes damages in an amount equal to the value of the certified claim. Defendants' argument, thus, misapprehends the relevant due process inquiry: whether Title III adequately places potential defendants on notice of the conduct that is prohibited and the damages that accompany noncompliance. Because this question must be answered affirmatively, Defendants' objections should be overruled.

With Title III, Congress determined that trafficking in property wrongfully confiscated by the Cuban Government warranted a judicial remedy. *See* 22 U.S.C. § 6081(11) ("To deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United

States[.]"). In providing for money damages, Congress intended, in part, to compensate claimants and deter trafficking by assessing damages in an amount corresponding to a certified claim. *See* H.R. REP. 104-468, at 58 (1996) (Conf. Rep.), 1996 WL 90487, at *H1660 (reflecting Congress's intent "to provide an additional remedy for U.S. nationals through which they may take action to protect their claim to a confiscated property in Cuba."). With its strong presumption in favor of the FCSC's valuation, Congress enacted—in its view—a "unique but proportionate remedy for U.S. nationals who were targeted by the Castro regime when their property was wrongfully confiscated." *Id.* Put differently, Congress intended for damages—based on the amount in a certified claim—to deter would-be traffickers, the hallmark of statutory damages. *See F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952) (noting that statutory damages are designed "to sanction and vindicate the statutory policy."); *see also* H.R. Rep. No. 106-216 at 6 (1999), 1999 WL 446444, at *6 (explaining, in the context of the Copyright Damages Improvement Act, that the goal of statutory damages provisions is to provide a "strong incentive" for compliance with the law).

The due process analysis of statutory damages turns, typically, on whether a potential defendant is on notice of the prohibited conduct and the damages that flow from engaging in such conduct. *See, e.g.*, *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1312 (11th Cir. 2009) (rejecting due process challenge to the Fair and Accurate Credit Transaction Act's damages provision because the statute "clearly defines what conduct is prohibited and the potential range of fine that accompanies noncompliance"); *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907 (8th Cir. 2012) (finding that, under the Copyright Act, the "concern about fair notice does not apply to statutory damages, because those damages are identified and constrained by the authorizing statute."); *cf. United States v. Batchelder*, 442 U.S. 114, 123 (1979) (rejecting due

process challenge to two federal criminal statutes which imposed different penalties for the same conduct because the statutes "clearly define the conduct prohibited and the punishment authorized").

On this point, Title III is clear. Since 1996, the statute has given would-be defendants fair notice that trafficking in confiscated property is prohibited. *See Havana Docks Corp. v. MSC Cruises SA Co.*, 484 F.Supp.3d 1177, 1199 (S.D. Fla. 2020) ("[L]iability for trafficking [] attached to conduct on confiscated property beginning on November 1, 1996[.]"). The FCSC's decisions were a matter of public record and, since 2015, have been available online. (*See* Omnibus Order at 93 n.31.) Defendants are sophisticated companies that are "expected to consult relevant legislation in advance of action." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S 489, 498 (1982). Instead of requesting Havana Docks' authorization to operate at the Terminal, Defendants chose to traffic with actual knowledge of (1) the LIBERTAD Act, including its damages provision, (Omnibus Order at 70), and (2) the Certified Claim, with its value of its $9,179,700.88 plus interest. (*Id.*). This was an informed business decision, and Defendants cannot claim to have lacked notice of the potential damages that would attach to their conduct. Indeed, they calculated them. (*See* Pl.'s Omnibus Stmt. of Material Facts at ¶ 91)[11] (reflecting the estimation provided by Carnival's Chair of its Board of Directors, Micky Arison, to President Trump that Carnival's liability for trafficking in the confiscated ports would be over $600 million).

Contrary to Defendants' argument, Title III does not impermissibly bind them to the FCSC's determination of value. Instead, Title III's damages provision reflects Congress's legislative judgment—in enacted law—to treat the publicly available certified claim as the amount

---

[11] Havana Docks' Omnibus Statement of Material Facts in Support of its Omnibus Motion for Summary Judgment appears at *Carnvial*, ECF No. 337; *MSC*, ECF No. 223; *Royal*, ECF No. 144; *Norwegian*, ECF No. 233.

13

of statutory damages for trafficking. Whether that amount is $6 million, $60 million or $600 million, the relevant due process inquiry is the same—would persons operating a profit-driven business understand that the amount posted in a publicly available certified claim could be the minimum amount of statutory damages for trafficking? As far as due process is concerned, the answer is yes.

### III. The Plain Text of § 6082(a)(1)(A)(i)(III) Precludes Spiller's Second Opinion.

When it comes to the fair market value of confiscated property, Title III ultimately allows only one option: "either the current value of the property, or the value of the property when confiscated plus interest, ***whichever is greater***." 22 U.S.C. § 6082(a)(1)(A)(i)(III) (emphasis added). Should this greater value also be greater than the certified claim amount (and proven by clear and convincing evidence), then Title III's presumption will have been rebutted and the fair market value will be the controlling measure of damages.

In his report, Spiller calculates fair market value both ways. He assesses the current value of Havana Docks concession[12] at approximately $46 million, and its value as of October 24, 1960 at $1,458,821 (approximately $1.5 million, including interest).[13] (Spiller Report at 8, ¶¶ 9-10). However, his 1960 valuation is clearly *less than* his current valuation. So far as Congress meant what it said in subclause (III) of § 6082(a)(1)(A)(i), Defendants' reliance on Spiller's 1960 valuation as the controlling measure of fair market value ignores a crucial modifier—"*whichever*

---

[12] As Judge McAliley noted in the Report, Spiller's opinions regarding fair market value—like his critique of the FCSC's valuation—proceed on the assumption that Havana Docks' property interest is "a concession that does not include an interest in real property." (Report at 42.)

[13] Given that interest is calculated from the date of confiscation to the time an action is brought, Spiller's past fair market value differs slightly based on the date that Havana Docks filed its complaint against each Defendant.

*is greater*." Stated differently, because Spiller's current valuation is the greater of the two fair market values, his lesser 1960 valuation could never be Havana Docks' measure of damages and, thus, will not assist the fact finder. *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 806 (N.D. Ill 2005) ("Expert opinions that are contrary to law are inadmissible. . . . They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact.") (citations omitted). As such, the Report properly recommends its exclusion:

> [Spiller's] $1.5 million value of the Confiscated Property in 1960 is less than the $9.2 million that the Commission certified; it is also less than his current fair market valuation of $46 million. The Act's damages provision plainly states that the greater figure is the amount of damages. It also provides that the Commission's $9.2 million finding is presumed to be the amount of liability. 22 U.S.C. § 6082(a)(1)(A), (a)(2). As the lesser and disfavored number, Spiller's 1960 fair market value is irrelevant.

(Report at 44.)

Notwithstanding the plain text of subclause (III), Defendants contend that the rebuttable presumption allows them to argue that *either* amount of fair market value—irrespective of which one is greater—is the appropriate amount of damages. (*See* Defs.' Objections at 16) ("[The FCSC's valuation] may be rebutted by clear and convincing evidence that … the fair market value of the property in 1960 or the current fair market value is the 'appropriate amount of liability.'"). But, as explained above, Title III does not award damages based on this nebulous concept of appropriateness. Instead, as Judge McAliley rightly noted, it instructs the fact finder to assess money damages as the greater of the certified claim or (if proven by clear and convincing evidence) the confiscated property's past or current value (*whichever of those two values is greater*). (*See* Report at 5) (quoting 22 U.S.C. § 6082(a)(1)(A)(i)). Given the letter of Title III, Spiller's lesser past fair market value could never be relevant. The inquiry should accordingly end here.

But even if the term "appropriate" could somehow be grafted on to subclause (III)—which, to be clear, it can't—Defendants' contention that Spiller's current fair market valuation is

15

inappropriate, (*see* Defs.' Objections at 16-17), is not one that he shares. Consider his deposition testimony on the subject:

> Q: [I]n your rebuttal report … you write … "I remain of the opinion that the current fair market value of the property is … $46.3 million as of February 28, 2021." Is that quoted correctly from your rebuttal report?
>
> A: Yes, sir.
>
> Q: And are you still of that opinion, sir?
>
> A: I am.
>
> Q: And do you believe that that valuation by you is reliable?
>
> A: Oh, yeah.
>
> Q: Do you believe that your assumptions were reasonable?
>
> A: Yes, sir; very reasonable.
>
> Q: And you believe that the method that you used was a reasonable method?
>
> A: Yes; it's very reliable and *appropriate for the case at hand*.

(Spiller Dep. at 88:7–89:5)[14] (emphasis added).

In all, the word "appropriate"—as used in § 6082(a)(2)—cannot alter Title III's clear instruction in § 6082(a)(1)(A)(i)(III): between a past and current fair market value, the only relevant amount is "whichever is greater." To the extent Defendants contend that Spiller's lesser 1960 valuation is relevant and helpful, their argument is foreclosed by the plain language of Title III. Their objections to the contrary should be overruled.

---

[14] Spiller's Deposition appears at *Carnival*, ECF No. 325-6; *MSC*, ECF No. 213-6; *Royal*, ECF No. 136-6; *Norwegian*, ECF No. 225-6. This citation refers to the transcript's internal pagination.

## CONCLUSION

On the exclusion of Spiller's first and second opinions, Judge McAliley's Report should be adopted. It correctly determines that Spiller's first opinion impermissibly disputes the FCSC's ownership determinations and that his second opinion is irrelevant under Title III's plain language. Defendants' objections misinterpret Title III's damages provision and misapprehend the governing due process inquiry. They should be overruled.

Dated:  May 13, 2022                              Respectfully submitted,


                                          **COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
E-mail: eservice@colson.com

By: /s/ Thomas A. Kroeger
Thomas A. Kroeger
Florida Bar No. 19303
tom@colson.com
Roberto Martínez
Florida Bar No. 305596
Bob@colson.com
Stephanie A. Casey
Florida Bar No. 97483
scasey@colson.com
Aziza F. Elayan-Martínez
Florida Bar No. 92736
aziza@colson.com
Zachary A. Lipshultz
Florida Bar No. 123594
zach@colson.com
Sabrina S. Saieh
Florida Bar No. 125290
sabrina@colson.com

– and –

          **MARGOL & MARGOL, P.A.**
          2029 3rd Street North
          Jacksonville Beach, Florida 32250
          Telephone: (904) 355-7508
          Facsimile: (904) 619-8741

          Rodney S. Margol
          Florida Bar No. 225428
          Rodney@margolandmargol.com

          *Counsel for Plaintiff Havana Docks Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of the Court. I also certify that the foregoing document is being served this May 13, 2022, on all counsel of record or pro se parties either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

          By: /s/ Thomas A. Kroeger
          Thomas A. Kroeger